FILED
CLERK, U.S. DISTRICT COURT

OCT 18 2017

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

February 2017 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>          v.<br><br>JULIAN OMIDI,<br>     aka "Combiz Omidi,"<br>     aka "Combiz Julian Omidi,"<br>     aka "Kambiz Omidi,"<br>     aka "Kambiz Beniamia Omidi,"<br>     aka "Ben Omidi,"<br>INDEPENDENT MEDICAL SERVICES,<br>INC., a professional<br>corporation, and<br>SURGERY CENTER MANAGEMENT, LLC,<br><br>          Defendants. | CR No. 17-CR 0 0661-PA<br><br>I N D I C T M E N T<br><br>[18 U.S.C. § 1341: Mail Fraud; 18 U.S.C. § 1343: Wire Fraud; 18 U.S.C. § 1028A(a)(1): Aggravated Identity Theft; 18 U.S.C. § 1035: False Statements Relating to Health Care Matters; 18 U.S.C. § 1956(h): Conspiracy to Commit Promotional Money Laundering; 18 U.S.C. § 1956(a)(1)(A): Promotional Money Laundering; 18 U.S.C. § 2: Aiding and Abetting and Causing an Act to Be Done; 18 U.S.C. §§ 981(a)(1)(C), 982(a)(1), 982(a)(2)(B), 982(a)(7), and 1029(c)(1)(C) and 28 U.S.C. § 2461(c): Criminal Forfeiture] |

The Grand Jury charges:

COUNTS ONE THROUGH SIXTEEN

[18 U.S.C. §§ 1341, 2]

[Defendants J. OMIDI, IMS, and SCM]

A.    INTRODUCTORY ALLEGATIONS

At all times relevant to this Indictment:

1.   Defendant JULIAN OMIDI, also known as ("aka") "Combiz Omidi," aka "Combiz Julian Omidi," aka "Kambiz Omidi," aka "Kambiz Beniamia Omidi," aka "Ben Omidi" ("defendant J. OMIDI"), was a resident of Los Angeles, California, within the Central District of California.

2.   Defendant SURGERY CENTER MANAGEMENT, LLC ("defendant SCM") was a limited liability company registered in the State of California, operating in Beverly Hills, California, within the Central District of California.  SCM had multiple bank accounts, including bank accounts at Wells Fargo Bank from in or about July 2010 until in or about March 2012.  Defendant J. OMIDI was listed as an owner of and had signature authority for the SCM Wells Fargo Bank account with account number ending in 4735 (the "SCM WFB Account").  Co-conspirator C.K. was an employee of defendant SCM starting in or about July 2010 and, beginning at least in or about October 2010, was listed as a manager for defendant SCM on corporate documents and agreements.

3.   Defendant INDEPENDENT MEDICAL SERVICES, INC. ("defendant IMS") was a professional corporation registered in the State of California, operating primarily in Beverly Hills, California, within the Central District of California.  Defendant IMS had multiple bank accounts, including a bank account at Chase Bank bearing an account number ending in 7541 (the "IMS Chase Account") from in or about May 2012 until in or about August 2014.

4.   1-800-Get-Thin, LLC was a limited liability company registered in the State of California, operating in Beverly Hills, California, within the Central District of California.  1-800-Get-Thin, LLC leased to defendant SCM the "1-800-Get-Thin" telephone

number 1-800-438-8446 and the URL "800getthin.com," from in or about 2010 to in or about 2015.

Lap-Band Surgery and Bariatric Coverage

5.   Lap-Band surgery (a type of bariatric surgery) was an elective weight-loss procedure that employed the Lap-Band, a restricted device, regulated by the United States Food and Drug Administration.

6.   Lap-Band surgery was intended for use only in morbidly obese adult patients who met specific criteria based on their body mass index ("BMI"), had failed more conservative weight-reduction alternatives, and committed to making various permanent changes in their eating habits.

7.   If a patient had bariatric coverage through their health insurance, the insurance company typically required that the Lap-Band surgery be pre-approved before providers could bill and obtain payment for the surgery and related pre-operative and post-operative services and procedures.  Patients with bariatric coverage would generally be pre-approved and the Lap-Band surgery deemed medically necessary only if, among other requirements, they either had a BMI of 40 or more, or a BMI of 35 or more and at least one co-morbidity, such as obstructive sleep apnea ("OSA"), typically diagnosed through a sleep study.

8.   In order to obtain pre-approval for Lap-Band surgery, the medical provider would typically submit a pre-authorization request (also known as a letter of medical necessity or "LOMN") that established the medical necessity for the Lap-Band procedure with documentation showing that the patient was morbidly obese and met all

1  the additional qualifications of the particular plan, including
2  documentation of any co-morbidity.

3      Sleep Studies
4      9.   A polysomnography ("PSG") was a baseline sleep study
5  ordered by a licensed physician based on an individualized assessment
6  of a patient's risk for a sleep disorder.   That individualized
7  assessment could include a review of a patient's score on
8  questionnaires designed to evaluate a patient's risk for sleep apnea
9  or other sleep-related disorders, including the Berlin questionnaire
10 and the Epworth Sleepiness Scale ("ESS").

11     10.  If, based on the PSG results, the licensed physician
12 interpreting the PSG diagnosed the patient with OSA and prescribed
13 treatment using a continuous positive airway pressure ("CPAP")
14 machine, a second sleep study, known as a titration study or CPAP
15 study, could be conducted to find the appropriate pressure for use in
16 treating the OSA using the CPAP.

17     11.  Sleep studies such as PSGs and titration studies generated
18 raw data that was scored by a Registered Polysomnographic Sleep
19 Technician ("RPSGT").   As part of that scoring, the RPSGT calculated
20 the apnea-hypopnea index ("AHI"), a score related to the number of
21 breathing cessations (apneas) and drops in the breathing rate
22 accompanied by oxygen desaturation (hypopneas) that occurred in the
23 study.   An AHI of less than 5 was normal, while an AHI between 5 and
24 14.9 reflected mild OSA, between 15 and 29.9 reflected moderate OSA,
25 and 30 or higher reflected severe OSA.

