UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

February 2017 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>JULIAN OMIDI,<br>    aka "Combiz Omidi,"<br>    aka "Combiz Julian Omidi,"<br>    aka "Kambiz Omidi,"<br>    aka "Kambiz Beniamia Omidi,"<br>    aka "Ben Omidi,"<br>INDEPENDENT MEDICAL SERVICES,<br>INC., a professional corporation,<br>SURGERY CENTER MANAGEMENT, LLC,<br>and<br>MIRALI ZARRABI, M.D.,<br>    aka "Mirali Akba Ghandchi<br>        Zarrabi,"<br>    aka "M.A. Ghandchi Zarrabi,"<br><br>    Defendants. | CR No. 17-00661(A)-DMG<br><br>F I R S T<br>S U P E R S E D I N G<br>I N D I C T M E N T<br><br>[18 U.S.C. § 1341: Mail Fraud; 18<br>U.S.C. § 1343: Wire Fraud; 18<br>U.S.C. § 1028A(a)(1): Aggravated<br>Identity Theft; 18 U.S.C. § 1035:<br>False Statements Relating to<br>Health Care Matters; 18 U.S.C.<br>§ 1956(h): Conspiracy to Commit<br>Promotional Money Laundering; 18<br>U.S.C. § 1956(a)(1)(A):<br>Promotional Money Laundering; 18<br>U.S.C. § 2: Aiding and Abetting<br>and Causing an Act to Be Done; 18<br>U.S.C. §§ 981(a)(1)(C), 982(a)(1),<br>982(a)(2)(B), 982(a)(7), and<br>1029(c)(1)(C) and 28 U.S.C.<br>§ 2461(c): Criminal Forfeiture] |

The Grand Jury charges:

COUNTS ONE THROUGH TWENTY-EIGHT

[18 U.S.C. §§ 1341, 2]

[Defendants J. OMIDI, IMS, SCM, and ZARRABI]

A.    INTRODUCTORY ALLEGATIONS

At all times relevant to this First Superseding Indictment:

1.    Defendant JULIAN OMIDI, also known as ("aka") "Combiz Omidi," aka "Combiz Julian Omidi," aka "Kambiz Omidi," aka "Kambiz Beniamia Omidi," aka "Ben Omidi" ("defendant J. OMIDI"), was a resident of Los Angeles, California, within the Central District of California.  Defendant J. OMIDI was a medical doctor whose license to practice in California was revoked effective June 19, 2009.

2.    Defendant SURGERY CENTER MANAGEMENT, LLC ("defendant SCM") was a limited liability company registered in the State of California, operating in Beverly Hills, California, within the Central District of California.  Defendant SCM used the address 269 Beverly Drive, Suite 353, Beverly Hills, California 90212 (the "Suite 353 Address").  Defendant SCM had multiple bank accounts, including bank accounts at Wells Fargo Bank from in or about July 2010 until in or about March 2012.  Defendant J. OMIDI was listed as an owner of and had signature authority for the SCM Wells Fargo Bank account with account number ending in 4735 (the "SCM WFB Account").  Co-conspirator C.K. was an employee of defendant SCM starting in or about July 2010 and, beginning at least in or about October 2010, was listed as a manager for defendant SCM on corporate documents and agreements.

3.    On or about March 15, 2012, defendant SCM entered into an assignment agreement with Golden State Practice Management, LLC ("GSPM"), under which defendant SCM, among other things, assigned to GSPM its duties, obligations, rights, title, and interest in and to all contracts and agreements between defendant SCM and defendant INDEPENDENT MEDICAL SERVICES, INC. ("defendant IMS", as further described below), and delivered to GSPM any checks, cash, or other form of payment defendant SCM received.  Co-conspirator C.K. signed

the agreement as "President" of defendant SCM. Under the agreement, defendant IMS agreed to maintain and perform with GSPM all of its agreements, duties, obligations, and other contracts it had with defendant SCM to the full nature and extent it was obligated to do so with defendant SCM.

4. Defendant IMS was a professional corporation registered in the State of California, operating primarily in Beverly Hills, California, within the Central District of California. Defendant IMS used the Suite 353 Address. Defendant IMS had multiple bank accounts, including a bank account at Chase Bank bearing an account number ending in 7541 (the "IMS Chase Account") from in or about May 2012 until in or about August 2014.

5. On or about March 15, 2012, defendant IMS entered into an assignment agreement with GSPM, under which defendant IMS assigned to GSPM, among other things, all of its rights, title, and interest in and to all accounts receivable, rights to receive monies, and payments for services rendered by defendant IMS and its physicians. In the agreement, defendant IMS described as its property a number of entities, including VIMA Medical, Inc., a professional corporation ("VIMA").

6. Defendant MIRALI ZARRABI, M.D., aka "Mirali Akbar Ghandchi Zarrabi," aka "M.A. Ghandchi Zarrabi" ("defendant ZARRABI"), was a resident of Beverly Hills, California, within the Central District of California. Defendant ZARRABI was a medical doctor licensed to practice in California and an independent contractor for defendant IMS.

7. 1-800-Get-Thin, LLC ("1-800-Get-Thin") was a limited liability company registered in the State of California, operating in

3

Beverly Hills, California, within the Central District of California. 1-800-Get-Thin leased to defendant SCM the "1-800-Get-Thin" telephone number 1-800-438-8446 and the URL "800getthin.com," from in or about 2010 to in or about 2015.

Lap-Band Surgery and Bariatric Coverage

8. Lap-Band surgery (a type of bariatric surgery) was an elective weight-loss procedure that employed the Lap-Band, a restricted device, regulated by the United States Food and Drug Administration.

9. Lap-Band surgery was intended for use only in morbidly obese adult patients who met specific criteria based on their body mass index ("BMI"), had failed more conservative weight-reduction alternatives, and committed to making various permanent changes in their eating habits.

10. If a patient had bariatric coverage through his or her health insurance, the insurance company typically required that the Lap-Band surgery be pre-approved before providers could bill and obtain payment for the surgery and related pre-operative and post-operative services and procedures. Patients with bariatric coverage generally were pre-approved and the Lap-Band surgery deemed medically necessary only if, among other requirements, they either had a BMI of 40 or more, or a BMI of 35 or more and at least one co-morbidity, such as obstructive sleep apnea ("OSA"), typically diagnosed through a sleep study.

11. In order to obtain pre-approval for Lap-Band surgery, the medical provider typically submitted a pre-authorization request (also known as a letter of medical necessity or "LOMN") that established the medical necessity for the Lap-Band procedure with

4

documentation showing that the patient was morbidly obese and met all the additional qualifications of the particular plan, including documentation of any co-morbidity.

Sleep Studies

12. A polysomnography ("PSG") was a baseline sleep study ordered by a licensed physician based on an individualized assessment of a patient's risk for a sleep disorder. That individualized assessment could include a review of a patient's score on questionnaires designed to evaluate a patient's risk for sleep apnea or other sleep-related disorders, including the Berlin questionnaire and the Epworth Sleepiness Scale ("ESS").

13. If, based on the PSG results, the licensed physician interpreting the PSG diagnosed the patient with OSA and prescribed treatment using a continuous positive airway pressure ("CPAP") machine, a second sleep study, known as a titration study or CPAP study, could be conducted to find the appropriate pressure for use in treating the OSA using the CPAP.

