Michael S. Schachter** (NY 3910205)
Randall W. Jackson** (NY 5274048)
Casey E. Donnelly** (NY4936803)
**WILLKIE FARR & GALLAGHER LLP**
787 Seventh Avenue
New York, New York 10019
Tel: (212) 728-8102; Fax: (728) 728-8111
Email: *mschachter@willkie.com*

 *Attorneys for Defendant*,
 Julian Omidi

[Additional Counsel Continued On Next Page]

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR 17-00661(A)-DMG |
| Plaintiff, | [*Assigned to Hon. Dolly M. Gee, District Court Judge*] |
| *vs.* | |
| JULIAN OMIDI, INDEPENDENT MEDICAL SERVICES INC., a professional corporation, SURGERY CENTER MANAGEMENT, LLC, and MIRALI ZARABI, M.D., | **NOTICE OF MOTION TO DISMISS FOR IMPROPER RESTRAINT OF FUNDS FOR DEFENSE AND DENIAL OF THE RIGHT TO COUNSEL OF CHOICE; REQUEST FOR RELEASE OF INNOCENT SEIZED FUNDS FOR DEFENSE, AND TO ENJOIN THE GOVERNMENT FROM RESTRAINT OF AND INTERFERENCE WITH THE FUNDS; REQUEST FOR HEARING AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION.** |
| Defendants. | |
| . | Hearing:  May 26, 2021 at 2 P.M. |
| | Dept.:  Courtroom 8C |
| | Location:  350 West 1st Street, 8th Floor |
| | Los Angeles, CA 90012 |

1
2
[Additional Counsel Continued From Previous Page]
3
4
Simona Agnolucci (SBN 246943)
**WILLKIE FARR & GALLAGHER LLP**
One Front Street
5
San Francisco, CA 94111
6
Tel: (415) 858-7447, Fax: (415) 858-7599
Email: *sagnolucci@willkie.com*
7
8
Bruce H. Searby* (SBN 183267)
Edmund W. Searby** (OH 067455)
9
**SEARBYLLP**
1627 Connecticut Ave, NW, Suite 4
10
Washington, D.C. 20009
Tel: (202) 750-6106, Fax: (202) 849-2122
11
Email: *bsearby@searby.law*
12
*Appearing specially  ** Appearing pro hac vice*
13
*Counsel for Defendant Julian Omidi*
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TO THE CLERK OF THE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD HEREIN:**

**PLEASE TAKE NOTICE** that, on May 26, 2021 at 2 P.M., or, as soon as this matter may be heard in Courtroom 8C, of this Court, located at 350 West 1st Street, 8th Floor, Los Angeles, California, 90012, Defendant Julian Omidi ("Defendant"), by and through his counsel of record, will move and does hereby move this Court for an order to dismiss the Indictment, based on the Government's improper restraint of funds and the denial of Mr. Omidi's Sixth Amendment right to counsel of choice.  Mr. Omidi also requests that the Court enjoin the Government from restraint and interference with the seized funds.  On April 15, 2021, Mr. Omidi filed a version of this Motion, *see* Dkt. 1026, which the Court denied, without prejudice to re-filing, so that the parties could meet and confer on the relief sought.  (Dkt. 1029.)  On the afternoon of April 21, 2021 and the morning of April 22, 2021, counsel for Mr. Omidi met and conferred with counsel for the Government, but the parties were unable to agree on a resolution of the issues raised herein.

This Motion is based on the grounds that the Government improperly seized innocent funds in its June 2014 seizure, and also continued to improperly restrain funds, even after the statute of limitations for civil forfeiture had expired, which deprived Mr. Omidi of his right to use those funds to retain counsel of choice.  Dismissal of the Indictment is required because it is impossible to remove the taint of the years-long constitutional violation and restore Mr. Omidi to the position he would have been, absent the Government's wrongdoing.

This Motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities in support of this Motion, the accompanying Declaration of Casey E. Donnelly and attached exhibits, the Declaration of Carl Knudson and attached exhibits, including the Declaration of Araminta Salazar, all matters which the Court may judicially notice, the documents and pleadings previously filed with this

Court, and upon such oral and documentary evidence that Mr. Omidi may present at the hearing of this Motion.

      Dated:  April 22, 2021        Respectfully submitted,

                            **WILLKIE FARR & GALLAGHER LLP**

                          By: s/ Michael S. Schachter

                              MICHAEL S. SCHACHTER
                              RANDALL W. JACKSON
                              CASEY E. DONNELLY
                              SIMONA AGNOLUCCI

                              ATTORNEYS FOR DEFENDANT
                              JULIAN OMIDI

# TABLE OF CONTENTS

**Page(s)**

I.      INTRODUCTION ................................................................................... 1

II.     STATEMENT OF FACTS ...................................................................... 3

    A.      In 2014, the Government Seized Omidi Assets That Should Have Been Available to Retain Counsel of Choice and Unlawfully Restrained Those Assets for More than Six Years. ............................................... 3

        1.      The Government Knowingly Seized At Least $27 Million in Innocent Assets. ............................................................................ 3

        2.      In 2015, the Government Released $2.25 Million In Innocent Assets In Order To Defray Its Own Investigative Expenses, But Refused to Release Additional Innocent Funds for Mr. Omidi's Attorneys' Fees. .................................................................... 5

        3.      In 2017, the Applicable Statute of Limitations Ran Out And the Government Should Have Returned All of the Seized Assets to the Omidis. ...................................................................... 5

    B.      The Government's Unlawful Restraint of Innocent Assets Left Mr. Omidi Unable to Hire Counsel with the Experience and Resources to Defend This Complex Case. ........................................................... 7

ARGUMENT ............................................................................................... 11

III.    THE SEIZURE OF INNOCENT ASSETS VIOLATED MR. OMIDI'S SIXTH AMENDMENT RIGHT TO COUNSEL OF CHOICE. ........................... 11

    A.      The Government's Seizure and Continued Retention of Untainted Assets That Could Have Been Used By Mr. Omidi to Hire Counsel of His Choice Violated the Sixth Amendment. ................................. 12

        1.      Section 981(a)(1)(C) Provides No Justification For Seizing All $110 Million From the Omidi Accounts. ......................................... 12

        2.      The Government's Argument That Innocent Assets Can Be Seized If Commingled With Tainted Assets Has No Application to This Case and Does Not Justify a Six-Year Restraint On Tens Of Millions of Dollars of Innocent Assets. ......................................... 14

    B.      The Government Was Required to Return the Seized Assets No Later Than 2017 When the Statute of Limitations Expired. .......................... 17

IV.   THE PRETRIAL RESTRAINT OF INNOCENT ASSETS IS
      STRUCTURAL ERROR AND THE CONSTITUTIONAL VIOLATION IS
      COMPLETE, AND DISMISSMAL OF THE INDICTMENT IS THE ONLY
      REMEDY TO NEUTRALIZE THE TAINT UNDER THE SIXTH
      AMENDMENT. ........................................................................................... 18

      A.   The Indictment Must Be Dismissed to Remedy the Six-Year
           Deprivation of Mr. Omidi's Sixth Amendment Right to Autonomy............ 20

      B.   Alternatively, the Indictment Must Be Dismissed Because the
           "Effects" of the Government's Interference with Mr. Omidi's Right to
           Counsel of Choice Cannot Be Measured. ...................................................... 22

           1.   The Impact of the Constitutional Violation Due to the Improper
                Post-Indictment Restraint of Assets Cannot Be Remedied. ............... 22

           2.   The Impact of the Constitutional Violation Due to the Improper
                Pre-Indictment Restraint of Assets Cannot Be Remedied. ................. 26

      C.   Alternatively, the Indictment Must Be Dismissed Because Mr. Omidi's
           Substantial Rights Have Been Violated and The Fairness of the
           Criminal Proceeding as a Whole Has Been Undermined. ........................... 28

           1.   The Denial of the Right to Counsel of Choice Has Resulted in
                Structural Fundamental Unfairness, Necessitating Dismissal. ........... 28

           2.   Under Ninth Circuit Precedent, the Structural Error Here
                Undermines the Fairness of the Criminal Proceeding as a
                Whole, and Require the Indictment to be Dismissed. ....................... 29

           3.   The Indictment Should Be Dismissed to Deter this Type of
                Intentional Misconduct. ................................................................... 29

      D.   Alternatively, the Indictment Must be Dismissed Under the Fifth
           Amendment. .................................................................................................. 30

      E.   Alternatively, the Indictment Must be Dismissed Under the Court's
           Supervisory Powers. ...................................................................................... 31

V.    NO REMEDY LESS THAN DISMISSAL RESOLVES THE TAINT. ................. 32

VI.   THE COURT SHOULD ALSO ORDER FULL UNCONDITIONAL
      RELEASE OF THE SEIZED FUNDS FOR ATTORNEYS FEES. ...................... 32

VII.  CONCLUSION. ................................................................................................... 34

# TABLE OF AUTHORITIES

**Cases**

*Barker v. Wingo,*
    407 U.S. 514 (1972)........................................................................................26

*Caplin & Drysdale, Chartered v. United States,*
    491 U.S. 617 (1989)........................................................................................11

*Chapman v. California,*
    386 U.S. 18 (1967)..........................................................................................28

*County of Sacramento v. Lewis,*
    523 U.S. 833 (1998)........................................................................................31

*Doggett v. United States,*
    505 U.S. 647 (1992)........................................................................................24

*Faretta v. California,*
    422 U.S. 806 (1975)........................................................................................21

*Gannett Co. v. DePasquale,*
    443 U.S. 368 (1979)........................................................................................20

*Gideon v. Wainwright,*
    372 U.S. 335 (1963)........................................................................................28

*Glasser v. United States,*
    315 U.S. 60 (1942)..........................................................................................27

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,*
    527 U.S. 308 (1999)........................................................................................29

*Herring v. New York,*
    422 U.S. 853 (1987)........................................................................................20

*In re Forfeiture Hearing As to Caplin & Drysdale, Chartered,*
    837 F.2d 637 (4th Cir. 1988) .........................................................................21

*Johnson v. Uribe,*
    700 F.3d 413 (9th Cir. 2012) ...............................................................3, 20, 21

*Kaley v. United States,*
    571 U.S. 320 (2014).................................................................................16, 18

*Koontz v. St. Johns River Water Mgmt. Dist.,*
    570 U.S. 595 (2013)........................................................................................34

*Krogmann v. State*,
 914 N.W. 2d 293 (IA 2018) ............................................................. 21

*Lafler v. Cooper*,
 566 U.S. 156 (2012) ........................................................................ 23

*Lainfiesta v. Artuz*,
 253 F. 3d 151 (2d Cir. 2001) .......................................................... 20

*Luis v. United States*,
 136 S. Ct. 1083 (2016) ............................................................. passim

*Maine v. Moulton*,
 474 U.S. 159 (1985) ........................................................................ 23

