UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CRIMINAL MINUTES—GENERAL

Page **1** of 15

| Case No. | CR 17-661(A)-DMG | Date | June 15, 2021 |
|---|---|---|---|

| Present: The Honorable | DOLLY M. GEE, UNITED STATES DISTRICT JUDGE |
|---|---|
| Interpreter | N/A |

| KANE TIEN | NOT REPORTED | NOT PRESENT |
|---|---|---|
| Deputy Clerk | Court Reporter | Assistant U.S. Attorney |

| U.S.A. v. Defendant(s): | Present | Cust. | Bond | Attorneys for Defendant(s): | Present | Appt. | Ret. |
|---|---|---|---|---|---|---|---|
| (1) Julian Omidi | Not | | ✓ | Michael Schachter | Not | | ✓ |

**Proceedings:** **[IN CHAMBERS] ORDER RE DEFENDANT JULIAN OMIDI'S MOTION TO DISMISS AND REQUEST FOR RELEASE OF SEIZED FUNDS [1038]**

## I.   INTRODUCTION

On April 22, 2021, Defendant Julian Omidi filed a motion to dismiss the Indictment and request for release of seized funds. [Doc. # 1038.] Defendant Omidi alleges that the Government improperly seized untainted funds in 2014 (i.e., funds unrelated to any alleged crimes) and continued to improperly restrain those funds, thereby depriving Defendant of his Sixth Amendment right to retain counsel of choice. Defendant Omidi further requests the release of the entirety of the remaining seized funds to cover his legal defense costs in this proceeding. On May 5, 2021, the Government filed its opposition. [Doc. # 1052.] On May 18, 2021, Defendant Omidi filed his reply. [Doc. # 1061.] On May 19, 2021, the Court granted the Government's *ex parte* application for leave to file a supplemental opposition [Doc. # 1062], which was filed that day [Doc. # 1063]. On May 24, 2021, Defendant Omidi filed a reply to the supplemental opposition. [Doc. # 1068.] Having thoroughly considered the arguments set forth in the parties' briefing, as well as the arguments presented at the June 2 and 4, 2021 hearings on the motion, the Court **DENIES** Defendant Omidi's motion to dismiss and request for release of seized funds.

## II.   BACKGROUND

On October 18, 2017, the Government indicted Defendant Omidi, Surgery Center Management, LLC ("SCM"), and Independent Medical Services, Inc. ("IMS"), for their roles in an alleged fraud scheme through a network of entities collectively known as "GET THIN," whereby from approximately May 2010 to March 2016, Defendants and others allegedly falsified sleep study reports and submitted them to insurance companies in support of requests for approval of millions of dollars in claims for Lap-Band surgeries and related procedures. [Doc. # 1.] On January 24, 2018, a First Superseding Indictment was filed, adding Defendant Mirali Zarrabi, M.D. for his alleged role in the fraud scheme. [Doc. # 12.] The FSI alleges that GET THIN providers billed insurance for at least $240 million in Lap-Band surgeries for patients who otherwise would not have qualified absent the falsified reports, and that insurance paid more than $38 million on those claims. *Id.* ¶ 39.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES—GENERAL**

Page **2** of **15**

Between May and June 2014, in relation to their GET THIN investigation, the Government applied for, and was granted, two warrants to seize approximately $127 million from several accounts held by GET THIN affiliated entities (collectively, "Seized Funds")[1]. The first seizure warrant, issued on May 23, 2014 by Hon. Victor B. Kenton, former United States Magistrate Judge, authorized seizure of the contents of 12 accounts at Deutsche Bank Securities: three accounts held by Property Care Insurance, Inc. ("PCI"), and nine accounts held by Asset Management Irrevocable Trusts (Asiatrust Nevis Limited, trustee) ("Trustee"), totaling over $109 million in funds and securities. [*See* Doc. # 1052-1, Exh. A.]  The second seizure warrant, issued on June 24, 2014 by Magistrate Judge Kenton, authorized seizure of the contents of two Bank of America accounts, both held by PCI, totaling over $17 million.  *See id.*, Exh. B (Exhs. A and B collectively referred to as "Seizure Warrants").

The affidavit supporting the Government's seizure application alleged that the Seized Funds were subject to seizure and forfeiture:  (1) pursuant to 18 U.S.C. § 981(a)(1)(C) and (b), because there was probable cause to believe that those funds represented or were traceable to proceeds of violations of 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), and/or 1347 (health care fraud), each of which is a "specified unlawful activity" as defined at 18 U.S.C. § 1956 (c)(7)(D) and (F); and (2) pursuant to 18 U.S.C. § 981(a)(1)(A) and (b), because there was probable cause to believe that those funds constituted or were traceable to property involved in one or more violations of 18 U.S.C. § 1956 (money laundering). [Doc. # 1049-27 (Application and Affidavit for Seizure Warrant by SA Pettigrew) ("Warrant Affidavit") ¶ 3.]

The Warrant Affidavit alleged, among other things, that GET THIN had been operating a widespread health care fraud scheme beginning in approximately 2008 that resulted in health insurance plans being billed for approximately $1.3 billion, with GET THIN entities receiving payments of approximately $219 million.  Warrant Aff. ¶ 6.  The Warrant Affidavit alleged that Defendant Omidi, his mother, Cindy Omidi, his brother, Michael Omidi, M.D. (collectively, the "Omidis") and their associates used a multitude of corporate entities and bank accounts to conceal or disguise the nature, source, location, ownership and control of the fraudulently-obtained funds through a widespread money laundering scheme, including, *inter alia*:  (a) the Omidis' creation and use of hundreds of GET THIN entities, many with no apparent business purpose; (b) efforts to conceal the Omidis' overall control of GET THIN and its operations, including the use of nominees/strawmen; (c) the deposit of checks made payable to one entity into the bank account of a different entity; (d) numerous intra-enterprise transfers back and forth, to obscure tracing the movement of the millions of dollars that ran through the numerous GET THIN bank accounts; (e) the failure of most of the GET THIN entities to file tax returns during most of the years the enterprise was promoting and getting paid for Lap-Band surgeries.  *Id.* ¶¶ 27, 252.  The Warrant Affidavit also alleged that to the extent any of the monies involved in the placement, layering, and integration of the fraud proceeds were untainted at the time they were initially received by GET THIN, the commingling of those monies with the tainted funds throughout the laundering process rendered them subject to seizure and forfeiture under the civil forfeiture statute, 18 U.S.C. § 981(a)(1)(A).  Civil forfeiture extends beyond direct proceeds of a crime to include all property

---

[1] References to the amount of the Seized Funds in the parties' briefs fluctuates between $110 to $127 million. [*Compare* Doc. # 1038 at 22 *with* Doc. # 1052 at 10-11; Doc. # 1052-1, Exhs. A, B.]  The Court has cited the higher figure as reflected in the Government's opposition.

