Michael S. Schachter** (NY 3910205)
Randall W. Jackson** (NY 5274048)
Casey E. Donnelly** (NY4936803)
**WILLKIE FARR & GALLAGHER LLP**
787 Seventh Avenue
New York, New York 10019
Tel: (212) 728-8102; Fax: (728) 728-8111
Email: *mschachter@willkie.com*

*Attorneys for Defendant,*
Julian Omidi

[Additional Counsel Continued On Next Page]

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　　vs.<br><br>JULIAN OMIDI, INDEPENDENT MEDICAL SERVICES INC., a professional corporation, SURGERY CENTER MANAGEMENT, LLC, and MIRALI ZARABI, M.D.,<br><br>　　　　Defendants.<br>　　　　　　　　. | Case No. CR 17-00661(A)-DMG<br><br>[*Assigned to Hon. Dolly M. Gee, District Court Judge*]<br><br>**MOTION TO SUPPRESS EVIDENCE OBTAINED FROM UNREASONABLE SEARCHES AND SEIZURES**<br><br>Hearing:　July 28, 2021 at 11:00 am<br>Dept.:　Courtroom 8C<br>Location:　350 West 1st Street, 8th Fl.<br>　　　　Los Angeles, CA 90012 |

[Additional Counsel Continued From Previous Page]

Simona Agnolucci (SBN 246943)
**WILLKIE FARR & GALLAGHER LLP**
One Front Street
San Francisco, CA 94111
Tel: (415) 858-7447, Fax: (415) 858-7599
Email: *sagnolucci@willkie.com*


Bruce H. Searby* (SBN 183267)
Edmund W. Searby* ** (OH 067455)
**SEARBY LLP**
1627 Connecticut Ave, NW, Suite 4
Washington, D.C. 20009
Tel: (202) 750-6106, Fax: (202) 849-2122
Email: *bsearby@searby.law*

*Appearing specially  ** Appearing pro hac vice*

*Counsel for Defendant Julian Omidi*

**TO THE CLERK OF THE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD HEREIN:**

**PLEASE TAKE NOTICE** that, on May 28, 2021 at 11 A.M., or, as soon as this matter may be heard in Courtroom 8C, of this Court, located at 350 West 1st Street, 8th Floor, Los Angeles, California, 90012, Defendant Julian Omidi ("Defendant"), by and through his counsel of record, will move and does move to suppress evidence obtained in clear violation of the Fourth Amendment of the United States Constitution from his home, offices, computers and other digital storage devices, email accounts, and his accountant's email account because (1) the search warrants utterly failed to particularly describe the evidence to be seized and instead authorized general searches and seizures; (2) the warrants are further facially deficient in their failure to establish probable cause that particular evidence of a specified crime would be found in a particular place, and to establish necessity for the search; and (3) the execution of the general warrants were further unreasonable in that the agents unlawfully seized privileged documents and failed to limit the searches and seizures to even the deficient showing in the Affidavits. Accordingly, the evidence seized must be excluded.

A Memorandum of Law more fully setting forth the grounds for suppression is attached hereto and fully incorporated by reference herein.   This Motion to Suppress is also supported by the Declaration of Julian Omidi and by exhibits, one of which is attached (Ex. 8) and the others have been submitted for manual filing under seal with an accompanying unopposed *ex parte* application and proposed order (Ex. 1-7, 9).  Finally, the Motion To Suppress is supported by all the files and records in this case.

Pursuant to Local Rule 7-3, counsel for Julian Omidi met and conferred about this Motion to Suppress with two of the assigned Assistant United States Attorneys on June 15, 2021.  The parties did not agree on the relief requested by Mr. Omidi, but did form the terms for an agreement on the schedule for filing, briefing, and hearing the substantially lengthy arguments in this Motion To Suppress, as set forth in the accompanying unopposed *ex parte* application for an order governing those items.

WHEREFORE, for the foregoing reasons and those more fully stated in the Memorandum in Support, Julian Omidi respectfully submits that this Court should grant the Motion to Suppress.

Dated:  June 18, 2021                    Respectfully submitted,

                                                         **SEARBY LLP**

By: /s/Bruce H. Searby
            EDMUND W. SEARBY
            BRUCE H. SEARBY

            ATTORNEYS FOR DEFENDANT
            JULIAN OMIDI

# TABLE OF CONTENTS

**Page(s)**

I. PRELIMINARY STATEMENT ............................................................................. 1

II. FACTUAL BACKGROUND ............................................................................. 2

ARGUMENT ......................................................................................................... 4

III. EACH OF THE WARRANTS VIOLATE THE PARTICULARITY
REQUIREMENT OF THE FOURTH AMENDMENT. ........................................ 5

    A.    The Home Warrant and Business Offices Warrant Are Facially
Deficient General Warrants. ......................................................................... 6

    B.    The Lack of Limitation In the Home Warrant and the Business Office
Warrant Regarding the Seizure of Electronically Stored Information
Exacerbated the Constitutional Violation. ................................................. 11

    C.    The Google Warrant and AOL Warrant Are Facially Deficient General
Warrants. ..................................................................................................... 13

IV. THE GOVERNMENT FAILED TO DEMONSTRATE PROBABLE
CAUSE. ............................................................................................................ 18

    A.    The Master Affidavit Failed to Establish A Contemporaneous Nexus
Between the Particular Evidence to be Seized and the Premises to Be
Searched. ..................................................................................................... 18

    B.    The Government Failed to Demonstrate Necessity to Conduct the
Searches and Seizures. ................................................................................ 22

V. THE EXECUTION OF THE GENERAL WARRANTS FURTHER
VIOLATED THE FOURTH AMENDMENT. ..................................................... 23

    A.    The Government Unlawfully Seized Privileged Documents ....................... 25

    B.    The Retention of Documents and Data Outside the Scope of Any
Probable Cause Showing Further Demonstrates the Generality of the
Searches and the Unreasonableness of the Warrants' Execution. ............... 26

VI. ALL EVIDENCE SEIZED PURSUANT TO THE WARRANTS MUST BE
SUPPRESSED. .................................................................................................. 27

# TABLE OF AUTHORITIES

## Cases

*Andresen v. Maryland,*
    427 U.S. 463 (1976) ............................................................................. 8

*Arizona v. Gant,*
    556 U.S. 332 (2009) ........................................................................... 16

*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,*
    403 U.S. 388 (1971) ........................................................................... 24

*Brigham v. City of Stuart,*
    547 U.S. 398 (2006) ............................................................................. 4

*Camara v. Mun. Court of San Francisco,*
    387 U.S. 523 (1967) ........................................................................... 25

*Cassady v. Goering,*
    567 F. 3d 628 (10th Cir. 2009) ............................................................ 9

*City of Ontario v. Quon,*
    560 U.S. 746 (2010) ........................................................................... 14

*Coolidge v. New Hampshire,*
    403 U.S. 443 (1971) ................................................................. 5, 16, 22

*Demassa v. Nunez,*
    770 F. 2d 1505 (9th Cir. 1985) .......................................................... 25

*Durham v. United States,*
    403 F. 2d 190 (9th Cir. 1968) ............................................................ 19

*Fisher v. United States,*
    425 U.S. 391 (1976) ........................................................................... 25

*Go-Bart Importing Co. v. United States,*
    282 U.S. 344 (1931) ............................................................................. 5

*Groh v. Ramirez,*
    540 U.S. 551 (2004) .............................................................. 6, 11, 27

*Hickman v. Taylor,*
    329 U.S. 495 (1947) ........................................................................... 25

*Horton v. California,*
  496 U.S. 128 (1990) ....................................................................... 24

*Hunt v. Blackburn,*
  128 U.S. 464 (1888) ....................................................................... 25

*Illinois v. Gates,*
  462 U.S. 213 (1983) ....................................................... 4, 5, 18, 19

*In the Matter of Search of Google Email Accts.,*
  92 F. Supp. 3d 944 (D. Alaska 2015) ........................................... 15

*Klitzman, Klitzman, & Gallagher v. Krut,*
  744 F. 2d 955 (3rd Cir. 1984) ....................................................... 26

*Massachusetts v. Sheppard,*
  468 U.S. 981 (1984) ......................................................................... 6

*Payton v. New York,*
  445 U.S. 573 (1980) .................................................................. 5, 23

*Riley v. California,*
  134 S. Ct. 2473 (2014) .................................................................. 13

*Riley v. California,*
  573 U.S. 373 (2014) ......................................................................... 4

*Sgro v. United States,*
  287 U.S. 206 (1932) ....................................................................... 19

*Stanford v. Texas,*
  379 U.S. 476 (1965) .................................................................. 5, 7, 8

*United States v. Adjani,*
  452 F. 3d 1140 (9th Cir. 2006) ............................................... passim

