Michael S. Schachter** (NY 3910205)
Randall W. Jackson** (NY 5274048)
Casey E. Donnelly** (NY4936803)
**WILLKIE FARR & GALLAGHER LLP**
787 Seventh Avenue
New York, New York 10019
Tel: (212) 728-8102; Fax: (728) 728-8111
Email: *mschachter@willkie.com*

Simona Agnolucci (SBN 246943)
**WILLKIE FARR & GALLAGHER LLP**
One Front Street
San Francisco, CA 94111
Tel: (415) 858-7447, Fax: (415) 858-7599
Email: *sagnolucci@willkie.com*

Bruce H. Searby* (SBN 183267)
Edmund W. Searby** (OH 067455)
**SEARBY LLP**
1627 Connecticut Ave, NW, Suite 4
Washington, D.C. 20009
Tel: (202) 750-6106, Fax: (202) 849-2122
Email: *bsearby@searby.law*

*Appearing specially  ** Appearing pro hac vice*

*Counsel for Defendant Julian Omidi*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>Julian Omidi, *et al.,*<br><br>Defendants. | CR No. 17-00661 (A) – DMG<br><br>**JOINT STATUS REPORT CONCERNING RELEASE OF ADDITIONAL FUNDS FOR OMIDI DEFENSE COSTS** |

TO THE HONORABLE COURT:

Defendant Julian Omidi and the Government respectfully submit this joint status report concerning Mr. Omidi's request for the release of additional funds to pay for defense costs, as directed by the Court in its Order, dated June 15, 2021 (the "Order," filed at Dkt. 1084). Consistent with the Order, the parties have met and conferred regarding Mr. Omidi's request for additional funds but were unable to come to a mutual resolution, as described below.

I.   <u>Mr. Omidi's Efforts to Meet and Confer With the Government Were Unsuccessful and Mr. Omidi Intends to File a Motion with the Court Seeking the Release of Additional Monies to Pay for Defense Costs.</u>

On Wednesday, June 9, 2021, counsel for Mr. Omidi contacted the Government, by email, and asked for an opportunity to meet and confer concerning access to additional funding for Mr. Omidi's defense. The Government was unable to make itself available until Tuesday, June 15, 2021. Prior to the meet and confer on June 15, defense counsel provided the Government with information concerning the use of the $10 million that was released in the fall of 2020, as well as information concerning counsel's anticipated expenses going forward. Specifically, defense counsel explained that of the original $10 million, approximately $5.7 million remains. Once the $389,088 owed to CJA is remitted, the available amount will decrease to $5,346,271. To date, legal expenses incurred out of the $10 million have been as follows:

- McGuire Woods LLP:  $404,464 (fees and expenses);
- Baker Hostetler LLP:  $480,153 (fees and expenses);
- Willkie Farr & Gallagher LLP:  $2,571,872 (fees and expenses), with an additional $548,842 incurred but not yet paid;
- Searby LLP:  $259,310 (fees and expenses).

Defense counsel requested that the Government release an additional $8.5 million to fund the following anticipated defense costs through the resolution of this matter:

| | |
|---|---|
| Retention of Defense Experts | $800,000 |
| Retention of trial graphics and jury consulting firm | $350,000 |
| Retention of professional to assist with review of technical sleep data | $400,000 |
| Investigative work: | $500,000 |
| Continued hosting of e-discovery | $500,000 |
| Contract attorneys to assist with document review | $300,000 |
| Fees for Searby LLP | $500,000 |
| Fees for Willkie Farr & Gallagher | $6.5 million |
| Fees for additional attorney (not yet retained) that Mr. Omidi would like to hire | $800,000 |
| Travel, accommodation, shipping, printing associated with trial | $700,000 |
| Fees and expenses associated with potential sentencing and appeal | $2.5 million |
| Total | $13.8 million |

The $5.3 million that remains of the $10 million originally released will not cover the defense's expenses through trial.  Moreover, the Government has previously acknowledged that, even by its own accounting, it seized between $23 and $27 million in *innocent* assets that even the Government agrees were *not* earned from any alleged wrongdoing.  (Dkt. 1038 at 4-5.)  It is undisputed that these monies, which exceed the total amount that Mr. Omidi has asked the Government to release so that he can pay for his defense costs, were honestly earned, but were seized solely on the basis that they were in the same bank accounts as allegedly tainted assets, under the Government's "commingling"

1   theory.[1]

2        During the June 15th meet and confer, the parties were unable to come to any

3   agreement concerning the release of additional monies.  The Government informed defense

4   counsel that, notwithstanding the information that defense counsel had provided concerning

5   anticipated expenses, the Government would be unwilling to release any additional monies

6   until Mr. Omidi demonstrated to the Government's satisfaction that neither he, nor any of

7   the family members that have assisted Mr. Omidi in the past, had any financial assets.

