1  Michael S. Schachter** (NY 3910205)
2  Randall W. Jackson** (NY 5274048)
   Casey E. Donnelly** (NY4936803)
3  **WILLKIE FARR & GALLAGHER LLP**
   787 Seventh Avenue
4  New York, New York 10019
   Tel: (212) 728-8102; Fax: (728) 728-8111
5  Email: *mschachter@willkie.com*

6   *Attorneys for Defendant*,
7   Julian Omidi

8  [Additional Counsel Continued On Next Page]
9

10              **UNITED STATES DISTRICT COURT**
11              **CENTRAL DISTRICT OF CALIFORNIA**
12

13 | UNITED STATES OF AMERICA, | Case No. CR 17-00661(A)-DMG |

14            Plaintiff,              [*Assigned to Hon. Dolly M. Gee, District Court Judge*]

15     *vs*.

16 JULIAN OMIDI, INDEPENDENT         MR. OMIDI'S REQUEST FOR
   MEDICAL SERVICES INC., a          RECONSIDERATION OF THE
17 professional corporation, SURGERY COURT'S JUNE 15, 2021 ORDER
   CENTER MANAGEMENT, LLC, and       (Dkt. 1084)**; ORAL ARGUMENT**
18 MIRALI ZARABI, M.D.,              **REQUESTED.**

19            Defendants.

20                 .                  Date:    July 28, 2021
                                      Time:    2:30 PM
21                                    Place:   Courtroom of the Honorable
                                              Dolly M. Gee
22                                            350 West 1st Street,
23                                            Courtroom 8C, 8th Floor,
                                              Los Angeles, California,
24                                    90012
25
26
27
28

[Additional Counsel Continued From Previous Page]

Simona Agnolucci (SBN 246943)
**WILLKIE FARR & GALLAGHER LLP**
One Front Street
San Francisco, CA 94111
Tel: (415) 858-7447, Fax: (415) 858-7599
Email: *sagnolucci@willkie.com*

Bruce H. Searby* (SBN 183267)
Edmund W. Searby*** (OH 067455)
**SEARBY LLP**
1627 Connecticut Ave, NW, Suite 4
Washington, D.C. 20009
Tel: (202) 750-6106, Fax: (202) 849-2122
Email: *bsearby@searby.law*

*Appearing specially  ** Appearing pro hac vice*

*Counsel for Defendant Julian Omidi*

MR. OMIDI'S MOTION FOR RECONSIDERATION OF THE COURT'S ORDER, DATED JUNE 15, 2021

**TO THE CLERK OF THE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD HEREIN:**

    **PLEASE TAKE NOTICE** that, on July 28, 2021 at 2:30 P.M., or, as soon as this matter may be heard in Courtroom 8C, of this Court, located at 350 West 1st Street, 8th Floor, Los Angeles, California, 90012, Defendant Julian Omidi ("Defendant"), by and through his counsel of record, will move and does hereby move this Court, pursuant to Local Rule 7-18(a), (c), FRCP Rule 59 and 60 (b)(1), (b)(6), to reconsider this Court's June 15, 2021 Order (Dkt. 1084), denying Mr. Omidi's Motion to Dismiss, filed at Dkt. 1038, which was based on the Government's improper restraint of funds and the denial of Mr. Omidi's Sixth Amendment right to counsel of choice.  Mr. Omidi seeks oral argument on this Motion for Reconsideration.

    On June 29, 2021, counsel for Mr. Omidi advised the Government of this filing and offered to meet and confer, if the Government believed it could be productive and might lead to a common filing.  The Government agreed that no meet and confer was necessary, as the Government opposes Mr. Omidi's request for reconsideration of the MTD Order.

    This Motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities in support of this Motion, all matters which the Court may judicially notice, the documents and pleadings previously filed with this Court, including those briefs and exhibits filed with the Court in connection with Mr. Omidi's Motion to Dismiss (Dkt. 1038), and upon such oral and documentary evidence that Mr. Omidi may present at the hearing of this Motion.

# TABLE OF CONTENTS

**Page**

I.   MR. OMIDI RESPECTFULLY REQUESTS RECONSIDERATION OF
     THE JUNE 15 MTD ORDER ................................................................... 1

     A.   The June 15th Order Denying Mr. Omidi's Motion To Dismiss .................... 1

     B.   The Court Erred When It Failed to Consider that Courts Other Than
          the Ninth Circuit Have Found That the Sixth Amendment Protects
          Against Government Interference With A Defendant's Right to Retain
          Counsel of Choice, Regardless of Whether Counsel is Being Paid by a
          Third Party ....................................................................................... 4

     C.   The Court Erred In Its Consideration of Whether the Government Had
          Established Probable Cause To Seize All of the Assets, Including
          Those Honestly Earned ..................................................................... 6

     D.   The Court Erred When It Concluded That the Government's Civil
          Forfeiture Complaint Was Filed Within the Applicable Statute of
          Limitations ....................................................................................... 9

