TRACY L. WILKISON
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
KRISTEN A. WILLIAMS (Cal. Bar No. 263594)
Deputy Chief, Major Frauds Section
ALEXANDER C.K. WYMAN (Cal. Bar No. 295339)
ALI MOGHADDAS (Cal. Bar No. 305654)
DAVID H. CHAO (Cal. Bar No. 273953)
DAVID C. LACHMAN (Cal. Bar No. 261711)
Assistant United States Attorneys
Major Frauds/General Crimes Sections
    1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-2400
    Facsimile: (213) 894-6269
    E-mail:    Kristen.Williams@usdoj.gov
              Alex.Wyman@usdoj.gov
              Ali.Moghaddas@usdoj.gov
              David.Chao@usdoj.gov
              David.Lachman@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>            v.<br><br>JULIAN OMIDI,<br>  aka "Combiz Omidi,"<br>  aka "Combiz Julian Omidi,"<br>  aka "Kambiz Omidi,"<br>  aka "Kambiz Beniamia Omidi,"<br>  aka "Ben Omidi,"<br>SURGERY CENTER MANAGEMENT, LLC,<br>and<br>MIRALI ZARRABI, M.D.,<br>  aka "Mirali Akba Ghandchi<br>      Zarrabi,"<br>  aka "M.A. Ghandchi Zarrabi,"<br><br>        Defendants. | No. CR 17-661(A)-DMG<br><br>GOVERNMENT'S TRIAL MEMORANDUM;<br>EXHIBITS 1-4<br><br>Trial Date:  September 21, 2021<br>Time:       9:00AM<br>Location:   Courtroom of the<br>            Hon. Dolly M. Gee |

1    Plaintiff United States of America, by and through its counsel

2  of record, the Acting United States Attorney for the Central District

3  of California and Assistant United States Attorneys Kristen A.

4  Williams, Alexander C.K. Wyman, Ali Moghaddas, David H. Chao, and

5  David C. Lachman, hereby files its trial memorandum, as well as

6  exhibits 1-4 thereto.

7    The government respectfully requests leave to file additional

8  memoranda as may become appropriate during the course of trial.

9   Dated: September 14, 2021          Respectfully submitted,

10                                      TRACY L. WILKISON
                                        Acting United States Attorney
11
                                        SCOTT M. GARRINGER
12                                      Assistant United States Attorney
                                        Chief, Criminal Division
13

14              /s/
                                        _____
15                                      KRISTEN A. WILLIAMS
                                        ALEXANDER C.K. WYMAN
16                                      ALI MOGHADDAS
                                        DAVID H. CHAO
17                                      DAVID C. LACHMAN
                                        Assistant United States Attorneys
18

19                                      Attorneys for Plaintiff
                                        UNITED STATES OF AMERICA

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

DESCRIPTION                                                              PAGE

**Contents**

TABLE OF AUTHORITIES....................................................1

MEMORANDUM OF POINTS AND AUTHORITIES....................................4

I.   CASE SCHEDULING MATTERS...........................................4

     A.   Motions......................................................4

     B.   Government Witnesses.........................................4

     C.   Defense Witnesses............................................5

II.  FACTUAL SUMMARY OF THE GOVERNMENT'S CASE..........................5

III. THE INDICTMENT AND ELEMENTS.......................................8

     A.   Mail Fraud...................................................9

     B.   Wire Fraud..................................................11

     C.   Aggravated Identity Theft...................................12

     D.   False Statements Relating to Health Care Matters............13

     E.   Conspiracy to Commit Money Laundering.......................14

     F.   Promotional Money Laundering................................16

IV.  EVIDENTIARY ISSUES...............................................18

     A.   Hearsay.....................................................18

          1.   Defendants' Statements, Adopted Admissions, and
               Agent Admissions.......................................18

          2.   Co-Conspirator Statements..............................20

          3.   Patient Files..........................................21

     B.   Authentication and Foundation...............................22

          1.   Federal Rule of Evidence 901...........................22

          2.   Audio Recordings.......................................23

     C.   The Parties' Agreements Regarding Limitations on the
          Introduction of Certain Evidence............................24

i

**TABLE OF CONTENTS (CONTINUED)**

DESCRIPTION                                                           PAGE

    D.   Evidence of Satisfied Patients, Successful Procedures,
       and Lawful Actions......................................25

    E.   Cross-Examination of Defendants........................26

    F.   Defense Witnesses......................................27

    G.   Character Evidence.....................................28

    H.   Reciprocal Discovery and Expert Disclosures............28

    I.   Jury Nullification.....................................29

1

**TABLE OF AUTHORITIES**

2

<u>DESCRIPTION</u>                                                                                   <u>PAGE</u>

3

**<u>CASES</u>**

4

<u>Anderson v. United States</u>,
      417 U.S. 211 (1974)........................................18

5

<u>Bourjaily v. United States</u>,
      483 U.S. 171 (1987)........................................17

6

7

<u>Bryan v. United States</u>,
      524 U.S. 184, (1998)......................................7, 11

8

<u>Gallego v. United States</u>,
      276 F.2d 914 (9th Cir. 1960)..............................19

9

10

<u>Michelson v. United States</u>,
      335 U.S. 469 (1948)........................................24

11

<u>United States v. Akintobi</u>,
      159 F.3d 401 (9th Cir. 1998)..............................15

12

13

<u>United States v. Aramula-Ruiz</u>,
      987 F.2d 599 (9th Cir. 1993)..............................18

14

<u>United States v. Awad</u>,
      551 F.3d 930 (9th Cir. 2009)..............................7, 11

15

16

<u>United States v. Black</u>,
      767 F.2d 1334 (9th Cir. 1985).............................19

17

<u>United States v. Chu Kong Yin</u>,
      925 F.2d 990 (9th Cir. 1991)..............................19

18

19

<u>United States v. Dearing</u>,
      504 F.3d 897 (9th Cir. 2007)...............................7

20

<u>United States v. Fagan</u>,
      996 F.2d 1009 (9th Cir. 1993).............................23

21

22

<u>United States v. Gay</u>,
      967 F.2d 322 (9th Cir. 1992)..............................23

23

<u>United States v. King</u>,
      587 F.2d 956 (9th Cir. 1978)..............................20

