UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES—GENERAL**

Page **1** of **18**

| Case No. | CR 17-661-DMG | Date | September 16, 2021 |
|---|---|---|---|

| Present: The Honorable | DOLLY M. GEE, UNITED STATES DISTRICT JUDGE |
|---|---|
| Interpreter | N/A |

| Kane Tien | Not Reported | Not Present |
|---|---|---|
| *Deputy Clerk* | *Court Reporter* | *Assistant U.S. Attorney* |

| U.S.A. v. Defendant(s): | Present | Cust. | Bond | Attorneys for Defendant(s): | Present | Appt. | Ret. |
|---|---|---|---|---|---|---|---|
| 1) Julian Omidi | Not | | ✓ | Michael Schachter | Not | | ✓ |
| 3) Surgery Center Management, LLC | Not | | | Michael Devereux | Not | | ✓ |
| 4) Mirali Zarrabi, M.D. | Not | | ✓ | Thomas O'Brien | Not | | ✓ |

**Proceedings:   [IN CHAMBERS] ORDER RE DEFENDANTS' MOTIONS *IN LIMINE***

## I.   INTRODUCTION

On August 16, 2021, the parties filed 18 motions *in limine* ("MILs"). Opposition briefs were filed on August 30, 2021. A hearing on the MILs was held on September 14, 2021. Defendants filed the below 13 MILs:

1. Defendant Zarrabi's MIL to Exclude Prejudicial and Irrelevant Patient Testimony [Doc. # 1191] and Defendant Omidi's related Motion to Preclude Argument, Evidence, and Reference to Victims Other than Insurance Companies and Exclude Impact Testimony [Doc. # 1203];

2. Defendant Omidi's MIL to Preclude the Government from Asking Improper Materiality Questions at Trial [Doc. # 1188];

3. Defendants Omidi and Zarrabi's MIL to Preclude the Admission of Hearsay Pursuant to Rule 801(D)(2)(E) Without Prior Showing by the Government to Demonstrate Foundation for Co-Conspirator Exception [Doc. # 1189];

4. Defendant Omidi's MIL to Exclude Testimonial Statements of Defendant Zarrabi [Doc. # 1193];

5. Defendants Omidi and Zarrabi's MIL to Preclude the Testimony of the Government's Proposed Expert, Michael Petron, CPA, CFE [Doc. # 1196];

6. Defendants Omidi and Zarrabi's MIL to Exclude Evidence Obtained from Michael Zarrabi's Personal Hard Drive and Dell Computer Tower [Doc. #1207];

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CRIMINAL MINUTES—GENERAL

Page **2** of **18**

7. Defendants Omidi and Zarrabi's MIL to Limit the Testimony of the Government's Proposed Expert, Dr. Daniel Norman [Doc. # 1200];

8. Defendant Omidi's MIL to Exclude Evidence Regarding "Commissions" Paid to Patient Care Specialists [Doc. # 1209] and Defendant Omidi's related MIL to Preclude Evidence of Defendants' General Billing Practices and Advertising and Marketing Efforts and Preclude the Testimony of Barbara Balcom, Tom Johnson, and Tommy Iorio [Doc. # 1223];

9. Defendants Omidi and Zarrabi's MIL to Preclude Evidence of Charles Klasky's Wife's Illness and Need for Health Insurance [Doc. # 1215];

10. Defendant Omidi's MIL to Admit Charles Klasky's Prior Invocation of the Fifth Amendment [Doc. # 1218]; and

11. Defendants Omidi and Zarrabi's MIL to Preclude Klasky Opinion Testimony [Doc. # 1235].

Defendant Surgery Center Management, LLC ("SCM") joined in each of Defendant Omidi's and Zarrabi's motions. [Doc. # 1225.]

## II.     DISCUSSION

**1. Defendant Zarrabi's MIL to Exclude Prejudicial and Irrelevant Patient Testimony and Defendant Omidi's Related MIL to Preclude Argument, Evidence, and Reference to Victims Other than Insurance Companies and Exclude Impact Testimony [Doc. # 1203]**

Defendants Omidi and Zarrabi filed separate, but related, MILs to exclude allegedly prejudicial and irrelevant patient testimony regarding complications following Lap-Band surgeries and related procedures. Defendant Omidi also seeks to exclude references to patients as "victims" given that the allegations in this case relate to alleged fraud against Tricare and private insurance companies. The Government filed an opposition representing that it does not intend to call patient witnesses to testify regarding alleged complications from Lap-Band surgeries and related procedures or patient deaths, and will not refer to patients as "victims." [Doc. # 1290 at 4, 5.[1, 2]] Instead, the Government represents that patient witnesses will be called to testify regarding sleep studies and related treatment they received during the periods in which they were seeking to obtain Lap-Band surgery. *Id.* at 5. The Court agrees that such testimony is relevant and admissible to support the Government's theory of the case. *See United States v. Loftis*, 843 F.3d 1173, 1177 (9th Cir. 2016) ("[T]he commission of . . . a mail fraud or

---

[1] Page references herein are to the page numbers inserted by the CM/ECF system.

[2] The Government represents that it reserves the right to offer such testimony to rebut claims made by the defense. *Id.*

wire fraud offense necessarily includes a fraudulent scheme as a whole . . ., including additional executions of the scheme that were not specifically charged.").

Accordingly, Defendants' MIL to preclude patient testimony is **DENIED as moot** insofar as the Government has agreed (except in rebuttal after Defendants have opened the door) that patients will *not* testify regarding alleged complications following their Lap-Band surgeries and related procedures, or patient deaths following Lap-Band surgery, and that the Government will not refer to patients as "victims." Defendants' MIL is **DENIED** to the extent that patient witnesses *may* testify regarding sleep studies and related treatment they received during the periods in which they were seeking to obtain Lap-Band surgery, including, for example, testimony that they were subjected to multiple sleep studies; falsely diagnosed with moderate or severe sleep apnea and told that they had stopped breathing; and/or were given continuous positive airway pressure ("CPAP") machines to wear on their face every night.

2. **Defendant Omidi's MIL to Preclude the Government from Asking Improper Materiality Questions at Trial [Doc. # 1188]**

Defendant Omidi asks the Court to preclude the Government from asking improper materiality questions at trial. Omidi contends that the Government is likely to call TriCare and insurance company representatives to testify about their review of GET THIN claims and, for example, about statements made on a claim form regarding a patient's height, weight, and body mass index ("BMI"). Defendant Omidi contends that it would be appropriate for the Government to ask these witnesses: "Did you review these statements?" and if the answer is "yes," the Government can inquire about the significance, if any, of the statement. Omidi contends, however, that the Government may not ask its witnesses: "If you had known that a sleep study claim was submitted with false information, would that information have been important to your decision to approve the claim?," or "If you had known that the doctor who signed this sleep study had not reviewed the raw data, would that information be important to your decision to approve the claim?," and similar questions to that effect. Omidi contends that "[s]uch questions are improper because the question at issue is whether the actual 'statements' that were contained in the claims paperwork were 'material' to the alleged victims' decision to approve the claim, not whether the alleged victims would have found information that the insurance claims paperwork was inaccurate or incomplete to be material." [Doc. # 1188 at 10.] Omidi contends that it would be prejudicial for the Government to phrase its questions in the aforementioned manner, as it would suggest to the jury that it may find the existence of material misrepresentations so long as it concludes that TriCare and insurance companies would have wanted to know certain information that was not specifically contained in the insurance claims paperwork. *Id.* at 12-13.