26     12.  The sleep study would then be interpreted by a qualified
27 licensed physician, who would have used the sleep study results to

28

4

1   arrive at diagnoses and treatment recommendations specific to the
2   patient's results.

3       13.  Most insurance companies required a diagnosis of moderate
4   or severe OSA to qualify as a co-morbidity that would support a
5   request for Lap-Band pre-approval.

6       GET THIN and the GET THIN Sleep Study Program

7       14.  "GET THIN" referred to a network of more than 200 entities
8   — including defendant IMS; defendant SCM; 1-800-Get-Thin, LLC;
9   Royalty Surgical Center, LLC ("Royalty"); and DeVida USA, LLC
10  ("DeVida") — that worked to promote, perform, and submit insurance
11  claims for Lap-Band surgeries and other medical procedures, including
12  sleep studies, in the Central District of California, and elsewhere,
13  between at least in or about 2008 and the present.

14      15.  GET THIN was controlled, at least in part, by defendant J.
15  OMIDI who, together with others: (a) set and reviewed GET THIN's
16  policies and procedures, including policies and procedures with
17  respect to the services GET THIN would provide, the billing for those
18  services, and materials submitted to insurance companies; (b)
19  reviewed individual patient files and claims for services submitted
20  to insurance carriers; and (c) approved GET THIN expenses.

21      16.  Beginning in or about February 2010, defendant SCM was
22  listed as a "Member" of GET THIN and as associated with the
23  management of multiple GET THIN entities, including GET THIN's
24  surgery centers.

25      17.  Beginning in or about April 2010 and continuing to at least
26  in or around December 2015, defendant IMS maintained a sleep study
27  program (the "GET THIN SSP") to conduct sleep studies for patients
28  who came to GET THIN seeking Lap-Band surgery.  The majority of

1  individuals who worked with defendant IMS with respect to the GET
2  THIN SSP were hired by defendant IMS as independent contractors.
3      18.  Between in or around May 2010 and in or around December
4  2015, co-conspirator C.K., who was not a licensed medical
5  professional, was the manager of the GET THIN SSP and an
6  administrator for defendant IMS.  Beginning at least in or about
7  December 2010, co-conspirator C.K. was listed as a manager for
8  defendant IMS on corporate documents and agreements.
9      19.  Defendant IMS contracted with (a) a Registered
10 Polysomnographic Sleep Technician ("RPSGT") to score manually the raw
11 data from sleep study tests between in or about April 2010 and in or
12 about August 2014; and (b) a "Sleep Specialist," Co-Conspirator 1
13 ("CC-1"), who was a licensed physician, to review and interpret the
14 scored sleep studies for the GET THIN SSP between in or about June
15 2010 and in or about September 2013.
16     20.  The GET THIN SSP also employed others who were not licensed
17 medical professionals, including the manager of GET THIN's nutrition
18 department ("S.H."), and Co-Conspirator 2 ("CC-2"), an administrative
19 assistant and then manager for the GET THIN SSP, to assist co-
20 conspirator C.K. in dealing with the influx of patients and backlog
21 of sleep study reports.
22     21.  The GET THIN SSP conducted sleep studies in multiple
23 locations in California, including locations in Apple Valley, Long
24 Beach, Palmdale, San Bernardino, and West Hills, all in the Central
25 District of California.  Although sometimes located in suites next to
26 ambulatory surgery centers ("ASCs"), the sleep studies were not
27 conducted in ASCs.  No sleep studies were conducted at the Modern
28 Institute of Plastic Surgery ("MIPS") in Beverly Hills, California.

6

GET THIN's Insurance Claims for Lap-Band Surgery and Sleep
Studies

22.  GET THIN included entities and associated individuals,
including defendant IMS, that were medical providers ("GET THIN
Providers"), with provider numbers enabling them to submit claims to
insurance companies for services they allegedly provided to patients.

23.  GET THIN Providers submitted claims for services to a
number of health care benefit programs, including TriCare (the
federally funded health care benefit program that provides coverage
for active duty, retired, and reserve members of the military and
certain other individuals) and private insurers such as Anthem Blue
Cross, UnitedHealthcare, Aetna, CIGNA, Health Net, Operating
Engineers Health & Welfare Fund, Blue Shield of California,
Government Employee's Health Association, Inc. ("GEHA"), and others
(collectively, the "Insurance Companies").  TriCare and the Insurance
Companies were health care benefit programs as defined in 18 U.S.C.
§ 24(b).

24.  GET THIN Providers were typically non-contracted or out-of-
network providers who lacked any agreement with the Insurance
Companies.  TriCare and the Insurance Companies would typically pay
such out-of-network providers a percentage of either (a) the amount
billed or (b) a "usual and customary" rate for the service, which was
generally higher than the in-network rate.  In addition, the patient
(also known as the "subscriber" or "member" of the insurance plan)
was also responsible for payment of the difference between the out-
of-network provider's fees and the amount paid by TriCare and the
Insurance Companies.

7

25.   GET THIN Providers submitted claims for professional services (on a CMS Form 1500) and facility fees (on a CMS Form UB-04) using current procedural terminology ("CPT") codes identifying the services provided.   In submitting a claim, the GET THIN Providers represented that all of the information in the claim was true and accurate -- including patient's identity, CPT codes, diagnosis, provider identity, place of service, and date of service - and that the service provided was medically necessary.

26.   GET THIN Providers, including defendant IMS, typically submitted claims to TriCare and the Insurance Companies for Lap-Band surgery using CPT code 43770.   Claims for other services and procedures billed in conjunction with the surgery -- such as anesthesia, pathology, biopsies, or hernia repair -- were submitted under separate CPT codes.

27.   GET THIN Providers, including defendant IMS, typically submitted claims for sleep studies under CPT codes 95810 (for PSGs) and 95811 (for titration studies).

28.   The information in the claim forms was material to payment, and TriCare and the Insurance Companies would deny claims that contained false, inaccurate or misleading information about, for example, the service purportedly performed or its medical necessity, the identity of the provider, and the place of service; insurers were only obligated to pay "clean" claims, that is, claims that were accurate and complete.