14. Sleep studies such as PSGs and titration studies generated raw data that was scored by a Registered Polysomnographic Sleep Technician ("RPSGT"). As part of that scoring, the RPSGT calculated the apnea-hypopnea index ("AHI"), a score related to the number of breathing cessations (apneas) and drops in the breathing rate accompanied by oxygen desaturation (hypopneas) that occurred in the study. An AHI of less than 5 was normal, while an AHI between 5 and 14.9 reflected mild OSA, between 15 and 29.9 reflected moderate OSA, and 30 or higher reflected severe OSA.

15. The sleep study would then be interpreted by a qualified licensed physician, who used the sleep study results to arrive at

5

diagnoses and treatment recommendations specific to the patient's results.

16. Most insurance companies required a diagnosis of moderate or severe OSA to qualify as a co-morbidity that would support a request for Lap-Band pre-approval.

GET THIN and the GET THIN Sleep Study Program

17. "GET THIN" referred to a network of more than 200 entities — including defendant IMS; defendant SCM; GSPM; VIMA; 1-800-Get-Thin; Royalty Surgical Center, LLC ("Royalty"); and DeVida USA, LLC ("DeVida") — that worked to promote, perform, and submit insurance claims for Lap-Band surgeries and other medical procedures, including sleep studies, in the Central District of California, and elsewhere, between at least in or about 2008 and the present.

18. GET THIN was controlled, at least in part, by defendant J. OMIDI who, together with others: (a) set and reviewed GET THIN's policies and procedures, including policies and procedures with respect to the services GET THIN would provide, the billing for those services, and materials submitted to insurance companies; (b) reviewed individual patient files and claims for services submitted to insurance carriers; and (c) approved GET THIN expenses.

19. Beginning in or about February 2010, defendant SCM was listed as a "Member" of GET THIN and as associated with the management of multiple GET THIN entities, including GET THIN's surgery centers.

20. Beginning in or about April 2010 and continuing to at least in or around December 2015, defendant IMS maintained a sleep study program (the "GET THIN SSP") to conduct sleep studies for patients who came to GET THIN seeking Lap-Band surgery. The majority of

6

individuals who worked with defendant IMS with respect to the GET THIN SSP, including defendant ZARRABI, were hired by defendant IMS as independent contractors with defendant J. OMIDI's approval.

21. Between in or around May 2010 and in or around December 2015, co-conspirator C.K., who was not a licensed medical professional, was the manager of the GET THIN SSP and an administrator for defendant IMS. Beginning at least in or about December 2010, co-conspirator C.K. was listed as a manager for defendant IMS on corporate documents and agreements.

22. Defendant IMS contracted with (a) an RPSGT to score manually the raw data from sleep study tests between in or about April 2010 and in or about August 2014; and (b) defendant ZARRABI to review and interpret the scored sleep studies for the GET THIN SSP starting in or about June 2010.

23. The GET THIN SSP also employed others who were not licensed medical professionals, including the manager of GET THIN's nutrition department ("S.H."), and Co-Conspirator 2 ("CC-2"), an administrative assistant and then manager for the GET THIN SSP, to assist co-conspirator C.K. in dealing with the influx of patients and backlog of sleep study reports.

24. The GET THIN SSP conducted sleep studies in multiple locations in California, including locations in Apple Valley, Long Beach, Palmdale, San Bernardino, and West Hills, all in the Central District of California. Although sometimes located in suites next to ambulatory surgery centers ("ASCs"), the sleep studies were not conducted in ASCs. In particular, no sleep studies were conducted at the Modern Institute of Plastic Surgery in Beverly Hills, California.

GET THIN's Insurance Claims for Lap-Band Surgery, Sleep Studies, and DME Referrals

25. GET THIN included entities and associated individuals, including defendant IMS and VIMA, that were medical providers ("GET THIN Providers") and had provider numbers enabling them to submit claims to insurance companies for services they allegedly provided to patients.

26. According to defendant ZARRABI's contract with IMS, defendant ZARRABI's services for the GET THIN SSP were to be billed under defendant IMS's provider number. In practice, however, defendant ZARRABI's services for the GET THIN SSP were billed under provider numbers for defendant IMS, VIMA, and other GET THIN entities.

27. GET THIN Providers submitted claims for services to a number of health care benefit programs, including TriCare (the federally funded health care benefit program that provides coverage for active duty, retired, and reserve members of the military and certain other individuals) and private insurers such as Anthem Blue Cross, UnitedHealthcare, Aetna, CIGNA, Health Net, Operating Engineers Health & Welfare Fund, Blue Shield of California, Government Employee's Health Association, Inc. ("GEHA"), and others (collectively, the "Insurance Companies"). TriCare and the Insurance Companies were health care benefit programs as defined in 18 U.S.C. § 24(b).

28. GET THIN Providers were typically non-contracted or out-of-network providers who lacked any agreement with the Insurance Companies. TriCare and the Insurance Companies typically paid such out-of-network providers a percentage of either (a) the amount billed

or (b) a "usual and customary" rate for the service, which was generally higher than the in-network rate. In addition, the patient (also known as the "subscriber" or "member" of the insurance plan) was also responsible for payment of the difference between the out-of-network provider's fees and the amount paid by TriCare and the Insurance Companies.

29. GET THIN Providers submitted claims for professional services (on a CMS Form 1500) and facility fees (on a CMS Form UB-04) using current procedural terminology ("CPT") codes identifying the services provided. In submitting a claim, the GET THIN Providers represented that all of the information in the claim was true and accurate -- including patient identity, CPT codes, diagnosis, provider identity, place of service, and date of service -- and that the service provided was medically necessary.

30. GET THIN Providers, including defendant IMS, typically submitted claims to TriCare and the Insurance Companies for Lap-Band surgery using CPT code 43770. Claims for other services and procedures billed in conjunction with the surgery -- such as anesthesia, pathology, biopsies, or hernia repair -- were submitted under separate CPT codes.

31. GET THIN Providers, including defendant IMS, typically submitted claims for sleep studies under CPT codes 95810 (for PSGs) and 95811 (for titration studies). GET THIN Providers submitted sleep study claims for professional services (often under the provider number of defendant IMS) or facility fees (often under the provider number of Modern Institute of Plastic Surgery, which used as its mailing address the Suite 353 Address), or sometimes both.

32.  GET THIN also referred patients to other providers, such as durable medical equipment ("DME") providers, including the primary DME provider used by GET THIN ("DME Provider 1"), for CPAP devices, including AutoPAP or APAP devices, and accessories following the patients' sleep studies.  GET THIN provided to the DME providers documentation including CPAP prescriptions signed by GET THIN-affiliated doctors, such as defendant ZARRABI, SSRs generated by the GET THIN SSP, and notes of the medical clearance visits conducted by GET THIN internists in support of those referrals.  The DME providers, including DME Provider 1, then submitted claims for CPAP devices and accessories to Tricare and the Insurance Companies, typically under CPT codes E0601, E0562, and A7030 through A7039.

33.  The information in the claim forms was material to payment, and TriCare and the Insurance Companies would deny claims that contained false, inaccurate, or misleading information about, for example, the service purportedly performed or its medical necessity, the identity of the provider, or the place of service; insurers were only obligated to pay "clean" claims, that is, claims that were accurate and complete.