*Massiah v. United States*,
 377 U.S. 201 (1964) ........................................................................ 23

*McCoy v. Louisiana*,
 138 S. Ct. 1500 (2018) .................................................................... 21

*McNeely v. Blanas*,
 336 F.3d 822 (9th Cir. 2003) .................................................... 24, 25

*Morris v. Slappy*,
 461 U.S. 1 (1983) ............................................................................ 21

*United States ex rel. Ferenc v. Brierley*,
 320 F.Supp. 406 (E.D.Pa.1970) ..................................................... 21

*United States v. $448,342.85*,
 969 F.2d 474 (7th Cir. 1992) ......................................................... 14

*United States v. $8,221,877.16 in U.S. Currency*,
 330 F.3d 141 (3d Cir. 2003) .......................................................... 15

*United States v. Bissell*,
 866 F.2d 1343 (11th Cir. 1989) ..................................................... 16

*United States v. Bornfield*,
 145 F. 3d 1123 (10th Cir. 1998) .................................................... 14

*United States v. Brown*,
 785 F.3d 1337 (9th Cir. 2015) ....................................................... 19

*United States v. Bundy*,
 968 F.3d 1019 (9th Cir. 2020) ....................................................... 32

*United States v. Chapman,*
  524 F.3d 1073 (9th Cir.2008 ............................................................... 31

*United States v. Contents in Account No. 059-644190-69,*
  253 F. Supp. 2d 789 (D. Vt. 2003) .................................................... 15

*United States v. Davila,*
  569 U.S. 597 (2013) ........................................................................... 19

*United States v. Engel,*
  968 F.3d 1046 (9th Cir. 2020) ..................................................... 21, 22

*United States v. Fitzen,*
  80 F.3d 387 (9th Cir. 1996) ............................................................... 18

*United States v. Gonzalez-Lopez,*
  548 U.S. 140 (2006) .................................................................... passim

*United States v. Gregory,*
  322 F.3d 1157 (9th Cir. 2003) ........................................................... 24

*United States v. Haynes,*
  216 F. 3d 789 (9th Cir. 2000) ............................................................ 30

*United States v. Marion,*
  404 U.S. 307 (1971) ..................................................................... 25, 30

*United States v. Marolf,*
  173 F.3d 1213 (9th Cir. 1999) ........................................................... 18

*United States v. Monsanto,*
  491 U.S. 600 (1989) ........................................................................... 18

*United States v. P.H.E., Inc.,*
  965 F.2d 848 (10th Cir. 1992) ........................................................... 28

*United States v. Puche,*
  350 F. 3d 1137 (11th Cir. 2003) ........................................................ 14

*United States v. Renzi,*
  722 F. Supp. 2d 1100 (D. Ariz. 2010) ............................................... 31

*United States v. Rivera-Corona,*
  618 F. 3d 976 (9th Cir. 2010) ............................................................ 19

*United States v. Ross,*
  372 F.3d 1097 (9th Cir. 2004) ........................................................... 31

*United States v. Stein*,
    435 F. Supp. 2d 330 (S.D.N.Y. 2006) ......................................... 27, 32

*United States v. Stein*,
    495 F. Supp. 2d 390 (S.D.N.Y. 2007) ............................................. 31

*United States v. Unimex, Inc.*,
    991 F.2d 546 (9th Cir. 1993) ......................................................... 34

*United States v. Valentine*,
    783 F.2d 1413 (9th Cir. 1986) ....................................................... 24

*United States v. Yamashiro*,
    788 F.3d 1231 (9th Cir. 2015) ....................................................... 29

*Weaver v. Massachusetts*,
    137 S. Ct. 1899 (2017) ....................................... 19, 20, 22, 28

## Statutes

18 U.S.C. § 3006A ............................................................................... 2

18 U.S.C. § 981 ................................................................................. 15

18 U.S.C. § 981(a)(1)(C) .................................................................. 12

19 U.S.C. § 1621 ......................................................................... 17, 18

*United States v. James Daniel Good Prop. Titled in Name of James Daniel
    Good*,
    971 F.2d 1376 (9th Cir. 1992) ....................................................... 17

## Other Authorities

*1 Criminal Practice Institute: Criminal Practice Manual* ................................ 25

18 U.S.C. § 983 legislative history 146 Cong. Rec. H2051 (daily ed. Apr. 11,
    2000) ............................................................................................. 14

ABA, *Criminal Justice Section Standards: Defense Section* ........................... 25

U.S. Dep't of Just., Justice Manual, 9-120.116 ..................................... 13

## I.    INTRODUCTION

The Sixth Amendment guarantees a defendant who is paying for his own defense to retain any qualified counsel of his choosing and the Government may not interfere with that retention.  If the Government *does* interfere with that retention, by seizing and restraining a defendant's innocent assets—thereby preventing him from hiring his preferred attorney for lack of funds—the Supreme Court has confirmed that such conduct constitutes a violation of the "root" constitutional guarantee to counsel in criminal cases. *Luis v. United States*, 136 S. Ct. 1083, 1097, 1089 (2016) ("The pretrial seizure of legitimate, untainted assets needed to retain counsel of choice violates the Sixth Amendment.").  The constitutional violation is "complete" at the point the defendant is denied access to "innocent assets" to retain counsel of choice and no inquiry is made as to whether the defendant suffered actual prejudice. *Id*. at 1093.  This constitutional violation can be remedied only by placing the defendant back in the position in which he would have been had his constitutional rights not been violated, which is often impossible, and thus requires the complete dismissal of the charges.  This case presents an extreme example of the Government violating Mr. Omidi's fundamental constitutional guarantees by its indiscriminate pretrial seizure of assets.  The only adequate remedy is the dismissal of the Indictment.

In 2014, the Government seized more than $110 million in assets, notwithstanding its own allegation in the Superseding Indictment that insurers paid only $38 million on fraudulent insurance claims.  Included in this seizure was *at least* $27 million that clearly fell outside the scope of allegedly tainted assets, since these monies were earned *prior* to any alleged wrongdoing or, in other cases, originated from sources that plainly demonstrated their detachment from any alleged crime.  For example, the Government seized $3 million in reimbursement funds sent by a property insurer to repay the Omidis for repairs made in connection with a water pipe break, as well as funds generated in connection with medical services that have never been alleged to be anything but legitimate, such as dermatology and podiatry services.  Although the law permits only the

seizure of allegedly tainted funds—here, the proceeds of the bariatric surgery insurance fraud alleged in the Indictment—the Government grabbed, without restraint, every penny it could find.

This lawless money grab of innocent assets violated Mr. Omidi's Sixth Amendment right to hire counsel of choice, as well as his Fifth Amendment right to mount a defense without Governmental interference. The Government held on to the innocent assets for years, thus *ensuring* that Mr. Omidi was left without adequate funds to hire his counsel of choice, that is, attorneys with experience litigating complex federal criminal cases. In addition, the Government's ability to lawfully restrain the seized assets expired with the running of the applicable statute of limitations—which occurred no later than 2017—and thus, from that moment forward, the Government was acting unlawfully when it continued to restrain assets that Mr. Omidi needed in order to fund his defense. As a result of the Government's overreach, Mr. Omidi could not afford to hire counsel of choice, which, for years, crippled his ability to develop a defense to the Government's charges. Mr. Omidi was prevented from conducting the necessary pre-Indictment investigation and defense, and even post-Indictment, was forced at first, to proceed with underfunded counsel, who lacked the necessary subject matter expertise. He, later, was made to accept court-appointed counsel, who repeatedly admitted that the demands of this case were beyond the capacities of his small practice.

The Government also thwarted Mr. Omidi's efforts to prove that the Government was unlawfully restraining innocent assets, by withholding discovery that would show that the assets seized could not be traced to the alleged unlawful activity. Only at the discovery deadline in May of 2020 did the Government produce in discovery evidence demonstrating that at least $27 million in funds seized could not be traced to the alleged scheme to defraud.

With the tracing evidence finally disclosed, the Government, in the fall of 2020, agreed on unfair terms for the release of $10 million in innocent assets for Mr. Omidi's defense. This step, however, was "too little, too late." By this point, the unlawful seizure

and retention of innocent assets had denied Mr. Omidi his constitutional right to hire counsel of choice, for more than six years, including three years post-Indictment. The opportunities that were missed by virtue of not having counsel of choice are numerous: relevant fact witnesses were not contacted and interviewed by defense counsel when their memories were fresh; evidence was lost; legal issues were presented in ways that more experienced counsel would have approached differently; and the voluminous discovery was left fundamentally unreviewed for years, for lack of funds and a competent electronic review platform. The consequence of this protracted denial of Mr. Omidi's right to counsel of choice is, as the Supreme Court has recognized, necessarily an "unquantifiable" and "indeterminate" structural error, such that this Court does not "even ask whether the error harmed the defendant." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 147-48 (2006).

Dismissal of the Indictment is required because it is impossible to remove the taint of the years-long constitutional violation and restore Mr. Omidi to the position he would have been, absent the Government's wrongdoing. *Johnson v. Uribe*, 700 F.3d 413, 425 (9th Cir. 2012). Mr. Omidi respectfully requests a hearing on this Motion.

## II.   STATEMENT OF FACTS

### A.   In 2014, the Government Seized Omidi Assets That Should Have Been Available to Retain Counsel of Choice and Unlawfully Restrained Those Assets for More than Six Years.

In June 2014, in the midst of the investigation that ultimately led to the criminal charges in this case, the Government executed warrants to Deutsche Bank and Bank of America, seizing approximately $109,789,422, despite knowing, for at least three reasons, that the accounts held demonstrably innocent assets—*i.e.*, assets that had been lawfully obtained and used.

#### 1.   The Government Knowingly Seized At Least $27 Million in Innocent Assets.

First, the Government seized more than $23 million in assets earned *prior* to the alleged scheme to defraud, which the Government contends was first commenced in 2008.

*See* S. Indictment (Dkt. 12) at ¶17.  Specifically, records produced in discovery demonstrate that the Government seized millions in funds traceable to an account held by Mr. Omidi at Bank of America and which contained $23.86 million as of year-end 2007, *before* any purported criminal activity is even alleged to have begun.  *See* Ex. 1 (Declaration of Carl R. Knudson, ¶¶ 4, 15 (describing $23,854,476.97, as of December 31, 2007, in BOA Account No. 11542-01352).  In February of 2008, these funds were deposited into a Wells Fargo account, held in the name of Mr. Omidi and other family members.  (*See id*. at ¶ 32 ; *see also* Ex. 1 to Knudson Declaration at WARRANTS_ WARRANTS_00002206 ("Timeline Analysis" prepared by Government in connection with 2014 asset seizure application, explaining that "source" of the monies deposited from the BOA account remained "to be determined" in June 2014).