"involved in" a money laundering offense to reach money actually laundered, money or property with which it is commingled or exchanged for when the money laundering transaction takes place, and any property that facilitates the money laundering offense, and includes untainted money that is commingled with tainted funds, as long as the other elements of the money laundering offense are met. *Id.* ¶¶ 12, 21. In issuing each of the Seizure Warrants, Magistrate Judge Kenton concluded that there was "probable cause to believe that the property so described is subject to seizure and that grounds exist for the issuance of this seizure warrant." [Doc. # 1052-1, Exhs. A and B.]

On May 8, 2018, the Government filed a Verified Complaint for Forfeiture *In Rem* in *United States v. Approximately $107,539,422.29 in Funds and Securities*, CV 18-3855-DMG (Ex) ("Civil Forfeiture Action"), similarly alleging that the defendant *res* was involved in a fraud scheme through a network of more than 200 GET THIN entities that, through the Omidis and their associates, worked together to promote, perform, and submit insurance claims for Lap-Band surgeries and other medical procedures, between at least 2008 to May 2018, when the Civil Forfeiture Complaint was filed. The Complaint alleges that over $200 million in fraudulent payments were collected from insurance companies and other entities and that all of the defendant *res* was involved in a continuous scheme to, among other things, conceal or disguise the nature, source, location, ownership, and control of the proceeds of the fraudulent scheme and its underlying illegal acts. [CV 18-3855, Doc. # 1 at ¶¶ 5, 6, 11-13.] Similar to the Warrant Affidavit, the Civil Forfeiture Complaint alleges that the Seized Funds were subject to forfeiture: (1) pursuant to 18 U.S.C. § 981(a)(1)(C) on the ground that they are property that constituted or were derived from proceeds traceable to one or more violations of 18 U.S.C. §§ 1035, 1341, 1343 and/or 1347; and (2) pursuant to 18 U.S.C. § 981(a)(1)(A) on the ground that they were property involved in one or more transactions or attempted transactions in violation of 18 U.S.C. §§ 1956 or 1957. *Id.* ¶¶ 44-45. On October 26, 2018, the relevant parties filed a stipulation and request to stay the Civil Forfeiture Action. [CV 18-3855, Doc. ## 23, 24.] Additional stipulations were entered between the parties and approved by the Court [*see* CV 18-3855, Doc. ## 27, 28, 29, 30], and the stay was eventually extended pending the conclusion of the instant criminal proceeding. [CV 18-3855, Doc. ## 36, 50.]

Throughout this and other proceedings, several individuals and entities have laid claim to the Seized Funds. On January 20, 2015, PCI, the Trusts, and Cindy Omidi (Defendant's mother and PCI's President) sought return of all of the Seized Funds in *In the Matter of the Seizure Funds on Deposit In Deutsche Bank Securities Inc.*, CV 15-389-ODW (VBKx). Cindy Omidi asserted that she "was the owner and president of [PCI] and the sole signatory on the five bank and investment accounts belonging to [PCI]" that became part of the Seized Funds. [CV 15-389, Doc. # 1-1 at 9.] Through its officers and agents, Asiatrust Nevis Limited submitted a declaration attesting that it was the Trustee of the Trusts, and that "Asiatrust Nevis Limited holds sole legal title to all trust property in the [Trusts]," including the nine Deutsche Bank accounts that became part of the Seized Funds. *Id.* at 49 ¶¶ 2, 3. The declaration further attested that "[a]s the Trustee, Asiatrust Nevis Limited is expressly bestowed all legal powers conferred upon the office of trustee in administering and managing the [] Trusts, including the powers to prosecute and defend actions, claims, or proceedings for the protection of trust property." *Id.* ¶ 4. Judge Wright denied the motion, which he construed as a motion for return of property pursuant to Federal Rule of Criminal Procedure 41(g) [CV 15-389, Doc. ## 23, 29], and the Ninth Circuit affirmed on appeal. *See Omidi v. United States*, 851 F.3d 859 (9th Cir. 2017). In this proceeding, in April 2019,

Defendant Omidi filed three motions for the return of some or all of the Seized Funds [Doc. ## 472, 476, 481], which he later stipulated to withdraw [Doc. ## 583, 584]. On December 10, 2020, SCM filed a motion seeking to recover some or all of the Seized Funds [Doc. # 882], but withdrew its motion on December 31, 2020 [Doc. # 923].

On September 24, 2020, the Government, Omidi, and others involved in the Civil Forfeiture Action filed a stipulation and proposed order: (1) dismissing certain claimants (defined as the "Current Claimants[2]"); (2) relieving certain potential claimants from default and permitting them to file late claims (defined as the "Substitute Claimants"[3]); (3) releasing $10 million from that action to be distributed to pay Defendant Omidi's legal defense costs in the instant criminal proceeding (as well as trust administration costs and expenses); and (4) staying the action until the instant criminal proceeding was resolved ("Stipulation"). [CV 18-3855, Doc. # 49.] In relevant part, the Stipulation provided:

> The Parties agree that a further request for release of funds by Julian Omidi is not anticipated, but that if MW [McGuire Woods, LLP (Defendant's counsel at the time)] or substitute counsel for Julian Omidi comes to believe that such a request will be necessary, the Parties will meet and confer on whether there is good cause for the release of additional funds. If the Parties cannot reach agreement, MW (or its successor) and Julian Omidi shall be allowed to move for the release of additional funds in CR 17-661(A) DMG, so long as all of the Substitute Claimants waive their respective rights to object to the release of any requested additional portion of the defendant *res*.

*Id.* at ¶ 13. The Court approved the Stipulation in its October 8, 2020 Order. [CV 18-3855, Doc. # 50.] The Order included a similar provision to the Stipulation, as follows:

> A further request for release of funds by Julian Omidi is not anticipated. However, if MW or substitute counsel for Julian Omidi comes to believe that such a request will be necessary, the Parties shall meet and confer on whether there is good cause for the release of additional funds. If the Parties cannot reach agreement, MW (or its successor) and Julian Omidi shall be allowed to move for the release of additional funds in CR 17-661(A) DMG, so long as all of the Substitute Claimants waive their respective rights to object to the release of any requested additional portion of the defendant *res*.