*United States v. Brooks,*
  594 F. 3d 488 (6th Cir. 2010) ....................................................... 19

*United States v. Bucuvalas,*
  970 F. 2d 937 (1st Cir. 1992) ....................................................... 19

*United States v. Comprehensive Drug Testing, Inc.,*
  621 F.3d 1162 (9th Cir. 2010) ................................................ 13, 15

*United States v. Dethlefs,*
  883 F. Supp. 766 (D. Maine 1995) ............................................... 20

United States v. Dozier,
   844 F. 2d 701 (9th Cir. 1988).................................................................... 21

*United States v. Forrester*,
   512 F. 3d 500 (9th Cir. 2008).................................................................... 14

*United States v. Galpin*,
   720 F. 3d 436 (2d Cir. 2013)................................................................. 5, 13

*United States v. Gann*,
   732 F. 2d 714 (9th Cir. 1984).................................................................... 19

*United States v. Grant*,
   682 F. 3d 827 (9th Cir. 2012)............................................................... 19, 21

*United States v. Hill*,
   459 F. 3d 966 (9th Cir. 2006)......................................................... 15, 16, 23

*United States v. Kow,*
   58 F. 3d 423 (9th Cir. 1995)................................................................... 8, 17

*United States v. Lazar*,
   604 F. 3d 230 (6th Cir. 2010)...................................................................... 9

*United States v. Leon*,
   468 U.S. 897 (1984) ........................................................................... 27, 28

*United States v. Matter of Search of Info Assoc. with Fifteen Email
   Addresses*,
   No. 2:17-CM-3152-WC, 2017 WL 4322826 (M.D. Ala. Sept. 28, 2017) ................... 17

*United States v. Nobles*,
   422 U.S. 225 (1975) ................................................................................ 25

*United States v. Otero*,
   563 F. 3d 112 (10th Cir. 2009)................................................................... 12

*United States v. Ramirez*,
   523 U.S. 65 (1998) .................................................................................. 24

*United States v. Ramirez*,
   976 F. 3d 946 (9th Cir. 2020)...................................................................... 5

*United States v. Richards*,
   659 F. 3d 527 (6th Cir. 2011)..................................................................... 12

*United States v. Schesso*,
    730 F. 3d 1040 (9th Cir. 2013)...................................................................... 13, 15

*United States v. Spilotro*,
    800 F. 2d 959 (9th Cir. 1986)........................................................................ 6, 9

*United States v. Stabile*,
    633 F. 3d 219 (3d Cir. 2011)........................................................................... 13

*United States v. Tamura*,
    694 F. 2d 591 (9th Cir. 1982)......................................................................... 15

*United States v. Underwood,*
    725 F.3d 1076, 1085 (9th Cir. 2013) ............................................................. 26

*United States v. U.S. Dist. Court*,
    407 U.S. 297 (1972) ...................................................................................... 14

*United States v. Warshak*,
    631 F. 3d 266 (6th Cir. 2010)......................................................................... 14

*United States v. Wey*,
    256 F. Supp. 3d 355 (S.D.N.Y. 2017) ............................................................. 9

*United States v. Zolin*,
    491 U.S. 554, 571 (1989) .............................................................................. 25

*Wong Sun v. United States*,
    371 U.S. 471 (1963) ...................................................................................... 27

*Zurcher v. Stanford Daily*,
    436 U.S. 547 (1978) .................................................................................... 5, 18

## Rules

Fed. R. Crim. P. 41 ....................................................................................... 26

## Constitutional Provisions

U.S. Const. amend IV................................................................................ 4, 5, 11

# I.     PRELIMINARY STATEMENT

At least two years into an apparently stalled investigation, the Government sought to discover some case against Mr. Omidi through broad, exploratory search warrants for at least five locations and five email accounts.  In seeking to cast its net as wide as possible to find something new, the Government violated the particularity requirement of the Fourth Amendment.  Its warrants to search the Get Thin offices, as well as Mr. Omidi's residence, and all of his Gmail accounts failed to include any meaningful subject matter limitation on the evidence to be seized. The warrants further improperly authorized the seizure, without limitation, of any digital storage device found at the locations to be searched.  In short, the facially deficient warrants placed no meaningful limits on the Government, and under controlling law, the searches and seizures should be considered "warrantless."

In intentionally failing to specify the evidence sought, the Government further failed the basic constitutional touchstone to demonstrate that its massive intrusion was even *necessary* in light of the evidence already obtained in the first two years of the investigation. The Government labored under the basic misunderstanding that all it needed to do was demonstrate probable cause that the Omidis were guilty of *something* and then the Government could search for and seize *anything*, which is what the Government did, in violation of clearly established constitutional law.  The Government seized a shocking 203 digital storage devices (with a combined capacity to store hundreds of millions of electronic documents), including 91 laptop and desktop computers, 26 mobile devices, 7 servers, 17 external hard drives, 21 USB flash devices, and other digital storage devices.  The Government further seized some 1,700 boxes of hard copy documents.  This indiscriminate seizure included tens of thousands of privileged documents which were unlawfully seized without prior judicial authorization.

Even if the Government had particularly described the evidence to be seized—which it did not—its searches and seizures were still unreasonable for failure to demonstrate probable cause.  By the time the Government applied for the search warrants, the information it had obtained as part of its years-long investigation was stale.   In particular, as the Government

well knew, it lacked current information to support that the alleged unlawful activity was ongoing; a highly improbable contention given that the Government had already disclosed to the Omidis that they were being investigated.  Likewise, the Government lacked current information to support its contention that evidence not already in its possession could still be found in the places to be searched.

As described more fully below, the Government's conduct was lawless, in callous disregard of constitutional requirements, and should result in the exclusion, at trial, of all of the evidence seized pursuant to the Government's unlawful search warrants.

## II.    FACTUAL BACKGROUND

In 2010, an official with the Los Angeles County Department of Public Health sent a letter to the Food and Drug Administration ("FDA") requesting that the agency investigate whether advertisements for "Lap-Band" bariatric weight-loss surgery adequately disclosed the risks of the procedure.  (Ex. 1, Application for a Search Warrant with attachments and exhibits, Case No. 14-1111M, Affidavit of Zeva J. Pettigrew, dated May 23, 2014 ("Master Affidavit"), at p. 34).  As a result of this request, the FDA's Office of Criminal Investigations commenced an investigation and began an inquiry into various surgery centers and related healthcare companies involved in providing Lap-Band surgeries, along with their physicians and staff.[1]  Over time, the investigation broadened from allegedly misleading advertising to suspected surgeries without medical justification as well as falsification of data in support of medical necessity, during the period between 2008 and 2012.[2]

In furtherance of its investigation—and prior to applying for any search warrant—the Government subpoenaed dozens of Get Thin entities and persons associated with Get Thin, including Mr. Omidi, as well as third parties.  The Government's subpoenas sought a wide range of documents including thousands of patient files, other medical records, patient interview reports, email (including internal email between targets), letters, insurance claims

---

[1] The Master Affidavit referred to the alleged participants collectively as "Get Thin."

[2] As the Master Affidavit in support of the Government's search warrants acknowledged in its descriptions of Get Thin's operations, those operations ceased by 2013.  (*See generally,* Ex. 1, Master Affidavit.)

and data, corporate filings, tax records, bank and brokerage records for more than sixty accounts, credit card records, call center scripts and manuals, advertisements, internal company memoranda, internal meeting minutes and agendas, complaints and other legal filings, as well as other documents.  (*See* Ex. 1, Master Affidavit, at pp. 29-31, 33-34, 37-38, 40-41, 50, 55-56, 93, 109, 113, 136, and 149).  Pursuant to these subpoenas, the Government received hundreds of thousands of pages of material.  In addition, the Government also interviewed more than sixty-five individuals, including former Get Thin employees and patients, as well as insurance company investigators.  (*See id.*, Master Affidavit, at pp. 42-44, 48, 51-54, 59, 61-63, 67, 72, 75, 77, 79, 89, 91, 95-96, 104, 109, 112.)

Notwithstanding the breadth and depth of the information already obtained by the Government through its subpoenas and many witness interviews, the Government, in May 2014, sought to execute dozens of search warrants on the home where Mr. Omidi lived, the Get Thin business offices, and various Internet Service Providers for email accounts. Specifically, the Government obtained a search warrant for: (i) Mr. Omidi's residence at 1235 Sierra Alta Way (the "Home Warrant"), *see* Ex. 2, Application for a Search Warrant with attachments and exhibits, Case No. 14-1033M; (ii) business offices located at 9001 Wilshire Blvd., Beverly Hills, CA (the "Business Offices Warrant"), *see* Ex. 1; (iii) four Google email accounts, including weightlosscenters@gmail.com, executed upon Google, Inc. (the "Google Warrant"), *see* Ex. 3, Search and Seizure Warrant with attachments and exhibits, Case No. 14-1029M; and (iv) the America Online email account used by Mr. Omidi's accountant, itransact2@aol.com, executed upon America Online (the "AOL Warrant"), *see* Ex. 4, Search and Seizure Warrant with attachments and exhibits, Case No. 14-1026M (with the Home Warrant, Business Offices Warrant, and Google Warrant, collectively the "Warrants").