8   Defense counsel pointed out that Mr. Omidi does not own any property—he lives with his

9   mother, in her home, and drives a car lent to him by his brother, who also contributes to Mr.

10  Omidi's modest living expenses—and asked whether proof of these facts, in the form of a

11  declaration, accompanied by proof of credit card receipts, etc., would satisfy the

12  Government.  The Government responded that such evidence would not be enough, as it

13  wanted proof that no one else in Mr. Omidi's family had any assets either.[2]

14       Defense counsel responded to the Government's request for proof that no one else in

15  the Omidi family had any assets by explaining to the Government that the courts have found

16  that the relevant test for assessing whether a defendant has means to hire counsel is limited

17  to only those assets that the defendant controls, since he cannot *force* his family to sell their

18  assets to pay for his defense.  *See In re Extradition of Manrique*, Case No. 19-mj-71055,

19  2020 WL 510229, at *3 (N.D. Cal. Jan. 31, 2020) (unless defendant has legal "control" over

20

21  ───────────────

22  [1] While the Government quibbles with the defense's characterization of these assets as "innocent" and "honestly earned," *see infra* at 9, the Government does not—and cannot—contest the undisputed fact that it seized between $23 and $27 million in assets that it agrees were not earned as a result of any alleged wrongdoing.  This enormous sum of assets was seized simply because these funds happened to be in the same bank accounts that allegedly "tainted" assets were later deposited into.  Given that these millions of dollars were earned from legitimate medical procedures and not fraud, they should be available to Mr. Omidi to fund his defense against the Government's allegations.

25  [2] The Government now faults defense counsel for not providing a "comprehensive listing of assets" to the Government, but in fact, defense counsel offered to provide such information, in a declaration describing Mr. Omidi's assets and detailing how he pays his living expenses and how he has afforded counsel in the past.  In response to that offer, the Government confirmed that such a declaration would not be sufficient because it wanted information regarding the financial assets of the entire Omidi family.  Of course, with the Court's permission, Mr. Omidi is willing to disclose, *in camera*, all of his assets, along with information about his living expenses, so that the Court may reference that information while considering Mr. Omidi's soon-to-be-filed motion requesting additional funds.

3

his wife's assets, *her* property does not constitute *his* property for purposes of considering whether he can afford to retain counsel).  During the meet and confer, the Government claimed that it had law to the contrary, but it did not provide any actual legal citations.  In its position statement to the Court, *see infra* at 7, the Government now claims that *United States v. Bonventre*, 720 F.3d 126, 133 (2d Cir. 2013), stands for the proposition that a court can consider assets of family members in considering whether a defendant can afford to retain counsel of choice.  *Bonventre* says no such thing.  In *Bonventure*, the Second Circuit found that the defendant was not yet entitled to a *Monsanto* hearing because "he provided insufficient information for a court to evaluate the extent of *his* unrestrained funds."  *Id.* (emphasis added).  The Court explained that the defendant had only disclosed the balances of those bank accounts identified by the Government, but had not "clarif[ied]" whether he also held other bank accounts, that the Government had not identified in its submission.  *Id.* Nor had the defendant "disclose[d] his net worth, provide[d] a comprehensive list of his assets, or explain[ed] how he ha[d] been paying his significant living expenses."  *Id.*

Nothing in *Bonventure* supports the Government's contention that Mr. Omidi must prove not only that *he* does not have sufficient assets to hire counsel of choice, but *also* that no one in his family has any assets either.  The Government's claim is inconsistent with the law, which looks only at those assets that the defendant controls.  *See, e.g.*, *United States v. Lexin*, 434 F. Supp. 2d 836, 840 (S.D. Cal. 2006) (in considering whether a defendant can afford to retain counsel, "if the Defendants' spouses are unwilling or financially unable to retain counsel, the spouses' assets are not to be considered by the Court."); *United States v. Zelenka*, 112 F. Supp. 2d 708, 716 (M.D. Tenn. 1999) ("Although a defendant may have family or friends who are capable of providing the defendant with funds, the defendant has no legal means of compelling such aid. It cannot be said that a defendant who is in the position of relying on the goodwill of friends and family, who are under no legal obligation to assist the defendant, possesses the ability to retain counsel.") (citing cases).  As Mr. Omidi will detail in his upcoming motion for release of funds, he has no money in his control.  Contrary to the Government's speculation, *see infra* at 8, Mr. Omidi is not a