II.  CONCLUSION ................................................................................... 15

# TABLE OF AUTHORITIES

**Case**                                                                    **Page(s)**

*Caplin & Drysdale, Chartered v. United States,*
    491 U.S. 617 (1989)......................................................................................4

*City of Emeryville v. Robinson,*
    621 F.3d 1251 (9th Cir. 2010) ...............................................................11

*Luis v. United States,*
    136 S. Ct. 1083 (2016).......................................................................9, 10

*Recycle for Change v. City of Oakland,*
    856 F.3d 666 (9th Cir. 2017) .................................................................11

*United States v. 22 Santa Barbara Drive,*
    Case No. 91-56184, 1997 U.S. App. Lexis 17960
    (9th Circuit July 16, 1997)......................................................................6

*United States v. 5443 Suffield Terrace, Skokie, Ill.,*
    No. 02 C 1883, 2008 WL 4874826 (N.D. Ill. June 17, 2008),
    *aff'd,* 607 F.3d 504 (7th Cir. 2010) ......................................................13

*United States v. $116,000 in U.S. Currency,*
    721 F. Supp. 701 (D.N.J. 1989) ............................................................12

*United States v. $448,342.85,*
    969 F.2d 474 (7th Cir. 1992) ..................................................................7

*United States v. $515,060.42 in U.S. Currency,*
    152 F.3d 491 (6th Cir. 1998) .................................................................11

*United States v. Bornfield,*
    145 F. 3d 1123 (10th Cir. 1998) .............................................................7

*United States v. Four Tracts of Prop.,*
    70 F.3d 1273 (6th Cir. 1995) .................................................................11

*United States v. Huber,*
    404 F.3d 1047 (8th Cir. 2005) ............................................................6, 8

*United States v. James Daniel Good Prop. Titled in Name of James Daniel Good*, 971

      F.2d 1376 (9th Cir. 1992) ...............................................................11

*United States v. Inman*,

      483 F. 2d 738 (4th Cir. 1973) ..........................................................5

*United States v. Lazarenko*,

      564 F.3d 1026 (9th Cir. 2009) ..........................................................6

*United States v. Puche*,

      350 F. 3d 1137 (11th Cir. 2003) ........................................................7

*United States v. Real Property 874 Gartel Drive, Walnut, California*,

      79 F.3d 918 (9th Cir. 1996) .............................................................11

*United States v. Ritchie*,

      2019 U.S. District LEXIS 112121  (D. Nev. 2019) ........................................6

*United States v. Spiegel*,

      995 F.2d 138 (9th Cir. 1993) ...........................................................10

*United States v. Stein*,

      541 F.3d 130 (2d Cir. 2008) ............................................................5

*United States v. Tencer*,

      107 F.3d 1120 (5th Cir. 1997) .........................................................7

*United States v. Yashar*,

      166 F.3d 873 (7th Cir. 1999) ..........................................................14

Other Authorities

L.R. 7-18(a) ..................................................................................10

FRCP 60(b)(1), (b)(6) ........................................................................10

Defendant Julian Omidi hereby submits this motion seeking reconsideration of portions of the Court's Order, dated June 15, 2021, denying Mr. Omidi's motion to dismiss (the " MTD Order," filed at Dkt. 1084).

## I.    MR. OMIDI RESPECTFULLY REQUESTS RECONSIDERATION OF THE JUNE 15 MTD ORDER.

### A.    The June 15th Order Denying Mr. Omidi's Motion To Dismiss.

On April 22, 2021, Mr. Omidi filed a Motion to Dismiss the Indictment on the basis that the Government had improperly interfered with his Sixth Amendment right to retain counsel of choice, through its illegal restraint of $127 million in assets that would otherwise have been available to Mr. Omidi to fund his defense, and which also sought the release of the seized funds to pay for Mr. Omidi's legal fees through the resolution of this matter.[1]  The Court denied Mr. Omidi's Motion on June 15, 2021.  (Dkt. 1084).

In relevant part, the Court found that Mr. Omidi could not raise a complaint under the Sixth Amendment concerning the Government's seizure of the $127 million, given that the monies were seized from accounts held by Property Care Insurance ("PCI") and three family Trusts (the "Trusts") to which Mr. Omidi is an beneficiary.  The Court concluded that even though PCI and the Trusts agreed that they would have made their assets available to Mr. Omidi to fund his defense (and that they had no objection to a contemporaneous release of the seized funds to Mr. Omidi's counsel, for use in Mr. Omidi's defense), that "agreement" did not give Mr. Omidi a "viable Sixth Amendment claim based on the pretrial seizure of [PCI and the Trusts'] funds."  *See* MTD Order at 8. Instead, the Court found that a claim based on the Government's interference with a defendant's right to retain counsel of choice was only legitimate when the defendant was

---

[1] Mr. Omidi hereby incorporates by reference the facts and each of the arguments made in his Motion to Dismiss, which includes briefing and supporting exhibits filed at Dkts. 1038, 1061, and 1068.  Defined terms used herein have the same meaning as in Mr. Omidi's Motion to Dismiss.