24

25

<u>United States v. Knigge</u>,
      832 F.2d 1100 (9th Cir. 1987).........................17, 19

26

<u>United States v. Kreimer</u>,
      609 F.2d 126 (5th Cir. 1980)..............................22

27

28

United States v. Lloyd,
    807 F.3d 1128, (9th Cir. 2015)................................7

United States v. McCollom,
    664 F.2d 56 (5th Cir. 1981)................................25

United States v. Miranda-Uriarte,
    649 F.2d 1345 (9th Cir. 1981)..............................22

United States v. Moreira,
    605 Fed. App'x 852 (11th Cir. 2015)........................22

United States v. Orellana-Blanco,
    294 F.3d 1143 (9th Cir. 2002)..............................16

United States v. Ortega,
    203 F.3d 675 (9th Cir. 2000)...............................17

United States v. Osuna-Alvarez,
    788 F.3d 1183 (9th Cir. 2015)...............................9

United States v. Powell,
    955 F.2d 1206 (9th Cir. 1992)..............................25

United States v. Reese,
    666 F.3d 1007 (7th Cir. 2012)..............................21

United States v. Santos,
    553 U.S. 507 (2008)........................................15

United States v. Scarpa,
    897 F.2d 63 (2d Cir. 1990).................................21

United States v. Schmit,
    881 F.2d 608 (9th Cir. 1989)...............................17

United States v. Smith,
    893 F.2d 1573 (9th Cir. 1990)..........................17, 20

United States v. Taylor,
    716 F.2d 701 (9th Cir. 1983)...............................19

United States v. Turner,
    528 F.2d 143 (9th Cir. 1975)...............................20

United States v. Yarborough,
    852 F.2d 1522 (9th Cir. 1988)..............................18

Zal v. Steppe,
    968 F.2d 924 (9th Cir. 1992)...............................26

**STATUTES**

18 U.S.C. § 1028...........................................9, 10

18 U.S.C. § 1341.............................................................6

18 U.S.C. § 1343.............................................................8

18 U.S.C. § 1956........................................................11, 14

18 U.S.C. §§ 1035...........................................................11

U.S.C. § 1347...............................................................7

**RULES**

Fed. R. Evid. 1003.........................................................20

Fed. R. Evid. 405..........................................................24

Fed. R. Evid. 801.................................................15, 16, 17

Fed. R. Evid. 901.....................................................19, 20

Fed. R. Evid. 401..........................................................26

Fed. R. Evid  608..........................................................23

**CRIMINAL JURY INSTRUCTION**

Ninth Circuit Model Criminal Jury Instruction No. 8.147............14

Ninth Circuit Model Criminal Jury Instruction No. 5.6 (2010 ed.)....7

Ninth Circuit Model Criminal Jury Instruction No. 8.121 (2010
      ed.; approved 6/2021)........................................7

Ninth Circuit Model Criminal Jury Instruction No. 8.122 (2010
      ed.; approved 6/2021)........................................8

Ninth Circuit Model Criminal Jury Instruction No. 8.124 (2010
      ed.; approved 6/2021)........................................9

Ninth Circuit Model Criminal Jury Instruction No. 8.83 (2010
      ed.; approved 3/2021)........................................9

Ninth Circuit Model Instruction Nos. 8.146........................14

Ninth Circuit Model Jury Instruction No. 8.23 (2010 ed.;
      approved 4/2019)............................................13

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

**I.    CASE SCHEDULING MATTERS**

3

Jury trial is set for September 21, 2021, at 9:00AM.  The

4 estimated time for the government's case-in-chief is approximately

5 nine to ten weeks.  Defendants JULIAN OMIDI ("OMIDI"), SURGERY CENTER

6 MANAGEMENT, LLC ("SCM"), and MIRALI ZARRABI, MD ("ZARRABI")

7 (collectively, "defendants") are proceeding to trial.[1]  Trial by jury

8 has not been waived.  Defendants have been released on bond.

9

**A.    Motions**

10

On August 30, 2016, the government filed five motions <u>in limine</u>.

11 (Dkt. 1192, 1194, 1199, 1220, 1226.)  Defendants OMIDI and ZARRABI

12 filed 13 motions <u>in limine</u>, six jointly (Dkt. 1189, 1196, 1200, 1207,

13 1215, 1235), six by OMIDI along (Dkt. 1203, 1188, 1193, 1209, 1223,

14 and 1218), and one by ZARRABI alone (Dkt. 1191).  SCM joined in all

15 of these.  (Dkt. 1225.)  All of the motions are contested, set for

16 hearing on September 14, 2021, and remain pending as of this filing.

17

As of this filing, OMIDI's Motion for Relief Based on

18 Interference with Fifth and Sixth Amendment Privilege (Dkt. 1162),

19 also remains pending.

20

**B.    Government Witnesses**

21

The government anticipates calling approximately 45 witnesses in

22 its case-in-chief.  Those witnesses are listed on the chart attached

23 hereto as Exhibit 1, with the government's anticipated time on direct

24 examination and the anticipated defense cross-examination as provided

25 by defendants OMIDI and ZARRABI.  SCM did not provide anticipated

26 cross-examination times.

27

_____

28

[1] The case against defendant INDEPENDENT MEDICAL SERVICES, INC.
remains severed and stayed.  (Dkt. 519.)