Defendant Omidi's proposed approach to the Government's framing of questions regarding materiality is foreclosed by *United States v. Woods*, 335 F.3d 993, 997-98 (9th Cir. 2003), which held that "[a] defendant's actions can constitute a scheme to defraud *even if there are no specific false statements involved*. The deception need not be premised upon words or statements standing alone. The arrangement of the words or the circumstances in which they are used may create an appearance which is false or deceptive, even if the words themselves fall short of this." (Emphasis added) The *Woods* court further explained that "even if statements as part of the scheme are not literally false, [a jury] may consider whether the statements taken as a whole were misleading and deceptive. Evidence beyond a

reasonable doubt that a scheme was reasonably calculated to deceive is sufficient to establish a scheme to defraud." *Id.*

The Model Ninth Circuit Criminal Jury Instructions for mail fraud and wire fraud explain that "[i]n determining whether a scheme to defraud exists, you may consider not only the defendant's words and statements, but also *the circumstances in which they are used as a whole*" and "[d]eceitful statements of half-truths may constitute false or fraudulent representations[.]"  Model. Crim. Jury Instr. 8.121 (Mail Fraud); 8.124 (Wire Fraud) (emphasis added).

For the foregoing reasons, Defendant Omidi's MIL to narrow the scope of the Government's questions regarding materiality is **DENIED.**

3. **Defendants Omidi and Zarrabi's MIL to Preclude the Admission of Hearsay Pursuant to Rule 801(D)(2)(E) Without Prior Showing by the Government to Demonstrate Foundation for Co-Conspirator Exception [Doc. # 1189]**

Defendants Omidi and Zarrabi request that the Court order the Government to file, before trial, a summary disclosing:  (1) the identity of co-conspirators whose statements the Government will seek to introduce as co-conspirator statements under Federal Rule of Evidence ("FRE") 801(d)(2)(E), and/or  (2) the specific co-conspirator statements that it seeks to offer at trial, and other basic information necessary to gauge the admissibility of those statements.  [Doc. # 1189 at 6.]  In support, Defendants rely on two district court cases in the Northern District of California where Hon. Phyllis J. Hamilton ordered such relief pursuant to her standard protocol.  *See United States v. Joyce,* 2017 WL 895563, Case No. 14-cr-00607 at *5 (N.D. Cal. Jan. 1, 2017); *United States v. Ellis,* 121 F. Supp. 3d 927, 941 (N.D. Cal. 2015).  Defendants contend that "the length of the trial, the complexity of the facts and the numbers of individuals and entities involved, as well as the Government's lack of specificity in the FSI as to the alleged members of the conspiracy and their purposes, all militate in favor" of the requested relief.  [Doc. # 1189 at 6.]

In response, the Government points out that the relief in *Joyce* and *Ellis* is hardly established precedent in this Circuit, but instead simply one district court's preferred procedure.  The Government submits that many of its exhibits are admissible through a number of ways including as:  party opponent statements under FRE 801(d)(2); business records under FRE 803(6); and co-conspirator statements made in furtherance of the conspiracy under FRE 801(d)(2)(E).  The Government contends that most of the proffered co-conspirator statements will be in the form of emails and other written communications between co-conspirators of the charged conspiracy and many, if not all, of these statements are included in the Government's preliminary and updated exhibit lists.

It is within this Court's discretion to determine the order of proof or the showing, if any, that is appropriate prior to the Government's introduction of the co-conspirator statements.  *United States v. Arbelaez*, 719 F.2d 1453, 1460 (9th Cir. 1983).  "A coconspirator's statement may be admitted against a defendant where the prosecution shows by preponderance of the evidence that (1) the conspiracy existed when the statement was made; (2) the defendant had knowledge of, and participated in, the conspiracy; and (3) the statement was made 'in furtherance of' the conspiracy." *United States v. Larson*, 460 F.3d 1200, 1211 (9th Cir. 2006), *on reh'g en banc*, 495 F.3d 1094 (9th Cir. 2007) (citations omitted).

The Government represents that it is attempting to meet and confer with defense counsel regarding the potential pre-admission of exhibits to which the parties can agree and, during the course of this process, the Government "intends to identify specifically those exhibits it seeks to admit as co-conspirator statements . . . and, in the course of doing so, will identify the specific co-conspirator statements, the identity of the declarant for each co-conspirator statement, and a summary establishing that each declarant of the coconspirator statements knew about and participated in the conspiracy." [Doc. # 1305 at 4-5.] Thus, because the Government has agreed to provide Defendants with the requested relief, Defendants' MIL is **DENIED as moot**.

4. **Defendant Omidi's MIL to Exclude Testimonial Statements of Defendant Zarrabi [Doc. # 1193]**

For the reasons outlined in the Court's separate order regarding the Government's MIL to Admit Certain Statements by Defendant Zarrabi [Doc. # 1192], Defendant Omidi's MIL to Exclude Testimonial Statements of Defendant Zarrabi [Doc. # 1193] is **GRANTED IN PART** consistent with that Order.

5. **Defendants Omidi and Zarrabi's MIL to Preclude the Testimony of Michael Petron, CPA, CFE [Doc. # 1196]**

Defendants seek to exclude the testimony of the Government's proposed expert witness, Michael Petron, CPA, CFE, who performed statistical analyses based on various GET THIN records. In sum, Petron designed a survey from a spreadsheet of more than 11,000 sleep studies corresponding to 8,109 patients (the "sample frame") from data provided by Michael Zarrabi, who is Defendant Zarrabi's brother and GET THIN's former registered polysomnographic technician ("RPSGT"). [Doc. # 1288 at 24 (Williams Decl.) ¶ 2.] From this, Petron identified a random sample of 250 patients (the "sample") and extrapolated from that sample to offer opinions on the number of altered sleep studies for the sample frame. [*See* Doc. # 1242, Exh. 1 (Petron draft charts).] For example, Petron determined that 68% of the beneficiaries in the sample (or, 169 out of 250) had at least one altered sleep study.[3] Petron then extrapolated that of the 8,109 beneficiaries in the sample frame, there were 5,482 beneficiaries with at least one altered sleep study (collectively, "Altered Sleep Study Data"). *Id.* at 7.