29.   If TriCare and the Insurance Companies had known that a sleep study claim was submitted for a sleep study with false information, including false information as to whether the study had actually been interpreted by a qualified licensed physician, or that

the sleep study was not medically necessary, TriCare and the Insurance Companies might have denied that claim or might have subjected it to additional scrutiny.

30. If TriCare and the Insurance Companies had known that medical records, such as sleep study reports, submitted in support of the claim contained false and fraudulent information, TriCare and the Insurance Companies might have denied that claim or might have subjected it to additional scrutiny.

31. Additionally, if TriCare and the Insurance Companies had known that an LOMN and/or attached supporting documentation contained false or fraudulent statements purporting to support the medical necessity for the Lap-Band procedure, including false or fraudulent statements or documentation concerning an alleged co-morbidity, they might have not approved Lap-Band surgery or paid claims submitted for Lap-Band surgery and related services for that patient, or might have subjected the pre-authorization request to additional scrutiny.

B.   THE FRAUDULENT SCHEME

32. Beginning in or about May 2010 and continuing through in or about March 2016, in Los Angeles County, within the Central District of California, and elsewhere, defendants J. OMIDI, IMS, and SCM, together with co-conspirators C.K., S.H., CC-1, and CC-2, and others known and unknown to the Grand Jury, knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud TriCare and the Insurance Companies as to material matters, and to obtain money and property from TriCare and the Insurance Companies by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

33.    The fraudulent scheme was carried out, in substance, as follows:

        a.    GET THIN aggressively promoted Lap-Band surgery through advertisements in Southern California, and elsewhere, encouraging potential patients to call "1-800-GET-THIN" and attend a presentation (often referred to as a "seminar") about the surgery.

        b.    Before patients attended a seminar, GET THIN would obtain their insurance information, using that to determine whether the patients had bariatric coverage (that is, whether their insurance plan covered Lap-Band surgery) and, if so, whether that coverage extended to out-of-network providers like GET THIN.  If the potential patients' insurance plans did not cover Lap-Band surgery, GET THIN would internally identify these patients as having "No Bariatric Benefits" or "No Bariatric Benefits-Even With Medical Necessity."

        c.    Before or around the time patients attended a seminar, those patients were instructed to fill out and sign a variety of intake paperwork.  That paperwork typically included forms in which the patients assigned their rights and benefits regarding their insurance policies to defendant SCM, instructed their insurance companies to pay for services purportedly provided by GET THIN Providers by check made out and mailed to defendant SCM, and authorized defendant SCM to deposit any insurance checks received in payment for services provided by GET THIN Providers.  The intake paperwork also at times included a form entitled "Assignment of Benefits," to be signed by the patients, in which the patients authorized direct payment to GET THIN Providers of any benefits for treatments or services.  The "Assignment of Benefits" form also notified patients that defendant J. OMIDI was an owner of "the

management company for the above mentioned surgery center" and had a "vested interest in the [surgery] center and will be receiving compensation for the procedures performed."

d.   After attending a seminar, patients often met with Lap-Band surgeons under contract with GET THIN entities, including defendant IMS, who conducted brief examinations.  After these examinations, a sleep study typically was ordered as a pre-operative procedure by marking a check-box on a "Surgery Scheduling Form," even though some of the patients had insurance that likely would not cover Lap-Band surgery under any circumstances and even though there was often little medical need for the sleep study documented by the brief examinations or in the patient intake materials.

e.   Next, GET THIN's patient consultants would, in accordance with policies set by defendant J. OMIDI and others, routinely schedule patients for a PSG to be conducted through the GET THIN SSP in an effort to uncover a co-morbidity that would assist GET THIN in obtaining insurance approval for Lap-Band surgery from various health care benefit programs.  Later, policies required the scheduling of a titration study at the same time, even though the PSG had not yet been conducted and sleep apnea had not been diagnosed. At the time defendant J. OMIDI and others set these policies, defendant J. OMIDI knew that some of these patients had insurance that likely would not cover Lap-Band surgery under any circumstances, but that the insurance often would pay for the performance of one or more sleep studies.

f.   Individuals hired by defendant IMS conducted the sleep studies, which were then scored by an RPSGT hired by defendant IMS. At co-conspirator C.K.'s direction, the RPSGT would input the sleep

study scores into a sleep study report ("SSR") template that included the electronic signature of CC-1 and standardized diagnoses and treatment options that were not individualized to the patient. As defendant J. OMIDI and co-conspirator C.K. knew, CC-1 permitted his electronic signature to be used in these SSRs even though he would often not review or interpret the SSRs or was reviewing SSRs that, as discussed below, had been altered by co-conspirator C.K. and others at defendant J. OMIDI's direction to reflect results not supported by the raw data from the sleep study.

g. Defendant J. OMIDI instructed co-conspirator C.K., either directly or through intermediaries such as co-conspirator S.H. or post-it notes on patient files, to alter the sleep study results in the SSRs to make it appear as though the patients had OSA when they, in fact, did not, or to make it appear as though they had more severe OSA than they, in fact, had. Defendant J. OMIDI authorized other GET THIN SSP employees, including co-conspirator S.H., to assist co-conspirator C.K. in the falsification of SSRs.

h. In order to make patients more likely to receive insurance pre-approval for Lap-Band surgery and provide supporting documentation justifying the initial performance of the sleep studies, defendant J. OMIDI also instructed co-conspirator C.K. to conduct or provide ESS scores for patients. Defendant J. OMIDI authorized co-conspirator C.K.'s use of CC-2 to obtain those ESS scores, which, as defendant J. OMIDI and co-conspirator C.K. both knew, were often obtained after the sleep studies had already been performed and were often fabricated to indicate falsely that the patients were suffering from extreme daytime sleepiness when, in

12

1  fact, they were not.  The falsified ESS scores were then included in

2  the SSRs and often referenced in LOMNs.