34.  With respect to sleep study claims, if TriCare and the Insurance Companies had known any of the following, they might have denied the claims or subjected them to additional scrutiny:

a.    That a sleep study claim was submitted for a sleep study with false information, including false information as to whether the study had actually been interpreted by a qualified licensed physician;

b.    That the sleep study was not medically necessary;

c.    That medical records, such as sleep study reports, submitted in support of the claims contained false and fraudulent information; or

d.    That employees had received commissions for the scheduling or completion of sleep studies.

35.    With respect to claims for DME such as CPAPs or CPAP-accessories, if TriCare and the Insurance Companies had known any of the following, they might have denied the claims or subjected them to additional scrutiny:

a.    That the CPAP was not medically necessary;

b.    That the CPAP had not, in fact, been prescribed by a physician;

c.    That the prescribing physician expected to be paid for writing the CPAP prescription; or

d.    That medical records purporting to support the medical necessity of the CPAP contained false and fraudulent information.

36.    With respect to requests for Lap-Band approval, if TriCare and the Insurance Companies had known that an LOMN and/or attached supporting documentation contained false or fraudulent statements purporting to support the medical necessity for the Lap-Band procedure, including false or fraudulent statements or documentation concerning an alleged co-morbidity, they might not have approved Lap-Band surgery or paid claims submitted for Lap-Band surgery and related services for that patient, or they might have subjected the pre-authorization request to additional scrutiny.

B.    THE FRAUDULENT SCHEME

37.    Beginning in or about May 2010 and continuing through in or about March 2016, in Los Angeles County, within the Central District

11

of California, and elsewhere, defendants J. OMIDI, IMS, SCM, and ZARRABI, together with co-conspirators C.K., S.H., and CC-2, and others known and unknown to the Grand Jury, knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud TriCare and the Insurance Companies as to material matters, and to obtain money and property from TriCare and the Insurance Companies by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

38. The fraudulent scheme was carried out, in substance, as follows:

a. GET THIN aggressively promoted Lap-Band surgery through advertisements in Southern California, and elsewhere, encouraging potential patients to call "1-800-GET-THIN" and attend a presentation (often referred to as a "seminar") about the surgery.

b. Before patients attended a seminar, GET THIN obtained their insurance information, using that to determine whether the patients had bariatric coverage (that is, whether their insurance plan covered Lap-Band surgery) and, if so, whether that coverage extended to out-of-network providers like GET THIN. If the potential patients' insurance plans did not cover Lap-Band surgery, GET THIN would internally identify these patients as having "No Bariatric Benefits" or "No Bariatric Benefits-Even With Medical Necessity."

c. Before or around the time patients attended a seminar, those patients were instructed to fill out and sign a variety of intake paperwork. That paperwork typically included forms in which the patients assigned their rights and benefits regarding their insurance policies to defendant SCM, instructed their insurance companies to pay for services purportedly provided by GET THIN

Providers by check made payable and mailed to defendant SCM at the Suite 353 Address, and authorized defendant SCM to deposit any insurance checks received in payment for services provided by GET THIN Providers. The intake paperwork also at times included a form entitled "Assignment of Benefits," to be signed by the patients, in which the patients authorized direct payment to GET THIN Providers of any benefits for treatments or services. Some of those "Assignment of Benefits" forms notified patients that defendant J. OMIDI was an owner of "the management company for the above mentioned surgery center" and had a "vested interest in the [surgery] center and will be receiving compensation for the procedures performed."

d.   After attending a seminar, patients often met with Lap-Band surgeons under contract with GET THIN entities, including defendant IMS, who conducted brief examinations. After these examinations, a sleep study typically was ordered as a pre-operative procedure by marking a check-box for "Polysomnography" on a "Surgery Scheduling Form," even though some of the patients had insurance that likely would not cover Lap-Band surgery under any circumstances and even though there was often little medical need for the sleep study documented by the brief examinations or in the patient intake materials. On some occasions, the check-box for "Polysomnography" was not checked.

e.   Next, GET THIN's patient consultants, in accordance with policies set by defendant J. OMIDI and others, and irrespective of whether the "Polysomnography" box on the "Surgery Scheduling Form" was checked, routinely scheduled patients for a PSG to be conducted through the GET THIN SSP in an effort to uncover a co-morbidity that would assist GET THIN in obtaining insurance approval for Lap-Band

13

surgery from various health care benefit programs.  Later, policies
required the scheduling of a titration study at the same time, even
though the PSG had not yet been conducted and sleep apnea had not
been diagnosed.  At the time defendant J. OMIDI and others set these
policies, defendant J. OMIDI knew that some of these patients had
insurance that likely would not cover Lap-Band surgery under any
circumstances, but that the insurance often would pay for the
performance of one or more sleep studies.

      f.   As an incentive to encourage the performance of Lap-
Band surgeries and other procedures including sleep studies, GET THIN
patient consultants received commissions when patients they worked
with underwent the procedures, including approximately $40-$70 for
each Lap-Band surgery and approximately $20 for each sleep study.
Other GET THIN employees or independent contractors also received
commissions relating to procedures, including for confirming sleep
study appointments.  Defendant J. OMIDI reviewed and approved the
payment of those commissions.

      g.   Individuals hired by defendant IMS, with defendant J.
OMIDI's approval, conducted the sleep studies, which were then scored
by an RPSGT hired by defendant IMS.  At co-conspirator C.K.'s
direction, the RPSGT would input the sleep study scores into a sleep
study report ("SSR") template that included the electronic signature
of defendant ZARRABI and standardized diagnoses and treatment options
that were not individualized to the patient.  As defendant J. OMIDI
and co-conspirator C.K. knew, defendant ZARRABI permitted his
electronic signature to be used in these SSRs even though he would
often not review or interpret the SSRs or was reviewing SSRs that, as
discussed below, had been altered by co-conspirator C.K. and others

at defendant J. OMIDI's direction to reflect results not supported by the raw data from the sleep studies, without reviewing the underlying raw data to confirm their accuracy. Although defendant ZARRABI did not review many of these SSRs, he knew they included results not supported by the raw data from the sleep studies.

h.   Defendant J. OMIDI instructed co-conspirator C.K., either directly or through intermediaries such as co-conspirator S.H. or through post-it notes on patient files, to alter the sleep study results in the SSRs (i) to make it appear as though the patients had OSA when they, in fact, did not; or (ii) to make it appear as though they had more severe OSA than they, in fact, had. Defendant J. OMIDI authorized other GET THIN SSP employees, including co-conspirator S.H., to assist co-conspirator C.K. in the falsification of SSRs.

i.   In order to make patients more likely to receive insurance pre-approval for Lap-Band surgery and provide supporting documentation justifying the initial performance of the sleep studies, defendant J. OMIDI also instructed co-conspirator C.K. to conduct or provide ESS scores for patients. Defendant J. OMIDI authorized co-conspirator C.K.'s use of CC-2 to obtain those ESS scores, which, as defendant J. OMIDI and co-conspirator C.K. both knew, were often obtained after the sleep studies had already been performed and were often fabricated to indicate falsely that the patients were suffering from extreme daytime sleepiness when, in fact, they were not. The falsified ESS scores were then included in the SSRs and often referenced in LOMNs.

j.   Defendant J. OMIDI instructed co-conspirator C.K. to falsify the SSRs, knowing and intending that (i) those falsified SSRs would be provided to TriCare and the Insurance Companies -- often