Second, the Government seized funds traceable to $3 million in insurance proceeds paid by State Farm Insurance on a claim arising from a broken water pipe in a commercial property.  (*See* Knudson Decl. at ¶ 32; *see also* Ex. 1 to Knudson Declaration at WARRANTS_00002211.).  In various filings, the Government acknowledged that this $3 million in funds originated from innocent sources.  *See* Ex. 2 (Excerpt from Affidavit of Z. Pettigrew in Support of Government Application for Seizure Warrant) at ¶ 55(f)(i) ("this payment does not represent proceeds of the fraud scheme…").  Nevertheless, the Government seized and retained these funds for years anyway.

Third, an additional $32 million traces to procedures other than lap-band surgery and sleep studies, such as dermatology, plastic surgery, gynecology, general surgery, and podiatry procedures, which were legitimately earned from 2008 to July 31, 2012 and which are not part of the alleged fraud.  *See* Ex. 6 and Ex. 6A to Knudson Declaration. This fact was also well known to, and acknowledged by, the Government in various filings.  *See* Dkt. 516 (Gov't Opp. to Omidi Motion for Return of Property) at 22 ("the [G]overnment[] acknowledge[d] in both the [seizure warrant] affidavit and the Forfeiture Complaint that some portion of the defendant funds and securities *are not directly*

*traceable to the underlying fraud scheme*") (emphasis added).[1]   Indeed, during the April 21-22, 2021 meet and confer conferences between counsel and the Government, the Government *acknowledged* that a substantial amount of the seized assets—between $23 and $27 million—did *not* constitute proceeds of the fraud scheme alleged in the Indictment, but were seized purely on the basis of the Government's (legally invalid) "commingling" theory of money laundering, which as described below, *see infra* at 15-16, has been refuted by multiple courts.

### 2. In 2015, the Government Released $2.25 Million In Innocent Assets In Order To Defray Its Own Investigative Expenses, But Refused to Release Additional Innocent Funds for Mr. Omidi's Attorneys' Fees.

Actions taken by the Government in 2015 further demonstrate the Government's knowledge that it unlawfully held innocent assets.  In 2015, the Government unilaterally released $2.25 million to fund a privilege review by its designated Special Master Stroz Friedberg and to fund a discovery referee, to review materials seized in the execution of search warrants.  Moreover, in 2015, during discussions of a potential settlement, the Government told defense counsel that at least $20 million in seized funds had been determined not to be tainted.

Yet, when the Omidis, in 2015, asked the Government to release additional innocent funds so that retained counsel could be paid and additional experienced counsel hired to conduct a pre-indictment investigation and privilege review, the Government refused to release any monies.  *See* Ex. 3 (Sept. 21, 2015 Gov't Opposition to PCI's Motion for Inquiry, Case No. 15-cm-1030, at 8, lines 15-23); Ex. 4 (December 16, 2015 Letter to Gov't, at 13-14).

### 3. In 2017, the Applicable Statute of Limitations Ran Out And the Government Should Have Returned All of the Seized Assets to the Omidis.

As described more fully below, *see infra* at 17-18, even if the Government had a

---

[1] The interest amount on the funds earned prior to the alleged scheme to defraud and on the insurance proceeds is calculated to exceed $500,000.  (*See* Knudson Declaration, ¶ 4(c).)

lawful basis to seize every last dollar of the $110 million—which it did not—its right to retain those assets expired with the passing of the statute of limitations, which gives the Government no longer than five years to file an asset forfeiture action after discovery of the alleged wrongdoing.

On May 8, 2018, the Government filed the Civil Forfeiture Complaint.  (No. CV 18-3855-DMG; Dkt. 1 (the "Civil Forfeiture Complaint").)  But, by the time the Forfeiture Complaint was filed, the Government had known for well over five years about the alleged offenses giving rise to its claim that the seized funds were traceable to the proceeds of fraud.  *See* Ex. 5 (Declaration of Casey E. Donnelly at ¶¶ 7-56 (describing documents demonstrating Government's knowledge).  As far back as October 2010, the Department of Defense Inspector General ("DOD OIG") received a fraud referral from Tricare, a federal health insurance program, regarding surgery centers owned by the Omidis.  (Ex. 1 to Donnelly Decl., at 1.)  The referral alleged that Mr. Omidi was "billing for medically unnecessary services, billing for services not rendered, misrepresenting services, and submitting falsified or altered medical claims."  *Id.*  The Tricare referral specifically alleged that the surgery centers were "billing patients for sleep apnea, while the studies show normal results."  *Id.*  On October 22, 2010, the DOD OIG concluded that "sufficient information was received from Tricare to warrant the initiation of an investigation."  (Ex. 2 to Donnelly Decl., at 1.)  The investigation was conducted jointly with the FBI.  *Id.*

Throughout 2011, the Government interviewed patients who received treatment at facilities connected to the Omidis, doctors who worked with the Omidis, and employees of the Omidis.  (Ex. 15 to Donnelly Decl., at 2.)  One employee, an anesthesiologist named Scott Bickman, told investigators that he did not believe that every patient that the surgery centers deemed qualified to have lap-band surgery was actually qualified.  (Ex. 14 to Donnelly Decl., at 3-4.)

By January 2012, the Office of the U.S. Attorney for the Central District of California ("USAO") had joined the investigation, as had the Food and Drug

Administration ("FDA").  *Id.*  Throughout 2012, the USAO and the other investigating agencies conducted interviews with former employees of the various Omidi business entities/medical facilities.  *Id.*  On May 5, 2012, the Government interviewed a former employee named Brianne Miley, who told the Government of allegedly fraudulent sleep studies.  (Ex. 16 to Donnelly Decl., at 3-4.)  She said that according to the sleep study reports "almost all" patients had sleep apnea, but she did not believe they all in fact suffered from the malady.  *Id.*  She instead estimated that only "70% of the patients had some sort of apnea episode," while "95% of the reports showed patients had sleep apnea." (*Id.* at 4.)

In December 2012, the Government interviewed certain patients of 1-800-Get-Thin who underwent lap-band procedures.  (Ex. 15 to Donnelly Decl., at 4.)  In these interviews the patients claimed that they never received certain treatments for which their insurers were billed by 1-800-Get-Thin.  (*Id.*)  Indeed, the Government itself expressed its view in these interviews that incorrect information was provided by 1-800-Get-Thin to the insurers in authorization requests for lap-band procedures that these patients did in fact receive. (*Id.*)

In sum, by no later than the end of 2017, the Government had known about the allegedly fraudulent conduct associated with the seized funds for over five years.  Because the applicable statute of limitations had run, the Government should have returned the funds to the Omidis no later than 2017.

### B. The Government's Unlawful Restraint of Innocent Assets Left Mr. Omidi Unable to Hire Counsel with the Experience and Resources to Defend This Complex Case.

As a result of the unlawful seizure and retention of innocent assets, Mr. Omidi was left without sufficient funds to retain counsel of choice.  By 2015, the retainers paid for experienced criminal defense attorneys representing Mr. Omidi and Get Thin were all but exhausted.  Had the funds from the seized Bank of America and Duetsche Bank accounts been available, Mr. Omidi would have been able to access those monies to fund his defense.  *See* Ex. 14 (Declaration of Trustees, dated May 24, 2019, confirming that the

funds seized from accounts held by the Omidi family trusts would be made available to Mr. Omidi to fund his defense); Ex. 15 (Declaration of Cindy Omidi, dated May 23, 2019, confirming that funds seized from accounts held by Property Care Insurance, Inc. would have been made available to Mr. Omidi to fund his defense.)

Unable to retain counsel of choice to represent him with regards to the complex ongoing federal criminal investigation, Mr. Omidi had to instead retain solo practitioners, who demanded materially lower advanced retainers and rates.  By February 28, 2018, when the Government unsealed the Superseding Indictment, charging him with thirty-seven criminal counts, Mr. Omidi still lacked the funds necessary to retain counsel of choice, that is, specialized white collar criminal defense attorneys with the experience and resources to defend this complicated and document-intensive federal mail, wire, and healthcare fraud and money-laundering prosecution.

Instead, with help from family and friends, Mr. Omidi retained two solo-practitioners:  Kamile Dean and Roger Diamond.  Ms. Dean represents her practice to be a general felony and misdemeanor street crime practice, including DUI, drug possession, disorderly conduct, and other common-law crimes that bear little resemblance to the federal charges against Mr. Omidi.  (*See* www.kamilledean.com.)  Roger Diamond is perhaps best known for his litigation on behalf of adult businesses.  (*See* latimes.com, *A Hard-Core Fighter for Adult Businesses*, Dec. 1, 1997).  They lacked the resources even to review the full terabytes of data or millions of pages of discovery produced on a rolling basis.  Without a document management platform, Ms. Dean and Mr. Diamond asked the Government to produce the discovery in pdf format so that they could review a mountain of documents page by page.  A page by page manual review of discovery might be feasible in certain criminal cases, but any seasoned defense lawyer with experience litigating complex federal fraud cases would have known that such an approach is entirely impractical in cases involving millions of page of material.

On March 7, 2018, Ms. Dean wrote to the Government, explaining Mr. Omidi's (and SCM's) belief that innocent assets had been improperly seized.  (Ex. 6 (March 7,

2018 Ltr. from K. Dean to Govn't)).  She pointed out that the Superseding Indictment alleged only $38 million in fraudulent claims, *see* S. Ind. at ¶ 39, and stressed that Mr. Omidi needed the improperly seized funds in order to retain his counsel of choice.  Citing the prohibition in *Luis* on the restraint of innocent assets required to retain counsel of choice, Ms. Dean further requested that the Government produce "any and all information" in the Government's possession that could demonstrate that the seized "funds were tainted or untainted," and specifically asked for the factual affidavits submitted in support of the issuance of the seizure warrants, to permit tracing.  *Id.*

The Government responded that it "would not comply" with Ms. Dean's requests at that time or "on any other specific, future date."  (Ex. 7 (March 8, 2018 email from AUSA Welk)).  The Government instead stated, "to the extent that the materials you demanded are required to be produced, either in the criminal case or some other proceedings, the [G]overnment will comply in a timely manner."  *Id.*  Still*, for almost three years, the Government stonewalled on producing this requested information until May of 2020*.  In October of 2018, Ms. Dean and Mr. Diamond were disqualified for conflicts of interest.