---

[2] The Current Claimants were the claimants who had filed verified claims: Valley Surgical Center, LLC; Golden State Practice Management, LLC; San Diego Ambulatory Surgery Center, LLC; Top Surgeons, LLC; New Life Surgery Center, LLC; Beverly Hills Surgery Center, LLC; Orange Grove Surgery Center, LLC; Valencia Ambulatory Surgery Center, LLC; East Bay Ambulatory Surgery Center, LLC; Skin Cancer and Reconstructive Surgery Center Specialists of Beverly Hills, Inc.; Ciro Surgery Center, LLC; Palmdale Ambulatory Surgery Center, LLC; and IMS. [CV 18-3855, Doc. # 49 at 2 n.1.]

[3] The "Substitute Claimants" were those claimants against whom default had been entered, but whom the Parties agreed should be granted relief from default and given leave to file late claims: PCI; SCM; and the Trusts. Default had been entered against Defendant Omidi, and while he was not one of the Substitute Claimants permitted to file a late claim, Defendant Omidi and his counsel agreed to be bound by the Stipulation and Proposed Order, "as both bear directly on the proceedings in the related criminal prosecution [i.e., the instant action]." [CV 18-3855, Doc. # 49 at 2 n. 2, 3.]

*Id.* ¶ 13. After Defendant Omidi retained his present, substitute counsel, Willkie Farr and Gallagher LLP and Searby LLP, on December 28, 2020, Defendant, his counsel, and other relevant parties filed a stipulation agreeing to be bound by the Court's October 8, 2020 Order. [CV 18-3855, Doc. ## 65; 66.]

The Civil Forfeiture Action remains stayed and PCI, the Trusts, and SCM are the only Claimants to have filed verified claims asserting an interest in the Seized Funds. [CV 18-3855, Doc. ## 51-1 through 51-5.]

### III. LEGAL STANDARD

#### A. The Sixth Amendment and the Pretrial Restraint of Assets

"The Sixth Amendment guarantees a defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire." *Luis v. United States*, 136 S.Ct. 1083, 1089 (2016) (*quoting Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 (1989)). The right to counsel of choice is not absolute, however. For example, "[a] defendant has no Sixth Amendment right to spend another person's money for services rendered by an attorney, even if those funds are the only way that that defendant will be able to retain the attorney of his choice." *Caplin & Drysdale*, 491 U.S. at 626. The pretrial restraint of assets "*in a defendant's possession*[,]" even if needed to pay for that defendant's legal defense, is permissible if it is "based on a finding of probable cause to believe that the assets are forfeitable." *United States v. Monsanto*, 491 U.S. 600, 615 (1989) (emphasis added); *see also Kaley v. United States*, 571 U.S. 320, 327 (2014) ("With probable cause, a freeze is valid."). "Allowing pretrial restraint of assets is consistent with 'the long-recognized and lawful practice of vesting title to any forfeitable assets, in the United States, at the time of the criminal act giving rise to forfeiture'" to ensure that any "any 'ill-gotten gains' will not dissipate before conviction and protects the community's interest in recovery." *United States v. Lacey*, 378 F. Supp. 3d 814, 820 (D. Ariz. 2019) (*quoting Caplin*, 491 U.S. at 627; *Monsanto*, 491 U.S. at 616).

#### B. *Monsanto/Unimex* Hearing Standard

If a defendant provides sufficient evidence that his Sixth Amendment rights are implicated, i.e., that his or her seized assets are needed to pay for counsel, "the Court must hold a hearing to determine whether the release of funds is necessary." *Matter of Seizure of Any & All Funds Held in Republic Bank of Arizona Accounts*, No. CV 18-6742-RGK (PJWx), 2019 WL 8892585, at *8 (C.D. Cal. Dec. 20, 2019), *appeal dismissed sub nom.*, 817 F. App'x 483 (9th Cir. 2020) (*citing United States v. Unimex*, 991 F.2d 546, 551 (9th Cir. 1993)). "Such a hearing is not automatic, however, and will be held only upon a properly supported motion by a Defendant" if "'the moving papers filed, including affidavits, are sufficiently definite, specific, detailed, and nonconjectural, to enable the court to conclude that a substantial claim is presented.'" *Id.* at *8 (*quoting Unimex*, 991 F.2d at 551).

"Although the Ninth Circuit has not spoken directly to the issue, numerous other circuits have required at least some showing that the Defendant lacks other funds to pay counsel." *Arizona Accounts*, 2019 WL 8892585, at *8 (*citing United States v. Jones*, 160 F.3d 641, 647 (10th Cir. 1998); *United*

*States v. Bonventre*, 720 F.3d 126, 128, 133 (2d Cir. 2013)); *see also United States v. Cobb*, No. 2:14-CR-00194-APG-NJ, 2015 WL 518548, at *17 (D. Nev. Feb. 9, 2015) ("cases that allow a defendant a *Monsanto* hearing . . . require a defendant to provide sufficient evidence to make a threshold showing that seized assets are needed to pay for counsel of choice before a defendant is entitled to a hearing"); *Unimex*, 991 F.2d at 547 (defendant corporation left without *any* funds to defend itself at trial violated its Sixth Amendment rights).

If a defendant makes a threshold showing demonstrating his or her lack of funds and access to funds, a *Monsanto/Unimex* hearing then takes place where "the government has the burden to show probable cause." *United States v. Feathers*, No. 14-CR-00531-LHK, 2016 WL 7337518, at *6 (N.D. Cal. Dec. 19, 2016) (*citing inter alia Monsanto*, 491 U.S. at 615); *see also United States v. Swenson,* No. 1:13-CR-00091-BLW, 2013 WL 4782134, at *2 (D. Idaho Sep. 5, 2013) (if defendant makes threshold showing of lack of funds, "the government would carry the burden of proving probable cause at the [*Monsanto*] hearing"); *Bonventre*, 720 F.3d at 131 (at a *Monsanto* hearing, "the government will bear the relatively modest burden of demonstrating probable cause to believe the assets are properly forfeitable."); *Kaley* (at *Monsanto* hearing, inquiry is whether "probable cause exists to believe that the assets in dispute are traceable or otherwise sufficiently related to the crime charged in the indictment").

## IV.   DISCUSSION

### A.   Omidi's Request for Release of Funds

As an initial matter, the Court finds that Defendant Omidi may bring a request for the release of additional funds for his defense costs because the relevant parties previously stipulated, and the Court approved an Order, permitting him to do so.  [CV 18-3855, Doc. ## 49, 50.]  Defendant's ability to request additional funds, however, is separate and distinct from whether the pretrial restraint of the Seized Funds implicates Defendant Omidi's Sixth Amendment right to counsel, his Fifth Amendment rights, or his entitlement to a *Monsanto/Unimex* hearing, which is discussed further below.