In support of its application for these Warrants, the Government submitted a supplemental affidavit of Zeva J. Pettigrew also dated May 2014 (the "Email Provider Affidavit").  (*See* Ex. 5, Application for a Search Warrant with attachments and exhibits, Case No. 14-1026M).  Significantly, the Government's applications to the Court did not explain why the broad exploratory Warrants were necessary in light of all of the information already

obtained. The Government failed to identify what specific evidence it still needed, other than medical insurance billing policies and procedures (which a witness said did not exist and another conceded might not exist) and access to an entire patient database. (*Id.*, Email Provider Affidavit, at pp. 139, 156-57.) Instead, the Warrants sought broad and generic "categories" of documents, including record requests related to 174 different companies, that lacked any further specificity or subject matter.

Mr. Omidi had a reasonable expectation of privacy over each of the premises that were searched and from which evidence was taken. (Declaration of Julian Omidi, at ¶¶ 2-8.)

In executing the Warrants, the Government further demonstrated no real focus or restraint, seizing by its own admission some 203 digital storage devices, entire email accounts, and at least 1,700 boxes of paper documents. (*See* Ex. 6, Government's Ex Parte Application for Order Imposing Privilege Review, Case No. CR Misc. 15-1030). While most of this evidence is outside of any conceivable probable cause showing, the Government has, to date, returned only twenty digital devices and a limited number of documents.

## ARGUMENT

The Fourth Amendment protects "the people…against unreasonable searches and seizures." U.S. Const. amend. IV; *see also Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006). "Reasonableness generally requires the obtaining of a judicial warrant." *Riley v. California*, 573 U.S. 373 (2014).[3] For a valid warrant to issue, the Government must demonstrate "probable cause:" that is, "a fair probability that contraband or evidence will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983); U.S. Const. amend. IV. The warrant itself must "particularly" describe "the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Underlying these constitutional requirements is the "premise…that any intrusion in the way of search or seizure is an evil, so that no intrusion at all is justified without a careful prior determination of necessity," and "that those searches deemed necessary should be as limited as possible." *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971).

---

[3] The warrant requirement is subject to six exceptions that do not apply to the searches in this case.

The Government's effort to execute broad exploratory search warrants violated these basic constitutional principles. Simply put, the Government completely failed to demonstrate probable cause that particular evidence would be found in a particular place. *Gates*, 462 U.S. at 228. "The critical element in a reasonable search is not that the owner of property is suspected of crime but that there is reasonable cause to believe that the specific things to be searched for and seized are located on the property to which entry is sought." *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978). The Government's misguided searches wholly lacked this "critical element," *see id.*, because they failed to particularly describe the evidence to be seized and accordingly failed to curtail the seizure to any probable cause showing.

## III. EACH OF THE WARRANTS VIOLATE THE PARTICULARITY REQUIREMENT OF THE FOURTH AMENDMENT.

"The chief evil that prompted the framing and adoption of the Fourth Amendment was the 'indiscriminate searches and seizures' conducted by the British 'under the authority of general warrants.'" *United States v. Galpin*, 720 F. 3d 436, 445 (2d Cir. 2013) (*quoting Payton v. New York*, 445 U.S. 573, 583 (1980)); *see also Go-Bart Importing Co. v. United States*, 282 U.S. 344, 357 (1931) (general searches "have been deemed obnoxious to fundamental principles of liberty."). As a result, the Fourth Amendment provides that "no warrants shall issue, but upon probable cause,…and *particularly describing* the place to be searched, and the persons or *things to be seized*." *United States v. Ramirez*, 976 F. 3d 946, 951 (9th Cir. 2020) (*quoting* U.S. Const. amend. IV (emphasis added)). "The Fourth Amendment's particularity requirement is not a mere technicality; it is an express constitutional command." *Id.*

The Particularity Clause "prevents the seizure of one thing under a warrant describing another," and ensures that "nothing is left to the discretion of the officer executing the warrant." *Stanford v. Texas*, 379 U.S. 476, 485 (1965) (*quoting Marron v. United States*, 275 U.S. 192, 196 (1927)). "The uniformly applied rule is that a search conducted pursuant to a warrant that fails to conform to the particularity requirement of the Fourth Amendment is unconstitutional." *Groh v. Ramirez*, 540 U.S. 551, 559 (2004) (*quoting Massachusetts v. Sheppard*,

468 U.S. 981, 988 n.5 (1984)); *accord, United States v. Adjani*, 452 F. 3d 1140, 1147-48 (9th Cir. 2006).

In determining whether a warrant fails the particularity requirement, the Ninth Circuit considers: "'(1) whether probable cause exists to seize all items of a particular type described in the warrant; (2) whether the warrant sets out objective standards by which executing officers can differentiate items subject to seizure from those which are not; and (3) whether the government was able to describe the items more particularly in light of the information available to it at the time the warrant was issued.'" *Adjani*, 452 F. 3d at 1148 (*quoting United States v. Spilotro*, 800 F. 2d 959, 963 (9th Cir. 1986)).

## A.   The Home Warrant and Business Offices Warrant Are Facially Deficient General Warrants.

Here, the Home Warrant and the Business Offices Warrant plainly fail constitutional requirement of particularity.  With respect to the Business Offices Warrant, the Government sought *any* documents from Get Thin's offices that happened to fall within thirty-four broad categories.  At least twenty-three of the thirty-four boiler plate categories of Items To Be Seized were not even limited in scope to the alleged Lap-Band fraud described in the Master Affidavit.  (*See* Ex. 1, Attachment B-1, at ¶¶ 7, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, and 34.).  Rather, for example, the Business Offices Warrant purported to authorize the seizure of *any* communication relating to Julian Omidi without further subject matter limitation or (i) "any aspect" of the business of some 174 business entities listed on Exhibit 1 to the Business Offices Warrant, *see id.*, Attachment B-1, at ¶ 20; (ii) any document, without subject matter limitation, related to a captive insurance company called Property Care Insurance, *see id.*, Attachment B-1, at ¶ 24; and (iii) an almost unlimited range of other documents relating to the 174 entities listed on Ex. 1 *to the warrant*,[4] Mr. Omidi, Michael Omidi, and Cindy Omidi without limitation to the alleged lap band scheme described in the Affidavits.   (*See id.*, Attachment B-1, at ¶¶ 15, 16, 17, 18, 21, 25, and 26-32).

---

[4] References to Ex. 1 to the warrant itself are not to be confused with references to Ex. 1 to this brief, which appear throughout this brief in citation to the application for a search and seizure warrant (with attachments and exhibits) for the Business Offices.

1        Particularly offensive to the particularity requirement is paragraph 20 of the Items To

2 Be Seized pursuant to the Business Offices Warrant, which authorizes the seizure of any

3 "(c)ommunications to, from, including ('cc') or about [Mr.] Omidi, Michael Omidi, or Cindy

4 Omidi related to the Lap-Band, Lap-Band patients, *or any other aspect of the business of any Ex. 1*

5 *Entity*." (*Id.*, Attachment B-1, at p. 4) (emphasis added).  This last clause thus opened up the

6 scope of the seizure to any communication involving, in any way, the Omidis and "***any…***

7 ***aspect***" of the business of some 174 entities, for a six-year time period.[5]  This category alone

8 subjected Mr. Omidi to a general exploratory search and seizure of all of his electronic mail,

9 text messages, correspondence, and other communications.  The Government's search vastly

10 exceeded the scope of any probable cause showing in the Master Affidavit.  *Adjani*, 452 F. 3d

11 at 1148; *Spilotro*, 800 F. 2d at 963.  Moreover, the Business Offices Warrant further failed to

12 set forth "objective standards" limiting the discretion of the agents as to what could be seized

13 and what could not.  *Id.*; *see also Stanford*, 379 U.S. at 485.