4

1   signatory on any bank accounts that contain assets.[3] No one is "holding" assets that actually

2   belong to Mr. Omidi.  Instead, Mr. Omidi depends on his family for everything from

3   groceries to gas, as Mr. Omidi will detail for the Court in his soon-to-be-filed motion for

4   additional funds.

5          Even though the law clearly provides that assets of a defendant's friends and family

6   members should not be taken into account in considering whether a defendant can afford to

7   retain counsel, defense counsel nevertheless asked the Government whether declarations

8   from Mr. Omidi's family members—in which they explained that they were not willing, or

9   were not in a position, for their own reasons, to sell whatever remaining assets they might

10  have in order to pay Mr. Omidi's defense costs through trial—would prove, to the

11  Government's satisfaction, that Mr. Omidi truly does not have any other way to pay for his

12  defense, other than through the release of more of the seized funds.[4]  The Government said

13  that such declarations would not be sufficient to persuade the Government to release

14  additional funds, because the money was seized pursuant to a probable cause finding.

15  Defense counsel pointed out that the $10 million that was previously released, in the fall of

16  2020, had also been seized pursuant to a probable cause finding and asked the Government

17  why the probable cause finding did not bar release in the fall of 2020, but would now.  The

18  Government refused to answer, stating only that the Government was not required to

19  disclose its internal deliberations.

20         Because the Government has now explained that it will not voluntarily release any

21  additional monies, regardless of what proof of need is presented, because of the probable

22  cause finding, Mr. Omidi intends to file a further motion with the Court, seeking the release

23  ──────────────────────

24  [3] Mr. Omidi might have a suspended bank account with less than $1,000 dollars in it, which was set up
    over 20 years ago at Orange County Teachers Federal Credit Union. He has not been able to find records

25  for this bank account.

26  [4] The Government cites to *United States v. Jamieson*, 189 F. Supp. 2d 754, 757 (N.D. Ohio 2002*), see
    infra* at 12, n.5, but the only thing that *Jamieson* says is that the defendant's friends and family should
    confirm that they are unwilling to make their assets available to the defendant to fund his defense; it does

27  not say that the assets of friends and family—even if unavailable to the defendant—"count" as assets
    attributable to the defendant in considering whether he can afford counsel.  Mr. Omidi can and will

28  confirm for the Court that his family members are not willing to use their remaining assets to pay for his
    defense and given that fact, their assets should not, and cannot, be attributed to him.

──────────────────────
5

1  of additional funds to pay for defense costs.   Mr. Omidi will provide the Court, *in camera*,

2  with evidence of his financial status, as well as evidence identifying how his living expenses

3  are paid and how the retained attorneys who formerly represented him were paid.[5]  As the

4  Court will see, Mr. Omidi's day to day living expenses are very minimal, and with some

5  small amount of assistance from his brother, he is able to manage.  But, he simply does not

6  have the millions of dollars in assets that the Government seems to believe.  Nor is there

7  any reasonable basis for the Government's speculation on this issue:  as defense counsel

8  has pointed out before, if Mr. Omidi had the millions of dollars in assets that the

9  Government seems to believe he has, he never would have accepted court-appointed

10  counsel to represent him for more than a year, given that Mr. Omidi's very *liberty* is at stake

11  in this proceeding.

12        II.      The Government Submits that Defendant Julian Omidi Has Not Established

13        Good Cause for the Release of Additional Funds

14       The government disagrees with defendant Julian Omidi's ("OMIDI") counsel's

15  characterization of the meet-and-confer discussions.  Moreover, OMIDI's counsel has not

16  provided factual support for OMIDI's claim that he does not have access to funds for his

17  criminal defense, and, therefore, OMIDI's counsel has not demonstrated good cause for

18  the release of additional funds.