1  planning to retain counsel of choice with "his own money," rather than money belonging

2  to others.[2]  *Id*. at 8.

3    The Court also found that even if the Sixth Amendment *did* apply in circumstances

4  in which someone else was willing to pay the defendant's legal fees, as is the case here,

5  Mr. Omidi had not met the "threshold" standard for an evidentiary hearing under

6  *Unimex/Monsanto* to determine whether the Government could demonstrate probable

7  cause that the assets it had seized (which otherwise would have been used to retain

8  counsel of choice) were truly forfeitable.  MTD Order, at 9-10.  The Court determined

9  that Mr. Omidi had not yet made the "threshold showing that he lacks funds and access to

10 funds for his defense" to justify a *Unimex/Monsanto* hearing.  *Id*.  The Court noted that it

11 had released $10 million for Mr. Omidi's legal fees in the fall of 2020 and that Mr. Omidi

12 had not explained what, if anything, was left of that sum.  *Id*.  In setting forth its

13 conclusion, the Court cited to the Second Circuit's decision in *United States v. Bonventre*,

14 which found that a *Monsanto* hearing was premature where the defendant had not yet

15 "disclose[d] his net worth, provide[d] a comprehensive list of his assets, or explain[ed]

16 how he has been paying his significant living expenses."  MTD Order, at 9 (*citing* 720

17 F.3d 126, 133 (2d Cir. 2013).)

18   In addition, the Court "note[d]," but refrained from "expressly find[ing]," that

19 Magistrate Judge Kenton's probable cause finding in 2014 had "support in the record."

20 MTD Order at 10.   In his Motion to Dismiss, Mr. Omidi had argued that the $127 million

21 in assets were improperly restrained for two reasons.  First, Mr. Omidi argued that a

22 significant portion of the seized assets were earned through entirely legitimate means,

23 such as medical procedures that have never been alleged to be improper, and were seized

24 by the Government solely on the basis of a legally dubious "commingling" theory that

25

26 _____

27 [2] For this same reason, the Court rejected Mr. Omidi's claim that the Government,
   through its asset seizure, had also violated the Fifth Amendment's due process clause
   when it interfered with Mr. Omidi's right to mount a defense against the Government's
28 allegations.  (*Id*. at 9.)

permitted clean assets to be transformed into forfeitable assets simply because they were in the same bank accounts that allegedly "tainted" assets were later deposited into. Second, Mr. Omidi argued that the Government no longer had any claim to the assets it had seized in 2014, since it had failed to file a civil forfeiture action until after the applicable statute of limitations had expired and thus, all of the assets should have been released years ago, upon the passage of the statute of limitations, so that Mr. Omidi could have used them to fund his defense.

The Court rejected Mr. Omidi's first argument after finding that the Government's commingling theory had "support in case law." *Id*. at 10-11 (citing *United States v. Lazarenko*, 564 F.3d 1026 (9th Cir. 2009), *United States v. Warshak*. 631 F.3d 266 (6th Cir. 2010) and *United States v. Huber*, 404 F.3d 1047 (8th Cir. 2005). The Court explained that even though Mr. Omidi was able to point to seized monies that were honestly earned ("clean"), that fact did not "mean that the funds did not become commingled and tainted and subject to forfeiture or that the funds were not central to the commission of the alleged crimes." MTD Order, at 12.

The Court also rejected Mr. Omidi's argument that the Government had been improperly restraining the seized funds since the date when the statute of limitations expired in the Civil Forfeiture Case. The Court found that the defendant *res* in the Civil Forfeiture Case was "engaged in a continuing course of conduct" to defraud insurance companies and a "money laundering scheme (where all of the defendant *res* was involved) in one or more of the money laundering transactions to conceal and disguise the nature, source, location, ownership and control of the proceeds of the fraud scheme to promote further criminal conduct, such that the statute of limitations restarted with each new offense, rendering the claims timely." MTD Order at 13.

However, notwithstanding these conclusions, the Court found that Mr. Omidi did have grounds to bring a motion to release additional funds for legal fees from the sum seized by the Government in 2014, since the Court's October 8, 2020 Order (CV-18-3855, Doc. #50) expressly permits Mr. Omidi to file such a motion. The Court agreed that if the

1   parties themselves could not come to a mutual agreement about the release of additional

2   funds, Mr. Omidi could bring such a request to the Court, so long as Mr. Omidi's request

3   included "sufficiently detailed information" about why additional funds were necessary.

4   *See* MTD Order at 6, 15.

5          As described in the parties' joint status report, *see* Dkt. 1097, Mr. Omidi is

6   currently in the process of collecting information for the Court for a motion to release

7   additional funds, which will explain how Mr. Omidi pays his everyday living expenses

8   and will describe how Mr. Omidi has paid for retained counsel in the past.