4

1    There are two cooperating defendants testifying; neither is in
2    custody.
3    At this time, the government does not anticipate that any
4    government witness will require the assistance of an interpreter.
5    **C.   Defense Witnesses**
6    Per the Court's order, on September 7, 2021, defendants were
7    required to provide their witness lists.  OMIDI provided a witness
8    list, attached hereto as Exhibit 2, with 96 witnesses on it.  Of
9    those, more than 80 appear to have been drawn from earlier, longer
10   versions of the government's witness list, including the vast
11   majority of the witnesses on the government's current witness list,
12   some of whom OMIDI has elsewhere moved to exclude.  (See, e.g., Dkt.
13   1169 (Michael Petron); Dkt. 1223 (Tommy Iorio, Tom Johnson, and
14   Barbara Balcom).)  The list also includes a deceased GET THIN patient
15   (Paula Rojeski).
16   ZARRABI provided a witness list, attached hereto as Exhibit 3,
17   with four witnesses, two of whom were ZARRABI's noticed experts.
18   SCM has provided no witness list.
19   **II.   FACTUAL SUMMARY OF THE GOVERNMENT'S CASE**
20   The government intends to prove at trial the following facts,
21   among others.  Defendants have not provided a position with respect
22   to this summary.
23   From approximately May 2010 to approximately March 2016, OMIDI,
24   ZARRABI, SCM, Charles Klasky, Sherwin Hong, and others, participated
25   in a scheme to defraud Tricare and private insurance companies in
26   connection with GET THIN's billings for sleep studies and Lap-Band
27   surgeries.
28

1    OMIDI, together with his brother and mother, controlled GET

2  THIN, including SCM, setting and implementing policies to induce

3  patients to seek Lap-Band surgery through out-of-network provider GET

4  THIN and then ensure those patients received numerous services such

5  as sleep studies, irrespective of medical necessity, which services

6  could both be billed to insurance at exorbitant rates and used in an

7  effort to hunt for a co-morbidity that would support the lucrative

8  Lap-Band surgery, even when, as OMIDI knew, the patient's insurance

9  would sometimes never cover the surgery.  OMIDI further directed

10  employees in the information to be gathered and provided to insurance

11  companies in connection with seeking approval and billing for those

12  services, including false and fabricated information, as described

13  below.

14    OMIDI directed the conduct of GET THIN's sleep study program,

15  hiring Klasky to manage it, with the assistance of Sherwin Hong and

16  Daniel Carriedo, among others; ZARRABI's brother, Michael Zarrabi

17  ("M. Zarrabi"), to score the sleep studies; and ZARRABI to interpret

18  those scored studies.  M. Zarrabi would score the sleep studies, and

19  input those scores into a template sleep study report complete with

20  diagnoses and treatment recommendations that were not individualized

21  to the patients, as well as ZARRABI's electronic signature,

22  purportedly for ZARRABI's review.  ZARRABI allowed his e-signature to

23  be used on the SSRs, providing GET THIN's sleep study program with a

24  veneer of legitimacy and making it appear that ZARRABI had reviewed

25  and interpreted the SSRs and was approving the boilerplate diagnosis

26  and treatment recommendations set forth therein, including routine

27  recommendations for second sleep studies purportedly premised on the

28  findings of the first.  In fact, ZARRABI often had not reviewed or

6

interpreted the SSRs, even though ZARRABI was aware of those reports and their use in seeking Lap-Band approval and CPAP provision, and repeatedly demanded payment for his purported interpretations and, for a period, for allegedly writing CPAP prescriptions for patients based on those reports.  GET THIN continued to use ZARRABI's signature on sleep study reports even after it stopped paying him in late 2013, although ZARRABI accepted payment in late 2015 for GET THIN sleep study reports from 2014.

Moreover, OMIDI regularly directed co-schemer Klasky to alter the data in the sleep study reports to make it appear that the patients had sleep apnea when they did not, or more severe sleep apnea than they in fact had in order to support insurance approval for Lap-Band surgeries.  As OMIDI knew, Klasky sought help in this task from others, including Sherwin Hong.  In order to make it more likely that patients would receive insurance pre-approval for Lap-Band surgery, OMIDI also (1) instructed Klasky to provide Epworth Sleepiness Scale scores that falsely indicated that the patients had extreme daytime sleepiness, a task Klasky gave to Daniel Carriedo; (2) instructed Klasky and Hong, among others, to inflate patients' weights in order to increase the body mass index ("BMI") scores that insurers used in determining their approval of Lap-Band surgery; and (3) instructed GET THIN employees to falsify other information used in connection with the pre-approval requests, provide falsified supporting documentation to the bariatric surgeons who would purportedly approve these letters of medical necessity, and sometimes send the letters out without the authorization of those surgeons.

In an effort to conceal the alteration of sleep study reports, OMIDI directed Klasky to create new GET THIN policies that purported

7

to adjust the sleep study scoring parameters, allegedly at ZARRABI's direction, and induced ZARRABI to sign these memoranda through payments for ZARRABI's purported services.  OMIDI also directed Klasky to obtain and destroy the raw data from the sleep studies, which Klasky proceeded to do.

GET THIN then used the fraudulent sleep study reports and other falsified information to seek approval from Tricare and the insurance companies for Lap-Band surgeries and ultimately submit tens, if not hundreds, of millions of dollars in claims for Lap-Band surgeries and sleep studies under the provider number of IMS and other GET THIN entities.  Those claims often contained false and misleading information, including regarding the services performed and their location, and were often accompanied by the fraudulent sleep study reports.  GET THIN also provided the falsified GET THIN sleep study reports and prescriptions purportedly written by ZARRABI and other GET THIN doctors to durable medical equipment companies, which then used those to support claims to insurance for the provision of CPAP devices.

Finally, OMIDI approved the hiring of and payments to GET THIN employees and contractors, including ZARRABI, Klasky, and others associated with GET THIN's sleep study program, to promote the scheme, including payments to Hong and Carriedo for their roles in falsifying sleep study and Epworth information and to ZARRABI for purportedly interpreting studies.

## III. THE INDICTMENT AND ELEMENTS

Defendants OMIDI, SCM, and ZARRABI are charged in a First Superseding Indictment as follows:  OMIDI, SCM, and ZARRABI with wire fraud (counts 1—28) and mail fraud (counts 29-31), OMIDI and ZARRABI

1   with false statements relating to health care matters (counts 33-34),

2   OMIDI and SCM with conspiracy to commit money laundering (count 35),

3   and OMIDI with aggravated identity theft (count 32) and promotional

4   money laundering (count 36).  (Dkt. 12.)  Defendants have not

5   provided their position regarding the above statement of the charges.

6       Defendants OMIDI and ZARRABI were arraigned on the FSI and

7   pleaded not guilty to all of the charges in which they were named on

8   February 28, 2018.  SCM was arraigned and pleaded not guilty to all

9   of the charges in which it was named on March 20, 2018.  A copy of

10  the FSI is attached to this memorandum as Exhibit 4.