Petron was also asked to "estimate the amount of loss associated with certain categories of sleep study, lap band, and CPAP claims," which he refers to as "intended loss" and "actual loss" (collectively, "Loss Data"). [Doc. # 1242, Exh. 2 (Petron report) at 15 ¶ 5.] "Intended loss" measures amounts that GET THIN entities billed to insurers for beneficiaries who were determined to have: (i) an Altered Sleep

---

[3] An "altered sleep study" is defined as a study where the "AHI value was altered and increased by one point or more from an original sleep study to a subsequent version of the same sleep study for the beneficiary." [Doc. # 1242, Exh. 2 (Petron expert report) at 15-16.] An "AHI value" refers to the apnea-hypopnea index, a score related to the number of breathing cessations (apneas) and drops in the breathing rate accompanied by oxygen desaturation (hypopneas) that occurred in a sleep study. According to the Government, an AHI of less than 5 was normal, while an AHI between 5 and 14.9 reflected mild obstructive sleep apnea ("OSA"), between 15 and 29.9 reflected moderate OSA, and 26 and 30 or higher reflected severe OSA. *See* FSI ¶ 14.

Study sent to the insurer, (ii) no record of email feedback provided by Defendant Zarrabi, and/or (iii) the sleep study is a CPAP [or, secondary, sleep] study following a normal PSG [polysomnography, or initial, sleep] study. *Id* ¶ 6.K. "Actual loss" measures amounts *paid* by insurers for beneficiaries that were determined to have any one of the three criteria noted above. *Id.* ¶ 6.L. Petron concluded that based on his review of GET THIN records, the Loss Data reflected the following for sleep studies: over $175 million (intended) and $27 million (actual); Lap-Bands: over $180 million (intended) and $41 million (actual); and CPAP devices: over $18 million (intended) and $6 million (actual). [Doc. # 1242, Exh. 1 (Petron draft charts).]

Defendants seek to exclude Petron's testimony regarding both the Altered Sleep Study Data and Loss Data on the grounds that such data should have been restricted to the 27 patients referenced in the FSI, and not the thousands of additional patients not directly at issue. Defendants also contend that the Loss Data is irrelevant as it is not an element of any of the charged offenses. Defendants further contend that Petron's testimony is not relevant under FRE 402, his testimony fails to satisfy FRE 702, and even if otherwise relevant and admissible, it should be excluded under FRE 403.

The Government contends that Petron's testimony is relevant and admissible, as it will assist the jury in understanding the scope of the charged scheme and Defendants' knowledge and intent with respect to their conduct. The Government notes that any potential confusion caused by references to "intended loss" and "actual loss" may be addressed by using different terms, such as "amounts billed" and "amounts paid." The Government also notes that Petron is qualified to provide expert testimony under FRE 702, noting that Defendants do not question his qualifications generally, but critique his conclusions, which they can challenge on cross-examination.

The Ninth Circuit has noted that under the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), and its progeny, a court must

> assess [an expert's] reasoning or methodology, using as appropriate such criteria as testability, publication in peer reviewed literature, and general acceptance, but the inquiry is a flexible one. Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion. In sum, the trial court must assume that the expert testimony both rests on a reliable foundation and is relevant to the task at hand. [¶] Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline.

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969-70 (9th Cir. 2013) (internal quotation marks and citations omitted).

With regard to Defendants' claims that Petron's testimony does not meet the FRE 702 standard, the Court disagrees. Petron is a Certified Public Accountant and Certified Fraud Examiner with approximately 20 years of experience in, among other things, the field of statistical analysis. [*See* Doc. #

1288-1 (Petron biography).]   The Government is not limited to presenting only evidence relating to the specific charges set forth in the FSI, particularly when it has alleged a broad and widespread fraud scheme. *See United States v. Soliman*, 813 F.2d 277, 279 (9th Cir. 1987) ("To prove the mail fraud counts, the Government had to show the existence of a scheme of mail fraud activity and Soliman's connection to that scheme."); *see also Loftis*, *supra,* 843 F.3d at 1177; *United States v. Serang*, 156 F.3d 910, 915 (9th Cir. 1998) (government not precluded from introducing evidence relevant to entire scheme where defendant is indicted for less than all of his actions).  Petron's testimony regarding Altered Sleep Studies is probative of the Government's allegations that Defendants were engaged in a widespread fraud scheme to consistently alter (and always increase) patients' sleep study scores.  To the extent that Defendants claim that having two or more sleep study reports suggests that one was a draft report and one was final, or that these reports did not otherwise evince fraudulent conduct (i.e., where a patient's score was increased, but did not ultimately affect potential insurance coverage because the patient either *already* qualified for Lap Band surgery or because the sleep score alteration did not sufficiently place the patient in a higher sleep apnea category), those are questions that can be addressed on cross-examination.  *See Daubert,* 509 U.S. at 595-06 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence").

Petron's testimony regarding Loss Data is probative of Defendants' alleged knowledge and intent to demonstrate the losses flowing from their alleged widespread fraud scheme.  *See United States v. Stargell*, ED CR 09-05 VAP, 2010 WL 11475579, at *2 (C.D. Cal. June 16, 2010) (finding evidence of loss was admissible at trial because "[t]he fact, and amount, of loss makes it more probable that Defendant intended to defraud the financial institutions in question. Accordingly, such evidence is relevant."); *see also United States v. Copple,* 24 F.3d 535, 545 (3d Cir. 1994) (evidence of loss relevant to proving specific intent in mail fraud case).  To the extent that Defendants contend that the loss amounts are inflated because the figures incorrectly assume, *inter alia*, that *any* altered sleep study constituted fraud, those criticisms may be raised on cross-examination.  *See Daubert*, 509 U.S. at 595-06.

Because the terminology "intended loss" and "actual loss" may be confusing to a jury, however, they should be replaced with the terms "amounts billed" and "amounts paid."

Finally, the Court concludes that a *Daubert* hearing is not necessary.  Defendants will be afforded the opportunity to *voir dire* Petron's qualifications and methodology outside the presence of the jury before he is accepted as an expert witness.  *See United States v. Alatorre,* 222 F.3d 1098, 1105 (9th Cir. 2000) (noting, with approval, similar procedure instead of pretrial *Daubert* hearing).