3       i.   GET THIN employees, including co-conspirators C.K. and

4  S.H., acting at defendant J. OMIDI's direction or with his knowledge

5  and approval, would also falsify other information that would be

6  included in the LOMNs, including patients' BMIs, in an effort to make

7  the patients more likely to receive insurance pre-approval for Lap-

8  Band surgery.

9       j.   Defendant J. OMIDI instructed co-conspirator C.K. to

10  falsify the SSRs, knowing and intending that (i) those falsified SSRs

11  would be provided to TriCare and the Insurance Companies — often

12  attached to an LOMN that also referenced the falsified sleep study

13  results and ESS scores — as part of GET THIN's request for pre-

14  authorization for Lap-Band surgery and (ii) TriCare and the Insurance

15  Companies would rely on the falsified SSRs and corresponding

16  inaccurate LOMN statements regarding the sleep study results in

17  making decisions regarding Lap-Band pre-approval.

18       k.   Defendant J. OMIDI also instructed GET THIN employees

19  to increase patients' weights and BMIs, knowing and intending that

20  GET THIN would use those higher weights and BMIs to support insurance

21  pre-approval for Lap-Band surgery, including through their use on

22  LOMNs.

23       l.   Defendant J. OMIDI routinely reviewed LOMNs and

24  discussed their contents with members of GET THIN's processing

25  department, which was responsible for generating the LOMNs.

26  Defendant J. OMIDI at times directed GET THIN employees to revise the

27  LOMNs, including to reflect the falsified sleep study results and ESS

28  scores.  Defendant J. OMIDI did so, knowing that the individuals

1  writing and revising the LOMNs were not medical professionals, that
2  LOMNs were created from templates with cloned language not specific
3  to patients' conditions, and that, to the extent the LOMNs were
4  reviewed by physicians (which was not always the case), those
5  physicians had often never seen or examined the patients and were
6  asked to review the LOMNs based only on select supporting
7  documentation provided to them by other GET THIN employees or without
8  receiving any supporting documentation at all.  Defendant J. OMIDI
9  typically approved the LOMNs before they were submitted to TriCare
10  and the Insurance Companies.

11          m.   As defendant J. OMIDI knew and intended, once
12  insurance pre-approval for Lap-Band surgery was obtained, based in
13  part on the fraudulent information in the SSRs altered by co-
14  conspirators C.K. and S.H. and others at defendant J. OMIDI's
15  direction, surgeons contracted by GET THIN performed Lap-Band surgery
16  on the patients, and GET THIN Providers, including defendant IMS,
17  submitted claims for Lap-Band surgery and service associated with it
18  to TriCare and the Insurance Companies, and often received payment
19  from TriCare and the Insurance Companies for those claims.

20          n.   As defendant J. OMIDI also knew and intended, GET THIN
21  Providers, including defendant IMS, billed TriCare and the Insurance
22  Companies for sleep studies that had not been reviewed or interpreted
23  by CC-1, submitted to TriCare and the Insurance Companies falsified
24  SSRs in support of sleep study claims, and often received payment
25  from TriCare and the Insurance Companies for those claims.

26          o.   In an attempt to conceal the falsification of the
27  SSRs, defendant J. OMIDI directed co-conspirator C.K. to obtain and
28  destroy the raw data associated with the sleep studies conducted

through GET THIN's SSP; co-conspirator C.K. followed that direction and destroyed the raw data.

p.   Also in an attempt to prevent discovery of the falsification of the SSRs and lull GET THIN physicians into believing the changing of SSRs was medically appropriate, defendant J. OMIDI directed co-conspirator C.K. to create documentation that attempted to justify the changing of SSRs, even though defendant J. OMIDI and co-conspirator C.K. both knew at the time that the documentation did not justify the falsification of the SSRs.

34.   GET THIN Providers, including defendant IMS, billed TriCare and the Insurance Companies at least approximately $240,000,000 for Lap-Band surgeries for patients for whom SSRs had been falsified to reflect that the patients suffered from OSA or more severe OSA than the patients, in fact, had.   TriCare and the Insurance Companies paid more than approximately $38,000,000 on those claims.

35.   GET THIN Providers, including defendant IMS, also billed TriCare and the Insurance Companies between approximately $14,000 and $18,000 each for sleep studies that were not interpreted by CC-1, often providing falsified sleep study reports in support of the claims.

36.   Payments by TriCare and the Insurance Companies on these claims were often made out to GET THIN providers, including defendant IMS, or, at times, to patients, who would then sign them over to GET THIN.   The insurance payments were then deposited into bank accounts associated with GET THIN entities, including bank accounts associated with defendants SCM and IMS.

C.   THE USE OF THE MAILS

37.   On or about the dates set forth below, within the Central District of California and elsewhere, defendants J. OMIDI, IMS, and SCM, for the purpose of executing and attempting to execute the above-described scheme to defraud, willfully caused the following items to be placed in an authorized depository for mail matter to be sent and delivered by the United States Postal Service:

| COUNT | DATE | ITEM MAILED |
|-------|------|-------------|
| ONE | 5/8/13 | CMS HCFA 1500 claim form for $15,540 for titration study (CPT code 95811) for V.C. on June 2, 2011 and titration study SSR, mailed to Anthem |
| TWO | 6/5/13 | Check No. 38134488 issued by GEHA payable to Lee K. Au, MD in the amount of $3,684.00 in payment of a claim for Lap-Band surgery for S.G. on August 31, 2012, mailed to Dr. Au |
| THREE | 6/5/13 | CMS UB04 claim form for $16,525 for PSG (CPT 95810) for A.A. on October 14, 2010 and PSG SSR, mailed to GEHA |
| FOUR | 6/12/13 | Check No. 169205 issued by Operating Engineers Health and Welfare Fund payable to Independent Medical Services, Inc. in the amount of $888.90 in payment of a claim for titration study (CPT code 95811) for K.R. on February 16, 2012, mailed to IMS |
| FIVE | 7/25/13 | Check No. 0108284910 issued by Anthem payable to Independent Medical Services, Inc. in the amount of $6,687.25, including $3,245.00 in payment of a claim for PSG (CPT code 95810) for S.K. on February 9, 2012, mailed to IMS |
| SIX | 9/7/13 | Check issued by Anthem payable to P.R. in the amount of $6,076.16 in payment of a claim for Lap-Band surgery (CPT code 43770) for P.R. on September 8, 2011, mailed to P.R. |
| SEVEN | 11/9/13 | Check issued by Anthem payable to P.R. in the amount of $6,076.16 in payment of a claim for Lap-Band surgery (CPT code 43770) for P.R. on September 8, 2011, mailed to P.R. |