15

attached to an LOMN that also referenced the falsified sleep study results and ESS scores -- as part of GET THIN's request for pre-authorization for Lap-Band surgery and (ii) TriCare and the Insurance Companies would rely on the falsified SSRs (including their fabricated results and representation that the SSRs had been reviewed by defendant ZARRABI) and corresponding inaccurate LOMN statements regarding the sleep study results in making decisions regarding Lap-Band pre-approval. Defendant ZARRABI was also aware that SSRs he did not review and which he knew contained inaccurate information would be provided to, and relied upon by, TriCare and the Insurance Companies as part of GET THIN's request for pre-authorization for Lap-Band surgery.

k. GET THIN employees, including co-conspirators C.K. and S.H., acting at defendant J. OMIDI's direction or with his knowledge and approval, also falsified other information that was included in the LOMNs, including patients' heights, weights, and BMIs, or materials that would be attached to the LOMNs, including nutrition summary letters, some of which J. OMIDI knew or later became aware bore forged or unauthorized signatures of dieticians contracted with GET THIN. As defendant J. OMIDI knew and intended, this false information was included in an effort to make the patients more likely to receive insurance pre-approval for Lap-Band surgery.

l. Defendant J. OMIDI routinely reviewed LOMNs and discussed their contents with members of GET THIN's processing department, which was responsible for generating the LOMNs. Defendant J. OMIDI at times directed GET THIN employees to revise the LOMNs, including to reflect the falsified sleep study results and ESS scores. Defendant J. OMIDI did so, knowing that his medical license

had been revoked, that the individuals writing and revising the LOMNs were not medical professionals, that LOMNs were created from templates with cloned language not specific to patients' conditions, and that, to the extent the LOMNs were reviewed by physicians (which was not always the case), those physicians had often never seen or examined the patients and were asked to review the LOMNs based only on select supporting documentation provided to them by other GET THIN employees or without receiving any supporting documentation at all. Defendant J. OMIDI typically approved the LOMNs before they were submitted to TriCare and the Insurance Companies.

m.    Once insurance pre-approval for Lap-Band surgery was obtained, based in part on the fraudulent information in the SSRs altered by co-conspirators C.K. and S.H. and others at defendant J. OMIDI's direction, surgeons contracted by GET THIN performed Lap-Band surgery on the patients, and GET THIN Providers, including defendant IMS, submitted claims for Lap-Band surgery and services associated with it to TriCare and the Insurance Companies, and often received payment from TriCare and the Insurance Companies for those claims.

n.    As defendants J. OMIDI and ZARRABI knew and intended, GET THIN Providers, including defendant IMS, billed TriCare and the Insurance Companies for sleep studies that had not been reviewed or interpreted by defendant ZARRABI. As defendants J. OMIDI and ZARRABI also knew and intended, GET THIN employees submitted to TriCare and the Insurance Companies falsified SSRs in support of sleep study claims, and often received payment from TriCare and the Insurance Companies for those claims.

o.    At times, GET THIN also sent statements to patients, demanding payment from patients for co-insurance, co-pay, or

17

deductible payments or amounts not covered by the patients' insurance plans relating to services provided by the various GET THIN Providers. Some of these statements, including statements issued as late as 2015, purported to come from defendant SCM and direct the patient to remit payment to defendant SCM.

p. GET THIN also provided the falsified SSRs to DME providers such as DME Provider 1, together with prescriptions for CPAP devices, as purported support for the medical necessity of the DME. The prescriptions were almost uniformly for APAP devices and accessories, with a claimed lifetime need. Between in or about September 2010 and in or about April 2011, those prescriptions were signed by GET THIN internists contracted with defendant IMS, who often signed the prescriptions after only reviewing, if anything, the falsified SSRs provided to them by co-conspirator C.K. and others, and without making any independent medical assessment of the type of DME that would be medically necessary. The types of DME to be ordered typically were already pre-printed on the prescriptions when the GET THIN internists signed them. Between in or about April 2011 and in or about January 2013, defendant ZARRABI authorized the use of his electronic signature on the CPAP prescriptions, knowing that (1) he had not reviewed all of the SSRs that purportedly supported the DME prescriptions and (2) he had demanded to be paid approximately $10 to $25 for each CPAP prescription submitted under his name.

q. As defendants J. OMIDI and ZARRABI knew and intended, the materials sent to DME providers in support of the purported medical necessity of the DME were used by those DME providers in support of claims for the DME that the DME providers submitted to

18

insurance companies, claims for which, in many instances, the DME providers received payment from the insurance companies.

r.     In an attempt to conceal the falsification of the SSRs, defendant J. OMIDI directed co-conspirator C.K. to obtain and destroy the raw data associated with the sleep studies conducted through GET THIN's SSP, and co-conspirator C.K. followed that direction and destroyed the raw data.

s.     Also in an attempt to prevent discovery of the falsification of the SSRs and lull GET THIN physicians into believing the changing of SSRs was medically appropriate, defendant J. OMIDI directed co-conspirator C.K. to create documentation that attempted to justify the changing of SSRs by claiming that defendant ZARRABI was adjusting the standard sleep study scoring parameters, even though defendant J. OMIDI and co-conspirator C.K. both knew at the time that the documentation did not justify the falsification of the SSRs. Defendant ZARRABI was aware his name was being used on this documentation at least by July 2012, if not before, even though he knew he was not qualified to modify the standard sleep study scoring parameters.

t.     Between in or about August 2010 and in or about October 2013, defendant ZARRABI received payment for the interpretations he purported to provide to the GET THIN SSP from bank accounts associated with defendants SCM and IMS, as well as GSPM, including the SCM WFB Account and the IMS Chase Account. Defendant ZARRABI received additional payments, purportedly for interpretations he provided in 2014, in October and December 2015 from a bank account associated with Royalty. Defendant J. OMIDI approved these payments.

39.  GET THIN Providers, including defendant IMS, billed TriCare and the Insurance Companies at least approximately $240,000,000 for Lap-Band surgeries for patients for whom SSRs had been falsified to reflect that the patients suffered from OSA or more severe OSA than the patients, in fact, had.  TriCare and the Insurance Companies paid more than approximately $38,000,000 on those claims.

40.  GET THIN Providers, including defendant IMS, also billed TriCare and the Insurance Companies between approximately $14,000 and $18,000 each for sleep studies that were not interpreted by defendant ZARRABI, often providing falsified SSRs in support of the claims. GET THIN Providers, including defendant IMS, also billed TriCare and the Insurance Companies between approximately $14,000 and $18,000 each for titration sleep studies that were not medically necessary, given the results of the initial sleep studies.  During the course of the scheme, GET THIN Providers billed Anthem Blue Cross, Aetna, UnitedHealthcare, CIGNA, HealthNet, and TriCare tens of millions of dollars for sleep studies and received millions in payment on those claims.

41.  Payments by TriCare and the Insurance Companies on these claims were often made out to GET THIN providers, including defendant IMS, or, at times, to patients, who had often agreed during the patient intake process to assign and sign over those payments to defendant SCM and later signed them over to defendant SCM or other GET THIN affiliates.  The insurance payments were then deposited into bank accounts associated with GET THIN entities, including bank accounts associated with defendants SCM and IMS.

42.  DME providers such as DME Provider 1 also submitted claims for CPAP devices and accessories, including rental and equipment

replacement claims that stretched over years, based on fabricated SSRs and prescriptions signed by defendant ZARRABI and others as described above, and received payment for those claims.