Thereafter, again with the assistance of friends and family, Mr. Omidi retained Victor Sherman, who agreed to make an appearance for the limited purpose of seeking the return of seized funds needed to retain counsel of choice.[2]  (Dkt. 469.)  In furtherance of this goal, on April 9, 2019, Mr. Omidi filed a motion for return of property for attorneys' fees.  (Dkt. 472; 476; 481).  At the status conference on April 3, 2019, the Government addressed Mr. Omidi's return of property motion, claiming that it was "substantively

---

[2] By this point in time, Mr. Omidi did not have sufficient assets of his own to afford counsel, and especially not counsel experienced in federal criminal law and had been relying on the generosity of family to fund Ms. Dean, Mr. Diamond and Mr. Sherman.  During the March 17, 2021 Status Conference, the Court asked Mr. Omidi for additional information concerning the home where he resides. Since 2017, Mr. Omidi has lived at 1255 Sierra Alta Way, Los Angeles, CA, along with his mother, Cindy Omidi, who is 73 years old, and who relies on Mr. Omidi to maintain the property and assist her with tasks that she is no longer able to handle herself.  The homes at 1255 and 1235 Sierra Alta Way are owned by limited liability companies, Beverly Hills Estate, LLC, and FJKJ, LLC, respectively, whose sole member is Cindy Omidi, Mr. Omidi's mother.  Mr. Omidi has never had any ownership stake in either of the LLCs or in the homes at 1255 and 1235 Sierra Alta Way.

meritless" and procedurally barred. *See* Ex. 8 (excerpts of transcript of April 3, 2019 status conference, at *9-10, 13, 14). The Government further dismissed Mr. Omidi's request that the Government return the innocent assets so that he could use them to retain counsel of choice, stating: "Defendant Omidi believes that he is entitled to representation that he wishes he could have if he had a certain amount of extra money that he doesn't currently have." (*Id.*) What the Government did *not* acknowledge to this Court was that it possessed, but had not produced, a tracing analysis that proved that untainted assets had, in fact, been seized. Instead, the Government asked the Court to appoint CJA counsel for Mr. Omidi. (*Id.* at 13-14). The Court acceded to the Government's call and Peter Johnson was appointed to represent Mr. Omidi. (Dkt. 485.)

Following his appointment, Mr. Johnson candidly acknowledged his difficulty in effectively representing Mr. Omidi given the scale of the discovery produced in electronic format and the complexity of the issues presented. (*See* Dkt. 703; Dkt. 790). In addition, Mr. Johnson requested the same asset seizure tracing information that Mr. Omidi, through Ms. Dean, had previously sought. (Dkt. 703 at 2, 10-12). The Government *once again ignored this request*, and filed an Opposition (Dkt. 516) to Mr. Omidi's motion for return of property where it asserted that all of the seized funds were tainted and could not be released for Mr. Omidi to exercise his Sixth Amendment right to counsel of choice. *Id.*

In fact, the Government even argued that one reason why Mr. Omidi's return of property motion should be denied was because Mr. Omidi had not traced the seized funds back to their innocent origin. (*See* Dkt. 516 at 21 ("[Mr. Omidi] fails to explain to whom the funds initially were paid, from whom they were received, *how they found their way into the seized accounts, which of the seized accounts they were seized from*") (emphasis added)). Of course, what the Government did not acknowledge in its brief was that it was sitting on the discovery that would permit Mr. Omidi to complete such a tracing analysis. Without access to the tracing discovery necessary to prove that innocent assets had been seized, Mr. Omidi withdrew his motion for return of property for attorneys' fees.

In May of 2020, more than *two years* after Mr. Omidi first requested the tracing

**MOTION TO DISMISS FOR IMPROPER RESTRAINT OF ATTORNEYS' FEES; REQUEST FOR FURTHER RELIEF**

data and on the *last day* of the discovery deadline in this case, the Government finally produced the critical tracing schedules.  This evidence unquestionably demonstrated the Government had improperly seized and retained in excess of $27 million in innocent assets for almost six years.  (*See* Dkt. 703 (June 30, 2020 Status Report of Peter Johnson) at 2 ("the [G]overnment's failure to timely produce critical financial records has resulted in the recent discovery by Mr. Omidi's counsel of approximately $27 million that was inappropriately seized from Mr. Omidi…")); Ex. 1 (Knudson Declaration) at ¶3 (determining that the Government seized at least $27,793,169.53 in "innocent" assets). The Government has never explained why it withheld these tracing schedules for so long. In fact, on April 21, 2021, defense counsel asked the Government when it had first obtained the tracing schedules that were produced in May of 2020 and the Government refused to provide an answer.

In October 2020, after being confronted with the evidence belatedly produced in discovery, the Government finally agreed to release $10 million in innocent assets, but conditioned the release upon a number of requirements, including that Mr. Omidi use a portion of the released funds to reimburse the CJA Fund for the cost of appointed counsel. The Court approved the asset release in an Order dated October 8, 2020.  *See United States v. Approximately $107,539,422.29 in Funds and Securities*, No: 2:18-cv-03855, Dkts. 49-50.  Mr. Omidi finally retained counsel of his choice starting in or about November of 2020.  However, by that point, Mr. Omidi had been denied the right to counsel of choice for almost three years, including a year and a half during which appointed counsel was imposed upon him at the Government's request.

## ARGUMENT

### III.   THE SEIZURE OF INNOCENT ASSETS VIOLATED MR. OMIDI'S SIXTH AMENDMENT RIGHT TO COUNSEL OF CHOICE.

The Sixth Amendment provides a defendant with a constitutional "right to counsel," which itself encompasses two distinct rights:  (i) a right to effective representation; and (ii) a right to "'to secure counsel of his own choice.'"  *Luis*, 136 S. Ct. at 1089 (citation

omitted).  "The right to counsel of choice is regarded as the root meaning of the

constitutional guarantee" of the right to counsel and its denial results in a "structural

error," where "it is unnecessary to conduct an ineffectiveness or prejudice inquiry to

establish a Sixth Amendment violation."  *United States v. Gonzalez-Lopez*, 548 U.S. 140,

147-48 (2006).  Included in this Sixth Amendment guarantee of counsel of choice is the

"right to be represented by an otherwise qualified attorney whom that defendant can afford

to hire." *Caplin & Drysdale, Ctd. v. United States*, 491 U.S. 617, 627 (1989).  Thus,

"pretrial restraint of legitimate, untainted assets needed to retain counsel of choice violates

the Sixth Amendment." *Luis*, 136 S. Ct. at 1088.  When a defendant is wrongly denied the

right to counsel of choice, the constitutional violation is "complete." *Id.*; *see also United

States v. Stein*, 541 F. 3d 130, 156 (2d Cir. 2008) ("the Sixth Amendment protects against

unjustified interference with the right to defend oneself using whatever assets one has or

might reasonably and lawfully obtain.").

### A. The Government's Seizure and Continued Retention of Untainted Assets That Could Have Been Used By Mr. Omidi to Hire Counsel of His Choice Violated the Sixth Amendment.

Here, under a clear application of *Luis*, the Government violated Mr. Omidi's Sixth

Amendment right to use untainted assets for his defense in this criminal case.  At least $27

million in innocent assets were seized that should have been available, from 2014 to the

present, for Mr. Omidi to use to retain counsel of his choice.

### 1. Section 981(a)(1)(C) Provides No Justification For Seizing All $110 Million From the Omidi Accounts.

The Government previously claimed the right to seize all of the funds in the seized

accounts pursuant to 18 U.S.C. § 981(a)(1)(C).  But that provision only entitles the

Government to seize proceeds derived from "specified unlawful activity"—here, the

proceeds of the alleged fraud scheme. *See* 18 U.S.C. § 981(a)(1)(C) ("The following

property is subject to forfeiture to the United States: . . . (C) Any property, real or

personal, which constitutes or is derived from proceeds traceable to . . . any offense

constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or

1   a conspiracy to commit such offense.")  The statute does *not* justify the seizure and

2   forfeiture of legitimately earned funds.

3           Yet, even the Government has conceded that its asset seizure was not limited to

4   funds that it knew to be the proceeds of fraud.  *See* Dkt. 516 (Gov't Opp. to Omidi Motion

5   for Return of Property) at 22 ("the [G]overnment[] acknowledge[d] in both the [search

6   warrant] affidavit and the Forfeiture Complaint that some portion of the defendant funds

7   and securities *are not directly traceable to the underlying fraud scheme*"); *see also*

8   Forfeiture Complaint at ¶ 13 ("While Get Thin was permeated with fraud, as explained

9   herein, some of the monies it collected or manipulated during the course of the scheme

10  *may not* have constituted fraud proceeds.") (emphasis added)).  Thus, even accepting the

11  Government's allegations of fraud as true—which allegations Mr. Omidi denies—the

12  Government, by its *own allowance*, seized assets which cannot be traced to the alleged

13  scheme to defraud.

14          In fact, there is no doubt that a substantial portion of the funds seized by the

15  Government cannot be traced to the alleged fraud.  While the Government should bear the

16  burden of proving that *all* of the assets seized are tainted, Mr. Omidi can prove that the

17  Government seized at least three categories of innocent assets.  First, as described above,

18  *see supra* at 3-4, the Government seized more than $23 million in assets which were

19  earned *prior* to the commencement of the purported scheme to defraud, which is not

20  alleged to have even begun until 2008.  Second, the Government seized funds that it *knew*

21  were traceable to $3 million in insurance proceeds paid by State Farm Insurance on a

22  claim arising from a broken water pipe in a commercial property.  *Supra* at 4.  Third, the

23  Government seized funds that were earned through medical procedures that have never

24  been alleged to be anything but legitimate.  *Id.*  Indeed, the Government confirmed to

25  defense counsel on April 22, 2021, that, by the Government's own estimation, between

26  $23 and $27 million was seized that had no connection to the alleged fraud described in

27  the Indictment.  *See supra* at 5.

28          Furthermore, the fact that the Government belatedly released $10 million in seized

funds (after providing Mr. Omidi with the tracing evidence) is proof positive that these funds should never have been seized.  If these funds *actually* constituted forfeitable assets, the Government was obligated to preserve them for potential future disbursement—*e.g.*, to alleged victims.  *See* U.S. Dep't of Just., Justice Manual, 9-120.116 ("Agreements may be entered into to exempt from forfeiture an asset transferred to any attorney as fees for legal services. . . *only* if. . .there are *reasonable grounds to believe that the particular asset is not subject to forfeiture*…") (emphasis added).  Thus, there can be no dispute that from the day the criminal charges were handed down in this case, the Government was engaged in a violation of Mr. Omidi's Sixth Amendment right to counsel of his choice, through the unlawful restraint of *at least* $10 million in untainted funds that should have been available, from the outset, for Mr. Omidi to retain the experienced criminal defense counsel that a case of this complexity demands.

> ## 2. The Government's Argument That Innocent Assets Can Be Seized If Commingled With Tainted Assets Has No Application to This Case and Does Not Justify a Six-Year Restraint On Tens Of Millions of Dollars of Innocent Assets.

In 2015, the Government admitted to Mr. Omidi and his counsel that at least $20 million of the funds seized in 2014 had been determined not to be tainted, and in April 2021, the Government revised this estimate to an amount between $23 million and $27 million.  (*Supra* at 5.)  Yet, for years, the Government held these millions in innocent assets, which Mr. Omidi needed to fund his defense, while simultaneously withholding critical asset tracing discovery, and actively encouraging this Court to appoint counsel for Mr. Omidi.  The Government's only apparent justification for the continued retention of these innocent funds was its argument that the innocent assets had been "commingled" with funds obtained from the alleged fraud.  *See* Ex. 9 (Excerpt from Affidavit of Z. Pettigrew in Support of Government Application for Seizure Warrant at ¶ 21 ("Moreover, to the extent any of the monies involved in the placement, layering and integration of the fraud proceeds were untainted at the time they were initially received by GET THIN, the commingling of those monies with the tainted funds throughout the laundering process

renders them subject to seizure and forfeiture.").