The Court concludes that Defendant Omidi's request for additional funds must be denied as premature because:  (1) he has not demonstrated to the Court's satisfaction that he has insufficient funds for his defense, and (2) the October 8 Order sets forth the procedure that Defendant Omidi must follow should he seek the release of additional funds.

First, this case is unlike the above-cited cases, *see, e.g.*, *Unimex*, 991 F.2d at 547, where a defendant has *no funds* available to defend himself against criminal charges absent the release of funds. Defendant already has $10 million available to fund his defense in a trial that is approximately three months away.  In support of Defendant's request for additional funds, he states that "[t]he funds already released, particularly after the payment of prior counsel, *are likely not sufficient* to fund Mr. Omidi's defense through trial in this complex case." [Doc. # 1038 at 43 (emphasis added).]  There has been no accounting of, or clear statement regarding, what funds out of the $10 million have already been spent, or any detailed information, such as a declaration from Defendant Omidi, providing specific information regarding his lack of funds or lack of access to other funds.  Defense counsel has only submitted a generalized declaration attesting that their legal fees in another criminal matter "exceeded $20 million"

and they "believe costs are likely to be similar in Mr. Omidi's case." [Doc. # 1038-3 (Donnelly Decl.) ¶ 5.][4]

Second, there is no indication that the parties have meaningfully met and conferred, as required, to discuss whether good cause exists to stipulate to the release of additional funds. Defendant Omidi's submission of relevant documents only with his Reply brief [*see*, *e.g.*, Doc. ## 1061-1 through 1061-4] suggests that the parties must discuss in detail whether to stipulate to the release of additional Seized Funds for Defendant's defense costs.[5] In sum, at this stage, Defendant Omidi's request for the release of additional funds is denied as premature because he has not shown to the Court's satisfaction that he has insufficient funds to fund his defense, and if he believes this to be the case, he must, as agreed upon and as previously ordered by this Court, first meaningfully confer with the relevant parties regarding the potential release of additional funds and, if possible, submit a stipulation and proposed order for the Court's review. Only if the relevant parties are unable to reach an agreement will Defendant Omidi be permitted to refile a motion for the release of additional funds, supported by sufficiently detailed information to support his request.[6]

---

[4] While defense counsel are, of course, free to bill as they see appropriate and as agreed to by their client, the Court notes that in Omidi's withdrawn motion for return of property filed on April 3, 2019, Defendant submitted a declaration stating that prior counsel (Victor Sherman) and an unnamed "major international law firm" estimated that it would cost between $3.5 and $5 million to take this case to trial. [Doc. # 472-1 at ¶¶ 14-15.]

[5] In support of his motion to dismiss, Defendant submitted a letter from the Claimants' counsel stating that the Claimants do not object to the release of Seized Funds to pay Defendants' defense costs in the instant action. [Doc. # 1038-32 (Exh. 16) (April 22, 2021 Letter from William Weldon).] The letter is addressed to defense counsel, and unlike the exhibit filed with Defendant's Reply [*see* Doc. # 1061-4], was not a declaration submitted under penalty of perjury.

[6] Defendant Omidi's request for release of funds appears to be distinct from a motion for return of property pursuant to Federal Rule of Criminal Procedure 41(g), which he does not cite in his papers. To the extent that Defendant's motion may be construed as a Rule 41(g) motion, it would fail given the commencement of the Civil Forfeiture Action, which provides a remedy to challenge the alleged improper seizure of funds. *See United States v. U.S. Currency $83,310.78*, 851 F.2d 1231, 1235 (9th Cir. 1988) ("when a civil forfeiture proceeding has been filed, the claimant has adequate remedies to challenge any fourth amendment violation. Accordingly, when a civil forfeiture proceeding is pending, there is no need to fashion an equitable remedy to secure justice for the claimant."); *see also Arizona Accounts*, 2019 WL 8892585, at *9 ("General challenges to the seizure warrants are foreclosed by the ongoing civil forfeiture action, which provides Claimants the appropriate avenue through which to pursue the return of their property."). As referenced above, Defendant Omidi is not a claimant in the Civil Forfeiture Action. Even assuming that the Civil Forfeiture Action did not foreclose his ability to file a Rule 41(g) motion, such a motion would also fail given that Defendant Omidi has not met his burden to show, *inter alia*, his entitlement to the Seized Funds. *See United States v. Van Cauwenberghe*, 934 F.2d 1048, 1061 (9th Cir.1991) (generally, a Rule 41(g) motion is properly denied "if the defendant is not entitled to lawful possession of the seized property, the property is contraband or subject to forfeiture or the government's need for the property as evidence continues."); *see also United States v. Swenson*, No. 1:13-CR-00091-BLW, 2013 WL 4782134, at *2 (D. Idaho Sept. 5, 2013) ("If a motion for return of property is made while a criminal proceeding is pending, the burden is on the movant to show that he is entitled to the property.") (citing *Van Cauwenberghe*, 934 F.2d at 1061).

**B.     Motion to Dismiss on Sixth Amendment Grounds**

    **1.     *Caplin & Drysdale* and *Monsanto* Control**

    At the June 2, 2021 hearing, in response to the Court's question, defense counsel specified that Defendant Omidi's motion is limited to the criminal forfeiture allegations in this proceeding. But Defendant's motion is predicated entirely on the alleged improper seizure of assets by the Seizure Warrants issued pursuant to the civil forfeiture statute (18 U.S.C. § 981) and underlying the separate Civil Forfeiture Action. Defendant Omidi is not an account holder or signatory on any of the 14 accounts that became the Seized Funds. He also has not filed a verified claim (and is a defaulted party) in the Civil Forfeiture Action. As noted above, Defendant Omidi appears to be a beneficiary of the Trusts, and has submitted evidence that PCI, the Trusts, and SCM (the claimants in the Civil Forfeiture Action) do not object to the release of Seized Funds to help fund his defense costs in this proceeding. [*See* Doc. ## 1061-1 to 1061-3 (Exhs. 17-19) (Trust Documents); *see also* Doc. # 1061-4 (Exh. 20) (May 18, 2021 Declaration of William Weldon (Claimants' counsel)).] But Defendant's potential access to the Seized Funds, through an agreement with entities who once held those funds, is separate and distinct from Defendant's ability to state a viable Sixth Amendment claim based on the pretrial seizure of those funds.