14        Similarly, Paragraph 21, the next category in the Items To Be Seized in the Business

15 Offices Warrant, purported to authorize the seizure of any document evidencing the

16 involvement of any of the three Omidis in "***any…aspect*** of the business" of any of the 174

17 entities listed on Ex. 1 to the warrant for a six-year time period.  (Ex. 1, Attachment B-1, at

18 pp. 4-5.)  This category alone opened up the scope of the seizure to an almost limitless range

19 of documents for which there was no probable cause established in the Master Affidavit and

20 no limitation on the discretion of the agents executing the search warrants as to what they

21 might seize.  *See Adjani*, 452 F. 3d at 1148; *Andresen v. Maryland,* 427 U.S. 463, 480 (1976) (*citing*

22 *Stanford*, 379 U.S. at 485).   The Business Offices Warrant further contained extensive

23 boilerplate descriptions of generic documents that would be found in *any* business, such as

24

25

26

27

28

---

[5] The Master Affidavit demonstrates the non-existent basis to include hundreds of entities within the scope of purported authorization to search and seize.  As the affiant explained, an entity is listed in the Affidavit if it meets even *one* of the following criteria: (a) identified in claims data for the six insurers; (b) were issued a form 1099; (c) had a bank account controlled by one or more of the Omidis; are a Four Letter Corporation; are mentioned in this affidavit; or are a dba or "were converted (sic) one of the foregoing." (Ex. 1, Master Affidavit, at p. 143).  These criteria individually, or even in combination, do not establish probable cause that documents related to one of these 174 entities constitutes evidence of a crime.

1  "contracts," "agreements," "payments," "balance sheets," "ledgers," "journals," "property

2  ownership records," "deeds," leases" "tax returns," without further guidance as to which

3  documents *within* these categories could be seized as actual evidence of a crime.  (*See* Ex. 1,

4  Attachment B-1, at pp. 4-6.

5       As for the Home Warrant, it too opened the scope of the search to any

6  communication to, from, or including any of the Omidis and "relating to *any other aspect* of the

7  business of any Ex. 1 entity," *see* Ex. 2, Attachment B-2, at ¶ 14 (emphasis added), without

8  further subject matter limitation, as well as any document "referencing or relating to Property

9  Care Insurance." (*Id.*, Attachment B-2, at ¶ 9.)  By these descriptions alone, the Home

10  Warrant authorized a general search for nearly any business document that happened to be in

11  the home where Mr. Omidi lived.  Like the Business Offices Warrant, the Home Warrant also

12  contained boilerplate descriptions of generic documents that would be found in any business

13  such as "contracts," agreements;" "(a)ny other documents showing actual or projected

14  income, profits, expenses, losses, assets, or liabilities;" "(b)ank statements and records,

15  brokerage statement and records, investment records, purchase and sale records…;

16  "(p)roperty ownership records, trust documents, deeds, leases, and rental agreements; and

17  other categories of generic documents.  (*See id.* at Attachment B-2, at pp. 1-3).

18       Federal courts must invalidate general warrants, like the Business Offices Warrant and

19  the Home Warrant, that contain no more than broad categories of the types of documents

20  that would be found in *any* business, without further specificity as to which documents within

21  those categories may be seized.  *See e.g., United States v. Kow,* 58 F. 3d 423, 427 (9th Cir. 1995)

22  (invalidating warrant for business because it described general categories of documents (*e.g.*,

23  "bank statements," "balance sheets," records related to "Federal Tax Returns") but

24  "contained no limitations on which documents within each category could be seized or

25  suggested how they related to specific criminal activity"); *Spilotro,* 800 F. 2d at 964

26  (invalidating warrant seeking "address books, notebooks, notes, documents, records"…and

27  other generic items without stating the "precise identity, type, or contents of the records

28  sought."); *United States v. Lazar,* 604 F. 3d 230 (6th Cir. 2010) (suppressing seizure of patient

files where government relied upon a generic description and did not specify the particular patient files sought on a list provided to the examining magistrate); *United States v. Wey*, 256 F. Supp. 3d 355, 385 (S.D.N.Y. 2017) (invalidating warrants that set forth "expansive categories of often generic items subject to seizure – several of a 'catch-all' variety—without crucially, any linkage to the suspected criminal activity, or indeed any meaningful content-based parameter or other limiting principle.  Importantly, the property listed is hardly, by its 'particular character, contraband.'")

Both the Business Offices Warrant and the Home Warrant thus utterly failed the requirement to describe the items sought as particularly as possible.  *See Spilotro*, 800 F. 2d at 963 (specificity required in warrant varies depending on "whether the government was able to describe the items more particularly in light of the information available to it at the time the warrant was issued"); *Cassady v. Goering*, 567 F. 3d 628, 636 (10th Cir. 2009) (difference between valid warrant and invalid warrant is whether the Government could have phrased the warrant with more specificity).   Here, the Government sought warrants after investigating the suspected Lap-Band surgery fraud for more than three years, dating back at least to December of 2010, and after having served subpoenas for records upon Get Thin and related entities beginning in February of 2012.  (*See* Ex. 1, Master Affidavit, at pp. 34, 136).  Certainly, based upon the substantial information previously received by the Government, which is summarized in the Master Affidavit, the Government should have, and could have, described the items to be seized with far greater particularity.  *Adjani*, 452 F. 3d at 1148; *Spilotro*, 800 F. 2d at 963d.  For example, the Master Affidavit could easily have limited the scope of the search and seizure to the Lap-Band surgery scheme for which the Government sought to demonstrate probable cause and any particularly described documents that the Government needed, but did not already possess, to prove the alleged tax or money-laundering offenses.

This blatant failure to comply with the Fourth Amendment results in two related constitutional problems.  Both the Business Offices Warrant and the Home Warrant failed to limit the discretion of the Government agents as to what they could seize and both Warrants also failed to limit the scope of the seizure to the probable cause showing, if any, in the

1  Master Affidavit.  *United States v. Hill*, 459 F.3d 966, 973 (9th Cir. 2006) ("Search warrants
2  must be specific. 'Specificity has two aspects: particularity and breadth. Particularity is the
3  requirement that the warrant must clearly state what is sought.  Breadth deals with the
4  requirement that the scope of the warrant be limited to the probable cause on which the
5  warrant is based.'").  As discussed above, the Government's utter lack of effort in attempting
6  to satisfy these requirements is plain, since both Warrants purport to authorize the seizure of
7  any communication or document related to "**any… aspect" of the business of some 174**
8  **entities for a six-year time period.**  (Ex. 2, Attachment B-2, at p. 4; Ex. 1, Attachment B-
9  1A, at pp. 4-5)  This same description in both Warrants further demonstrates the problem of
10  breadth, in that both Warrants purport to authorize the seizure of documents related to
11  hundreds of entities that are never even *discussed* in the Master Affidavit, much less
12  demonstrated, to a fair probability, to be involved in a specified crime.   By way of further
13  example, the authorization in the Business Offices Warrant to seize documents relating to
14  "the payment of commissions or kickbacks," while comparatively more specific, exceeded the
15  scope of the probable cause showing in the Master Affidavit, which never addresses a kick-
16  back scheme.  (Ex. 1, Attachment B-1, at p. 3, ¶ 13).

17  No reasonable agent or attorney could believe in the validity of a search warrant that
18  opened up the scope of the search and seizure to any communication or document relating to
19  "**any… aspect" of the business of some 174 entities for a six-year time period**.[6]  The
20  Government's apparent effort to maximize the scope of its Warrants can only be understood
21  as a deliberate and callous disregard for the Constitutional requirement to "particularly
22  describe…the things to be seized." U.S. Const. amend. IV; *see also Groh*, 540 U.S. at 559 ("a
23  warrant that fails to conform to the particularity requirement…is unconstitutional.").
24  Accordingly, as discussed more fully below, suppression of the evidence seized via the
25  unlawful Home Warrant and Business Offices Warrant must be suppressed.

26
27
28  _____
[6] Indicative of the extraordinary lack of particularity of the search warrants, the Government later claimed that it had amassed "18 million electronic documents" purportedly "responsive to the search warrants." (*See* Ex. 6 (excerpt from Government's Ex Parte Motion to Impose Privilege Review) at p. 5.

### B. The Lack of Limitation In the Home Warrant and the Business Office Warrant Regarding the Seizure of Electronically Stored Information Exacerbated the Constitutional Violation.

Moreover, beyond the lack of any meaningful subject matter limitation on the evidence to be seized in the Business Offices Warrant and the Home Warrant, the authorization in these Warrants to seize "(a)ny digital device capable of being used to commit, further or store evidence of the offense(s) listed above" and to seize evidence from "any device used to facilitate the above-listed violations or containing evidence falling within the scope of the foregoing categories of items to be seized" only exacerbated the blatant violation of the Fourth Amendment's particularity requirement. (Ex. 2, Attachment B-2, at pp. 7-10; Ex. 1, Attachment B-1, at p. 13). Every smart phone or computer would be "capable" of being used to commit the offenses listed; the question that the Government failed to answer is whether probable cause existed to suspect that a particular digital device contained evidence of those crimes. The Government never specified or limited the individuals whose smart phones, computers, or other digital devices could be seized and searched. Rather, by their terms, the Business Offices Warrant and the Home Warrant both impermissibly purported to authorize the seizure of any device found at the locations searched. Because no device states on the outside whether it is used to facilitate or store evidence of a criminal offense, these Warrants thus authorized a general search of any device found at the locations to be searched.