19       In an email sent on June 9, 2021, in response to OMIDI's counsel's email from the

20  same day requesting the scheduling of a meet-and-confer, the government advised

21  OMIDI's counsel that it needed further information to evaluate OMIDI's contention that

22  there is good cause for the government to release additional funds.  Specifically, the

23  government requested:

24       a comprehensive listing of [OMIDI's] assets, information regarding his access to

25       assets (to fund his living expenses and the retention of counsel over the last few

26       years, for example), and information regarding both the disposition of the $10

27

28  ---

[5] The Government does not appear to appreciate that in the civil litigation it references, *see infra* at 8, Mr. Omidi represents himself *pro se* and does not have counsel.

6

million in released funds and estimated future expenses related to his criminal

defense).

(Email to Michael Schachter, Esq., et al., from AUSA Kristen Williams, dated June 9, 2021, at 3:05 p.m. PDT.)

In response, several days later, OMIDI's counsel provided information regarding use of the released funds to date and estimated future expenses (as set forth in OMIDI's position above), but did not provide the requested comprehensive listing of assets or information regarding his access to assets for his living expenses and his prior retention of counsel.  Rather, OMIDI's counsel merely indicated that OMIDI has "no meaningful assets," noting that "[h]e lives with his mother in a house he does not own," "[h]e does not own a car," and "[h]is relatively modest day to day living expenses are paid by his brother."  (Email to AUSA Kristen Williams, et al. from Michael Schachter, Esq., dated June 14, 2021, at 5:35 p.m. PDT.)

Nor did OMIDI's counsel provide the requested information during the meet-and-confer, citing *United States v. Stein*, 541 F.3d 130 (2d Cir. 2008) -- distinguished by the government and this Court (*see* Order Denying Mot. to Dismiss ("Order") at 8 n.7, Dkt. 1084) -- in refusing to provide information regarding OMIDI's access to funds held in the names of other individuals and entities.  The government maintained that OMIDI's access to funds of other individuals and entities is relevant under case law previously cited.  *See, e.g.*, *United States v. Bonventre*, 720 F.3d 126, 133 (2d Cir. 2013).  (*See* Gov't Opp. to Mot. To Dismiss at 23, Dkt. 1052; Order at 9.)  Also, to permit a defendant to evade a showing that he lacks funds for his defense by ensuring that the assets from which he benefits and pays his living expenses are in others' names would only encourage the concealment of assets and obfuscation of the defendant's true financial situation through gamesmanship, as recognized by the authority OMIDI cites.  Thus, in *In re Extradition of Manrique*, cited by OMIDI's counsel above, the court noted that the unwillingness of defendant's wife to pay for defendant's legal expenses, even though she had considerable funds and previously used them for joint expenses to pay for counsel,

1    is not necessarily the end of the matter because sometimes people lie about what

2    assets they have, or who has them.  Putting all your money in your spouse's name

3    to avoid payment obligations is hardly a new idea.  A defendant who has a lot of

4    money but who wants the government to foot the bill for his defense has an

5    incentive to say his money all belongs to family members, and courts can't just

6    credulously accept that assertion when it seems false.  *See, e.g.*, *United States v.*

7    *Lefkowitz*, 125 F.3d 608, 621 (8th Cir. 1997).  Indeed, an affidavit claiming

8    indigency is particularly unworthy of belief when the government later comes

9    forward with information that the defendant had access to significantly more funds

10    than he disclosed in the affidavit.  *See United States v. Harris*, 707 F.2d 653, 660-

11    61 (2d Cir. 1983).

12    2020 WL 510229, at *2.  Moreover, the bare fact that OMIDI has had a multitude of

13    *retained* attorneys in this case and others, even when represented by appointed counsel

14    and well before the $10 million was released in October 2020, speaks to his ability to

15    access funds for his defense when he chooses to do so.

16    Instead of providing information, OMIDI's counsel repeatedly asked the

17    government to confirm whether or not it would release funds based on vague

18    hypotheticals without any information about whether they were even based in fact.  The

19    government responded that it would have to see the proof itself and consider it in its

20    totality before making any determination, and provided a further listing of information (in

21    addition to that described in the June 9, 2021 email) that it would find relevant on that

22    issue, including:

23    •    Information regarding the source of funds used to retain counsel for OMIDI

24    in this case and the numerous other civil litigation matters in which he has been a

25    party;

26    •    Information regarding the source of funds used to retain Brian Oxman,

27    litigation coordinator for OMIDI and the GET THIN entities;

28    •    To the extent other individuals and/or entities have provided funding to retain

8

those counsel and/or Mr. Oxman, or funded or provided access to their assets for OMIDI's living expenses, information regarding the assets for those individuals and entities;

- To the extent not captured above, information regarding the unrestrained assets of Property Care Insurance and the Trusts (who have indicated they are willing to permit OMIDI to access any interest they may have in the restrained assets); and

- Information regarding OMIDI's status as a signatory on bank accounts associated with GET THIN entities that would indicate his control over assets, irrespective of the entity's nominal owner.