9          **B.     The Court Erred When It Failed to Consider that Courts Other Than the
10                  Ninth Circuit Have Found That the Sixth Amendment Protects Against
                    Government Interference With A Defendant's Right to Retain Counsel of
11                  Choice, Regardless of Whether Counsel is Being Paid by a Third Party.**

12         As described above, the Court found that Mr. Omidi could not raise a complaint

13   under the Sixth Amendment concerning the Government's seizure of the $127 million

14   because Mr. Omidi would not be retaining counsel of choice with "his own money," but

15   rather that made available to him by PCI and the Trusts.[3]  *Id.* at 8.  While the Court found

16   that the Supreme Court's statement in *Caplin & Drysdale, Chartered v. United States,*

17   where the Supreme Court stated that a defendant "has no Sixth Amendment right to spend

18   another person's money for services rendered by an attorney," constituted a holding that

19   the Sixth Amendment does not apply in circumstances in which the defendant's legal fees

20   would be paid by a third party, Mr. Omidi respectfully contends that the Court

21   misinterpreted the point the Supreme Court was making.  491 U.S. 617, 626 (1989).  In

22   *Caplin & Drysdale*, the Supreme Court was distinguishing between tainted assets and

23   untainted assets and was making the pointed that tainted assets cannot be used by the

24   defendant to pay counsel because they do not belong to him—they belong to his victims,

25   vis a vis the Government.   *Id.* ("A robbery suspect…has no Sixth Amendment right to

26

27   _____
     [3] For this same reason, the Court rejected Mr. Omidi's claim that the Government had also
28   violated the Fifth Amendment's due process clause when it interfered with Mr. Omidi's
     right to mount a defense against the Government's allegations.  (*Id.* at 9.)

1  use funds he has stolen from a bank to retain an attorney to defend him if he is
2  apprehended.  The money, though in his possession, is not rightfully his; the Government
3  does not violate the Sixth Amendment if it seizes the robbery proceeds and refuses to
4  permit the defendant to use them to pay for his defense.").  Mr. Omidi does not contest
5  that he has no right to use tainted assets to pay for his defense but Mr. Omidi contends
6  that *Caplin & Drysdale* cannot be read as excluding from the Sixth Amendment a
7  defendant's right to use untainted assets, offered to the defendant from a family or friend
8  or employer, to pay for his defense, without Government's interference.  No such
9  circumstance was in front of the Court in *Caplin & Drysdale.*

10         While Mr. Omidi appreciates the Court's position that the Second Circuit's decision
11  in *United States v. Stein*, 541 F.3d 130, 156 (2d Cir. 2008), is distinguishable, *see* MTD
12  Order at 8 n.7, Mr. Omidi's respectfully contends that *Stein* is in fact consistent with
13  another decision, by the Fourth Circuit Court of Appeals, that the Court may have
14  inadvertently overlooked in its analysis.  In *United States v. Inman*, the Fourth Circuit
15  held that the "Sixth Amendment right to counsel includes…the right of any accused, if he
16  can provide counsel for himself by his own resources *or through the aid of his family or*
17  *friends*, to be represented by an attorney of his own choosing." 483 F. 2d 738, 739-40 (4th
18  Cir. 1973).  *Inman* remains good law and has been cited dozens of times over its forty
19  year history.  Importantly, the Supreme Court never said, in either *Caplin & Drysdale* or
20  *Monsanto*, that it was overruling the Fourth Circuit's holding on this issue—nor did it
21  have to, since the question of whether the Sixth Amendment prohibition against
22  Governmental interference applies to untainted assets offered to a defendant from a third
23  party was not in front of the Court in those cases.  For these reasons, Mr. Omidi
24  respectfully requests that the Court reconsider its finding that Mr. Omidi cannot raise a
25  complaint under the Sixth Amendment simply because he is not the direct owner of the
26  assets that would fund his defense.
27
28

**C.   The Court Erred In Its Consideration of Whether the Government Had Established Probable Cause To Seize All of the Assets, Including Those Honestly Earned.**

As described in Mr. Omidi's motion to dismiss, the Government seized tens of millions of dollars that even the Government agrees were not the product of any fraud, but were seized only on the basis of the Government's comingling theory.  *See* Dkt. 1038 at 3-5.   While Mr. Omidi argued that the Government had unlawfully taken completely innocent assets for no reason other than that they were in a bank account with allegedly tainted assets, the Court's MTD Order "notes," without "expressly find[ing]" that the Government's commingling theory had "support in case law."  *Id*. at 10-11.  The Court cited to *United States v. Lazarenko*, 564 F.3d 1026 (9th Cir. 2009), *United States v. Warshak*. 631 F.3d 266 (6th Cir. 2010) and *United States v. Huber*, 404 F.3d 1047 (8th Cir. 2005), as examples of such "support," but none of these cases can be persuasively analogized to the one at bar.