11      The elements of the charges are set forth below, and further

12  detailed in the parties' proposed joint and disputed jury

13  instructions, to be filed September 14, 2021.  All of the below

14  elements are disputed at least in part by defendants, and their

15  positions with respect to the proposed jury instructions addressing

16  these issues can be found in the parties' proposed disputed jury

17  instruction filing.

18      **A.   Mail Fraud**

19      Counts 1 through 28 charge defendants OMIDI, SCM, and ZARRABI

20  with mail fraud, in violation of 18 U.S.C. § 1341, which has the

21  following elements: (1) the defendant knowingly participated in or

22  devised a scheme or plan to defraud, or a scheme or plan for

23  obtaining money or property by means of false or fraudulent

24  pretenses, representations, or promises.  Deceitful statements of

25  half-truths may constitute false or fraudulent representations; (2)

26  the statements made as part of the scheme were material; that is,

27  they had a natural tendency to influence, or were capable of

28  influencing, a person to part with money or property; (3) the

defendant acted with the intent to defraud; that is, the intent to deceive and cheat; and (4) the defendant used, or caused to be used, the mails to carry out or attempt to carry out an essential part of the scheme.

In determining whether a scheme to defraud exists, you may consider not only the defendant's words and statements, but also the circumstances in which they are used as a whole.

A mailing is caused when one knows that the mails will be used in the ordinary course of business or when one can reasonably foresee such use. It does not matter whether the material mailed was itself false or deceptive so long as the mail was used as a part of the scheme, nor does it matter whether the scheme or plan was successful or that any money or property was obtained. See Ninth Circuit Model Criminal Jury Instruction No. 8.121 (2010 ed.; approved 6/2021).

The intent to defraud may be proved through reckless indifference to the truth or falsity of statements. See United States v. Lloyd, 807 F.3d 1128, 1163 (9th Cir. 2015); United States v. Dearing, 504 F.3d 897, 901-03 (9th Cir. 2007).

A defendant acts knowingly if the defendant is aware of the act and does not act or does not fail to act through ignorance, mistake, or accident. See Ninth Circuit Model Criminal Jury Instruction No. 5.6 (2010 ed.). A defendant acts willfully if the defendant committed the act voluntarily and purposely, and with knowledge that his conduct was, in a general sense, unlawful. See 18 U.S.C. § 1347(b); Ninth Circuit Model Criminal Jury Instruction No. 5.5 (2010 ed.); Bryan v. United States, 524 U.S. 184, 189-91, 193-96, 198-99 (1998); United States v. Awad, 551 F.3d 930, 937-41 (9th Cir. 2009).

10

1    If the defendant was a member of a scheme to defraud and had the

2    intent to defraud, the defendant may be responsible for other co-

3    schemers' actions during the course of and in furtherance of the

4    scheme, even if the defendant did not know what they said or did.

5    For the defendant to be guilty of an offense committed by a co-

6    schemer in furtherance of the scheme, the offense must be one that

7    the defendant could reasonably foresee as a necessary and natural

8    consequence of the scheme to defraud.  See Ninth Circuit Model

9    Criminal Jury Instruction No. 8.122 (2010 ed.; approved 6/2021)

10   **B.   Wire Fraud**

11   Counts 29 through 31 charge defendants OMIDI, SCM, and ZARRABI

12   with wire fraud, in violation of 18 U.S.C. § 1343, which has the

13   following elements: (1) the defendant knowingly participated in or

14   devised a scheme or plan to defraud, or a scheme or plan for

15   obtaining money or property by means of false or fraudulent

16   pretenses, representations, or promises.  Deceitful statements of

17   half-truths may constitute false or fraudulent representations; (2)

18   the statements made as part of the scheme were material; that is,

19   they had a natural tendency to influence, or were capable of

20   influencing, a person to part with money or property; (3) the

21   defendant acted with the intent to defraud, that is, the intent to

22   deceive and cheat; and (4) the defendant used, or caused to be used,

23   an interstate wire communication to carry out or attempt to carry out

24   an essential part of the scheme.

25   In determining whether a scheme to defraud exists, you may

26   consider not only the defendant's words and statements, but also the

27   circumstances in which they are used as a whole.

28

A wiring is caused when one knows that a wire will be used in the ordinary course of business or when one can reasonably foresee such use.

It need not have been reasonably foreseeable to the defendant that the wire communication would be interstate in nature. Rather, it must have been reasonably foreseeable to the defendant that some wire communication would occur in furtherance of the scheme, and an interstate wire communication must have actually occurred in furtherance of the scheme. See Ninth Circuit Model Criminal Jury Instruction No. 8.124 (2010 ed.; approved 6/2021).

### C. Aggravated Identity Theft

OMIDI is charged in count 32 with aggravated identity theft, in violation of 18 U.S.C. § 1028A, which has the following elements: (1) the defendant knowingly transferred, possessed, or used without legal authority a means of identification of another person, namely the name of defendant Mirali Zarrabi; (2) the defendant knew that the means of identification belonged to a real person; and (3) the defendant did so during and in relation to the crime of mail fraud, in violation of Section 1341 of Title 18 of the United States Code, as charged in Count Twenty-One of the First Superseding Indictment.

The term "means of identification" means any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual, including any name, date of birth, or government issued identification number.

"Use" requires that the use of the means of identification was central to the specified felony and facilitated its commission.

The government need not establish that the means of identification of another person was stolen. See Ninth Circuit Model

12

Criminal Jury Instruction No. 8.83 (2010 ed.; approved 3/2021);
United States v. Osuna-Alvarez, 788 F.3d 1183, 1185 (9th Cir. 2015)
(permission of another to use his or her identity in an unlawful
scheme is not "lawful authority" within the meaning of 18 U.S.C.
§ 1028A).

**D.   False Statements Relating to Health Care Matters**

OMIDI and ZARRABI are charged in counts 33-34 with false
statements relating to health care matters, in violation of 18 U.S.C.
¶ 1028A, which has the following elements: (1) the defendant made a
false, fictitious, or fraudulent statement or representation
involving a healthcare benefit program; (2) the statement or
representation was in connection with the delivery of or payment for
health care benefits, items, or services; (3) defendant acted with
knowledge that the statement or representation was untrue; (4) the
defendant acted willfully; and (5) the statement or representation
was material to the activities or decisions of a healthcare benefit
program, that is, it had a natural tendency to influence, or was
capable of influencing, the healthcare benefit program's decisions or
activities.