For the foregoing reasons, Defendants' MIL to exclude the testimony of Michael Petron is **DENIED.**

### 6. Defendants Omidi and Zarrabi's MIL to Exclude Evidence Obtained from Michael Zarrabi's Personal Hard Drive and Dell Computer Tower [Doc. # 1207]

Defendants seek to exclude evidence obtained by the Government from Michael Zarrabi's Dell computer tower, which was provided by GET THIN (through Top Surgeons) ("Work Computer"), and his personal hard drive, where he had copied some data from his Work Computer ("Personal Hard Drive"). [Doc. # 1207.]  The evidence at issue consists of the alleged "raw data" from Lap-Band patients' sleep studies, with initial scoring of that data prepared by Michael Zarrabi, who was the GET THIN's RPSGT as well as Technical Facilities Manager. [Doc. # 1310-1, Exh. A (Sleep Study Facilities Program Policies and Procedures Manual) at 5.]  Defendants contend that because Michael Zarrabi is not anticipated to testify at trial to authenticate evidence obtained from his Work Computer and Personal Hard Drive, they cannot be deemed trustworthy and reliable.  Moreover, according to Defendants, given Michael Zarrabi's documented mental health issues (including bipolar disorder), and the length of time he retained these devices, there is a risk that he manipulated the data contained therein.[4]

The Government contends that the evidence is admissible under FRE 901(a), 801(d)(2), or 803(6). The Court agrees.  Under Rule 901(a), "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."  Evidence from Michael Zarrabi's Work Computer and Personal Hard Drive is admissible under FRE 901(a) through the testimony of agents who directly obtained the devices from Michael Zarrabi.  A forensic analyst also generated reports of the contents of the Work Computer and Personal Hard Drive, including information regarding file creation and access dates.  [*See* Doc. # 1310-1, Exh. M (SCERS Activity Report).]  The analyst found that the Work Computer's time "was approximately 49 minutes behind the current Pacific Daylight Time" but "the analyst did not note any evidence that the files contained on that drive had been manipulated."  [Doc. # 1310-1, Exh. M at 117.]  The Government further notes that the evidence from Michael Zarrabi's Work Computer and Personal Hard Drive appears similar to records the Government obtained through other contemporaneous sources (including Charles Klasky, Sherwin Hong, and Defendant Zarrabi).  [*Compare* Williams Decl., Exhs. F, I, L (documents obtained by Government from Klasky, Hong, and Defendant Zarrabi for patients E.A, J.J., and N.S) *with id.*, Exhs. D, G, J (documents for same patients obtained from Michael Zarrabi's Work Computer) *and id.*, Exhs. E, H, K (documents for same patients obtained from Michael Zarrabi's Personal Hard Drive).]

The evidence is also admissible as an admission by a party opponent under FRE 801(d)(2)(C) or (D), as it is undisputed that Michael Zarrabi was GET THIN's RPSGT and Technical Facilities Manager, and his duties included, *inter alia,* saving all "raw data files, used in the acquisition of sleep study reports" and scoring "all raw data files into pre-approved templates, which result in the final product, the Sleep Study Report (SSR)".  [Doc. # 1310-1, Exh. A at 10.]

Finally, evidence from the Work Computer is potentially admissible under the business records exception under FRE 803(6).  For records to be admissible under Rule 803(6), "the following foundational

---

[4] Michael Zarrabi met with government agents on November 13, 2015. [Doc. # 1207, Exh. 1.]  He provided the Personal Hard Drive to the Government on December 8, 2015. [Doc. # 1207-3, Exh. 3 at 7.]  The Work Computer was obtained by the Government on September 6, 2016 pursuant to a search warrant.  [Doc. # 1248, Exh. 7.]

facts must be established through the custodian of the records or another qualified witness: (1) the records must have been made or transmitted by a person with knowledge at or near the time of the incident recorded; and (2) the record must have been kept in the course of a regularly conducted business activity." *United States v. Ray*, 930 F.2d 1368, 1370 (9th Cir. 1990), *as amended on denial of reh'g* (Apr. 23, 1991) (citation omitted). Although Michael Zarrabi is not expected to testify, the Government represents that former GET THIN employees (including former sleep study manager, Charles Klasky) will testify that these records were made, or transmitted, at or near the time of the incident recorded – i.e., that the reports were created at or near the time when Michael Zarrabi scored the patients' raw sleep study data; and that the unaltered sleep study reports were kept in the course of a regularly conducted business activity at GET THIN. As the former sleep study manager for GET THIN, Klasky is qualified to testify regarding GET THIN's recordkeeping system and Michael Zarrabi's role within it, as Michael Zarrabi would score the raw sleep study data and then pass it along to Klasky or Defendant Zarrabi. *See Ray*, 930 F.2d at 1370 ("The phrase 'other qualified witness' [in Rule 803(6)] is broadly interpreted to require only that the witness understand the record-keeping system."); *see also United States v. Childs*, 5 F.3d 1328, 1334 (9th Cir. 1993) (permitting former employees to lay foundation for business records exception, explaining that "[a] witness does not have to be the custodian of documents offered into evidence to establish Rule 803(6)'s foundational requirements.").[5]

Defendants contend that Michael Zarrabi may have manipulated data contained in the Work Computer and Personal Hard Drive because of his documented mental health issues [*see* Doc. # 1248, Exh. 16] and based on a prior statement where Michael Zarrabi recounted to a government agent that he had changed the date on his computer. [*See* Doc. 1207-5, Exh. 12 (Dec. 3, 2015 email from Michael Zarrabi to SA Pettigrew, stating *inter alia* that "when I was writing my letter to the FBI, I changed the date of my computer to 3 months ago, so the date of creation of word file shows three months ago.so [sic] if he wants to go to properties figure to see when it was written, it shows three months ago.").][6] While this statement is concerning, it does not follow that the sleep study data in the Work Computer or Personal Hard Drive was manipulated. [*See* Doc. # 1310-1, Exh. M at 117 (forensic analyst did not note any evidence that the files contained on that drive had been manipulated).] Moreover, "[m]erely raising the *possibility* of tampering is not sufficient to render evidence inadmissible," *United States v. Harrington*, 923 F.2d 1371, 1374 (9th Cir. 1991) (emphasis added), and Defendants' arguments regarding the possibility that data was altered, without more, bear on the weight of the evidence, not its admissibility. *See United States v. Bonallo*, 858 F.2d 1427, 1436 (9th Cir. 1988) ("The fact that it is possible to alter data contained in a computer is plainly insufficient to establish untrustworthiness. The mere possibility that the logs may have been altered goes only to the weight of the evidence not its admissibility.").

---

[5] Defendants contend that Michael Zarrabi's Personal Hard Drive belonged to him (not GET THIN) and does not qualify for the business records exception under FRE 803(6). The Court notes that the contents of the Personal Hard Drive appear to contain an identical copy of a subset of GET THIN records from the Work Computer, so the issue appears to be moot, absent evidence of material differences in the records from the two devices.