| COUNT | DATE | ITEM MAILED |
|---|---|---|
| EIGHT | 2/19/14 | Check No. 4981383 issued by California's Valued Trust payable to Independent Medical Services, Inc. in the amount of $548.93 in payment of a claim for PSG (CPT code 95810) for S.Z. on February 7, 2014, mailed to IMS |
| NINE | 3/31/14 | Check No. 854866457 issued by Blue Cross Blue Shield of Massachusetts payable to T.M. in the amount of $1,072.25 in payment of a claim for titration study (CPT code 95811) for F.M. on March 14, 2014, mailed to T.M. |
| TEN | 4/4/14 | Check No. 278850 issued by Operating Engineers Health & Welfare Fund in the amount of $514.08 payable to Independent Medical Services, Inc. in payment of a claim for Lap-Band surgery (CPT code 43770) for S.N. on May 17, 2013, mailed to IMS |
| ELEVEN | 4/8/14 | Check No. 239426 issued by Operating Engineers Health & Welfare Fund payable to Modern Institute of Plastic Surgery in the amount of $5,745.42 in payment of a claim for titration study (CPT code 95811) for A.W. on February 19, 2011, mailed to MIPS |
| TWELVE | 8/21/14 | Check No. 5064977 issued by California's Valued Trust payable to Independent Medical Services, Inc. in the amount of $879.28, including $601.39 in payment of a claim for titration study (CPT code 95811) for S.Z. on August 1, 2014, mailed to IMS |
| THIRTEEN | 9/12/14 | Check No. 50006640 issued by Blue Shield of California payable to T.R. in the amount of $421.44 in payment of a claim for titration study (CPT code 95811) for T.R. on August 8, 2014, mailed to T.R. |
| FOURTEEN | 10/1/14 | Check No. 356653 issued by Operating Engineers Health & Welfare Fund payable to Independent Medical Services in the amount of $3,213.01 in payment of a claim for Lap-Band surgery (CPT code 43770) for S.N. on May 17, 2013, mailed to IMS |
| FIFTEEN | 1/8/15 | Check No. 394464 issued by Operating Engineers Health & Welfare Fund payable to San Diego ASC, LLC in the amount of $24,374.82 in payment for a claim for Lap-Band surgery (CPT code 43770) for S.N. on May 17, 2013, mailed to San Diego ASC, LLC |

| COUNT | DATE | ITEM MAILED |
|-------|------|-------------|
| SIXTEEN | 3/22/16 | Check No. 0121443507 issued by Anthem Blue Cross payable to Independent Medical Services, Inc. in the amount of $782.75 in payment of a claim for PSG (CPT code 95810) for K.M. on August 15, 2014, mailed to IMS |

COUNTS SEVENTEEN THROUGH NINETEEN

[18 U.S.C. §§ 1343, 2]

[Defendants J. OMIDI, IMS, and SCM]

38.   The Grand Jury hereby realleges and incorporates by reference paragraphs 1 through 36 of this Indictment as though fully set forth herein.

C.   THE USE OF THE WIRES

39.   On or about the dates set forth below, within the Central District of California and elsewhere, defendants J. OMIDI, IMS, and SCM, for the purpose of executing and attempting to execute the above-described scheme to defraud, transmitted, willfully caused the transmission of, and aided and abetted the transmission of, the following items by means of wire and radio communication in interstate and foreign commerce:

| COUNT | DATE | ITEM WIRED |
|---|---|---|
| SEVENTEEN | 1/16/15 | Facsimile from MIPS in California to Aetna in Kentucky regarding PSG conducted on June 18, 2011 for patient K.H., including PSG SSR and itemized bill for $17,365.00 |
| EIGHTEEN | 1/22/15 | Facsimile from MIPS in California to Aetna in Kentucky regarding titration sleep study conducted on August 3, 2011 for patient K.H., including titration study SSR |
| NINETEEN | 7/16/15 | Facsimile from MIPS in California to Aetna in Kentucky regarding PSG conducted on October 24, 2011 for patient V.G., including PSG SSR, History and Physical form, and insurance information |

COUNT TWENTY

[18 U.S.C. §§ 1028A(a)(1), 2]

[Defendant J. OMIDI]

40.  The Grand Jury hereby realleges and incorporates by reference paragraphs 1 through 36 of this Indictment as though fully set forth herein.

41.  On or about March 24, 2014, in Los Angeles County, within the Central District of California, and elsewhere, defendant J. OMIDI, aided and abetted by others known and unknown to the Grand Jury, knowingly transferred, possessed, and used, and willfully caused to be transferred, possessed, and used, without lawful authority, a means of identification that defendant J. OMIDI knew belonged to another person, that is, the name of CC-1, during and in relation to mail fraud, a felony violation of Title 18, United States Code, Section 1341, as charged in Count Nine of this Indictment.

COUNTS TWENTY-ONE AND TWENTY-TWO

[18 U.S.C. §§ 1035, 2]

[Defendant J. OMIDI]

42.   The Grand Jury hereby realleges and incorporates by reference paragraphs 1 through 36 of this Indictment as though fully set forth herein.