C. THE USE OF THE MAILS

43. On or about the dates set forth below, within the Central District of California and elsewhere, defendants J. OMIDI, IMS, SCM, and ZARRABI, for the purpose of executing and attempting to execute the above-described scheme to defraud, willfully caused the following items to be placed in an authorized depository for mail matter to be sent and delivered by the United States Postal Service:

| COUNT | DATE | ITEM MAILED |
| --- | --- | --- |
| ONE | 1/29/13 | CMS HCFA 1500 claim form for $15,971 for titration study (CPT code 95811) for D.S. on December 10, 2011 and titration study SSR, mailed to United Healthcare |
| TWO | 2/13/13 | Check No. I0001682492 issued by Tricare – West Region Claims payable to DME Provider 1 in the amount of $2,969.59, including $187.01 in payment of a claim for CPAP accessories (CPT codes A7032, A7034, A7037, and A7038) provided to J.J. on January 10, 2013, mailed to DME Provider 1 |
| THREE | 2/27/13 | Check No. I0001755925 issued by Champus – Tri West WI payable to DME Provider 1 in the amount of $4,085.34, including $285.14 in payment of a claim for CPAP accessories (CPT codes A7032, A7034, A7035, A7037, A7038, and A7039) provided to A.F. on January 30, 2013, mailed to DME Provider 1 |
| FOUR | 3/6/13 | Check No. I0001792136 issued by Champus – Tri West WI payable to DME Provider 1 in the amount of $2,747.32, including $50.49 in payment of a claim for CPAP accessories (CPT codes A7033 and A7038) provided to L.M. on February 21, 2013, mailed to DME Provider 1 |

| COUNT | DATE | ITEM MAILED |
|-------|------|-------------|
| FIVE | 3/12/13 | Check No. 0806075258 issued by HealthNet payable to DME Provider 1 in the amount of $3,559.65, including $991.64 in payment of claims for CPAP accessories (CPT codes A7032, A7034, A7037, and A7038) provided to J.C. on 8/24/12 and $880.02 in payment of claims for CPAP accessories (CPT codes A7032, A7034, A7035, A7037, A7038, and A7039) provided to J.C. on 11/27/12, mailed to DME Provider 1 |
| SIX | 3/15/13 | Check No. 121301 issued by Operating Engineers Health and Welfare Fund payable to DME Provider 1 in the amount of $185.03 in payment of a claim for an APAP (CPT code E0601) provided to E.J. on July 31, 2011, mailed to DME Provider 1 |
| SEVEN | 4/3/13 | Check No. I0001937686 issued by Champus – Tri West WI payable to DME Provider 1 in the amount of $3,280.82, including $220.64 in payment of a claim for CPAP accessories (CPT codes A7030, A7035, A7037, A7038, and A7039) provided to M.B. on March 21, 2013, mailed to DME Provider 1 |
| EIGHT | 4/5/13 | Check No. 5692250094SRS issued by Tricare – West Claims payable to DME Provider 1 in the amount of $310.75, including $195.94 in payment of a claim for CPAP accessories (CPT codes A7032, A7034, A7037, and A7038) provided to L.W. on March 21, 2013, mailed to DME Provider 1 |
| NINE | 4/15/13 | Check No. 92301737 issued by United Healthcare payable to DME Provider 1 in the amount of $130.50 in payment of a claim for CPAP accessories (CPT codes A7032, A7034, A7037, and A7038) provided to T.L. on March 30, 2013, mailed to DME Provider 1 |
| TEN | 4/24/13 | Check No. I0002014136 issued by Tricare – West Region Claims payable to DME Provider 1 in the amount of $8,515.20, including $224.39 in payment of a claim for CPAP accessories (CPT codes A7030, A7037, and A7038) provided to T.S. on March 29, 2013, mailed to DME Provider 1 |
| ELEVEN | 5/8/13 | CMS HCFA 1500 claim form for $15,540 for titration study (CPT code 95811) for V.C. on June 2, 2011 and titration study SSR, mailed to Anthem |
| TWELVE | 6/5/13 | Check No. 38134488 issued by GEHA payable to Lee K. Au, MD in the amount of $3,684.00 in payment of a claim for Lap-Band surgery for S.G. on August 31, 2012, mailed to Dr. Au |

| COUNT | DATE | ITEM MAILED |
|-------|------|-------------|
| THIRTEEN | 6/5/13 | CMS UB04 claim form for $16,525 for PSG (CPT 95810) for A.A. on October 14, 2010 and PSG SSR, mailed to GEHA |
| FOURTEEN | 6/12/13 | Check No. 169205 issued by Operating Engineers Health and Welfare Fund payable to Independent Medical Services, Inc. in the amount of $888.90 in payment of a claim for titration study (CPT code 95811) for K.R. on February 16, 2012, mailed to IMS |
| FIFTEEN | 7/25/13 | Check No. 0108284910 issued by Anthem payable to Independent Medical Services, Inc. in the amount of $6,687.25, including $3,245.00 in payment of a claim for PSG (CPT code 95810) for S.K. on February 9, 2012, mailed to IMS |
| SIXTEEN | 9/7/13 | Check issued by Anthem payable to P.R. in the amount of $6,076.16 in payment of a claim for Lap-Band surgery (CPT code 43770) for P.R. on September 8, 2011, mailed to P.R. |
| SEVENTEEN | 11/9/13 | Check issued by Anthem payable to P.R. in the amount of $6,076.16 in payment of a claim for Lap-Band surgery (CPT code 43770) for P.R. on September 8, 2011, mailed to P.R. |
| EIGHTEEN | 12/18/13 | Check No. 240646 issued by Operating Engineers Health and Welfare Fund payable to DME Provider 1 in the amount of $527.28 in payment of a claim for CPAP accessories (CPT Codes A7032, A7034, A7035, A7037, A7038, A7039) provided to C.R. on August 28, 2013, mailed to DME Provider 1 |
| NINETEEN | 12/18/13 | Check No. 238759 issued by Operating Engineers Health and Welfare Fund payable to DME Provider 1 in the amount of $148.02 in payment of a claim for APAP (CPT Code E0601) provided to N.A. on June 24, 2011, mailed to DME Provider 1 |
| TWENTY | 2/19/14 | Check No. 4981383 issued by California's Valued Trust payable to Independent Medical Services, Inc. in the amount of $548.93 in payment of a claim for PSG (CPT code 95810) for S.Z. on February 7, 2014, mailed to IMS |
| TWENTY-ONE | 3/31/14 | Check No. 854866457 issued by Blue Cross Blue Shield of Massachusetts payable to T.M. in the amount of $1,072.25 in payment of a claim for titration study (CPT code 95811) for F.M. on March 14, 2014, mailed to T.M. |