This seizure theory, which is predicated on an assumption that "the presence of one illegal dollar in an account . . . taint[s] the rest—as if the dollar obtained from fraud were like a drop of ink falling into a glass of water"—has been rejected by the courts time and again. *United States v. $448,342.85*, 969 F.2d 474, 476 (7th Cir. 1992). In fact, the "mere pooling or commingling of tainted and untainted funds in an account does not, without more, render the entire contents of the account subject to forfeiture." *See, e.g.*, *United States v. Bornfield*, 145 F. 3d 1123, 1135 (10th Cir. 1998). The Government must show that the funds were commingled for the purpose of disguising the money laundering scheme. *Id.; accord United States v. Puche*, 350 F. 3d 1137, 1153 (11th Cir. 2003); *see* 18 U.S.C. § 983 legislative history 146 Cong. Rec. H2051 (daily ed. Apr. 11, 2000) (forfeiting commingled, untainted funds requires substantial connection to money-laundering activity).

A commingling theory particularly makes no sense in the context of this case, given that any "proceeds" from the offenses alleged here were easily traceable through a simple accounting of the funds paid by the insurance companies on the claims alleged to be fraudulent. Mr. Omidi could not "disguise" the origin of the funds received in payment on allegedly fraudulent insurance claims by commingling them with innocent assets, because, as Mr. Omidi knew, the insurance companies themselves had a record of exactly what they paid on each claim. As there is a clear financial record tracing the allegedly tainted funds to their sources, this case is different from the prototypical laundering case in which the cash proceeds of drug sales are run through the cash register of a legitimate business to disguise the source of the illegal proceeds. There is no dispute that the insurance companies know how much they paid on each claim and thus "commingling" these funds did not, and could not, "disguise" their origins.

*Luis* makes clear that the constitutional line between lawful restraint and unlawful restraint is drawn between assets that can be directly "traced" to a crime and those that cannot. 136 S. Ct. at 1095; *United States v. $8,221,877.16 in U.S. Currency*, 330 F.3d

141, 158 (3rd Cir. 2003) ("the term 'traceable to' means exactly what it says.").  Invoking talismanically the money laundering statutes does not subject all of the Omidis' assets to seizure unless the Government includes factual allegations sufficient to establish probable cause that the legitimate assets were involved in facilitating a prohibited money laundering transaction.  *United States v. Contents in Account No. 059-644190-69*, 253 F. Supp. 2d 789, 799–800 (D. Vt. 2003) ("If the tracing requirement in § 981 is to be given any effect—as, indeed, it must—then the Government is required to demonstrate something more than the fact of commingling, even across a series of complicated transactions, to establish that legitimate money is forfeitable by virtue of its commingling with tainted funds.").  Here, the Government failed to make such an allegation: neither its seizure warrant application nor the Civil Forfeiture Complaint specifies how commingling with legitimate funds facilitated a prohibited transaction in illicit funds.  *See* Ex. 9 (excerpts from Affidavit of Z. Pettigrew in Support of Government Application for Seizure Warrant); Civil Forfeiture Compl. ¶¶ 12(k), 13, 38.

The Government's retention of innocent assets based on a "commingling" theory was particularly unjustified, given that those funds were and are needed by Mr. Omidi in order to defend himself against the Government's charges.  "An individual facing serious criminal charges brought by the United States has little but the Constitution and his attorney standing between him and prison.  He might readily give all he owns to defend himself."  *Kaley v. United States*, 571 U.S. 320, 341 (2014) (Roberts, C.J. dissenting). Where a defendant needs his assets to retain counsel, the Government's authority to restrain assets should be construed narrowly, not expansively.  As Justice Thomas explained in his concurring opinion in *Luis*, "an unlimited power to freeze a defendant's *potentially forfeitable asset*s in advance of trial would eviscerate the Sixth Amendment's original meaning and purpose."  136 S. Ct. at 1098 (Thomas, J., concurring).  Indeed, if the concerns expressed by Justice Thomas in *Luis* were to be ignored, it is entirely foreseeable that "prosecutors will seek broad, sweeping [pretrial asset] restraints" that "recklessly or intentionally encompass[] legitimate, nonindictable assets" simply *because*

such pretrial asset seizure can "improperly cripple a defendant's ability to retain counsel." *United States v. Bissell*, 866 F.2d 1343, 1355 (11th Cir. 1989).  To protect the Sixth Amendment's guarantee of a right to counsel of choice, the Supreme Court instituted a bright "constitutional line" between property that could be traced to specified unlawful activity and that which could not.  *Luis*, 136 S. Ct. at 1093-95 (rejecting Government's argument that it was appropriate to seize innocent assets as "substitute property" for tainted assets that could not be recovered).  In other words, the Supreme Court held that the need to use innocent assets to retain counsel of choice prevails over the Government's interest in restraining those assets as substitute property.  *Id.*

Like the Government's argument in *Luis* that it should be allowed to seize innocent assets as substitute property, the Government's commingling argument here expands the restraint of innocent assets to the point of evisceration of the root Sixth Amendment right. Mr. Omidi's right to use lawfully earned funds to fund his defense and retain counsel of choice should have been prioritized over the Government's expansive (and legally unsupported) justification for the seizure of $110 million in assets.

## B.     The Government Was Required to Return the Seized Assets No Later Than 2017 When the Statute of Limitations Expired.

Even if the Government had a lawful basis to seize every last dollar of the $110 million—which it did not—its right to retain those assets expired with the passing of the statute of limitations, which gives the Government no longer than five years to file an asset forfeiture action after discovery of the alleged wrongdoing.  *See* 19 U.S.C. § 1621 (no action may be instituted unless commenced within "5 years after the date of the alleged violation or, if such violation arises out of fraud, within 5 years after the date of discovery of fraud.").  Time of discovery is a factual determination based on a "known" or "should-have-known" standard, and the offense should be deemed "discovered" when the Government actually discovers, or possesses the means to discover, the alleged wrong, whichever occurs first.  *United States v. James Daniel Good Prop. Titled in Name of James Daniel Good*, 971 F.2d 1376, 1381 (9th Cir. 1992).  In this case, the statute of

1  limitations expired no later than 2017.

2      On May 8, 2018, the Government filed the Civil Forfeiture Complaint.  The *res*—

3  the seized funds—had not been touched during the five years preceding the filing of the

4  forfeiture actions.  *See* Ex. 10 at fn.10 (Government affidavit, in support of the June 2014

5  Asset Seizure Warrant, which included a concession that "[t]he last outside deposit into

6  the Subject Accounts [which the Government seized] occurred on July 31, 2012," five

7  years and 11 months before the Forfeiture Complaint was filed.).  Thus, the Forfeiture

8  Complaint was time-barred under 19 U.S.C. § 1621 because "the *res*," seized in June

9  2014, had not been involved in any alleged criminal activity for six years.

10      In addition, by the time the Forfeiture Complaint was filed, the Government had

11  known for well over five years about the alleged offenses giving rise to its claim that the

12  seized funds were traceable to the proceeds of fraud.  As described above, *see supra* at 5-

13  7, the Government knew about the allegedly fraudulent conduct associated with the *res* for

14  over five years prior to the filing of the Civil Forfeiture Complaint on May 8, 2018.  *See*

15  *also* Donnelly Decl. at ¶¶ 7-56.  Therefore, under 19 U.S.C. § 1621, the Civil Forfeiture

16  Complaint was time-barred and the Government had no right to continue to restrain the

17  assets.

18      Once the statute of limitations for a civil forfeiture action expired, the Government

19  consequently had no remaining lawful interest in the seized funds.  *Luis*, 136 S. Ct. at

20  1091 ("[W]hether property is . . . subject to pretrial restraint . . . very much depends on

21  who has the superior interest in the property at issue.").   As the Ninth Circuit explained in

22  *United States v. Marolf*, when "the period of limitations has passed" the Government

23  "cannot go back to square one because it is barred from instituting any forfeiture

24  proceeding by the five-year statute of limitations," and thus, "*the forfeiture is void*" and

25  the defendant is "entitled to return of his property (or its value)."  173 F.3d 1213, 1220

26  (9th Cir. 1999) (emphasis added).  Indeed, the Government itself has conceded that "[t]o

27  be allowed to hold such assets, the government must show that there is '*probable cause to*

28  *believe that the property will ultimately be proved forfeitable*.'"  Dkt. 516 (emphasis

added), *quoting Kaley*, 571 U.S. at 340 and *United States v. Monsanto*, 491 U.S. 600, 615 (1989).[3]  The Government could make no such mandatory showing of forfeitability because the statute of limitations had expired no later than 2017, and the seized assets should have been released, making them available to Mr. Omidi to pay for counsel.  *Luis*, 136 S. Ct. at 1092.  By failing to unfreeze sufficient funds from the seized accounts to pay for attorneys' fees, the Government committed a Sixth Amendment violation.

## IV.  THE PRETRIAL RESTRAINT OF INNOCENT ASSETS IS STRUCTURAL ERROR AND THE CONSTITUTIONAL VIOLATION IS COMPLETE, AND DISMISSMAL OF THE INDICTMENT IS THE ONLY REMEDY TO NEUTRALIZE THE TAINT UNDER THE SIXTH AMENDMENT.

The Government's restraint, for more than six years, of tens of millions of dollars in innocent assets, as well as its continued restraint of assets after the expiration of the applicable statute of limitations, completed a violation of the Sixth Amendment right to counsel of choice.  *Luis*, 136 S. Ct. at 1088-89.  Such "erroneous deprivation of the right to counsel of choice" is "structural error," and "it is unnecessary to conduct an ineffectiveness or prejudice inquiry to establish a Sixth Amendment violation."  *Gonzalez-Lopez*, 548 U.S. at 150, 148 (citations omitted); *accord*, *Luis*, 136 S. Ct. at 1089; *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1908 (2017); *United States v. Brown*, 785 F.3d 1337, 1344 (9th Cir. 2015).  The recognition by the courts that infringement upon a defendant's right to counsel of choice is a "structural" error is significant.  As the Supreme Court explained in *United States v. Davila*, the class of errors that can be categorized as "structural" are purposefully limited, because these errors "trigger automatic reversal." 569 U.S. 597, 610-611 (2013). However, such a remedy is necessary for Sixth Amendment violations, as these are not simply trial errors but rather violations that "undermine the fairness of a criminal proceeding as a whole."  *Id.*

"Deprivation of the right [to counsel of choice] is *complete* when the defendant is

---

[3] Thus, by allowing the statute of limitations to expire, the Government no longer had "any cognizable claim of ownership or right to possession" adverse to the seized funds. *United States v. Fitzen*, 80 F.3d 387, 389 (9th Cir. 1996).

erroneously prevented from being represented by the lawyer he wants, regardless of the quality of the representation he receives." *Gonzalez-Lopez*, 548 U.S. at 148 (emphasis added); *accord United States v. Rivera-Corona*, 618 F. 3d 976, 979 (9th Cir. 2010). As the Supreme Court said in *Luis*, the deprivation of counsel of choice so "'affects the framework within which the trial proceeds' that courts may not even ask whether the error harmed the defendant." 136 S. Ct. at 1089 (*quoting Gonzalez-Lopez*, 548 U.S. at 1048.) Thus, the error here is necessarily plain and affects substantial rights.