    "The Sixth Amendment right to counsel is personal to the defendant and specific to the offense." *Texas v. Cobb*, 532 U.S. 162, 172 n.2 (2001). In *Caplin & Drysdale*, the Supreme Court explained that the Sixth Amendment right to counsel of choice does not extend beyond "the individual's right to spend *his own money* to obtain the advice and assistance of . . . counsel." 491 U.S. at 626 (emphasis added). There, the Supreme Court held that a "defendant has no Sixth Amendment right to spend another person's money for services rendered by an attorney, even if those funds are the only way that that defendant will be able to retain the attorney of his choice." *Id.* at 626-27. While *Caplin & Drysdale* dealt with post-trial forfeiture (rather than the pretrial seizures at issue here), the Supreme Court's *Monsanto* decision relatedly held that the pretrial seizure of a defendant's assets does not violate the Sixth Amendment upon a finding of probable cause, which occurred here. *See Monsanto*, 491 U.S. at 615 ("Assets *in a defendant's possession* may be restrained in the way they were here [pretrial] based on a finding of probable cause to believe that the assets are forfeitable.") (emphasis added).

    Defendant Omidi's reliance on cases where a Sixth Amendment violation was found are distinguishable as they involved the pretrial seizure of that particular defendant's assets. *See Unimex*, 991 F.2d at 547 (Sixth Amendment violation occurred where corporate defendant was left unrepresented at trial as "all of *its assets* had been seized prior to trial") (emphasis added); *see also Luis*, 136 S.Ct. at 1088 (Sixth Amendment violation occurred where government's pretrial seizure prevented defendant from "using *her own* untainted funds" to retain counsel of choice) (emphasis added).[7]

---

[7] Defendant Omidi relies heavily on *United States v. Stein*, 541 F.3d 130 (2d Cir. 2008), where the Second Circuit affirmed the district court's dismissal of defendants' indictments on Sixth Amendment grounds in a situation where, due to improper government influence and pressure, defendants' employer, KPMG, declined to follow its longstanding practice of advancing defense costs for its employees during a criminal investigation. The funds at issue, as here, did not directly belong to defendants. The *Stein* facts are distinguishable, however, as the case did not involve pretrial asset seizure (the funds at

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES—GENERAL**

Page **9** of **15**

      In sum, the Court finds that under *Caplin & Drysdale* and *Monsanto*, Defendant Omidi cannot state a viable Sixth Amendment claim for his lack of access to the Seized Funds for his defense costs. For the same reasons, the Court finds no Fifth Amendment violation due to any alleged governmental interference with Defendant Omidi's defense or violation of his due process rights.  *See Monsanto*, 491 U.S. at 614 (no Fifth Amendment violation where pretrial seizure of defendant's assets based on probable cause finding) (*citing Caplin & Drysdale*, 491 U.S. at 633).

      **2.**      **Even If the Sixth Amendment Were Implicated, Defendant Omidi Fails to Set Forth a Viable Claim**

          **a.**      **Defendant Omidi Has Not Made a Threshold Showing for a *Monsanto/Unimex* Hearing**

      Even assuming *arguendo* that Defendant's Sixth Amendment rights were implicated by the pretrial seizure of funds held by other entities (and the Court finds that they are not), the Court concludes, in the alternative, that Defendant Omidi fails to set forth a viable Sixth Amendment violation. As noted above, in order for a defendant to be entitled to *Monsanto/Unimex* hearing, (which Defendant did not request in his motion, but requested in his reply brief and at the June 2 and 4 hearings), he must make a threshold showing that he lacks funds and access to funds for his defense. *See Arizona Accounts*, 2019 WL 8892585, at *8; *Bonventre*, 720 F.3d at 128, 133; *Cobb*, 2015 WL 518548, at *17. Defendant Omidi fails to make this showing given, as discussed above:  (1) his access to $10 million for his defense, and (2) even assuming that those funds were depleted (which he has neither claimed nor established), insufficient evidence that he lacks other funds or access to other funds for his defense. *See Bonventre*, 720 F.3d at 128, 133 (affirming district court denial of *Monsanto* hearing given that defendant did not make threshold showing that he lacked non-restrained funds to pay for counsel, as he "did not disclose his net worth, provide a comprehensive list of his assets, or explain how he has been paying his significant living expenses" and although submitted affidavits "describe the aggregate balances of bank accounts enumerated in the government's submissions, they do not clarify whether [defendant] has access to other accounts and, if so, their value.").[8]

---

issue were part of KPMG's general business) and involved the employees' expectation of advancement of legal defense costs by their employer.  As other cases have noted, the *Stein* facts are unique to that case and there do not appear to be other cases relying upon *Stein* to find a Sixth Amendment violation, and the Court declines to do so here.  *See United States v. Fisher*, 273 F. Supp. 3d 354, 362 (W.D.N.Y. 2017) ("That *Stein* tested the outer limits of the Sixth Amendment's protection is demonstrated by the fact that, since the Second Circuit decided *Stein* nearly nine years ago, no court appears to have relied on the case to find a Sixth Amendment violation. A *Stein* claim is also difficult to make because *Stein's* unique facts make it challenging to extract a rule from the case.") (citation and internal quotation marks omitted); *see also United States v. Kolfage*, No. 20 CR. 412 (AT), 2021 WL 1792052, at *3 (S.D.N.Y. May 5, 2021) (recently describing other courts' lack of reliance on *Stein*); *Lacey*, 378 F. Supp. 3d at 819 ("Defendants miss an important distinction with the *Stein* cases and their case, however, as the *Stein* cases concerned [undisputedly] untainted funds from the accounting firm's general business . . . . The Government . . . never alleged the funds were tainted.  In this way, the case is also different than *Luis*, where the Government acknowledged that it was trying to stop *Luis* from using her own untainted funds.").

      [8] Defendant suggests that by virtue of the Court having previously appointed CJA counsel to represent him, he has made a sufficient showing of lack of funds or access to funds.  As discussed in greater detail below, however, the appointment of CJA counsel resulted from an unusual situation following the disqualification of Defendant Omidi's former counsel due to their conflicts of interest.  Out of an abundance of caution, the Court appointed CJA counsel as independent

### b. Magistrate Judge Kenton's Probable Cause Finding

As Defendant Omidi fails to make a threshold showing to warrant a *Monsanto/Unimex* hearing, any alternate Sixth Amendment analysis ends. The Court notes (but need not, and does not, expressly find) that Magistrate Judge Kenton's probable cause finding in issuing the Seizure Warrants has support in the record. *See Monsanto*, 491 U.S. at 615. Generally, the issuance of a search warrant by a magistrate judge is reviewed for clear error and whether the magistrate judge had a substantial basis for concluding that the affidavit in support of the warrant established probable cause. *United States v. Wright*, 215 F.3d 1020, 1025 (9th Cir. 2000) (citations omitted); *see also* 18 U.S.C. § 981(b)(2) ("Seizures pursuant to this section shall be made pursuant to a warrant obtained in the same manner as provided for a search warrant under the Federal Rules of Criminal Procedure . . . .").