Moreover, as described more fully in Section A above, the Home Warrant and the Business Office Warrant did not meaningfully limit the information that could be seized from the electronic devices. Because these Warrants did not contain a limitation as to the employees or other individuals whose computers and other electronic storage devices could be seized and searched, nor (as discussed above) any meaningful limitation as to the information that could be seized from those devices, the Warrants unconstitutionally left the contours of the search to the complete discretion of the Government agents. [7]

---

[7] As a result of the absence of limitations, as discussed in Section A above, the Government seized some 200 digital storage devices.

In this and too many other cases, the Government abuses the need to find a needle of evidence in the electronic haystack into an unlimited right to review and retain evidence without limitation. But a computer's ability to store "a huge array of one's personal papers in a single place…makes the particularity requirement that much more important." *United States v. Otero*, 563 F. 3d 1127, 1132 (10th Cir. 2009); *accord United States v. Richards*, 659 F.3d 527, 537-38 (6th Cir. 2011) (the risk of an unconstitutional general search has increased exponentially in the computer era); *Matter of Black iPhone 4*, 27 F. Supp. 3d 74, 79 (D.D.C. 2014) (allowing the Government to search all of the records on an electronic device regardless of "whether they bear any relevance whatsoever to the investigation" is "precisely the type of 'general exploratory rummaging in a person's belongings' that the Fourth Amendment prohibits.") (citation omitted).

This situation is all the more problematic because of the Government's insistence on its right to invoke "the plain view doctrine" to retain as evidence even documents *outside* of the scope of its purported healthcare fraud investigation. (*See e.g.,* Ex. 1, Search Procedure for Digital Devices, at p. 11). Federal courts have expressed the need for judicial oversight to prevent the Government from "overseizing data and then using the process of identifying and segregating electronic data to bring constitutionally protected data…into plain view." *United States v. Schesso*, 730 F. 3d 1040, 1047 (9th Cir. 2013) (*citing United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1180 (9th Cir. 2010)). "Once the government has obtained authorization to search the hard drive, the government may claim that the contents of every file it chose to open were in plain view and, therefore admissible even if they implicate the defendant in a crime not contemplated by the warrant." *United States v. Galpin*, 720 F. 3d 436, 447 (2d Cir. 2013). This results in a serious risk that every warrant for electronic information will become, in effect, a general warrant, rendering the Fourth Amendment irrelevant. *Comprehensive Drug Testing*, 621 F.3d at1176; *accord United States v. Stabile*, 633 F. 3d 219, 237 (3d Cir. 2011) ("granting the Government a carte blanche to search every file on the hard drive impermissibly transforms a limited search into a general one.").

The magnitude of this intrusion should be understood.  Just one cell phone or smart phone may have the capacity to store "millions of pages of text, thousands of pictures, or hundreds of videos."  *Riley v. California*, 573 U.S. 373, 375 (2014).  Smart phones "are in fact minicomputers" with "immense storage capacity" for all different types of information wholly unrelated to whatever showing of probable cause the Government may claim.  *Id.* at 393.  Indeed, for the same reasons that the Supreme Court refused in *Riley* the automatic right to seize and search entire smart phones incident to arrest, *see id.*, this Court should invalidate a warrant purporting to authorize the seizure of an entire smart phone or digital device that happens to be at the scene of a search and is "*capable*" of being used to send or store a communication deemed by the Government to be fraudulent.

## C.   The Google Warrant and AOL Warrant Are Facially Deficient General Warrants.

Also, if not more, blatantly offensive to the particularity requirement of the Fourth Amendment are the warrants served upon Google and America Online to obtain respectively "*all* e-mails associated" with Mr. Omidi's email account (weightlosscenters@gmail.com), *see* Ex. 3, and his accountant's email account (itransact2@aol.com), *see* Ex. 4, for a more than six year period.  These Warrants included *no* subject matter limitation on the email seized from Google and America Online and then no meaningful limitation on the emails within this comprehensive set which could be reviewed and permanently retained.  These Warrants further reflect no effort to tailor the scope of the Government's search, and no reasonable prosecutor or agent could believe in good faith that these Warrants complied with Constitutional requirements.

Communications by electronic mail through an Internet Service Provider are entitled to the full protections of the Fourth Amendment.  *See United States v. Warshak*, 631 F. 3d 266, 285 (6th Cir. 2010) (*citing United States v. U.S. Dist. Court*, 407 U.S. 297, 313 (1972) ("[T]he broad and unsuspected governmental incursions into conversational privacy which electronic surveillance entails necessitate the application of Fourth Amendment safeguards.)).  As federal courts have repeatedly recognized, electronic mail is an essential means of

1  communication entitled to the same expectation of privacy as other protected means of

2  communication.  *See e.g., United States v. Forrester*, 512 F. 3d 500, 511 (9th Cir. 2008) ("The

3  privacy interests in [mail and email] are identical."); *Warshak*, 631 F. 3d at 286 ("It follows

4  that email requires strong protection otherwise the Fourth Amendment would prove an

5  ineffective guardian of private communication, an essential purpose it has been long

6  recognized to serve."); *cf. City of Ontario v. Quon*, 560 U.S. 746, 759 (2010) ("Cell phone and

7  text message communications are so pervasive that some persons may consider them to be

8  essential means or necessary instruments for self-expression, even self-identification.").

9        Accordingly, the Fourth Amendment should have protected Mr. Omidi's email

10  account (and his personal information contained in his accountant's email account) against

11  the wholesale search and seizure that transpired.  While the Ninth Circuit has accepted the

12  initial over-seizing of electronic data as a practical reality in certain cases, "there must be some

13  threshold showing before the government may 'seize the haystack to look for the needle.'"

14  *Hill*, 459 F. 3d at 975.  "'The wholesale seizure for later detailed examination of records not

15  described in a warrant is significantly more intrusive, and has been characterized as the kind

16  of investigatory dragnet that the Fourth Amendment was designed to prevent.'"  *Id.* at 976

17  (*quoting United States v. Tamura*, 694 F. 2d 591, 596 (9th Cir. 1982) (further citations omitted)).

18        Furthermore, the Government has a heightened duty to cabin the later search of the

19  proverbial "haystack"—the entirety of a person's email account, without limitation—to avoid

20  a general exploratory search in violation of the Fourth Amendment.  *See Schesso*, 730 F. 3d at

21  1042 ("reality" of over-seizing of evidence requires judicial officers to exercise "greater

22  diligence" to protect against the danger of a general search); *In Matter of Search of Info.*

23  *Associated With Four Redacted Gmail Accts.*, 371 F. Supp. 3d 843 (D. Or. 2018) (finding warrant

24  issued to Google unreasonable because it authorized turn-over of all emails in account); *In re*

25  *Search of Google Email Accts. identified in Attachment A*, 92 F. Supp. 3d 944, 946 (D. Alaska 2015)

26  (refusing to authorize search warrant to Google because "(t)he court is nevertheless

27  unpersuaded that the particular ['] seize first, search second ['] [approach] proposed here is

28  reasonable in the Fourth Amendment sense of the word.").

1   The Google Warrant and AOL Warrant reflect no effort to protect against a general

2   search.  This is surprising because the Ninth Circuit—more so than any other Circuit—has

3   acted strongly to protect the particularity requirement of the Fourth Amendment against

4   Government overreach and to address the Constitutional problem presented by the over-

5   seizure of electronically stored information.  *See e.g., Schesso*, 730 F. 3d at 1042; *United States v.*

6   *Comprehensive Drug Testing, Inc.*, 621 F. 3d 1162, 1177 (9th Cir. 2010) (en banc)).  Here, the

7   Government, in seeking and executing the Google Warrant and AOL Warrant plainly evaded

8   the Ninth Circuit's controlling authority and guidance and the contents of those seizures

9   should be suppressed for the following reasons.

10   First, the affidavits in support of the Google Warrant and AOL Warrant failed to

11   justify the initial wholesale seizure from Google (Mr. Omidi's email account) and America

12   Online (his accountant's email account) without a subject matter limitation.  As the Ninth

13   Circuit has plainly stated, "(w)e do not approve of issuing warrants authorizing blanket

14   removal of all computer storage media for later examination when there is no affidavit giving

15   a reasonable explanation…as to why a wholesale seizure is necessary."  *Hill*, 459 F. 3d at 976.