OMIDI's counsel neither committed to  providing any of the requested information to the government (substantiating his hypotheticals or otherwise) nor indicated that he would be unwilling to do so.  However, following the meet-and-confer discussion, OMIDI did not provide the requested information, but instead sent a proposed joint status report and asked the government to insert its position.  After the government provided that position to OMIDI, OMIDI then revised his position to state that he *is* willing to offer evidence of his financial status and how his living expenses and former retained attorneys were paid, but only in an *in camera* submission to the Court that will provide the government no opportunity to respond, rather than in the meet-and-confer process.

The government also notes that the anticipated expenses set forth by OMIDI's counsel above and in response to the government's June 9, 2021 email requesting further information far exceed prior estimates of the cost to defend this case, as evidenced by the parties' earlier stipulation regarding the release of funds.  (*See United States v. Approximately $107,539,422.29 in Funds and Securities*, CV 18-3855-DMG, Dkt. 49.) The expenses largely are attributable to one law firm, Willkie Farr & Gallagher (more than $3 million thus far and an additional $6.5 million sought), with considerably lesser but still significant amounts attributable to Searby LLP, which was hired to and has been litigating pretrial motions (more than $250,000 thus far and an additional $500,000

9

sought), and an additional, not-yet-retained law firm that OMIDI "would like to hire" ($800,000). OMIDI apparently believes that he can spend as much money as he wants defending this case without any consideration for the availability of funds or the reasonableness of the expenses. But this is not what the law contemplates, nor does the unavailability of funds in this circumstance create a Sixth Amendment violation. *See, e.g., Caplin & Drysdale, Chartered v. United States,* 491 U.S. 617, 624 (1989) ("The [Sixth] Amendment guarantees defendants in criminal cases the right to adequate representation, but those who do not have the means to hire their own lawyers have no cognizable complaint so long as they are adequately represented by attorneys appointed by the courts. A defendant may not insist on representation by an attorney he cannot afford." (citation omitted)). Indeed, the funds seized by the government are not OMIDI's personal piggy bank from which he can withdraw as large an amount of funds as he believes he needs.

With respect to the forfeiture itself, the government has never "acknowledged that . . . it seized between $23 between $23 and $27 million in *innocent* assets . . . ." The government seized the entirety of the funds and securities that make up the defendant assets in the related civil forfeiture case on the ground that they represent proceeds of specified unlawful activity and/or were involved in one or more money laundering transactions. Those allegations were set out in the affidavits supporting the applications for seizure warrants and are also set out in detail in the verified complaint in the related civil forfeiture action, which is the only action in which the defendant funds and securities are implicated – an action to which OMIDI is not a party. Thus, none of the defendant assets are "innocent assets," as all of them were seized based on a judicial finding of probable cause that they were proceeds of crime or were involved in money laundering, and are sought for forfeiture on those same grounds.

Moreover, the government has made no admission that the monies not traceable to the scheme alleged in the civil forfeiture complaint were "honestly earned"; rather, the government has stated only that those funds were not proceeds of the specific scheme

10

1  alleged.  The government has not taken, and does not anticipate taking, a position on the

2  legitimacy of the source of those funds, as that issue is not relevant to any issue in either

3  case.

4         Absent a showing under *United States v. Monsanto*, 491 U.S. 600 (1989), that

5  OMIDI lacks assets to sufficient assets to retain counsel (which, as described above and in

6  the Order, OMIDI has declined to make), OMIDI cannot even reach the point of

7  challenging the probable cause finding that the defendant funds and securities are subject

8  to forfeiture, a finding that makes those funds and securities ineligible for release for use

9  for OMIDI's criminal defense and a finding that the Court has already noted appears to be

10 supported by the record (*see* Order at 10).  In addition, the government noted during the

11 meet-and-confer that there are conflicting claims to the defendant funds and securities,

12 and OMIDI is not among the claimants.  The government further notes that it is involved

13 in a separate meet-and-confer with defendant Surgery Center Management, LLC ("SCM")

14 in which SCM is also seeking to invade the defendant *res* on Sixth Amendment grounds.