First, as the Court acknowledges, *see* MTD Order at 10, the reference in *Lazarenko* was non-binding *dicta*.  In *Lazarenko*, the Ninth Circuit was not addressing what funds may be seized pretrial when the Government alleges a money laundering charge.  Instead, the question in front of the Court in *Lazarenko* was whether a defendant can be convicted of wire fraud, which requires the use of "wire," based on a wire transfer of monies from one account to another, where the Government did not prove that the transferred monies were the proceeds from the fraud scheme.  The Ninth Circuit found that as long as the wire transfer was an "important" part of the defendant's scheme, the Government had sufficiently proven the "use of wires" element of wire fraud, even if the monies actually transferred were not the gains from the fraud at issue.  *Lazarenko*, 564 F.3d at 1036.  In fact, other decisions in the Ninth Circuit support the conclusion—also reached by multiple other Courts of Appeal—that a dollar does not become "tainted" simply because it happens to be in the same account as a dollar that the Government contends is tainted. *See United States v. 22 Santa Barbara Drive*, Case No. 91-56184, 1997 U.S. App. Lexis

17960, *5 (9th Circuit July 16, 1997) (where some of the monies used to purchase a house were "legitimate" assets, that portion of the house "was not forfeitable."); *United States v. Ritchie*, 2019 U.S. District LEXIS 112121 *2 (D. Nev. 2019) (explaining that the Government cannot seize assets unless it can prove that the assets are the proceeds of criminal activity or were "used to facilitate the crimes"); *United States v. Ripinsky*, 20 F.3d 359, 365 n.8 (9th Cir. 1994) (explaining that because pretrial asset restraint can "cripple a business and destroy an individual's livelihood," the Ninth Circuit will not read the forfeiture statutes broadly).

The other cases cited in the MTD Order, *Warshak* (from the Sixth Circuit) and *Huber* (from the Eighth Circuit), are not binding on this Court and thus, no more persuasive than precedent cited by Mr. Omidi, from the Fifth Circuit, Seventh Circuit, Tenth Circuit and Eleventh Circuit. *See, e.g. United States v. Tencer*, 107 F.3d 1120, 1134 (5th Cir. 1997) ("merely pooling [of] tainted and untainted funds in an account does not, without more, render that account subject to forfeiture."); *United States v. $448,342.85*, 969 F.2d 474, 476 (7th Cir. 1992) (rejecting the theory that "the presence of one illegal dollar in an account . . . taint[s] the rest—as if the dollar obtained from fraud were like a drop of ink falling into a glass of water"); *United States v. Bornfield*, 145 F. 3d 1123, 1135 (10th Cir. 1998); *United States v. Puche*, 350 F. 3d 1137, 1153 (11th Cir. 2003).

Moreover, the facts of *Warshak* and *Huber* are so different from the case at bar that these cases are especially unpersuasive. As the MTD Order relates, *Warshak* involved a $500 million criminal forfeiture against the owner of an herbal supplements company. 631 F.3d at 274. The defendant argued, post trial, that at least $25 million in sales made at retail outlets like Walmart and GNC were entirely legitimate and thus, should not be forfeited. *Id*. at 332-33. The defendants also argued that these monies were made after the company had become more established and its business practices were "reformed." Id. But, the Sixth Circuit rejected this argument, on the factual basis that during trial the Government had established that the fraudulent practices "remained largely the same"

throughout the history of the company's existence.  Given this fact, the Court concluded that even the $25 million in sales made at Walmart and GNC were the product of the false advertising and lies told to consumers by the company's executives.  *Id*.   But, as described more fully in Mr. Omidi's Opening Motion, no such equivalent  argument can be made here.  For example, the Government seized more than $23 million in assets earned *prior* to the alleged scheme to defraud, which the Government contends was first commenced in 2008.  *See* S. Indictment (Dkt. 12) at ¶17.  Specifically, records produced in discovery demonstrate that the Government seized millions in funds traceable to an account held by Mr. Omidi at Bank of America and which contained $23.86 million as of year-end 2007, before any purported criminal activity is even alleged to have begun.  *See* Dkt. 1038 at 3-5.  Second, the Government seized funds traceable to $3 million in insurance proceeds paid by State Farm Insurance on a claim arising from a broken water pipe in a commercial property.  *Id*.   In various filings, the Government acknowledged that this $3 million in funds originated from innocent sources.  *See* Dkt. 1038-2 (Excerpt from Affidavit of Z. Pettigrew in Support of Government Application for Seizure Warrant) at ¶ 55(f)(i) ("this payment does not represent proceeds of the fraud scheme…").  In other words, unlike the $25 million at issue in *Warshak*, there can be no argument that the monies earned by Mr. Omidi in legitimate transactions were simply "indirect" proceeds of the fraud scheme, since there is no dispute that these monies were earned well before the fraud scheme was even alleged to have begun.