"Willfully" means to act with knowledge that one's conduct is
unlawful and with the specific intent to do something the law
forbids, that is to say with the bad purpose to disobey or disregard
the law.  The person need not be aware of the specific law or rule
that his conduct may be violating.  A defendant's conduct was not
"willful" if it was due to negligence, inadvertence or mistake.

An act is done "knowingly" if the defendant is aware of the act
and does not act through ignorance, mistake, or accident.  The
government is not required to prove that the defendant knew that his

13

acts or omissions were unlawful.  You may consider evidence of the defendant's words, acts, or omissions, along with all the other evidence, in deciding whether the defendant acted knowingly.

A "health care benefit program" means any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract.  18 U.S.C. §§ 1035(a)(2), 24; Ninth Circuit Model Criminal Jury Instruction Nos. 5.5 [Willfully] and 8.73 [False Statement to Government Agency] (modified); United States v. Awad, 551 F.3d 930, 939-41 (9th Cir. 2009); see also Bryan v. United States, 524 U.S. 184, 191 (1998).

**E.   Conspiracy to Commit Money Laundering**

OMIDI and SCM are charged in count 35 with conspiring to commit money laundering, in violation of 18 U.S.C. § 1956(h), which has the following elements:  (1) beginning in or about January 2011, and continuing to at least in or about December 2015, there was an agreement between two or more person to commit money laundering by conducting a financial transaction to promote an unlawful activity, that is, the making of false statements regarding health care matters, in violation of 18, United States Code, Section 1035; and (2) the defendant became a member of the conspiracy knowing of its object and intending to help accomplish it.

A conspiracy is a kind of criminal partnership—an agreement of two or more persons to commit one or more crimes, here, promotional money laundering.  The crime of conspiracy is the agreement to do

something unlawful; it does not matter whether the crime agreed upon was committed.

For a conspiracy to have existed, it is not necessary that the conspirators made a formal agreement or that they agreed on every detail of the conspiracy. It is not enough, however, that they simply met, discussed matters of common interest, acted in similar ways, or perhaps helped one another. You must find that there was a plan to commit money laundering as alleged in the First Superseding Indictment as an object of the conspiracy.

One becomes a member of a conspiracy by willfully participating in the unlawful plan with the intent to advance or further some object or purpose of the conspiracy, even though the person does not have full knowledge of all the details of the conspiracy. Furthermore, one who willfully joins an existing conspiracy is as responsible for it as the originators. On the other hand, one who has no knowledge of a conspiracy, but happens to act in a way which furthers some object or purpose of the conspiracy, does not thereby become a conspirator. Similarly, a person does not become a conspirator merely by associating with one or more persons who are conspirators, nor merely by knowing that a conspiracy exists. See Ninth Circuit Model Instruction No. 8.20 (2010 ed.; approved 1/2019) (modified for money laundering and single object); id. cmt. (stating that overt act element should be omitted in money laundering conspiracy cases).

A conspiracy may continue for a long period of time and may include the performance of many transactions. It is not necessary that all members of the conspiracy join it at the same time, and one may become a member of a conspiracy without full knowledge of all the

details of the unlawful scheme or the names, identities, or locations of all of the other members.

Even though a defendant did not directly conspire with the other conspirators in the overall scheme, the defendant has, in effect, agreed to participate in the conspiracy if the government proves each of the following beyond a reasonable doubt:  (1) that the defendant directly conspired with one or more conspirators to carry out at least one of the objects of the conspiracy; (2) that the defendant knew or had reason to know that other conspirators were involved with those with whom the defendant directly conspired; and (3) that the defendant had reason to believe that whatever benefits the defendant might get from the conspiracy were probably dependent upon the success of the entire venture.

It is not a defense that a person's participation in a conspiracy was minor or for a short period of time.  See Ninth Circuit Model Jury Instruction No. 8.23 (2010 ed.; approved 4/2019).

**F.   Promotional Money Laundering**

OMIDI is charged in Count 36 with conducting a financial transaction to promote an unlawful activity, namely false statements regarding health care matters, in violation of 18 U.S.C. ¶ 1956(a)(1)(A), which has the following elements: (1) the defendant conducted a financial transaction involving property that represented the proceeds of mail fraud or wire fraud; (2) the defendant knew that the property represented the proceeds of some form of unlawful activity; and (3) the defendant acted with the intent to promote the carrying on of false statements regarding health care matters.

A financial transaction is a transaction involving the use of a financial institution that is engaged in, or the activities of which

16

affect interstate or foreign commerce in any way.  The issuance of a check qualifies as a "financial transaction."

The phrase "knew that the property represented the proceeds of some form of unlawful activity" means that the defendant knew that the property involved in the transaction represented proceeds from some form, though not necessarily which form, of activity that constitutes a felony.  I instruct you that false statements regarding health care matters is a felony.

"Interstate commerce" means commerce between a state, territory or possession of the United States, including the District of Columbia, and another state, territory, or possession, or the District of Colombia.  It is not necessary that the defendant have intended or anticipated an effect on interstate commerce.

"Proceeds" means any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including gross receipts of such activity.  The government is not required to prove that all of the funds involved in the charged transactions were the proceeds of the specified unlawful activity.  A financial transaction involves "proceeds" of a specified unlawful activity even when proceeds of a specified unlawful activity are commingled in an account with funds obtained from legitimate sources.  It is sufficient if the government proves beyond a reasonable doubt that at least part of the funds involved in a transaction represents such proceeds of specified unlawful activity.

The government must prove that the defendant knew that the property represented the proceeds of a separate criminal activity but need not prove that the defendant knew that the act of laundering the proceeds was unlawful.  See Ninth Circuit Model Instruction Nos.

17

8.146 [Financial Transaction or Attempted Transaction to Promote Unlawful Activity] and 8.147 Laundering or Attempting to Launder Monetary Instruments] (second element) (2010 ed.; approved 6/2021); 18 U.S.C. § 1956(a)(1) ("Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity . . ."); United States v. Akintobi, 159 F.3d 401, 405 (9th Cir. 1998) (issuance of a check qualifies as a "financial transaction"), abrogated on other grounds by United States v. Santos, 553 U.S. 507 (2008).