[6] It is unclear whether Michael Zarrabi is referring to the Work Computer or another personal computer.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES—GENERAL**

Page **10** of **18**

For the foregoing reasons, Defendants' MIL to exclude evidence from Michael Zarrabi's Work Computer and Personal Hard Drive is **DENIED**.[7]

### 7. Defendants Omidi and Zarrabi's Motion to Limit the Testimony of Dr. Daniel Norman [Doc. # 1200]

Defendants move to partially exclude testimony from the Government's proposed expert, Dr. Daniel Norman, who intends to testify on issues relating to sleep apnea and treatment, sleep studies, and his review of GET THIN sleep study data. Although "Defendants acknowledge that some of Dr. Norman's intended testimony may be permissible evidence at trial," they seek an order precluding two particular types of testimony: (1) testimony relating to the "standard of care" in sleep medicine, as such evidence is typically reserved for medical malpractice cases; and (2) testimony on topics for which Dr. Norman is not an expert, such as opinions relating to bariatric surgery and legal consequences relating to alleged fraud. [Doc. # 1200.]

The Government responds that Defendants construe Dr. Norman's testimony too narrowly. While the allegations in the FSI center on a widespread insurance fraud scheme, incumbent in those charges are the Government's allegations that Lap Band surgery and related procedures (such as initial or secondary sleep studies) were not medically necessary and were part of Defendants' fraud scheme. Dr. Norman thus may provide his opinions which directly bear on whether or not GET THIN's sleep program provided medically necessary treatment.

The opinions to which Defendants object [*see* Doc. # 1200-4, Exh. 5 (Defendants' chart objecting to specific statements by Dr. Norman)] fall within the scope of permissible expert testimony. "Both the Supreme Court and [the Ninth Circuit] have allowed juries to assess the prevailing standards of care among medical professionals in cases involving the criminal prosecution of licensed practitioners." *United States v. Feingold*, 454 F.3d 1001, 1007 (9th Cir. 2006); *see also United States v. Boettjer*, 569 F.2d 1078, 1081-1082 (9th Cir. 1978) ("Evidence which tended to show that [defendant's] methods and consultation procedures fell short of acceptable medical standards was not offered to establish malpractice, but rather to support the absence of any legitimate medical purpose in his [actions]."). Although *Feingold* and *Boettjer* dealt with the standard of care for prescribing controlled substances, the reasoning applies here with equal force as to the applicable standard of care for diagnosing sleep apnea and the alleged medical necessity of sleep apnea-related procedures. *United States v. Chhibber,* 741 F.3d 852 (7th Cir. 2014), is particularly instructive. There, an internist was charged with healthcare fraud and making false statements by ordering medically unnecessary tests for patients and recording false diagnosis codes in patient charts and on claim forms in order to justify giving the tests. *Id.* at 859. The government's expert witness, Dr. Herdeman, testified that "each test at issue was not a general screening tool but was used only when patients exhibited particular signs and symptoms that required further investigation" and "[a]bsent those particular signs and symptoms, Dr. Herdeman stated, the tests were not medically necessary." *Id.* The Seventh Circuit affirmed the judgment "[i]n light of the wealth of evidence that [defendant] sought

---

[7] To the extent Defendants seek to exclude any of Dr. Norman's expert testimony on the basis that he reviewed raw data from Michael Zarrabi's Work Computer or Personal Hard Drive, that request is also **DENIED**.

reimbursement for tests he ordered *in the absence of any justification* [i.e., medical necessity] and the evidence that he fabricated patient charts to justify his actions." *Id.* at 861 (emphasis added).

Here, the FSI alleges, among other things, that "[i]n submitting a claim, the GET THIN Providers represented that all of the information in the claim was true and accurate including patient identity, CPT codes, diagnosis, provider identity, place of service, and date of service -- and that the service provided was medically necessary." FSI ¶ 29; *see also id.* ¶ 33 ("The information in the claim forms was material to payment, and TriCare and the Insurance Companies would deny claims that contained false, inaccurate, or misleading information about, for example, the service purportedly performed or its medical necessity. . . ."). Dr. Norman's anticipated testimony relates to the Government's claims that the GET THIN sleep studies were not medically necessary and are directly relevant to the charges in the FSI. Given that Dr. Norman's anticipated testimony directly bears on a key aspect of the alleged scheme, its probative value far outweighs any perceived prejudice.

Nor are Dr. Norman's excerpted statements from Defendants' Exhibit 5 outside the scope of his expertise. His statements relate to sleep apnea and sleep studies generally, the proper procedures and training needed to conduct sleep studies, and similar opinions, for which he is qualified to testify, and Defendants do not strongly contend otherwise.

Although not expressly included in Defendants' Exhibit 5, Defendants also cite to the Government's June 17, 2020 disclosure letter and ask the Court to preclude Dr. Norman from providing any testimony relating to bariatric surgery, since he is not an expert in that field. His opinions referencing bariatric surgery, however, are only discussed in relation to sleep studies, for which he is qualified to provide expert testimony. [*See* Doc. # 1200-2, Exh. 1 at 6 ("Bariatric surgeons order sleep studies to . . . [d]etermine whether a patient will need assistance breathing post-surgery.").] As for Dr. Norman's statement that "[b]ariatric surgeons order sleep studies to . . . [t]ry to get patients covered by insurance by 'hunting for a co-morbidity,'" to the extent that Dr. Norman would be testifying about his experiences in this field as a sleep study expert, it would be permissible. In its disclosure letter, the Government also references Dr. Norman's opinion that "[i]f [he] heard that data was being manipulated, he would not want to be affiliated with the individuals or companies manipulating the data because that would be fraudulent and he would be concerned about patient welfare and legal consequences." [*Id.* at 7.] To the extent Dr. Norman intends to testify about what he believes constitutes fraud and the legal consequences arising therefrom, such testimony will be excluded as his subjective beliefs regarding legal issues are irrelevant. *See* Fed. R. Evid. 704(b); *see also McHugh v. United Serv. Auto. Ass'n,* 164 F.3d 451, 454 (9th Cir. 1999) (although expert testimony concerning an ultimate issue is not *per se* improper, *see* Fed. R. Evid. 704(a), expert testimony "cannot be used to provide legal meaning.").

For the foregoing reasons, Defendants' MIL to partially exclude Dr. Norman's testimony is **GRANTED IN PART and DENIED IN PART.** He may not testify regarding what he believes constitutes fraud and the legal consequences arising therefrom, but may testify regarding all of the other issues highlighted in Defendants' motion.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES—GENERAL**

Page 12 of 18

8. **Defendant Omidi's MIL to Exclude Evidence Regarding "Commissions" Paid to Patient Care Specialists and MIL to Preclude Evidence of Defendants' General Billing Practices and Advertising and Marketing Efforts and Preclude the Testimony of Barbara Balcom, Tom Johnson, and Tommy Iorio [Doc. # 1223]**

Defendant Omidi also asks the Court to exclude evidence of nominal commissions (ranging from $5 to $70) paid to GET THIN employees when they completed tasks (such as scheduling a sleep study) as an incentive to help patients through the Lap-Band approval process. Defendant Omidi contends that such evidence is irrelevant since the Government has not alleged any violation of the Anti-Kickback Statute, *see* 42 U.S.C. § 1320a-7b, or the Physician Self-Referral Law (also known as the Stark Law), *see* 42 U.S.C. § 1395nn. Relatedly, Defendant Omidi seeks to preclude the Government from introducing evidence of GET THIN's advertising campaign and billing practices as irrelevant to the charged fraudulent scheme and, even if relevant, unduly prejudicial.