43.   On or about the dates set forth below, in Los Angeles County, within the Central District of California, and elsewhere, in a matter involving a health care benefit program, specifically, the private insurance providers set forth below, defendant J. OMIDI, together with co-conspirators C.K. and S.H., and others known and unknown to the Grand Jury, each aiding and abetting the other, knowingly and willfully made and caused to be made materially false, fictitious, and fraudulent statements and representations in connection with the delivery of and payment for health care benefits, items, and services, specifically, by submitting the sleep study reports, which they knew to be materially false, to the following insurance providers in support of requests for authorization of Lap-Band surgery:

| COUNT | DATE | FALSE AND FRAUDULENT STATEMENT |
|---|---|---|
| TWENTY-ONE | 3/29/13 | Letter of medical necessity and supporting documentation, including falsified PSG SSR, faxed to Aetna seeking pre-approval for Lap-Band surgery for J.R. |
| TWENTY-TWO | 4/12/13 | Letter of medical necessity and supporting documentation, including falsified titration SSR, faxed to Operating Engineers Health & Welfare Fund seeking pre-approval for Lap-Band surgery for S.N. |

COUNT TWENTY-THREE

[18 U.S.C. § 1956(h)]

[Defendants J. OMIDI, IMS, and SCM]

44.  The Grand Jury hereby realleges and incorporates by reference paragraphs 1 through 36 of this Indictment as though fully set forth herein.

45.  At all times relevant to this Indictment, DeVida was a limited liability company registered in the State of California, operating in Beverly Hills, California, within the Central District of California.  Defendant SCM was identified as DeVida's sole member in DeVida's Operating Agreement dated December 29, 2010.  Defendant J. OMIDI was identified in publicly filed documents as DeVida's organizer and initial agent for service of process, and was listed as a key individual on and had signature authority for one of DeVida's Wells Fargo Bank accounts, account number ending in x5892 (the "DeVida WFB Account"), from in or about January 2011 until in or about March 2012.

46.  At all times relevant to this Indictment, Royalty was a limited liability company registered in the State of California, operating in Beverly Hills, California, within the Central District of California.  Royalty maintained a bank account at Hanmi Bank bearing an account number ending in x4292 (the "Royalty Hanmi Account") from in or about January 2015 until at least August 2016.

C.  THE OBJECT OF THE CONSPIRACY

47.  Beginning no later than in or around January 2011, and continuing until at least in or around December 2015, in Los Angeles County, within the Central District of California, and elsewhere, defendants J. OMIDI, SCM, and IMS, together with co-conspirators

C.K., S.H., CC-1, and CC-2, and others known and unknown to the Grand
Jury, knowingly combined, conspired, and agreed to commit an offense
against the United States, namely, Money Laundering, in violation of
Title 18, United States Code, Section 1956(a)(1)(A)(i), by conducting
and attempting to conduct financial transactions affecting interstate
and foreign commerce to promote the carrying on of some form of
specified unlawful activity, namely, false statements regarding
health care matters, in violation of Title 18, United States Code,
Section 1035.

D.   MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE
     ACCOMPLISHED

     48.   The object of the conspiracy was carried out, and to be
carried out, in substance, in the following manner and by the
following means, among others:

          a.   Defendant J. OMIDI would authorize the hiring of, and
payments to, individuals engaged in promoting GET THIN's sleep study
fraud by completing such tasks as (i) altering SSR results, (ii)
fabricating SSR supporting documentation to justify the ordering of
sleep studies and the high incidence of obstructive sleep apnea
findings, and (iii) signing off on un-reviewed SSRs and accepting
clinical responsibility for SSRs.

          b.   Co-conspirator C.K. would hire individuals to complete
these tasks, including co-conspirators S.H. and CC-2, at the pay rate
approved by defendant J. OMIDI.

          c.   Co-conspirator C.K., at defendant J. OMIDI's
direction, would falsify SSRs, including fabricated test information
to support a fabricated diagnosis of more severe sleep apnea than the
patient, in fact, had.

        d.    Co-conspirator S.H. would aid co-conspirator C.K. in
his falsification of SSRs in exchange for a $10 commission for each
altered SSR.

        e.    CC-2 would aid co-conspirator C.K. by coaching
patients to higher ESS scores on patient questionnaires, or by
fabricating ESS scores altogether, to make it appear that patients
had significant daytime sleepiness.  The inflation and fabrication of
ESS scores, in favor of daytime sleepiness, helped justify the
consistent ordering of sleep studies and buttressed GET THIN's
consistent finding of obstructive sleep apnea among GET THIN
patients.  CC-2 received $2 for each ESS questionnaire completed.

        f.    CC-1 would accept clinical responsibility for SSRs,
even after he stopped consistently working for GET THIN, in exchange
for payment.

        g.    Co-conspirator C.K. would seek approval from defendant
J. OMIDI for individual payments made to co-conspirators S.H., CC-1,
and CC-2.

        h.    Co-conspirator C.K. would submit payment requests or
invoices for co-conspirators S.H., CC-1, and CC-2 to GET THIN's
accounting department to ensure issuance of checks to these
individuals.

        i.    GET THIN, through related entities, including
defendants SCM and IMS, Royalty, and DeVida, would issue checks using
the proceeds of mail fraud and wire fraud to co-conspirators S.H.,
CC-1, and CC-2 to compensate them for their roles in expanding and
buttressing the sleep study fraud.

E.    OVERT ACTS

49.    On or about the following dates, in furtherance of the conspiracy and to accomplish its object, defendants J. OMIDI, IMS, and SCM, together with co-conspirators C.K., S.H., CC-1, and CC-2, and others known and unknown to the Grand Jury, committed and willfully caused others to commit the following overt acts, among others, in the Central District of California and elsewhere:

Overt Act No. 1:    On or before April 1, 2011, defendant J. OMIDI approved a payment to CC-2 in the amount of $1,034.

Overt Act No. 2:    On or about April 1, 2011, co-conspirator C.K. sent GET THIN's accounting department an email, copying defendant J. OMIDI, seeking payment of CC-2's invoice in the amount of $1,034 for 517 ESS reports finalized between March 1, 2011 and March 30, 2011.

Overt Act No. 3:    On or about April 5, 2011, CC-2 negotiated, or caused to be negotiated, check number 20600, drawn on the DeVida WFB Account and made payable to CC-2 in the amount of $1,034.