| COUNT | DATE | ITEM MAILED |
|-------|------|-------------|
| TWENTY-TWO | 4/4/14 | Check No. 278850 issued by Operating Engineers Health & Welfare Fund in the amount of $514.08 payable to Independent Medical Services, Inc. in payment of a claim for Lap-Band surgery (CPT code 43770) for S.N. on May 17, 2013, mailed to IMS |
| TWENTY-THREE | 4/8/14 | Check No. 239426 issued by Operating Engineers Health & Welfare Fund payable to Modern Institute of Plastic Surgery in the amount of $5,745.42 in payment of a claim for titration study (CPT code 95811) for A.W. on February 19, 2011, mailed to MIPS |
| TWENTY-FOUR | 8/21/14 | Check No. 5064977 issued by California's Valued Trust payable to Independent Medical Services, Inc. in the amount of $879.28, including $601.39 in payment of a claim for titration study (CPT code 95811) for S.Z. on August 1, 2014, mailed to IMS |
| TWENTY-FIVE | 9/12/14 | Check No. 50006640 issued by Blue Shield of California payable to T.R. in the amount of $421.44 in payment of a claim for titration study (CPT code 95811) for T.R. on August 8, 2014, mailed to T.R. |
| TWENTY-SIX | 10/1/14 | Check No. 356653 issued by Operating Engineers Health & Welfare Fund payable to Independent Medical Services in the amount of $3,213.01 in payment of a claim for Lap-Band surgery (CPT code 43770) for S.N. on May 17, 2013, mailed to IMS |
| TWENTY-SEVEN | 1/8/15 | Check No. 394464 issued by Operating Engineers Health & Welfare Fund payable to San Diego ASC, LLC in the amount of $24,374.82 in payment for a claim for Lap-Band surgery (CPT code 43770) for S.N. on May 17, 2013, mailed to San Diego ASC, LLC |
| TWENTY-EIGHT | 3/22/16 | Check No. 0121443507 issued by Anthem Blue Cross payable to Independent Medical Services, Inc. in the amount of $782.75 in payment of a claim for PSG (CPT code 95810) for K.M. on August 15, 2014, mailed to IMS |

COUNTS TWENTY-NINE THROUGH THIRTY-ONE

[18 U.S.C. §§ 1343, 2]

[Defendants J. OMIDI, IMS, SCM, and ZARRABI]

44.   The Grand Jury hereby realleges and incorporates by reference paragraphs 1 through 42 of this First Superseding Indictment as though fully set forth herein.

C.   THE USE OF THE WIRES

45.   On or about the dates set forth below, within the Central District of California and elsewhere, defendants J. OMIDI, IMS, SCM, and ZARRABI, for the purpose of executing and attempting to execute the above-described scheme to defraud, transmitted, willfully caused the transmission of, and aided and abetted the transmission of, the following items by means of wire and radio communication in interstate and foreign commerce:

| COUNT | DATE | ITEM WIRED |
|-------|------|-----------|
| TWENTY-NINE | 1/16/15 | Facsimile from MIPS in California to Aetna in Kentucky regarding PSG conducted on June 18, 2011 for patient K.H., including PSG SSR and itemized bill for $17,365.00 |
| THIRTY | 1/22/15 | Facsimile from MIPS in California to Aetna in Kentucky regarding titration sleep study conducted on August 3, 2011 for patient K.H., including titration study SSR |
| THIRTY-ONE | 7/16/15 | Facsimile from MIPS in California to Aetna in Kentucky regarding PSG conducted on October 24, 2011 for patient V.G., including PSG SSR, History and Physical form, and insurance information |

COUNT THIRTY-TWO

[18 U.S.C. §§ 1028A(a)(1), 2]

[Defendant J. OMIDI]

46. The Grand Jury hereby realleges and incorporates by reference paragraphs 1 through 42 of this First Superseding Indictment as though fully set forth herein.

47. On or about March 24, 2014, in Los Angeles County, within the Central District of California, and elsewhere, defendant J. OMIDI, aided and abetted by others known and unknown to the Grand Jury, knowingly transferred, possessed, and used, and willfully caused to be transferred, possessed, and used, without lawful authority, a means of identification that defendant J. OMIDI knew belonged to another person, that is, the name of defendant ZARRABI, during and in relation to mail fraud, a felony violation of Title 18, United States Code, Section 1341, as charged in Count Twenty-One of this First Superseding Indictment.

COUNTS THIRTY-THREE AND THIRTY-FOUR

[18 U.S.C. §§ 1035, 2]

[Defendants J. OMIDI and ZARRABI]

48. The Grand Jury hereby realleges and incorporates by reference paragraphs 1 through 42 of this First Superseding Indictment as though fully set forth herein.

49. On or about the dates set forth below, in Los Angeles County, within the Central District of California, and elsewhere, in a matter involving a health care benefit program, specifically, the private insurance providers set forth below, defendants J. OMIDI and ZARRABI, together with co-conspirators C.K. and S.H., and others known and unknown to the Grand Jury, each aiding and abetting the other, knowingly and willfully made and caused to be made materially false, fictitious, and fraudulent statements and representations in connection with the delivery of and payment for health care benefits, items, and services, specifically, by submitting the SSRs, which they knew to be materially false, to the following insurance providers in support of requests for authorization of Lap-Band surgery:

| COUNT | DATE | FALSE AND FRAUDULENT STATEMENT |
|-------|------|--------------------------------|
| THIRTY-THREE | 3/29/13 | Letter of medical necessity and supporting documentation, including falsified PSG SSR, faxed to Aetna seeking pre-approval for Lap-Band surgery for J.R. |
| THIRTY-FOUR | 4/12/13 | Letter of medical necessity and supporting documentation, including falsified titration SSR, faxed to Operating Engineers Health & Welfare Fund seeking pre-approval for Lap-Band surgery for S.N. |

COUNT THIRTY-FIVE

[18 U.S.C. § 1956(h)]

[Defendants J. OMIDI, IMS, and SCM]

50. The Grand Jury hereby realleges and incorporates by reference paragraphs 1 through 42 of this First Superseding Indictment as though fully set forth herein.

51. At all times relevant to this First Superseding Indictment, DeVida was a limited liability company registered in the State of California, operating in Beverly Hills, California, within the Central District of California. Defendant SCM was identified as DeVida's sole member in DeVida's Operating Agreement dated December 29, 2010. Defendant J. OMIDI was identified in publicly filed documents as DeVida's organizer and initial agent for service of process, and was listed as a key individual on and had signature authority for one of DeVida's Wells Fargo Bank accounts, account number ending in x5892 (the "DeVida WFB Account"), from in or about January 2011 until in or about March 2012.

52. At all times relevant to this First Superseding Indictment, Royalty was a limited liability company registered in the State of California, operating in Beverly Hills, California, within the Central District of California. Royalty maintained a bank account at Hanmi Bank bearing an account number ending in x4292 (the "Royalty Hanmi Account") from in or about January 2015 until at least August 2016.

C. THE OBJECT OF THE CONSPIRACY

53. Beginning no later than in or around January 2011, and continuing until at least in or around December 2015, in Los Angeles County, within the Central District of California, and elsewhere,

defendants J. OMIDI, IMS, SCM, together with co-conspirators C.K., S.H., and CC-2, defendant ZARRABI, and others known and unknown to the Grand Jury, knowingly combined, conspired, and agreed to commit an offense against the United States, namely, Money Laundering, in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i), by conducting and attempting to conduct financial transactions affecting interstate and foreign commerce to promote the carrying on of some form of specified unlawful activity, namely, false statements regarding health care matters, in violation of Title 18, United States Code, Section 1035.