The Supreme Court has identified three categories of structural errors: (1) those where the right at issue is "not designed to protect the defendant from erroneous conviction but instead protects some other interest;" (2) those where the "effects of the error are simply too hard to measure;" and (3) those where the error "always results in fundamental unfairness." *Weaver*, 137 S. Ct. at 1903. The error occurring from the Government's pretrial restraint of innocent assets in this case is a structural error under each of these categories and the same factors that support the finding of structural error under each category establish that dismissal of the Indictment is the only appropriate remedy.

An adequate Sixth Amendment remedy "*must neutralize the taint*" of a constitutional violation, and "should put the defendant *back in the position he would have been in if the Sixth Amendment violation never occurred*." *Johnson v. Uribe*, 700 F.3d 413, 425 (9th Cir. 2012) (en banc), cert. denied, 571 U.S. 1015 (2013) (citations and internal quotations removed, emphasis added). The Government's belated release, in late 2020, of a portion of the untainted funds is not an adequate remedy because it neither neutralized the taint caused by the Government's interference with Mr. Omidi's right to counsel of choice, nor restored Mr. Omidi to the position he would have enjoyed absent that interference. To the contrary, the effects of the Government's interference, which continue, have simply been too pervasive, and no remedy other than dismissal can suffice.

**A.    The Indictment Must Be Dismissed to Remedy the Six-Year Deprivation**

**of Mr. Omidi's Sixth Amendment Right to Autonomy.**

When the Government improperly restrained innocent funds that could have been used to fund Mr. Omidi's counsel of choice, the Government interfered with Mr. Omidi's right to autonomy, that is, "the fundamental legal principle that a defendant must be allowed to make his own choice about the proper way to protect his own liberty." *Weaver*, 137 S. Ct at 1908; *Stein*, 435 F. Supp. 2d at 358 ("fairness in criminal proceedings requires that the defendant be firmly in the driver's seat, and that the prosecution not be a backseat driver."). "Inherent in a defendant's right to control the presentation of his defense is the right to choose the counsel who presents it." *Lainfiesta v. Artuz*, 253 F. 3d 151, 154 (2d Cir. 2001) (*citing Herring v. New York*, 422 U.S. 853, 857 (1987)). Indeed, the Constitution contemplates "a norm in which the accused" alone is the "master of his own defense." *Gannett Co. v. DePasquale*, 443 U.S. 368, 382, n.10 (1979). Mr. Omidi was forced to proceed with woefully underfunded counsel, and, subsequently, CJA counsel. *Faretta v. California*, 422 U.S. 806, 817 (1975) ("Forcing a lawyer upon an unwilling defendant" is a violation of the Sixth Amendment); *United States v. Engel*, 968 F.3d 1046, 1050-1052 (9th Cir. 2020) (reversing conviction on the basis of Sixth Amendment violation, where judge ordered appointed counsel to represent criminal defendant for several hours of trial, even though defendant did not want appointed counsel to represent him).[4]   When the Government restrained tens of millions of dollars that Mr. Omidi would have used to hire experienced criminal defense lawyers and to mount an investigation into the Government's allegations, the Government "usurp[ed] control of an issue within [Mr. Omidi's] sole prerogative," that is, how his defense would proceed, *see McCoy v. Louisiana*, 138 S. Ct. 1500, 1504 (2018), and violated his interest in "mak[ing]

---

[4] *See also In re Forfeiture Hearing As to Caplin & Drysdale, Chartered*, 837 F.2d 637, 644 (4th Cir. 1988) ("The government could not [] simply restrain funds to which it claims no legal entitlement so as to force a defendant to accept appointed counsel."); *id*. at 645 ("Those with their own funds must be given the fair opportunity to secure counsel up to the limit of their funds"); *Morris v. Slappy*, 461 U.S. 1, 23 (1983) ("The right to counsel of choice reflects the "harsh reality that the quality of a defendant's representation frequently may turn on his ability to retain the best counsel money can buy.") (Brennan, J., concurring).

the fundamental choices about his own defense." *Id*. at 1511.

In this case, there was extensive litigation without counsel of choice. Any remedy "must" neutralize the taint of the three-year deprivation of Mr. Omidi's constitutional right to autonomy *and* should put Mr. Omidi back in the position as if he had counsel of his choosing from the outset. *Uribe*, 700 F.3d at 425. The only remedy satisfying these two conditions is dismissal of the Indictment. *E.g.*, *United States ex rel. Ferenc v. Brierley*, 320 F. Supp. 406, 408-09 (E.D. Pa. 1970) (granting habeas because the Government improperly restrained approximately $600 of defendants' funds which prevented him from retaining his counsel of choice, and defendant was forced to accept appointed counsel, "no matter how well qualified court-appointed counsel may have been"); *Krogmann v. State*, 914 N.W. 2d 293, 324 (IA 2018) (relying on law of U.S. Supreme Court and reversing conviction after Government improperly restrained assets in violation of defendant's right to counsel of choice and explaining that the purpose of that right is "to protect the liberty and autonomy of the criminal defendant and ensure fairness in criminal proceedings.").

**B.    Alternatively, the Indictment Must Be Dismissed Because the "Effects" of the Government's Interference with Mr. Omidi's Right to Counsel of Choice Cannot Be Measured.**

In *Weaver*, the Supreme Court explained that "when a defendant is denied the right to select his or her own attorney," that error is structural because "the error's effects are simply too hard to measure," and, thus, it is "almost impossible for the government to show that the error was harmless beyond a reasonable doubt." 137 S. Ct. at 1903 (internal citations omitted). In this case, the Government, by its wrongful restraint of innocent assets for more than six years, completed a violation of the Sixth Amendment right to counsel of choice. Accordingly, the question is whether the taint or prejudice can be neutralized and Mr. Omidi restored to the position he would have been had his right to counsel of choice not been violated years ago.

**1.    The Impact of the Constitutional Violation Due to the Improper Post-Indictment Restraint of Assets Cannot Be Remedied.**

In this case, the Government, by its wrongful restraint of innocent assets for more

than six years, completed a violation of the Sixth Amendment right to counsel of choice and interfered with Mr. Omidi's right to control his own defense. This Constitutional violation cannot be remedied by the belated release of assets, three years after the filing of Indictment, to retain counsel for an imminent trial. *Engel*, 968 F.3d at 1052 (a Sixth Amendment violation depends on whether the violation occurred during a "critical stage" of the criminal prosecution). During the period of time when Mr. Omidi was denied counsel of choice, the docket reflects 815 separate docket entries and dozens of conferences. The fact that this is pretrial conduct does not diminish its significance. The Supreme Court has placed particular emphasis on the importance of the assistance of counsel prior to the commencement of trial: "[D]uring perhaps the most critical period of the proceedings...that is to say, from the time of their arraignment until the beginning of their trial, when consultation, thoroughgoing investigation and preparation [are] vitally important, the defendants...[are] as much entitled to such aid [of counsel] during that period as at the trial itself." *Massiah v. United States*, 377 U.S. 201, 205 (1964). Indeed, "the assistance of counsel cannot be limited to participation in a trial; to deprive a person of counsel during the period prior to trial may be more damaging than denial of counsel during the trial itself." *Maine v. Moulton*, 474 U.S. 159, 170 (1985); *Lafler v. Cooper*, 566 U.S. 156, 164-65 (2012).

Indeed, in finding that the deprivation of the right to counsel of choice is "structural" error, "with consequences that are necessarily unquantifiable and indeterminate," the Supreme Court itself has emphasized pretrial conduct, including how in the pre-trial period "different attorneys will pursue different strategies with regard to investigation and discovery." *See Gonzalez-Lopez*, 548 U.S. at 150 (emphasis added). Likewise, the Supreme Court has recognized how "the choice of the attorney will affect whether and on what terms the defendant cooperates with the prosecution, plea bargains, or decides instead to go to trial." *Id.* These examples, cited by the Supreme Court, all involve the *exact* type of pretrial representation tasked to CJA counsel (and before that, to underfunded retained counsel) during the period in which Mr. Omidi was denied access to

1  the funds he needed to retain counsel of choice.[5]

2        Here, there is no means by which to fully determine how the improper restraint of

3  funds impaired Mr. Omidi's strategy.  For example, Mr. Omidi was forced to proceed with

4  a faulty motion filed by CJA counsel concerning the Government's recording of defense

5  meetings that Mr. Omidi contended were privileged pursuant to a joint defense agreement.

6  (Dkt. 770 (the "JDA Motion")).  Once Mr. Omidi's new counsel entered the case, after

7  funds were released in October 2020, counsel attempted to withdraw the JDA Motion,

8  precisely because new counsel desired to pursue a different strategy.  (Dkt. 845.)

9  However, the Court denied this request and permitted Mr. Omidi only to "supplement" the

10 faulty JDA Motion.  (Dkt. 857.)

11       There is no means by which to "redo" the JDA Motion.  As another example, with

12 respect to the disqualification of Mr. Omidi's original attorneys, Ms. Dean and Mr.

13 Diamond, there is no means to divine if a properly funded defense, presenting different

14 evidence and arguments, could have potentially averted disqualification, which if

15 erroneous, is a structural error.  Here too, a "redo" is now impossible and the errors are

16 necessarily unquantifiable and indeterminate.

17        More important than what was done is what was left *undone* in those critical three

18 years after the Indictment, prior to the release of the innocent funds.  Memories have faded

19 and witnesses who could have been contacted by experienced counsel years ago no longer

20 have the recollections that they once did.  As the Supreme Court has explained, "time's

21 erosion of exculpatory evidence and testimony can rarely be shown," and "excessive delay

22 *presumptively compromises* the reliability of a trial in ways that neither party can prove or,

23 for that matter, identify."  *Doggett v. United States*, 505 U.S. 647, 655 (1992) (emphasis

24 added).  The Ninth Circuit too has "note[d] that some destruction of evidence or erosion of

25

26 ───────────────
   [5] In addition, Mr. Omidi was not permitted to participate in discovery with his counsel of choice, since
27 the discovery deadline passed many months before the Government agreed to release funds for Mr.
   Omidi to retain counsel of choice.  *See* Ex. 11 (May 17-18, 2020 emails between Government and
28 counsel for SCM) (Government statement to co-defendant SCM that no additional discovery requests
   would be considered because the "discovery cut-off date in this case was May 4, 2020").

testimony is inevitable over a six month period [of delay]," *United States v. Valentine*, 783 F.2d 1413, 1418 (9th Cir. 1986), and held that even "delays approaching one year are presumptively prejudicial," *United States v. Gregory*, 322 F.3d 1157, 1161-62 (9th Cir. 2003), and that an "almost two and one-half years" delay "alone warrants a finding of serious delay." *McNeely v. Blanas*, 336 F.3d 822, 831 (9th Cir. 2003).