The Warrant Affidavit alleged probable cause to believe that the Seized Funds represented or were traceable to proceeds of violations of 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), and/or 1347 (health care fraud), and probable cause to believe that the Seized Funds constituted or were traceable to property involved in one or more violations of 18 U.S.C. § 1956 (money laundering). The Warrant Affidavit alleged facts giving rise to probable cause to believe that the Omidis and their associates used numerous corporate entities and bank accounts in their attempts to conceal or disguise the nature, source, location, ownership and control of fraudulently-obtained funds through a widespread money laundering scheme, and to the extent any of the monies involved in the placement, layering, and integration of the fraud proceeds were untainted at the time they were initially received by GET THIN, the commingling of those monies with the tainted funds throughout the laundering process rendered them subject to seizure and forfeiture. The Government's theory of forfeitability finds support in case law. The Ninth Circuit has noted, albeit in *dicta*, that "in a money laundering charge, the commingling of tainted money with clean money taints the entire account." *United States v. Lazarenko*, 564 F.3d 1026, 1035 (9th Cir. 2009). In *United States v. Warshak*, 631 F.3d 266 (6th Cir. 2010), the Sixth Circuit affirmed an over $500 million criminal forfeiture judgment against defendant owner and principal of Berkeley, an herbal supplements company. There, the Sixth Circuit held that pursuant to 18 U.S.C. § 982(a)(2), there was sufficient evidence to conclude that the entirety of Berkeley's revenues were proceeds that resulted, whether directly or indirectly, from unlawful activity given that there was evidence that Berkeley's "entire operation was permeated with fraud[.]" The Circuit rejected Defendant owner's claim that Berkeley had roughly $25 million in legitimate sales through Walmart and GNC, holding that "[a]ny money generated through these potentially legitimate sales is nonetheless subject to

---

counsel to represent Omidi during the conflicts inquiry. [Doc. # 278.] After providing Defendant Omidi several months to retain substitute counsel, on April 9, 2019, the Court appointed CJA counsel, without objection from Omidi, to ensure that he had legal representation, because he had not retained private counsel and he made no indication that he wanted to proceed *pro se*. [Doc. # 485.] Although Defendant filed a CJA 23 financial affidavit [Doc. # 509] in support of the appointment of CJA counsel, the Court did not make an express finding of indigency because the affidavit was ambiguous in that regard. *See id.* In fact, the Court's April 9, 2019 Order expressly states that "Defendant Omidi shall file a CJA financial affidavit . . . *in order that the Court can determine the amount he shall be required to contribute to the cost of CJA counsel. In the event his financial situation improves in the future, Mr. Omidi shall notify the Court and, if appropriate, the amount of contribution shall be increased or the full cost of CJA counsel shall be reimbursed to the CJA Services fund.*" [Doc. # 485 (footnote omitted and emphasis added).] As detailed above, Defendant subsequently gained access to $10 million to help fund his defense.

forfeiture, as the sales all resulted 'directly or indirectly' from a conspiracy to commit fraud" rendering "forfeiture of Berkeley's revenues, including money generated through supposedly legitimate transactions . . . appropriate." *Id.* at 332-33. Similarly, in *United States v. Huber*, 404 F.3d 1047 (8th Cir. 2005), defendant, who ran a large farming operation, was convicted of violating various laws involving fraudulent statements to the government, tax fraud, and money laundering, in relation to the receipt of farm-program payments and federally subsidized crop-insurance benefits. Defendant claimed, among other things, that there was insufficient evidence to support the $5.9 million criminal forfeiture judgment against him, in part because it included legitimate, commingled crop-sales proceeds. In affirming the majority of the forfeiture judgment, the Eighth Circuit explained:

> The money . . . received from the sale of crops is not derived from a specified unlawful activity. Selling crops is not illegal, even if the seller falsifies his farm-program or insurance eligibility. Thus, these monies do not immediately appear to be the "proceeds of specified unlawful activity" [as set forth in the money laundering statute, 18 U.S.C. § 1956]. The government proceeded in the indictment, in its brief, and at oral argument on a commingling theory of forfeitability with regard to these funds.
>
> The crop-sales proceeds were properly forfeited under [18 U.S.C.] section 982(a)(1). As part of the money-laundering conspiracy, Huber would place or direct others to place crop-sales proceeds in the individuals' bank accounts. *Illegitimate funds from the government were also placed in those accounts and commingled with the legitimate funds.* As explained above, the payments from those accounts constituted money laundering because they were financial transactions made for, or with knowledge of, an unlawful purpose, and they "involve[d] the proceeds of specified unlawful activity"—the farm-program payments. *The presence of legitimate funds made the transactions no more lawful because the transactions still involved the illegitimate proceeds. We can find no basis to conclude that the crop-sales proceeds, although lawfully obtained, were not also laundered in violation of the statute when they were part of the money-laundering transactions. As funds Huber conspired to launder, they were properly included in the forfeiture judgment as part of the corpus of the money-laundering conspiracy.*

*Id.* at 1058 (emphasis added) (*citing United States v. Habhab*, 132 F.3d 410, 414-15 (8th Cir.1997); *United States v. Baker*, 227 F.3d 955, 969 (7th Cir. 2000)).[9]

---

[9] *Warshak* and *Huber* relied on the criminal forfeiture statute, 18 U.S.C. § 982(a)(1) and (2). The Seizure Warrants here were issued pursuant to the civil forfeiture statute, including *inter alia*, 18 U.S.C. § 981(a)(1)(A) (property subject to forfeiture where it was "involved in" a transaction or attempted transaction in violation of, among others, money laundering). Although *Warshak* and *Huber* dealt with the criminal forfeiture statute, the Court finds their analysis instructive as the cases dealt with similarly broad provisions of the respective forfeiture statutes.

The Court further notes that part of the *Huber* forfeiture judgment was reversed and remanded for issues not relevant here, where the Eighth Circuit concluded that some crop-insurance benefits (premium charges and premium subsidies) were funds that never came into individuals' accounts and thus not recoverable through the forfeiture provisions because they were not "involved in" the money-laundering conspiracy within the meaning of 18 U.S.C. § 982(a)(1). *Huber*, 404 F.3d at 1059-62.