16   Applying the Ninth Circuit's test for whether a warrant is "sufficiently particular," as set forth

17   in *Adjani*, the search warrant for Mr. Omidi's entire email account and his accountant's email

18   account plainly authorizes the seizure of material for which no probable cause existed and

19   also fails to set out objective standards to limit the discretion of the agents as to which emails

20   may be seized and retained as evidence.  *Adjani*, 452 F. 3d at 1148.  The Google Warrant

21   authorizes the seizure of "documents related…to any other aspect of the business of any

22   entity listed on Ex. 1."  (Ex. 3, Attachment B1, at p. 5, ¶11(a)(ii).)  In short, the Google

23   Warrant in just this request authorizes the permanent seizure from Mr. Omidi's email account

24   any document relating in any way to 174 entities – most of whom are never even referenced

25   in the affidavit. The AOL Warrant similarly authorizes the seizure from Mr. Omidi's

26   accountant's email account all documents "relating to" (i) any of the 174 entities listed on Ex.

27   1 or (ii) Mr. Omidi without *any* further meaningful limitation.  (Ex. 4, Attachment B3, at

28   ¶11(b)(ii), (iii).)  These Warrants are thus outrageous in their complete disregard for a

1    Constitutional requirement.[8]

2        As to the third element of the Ninth Circuit's particularity test, there can be no

3    reasonable argument about whether the Government was capable of describing the items to

4    be seized with more particularity, since the warrant authorized the seizure of literally *anything*

5    related to the business of 174 different entities.  *See Adjani*, 452 F. 3d at 1148.   By 2014, years

6    after the investigation had commenced, the Government should have been able to state with

7    specificity the items of evidence that it still required for which probable cause was established

8    in the Affidavits.  Its complete failure to do so speaks volumes to the Government's intent to

9    conduct the very "general exploratory" searches the Fourth Amendment was designed to

10   prevent.  *Coolidge*, 403 U.S. at 467; *accord, Arizona v. Gant*, 556 U.S. 332, 345 (2009).

11       Moreover, the lack of appropriate date limitations in the Google and AOL Warrants is

12   further problematic.  The Government articulated no justification for seizing *all* of the emails

13   in those accounts, for a *six-year period*.  Indeed, the lack of end date in the Google Warrant is

14   especially confounding given that the Master Affidavit alleges a scheme to defraud which

15   ended in 2012.  *See Kow*, 58 F. 3d at 427 (holding unconstitutional warrant which did not limit

16   the time frame to period when the suspected criminal activity occurred); Ex. 1, Master

17   Affidavit, at pp. 97 ("Based upon all of the evidence set forth above, there is probable cause

18   to believe that from *2008 to 2012*, the Omidis and Get Thin were engaged in a conspiracy and

19   scheme to defraud health benefit plans…), 115 ("Between 2008 and 2012…"), 132-33

20   ("…the money that insurance companies paid them between 2008 and 2012 was largely the

21   proceeds of health care fraud…").[9]  In similar circumstances, courts have found that warrants

22

23   ---
     [8] These categories of Items To Be Seized share a preamble that the seized information shall "constitute

24   evidence of" a broad variety of federal fraud, money laundering and tax evasion offenses. (Ex. 4, Search and
     Seizure Warrant, at p. 4-5. However, there is no further guidance or detail provided as to what does and does

25   not constitute evidence of such crimes, and thus no meaningful content to any purported limitation.

26   [9] Without real support and in contradiction of other statements in the Master Affidavit, the Master Affidavit
     also states that "the investigation to date indicates from 2008 *to the present*…" that the Omidis and others were

27   engaged in a conspiracy to defraud health insurance plans, patients, and others.  (Ex. 1, Master Affidavit, at p.
     8).  The notion that the activity was ongoing is not only inconsistent with other statements in the Master

28   Affidavit, but also highly implausible.  The Omidis had received notice at least two years before, in February
     of 2012, of a federal criminal investigation that had been referred to the Government by private insurers.  (*Id.*
     Master Affidavit, at p.136).  By 2014, the Omidis were engaged in litigation against one major insurer, United

without appropriate date restrictions violate the Fourth Amendment.  *See Matter of Search of Info. Associated With Four Redacted Gmail Accts.*, 371 F. Supp. 3d at 845 (warrants overbroad where failed to include date restrictions, which Google is readily capable of using, to limit initial seizure of data); *United States v. Matter of Search of Info. Associated With Fifteen Email Addresses Stored at Premises Owned*, No. 2:17-CM-3152-WC, 2017 WL 4322826, at *7 (M.D. Ala. Sept. 28, 2017) (warrant for "*all* data" related to Google email account without date restrictions "too broad.").

## IV.    THE GOVERNMENT FAILED TO DEMONSTRATE PROBABLE CAUSE.

Even if the Warrants particularly described the evidence to be seized, thereby allowing a meaningful determination of probable cause—which they did not—additional problems with the Government's warrant application include the demonstrable lack of probable cause justifying the search and seizures.  To demonstrate probable cause, "sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others."  *Gates*, 462 U.S. at 239.  Specifically, the affiant must demonstrate a "fair probability that contraband or evidence of a crime will be found in a particular place."  *Id.* at 238.  "The critical element in a reasonable search is not that the owner of property is suspected of crime but that there is reasonable cause to believe that the specific things to be searched for and seized are located on the property to which entry is sought."  *Zurcher*, 436 U.S. at 556.

### A.    The Master Affidavit Failed to Establish A Contemporaneous Nexus Between the Particular Evidence to be Seized and the Premises to Be Searched.

Here, the Master Affidavit, notwithstanding its voluble length, failed to demonstrate probable cause that specific types of evidence of a crime would be found in the places to be searched.  The Master Affidavit is long on identifying practices deemed fraudulent but fails to demonstrate probable cause for what specific evidence of those practices (that the Government did not already have) existed and why such evidence would still be found in the

---

Health Care, which had previously refused to pay for LapBand procedures and counterclaimed for fraud. (*Id.*, Master Affidavit, at 94-95).

1   locations to be searched.  For example, the Master Affidavit emphasizes "affirmatively

2   misleading" advertising, in the form of billboards, that failed to adequately warn patients of

3   the dangers involved with the Lap-Band.  (*See* Ex. 1, Master Affidavit, at pp. 9, 31-32, 140.)

4   Setting aside the question of how anyone could adequately inform patients of medical risks

5   through a billboard ad, the Government failed to explain what additional evidence was

6   necessary to prove such a scheme existed and why there was probable cause to believe that

7   such evidence will be found in the locations to be searched.

8        In addition to the general lack of information to support probable cause, the

9   Government also failed to provide "substantial" timely information to support a "fair

10   probability" that "evidence of a crime will be found in a particular place."  *Gates*, 462 U.S. at

11   238.  "An affidavit must be based on facts 'so closely related to the time of the issue of the

12   warrant as to justify a finding of probable cause at that time.'"  *Durham v. United States*, 403 F.

13   2d 190, 193 (9th Cir. 1968) (*quoting Sgro v. United States*, 287 U.S. 206, 210 (1932)); *accord United*

14   *States v. Brooks*, 594 F. 3d 488, 493 (6th Cir. 2010) (in seeking to establish probable cause to

15   obtain a search warrant, the affidavit may not employ "stale" information.)  For example, the

16   Master Affidavit describes "Subject Premises #1" as an administrative space for Get Thin,

17   but it fails to establish what business was being conducted there at the time of the

18   Government's warrant application, much less establishes that certain specified evidence

19   would still be found in that location.

20        While the Master Affidavit alleges that two "current employees… testified they worked

21   at Subject Premises 1," both were interviewed by the Government more than a year prior to

22   the Government's submission of its search warrant applications, neither described when they

23   last "worked" (past tense in the original) at that location, and neither is cited in support of

24   what evidence might remain there.  (Ex. 1, Master Affidavit, at pp. 75, 104, 146).)  The Master

25   Affidavit does cite the interview of "CW 1" as to the departments and computers "located in

26   Subject Premises 1," *see id.*, Master Affidavit, at p. 147, but this interview took place on April

27   8, 2013, more than a year before the Government submitted its May 2014 warrant

28   application, and the Master Affidavit is unclear when CW-1 last worked or visited this

location. (*Id.*, Master Affidavit, at p. 137). "Information offered to support a search warrant becomes stale when enough time has elapsed such that there is no longer 'sufficient basis to believe…that the items to be seized are still on the premises.'" *United States v. Grant*, 682 F. 3d 827, 835 (9th Cir. 2012) (*quoting United States v. Gann*, 732 F. 2d 714, 722 (9th Cir. 1984)); *see also United States v. Bucuvalas*, 970 F. 2d 937, 940 (1st Cir. 1992) (inquiry goes to whether the information is recent enough to support that evidence will still be found in particular place).