15 Neither OMIDI nor SCM was an account holder for any of the accounts from which the

16 defendant funds and securities were seized.

17        Further, the government noted during the meet-and-confer that OMIDI'S counsel

18 seemed to be suggesting that OMIDI's family was not lacking in assets that could be

19 applied to his defense, but only that it preferred that the criminally tainted funds in the

20 civil forfeiture cases be used for that purpose – a position that is materially inconsistent

21 with the body of law addressing these issues.  *See, e.g.*, *Caplin & Drysdale*, 491 U.S. at

22 626, 631; *Monsanto*, 491 U.S. at 613-14, 616; *United States v. Jones*, 160 F.3d 641, 647-

23

24

25

26

27

28

11

48 (10th Cir. 1998); *United States v. Farmer*, 274 F.3d 800, 804-05 (4th Cir. 2001).[6] Indeed, OMIDI's arguments here and in his recently denied motion to dismiss seek to use others' money as both a sword and a shield: claiming a Sixth Amendment right to use others' money to pay for his defense when those funds are restrained subject to a probable cause finding that they are forfeitable, while simultaneously attempting to prevent the Court from considering his access to unrestrained funds held by others in evaluating his request for additional funds.

Finally, the government made clear during the meet-and-confer that it would not disclose its internal deliberations that led to the earlier release of funds from the civil forfeiture case, but reminded OMIDI's counsel that the release was not, and could and should not be interpreted as, an admission that those released funds were not forfeitable. (*See* Stipulation and Request for Release of Funds, CV 18-3855 DMG, Dkt. No. 49, at ¶ 7 ("None of the Parties makes any admissions by entering into this Stipulation concerning the forfeitability of the Released Funds or any of the acts or omissions alleged in either the Complaint in this action or the First Superseding Indictment in CR 17-661(A) DMG.").)

For the above reasons, OMIDI has not demonstrated good cause for the release of additional funds, much less an additional $8.5 million, from the defendant *res* in the civil forfeiture case.

Dated:  June 25, 2021                                  Respectfully submitted,

---

[6] OMIDI contends above that he has no obligation to provide information concerning his access to the assets of his family members or companies that he or his family members control, relying upon cases from the Second Circuit and district court opinions from the Southern District of California and the District of Tennessee.  However, he fails to acknowledge, much less address, the substantive body of law that has developed in the wake of *Jones* and *Farmer*, the rules and structure of which have been adopted or cited with approval by the Third, Fourth, Fifth, Sixth and Tenth Circuits, and numerous district courts elsewhere. *See, e.g.*, *United States v. Jamieson*, 189 F. Supp. 2d 754, 757 (N.D. Ohio 2002) (to satisfy the Sixth Amendment requirement, defendant must show he has no access to funds from friends or family); *United States v. Emor*, 794 F. Supp. 2d 143,149 (D.D.C. 2011) (among other things, defendant failed to show that he did not have access to funds from the corporation that he controlled to pay for counsel).  While the Ninth Circuit has not explicitly adopted the *Jones*/*Farmer* rule, neither has it rejected it, and the rule is entirely consistent with existing Ninth Circuit law in this area.

1

2          TRACY L. WILKISON
           Acting United States Attorney
3

4          SCOTT M. GARRINGER
           Assistant United States Attorney
5          Chief, Criminal Division

6

7               /s/
           KRISTEN A. WILLIAMS
8          CATHY J. OSTILLER
           ALEXANDER C.K. WYMAN
9          STEVEN R. WELK
           Assistant United States Attorneys
10

11

12         Attorneys for Plaintiff
           UNITED STATES OF AMERICA
13

14         **WILLKIE FARR & GALLAGHER LLP**

15         By:   *s/ Michael S. Schachter*
                 MICHAEL S. SCHACHTER
16               RANDALL W. JACKSON
                 CASEY E. DONNELLY
17               SIMONA AGNOLUCCI

18

19

20

21

22

23

24

25

26

27

28

STATUS REPORT OF JULIAN OMIDI
CASE NO. 17-00661 (A) - DMG