Huber is actually consistent with arguments made by Mr. Omidi.  While the Eighth Circuit in *Huber* did find that certain legitimately earned monies, resulting from the sale of crops, were forfeitable, it came to that conclusion because these monies were combined with monies fraudulent obtained from the Government's farm-program and then laundered, for the purpose of disguising those illegitimate monies that had been fraudulently obtained.  404 F.3d at 1058.  In other words, *Huber* involves a classic money laundering scheme, in which a defendant uses a business, such as a bar, to "wash" dirty money, by combining the dirty money with the business's clean money, so that neither

can be distinguished from the other.  But, as *Huber* elsewhere acknowledges, where the comingling of legitimate and illegitimate funds into an account does *not* make the further laundering of the illegitimate funds any "less difficult or more or less free from obstruction or hindrance," there can be no viable money laundering charge and the legitimate assets are not forfeitable. Id. at 1061.  As Mr. Omidi has argued repeatedly—and which the Government has never responded to—the Government's commingling theory is particularly illogical in this case, given that it was virtually impossible to disguise the monies paid by the insurance companies, since the insurance companies themselves kept complete records of exactly what they had spent on the procedures at issue.  *Huber* makes clear that in these circumstances, a commingling theory will not justify criminal forfeiture of legitimately earned assets.

Moreover, it cannot be that the probable cause determination reached by Judge Kenton is infallible because, as Mr. Omidi pointed out in his Reply, if that was the case, the Government could not have agreed to release $10 million in assets in the fall of 2020. The fact that the Government agreed to release those funds constitutes strong evidence that the Government knows that it does not have probable cause to justify the seizure of all $127 million in assets.

For these reasons, Mr. Omidi respectfully requests that the Court reconsider its decision concerning the viability of the Government's commingling theory as applied to the facts of this case.

> **D.    The Court Erred When It Concluded That the Government's Civil Forfeiture Complaint Was Filed Within the Applicable Statute of Limitations.**

Mr. Omidi respectfully contends that the Court erred when it concluded that the Government's Civil Forfeiture Complaint was filed within the applicable Statute of Limitations and thus, that Mr. Omidi does not have the superior interest to the Government with respect to the seized funds.  *See Luis v. United States,* 136 S. Ct. 1083, 1093-1095 (2016).

As an initial matter, the Court appears to have misunderstood the procedural posture behind Mr. Omidi's argument.  The Court notes that Mr. Omidi's statute of limitations argument would fail if brought as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), because in such a circumstance, the allegations in the Complaint would be accepted as true.  MTD Order at 12, n. 10.  But, Mr. Omidi's motion is different. It seeks relief under the Supreme Court's decision in *Luis,* where the Supreme Court explained that the question of "whether property" can be "subject to pretrial restraint" is an inquiry that "very much depends on who has the superior interest in the property at issue." *Luis*, 136 S. Ct. at 1091. When a defendant needs the assets at issue in order exercise his right to retain counsel of choice under the Sixth Amendment, the Government cannot restrain those funds without a "showing" of an even stronger Governmental interest in the property.  *Id.* at 1092.  In other words, unlike in a case where a defendant moved to dismiss under Rule 12(b)(6) and the Government's allegations are presumed to be true, the Government here is obligated, on Constitutional grounds, and under Supreme Court precedent, to make an affirmative "showing" that it has an interest in the seized funds that is greater than the interest of the defendant: in this context, its allegations receive no deference.  *See also United States v. Spiegel*, 995 F.2d 138, 141 (9th Cir. 1993) (relying on *Unimex* and confirming that the merits of a civil forfeiture can be considered in the context of a related criminal case, before the commencement of the criminal trial).

The MTD Order appears to have incorporated by reference arguments made by the Government in a prior motion (Dkt. 561) concerning Mr. Omidi's statute of limitations argument, but which were not made in the Opposition brief filed by the Government in connection with Mr. Omidi's Motion to Dismiss.  *See* Dkt. 1052 (Government's Opposition to Motion to Dismiss, at footnote 23:  "The government has previously addressed OMIDI's meritless arguments regarding the statute of limitations in response to his prior motions for return of property. . .To the extent the Court would like further briefing on this matter in the criminal case, the government requests the opportunity to brief the issue further.).  Mr. Omidi respectfully contends that the Court erred in agreeing

to incorporate the Government's prior arguments into the Government's Opposition to Mr. Omidi's Motion to Dismiss, given the multiple cases in the Ninth Circuit that make clear that a party must substantively engage with the issues, rather than cursorily dismissing them in a footnote, as the Government did in its Opposition.  *See* Dkt. 1061 at 11, n. 4; *see also Recycle for Change v. City of Oakland*, 856 F.3d 666, 673 (9th Cir. 2017) ("RFC waived this argument because it never raised it in its briefs, other than in a terse one-sentence footnote."), citing *Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994) ("We review only issues which are argued specifically and distinctly in a party's opening brief.... [A] bare assertion does not preserve a claim ..."); *City of Emeryville v. Robinson*, 621 F.3d 1251, 1262 n.10 (9th Cir. 2010) (concluding that appellant waived claim "[b]y failing to address the issue in its opening brief except in a footnote").  Moreover, given that Mr. Omidi did not have an opportunity to wholly respond to the arguments made by the Government in its prior briefing, reconsideration of the conclusions in the MTD Order concerning Mr. Omidi's statute of limitations argument is especially appropriate.  *See* L.R. 7-18(a); FRCP 60(b)(1), (b)(6).