## IV.   EVIDENTIARY ISSUES

The government will not repeat here issues already briefed at length in connection with the parties' motions in limine, and instead addresses other issues that may arise during trial.  Defendants have not provided their position regarding the below issues.

### A.   Hearsay

Federal Rule of Evidence 801 defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Fed. R. Evid. 801(c).

#### 1.   Defendants' Statements, Adopted Admissions, and Agent Admissions

The government intends to admit statements made by defendants. Statements by a party opponent when offered against that party are excluded from the hearsay definition.  Fed. R. Evid. 801(d)(2)(A). Thus, defendants' statements may be admitted against the defendant who made the statements.  Where these statements are not in furtherance of the charged scheme, as in the case of ZARRABI's statements during interviews with law enforcement, the government

18

1  asks that the Court give a limiting instruction so that the jury

2  understands that it is not to consider the statement as evidence

3  against the other defendants.

4       Statements that defendants adopted or that were made by a person

5  authorized to speak on behalf of the defendants or by an agent of

6  defendants on a matter within the scope of that agency relationship

7  are similarly admissible.  Fed. R. Evid. 801(d)(2)(B), (C), (D).

8       As discussed above, the government anticipates the evidence will

9  show that OMIDI controlled GET THIN and directed its employees and

10 that SCM was a GET THIN company controlled by OMIDI managing numerous

11 other GET THIN entities, including IMS, through which GET THIN's

12 sleep study program was ostensibly run.  Co-schemers and other former

13 employees are anticipated to testify that they acted pursuant to

14 directions they understood to be coming from OMIDI, even if through

15 an intermediary and even if they were ostensibly employed by another

16 GET THIN entity.  Out-of-court statements from such individuals,

17 often contained in emails and instant messages, concern the work they

18 were hired to do for GET THIN, including regarding patient intake,

19 sleep studies, nutrition, processing, insurance authorizations, and

20 billing.

21      In particular, GET THIN's sleep study scoring technician, M.

22 Zarrabi, scored sleep studies and inputted them into template reports

23 as a part of his job.  While also business records and statements

24 related to medical history and treatment, as discussed below, these

25 reports are agent statements of OMIDI and SCM.  Those reports are

26 also adoptive admissions of ZARRABI, who permitted his electronic

27 signature to be used on them at the outset of his employment with GET

28 THIN.  See United States v. Orellana-Blanco, 294 F.3d 1143 (9th Cir.

19

2002) (noting that "a signature would ordinarily make adoption plain").

When the government offers some of a defendant's prior statements, the door is not thereby opened to the defendant to introduce all of his or her out-of-court statements because, when offered by the defendant, the statements are hearsay. See Fed. R. Evid. 801(d)(2. Accordingly, exculpatory statements made by a defendant are hearsay and are not admissible at trial, when offered by the defendant. See Fed. R. Evid. 801(d), 802; United States v. Ortega, 203 F.3d 675, 682 (9th Cir. 2000).

### 2. Co-Conspirator Statements

The government intends to admit statements made by co-schemers made in furtherance of the scheme. A statement made by one co-conspirator or co-schemer during the course and in furtherance of the conspiracy or scheme may be used against another conspirator or co-schemer because such statements are not hearsay. Fed. R. Evid. 801(d)(2)(E); Bourjaily v. United States, 483 U.S. 171, 183 (1987). A statement admitted under Rule 801(d)(2)(E) does not violate the Confrontation Clause, and no independent inquiry into reliability is needed. Bourjaily, 483 U.S. at 183-84; United States v. Knigge, 832 F.2d 1100, 1107 (9th Cir. 1987), amended, 846 F.2d 591 (9th Cir. 1988). Rule 801 (d)(2)(E) requires a foundation that: (1) the declaration was made during the life of the conspiracy; (2) the declaration was made in furtherance of the conspiracy; and (3) there is sufficient proof of the existence of the conspiracy and defendant's connection to it. Bourjaily, 483 U.S. at 173, 181; United States v. Smith, 893 F.2d 1573, 1578 (9th Cir. 1990). These foundational requirements must be established by a preponderance of

the evidence.  _Bourjaily_, 483 U.S. at 175; _United States v. Schmit_, 881 F.2d 608, 610 (9th Cir. 1989).  To be admissible under Rule 801(d)(2)(E), the statement must "further the common objectives of the conspiracy," or "set in motion transactions that [are] an integral part of the [conspiracy]."  _United States v. Aramula-Ruiz_, 987 F.2d 599, 607-08 (9th Cir. 1993); _United States v. Yarborough_, 852 F.2d 1522, 1535 (9th Cir. 1988).

Here, as the government has advised defendants, these consist primarily of statements made by OMIDI, ZARRABI, Klasky, Hong, and Carriedo, whose roles in the scheme (described in brief in the factual summary above) are well known to defendants and set forth in the FSI.  Klasky, Hong, and Carriedo are all also anticipated to testify regarding their roles in the scheme.  The government has further identified for defendants those exhibits on its exhibit list that it intends to admit as co-conspirator statements and offered to meet-and-confer with defendants regarding those exhibits.

### 3.   Patient Files

The government intends to introduce into evidence patient files and medical records produced by and obtained from GET THIN, whether in hard copy patient files, from its electronic medical records system NexTech, sent as attachments to emails, or otherwise.  These are admissible under a number of theories.  First, many of the records are business records created during GET THIN's business of providing medical services.  Second, many of the statements therein, such as prior medical histories provided by patients and examinations, orders, and tests, were statements made for medical diagnosis or treatment under Federal Rule of Evidence 803(4).  These patient files and records also contain fraudulent medical records,

1  including fraudulent sleep study reports, which are not offered for

2  their truth but to show that the documents contained within the files

3  and records are fraudulent.  See Anderson v. United States, 417 U.S.

4  211, 219-20 (1974) ("The election contest testimony of Tomblin and

5  Browning, however, was not admitted into evidence in the [§] 241

6  trial to prove the truth of anything asserted therein. Quite the

7  contrary, the point of the prosecutor's introducing those statements

8  was simply to prove that the statements were made so as to establish

9  a foundation for later showing, through other admissible evidence,

10  that they were false."); Knigge, 832 F.2d at 1108.