The Government contends that evidence of GET THIN's widespread advertising efforts to lure patients into its Lap-Band program, as well as billing issues related to those procedures, is inextricably intertwined with the charged fraud scheme and part of the Government's theory of the case. *See United States v. Vizcarra-Martinez*, 66 F.3d 1006, 1012-13 (9th Cir. 1995) (evidence concerning other acts that are inextricably intertwined with the charged acts may be admitted to, *inter alia,* permit the prosecutor to offer a coherent and comprehensible story regarding the commission of the crime). The Government intends to offer testimony from Tommy Iorio, owner of advertising agency Rio Media, that handled a large volume of GET THIN's radio, television, and other marketing, regarding the widespread advertising campaign, including Defendant Omidi's direct involvement in approving advertisements, offering feedback, and making payments for the advertising. [*See* Doc. # 122-2, Exh. 1 (Iorio Int.) ¶¶ 4, 9, 14, 24-26, 40, 43.]

Once prospective patients contacted GET THIN, they were allegedly scheduled to have numerous, often unnecessary, medical procedures, billed to TriCare and private insurance companies, and where GET THIN employees were incentivized to schedule as many procedures as possible to obtain nominal commissions (which could add up to a considerable figure) and which were directly reviewed and approved by Defendant Omidi. [*See* Doc. # 1250, Exh. 1 (Consultant's Commission List); Exh. 2 (sample approval of consultant's monthly commission for $1,102.00 "approved by" Defendant Omidi); Exh. 3 (sample commission report for same employee with handwritten notes to remove $183.00 in proposed commissions); Doc. # 1308-1, Exh. A (GET THIN email regarding commissions, instructing employees, *inter alia*, that "[n]o commission check will be cut unless the documents are with Dr. J.O.")]. GET THIN worked with third party medical billing service, The Business Office ("TBO"), from approximately October 2011 through 2014, during a large period of the charged scheme. *See* FSI ¶ 37. The Government intends to introduce testimony from TBO owner, Tom Johnson, and former employee, Barbara Balcom, regarding TBO's repeated problems with GET THIN's billing practices, such as GET THIN's perceived unwillingness to provide accurate and responsive claim information and alleged failure to amend incorrect claims (and instead simply submitting new claims). [*See* Doc. # 1223-7 (Johnson Int.); 1223-8 (Balcom Int.); 1223-9 (sample emails between TBO and GET THIN staff regarding billing issues).]

Evidence may be "inextricably intertwined" with a charged crime where: (1) it constitutes part of the transaction that serves as the basis for the criminal charge, or (2) to permit the prosecutor to offer a coherent and comprehensible story regarding the commission of the crime. *Vizcarra-Martinez*, 66 F.3d at 1012-13. Here, advertising and commission evidence is part of the Government's narrative alleging that GET THIN was operating as an insurance billing mill to attract as many prospective patients as possible, without regard to patient medical necessity, but in order to schedule and bill for as many procedures as possible. The billing evidence is also part of the Government's narrative regarding alleged fraudulent billing and intent. All of the aforementioned evidence, moreover, is relevant to show Defendant Omidi's alleged central role in the scheme, i.e., that he oversaw key aspects of GET THIN's advertising, commission payment, and billing processes. *See Soliman,* 813 F.2d at 279 ("To prove the mail fraud counts, the Government had to show the existence of a scheme of mail fraud activity and *Soliman's connection* to that scheme.") (emphasis added).

That Iorio, Johnson, and Balcom do not *directly* allege that they witnessed any alleged fraud does not mean that their testimony is irrelevant or should be excluded. The Government is permitted to introduce circumstantial evidence, through the aforementioned witnesses, to support its claims. *See Vizcarra-Martinez*, 66 F.3d at 1012-13. The probative value of such evidence outweighs any perceived prejudice. *See* Fed. R. Evid. 403; *see also Mende*, 43 F.3d at 1302. Moreover, given that the Government represents that its direct examination of these witnesses will be limited (between 30 minutes to one hour for each of the three witnesses, *see* Doc. # 1308-1 (Williams Decl.) ¶ 2), their testimony will be relatively brief and must be tethered to the Government's theory of the case.

For these reasons, Defendants' MILs to preclude evidence of commissions, billing, and advertising and the testimony of Iorio, Johnson, and Balcom, are **DENIED.**

9. **Defendants Omidi and Zarrabi's MIL to Preclude Evidence of Charles Klasky's Wife's Illness and Need for Health Insurance [Doc. # 1215]**

Defendants seek to preclude testimony from anticipated government witness and former sleep study manager, Charles Klasky, that his wife suffers from an illness and was dependent upon the health insurance that was offered to Klasky as part of his employment with Defendant SCM. [Doc. # 1215.] Defendants contend that such testimony is irrelevant as to why Klasky continued to work at SCM after allegedly being directed by Defendant Omidi to commit fraud and alter sleep study reports. Even if relevant, Defendants contend that testimony regarding Klasky's wife's illness would be unduly prejudicial, as it would cause the jury to sympathize with Klasky and cloud its credibility determination of him. Defendants suggest a less prejudicial way to convey the same point is to permit Klasky to testify that he needed money. *Id.* at 1215 at 11.

The Government counters that Defendants acknowledge that Klasky's credibility is a key component of his testimony and, as such, his stated reasons for staying at GET THIN despite the fraud, are directly relevant for a jury to assess his credibility. The Government asserts that this is particularly true since Defendants will likely attempt to portray Klasky as untrustworthy and will argue that he stayed at GET THIN either because nothing was amiss, or because *he* was the individual behind the alleged fraud scheme. [Doc. # 1289.] The Government further asserts that the testimony is not unduly prejudicial, as

the Government anticipates Klasky will testify succinctly that it was important to him to maintain his health insurance in light of his wife's medical condition, without elaborating on the specific details of her illness or treatment and because testimony regarding his wife's illness would not improperly provoke the jury to convict Defendants, since they are, of course, not alleged to bear any responsibility for her illness.

Relevant evidence includes evidence having "any tendency to make a fact more or less probable than it would be without the evidence" where "the fact is of consequence in determining the action." Fed. R. Evid. 401. "Evidence helpful in evaluating the credibility of a witness is of consequence to the determination of the action." *United States v. Hankey*, 203 F.3d 1160, 1171 (9th Cir. 2000); *see also United States v. Halbert*, 640 F.2d 1000, 1004 (9th Cir. 1981) (evidence of witness's guilty plea "may be elicited by the prosecutor on direct examination so that the jury may assess the credibility of the witnesses the government asks them to believe.").