Overt Act No. 4:    In or about June 2011, to increase sleep study processing productivity, defendant J. OMIDI approved a $10 commission to co-conspirator S.H. for each altered SSR.

Overt Act No. 5:    On or before July 1, 2011, defendant J. OMIDI approved a payment to co-conspirator S.H. in the amount of $1,310.

Overt Act No. 6:    On or about July 1, 2011, co-conspirator C.K. sent GET THIN's accounting department an email, copying defendant J. OMIDI, seeking payment of co-conspirator S.H.'s invoice in the amount of $1,310 for 131 SSRs altered or "pre-formatted" between June 16, 2011 to June 30, 2011.

Overt Act No. 7:  On or about July 1, 2011, defendant SCM issued check number 6499, drawn on the SCM WFB Account and made payable to co-conspirator S.H. in the amount of $1,310.

Overt Act No. 8:  On or about July 8, 2011, co-conspirator S.H. negotiated, or caused to be negotiated, check number 6499, drawn on the SCM WFB Account and made payable to co-conspirator S.H. in the amount of $1,310.

Overt Act No. 9:  On or about December 2, 2011, co-conspirator C.K. sent GET THIN's accounting department an email, copying defendant J. OMIDI, seeking payment of co-conspirator S.H.'s invoice in the amount of $1,220 for 122 SSRs altered or "pre-formatted" between November 16, 2011 to November 30, 2011.

Overt Act No. 10:  On or before December 5, 2011, defendant J. OMIDI approved a payment to co-conspirator S.H. in the amount of $1,220.

Overt Act No. 11:  On or about December 5, 2011, defendant SCM issued check number 8388, drawn on the SCM WFB Account and made payable to co-conspirator S.H. in the amount of $1,220.

Overt Act No. 12:  On or about December 7, 2011, co-conspirator S.H. negotiated, or caused to be negotiated, check number 8388, drawn on the SCM WFB Account and made payable to co-conspirator S.H. in the amount of $1,220.

Overt Act No. 13:  On or before October 8, 2012, defendant J. OMIDI approved a payment to co-conspirator S.H. in the amount of $430.

Overt Act No. 14:  On or about October 8, 2012, defendant IMS recorded as an accounts payable payment in its accounting records a

payment to co-conspirator S.H. in the amount of $430, which was previously recorded in the accounting records as a sleep study item.

Overt Act No. 15:  On or about October 8, 2012, defendant IMS issued check number 10110, drawn on the IMS Chase Account and made payable to co-conspirator S.H. in the amount of $430.

Overt Act No. 16:  On or about October 10, 2012, co-conspirator S.H. negotiated, or caused to be negotiated, check number 10110, drawn on the IMS Chase Account and made payable to co-conspirator S.H. in the amount of $430.

Overt Act No. 17:  On or about October 11, 2012, co-conspirator S.H. sent co-conspirator C.K. his invoice in the amount of $1,290 for 129 SSRs altered or "pre-formatted" during October 1, 2012 and October 15, 2012.

Overt Act No. 18:  On or before October 24, 2012, defendant J. OMIDI approved a payment to co-conspirator S.H. in the amount of $1,290.

Overt Act No. 19:  On or about October 24, 2012, defendant IMS issued check number 10141 drawn on the IMS Chase Account and made payable to co-conspirator S.H.'s wife in the amount of $1,290.

Overt Act No. 20:  On or about October 25, 2012, co-conspirator S.H. negotiated, or caused to be negotiated, check number 10141, drawn on the IMS Chase Account and made payable to co-conspirator S.H.'s wife in the amount of $1,290.

Overt Act No. 21:  On or about October 2, 2015, co-conspirator C.K. sent CC-1 an email informing CC-1 that a $2,000 payment would be issued to CC-1 on account of 125 sleep studies submitted in 2014 with CC-1's signature.

Overt Act No. 22: On or before October 9, 2015, defendant J. OMIDI approved a payment to CC-1 in the amount of $2,000.

Overt Act No. 23: On or about October 9, 2015, at defendant J. OMIDI's instruction, Royalty issued check number 1003 drawn on the Royalty Hanmi Account and made payable to CC-1's medical corporation in the amount of $2,000.

Overt Act No. 24: On or about October 23, 2015, CC-1 negotiated, or caused to be negotiated, check number 1003, drawn on the Royalty Hanmi Account and made payable to co-conspirator CC-1 in the amount of $2,000.

Overt Act No. 25: In or around November 2015, co-conspirators C.K. and CC-1 discussed GET THIN's practice of regularly falsifying SSRs.

Overt Act No. 26: In or around November 2015, CC-1, after discussing SSR falsifications with co-conspirator C.K., demanded payment for all SSRs submitted to insurance companies by Get Thin with CC-1's signature.

Overt Act No. 27: On or before December 1, 2015, co-conspirator C.K. sought authorization from defendant J. OMIDI to pay CC-1 $500 to "transfer clinical responsibility" for the SSRs submitted in 2014 and 2015.

Overt Act No. 28: On or before December 1, 2015, defendant J. OMIDI approved a payment to CC-1 in the amount of $500.

Overt Act No. 29: On or about December 18, 2015, CC-1 negotiated, or caused to be negotiated, check number 1006, drawn on the Royalty Hanmi Account and made payable to CC-1's medical corporation in the amount of $500, with a memo line stating "medical services sleep study."

28

COUNTS TWENTY-FOUR AND TWENTY-FIVE

[18 U.S.C. §§ 1956(a)(1)(A)(i), 2]

[Defendants J. OMIDI and IMS]

50.   The Grand Jury hereby repeats and realleges paragraphs 1 through 36, 45-46, and 48-49 of this Indictment as though fully set forth herein.