D.  MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE
    ACCOMPLISHED

54. The object of the conspiracy was carried out, and to be carried out, in substance, in the following manner and by the following means, among others:

a.  Defendant J. OMIDI would authorize the hiring of, and payments to, individuals engaged in promoting GET THIN's sleep study fraud by completing such tasks as (i) altering SSR results, (ii) fabricating SSR supporting documentation to justify the ordering of sleep studies and the high incidence of obstructive sleep apnea findings, and (iii) signing off on un-reviewed SSRs and accepting clinical responsibility for SSRs.

b.  Co-conspirator C.K. would hire individuals to complete these tasks, including co-conspirators S.H. and CC-2, at the pay rate approved by defendant J. OMIDI.

c.  Co-conspirator C.K., at defendant J. OMIDI's direction, would falsify SSRs, including fabricated test information

to support a fabricated diagnosis of more severe sleep apnea than the patient, in fact, had.

　　　d.　Co-conspirator S.H. would aid co-conspirator C.K. in his falsification of SSRs in exchange for a $10 commission for each altered SSR.

　　　e.　CC-2 would aid co-conspirator C.K. by coaching patients to higher ESS scores on patient questionnaires, or by fabricating ESS scores altogether, to make it appear that patients had significant daytime sleepiness.　The inflation and fabrication of ESS scores, in favor of daytime sleepiness, helped justify the consistent ordering of sleep studies and buttressed GET THIN's consistent finding of obstructive sleep apnea among GET THIN patients.　CC-2 received $2 for each ESS questionnaire completed.

　　　f.　Defendant ZARRABI would accept clinical responsibility for SSRs, even after he stopped consistently working for GET THIN, in exchange for payment.

　　　g.　Co-conspirator C.K. would seek approval from defendant J. OMIDI for individual payments made to co-conspirators S.H. and CC-2 and defendant ZARRABI.

　　　h.　Co-conspirator C.K. would submit payment requests or invoices for co-conspirators S.H. and CC-2 and defendant ZARRABI to GET THIN's accounting department to ensure issuance of checks to these individuals.

　　　i.　GET THIN, through related entities, including defendants SCM and IMS, Royalty, and DeVida, would issue checks using the proceeds of mail fraud and wire fraud to co-conspirators S.H. and CC-2 and defendant ZARRABI to compensate them for their roles in expanding and buttressing the sleep study fraud.

E.    OVERT ACTS

55.    On or about the following dates, in furtherance of the conspiracy and to accomplish its object, defendants J. OMIDI, IMS, and SCM, together with co-conspirators C.K., S.H., and CC-2, and defendant ZARRABI, and others known and unknown to the Grand Jury, committed and willfully caused others to commit the following overt acts, among others, in the Central District of California and elsewhere:

Overt Act No. 1:    On or before April 1, 2011, defendant J. OMIDI approved a payment to CC-2 in the amount of $1,034.

Overt Act No. 2:    On or about April 1, 2011, co-conspirator C.K. sent GET THIN's accounting department an email, copying defendant J. OMIDI, seeking payment of CC-2's invoice in the amount of $1,034 for 517 ESS reports finalized between March 1, 2011 and March 30, 2011.

Overt Act No. 3:    On or about April 5, 2011, CC-2 negotiated, or caused to be negotiated, check number 20600, drawn on the DeVida WFB Account and made payable to CC-2 in the amount of $1,034.

Overt Act No. 4:    In or about June 2011, to increase sleep study processing productivity, defendant J. OMIDI approved a $10 commission to co-conspirator S.H. for each altered SSR.

Overt Act No. 5:    On or before July 1, 2011, defendant J. OMIDI approved a payment to co-conspirator S.H. in the amount of $1,310.

Overt Act No. 6:    On or about July 1, 2011, co-conspirator C.K. sent GET THIN's accounting department an email, copying defendant J. OMIDI, seeking payment of co-conspirator S.H.'s invoice

in the amount of $1,310 for 131 SSRs altered or "pre-formatted" between June 16, 2011 to June 30, 2011.

Overt Act No. 7:   On or about July 1, 2011, defendant SCM issued check number 6499, drawn on the SCM WFB Account and made payable to co-conspirator S.H. in the amount of $1,310.

Overt Act No. 8:   On or about July 8, 2011, co-conspirator S.H. negotiated, or caused to be negotiated, check number 6499, drawn on the SCM WFB Account and made payable to co-conspirator S.H. in the amount of $1,310.

Overt Act No. 9:   On or about December 2, 2011, co-conspirator C.K. sent GET THIN's accounting department an email, copying defendant J. OMIDI, seeking payment of co-conspirator S.H.'s invoice in the amount of $1,220 for 122 SSRs altered or "pre-formatted" between November 16, 2011 to November 30, 2011.

Overt Act No. 10:   On or before December 5, 2011, defendant J. OMIDI approved a payment to co-conspirator S.H. in the amount of $1,220.

Overt Act No. 11:   On or about December 5, 2011, defendant SCM issued check number 8388, drawn on the SCM WFB Account and made payable to co-conspirator S.H. in the amount of $1,220.

Overt Act No. 12:   On or about December 7, 2011, co-conspirator S.H. negotiated, or caused to be negotiated, check number 8388, drawn on the SCM WFB Account and made payable to co-conspirator S.H. in the amount of $1,220.

Overt Act No. 13:   On or before October 8, 2012, defendant J. OMIDI approved a payment to co-conspirator S.H. in the amount of $430.

Overt Act No. 14:  On or about October 8, 2012, defendant IMS recorded as an accounts payable payment in its accounting records a payment to co-conspirator S.H. in the amount of $430, which was previously recorded in the accounting records as a sleep study item.

Overt Act No. 15:  On or about October 8, 2012, defendant IMS issued check number 10110, drawn on the IMS Chase Account and made payable to co-conspirator S.H. in the amount of $430.

Overt Act No. 16:  On or about October 10, 2012, co-conspirator S.H. negotiated, or caused to be negotiated, check number 10110, drawn on the IMS Chase Account and made payable to co-conspirator S.H. in the amount of $430.

Overt Act No. 17:  On or about October 11, 2012, co-conspirator S.H. sent co-conspirator C.K. his invoice in the amount of $1,290 for 129 SSRs altered or "pre-formatted" during October 1, 2012 and October 15, 2012.

Overt Act No. 18:  On or before October 24, 2012, defendant J. OMIDI approved a payment to co-conspirator S.H. in the amount of $1,290.

Overt Act No. 19:  On or about October 24, 2012, defendant IMS issued check number 10141 drawn on the IMS Chase Account and made payable to co-conspirator S.H.'s wife in the amount of $1,290.

Overt Act No. 20:  On or about October 25, 2012, co-conspirator S.H. negotiated, or caused to be negotiated, check number 10141, drawn on the IMS Chase Account and made payable to co-conspirator S.H.'s wife in the amount of $1,290.

Overt Act No. 21:  On or about October 2, 2015, co-conspirator C.K. sent defendant ZARRABI an email informing defendant ZARRABI that a $2,000 payment would be issued to defendant ZARRABI on

33

account of 125 sleep studies submitted in 2014 with defendant ZARRABI's signature.

Overt Act No. 22: On or before October 9, 2015, defendant J. OMIDI approved a payment to defendant ZARRABI in the amount of $2,000.

Overt Act No. 23: On or about October 9, 2015, at defendant J. OMIDI's instruction, Royalty issued check number 1003 drawn on the Royalty Hanmi Account and made payable to defendant ZARRABI's medical corporation in the amount of $2,000.