The record is clear that neither Mr. Omidi's underfunded counsel, nor the overwhelmed appointed CJA counsel was ever able to review the millions of pages of discovery through a discovery platform.[6]  Accordingly, for three years after the filing of the Indictment, the improper restraint of Mr. Omidi's funds irremediably prejudiced all aspects of Mr. Omidi's defense and strategy, since counsel was unable to conduct the requisite *prompt* investigation into the circumstances of the case,[7] and effective *timely* interviews of Mr. Omidi and other witnesses that was necessary to ensure that relevant evidence was preserved.[8]

The Government's substantial reliance on the testimony of Government cooperators compounds the significant prejudice to Mr. Omidi because "[i]n this case, the defense has been hindered by the passage of time, particularly given the nature of the charges which are most likely proved or rebutted through testimonial evidence." *Blanas*, 336 F.3d at

---

[6] Mr. Omidi's underfunded counsel could not afford a discovery platform and were forced to request the millions of pages of discovery in PDF format to review page by page. Subsequent CJA counsel finally obtained a discovery platform June 20, 2020, but reviewed no discovery through the platform, even with the help of the court appointed discovery attorney, John Ellis. Further it was not discovered until early 2021, months after Mr. Omidi finally obtained some access to the seized funds, that CJA counsel was missing half the discovery in this case. The irremediable harm here is pronounced.

[7] The American Bar Association Guidelines dictate that "[d]efense counsel should conduct a *prompt* investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case." ABA, *Criminal Justice Section Standards: Defense Section*, Standard 4-4.1: Duty to Investigate; *see also*, *1 Criminal Practice Institute: Criminal Practice Manual* at 2.1 ("It is counsel's obligation to find out as much as possible about every case, as soon as possible. Speed is essential. Physical evidence disappears, memories fade, and witnesses move away or are forgotten.").

[8] *See* ABA, *Criminal Justice Section Standards: Defense Section*, Standard 4-3.2: Interviewing the Client ("As soon as practicable, defense counsel should seek to determine all relevant facts known to the accused."). Just as witnesses' memories fade, so do defendants' recollections of the events. If an attorney does not have access to his client until months after the incident, the defendant will be less likely to be able to recall accurately essential details of the event.

832.  Specifically, due to the Government's improper years-long restraint of defense funds, the only witnesses with a clear purported "memory" of relevant events in this prosecution were prompted and molded by Government non-prosecution deals and plea bargains.  *United States v. Marion*, 404 U.S. 307, 325 (1971) (it would be improper for the prosecution to intentionally delay in order "to gain some tactical advantage over [defendants]").  Even if Mr. Omidi could somehow locate defense witnesses years later in 2021—which he is substantially hindered in doing because of the Covid pandemic—Mr. Omidi is significantly prejudiced by the passage of years of time.  *Blanas*, 336 F.3d at 831 ("The presumption that pretrial delay has prejudiced the accused intensifies over time.").

Separately, the ongoing pandemic, which started two years after the unsealing of the Indictment, has compounded defense challenges, including developing favorable trial testimony. While the pandemic is not attributable to the Government, had the Government not interfered with the timely release of defense funds, the trial could and should have commenced prior to the pandemic. Again, there is no way to ameliorate this prejudice.

Because there is no means by which to neutralize the taint of *years* without counsel of choice, and no practical means that could place Mr. Omidi back in the position he would have been, absent the Government's unlawful restraint of innocent assets, the Indictment must be dismissed.

### 2.    The Impact of the Constitutional Violation Due to the Improper Pre-Indictment Restraint of Assets Cannot Be Remedied.

Moreover, even aside from the harm that resulted from the three years post-indictment where Mr. Omidi did not have counsel of choice, the Government's unlawful restraint of innocent assets in the period before the Indictment also constitutes a further violation of Mr. Omidi's Sixth Amendment rights.  *Stein*, 541 F.3d at 153 ("When the government acts prior to indictment so as to impair the suspect's relationship with counsel post-indictment, the pre-indictment actions ripen into cognizable Sixth Amendment deprivations upon indictment.").  As one example of irremediable prejudice, certain key witnesses have died.  *See Barker v. Wingo*, 407 U.S. 514, 532 (1972) ("the inability of a

1    defendant adequately to prepare his case skews the fairness of the entire system. If

2    witnesses die or disappear during a delay, the prejudice is obvious.").

3         For example, Dr. Elliot Alpert died on July 31, 2017.  Dr. Alpert was the owner of

4    co-defendant Independent Medical Services Inc. ("IMS"), the company that hired and

5    supervised Government cooperators Charles Klasky, Sherwin Hong, and Daniel Carriedo.

6    Dr. Alpert would have provided material exculpatory testimony for Mr. Omidi and

7    Defendant Surgery Center Management, Inc.  This is not self-serving conjecture.  On

8    April 4, 2012, Dr. Alpert authored a declaration denying any alteration of medical records

9    and averring that "I am not aware of any such practices [improper alteration of medical

10   records which is the basis of the Superseding Indictment] taking place in my medical

11   practice or among the persons with whom I work."  Ex. 12 (April 4, 2012 Alpert Decl. at

12   ¶6).  Absent the improper restraint of funds, Mr. Omidi would have retained experienced

13   defense counsel who would have acted to preserve Dr. Alpert's critical testimony.

14        In addition, the raw data for the sleep studies—evidence that is critical to the

15   charges in this case—was maintained on remote FTP servers, outside of the Get-Thin

16   offices.  As a result of the Government's June 2014 seizure of funds, the Get-Thin entities

17   could no longer maintain the costs of the FTP servers and it was later discovered that the

18   data was lost.  Ex. 13 (Excerpt of FBI 302 of Charles Klasky, explaining that the file-

19   sharing sites were not maintained because of lack of funds).  Had millions of dollars in

20   untainted assets not been wrongly seized, those FTP sites would have remained

21   operational and experienced counsel would have moved to preserve this critical data,

22   which is now gone forever.

23        Accordingly, the scope and severity of the six year pre- and post-Indictment delay

24   due to improper restraint of funds, in this substantial and complex multi-defendant case

25   with 37 counts and millions of pages of documents, is irremediable and requires the

26   dismissal of the Indictment.  The Sixth Amendment right to counsel "would mean little if

27   defense counsel could be controlled by the government or vetoed without good reason," as

28   has occurred in this case.  *Stein*, 541 F. 3d at 154.

Because there is simply no way to turn back the clock, identifying a remedy narrower than dismissal that could make Mr. Omidi whole requires "a speculative inquiry into what might have occurred in an alternate universe," *Gonzalez-Lopez*, 548 U.S. at 150; *cf. Glasser v. United States*, 315 U.S. 60, 76 (1942) ("The right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial."); *United States v. Stein*, 435 F. Supp. 2d 330, 372 (S.D.N.Y. 2006) ("Virtually everything the defendants do in this case may be influenced by the extent of the resources available to them.  There simply would be no way to know, after the fact, whether the outcome had been influenced by limitations improperly placed upon the availability of resources."), *aff'd,* 541 F.3d 130 (2d Cir. 2008). "As a matter of law, moreover, even a good faith decision to continue a constitutionally tainted prosecution does not erase the taint when, as alleged here, the prosecution continues to utilize the fruits of the tainted behavior."  *United States v. P.H.E., Inc.*, 965 F.2d 848, 859 (10th Cir. 1992) ("[W]here, as here, a prosecution is premised on the fruits of constitutionally tainted behavior, we cannot permit the prosecution to continue").

### C. Alternatively, the Indictment Must Be Dismissed Because Mr. Omidi's Substantial Rights Have Been Violated and The Fairness of the Criminal Proceeding as a Whole Has Been Undermined.

#### 1. The Denial of the Right to Counsel of Choice Has Resulted in Structural Fundamental Unfairness, Necessitating Dismissal.

The Supreme Court in *Weaver* also explained that "an error has been deemed structural if the error always results in fundamental unfairness."  *Weaver*, 137 S. Ct. at 1908.  It is common sense that improperly depriving a defendant of his resources is fundamentally unfair because it limits not only *who* will represent him, but also *how* he will be represented.  The Government can be expected to "spend vast sums of money ... to try defendants accused of crime," *Gideon v. Wainwright*, 372 U.S. 335, 344 (1963), and of course devotes far greater resources to complex cases, such as here, in which the punitive stakes are high. Precisely for this reason, "there are few defendants charged with crime, few indeed, who fail to hire the best lawyers they can get to prepare and present their

1  defenses." *Id*.  This right to use all funds legally available for his defense, denied to Mr.

2  Omidi, assures some modicum of equality between the Government and those it chooses

3  to prosecute.  By restraining Mr. Omidi's assets, the Government took away not only

4  funds to hire counsel of choice, but funds for investigators, experts, and paralegals to at

5  least attempt to match the vast litigation resources available to the Department of Justice.

6       The deprivation of these rights are "too fundamental and absolute to allow courts to

7  indulge in nice calculations as to the amount of prejudice arising from its denial," *see*

8  *Chapman v. California*, 386 U.S. 18, 43 (1967), or speculation as to whether the prejudice

9  can even be remediated.  Rather, the right to be represented by counsel of one's choosing

10  "commands … that *a particular guarantee of fairness be provided*—to wit, that *the*

11  *accused be defended by the counsel he believes to be best*." *Gonzalez-Lopez*, 548 U.S. at

12  146 (emphasis added).  Accordingly, because the right to autonomy and to counsel of

13  choice is so fundamental, its violation always results in fundamental unfairness, which

14  thus permeated every single proceeding for three years before this Court, and further taints

15  this case going forward, requiring dismissal of the Indictment.

16       **2.  Under Ninth Circuit Precedent, the Structural Error Here**
         **Undermines the Fairness of the Criminal Proceeding as a Whole,**
17       **and Require the Indictment to be Dismissed.**

18       Separately, the Ninth Circuit has unequivocally held that "[w]hen an error is

19  constitutional in nature and implicates a structural right, *the error affects substantial*

20  *rights, and undermines the fairness of a criminal proceeding as a whole*."  *United States v.*

21  *Chavez-Cuevas*, 862 F.3d 729, 734 (9th Cir. 2017).  Given "that an error 'affect[ing]

22  substantial rights' means that the error must have been prejudicial, *i.e.*, that it must have

23  affected the outcome of the district court proceedings," *United States v. Yamashiro*, 788

24  F.3d 1231, 1236 (9th Cir. 2015) (citation omitted), the improper restraint of innocent

25  defense funds affected the outcome of three years of proceedings before this Court, *id*.,

26  and "undermines the fairness of [the] criminal proceeding as a whole." *Chavez-Cuevas*,

27  862 F.3d at 734.   Given that the fairness of this entire pretrial proceeding is impacted as a

28

matter of law, it cannot be remediated at this later stage.  Accordingly, the Indictment must be dismissed under binding Ninth Circuit law.