At the June 4, 2021 hearing, defense counsel cited examples where alleged "clean" money initially held in accounts in Defendant Omidi's name eventually traveled to the Trusts, which became part of the Seized Funds. [*See* Doc. # 1049-2, Knudson Exh. 1.] Whether money was considered clean at some earlier point, however, does not mean that the funds did not become commingled and tainted and subject to forfeiture or that the funds were not central to the commission of the alleged crimes. *See Warshak*, 631 F.3d at 332-33; *Huber*, 404 F.3d at 1058; *see also United States v. Fishenko,* No. 12-CV-626 SJ, 2014 WL 4804041, at *2 (E.D.N.Y. Sept. 25, 2014) (denying defendant's motion to release seized funds upon finding that magistrate judge had issued warrants upon finding not merely commingled funds, but that the seized assets were central to the commission of the alleged crimes). Here, the Warrant Affidavit alleged probable cause to believe that the Seized Funds were commingled and/or central to the commission of the alleged crimes. *See, e.g.*, Warrant Aff. ¶¶ 12, 21-26 ("Tracing of a Representative Sample of Funds to the Subject Accounts") and ¶¶ 27-34 ("The Use of Attorney Trust Accounts in the Laundering Process"), 231-36, 244, 252, 260; *see also* CV 18-3855 Doc. # 1 at ¶¶ 35, 37, 38.

### c. Timeliness of the Civil Forfeiture Action

Defendant Omidi also asserts that the Civil Forfeiture Complaint was untimely such that the Government lost any legitimate interest in the Seized Funds, rendering its continued restraint unconstitutional and violating Defendant's Sixth Amendment rights. The Court concludes that Defendant Omidi's statute of limitations argument fails. As an initial matter, the relevant parties, including Defendant Omidi, stipulated to stay the Civil Forfeiture Action and agreed, in relevant part, that the stay included "claims involving statute of limitations[.]" [CV 18-3855, Doc. ## 23, 24.] Second, the Court finds that, per *Caplin & Drysdale* and *Monsanto*, *supra,* even assuming *arguendo* that the Civil Forfeiture Action was untimely, Defendant Omidi has no Sixth Amendment right to use another person or entity's funds for his defense. Third, even putting *Caplin & Drysdale* and *Monsanto* aside, the Civil Forfeiture Complaint sets forth sufficient allegations that it was timely filed and that the Government is entitled to the relief sought.[10, 11]

According to 19 U.S.C. § 1621, a civil forfeiture action must be filed "within five years after the time when the alleged offense was discovered, or . . . within 2 years after the time when the involvement of the property in the alleged offense was discovered, whichever was later." The limitations period "begins to accrue only upon [the government's] discovery of the offense, not with the commission thereof." *United States v. Real Prop. 874 Gartel Drive*, 79 F.3d 918, 922 (9th Cir. 1996). Concealing

---

[10] Although Defendant Omidi does not cite Federal Rule of Civil Procedure 12(b)(6) in his motion, his statute of limitations argument rests on Rule 12(b)(6) grounds, i.e., that the Civil Forfeiture Complaint fails to state a claim upon which relief may be granted. *See Jablon v. Dean Witter & Co.,* 614 F.2d 677, 682 (9th Cir. 1980) (statute of limitations defense may be raised by Rule 12(b)(6) motion). A motion to dismiss for failure to state a claim may be granted only when there is no cognizable legal theory to support the claim or when the complaint lacks sufficient factual allegations to state a facially plausible claim for relief. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010).

[11] The Government's opposition expressly refers back to arguments made in its earlier-filed opposition to Defendant Omidi's withdrawn motions for the return of Seized Funds. [Doc. # 1052 at 53 (*citing* Doc. # 516).] Accordingly, the Court rejects Defendant Omidi's argument that the Government has waived its statute of limitations arguments.

the ownership of the subject property or taking steps to conceal the involvement of the subject property with the alleged offenses tolls the limitations period. *See* 19 U.S.C. § 1621(2) (time "of any concealment or absence of the property shall not be reckoned within the 5-year period of limitation"); *see also United States v. Carrell*, 252 F.3d 1193, 1205-06 (11th Cir. 2011) (government's civil *in rem* forfeiture action was timely because statute of limitations did not commence until government's discovery of property's true ownership, given that party had "affirmatively concealed" ownership through use of straw owners). Furthermore, if parties are engaged in a continuing course of conduct, the limitations period may recommence with each violative act. *United States v. Kivanc*, 714 F.3d 782, 790 (4th Cir. 2013) ("When there is a continuing course of conduct with multiple, distinct underlying crimes that independently could support forfeiture of the same property, the limitations period starts afresh with each new offense. Thus, a court may adjudicate a forfeiture action as long as one underlying offense is not time-barred, even if the statute of limitations has run on the remaining offenses."); *United States v. 5443 Suffield Terrace*, 607 F.3d 504, 509 (7th Cir. 2010) ("here Connors committed multiple, albeit related, offenses . . . each time Connors committed a new crime . . . , he re-exposed his house to the risk of forfeiture").

The Civil Forfeiture Complaint was filed on May 8, 2018 and alleged that the defendant *res*, through the GET THIN entities, the Omidis, and their associates, engaged in a fraud scheme beginning in approximately 2008 and continuing until at least March 2016, as well as a money laundering scheme beginning no later than June 7, 2011. [CV 18-3855, Doc. # 1 at ¶¶ 5, 6, 11-13.] Among other things, the Civil Forfeiture Complaint alleges that as part of the fraud scheme, the defendant *res* was engaged in a continuing course of conduct as part of GET THIN's actions to defraud insurance companies and other entities, and a money laundering scheme (where all of the defendant *res* was involved in one or more of the money laundering transactions) to conceal and disguise the nature, source, location, ownership, and control of the proceeds of the fraud scheme to promote further criminal conduct, such that the statute of limitations restarted with each new offense, rendering the claims timely. *See id.* For example, the Complaint alleges that GET THIN entities fraudulently billed Aetna approximately $168 million for services provided between January 2008 and June 2013, and that Aetna paid approximately $54 million on those claims. *Id.* ¶ 34(b). The Complaint presents a cognizable legal theory that this allegation in itself would extend the limitations period to June 2018. *See Kivanc*, 714 F.3d at 790; *5443 Suffield Terrace*, 607 F.3d at 508.[12]

### d. Ineffective Assistance of Counsel

Although Defendant Omidi does not expressly raise an ineffective assistance of counsel claim, he impliedly asserts one with respect to his prior counsel, Kamille Dean and Roger Diamond, whom he repeatedly refers to as DUI and adult business lawyers with no experience in federal criminal matters,