As for "Subject Premises 2," the Master Affidavit provides a generalized statement that "medical records" or "billing records" were kept there, but the information is again beyond stale. Arman Karapetyan, the Government's source for such information, last worked as an independent contractor for Get Thin in March of 2012, two years before the Government applied for the Business Offices Warrant, and Michael Whitman, another source, last worked for Get Thin five years before, in 2009.[10] While the Government appears to have made an effort to freshen the Master Affidavit by detailing recent observations by agents of signage for "Independent Medical Services" and "staff, file folders, and file cabinets," *see* Ex. 1, Master Affidavit, at p. 151, this generalized description conveyed nothing about the actual *contents* of the "files" or "file cabinets" and was far from constituting a "substantial basis" to believe that evidence of a crime could still be found at this location.

The Master Affidavit further failed to even provide information to support that the Omidis or other targets were still current residents of the house described as Subject Premises 3, much less that they maintained specified business records there. (Ex. 1, Master Affidavit, at pp. 152-53). The Master Affidavit relates information, from an unnamed informant, that Mr. Omidi, Michael Omidi, and Cindy Omidi all lived in the house at Sierra Alta Way almost *four years* before and that Mr. Omidi, at some *unspecified* time, took "files back and forth" between the office and home. (*Id.*; *United States v. Dethlefs*, 883 F. Supp. 766, 773 (D. Maine 1995) ("This Court has endeavored to find any case in which a federal court of appeals has upheld the validity of a warrant based on information describing acts occurring over two years earlier in the absence of new evidence suggesting continuity of the crime."). The Master

---

[10] Mr. Omidi cannot locate dates of employment or interview for Mark Martinez.

Affidavit then relates surveillance by other Government agents who observed Mr. Omidi, *in 2013*, leaving the Sierra Alta Way home and entering the lobby of the Get Thin offices "carrying a bag with an attached strap." (Ex. 1, Master Affidavit, at pp. 152-53). However, the Master Affidavit provides no information as to what, if anything, was *in* the bag, so this observation does not establish probable cause that Mr. Omidi, in 2014, carried evidence of criminal activity into the home where he lived. Information as to a trash run in January of 2014 is similarly lacking in probative value. The fact that the trash contained shredded business documents (of unknown subject matter) and non-shredded bank envelopes and advertisements is hardly probative. Most account holders receive personal bank statements at home and best practices is to shred personal financial documents before sending it out in the trash to avoid identity theft and other fraud. However, even drawing the inference that the business documents *might* concern the Get Thin entities because the trash bags also contained 66 self-inking stamps for unnamed Get Thin entities, this information suggests that any business documents that were once at the home had been thrown out. In short, this was far from the "substantial basis" needed before the Government can search a private home.

A "significant gap in time can diminish the probability that the evidence will be uncovered in the search." *Grant*, 682 F. 3d at 835. Here, the specific facts discount the possibility that there was a continuing pattern of criminal activity that would support a probability that evidence would be found in the places to be searched. As discussed, at least two years prior to the search, the Government put Mr. Omidi and other targets on notice of not only scrutiny by the FDA, but of a federal criminal investigation. (*See* Ex. 1, Master Affidavit, at p. 136 ("Beginning in February 2012, the federal government…served subpoenas on Get Thin that have required the production of original medical and billing records, among other things."). The Master Affidavit is further replete with acknowledgements that the Government's scrutiny had the effect of changing those practices which the Government alleged were problematic. (*See id.*, Master Affidavit, at p. 39 ("Get Thin's advertising dropped off markedly after the foregoing exchange with the FDA.")).[11] Thus, for this reason too, the

---

[11] The Master Affidavit further relates information from "a cooperating witness" provided more than a year

Government had no reason to believe that there was an ongoing criminal enterprise or that evidence of criminal activity would be found in the locations to be searched.

### B.   The Government Failed to Demonstrate Necessity to Conduct the Searches and Seizures.

The Government's inability to identify, in the Master Affidavit, any specific evidence that it did not already possess and was therefore seeking to find at any of these locations or in the email accounts, underscores why the Master Affidavit fails the legal requirement that the Government's search and seizure be a "necessity."   *Coolidge*, 403 U.S. at 467.   A careful reading of the Master Affidavit demonstrates how much evidence the Government had already received via its subpoenas: the Master Affidavit represents that the Government already had, *inter alia*, banking and brokerage records for more than sixty accounts, *see* Ex. 1, Master Affidavit, at pp. 12, 99, IRS 1099 payment information, *id.* at pp. 15-16, incorporation records and other corporate filings, *id.* at p. 17-18, 102, 103, specific billings by category of service and by insurer, *id.* at pp. 29-31, thousands of patient files, *id.* at pp. 31, 55-56, patient interview reports, *id.* at p. 31, credit card records, *id.* at p. 33, electronic mail, including internal email between targets, *id.* at pp. 33, 81, 101, 107, 109, 130, 149, correspondence with the FDA, *id.* at 37-38, call center scripts, *id.* at pp. 40-41, internal meeting minutes and agendas, *id.* at pp. 50, 113, nutrition letters, *id.* at p. 62, pre-approval surgery packets submitted to insurers, *id.* at p. 65, court filings, *id.* at p. 93, and other documents.   The Master Affidavit does not specify what particular *additional* evidence the Government actually needed and for which it could demonstrate probable cause that such material could be found in a particular place.   To the contrary, as discussed above, the Warrants simply contained broad, boiler plate document categories without an explanation of why or what was still needed years into the investigation, other than access to one computer database.   *Supra* at 5-16.

---

prior to the search warrant to suggest that Mr. Omidi shredded documents.   (Ex. 1, Master Affidavit, at pp. 137-38). However, the Affidavit never provides any date for when the actual alleged shredding of documents took place (it may have been years prior to the actual interview in 2013) or any reason to have confidence in the reliability of the confidential informant.   Accordingly, these facts do not enhance the probability that particular evidence would still be found in a particular place, and arguably make it materially less likely.

The Master Affidavit further demonstrates instead a real agenda on the Government's part to intrude upon the Omidi's space in the hope of seizing, and imaging, each of the smart phones owned by the Omidis.  (*See, e.g.*, Ex. 1, Master Affidavit, at p. 155 ("I believe that the occupants of Subject Premises # 3, J. Omidi and C. Omidi, both use mobile devices to conduct Get Thin business").  The lack of specificity in the Warrants leads to the inescapable conclusion that after years of investigating, the Government believed it needed to find something more and used the evidence already garnered to inflict "the evil" of a broad exploratory search, just to see what it could find.  The Fourth Amendment was designed to prevent exactly this.  *See e.g.*, *Payton*, 445 U.S. at 583.

As to the Google Warrant, the lack of necessity is even more blatant.  In support of a finding of probable cause, the Master Affidavit summarizes, for some thirty pages, email after email that the Government already possessed, and which has been sent or received by Mr. Omidi and others.  (Ex. 5, Email Affidavit, at pp. 6-36.)  What the Affidavit does not explain is why the intrusion into Mr. Omidi's entire email account for *six* years, *without* subject matter limitation, was even necessary, in light of the quantity of email already produced to the Government through subpoenas or other means.  *See Hill*, 459 F. 3d at 976 (applicant for warrant must demonstrate wholesale seizure of electronically stored information is "necessary.")  In addition, the Email Affidavit failed to explain why it was necessary to seize two years of email *after* the end of the alleged scheme to defraud in 2012.  *See e.g.*, Ex. 1, Master Affidavit, at p. 97 ("Based upon all of the evidence set forth above, there is probable cause to believe that from *2008 to 2012*, the Omidis and Get Thin were engaged in a conspiracy and scheme to defraud health benefit plans…").

## V.   THE EXECUTION OF THE GENERAL WARRANTS FURTHER VIOLATED THE FOURTH AMENDMENT.

Even if the Government had obtained lawful warrants—which it did not—the method by which a warrant is executed must also be reasonable.  *See e.g., United States v. Ramirez*, 523 U.S. 65, 71 (1998) ("the general touchstone of reasonableness which governs Fourth Amendment analysis…governs the method of execution of the warrant.").  In particular, the

officers must conduct their search "strictly within the bounds set by the warrant." *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 395 n.7 (1971). The Supreme Court has held that, "[i]f the scope of [a] search exceeds that permitted by the terms of a validly issued warrant…the subsequent seizure is unconstitutional without more." *Horton v. California*, 496 U.S. 128, 140 (1990).

Here, the wanton overbreadth of the Government's seizure is demonstrated by the fact the Government seized some 203 digital storage devices, including seven servers, 91 laptop and desktop computers, 26 mobile devices, 17 external hard drives, 21 USB flash drives, and other digital devices which collectively had the capacity to store hundreds of millions of electronic documents. (*See* Ex. 7, Declaration of James M. Aquilina ("Aquilina Decl.") at ¶11). The Government further seized entire email accounts, and at least 1,700 boxes of paper documents. (*See* Ex. 6 (excerpts of Government's Ex Parte Application for Order Imposing Privilege Review, No. CR Misc. 15-1030)). Of the 200 digital devices, the Government returned 23 digital devices, including cellular phones, hard drives, CDs, and thumbdrives that were represented to have never been processed by the filter team. Accordingly, the Government reviewed some 177 digital storage devices—each with the capacity to store millions of documents—pursuant to Warrants that provided no meaningful limits on what could be seized from those devices.