In finding that the Civil Forfeiture Complaint was timely filed, the Court first noted that in a civil forfeiture case, the statute of limitations is tolled for any period in which the identity of the defendant *res* is "affirmatively conceal[ed]" and only begins to run once the Government "discover[s] [] the property's true ownership."  MTD Order at 12-13.  It is not clear from the MTD Order whether the Court believes that there was a period in which the Government was unaware of who the $127 million in seized assets belonged to, but to the extent that is the case, Mr. Omidi respectfully wishes to correct the record.  In fact, the record is clear that the Government knew exactly who owned the $127 million in assets that were later seized, since, in 2012, the Government issued subpoenas to the very banks from which it seized the funds in 2014 and received all bank statements associated

with those accounts, which revealed the identity of the owners.[4]  *See* Dkts. 1038-3 (Donnelly Declaration) at Ex. 21 (under seal) and Ex. 22 (under seal).   In fact, as Mr. Omidi described in his Motion to Dismiss, the statute of limitations begins to run in a civil forfeiture case, when the government discovers or possesses the means to discover the alleged wrong, whichever comes first.  *United States v. $515,060.42 in U.S. Currency,* 152 F.3d 491, 499 (6th Cir. 1998); *see also United States v. Real Property 874 Gartel Drive, Walnut, California*, 79 F.3d 918, 922 (9th Cir. 1996) (five-year limitations period began upon filing of false loan application, not upon discovery that property was purchased with loan money); *United States v. Four Tracts of Prop*., 70 F.3d 1273 (6th Cir. 1995) (five-year limitations period began upon discovery of drug trafficking, not upon discovery that property was purchased with drug proceeds); *United States v. James Daniel Good Prop. Titled in Name of James Daniel Good*, 971 F.2d 1376, 1381 (9th Cir. 1992) ( Time of discovery is a factual determination based on a "known" or "should-have-known" standard, and the offense should be deemed "discovered" when the Government actually discovers, or possesses the means to discover, the alleged wrong, whichever occurs first.) As Mr. Omidi described in his Motion to Dismiss, there can be no legitimate dispute that the Government knew about the allegedly fraudulent conduct associated with the *res* for over five years prior to the filing of the Civil Forfeiture Complaint on May 8, 2018.  *See* Dkt. 1038-3 (Donnelly Decl.) at ¶¶ 7-56.

The MTD Order also notes that if "parties are engaged in a continuing course of conduct, the limitations period may recommence with each violative act."  MTD Order, at 13.  The MTD Order goes on to state that the defendant *res* in the Civil Forfeiture Case was "engaged in a continuing course of conduct" to defraud insurance companies and a

---

[4] Indeed, if the law was different, and followed the "government's definition of 'discovered,' the statute of limitations for forfeitures would not commence until the government said so, that is, until the government declared that it had uncovered sufficient facts. Such a result would turn legislative judgment on its head." *United States v. $116,000 in U.S. Currency*, 721 F. Supp. 701, 705 (D.N.J. 1989).

"money laundering scheme (where all of the defendant *res* was involved) in one or more of the money laundering transactions to conceal and disguise the nature, source, location, ownership and control of the proceeds of the fraud scheme to promote further criminal conduct, such that the statute of limitations restarted with each new offense, rendering the claims timely." MTD Order at 13.  Mr. Omidi respectfully moves for reconsideration of this conclusion, given that fact that the Court seems to have overlooked the fact that the Government's application for the seizure warrant *admits* that no additional monies were deposited into the accounts holding the defendant *res* after July 31, 2012, five years and 11 months before the Civil Forfeiture Complaint was filed.  *See* Dkt. 1038 at Ex. 10 (under seal) at p. 20, n. 10 (conceding that "[t]he last outside deposit into the Subject Accounts [which the Government seized] occurred on July 31, 2012.".)  The defendant *res* could not have been involved in any continuing "course of conduct" that "restarted" the statute of limitations, given the fact that the last deposit was dated July 31, 2012. [5]