### B.   Authentication and Foundation

#### 1.   Federal Rule of Evidence 901

13  Federal Rule of Evidence 901 (a) provides that "[t]he

14  requirement of authentication or identification as a condition

15  precedent to admissibility is satisfied by evidence sufficient to

16  support a finding that the matter in question is what its proponent

17  claims."  Under Rule 901(a), evidence should be admitted, despite any

18  challenge, once the government makes a *prima facie* showing of

19  authenticity or identification so "that a reasonable juror could find

20  in favor of authenticity or identification . . . [because] the

21  probative force of the evidence offered is, ultimately, an issue for

22  the jury."  United States v. Chu Kong Yin, 925 F.2d 990, 996 (9th

23  Cir. 1991) (citations and internal quotation marks omitted); see also

24  United States v. Black, 767 F.2d 1334, 1342 (9th Cir. 1985).  The

25  government need not establish all links in the chain of custody of an

26  item or call all persons who were in a position to come into contact

27  with it.  See Gallego v. United States, 276 F.2d 914, 917 (9th Cir.

28  1960).  Alleged gaps in the chain of custody go to the weight of the

evidence rather than to its admissibility.  See United States v. Taylor, 716 F.2d 701, 711 (9th Cir. 1983).  A duplicate is admissible to the same extent as the original, unless there is a genuine question as to the authenticity of the original or it would be unfair under the circumstances to admit the duplicate in lieu of the original.  See Fed. R. Evid. 1003; Smith, 893 F.2d at 1579.

        2.  Audio Recordings

The government intends to introduce audio recordings captured during interviews with ZARRABI in this case.  A recording is admissible upon a showing that it is "accurate, authentic, and generally trustworthy."  United States v. King, 587 F.2d 956, 961 (9th Cir. 1978).  For example, testimony that a recording depicts evidence that the witness observed is sufficient to authenticate the recording.  Fed. R. Evid. 901(b); United States v. Smith, 591 F.3d 974, 979-80 (8th Cir. 2010).  These recordings were in English.  As the Court is aware from the government's motion in limine to admit these excerpts (Dkt. 1192), the government has prepared written transcripts of the excerpts of those recordings that it intends to introduce as an aid to the jury in listening to the audio recordings. See United States v. Turner, 528 F.2d 143, 167 (9th Cir. 1975) (cautionary instruction given that only the recordings were evidence of the conversation).  Following the Court's ruling on the admissibility of those excerpts, the government will meet and confer with defendants regarding that transcription.  The transcript will be displayed on a screen simultaneous with the playing of the audio, but the transcripts will not be admitted into evidence.

1
2

     **C.    The Parties' Agreements Regarding Limitations on the Introduction of Certain Evidence**

3    During the course of preparing for trial, the parties have met

4 and conferred regarding the introduction of certain types of

5 evidence, some of which have resulted in agreements.  In particular,

6 the government has agreed it will not introduce during its case-in-

7 chief evidence of (1) patient deaths following their receipt of a

8 Lap-Band from GET THIN; (2) patient complications from and need to

9 seek corrective surgery for Lap-Band surgeries and procedures not

10 discussed in the FSI (e.g., unnecessary procedures including

11 biopsies, gallbladder removals, and hysterectomies); (3) OMIDI's

12 overall wealth, lifestyle, and spending[2]; (4) the recordings of OMIDI

13 conducted by Klasky between March and June 2016; and (5) Brian

14 Oxman's threats against Klasky's appointed counsel during a May 2016

15 meeting at that attorney's office.  The government has also agreed it

16 will not refer to GET THIN's patients as "victims."  OMIDI has agreed

17 he will not present evidence of insurer negligence (that is, evidence

18 that it is the insurers' fault they did not catch the charged conduct

19 at the outset and evidence that the insurers should have had other

20 procedures in place.  The government and OMIDI have agreed that they

21 will advise the jury that OMIDI has a medical degree but, at the time

22 of the events, was not maintaining an active medical license.  The

23 government has reserved its right to address issues related to

24 OMIDI's license revocation as appropriate in cross-examination,

25 should OMIDI take the stand.

26
27

28     [2]  This agreement does not apply to the government's introduction of evidence of OMIDI's financial interest in GET THIN and that he benefitted financially from GET THIN's success.

1    The government reserves the right to admit the above-described

2    evidence at any time to rebut claims made by the defense or if the

3    defense otherwise opens the door to this evidence, including by

4    asking questions on cross-examination that cannot be truthfully

5    answered without reference to the above-described evidence, as well

6    as for impeachment purposes.

7    **D.    Evidence of Satisfied Patients, Successful Procedures, and**
     **Lawful Actions**

8

9    OMIDI has contended elsewhere that the government's admission of

10   certain testimony regarding the patients' experiences related to the

11   charges in the FSI will prompt him to call "numerous patients" to

12   testify "about the positive impact Lap-Band surgery had on their

13   lives." (Dkt. 1203 at 9.) Admitting such evidence, or evidence that

14   some GET THIN services were medically necessary or billed

15   appropriately, would be improper. "[T]hat a defendant acted lawfully

16   on other occasions is generally inadmissible to prove he acted

17   lawfully on the occasion[s] alleged in the indictment." United

18   States v. Reese, 666 F.3d 1007, 1020 (7th Cir. 2012); see also United

19   States v. Scarpa, 897 F.2d 63, 70 (2d Cir. 1990) ("A defendant may

20   not seek to establish his innocence . . . through proof of the

21   absence of criminal acts on specific occasions."); United States v.

22   Kreimer, 609 F.2d 126, 130 (5th Cir. 1980) ("The question is not how

23   many times they obeyed the law but whether or not on the occasions

24   charged they violated it.").

25   Prior legitimate acts are routinely excluded. See United States

26   v. Moreira, 605 Fed. App'x 852, 855 (11th Cir. 2015). In Moreira,

27   the defendants were accused of billing for home health services never

28   rendered and paying kickbacks for referrals. Id. The trial court

1   excluded evidence that some patients received services and got no

2   kickbacks.  Id.  Upholding exclusion, the Eleventh Circuit observed

3   that "[t]he Government did not charge and did not argue that there

4   was no legitimate business conducted at Anna Nursing.  Thus, evidence

5   that some of the claims filed by Anna Nursing may have been for

6   services legitimately provided to eligible patients without the

7   payment of kickbacks was irrelevant."  Id. at 859.