The parties agree that Klasky is a key anticipated witness and the jury's assessment of his credibility is central to the Government's case. The Government should be allowed to elicit testimony from Klasky regarding his reasons for staying at GET THIN for years, despite allegations of ongoing fraud. The Court concludes, however, that allowing testimony that Klasky remained at GET THIN because of his wife's *illness* is unduly prejudicial as, even if moderately relevant, its probative value would be substantially outweighed by unfair prejudice, as it may cause the jury to sympathize with Klasky's predicament. The Court finds that a less prejudicial means of eliciting similar information to assess Klasky's credibility would be to allow him to testify that he stayed at GET THIN because he needed the money and the health insurance, but not elaborate on, or reference, his wife's illness. *See Old Chief v. United States*, 519 U.S. 172, 184-85 (1997) (in determining whether to exclude evidence under FRE 403, a court may compare the evidence's danger of undue prejudice against a similar assessment of evidentiary alternatives).

Accordingly, Defendants' MIL regarding Klasky's wife's illness is **GRANTED IN PART.**

### 10. Defendant Omidi's Motion to Admit Charles Klasky's Prior Invocation of the Fifth Amendment [Doc. # 1218]

Defendants Omidi and Zarrabi seek to ask Klasky about his recent refusal to testify at a deposition in a state civil case, *Platas v. Omidi et al.,* No. 37-2018-00045119-CU-MC-CTL (San Diego Sup. Ct.) ("*Platas*"). In *Platas,* Klasky repeatedly invoked his Fifth Amendment rights, but will apparently testify as to similar questions at this upcoming trial. Defendants contend that Klasky's refusal to testify at his *Platas* deposition constitutes a prior inconsistent statement under FRE 801(d)(1)(A), violated the terms of his plea agreement, and is probative of his character for untruthfulness and is admissible during his cross-examination pursuant to FRE 608(b).

The Government contends that Defendants seek to capitalize on Defendant Omidi's inappropriate conduct, as Klasky's *Platas* deposition was a transparent attempt to gain information from a government witness in contravention of the federal rules governing criminal discovery, sought Klasky's admissions regarding other potential criminal conduct, and sought to intimidate him before he could testify in this case. The Government contends that Klasky's invocation of the Fifth Amendment was appropriate, not a

prior inconsistent statement, and done so on the advice of his counsel, which the state court recognized was appropriate in light of his pending criminal case.

The *Platas* case was brought by a GET THIN patient against Defendants Omidi, Zarrabi, Valley Surgical Center, LLC, a GET THIN entity ("Valley Surgical"), and others, alleging fraud, malpractice, battery, and other claims. Valley Surgical noticed Klasky's deposition, the Government filed a motion to quash the subpoena or stay the deposition on the grounds that it interfered with the instant criminal proceeding and constituted an attempt to sidestep federal criminal discovery rules, and the state court judge ultimately permitted the Klasky deposition to proceed. Defendant Omidi's counsel in this case appeared for the *Platas* deposition *pro bono* to depose Klasky. Klasky refused to answer any questions and, on the advice of his counsel, who was present at the deposition, invoked his Fifth Amendment rights for each question posed. Klasky's deposition was not officially concluded given objections by Defendant Omidi's counsel and others regarding Klasky's non-responses, and the state court judge appears to have stayed Klasky's *Platas* deposition pending the conclusion of the trial in this case.

In *Grunewald v. United States*, 353 U.S. 391 (1957), and *United States v. Hale*, 422 U.S. 171 (1975), the Supreme Court held that a party may cross-examine a witness regarding his prior invocation of the Fifth Amendment if that party "establish[es] a threshold inconsistency" between the witness's invocation of the privilege and his testimony at trial. *Grunewald*, 353 U.S. at 419; *Hale*, 422 U.S. at 176. The Supreme Court has "identified three factors relevant to determining whether silence was inconsistent with later exculpatory testimony: (1) repeated assertions of innocence before the [tribunal]; (2) the secretive nature of the tribunal in which the initial questioning occurred; and (3) the focus on petitioner as potential defendant at the time ..., making it 'natural for him to fear that he was being asked questions for the very purpose of providing evidence against himself.'" *Hale*, 422 U.S. at 178-79 (*quoting Grunewald*, 353 U.S. at 423). As to the first factor, a relevant consideration is whether a witness invokes his Fifth Amendment rights on the advice of counsel. *See Grunewald*, 353 U.S. at 422. As to the second factor, courts may consider whether a witness may "have been intimidated by the setting, or at the very least, [] may have preferred to make any statements in more hospitable surroundings, in the presence of an attorney, or in open court." *Hale*, 422 U.S. at 179.

The Court concludes that the *Grunewald/Hale* factors weigh against allowing Defendants to cross-examine Klasky regarding his invocation of his Fifth Amendment rights in the *Platas* deposition, given that: (1) Klasky invoked the Fifth Amendment based on the advice of his counsel, who was present at the deposition; (2) Klasky was likely intimidated by the setting given that he was being deposed by Defendant Omidi's counsel in this criminal case, in a possible "dry run" for the questions to be asked of him on cross-examination at this trial, and after contentious litigation (necessitating the involvement of the U.S. Attorney's Office) regarding the propriety of even proceeding with his deposition; and (3) it would be natural for Klasky to fear being questioned for the purpose of providing evidence against himself, particularly in light of the pending criminal case against him. *See Grunewald*, 353 U.S. at 419; *Hale*, 422 U.S. at 176; *see also United States v. Tuzman,* No. 15 CR 536 (PGG), 2017 WL 5903356 (S.D.N.Y. Nov. 27, 2017) (applying the *Grunewald/Hale* factors to similar facts in concluding that defendant failed to establish a "threshold inconsistency" between witness's invocation of his Fifth Amendment rights at civil deposition and his anticipated testimony at criminal trial).

Nor was Klasky's invocation of his Fifth Amendment rights in the *Platas* case a violation of his plea agreement in his criminal case, *United States v. Klasky,* CR 17-401-DMG, which obligated Klasky to cooperate with the U.S. Attorney's Office, and which was not binding on any other federal, state, local, or foreign prosecuting, enforcement, administrative, or regulatory authorities.  [*See* Doc. # 1254, Exh. 3 ¶ 1.]  As referenced above, Klasky, on the advice of counsel, reasonably invoked his Fifth Amendment rights in the *Platas* deposition in light of his own pending criminal case and the lines of questioning that may have provoked him to admit additional criminal conduct.  [*See* Doc. # 1254, Exh. 5 (Klasky Depo. Tr. in *Platas* case).]