51.   On or about the following dates, in Los Angeles County, within the Central District of California, and elsewhere, defendants J. OMIDI and IMS, together with others known and unknown to the Grand Jury, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, conducted, attempted to conduct, aided and abetted the conducting of, and willfully caused others to conduct the following financial transactions affecting interstate and foreign commerce, which transactions, in fact, involved the proceeds of specified unlawful activity, namely, mail fraud and wire fraud, in violation of Title 18, United States Code, Sections 1341 and 1343, knowing that each of the transactions was designed in whole or in part to promote the carrying on of a specified unlawful activity, namely, false statements regarding health care matters, in violation of

//

//

1  Title 18, United States Code, Section 1035:

| COUNT | DEFENDANTS | DATE | FINANCIAL TRANSACTION |
|---|---|---|---|
| TWENTY-FOUR | J. OMIDI IMS | 10/24/2012 | Issuance of check number 10141 drawn on the IMS Chase Bank Account and made payable to co-conspirator S.H.'s wife in the amount of $1,290 |
| TWENTY-FIVE | J. OMIDI | 10/9/2015 | Issuance of check number 1003 drawn on the Royalty Hanmi Account and made payable to CC-1's medical corporation in the amount of $2,000 |

30

FORFEITURE ALLEGATION ONE

[18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

1.   Pursuant to Federal Rule of Criminal Procedure 32.2(a), notice is hereby given that upon conviction of any of the offenses set forth in Counts One through Nineteen of this Indictment, each defendant so convicted shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), the following:

a.   All right, title and interest in any property, real or personal, which constitutes or is derived from proceeds obtained, directly or indirectly, as a result of each such violation, or property traceable to such property; and/or

b.   To the extent such property is not available for forfeiture, a sum of money equal to the total value of property described in paragraph 1(a).

2.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, Section 2461(c), each defendant so convicted shall forfeit substitute property, up to the total value of the property described in paragraph 1 if, by any act or omission of the defendant, the property described in paragraph 1 or any portion thereof, (a) cannot be located upon the exercise of due diligence; (b) has been transferred or sold to, or deposited with, a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION TWO

[18 U.S.C. §§ 982(a)(2)(B) and 1029(c)(1)(C)]

1.   Pursuant to Federal Rule of Criminal Procedure 32.2(a), notice is hereby given that upon conviction of the offense set forth in Count Twenty of this Indictment, defendant JULIAN OMIDI, also known as ("aka") "Combiz Omidi," aka "Combiz Julian Omidi," aka "Kambiz Omidi," aka "Kambiz Beniamia Omidi," aka "Ben Omidi" ("defendant J. OMIDI"), shall forfeit to the United States of America, pursuant to Title 18, United States Code, Sections 982(a)(2)(B) and 1029(c)(1)(C), the following:

(a)   Any property, real of personal, constituting, or derived from, proceeds obtained directly or indirectly, as the result of such violation;

(b)   Any personal property used or intended to be used to commit the offense; and

(c)   To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraphs (a) and (b).

2.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Sections 982(b)(1), (2) and 1029(c)(2), defendant J. OMIDI, if so convicted, shall forfeit substitute property, if, by any act or omission of the defendant, the property described in subparagraphs 1(a) or (b), or any portion thereof, cannot be located upon the exercise of due diligence; has been transferred, sold to, or deposited with a third party; has been placed beyond the jurisdiction of the court; has been substantially diminished in value; or has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION THREE

[18 U.S.C. § 982(a)(7)]

1.   Pursuant to Federal Rule of Criminal Procedure 32.2(a), notice is hereby given that upon conviction of either or both of the offenses set forth in Counts Twenty-One and Twenty-Two of this Indictment, defendant JULIAN OMIDI, also known as ("aka") "Combiz Omidi," aka "Combiz Julian Omidi," aka "Kambiz Omidi," aka "Kambiz Beniamia Omidi," aka "Ben Omidi" ("defendant J. OMIDI"), shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(7) and (b)(1), the following:

(a)   Any property, real of personal, constituting or derived, directly or indirectly, from the gross proceeds traceable to any such offense; and

(b)   To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

2.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), defendant J. OMIDI, if so convicted, shall forfeit substitute property, if, by any act or omission of the defendant, the property described in subparagraphs 1(a) or (b), or any portion thereof, cannot be located upon the exercise of due diligence; has been transferred, sold to, or deposited with a third party; has been placed beyond the jurisdiction of the court; has been substantially diminished in value; or has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION FOUR

[18 U.S.C. § 982(a)(1)]

1.    Pursuant to Federal Rule of Criminal Procedure 32.2(a),
notice is hereby given that upon conviction of any offense set forth
in Counts Twenty-Three through Twenty-Five, each defendant so
convicted shall forfeit to the United States of America, pursuant to
Title 18, United States Code, Section 982(a)(1), the following:

          a.    All right, title and interest in any property, real or
personal, involved in or traceable to such offense; and

          b.    To the extent such property is not available for
forfeiture, a sum of money equal to the total amount of property
described in paragraph 1(a).

2.    Pursuant to Title 21, United States Code, Section 853(p),
as incorporated by Title 18, United States Code, Section 982(b)(1),
each defendant so convicted shall forfeit substitute property, up to
the total value of the property described in paragraph 1 if, by any
act or omission of the defendant, the property described in paragraph
1 or any portion thereof, (a) cannot be located upon the exercise of
due diligence; (b) has been transferred or sold to, or deposited
with, a third party; (c) has been placed beyond the jurisdiction of
//
//

1  the court; (d) has been substantially diminished in value; or (e) has

2  been commingled with other property that cannot be divided without

3  difficulty.

4                                                    A TRUE BILL

5                                                    /s/

6                                                    _____
                                                     Foreperson

7

8  SANDRA R. BROWN
   Acting United States Attorney

9

10 LAWRENCE S. MIDDLETON
   Assistant United States Attorney

11 Chief, Criminal Division

12 GEORGE S. CARDONA
   Assistant United States Attorney

13 Chief, Major Frauds Section

14 KRISTEN A. WILLIAMS
   Assistant United States Attorney

15 Deputy Chief, Major Frauds
   Section

16

17 CATHY J. OSTILLER
   Assistant United States Attorney

18 Major Frauds Section

19 KIMBERLY D. JAIMEZ
   Assistant United States Attorney
   Major Frauds Section

20

21

22

23

24

25

26

27

28