Overt Act No. 24: On or about October 23, 2015, defendant ZARRABI negotiated, or caused to be negotiated, check number 1003, drawn on the Royalty Hanmi Account and made payable to defendant ZARRABI in the amount of $2,000.

Overt Act No. 25: In or around November 2015, co-conspirator C.K. and defendant ZARRABI discussed GET THIN's practice of regularly falsifying SSRs.

Overt Act No. 26: In or around November 2015, defendant ZARRABI, after discussing SSR falsifications with co-conspirator C.K., demanded payment for all SSRs submitted to insurance companies by Get Thin with defendant ZARRABI's signature.

Overt Act No. 27: On or before December 1, 2015, co-conspirator C.K. sought authorization from defendant J. OMIDI to pay defendant ZARRABI $500 to "transfer clinical responsibility" for the SSRs submitted in 2015.

Overt Act No. 28: On or before December 1, 2015, defendant J. OMIDI approved a payment to defendant ZARRABI in the amount of $500.

Overt Act No. 29: On or about December 18, 2015, defendant ZARRABI negotiated, or caused to be negotiated, check number 1006,

drawn on the Royalty Hanmi Account and made payable to defendant ZARRABI's medical corporation in the amount of $500, with a memo line stating "medical services sleep study."

COUNTS THIRTY-SIX AND THIRTY-SEVEN

[18 U.S.C. §§ 1956(a)(1)(A)(i), 2]

[Defendants J. OMIDI and IMS]

56. The Grand Jury hereby repeats and realleges paragraphs 1 through 42, 51 through 52, and 54 through 55 of this First Superseding Indictment as though fully set forth herein.

57. On or about the following dates, in Los Angeles County, within the Central District of California, and elsewhere, defendants J. OMIDI and IMS, together with others known and unknown to the Grand Jury, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, conducted, attempted to conduct, aided and abetted the conducting of, and willfully caused others to conduct the following financial transactions affecting interstate and foreign commerce, which transactions, in fact, involved the proceeds of specified unlawful activity, namely, mail fraud and wire fraud, in violation of Title 18, United States Code, Sections 1341 and 1343, knowing that each of the transactions was designed in whole or in part to promote the carrying on of a specified unlawful activity, namely, false statements regarding health care matters, in violation of Title 18,

//

//

United States Code, Section 1035:

| COUNT | DEFENDANTS | DATE | FINANCIAL TRANSACTION |
|---|---|---|---|
| THIRTY-SIX | J. OMIDI IMS | 10/24/2012 | Issuance of check number 10141 drawn on the IMS Chase Bank Account and made payable to co-conspirator S.H.'s wife in the amount of $1,290 |
| THIRTY-SEVEN | J. OMIDI | 10/9/2015 | Issuance of check number 1003 drawn on the Royalty Hanmi Account and made payable to defendant ZARRABI's medical corporation in the amount of $2,000 |

## FORFEITURE ALLEGATION ONE

### [18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

1. Pursuant to Federal Rule of Criminal Procedure 32.2(a), notice is hereby given that upon conviction of any of the offenses set forth in Counts One through Thirty-One of this First Superseding Indictment, each defendant so convicted shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), the following:

    a. All right, title and interest in any property, real or personal, which constitutes or is derived from proceeds obtained, directly or indirectly, as a result of each such violation, or property traceable to such property; and/or

    b. To the extent such property is not available for forfeiture, a sum of money equal to the total value of property described in paragraph 1(a).

2. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, Section 2461(c), each defendant so convicted shall forfeit substitute property, up to the total value of the property described in paragraph 1 if, by any act or omission of the defendant, the property described in paragraph 1 or any portion thereof, (a) cannot be located upon the exercise of due diligence; (b) has been transferred or sold to, or deposited with, a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION TWO

[18 U.S.C. §§ 982(a)(2)(B) and 1029(c)(1)(C)]

1.    Pursuant to Federal Rule of Criminal Procedure 32.2(a), notice is hereby given that upon conviction of the offense set forth in Count Thirty-Two of this First Superseding Indictment, defendant JULIAN OMIDI, also known as ("aka") "Combiz Omidi," aka "Combiz Julian Omidi," aka "Kambiz Omidi," aka "Kambiz Beniamia Omidi," aka "Ben Omidi ("defendant J. OMIDI"), shall forfeit to the United States of America, pursuant to Title 18, United States Code, Sections 982(a)(2)(B) and 1029(c)(1)(C), the following:

(a)    Any property, real of personal, constituting, or derived from, proceeds obtained directly or indirectly, as the result of such violation;

(b)    Any personal property used or intended to be used to commit the offense; and

(c)    To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraphs (a) and (b).

2.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Sections 982(b)(1), (2) and 1029(c)(2), defendant J. OMIDI, if so convicted, shall forfeit substitute property, if, by any act or omission of the defendant, the property described in subparagraphs 1(a) or (b), or any portion thereof, cannot be located upon the exercise of due diligence; has been transferred, sold to, or deposited with a third party; has been placed beyond the jurisdiction of the court; has been substantially diminished in value; or has been commingled with other property that cannot be divided without difficulty.

39

FORFEITURE ALLEGATION THREE

[18 U.S.C. § 982(a)(7)]

1.   Pursuant to Federal Rule of Criminal Procedure 32.2(a), notice is hereby given that upon conviction of either or both of the offenses set forth in Counts Thirty-Three and Thirty-Four of this First Superseding Indictment, each defendant so convicted shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(7) and (b)(1), the following:

(a)   Any property, real of personal, constituting or derived, directly or indirectly, from the gross proceeds traceable to any such offense; and

(b)   To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

2.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), each defendant so convicted shall forfeit substitute property, if, by any act or omission of the defendant, the property described in subparagraphs 1(a) or (b), or any portion thereof, cannot be located upon the exercise of due diligence; has been transferred, sold to, or deposited with a third party; has been placed beyond the jurisdiction of the court; has been substantially diminished in value; or has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION FOUR

[18 U.S.C. § 982(a)(1)]

1.   Pursuant to Federal Rule of Criminal Procedure 32.2(a), notice is hereby given that upon conviction of any offense set forth in Counts Thirty-Five through Thirty-Seven, each defendant so convicted shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(1), the following:

     a.   All right, title and interest in any property, real or personal, involved in or traceable to such offense; and

     b.   To the extent such property is not available for forfeiture, a sum of money equal to the total amount of property described in paragraph 1(a).

2.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), each defendant so convicted shall forfeit substitute property, up to the total value of the property described in paragraph 1 if, by any act or omission of the defendant, the property described in paragraph 1 or any portion thereof, (a) cannot be located upon the exercise of due diligence; (b) has been transferred or sold to, or deposited with, a third party; (c) has been placed beyond the jurisdiction of

//

//

the court; (d) has been substantially diminished in value; or (e) has
been commingled with other property that cannot be divided without
difficulty.

A TRUE BILL

/s/
_____
Foreperson

SANDRA R. BROWN
Attorney for the United States,
Acting Under Authority Conferred
by 28 U.S.C. § 515

LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division

GEORGE S. CARDONA
Assistant United States Attorney
Chief, Major Frauds Section

KRISTEN A. WILLIAMS
Assistant United States Attorney
Deputy Chief, Major Frauds
Section

CATHY J. OSTILLER
Assistant United States Attorney
Major Frauds Section