### 3.    The Indictment Should Be Dismissed to Deter this Type of Intentional Misconduct.

The Supreme Court has explained that pretrial restraint of a defendant's assets is the "nuclear weapon of the law." *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,* 527 U.S. 308, 329 (1999).  Accordingly, it must be exercised with restraint and respect for the rule of the law so as not to cripple the defense.  Unchecked, this is a tactic that will convict the innocent.

Here, the constitutional violation is not an isolated instance of bad judgment or an innocent mistake.  As detailed above, the Government not only seized tens of millions of dollars in innocent assets, but it improperly restrained them for years over Mr. Omidi's protests.  What is more, the Government withheld to the very end of the discovery period the tracing analysis that proving that the Government had no legal basis to keep some 27 million dollars in funds which were essential to his defense.  When Mr. Omidi sought to challenge the seizure in court, the Government mocked his inability to trace the assets and called for the appointment of CJA counsel.  Only because the Government was eventually caught by its own tracing analysis did it finally agree to release ten million dollars of funds it never should have taken in the first place.

The further problem with deeming this belated release of funds a "cure" for the Sixth Amendment violation—other than it does not undo the harm to Mr. Omidi—is that the Government will pay no price for this monumental injustice. As a result, there will be no deterrence against future violations. The Supreme Court has recognized that the intentional character of misconduct supports the stronger remedy of dismissal.  *See, e.g., United States v. Marion*, 404 U.S. 307, 325 (1971) (whether "the Government intentionally delayed to gain some tactical advantage over appellees or to harass them" is a relevant consideration to whether the criminal charges should be dismissed. (emphasis added)).   Accordingly, the need to deter this type of intentional misconduct militates in

favor of dismissal of the Indictment.

### D.   Alternatively, the Indictment Must be Dismissed Under the Fifth Amendment.

"[A] defendant has a fundamental right under the Fifth Amendment to fairness in the criminal process, including the ability to get and deploy in defense all 'resources lawfully available to him or her, free of knowing or reckless government interference.'" *Stein*, 541 F.3d at 141 (citation omitted).  Here, as in *Stein*, the Government's conduct deprived Mr. Omidi not only of his Sixth Amendment right to retain counsel of choice, but his Fifth Amendment right to be free of Governmental interference with his defense. Indeed, the Ninth Circuit acknowledges a potential Fifth Amendment outrageous conduct claim "'premised upon deliberate intrusion into the attorney-client relationship.'" *United States v. Hayne*s, 216 F. 3d 789, 796 (9th Cir. 2000).

At bar, the Government outrageously interfered with Mr. Omidi's ability to fund a defense by its unbridled seizure of innocent assets, and its substantial delay in disclosing key evidence that proved that millions in assets were wrongfully seized.  This protracted interference with Mr. Omidi's defense is indeed "shocking."  *See United States v. Stein*, 495 F. Supp. 2d 390, 414 (S.D.N.Y. 2007) ("[W]here a government agent has 'time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations,' deliberate indifference to a person's rights can be shocking.") (*quoting County of Sacramento v. Lewis*, 523 U.S. 833, 853 (1998)). Accordingly, the Indictment should be dismissed under the Fifth Amendment.

### E.   Alternatively, the Indictment Must be Dismissed Under the Court's Supervisory Powers.

In addition, this Court has the power to, and should, dismiss the Indictment pursuant to its supervisory powers.  *United States v. Ross*, 372 F.3d 1097 (9th Cir. 2004). "Reckless government conduct may be remedied under the Court's supervisory powers even when prosecutors act in good faith."  *United States v. Renzi*, 722 F. Supp. 1100, 1132 (D. Ariz. 2010) (*citing United States v. Chapman*, 524 F.3d 1073, 1084 (9th Cir. 2008)).  While "accidental or merely negligent governmental conduct is insufficient to

establish flagrant misbehavior," a finding of "willful misconduct," in the sense of intentionality, is not required.  *Chapman*, 524 F.3d at 1085.  When the Government acts with at least reckless disregard for a defendant's rights, dismissal is appropriate if the defendant would otherwise suffer "substantial prejudice and if no lesser remedial action is available."  *Id.*  The Court's supervisory powers permit it to act to remedy Government misconduct that does not rise to the level of a Constitutional violation, *id.* at 1084, though the bar of Constitutional violation has been met in this case.

It is in the Government's interest, in our adversarial system of justice, that every defendant receive the best representation possible.  "But if it is in the government's interest that every defendant receive the best possible representation, it cannot also be in the government's interest to leave defendants naked to their enemies."  *Stein*, 541 F.3d at 157.  Indeed, "[t]he imposition of economic punishment by prosecutors, before anyone has been found guilty of anything, is not a legitimate governmental interest—it is an abuse of power."  *Stein*, 435 F. Supp. 2d at 363.  The Government's "unwillingness to take responsibility for his conduct" further supports dismissal. *Chapman,* 524 F.3d at 1088.

## V.   NO REMEDY LESS THAN DISMISSAL RESOLVES THE TAINT.

As discussed above, remedies such as the release of funds and additional time to prepare for trial are insufficient to remedy the years of improper Government restraint of innocent funds.  Similarly, disqualification of the Government, though warranted as an additional remedy, addresses only deterrence.  Here, the extensive delay in releasing Mr. Omidi's untainted assets has made it impossible to remove the taint and put Mr. Omidi back to the situation prior to the Constitutional violation.  A passage of time and intervening events have made a "redo" impossible.  In addition, over the three years of proceedings, both underfunded counsel and CJA counsel (that Mr. Omidi did not want) made significant strategic disclosures and material missteps.  For that reason, any remedy short of dismissal "would advantage the government."  *United States v. Bundy*, 968 F.3d 1019, 1043 (9th Cir. 2020).  Dismissal of the Indictment is necessary because "no lesser remedy will fully address the damage caused." *Id.*

## VI.   THE COURT SHOULD ALSO ORDER FULL UNCONDITIONAL RELEASE OF THE SEIZED FUNDS FOR ATTORNEYS FEES.

In addition, now that Mr. Omidi has demonstrated, *see supra* at 17-18, that the Civil Forfeiture Complaint and any continuing restraint of funds is barred by the statute of limitations, the Court should now release the entirety of the remaining seized funds for Mr. Omidi to use in the exercise of his Sixth Amendment right to counsel.  *See Stein*, 541 F. 3d at 156 ("the Sixth Amendment protects against unjustified governmental interference with the right to defend oneself using whatever assets one has or might reasonably and lawfully obtain.").  The only remaining Claimants in the Civil Forfeiture Action do not object to such release and have waived their right to make any objection, now or in the future.  (*See* Ex. 16 (Waiver Letter of PCI, SCM and Bridgeford Trust, confirming no objection to release of remaining *res*).)  The funds already released, particularly after the payment of prior counsel, are likely not sufficient to fund Mr. Omidi's defense through trial in this complex case.  *Id*. (noting actual costs of defense in complex white collar cases well above $10 million dollars as well as average estimate of costs in KPMG case of around $13 million.)

Should the Court find the restraint of funds not to be time barred, the Court should order the release, for use in Mr. Omidi's defense, the remaining untainted assets that have no connection to the alleged fraud.  *See supra* at 3-4 (describing at least $27 million in untainted assets that were seized by the Government).  This type of injunctive relief is warranted because Mr. Omidi has already demonstrated that the Government continues to hold innocent assets, that he faces irreparable harm from the continuing restraint of assets needed for his defense, that he has no adequate remedy other than a pre-trial order for the release of all of his innocent assets for use in this case, and the public interest certainly supports the protection of rights to funds for counsel of choice and to maintain the autonomy of a defendant over his or her own defense.

The Court should also note the Government's willingness to belatedly agree to the release of funds was not "unconditional" or "unlimited."  *See Stein*, 541 F. 3d at 146.

Though the record shows the knowing seizure and restraint of at least $27 million in "innocent" funds from the outset, as well as the unlawful retention of all of the funds after the expiration of the statute of limitations in 2017, the Government only agreed to release $10 million dollars which is insufficient to effectively try this complex case. *See* Donnelly Decl. at ¶¶ 2-5.

Further, as a condition for returning funds for Mr. Omidi's defense, the Government improperly imposed numerous conditions. As one example, discussed above, the Government unconstitutionally forced appointed counsel on Mr. Omidi by improperly restraining innocent funds for his defense. Thereafter, in October 2020, as a condition of returning funds for Mr. Omidi's defense, the Government required him to reimburse the Government for CJA representation. In other words, Mr. Omidi's ability to exercise his right to counsel of choice was conditioned on reimbursing the Government for its unconstitutional conduct, which is not only highly inequitable but also a violation of the unconstitutional conditions doctrine. *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013). Mr. Omidi asks to be relieved from this reimbursement obligation.

Other restrictions include the use of released defense funds only in *this* case, and the Government's right to supervise of the use of funds. Mr. Omidi asks the Court to remove all the unconstitutional conditions imposed by the Government in the October 8, 2020 Order, and enjoin the Government from further interference in the use of defense funds. The Court has jurisdiction under *Luis* and *United States v. Unimex, Inc.*, 991 F.2d 546, 551 (9th Cir. 1993) to grant relief here, or alternatively, to open the associated Civil Forfeiture case as necessary.

## VII. CONCLUSION

Mr. Omidi respectfully requests this Motion to be granted in its entirety.

Dated:  April 22, 2021      Respectfully submitted,

**WILLKIE FARR & GALLAGHER LLP**

By: s/ Michael S. Schachter
    MICHAEL S. SCHACHTER

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

RANDALL W. JACKSON
CASEY E. DONNELLY
SIMONA AGNOLUCCI

ATTORNEYS FOR DEFENDANT
JULIAN OMIDI

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

<u>PROOF OF SERVICE</u>

I am employed and a resident of New York. I am over the age of 18 and not a party to the within action; my business address is 787 Seventh Avenue, New York, NY 10019. On April 22, 2021, I served the document described as:

**MOTION TO DISMISS FOR IMPROPER RESTRAINT OF FUNDS AND DENIAL OF THE RIGHT TO COUNSEL OF CHOICE; REQUEST FOR RELIEF FROM REIMBURSEMENT OF CJA EXPENSES**

Upon the interested parties in this action as follows:

_____X_____ By the Court's ECF.

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on April 22, 2021.

s/ Michael S. Schachter
Michael S. Schachter