---

[12] *See also* CV 18-3855, Doc. # 1 at ¶ 34(f) (alleging GET THIN fraudulently billed TRICARE approximately $67 million for services provided between January 2008 and November 2013 and that TRICARE paid approximately $2 million on those claims, extending statute of limitations to November 2018); ¶ 16(c), (d) (alleging money laundering scheme involving GET THIN Wells Fargo Bank accounts, where "[t]he total amount of inbound transactions for these 18 Omidi-controlled accounts (including numerous transfers amongst the accounts) exceeded $300 million during the period between January 2008 and December 2013[,]" extending the period to December 2018).

and CJA counsel Peter Johnson and Gregory Nicolaysen, whom he asserts were under-resourced and unable to handle the scope of this large criminal case. [*See, e.g.*, Doc. # 1038 at 18, 20.] To the extent Defendant Omidi makes an ineffective assistance of counsel argument, it fails. Generally, to establish a violation of Defendant's Sixth Amendment right to effective assistance of counsel, he must identify acts or omissions that show: (1) his counsel's performance fell below an objective standard of reasonableness; and (2) he was prejudiced as a result. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). Notably, the Court's scrutiny of counsel's performance "must be highly deferential" and it "must indulge a strong presumption" that counsel's performance "falls within the wide range of reasonable professional assistance[.]" *Id*. at 689.[13]

Defendant Omidi has had approximately 20 different attorneys make appearances for him in this case. [*See generally* CM/ECF docket.] All have taken a consistent and aggressive litigation strategy to date, namely, to attack the Government's investigation, evidence, and discovery production, to focus on discrediting government cooperator and former sleep study manager, Charles Klasky, and to contend that alleged joint defense agreements have been violated. Defendant's assertion, at this late juncture, that he would have retained different counsel had he had access to the Seized Funds, is speculative and unsupported by the record. Indeed, Defendant appears to have had a long-standing relationship with both Dean and Diamond through his self-described litigation coordinator and disbarred attorney, Brian Oxman. [*See* Doc. # 427 (Jan. 16, 2019 Hearing Tr.) at 30 (Defendant stating that "Mr. Diamond has been representing me for about six years prior to that."].) Defendant also fought forcefully to retain Dean and Diamond as his counsel before the Court ultimately disqualified them for conflicts of interest, asserting at the time that he was being deprived of his counsel of choice. [*See* Doc. ## 327 (June 13, 2018 Hearing Tr.) at 34-38; 339 (July 18, 2018 Hearing Tr.) at 92; 376; 384.] In the approximately one year between the Indictment (October 18, 2017) and the Order disqualifying Dean and Diamond (September 19, 2018), most of Defendant Omidi's filings were less than substantive in nature and revolved around spurious attempts to sanction government counsel or were related to Dean and Diamond's conflicts inquiry. [*See, e.g.*, Doc. # 188; *see generally* CM/ECF docket.] In sum, the Court declines to find that, notwithstanding Dean and Diamond's disqualification, their performance fell below an objective standard of reasonableness or that Defendant Omidi suffered any prejudice as a result during the period of their representation.

Nor did the appointment of CJA counsel violate Defendant Omidi's Sixth Amendment rights. Following Dean and Diamond's disqualification, the Court gave Defendant Omidi ample opportunity, over the course of several months, to retain substitute counsel, yet he failed to do so. [*See* Doc. # 427 (Jan. 16, 2019 Hearing Tr.) at 16-17.] Defendant did not object to CJA counsel's appointment and the Court appointed two well-qualified attorneys from the Central District's carefully vetted CJA panel to represent him pending his search for, and retention of, privately paid counsel. While current counsel now contends that CJA was under-resourced and unable to represent Defendant in this complex case, the mere fact that CJA counsel were not from a large firm does not mean that they were unable to reasonably represent Defendant Omidi's interests. Indeed, CJA counsel filed a comprehensive JDA

---

[13] Ineffective assistance of counsel claims are typically raised in the post-conviction context. *See Strickland*, 466 U.S. at 687. Notwithstanding the different procedural posture presented here, the Court uses the above framework to address Defendant Omidi's ineffective assistance claim, to the extent he is in effect asserting one.

motion [*see* Doc. # 770], which, although ultimately unsuccessful, worked to further Defendant's consistent strategy throughout this case. Moreover, CJA counsel was assisted by a coordinating discovery attorney (John C. Ellis), appointed by the Court on Defendant's behalf, to assist in their review of the discovery in this proceeding. [*See* Doc. # 535.] The Court thus rejects any contention that CJA counsel's performance fell below an objective standard of reasonableness or that Defendant Omidi suffered any prejudice as a result during the period of their representation.

**C.  Request to be Relieved of Compliance with October 8 Order**

The Court further denies Defendant Omidi's request [Doc. # 1038 at 44] to be relieved of compliance with the terms of the October 8, 2020 Order [CV 18-3855, Doc. # 50], including Defendant's obligation to reimburse CJA funds, given that the Order incorporates the provisions expressly agreed to by the parties in the Stipulation and previously raised (and not objected to by Defendant Omidi) in the Court's April 9, 2019 Order. [*See* CV 18-3855, Doc. ## 49; 50; 65; 66; *see also* Doc. # 485.] The Court notes that at the time of the Stipulation, Defendant Omidi was represented by experienced defense counsel from McGuireWoods, LLP, and he has not presented evidence to support his contention that the Stipulation was anything but voluntary. *See United States v. Molina*, 596 F.3d 1166, 1168-69 (9th Cir. 2010) ("The test regarding the validity of a stipulation is voluntariness. This court has held that stipulations freely and voluntarily entered into in criminal trials are as binding and enforceable as those entered into in civil actions. Stipulations serve both judicial economy and the convenience of the parties, and courts will enforce them absent indications of involuntary or uninformed consent.") (internal quotation marks and citations omitted); *Hotop v. City of San Jose*, 982 F.3d 710, 718 (9th Cir. 2020) ("there can be no 'unconstitutional conditions' when there is no unconstitutionality.").

**V.      CONCLUSION**

For the reasons set forth above, Omidi's motion to dismiss the Indictment and request for release of funds is **DENIED**. Should Defendant continue to seek additional funds to pay for his defense costs in this case, the parties are **ORDERED** to meet and confer and submit a stipulation and proposed order in the Civil Forfeiture Action, CV 18-3855, regarding the release of additional funds for Defendant's defense costs, if necessary, by no later than **June 25, 2021**. If the parties are unable to so stipulate, they shall file a joint status report by that date. Only after being unable to reach an agreement will Defendant Omidi be permitted to file a motion for the release of funds which includes sufficiently detailed information to support his request.

**IT IS SO ORDERED.**