Furthermore, in executing the Warrants, the Government abused the generality of each of the Warrants to seize and retain vast numbers of documents that were not particularly described in the Warrants and for which the Government never established probable cause to seize, including tens of thousands of privileged documents. The Government further violated provisions in the Warrants intended to limit the intrusion of the search and seizure, such as provisions limiting the time that electronic devices could be retained off-site to be searched.

### A.    The Government Unlawfully Seized Privileged Documents

"The basic purpose" of the Fourth Amendment, as recognized in "countless decisions" of the Supreme Court, "is to safeguard the privacy and security of individuals

1   against arbitrary invasions by government officials." *Camara v. Mun. Court of San Francisco*, 387

2   U.S. 523, 528 (1967).  The attorney-client privilege and the attorney work product are firmly

3   established rights to privacy.  *See Upjohn Co. v. United States*, 449 U.S. 383, 389 (1991).  This

4   privilege operates as a bar to the disclosure of confidential communications between attorney

5   and client.  *See e.g., Fisher v. United States*, 425 U.S. 391, 403 (1976).  The right to the assistance

6   of legal counsel "can only be safely and readily availed of when free from the consequences

7   or the apprehension of disclosure."  *Upjohn*, 449 U.S. at 389 (*quoting Hunt v. Blackburn*, 128

8   U.S. 464, 470 (1888)); *accord, United States v. Zolin*, 491 U.S. 554, 571 (1989).

9       The law further recognizes "a qualified privilege" to be held by lawyer and client for

10   "certain materials prepared by an attorney 'acting for his client in anticipation of litigation.'"

11   *United States v. Nobles*, 422 U.S. 225, 237-38 (1975) (*quoting Hickman v. Taylor*, 329 U.S. 495, 508

12   (1947)).  As the Supreme Court explained, a lawyer must be able to "work with a certain

13   degree of privacy, free from unnecessary intrusion by opposing parties and their counsel."

14   *Hickman*, 329 U.S. at 510; *Demassa v. Nunez*, 770 F. 2d 1505, 1507 (9th Cir. 1985) (finding

15   attorney-client privilege essential to the Sixth Amendment right to effective assistance of

16   counsel.)

17       Here, by executing sweeping search warrants years after disclosing to Mr. Omidi the

18   ongoing investigation, the Government knew that there was a substantial likelihood that it

19   would encounter privileged material.  Indeed, by first notifying the Omidis of the

20   investigation and then, later, executing search warrants, the Government primed the pump to

21   the creation of attorney-client communications and attorney work product, which were seized

22   by the Government pursuant to the Home Warrant, the Business Offices Warrant and the

23   Google Warrant.  The Government aimed the Google Warrant in particular at the account

24   that Mr. Omidi used to communicate with his counsel, and, by including an overly broad time

25   frame that captured all communications from 2008 until the execution of the Warrant, in

26   2014, seized privileged communications and attorney-work product regarding the

27   investigation itself.

28

Accordingly, the Government purposefully violated its duty to avoid and minimize the extent of any intrusion into the privilege.  *See Klitzman, Klitzman, & Gallagher v. Krut*, 744 F. 2d 955, 961 (3rd Cir. 1984) ("The government well knew, prior to the search, that the client files contained privileged communications, *yet the government took not one step to minimize the extent of the search or to prevent the invasion of the clients' privacy guaranteed by the attorney-client privilege*.") (emphasis added).  As the Government's unauthorized taint team or filter team later determined, the agents seized tens of thousands of privileged documents which it listed on a 4,227-page log.  *See* Ex. 8, May, 1, 2020 letter from Taint Team to Counsel for Michael Omidi ("The database privilege log refers to more than 60,000 documents withheld from the prosecution team as they were deemed to potentially contain attorney-client communications, communications that one or more defendants might claim were protected under a joint defense agreement, or constituted attorney-work product.")).

### B.   The Retention of Documents and Data Outside the Scope of Any Probable Cause Showing Further Demonstrates the Generality of the Searches and the Unreasonableness of the Warrants' Execution.

Not only did the Government retain privileged documents for years after the execution of the Warrants, but the Government retained a massive number of documents outside the scope of any probable cause showing in the Affidavits.  As for the documents in paper form, Fed. R. Crim. P. 41 makes no allowance to review the paper documents offsite to determine whether within the scope of the warrants.  But, the Government seized more than 1,700 boxes of hard copy materials.  As for documents stored digitally, Rule 41 does allow for the offsite segregation of data, but the Google Warrant at least rightly placed a sixty-day time limit on that review.  (*See e.g.*, Ex. 3, Attachment B1, at p. 2)

The Government violated those limits by retaining data for longer than allowed.  For example, the Google Warrant issued to Google allowed the Government thirty days—or until August 7, 2014—to complete its review of the electronic mail produced.  However, the Government apparently did not initiate its taint team (or filter team) review until months after the deadline.  (*See* Ex. 9, April 19, 2016 email of AUSA Evan Davis ("you've known that we've been reviewing seized evidence (through a taint team) since October 30, 2015). Based

on available information, the Government did not receive any extension of the deadline set forth in the Google Warrant.  These examples further prove the unreasonableness of the Government's execution of the Warrants.

## VI.   ALL EVIDENCE SEIZED PURSUANT TO THE WARRANTS MUST BE SUPPRESSED.

For the reasons discussed above, the search and seizures executed pursuant to the Warrants plainly failed the basic requirements of the Fourth Amendment.  The remedy for these violations is suppression of the evidence obtained.  *See e.g., Wong Sun v. United States*, 371 U.S. 471, 488 (1963).  The Government cannot invoke its good faith reliance on the issuance of the Warrants to avoid the exclusion of evidence.  For the reasons described above, the Warrants "were so obviously deficient" that the Court must conclude that the Government's searches were "'warrantless' within the meaning of [controlling] case law." *Groh*, 540 U.S. at 559 (*citing United States v. Leon*, 468 U.S. 897, 923 (1984)).

The Government plainly labored under either a complete misunderstanding or a complete disregard for the requirements of the Fourth Amendment.  But it does not matter which.  "Given that the particularity requirement is set forth in the text of the Constitution, no reasonable officer could believe that a warrant that plainly did not comply with that requirement was valid." *Groh*, 540 U.S. at 563.  Similarly, no reasonable agent could believe that the Master Affidavit in support of the Warrants established probable cause for the general search and seizure performed by the Government.  As discussed above, given the lack of current information, or in many instances, *any* information to support probable cause to search specific locations and to seize specific digital devices, no Government agent could have believed in good faith in the legality of the Warrants.  *See Leon*, 468 U.S. at 923 ("Nor would an officer manifest objective good faith in relying on a warrant 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" (citation omitted.); *United States v. Underwood*, 725 F.3d 1076, 1085-86 (9th Cir. 2013) (in view of the lack of probable cause on the face of the affidavit, the government  failed to carry its burden of establishing applicability of the good faith exception).  Nor could the Government believe

1   in good faith in their right to search Mr. Omidi's home and offices when the Master Affidavit

2   provided no basis to believe that there was ongoing criminal activity there or evidence of a

3   crime still kept there. *See id.* This Court should order the suppression of all of the evidence

4   seized pursuant to the Warrants.

5

6   Dated:  June 18, 2021            Respectfully submitted,

7                                           **SEARBY LLP**

8                               By: /s/Bruce H. Searby

9                                     EDMUND W. SEARBY
                                      BRUCE H. SEARBY

10

11                                    ATTORNEYS FOR DEFENDANT
                                      JULIAN OMIDI

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## PROOF OF SERVICE

2

3    I am employed and a resident of the District of Columbia. I am over the age of 18

4    and not a party to the within action; my business address is 1627 Connecticut Avenue,

5    NW, Suite 4, Washington, DC, 20009. On June 18, 2021, I served the document described

     as:

6

7

8    **MOTION TO SUPPRESS EVIDENCE OBTAINED FROM
     UNREASONABLE SEARCHES AND SEIZURES**

9

10   Upon the interested parties in this action as follows:

11        _____X_____  By the Court's ECF.

12   I declare that I am employed in the office of a member of the bar of this Court at whose
     direction the service was made.

13   Executed on June 18, 2021.

14

15                                        /s/Bruce H. Searby_____

16                                        Bruce Searby

17

18

19

20

21

22

23

24

25

26

27

28