---

[5] The Seventh Circuit's decision in *5443 Suffield Terrace* does not assist the Government. There, the district court determined that the house at issue should be forfeited because there was a "lucrative business selling illegally imported Cuban cigars out of the property and [] mortgage payments [were made] on the property from the profits of that illegal business." *United States v. 5443 Suffield Terrace, Skokie, Ill.*, No. 02 C 1883, 2008 WL 4874826, at *1 (N.D. Ill. June 17, 2008), *aff'd,* 607 F.3d 504 (7th Cir. 2010). The Seventh Circuit agreed that the reuse of the same house in subsequent illegal smuggling restarted the clock—a distinguishing fact that this not present in this case, since the Government concedes that the bank accounts were dormant after July 31, 2012.  Moreover, as the Seventh Circuit explained, in *5443 Suffield Terrace*, 607 F.3d 504 (7th Cir. 2010), the Government had alleged a series of **_discrete_** acts of smuggling using the *same* house that could each independently support forfeiture of the house. Here, in contrast to *5443 Suffield Terrace*, the Government previously argued that the Get-Thin Entities had been **_continuously_** operating a "[medical business with the use and transfers of the funds its procured] in general." (Dkt. 516 at 6-7; Dkt. 516 at 29 ("continuing course of conduct"); Dkt. 516 at 32, n.12 ("continuing criminal conduct alleged in the Complaint")).  Because the Government's forfeiture claims are predicated on an ongoing scheme, the statute of limitations runs from the date the Government discovers the offense, and does not restart with each independent act, even if those acts could have been charged separately. *$515,060.42*, 152 F.3d at 503 (holding, in case where the Government could have charged separate offenses for each bingo game at issue, and then brought forfeiture claim for each,

While the MTD Order notes allegations that Aetna paid approximately $54 million to Get Thin entities between January 2008 and June of 2013, and the Court contends that such payments would have extended the statute of limitations, *see* MTD Order, at 13, Mr. Omidi respectfully wishes to clarify to the Court that any of those monies—the $54 million from Aetna—that were deposited after July 31, 2012 could not be part of the defendant *res*, since it is undisputed that no additional monies were deposited into the accounts from which the *res* was seized after July 31, 2012. As noted above, the defendant *res* could not have been involved in any "continuing course of conduct" after July 31, 2012, because there were no more deposits after that date. For largely the same reason, the allegations in the Civil Forfeiture Complaint concerning monies paid by Tricare "between January 2008 and November 2013," *see* MTD Order, at 13, n. 12, do not affect the statute of limitations because any monies from Tricare that were deposited into the subject accounts from which the defendant *res* was seized were deposited prior to July 31, 2012. Finally, the Court notes that deposits were made into Wells Fargo accounts until December 2013. *See* MTD Order, at 13, n. 12. The defendant *res* however does not include any monies from Wells Fargo accounts; the only money at issue in the Civil Forfeiture Action is that seized from the accounts at Bank of America and Deutsche Bank and no deposits were made into those accounts after July 31, 2012. Moreover, it is not clear to the defense what deposits the Government could be referring to in December 2013, given that all of the Wells Fargo accounts were closed on March 16,

---

that the "Government cannot disregard its discovery of earlier occurring offenses in preference for later offenses which would produce a more favorable timeline."). To hold otherwise and adopt the Government's view would "transform the limitations period from a check on governmental delay in prosecution to a function of prosecutorial discretion." *United States v. Yashar*, 166 F.3d 873, 879 (7th Cir. 1999). Indeed, here, while the Government arguably could have based its forfeiture claim on allegations of distinct crimes that occurred within the statute of limitations, *i.e.* within 5 years of May 8, 2018, it did not do so, presumably because it did not want to be limited to seeking only the property traceable to, or involved in, those specific offenses.

2012.  *See* Dkt. 1038-3 (Donnelly Decl.) at Ex. 24 (under seal) (SAR submitted by Wells Fargo, explaining that all accounts were closed on March 16, 2012).

For these reasons, Mr. Omidi respectfully requests that the Court reconsider its conclusion that the Government's Civil Forfeiture Action was not time-barred.

## II.      CONCLUSION

For the reasons described herein, Mr. Omidi respectfully requests that the Court reconsider its June 15, 2021 Order denying Mr. Omidi's Motion to Dismiss.


DATED:  June 29, 2021              Respectfully submitted,


                                   **WILLKIE FARR & GALLAGHER LLP**

                                   By: s/ Michael S. Schachter
                                       MICHAEL S. SCHACHTER
                                       RANDALL W. JACKSON
                                       CASEY E. DONNELLY
                                       SIMONA AGNOLUCCI

                                       ATTORNEYS FOR DEFENDANT
                                       JULIAN OMIDI

## PROOF OF SERVICE

I am employed and a resident of New York. I am over the age of 18 and not a party to the within action; my business address is 787 Seventh Avenue, New York, NY 10019. On June 29, 2021, I served the document described as:

**Mr. OMIDI'S MOTION FOR RECONSIDERATION OF THE COURT'S JUNE 15, 2021 ORDER.**

Upon the interested parties in this action as follows:

_____X_____ By the Court's ECF.

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on June 29, 2021.

s/ Michael S. Schachter
Michael S. Schachter