8        **E.   Cross-Examination of Defendants**

9        A defendant who testifies at trial may be cross-examined as to

10   all matters reasonably related to the issues he or she puts in

11   dispute during direct examination.  "A defendant has no right to

12   avoid cross-examination on matters which call into question his claim

13   of innocence."  United States v. Miranda-Uriarte, 649 F.2d 1345,

14   1353-54 (9th Cir. 1981).

15       Defendants' credibility will be crucial if they choose to

16   testify in order to refute the government's showing of knowledge and

17   intent.  Indeed, because defendants are the only witnesses with

18   "direct" evidence of their own knowledge and intent, if they take the

19   stand to deny any knowledge of the fraud, their credibility becomes a

20   key issue.  Accordingly, cross-examination of defendants about other

21   fraudulent conduct in which they have engaged is necessary for the

22   jury to weigh whether defendant's denial of knowledge and intent is

23   credible given his other actions.  As the Ninth Circuit has held,

24   Rule 608(b):

25       specifically contemplates inquiries into prior behavior in
        order to challenge a witness's credibility.  Evidence of
26       prior frauds is considered probative of the witness's
        character for truthfulness or untruthfulness.

27

28   United States v. Gay, 967 F.2d 322, 328 (9th Cir. 1992).

1    The prejudicial effect of such evidence, if any, can be

2    addressed by a limiting instruction.  The admission of evidence

3    harmful to the defendant's case does not necessarily constitute

4    unfair prejudice.  United States v. Fagan, 996 F.2d 1009, 1015 (9th

5    Cir. 1993).  Unfair prejudice results from evidence that "provokes an

6    emotional response in the jury or otherwise tends to affect adversely

7    the jury's attitude toward the defendant wholly apart from its

8    judgment as to his guilt or innocence of the crime charged."  Id.

9    (internal quotation marks omitted).

10   Finally, the government is not required to provide notice of

11   matters about which it may seek to cross-examine defense witnesses,

12   including defendants, should they testify.

13       **F.    Defense Witnesses**

14   As noted above, OMIDI has provided a witness list containing 96

15   witnesses, the vast majority of whom appear to have just been copied

16   from prior iterations of the government's witness list.  To the

17   extent those witnesses are called by the government, defendants will

18   have an opportunity to cross examine them at that time.  To the

19   extent defendants elect to call other witnesses at trial, aside from

20   experts they have noticed, the government requests that the Court

21   order defendants to provide an offer of proof with respect to the

22   anticipated testimony of those witnesses so that the government may

23   assess whether their testimony would be relevant and otherwise

24   admissible, and whether their testimony would implicate any Fifth

25   Amendment rights those witnesses might have, before the witnesses

26   take the stand.

27

28

### G.   Character Evidence

The Supreme Court has recognized that character evidence –
particularly cumulative character evidence – has weak probative value
and great potential to confuse the issues and prejudice the jury.
See Michelson v. United States, 335 U.S. 469, 480, 486 (1948).  The
Court has thus given trial courts wide discretion to limit the
presentation of character evidence.  Id.

In addition, the form of the proffered evidence must be proper.
Federal Rule of Evidence 405(a) sets forth the sole methods for which
character evidence may be introduced.  It specifically states that,
where evidence of a character trait is admissible, proof may be made
in two ways:  (1) by testimony as to reputation and (2) by testimony
as to opinion.  Thus, a defendant may not introduce specific
instances of his or her good conduct through the testimony of others.
See Michelson, 335 U.S. at 477.  On cross-examination of a
defendant's character witness, however, the government may inquire
into specific instances of a defendant's past conduct relevant to the
character trait at issue.  See Fed. R. Evid. 405(a).  In particular,
a defendant's character witnesses may be cross-examined about their
knowledge of the defendant's past crimes, wrongful acts, and arrests.
See Michelson, 335 U.S. at 481.  The only prerequisite is that there
must be a good faith basis that the incidents inquired about are
relevant to the character trait at issue.  See United States v.
McCollom, 664 F.2d 56, 58 (5th Cir. 1981).

### H.   Reciprocal Discovery and Expert Disclosures

The United States has requested and the Court ordered production
of expert disclosures and reciprocal discovery from defendants on
July 28, 2021, and September 7, 2021, respectively.  ZARRABI provided

28

timely notice of two expert witnesses, and OMIDI of five expert witnesses.  On August 31, 2021, OMIDI provided untimely notice regarding another expert witness.  The government has attempted to meet-and-confer regarding the inadequacies of that untimely disclosure, and reserves its right to move to exclude that expert if the disclosure is not supplemented in a timely manner.

To date, ZARRABI has only provided a handful of documents in reciprocal discovery and OMIDI only a single video of a sleep apnea patient.  To the extent defendants may attempt to introduce or use any documents at trial that they have not previously produced, the United States reserves the right to object and to seek to have such documents precluded.

### I.   Jury Nullification

The Court should exclude any evidence and/or argument relating to or concerning any possible jury nullification defense.  This includes any evidence and/or argument meant to play on the jury's sympathy for defendants.

It is well-established that a defendant does not have a right to a jury nullification instruction.  United States v. Powell, 955 F.2d 1206, 1213 (9th Cir. 1992).  Having no right to seek jury nullification, defendant has no right to present evidence relevant only to such a defense.  Zal v. Steppe, 968 F.2d 924, 930 (9th Cir. 1992) (Trott, J., concurring) ("[N]either a defendant nor his attorney has a right to present to a jury evidence that is irrelevant to a legal defense to, or an element of, the crime charged.  Verdicts must be based on the law and the evidence, not on jury nullification as urged by either litigant.").

Since they do not make any fact in issue more or less probable, evidence and arguments meant to play on the jury's sympathy are not relevant under Federal Rule of Evidence 401 and must be excluded on that basis.  In addition, appeals to sympathy are unduly prejudicial and confusing to the jury and misleading under Rule 403 and, therefore, properly excluded on that basis even if they had some arguable relevance.