Finally, the Court finds that Klasky's silence in the *Platas* deposition generally has little or no probative value, whereas evidence of his *invocation* of his constitutional right carries a significant risk of unfair prejudice and is otherwise inadmissible under FRE 403.  *See Hale*, 422 U.S. at 176 ("In most circumstances silence is so ambiguous that it is of little probative force."); *see also United States v. Zaccaria*, 240 F.3d 75, 79 (1st Cir. 2001) (explaining that silence generally has little or no probative value for impeachment purposes and evidence of the invocation of the right to remain silent is inherently prejudicial, such that "a proffer of such evidence should be rejected unless special circumstances exist in a given case that materially shift the balance in favor of admissibility.").

Because the risk of unfair prejudice outweighs its probative value, Defendants' MIL to inquire about Klasky's prior invocation of the Fifth Amendment at his *Platas* deposition is **DENIED.**

### 11. Defendants Omidi and Zarrabi's Motion to Preclude Klasky Opinion Testimony [Doc. # 1235]

Defendants seek to preclude the Government from soliciting Klasky's opinion on scientific or technical matters, including sleep studies, sleep disorders, bariatric surgery, and requirements for insurance coverage of the same, given that Klasky is not an expert and may not offer his opinion testimony based on scientific, technical, or other specialized knowledge.  [Doc. # 1235 at 7.]  The Government filed a partial opposition, acknowledging that Klasky is not an expert witness and that the Government has no intention of eliciting expert testimony from him at trial.  [Doc. # 1285 at 3.]  The Government contends that it is appropriate, however, for Klasky to testify as a percipient witness to the experiences and factual observations of what occurred during his work as a sleep study manager with the GET THIN entities, and what he was told to do.  *Id.*

"Lay witnesses can permissibly base opinion testimony upon their experience, but the Federal Rules of Evidence require that lay opinion testimony be '(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.'"  *Jerden v. Amstutz*, 430 F.3d 1231, 1239 (9th Cir. 2005) (*quoting* Fed. R. Evid. 701).  "The mere percipience of a witness to the facts on which he wishes to tender an opinion does not trump Rule 702." *United States v. Figueroa–Lopez*, 125 F.3d 1241, 1246 (9th Cir. 1997).

The Government represents that it does not intend to elicit the opinions or statements of specialized knowledge identified in Defendants' MIL, except for:  (1) Klasky's testimony regarding his experiences

and factual observations of what occurred during his work at GET THIN (for example, Klasky's observations that medical assistants who performed work (hooking up a patient or supervising such work) were untrained, as well as testifying about what Klasky was told to do; and (2) Klasky's testimony regarding his *own* understanding of the insurance approval process (i.e., that in order to get approved for Lap-Band surgery, a patient generally needed to have two co-morbidities, which could include obesity and another condition).

The Court agrees that Klasky may testify regarding the above, and related, types of percipient testimony. Klasky's observation that GET THIN's medical assistants were untrained is an observation that he is qualified to make as a percipient witness. Klasky's testimony about his understanding of the insurance approval process is relevant as it bears on what he, as GET THIN's sleep study manager, was allegedly directed to do by Defendant Omidi, including falsifying sleep study data, and what Klasky, in turn, allegedly directed GET THIN employees to do to assist in the alleged fraudulent insurance scheme to comply with the insurance approval process, as he understood it. Such opinion testimony would be rationally related to Klasky's perceptions; helpful to a trier of fact; and would not be based on scientific, technical, or other specialized knowledge. *See* Fed. R. Evid. 701; *cf. Jerden*, 430 F.3d at 1239-40 (holding that nurse practitioner could not provide observations on medical report because his testimony "scientific observations about the [medical] report" and "did not merely relate his factual observations of what occurred that was within his competence to describe"). Klasky's understanding of the insurance approval process is also relevant to establish SCM's vicarious liability through the alleged actions of Klasky, its agent and sleep study manager. *See United States v. Hilton Hotels Corp.*, 467 F.2d 1000, 1004 (9th Cir.1972) ("[A] corporation is liable for acts of its agents within the scope of their authority"), *cert. denied*, 409 U.S. 1125 (1973).

Accordingly, Defendants' MIL to preclude the Government from soliciting Klasky's opinion on scientific or technical matters is **GRANTED IN PART**. Klasky may not testify on matters within the purview of an expert witness, but he may testify as a percipient witness regarding his own experiences and factual observations of what occurred during his work at GET THIN, as outlined above.

### III.   CONCLUSION

For the foregoing reasons, the Court rules as follows on Defendants' motions:

1. Defendant Zarrabi's MIL to Exclude Prejudicial and Irrelevant Patient Testimony [Doc. # 1191] and Defendant Omidi's related MIL to Preclude Argument, Evidence, and Reference to Victims Other than Insurance Companies and Exclude Impact Testimony [Doc. # 1203] is **DENIED** as outlined above and is otherwise **DENIED as moot**;

2. Defendant Omidi's MIL to Preclude the Government from Asking Improper Materiality Questions at Trial [Doc. # 1188] is **DENIED**;

3. Defendants Omidi and Zarrabi's MIL to Preclude the Admission of Hearsay Pursuant to Rule 801(D)(2)(E) Without Prior Showing by the Government to Demonstrate Foundation for Co-Conspirator Exception [Doc. # 1189] is **DENIED as moot**;

4. Defendant Omidi's MIL to Exclude Testimonial Statements of Defendant Zarrabi [Doc. # 1193] is **GRANTED IN PART**;

5. Defendants Omidi and Zarrabi's MIL to Preclude the Testimony of Michael Petron [Doc. # 1196] is **DENIED**;

6. Defendants Omidi and Zarrabi's MIL to Exclude Evidence Obtained from Michael Zarrabi's Personal Hard Drive and Dell Computer Tower [Doc. #1207] is **DENIED**;

7. Defendants Omidi and Zarrabi's MIL to Limit the Testimony of Dr. Daniel Norman [Doc. # 1200] is **GRANTED IN PART**;

8. Defendant Omidi's MIL to Exclude Evidence Regarding "Commissions" Paid to Patient Care Specialists [Doc. # 1209] and Defendant Omidi's related MIL to Preclude Evidence of Defendants' General Billing Practices and Advertising and Marketing Efforts and Preclude the Testimony of Barbara Balcom, Tom Johnson, and Tommy Iorio [Doc. # 1223] are **DENIED**;

9. Defendants Omidi and Zarrabi's MIL to Preclude Evidence of Charles Klasky's Wife's Illness and Need for Health Insurance [Doc. # 1215] is **GRANTED IN PART**;

10. Defendant Omidi's MIL to Admit Charles Klasky's Prior Invocation of the Fifth Amendment [Doc. # 1218] is **DENIED**; and

11. Defendants Omidi and Zarrabi's MIL to Preclude Klasky Opinion Testimony [Doc. # 1235] is **GRANTED IN PART.**

**IT IS SO ORDERED.**