Exhibit A

ROUGH DRAFT ONLY - NOT CERTIFIED

08:32:13          September 22, 2021 - 9:20 a.m. - USA versus Omidi - FINAL

08:32:14

09:20:08              THE COURTROOM DEPUTY:  Calling item No. 1,
CR-17-661-DMG, United States of America vs. Julian Omidi,
Surgery Center Management, LLC, and Mirali Zarrabi, M.D.

09:26:04          For the government, first, we have?

09:26:05              MS. WILLIAMS:  Good morning, Your Honor.  Kristen
William, United States.  And with me at counsel table is Ali
Moghaddas, David Chao, David Lachman.  Also from the United
States is Special Agent Zeva Pettigrew, from the Food and Drug
Administration, OCI.  Thank you, Your Honor.

09:26:20              MR. JACKSON:  Your Honor, Randall Jackson, Michael
Schachter, Casey Donnelley, and John Brennan on behalf of
Julian Omidi.  Good morning, Your Honor.

09:26:30              MR. O'BRIEN:  Good morning, Your Honor.  Tom O'Brien
along with Matt Kussman, Jennie VonCannon, Ivy Wang, and our
client, Dr. Zarrabi, who is present before the Court.

09:26:42              THE COURT:  Good morning.

09:26:43              MR. DEVEREUX:  Good morning, Your Honor.  Michael
Devereux on behalf Surgery Center Management.  Good morning.

09:26:48              THE COURT:  Good morning.

09:26:53          I wanted to communicate with you about a new development.
One of our jurors had an exposure to COVID because his daughter
tested positive yesterday.  And -- well, not yesterday.  On
Monday.  Apparently, his last exposure to her was on Sunday.

ROUGH DRAFT ONLY - NOT CERTIFIED

in Woodland Hills or West Hills, about 7 or 8:00 o'clock at night.  They attached all of these things to my head and my body.  And there was a wall and people -- two people on the other side of the wall that I brought all of my -- I brought a pillow, my laptop, because I don't go to bed too early.

10:54:45　　　　But it was kind of strange because I went to sleep, and then they woke me up, like, at 3 or 4:00 o'clock in the morning and were like, okay, you're done, get out.  So, I mean, they woke me up in the middle of my sleep.

10:54:45　　Q.　After you completed the sleep study, did a doctor call you to give you the results of that sleep study?

10:54:45　　A.　No.

10:54:45　　Q.　Did you, in fact, call them?

10:54:45　　A.　Yes.

10:54:45　　Q.　Multiple times?

10:54:45　　A.　Yes, I called them multiple times.

10:54:45　　Q.　And eventually did someone give you your results?

10:54:45　　A.　They just said that I had sleep apnea and we're going to schedule you for a CPAP or an APAP.

10:54:45　　Q.　Did anybody at GET-THIN explain to you what a CPAP machine was?

10:54:45　　A.　No.

10:54:45　　Q.　Did anybody at GET-THIN explain to you what a APAP machine was?

10:54:45　　A.　No.

10:54:45     Q.    Did anybody at GET-THIN tell you at that time that your
             insurance, Aetna, didn't cover the lap band through GET-THIN?
10:54:45     A.    No.
10:54:45     Q.    Did anybody at GET-THIN explain to you that your insurance
             only covered in-network lap band providers?
10:54:45     A.    No.
10:54:45     Q.    So what did you tell them?
10:54:45     A.    Well, I kept asking why I had to keep reapplying.  I'm
             sorry.
10:54:45     Q.    I apologize, Ms. Steward.  I know this is difficult.
10:54:45     A.    I had to keep calling and asking them about what was going
             on with my file and what was going on with the case, how come I
             can't -- how come I can't get approved and what's going on.
             And they kept telling me -- giving me the runaround, telling
             me, you know, sometimes this happens, and we have to keep doing
             -- we have to do what we have to do.
10:54:45     Q.    In total, how long did you spend with GET-THIN to try to
             get the lap band procedure?
10:54:45     A.    I think about a year or two.
10:54:45     Q.    And eventually did you give up?
10:54:45     A.    I gave up.
10:54:45     Q.    What did you do?
10:54:45     A.    I went to another doctor.  I mean, I went to another
             doctor, Dr. Philippe Quilici.  And I think had I stayed with
             1-800-GET-THIN or GET-SLIM whatever --

ROUGH DRAFT ONLY - NOT CERTIFIED

10:54:45                    MR. JACKSON:  Objection.

10:54:45                    THE WITNESS:  -- I wouldn't be here.

10:54:45                    MR. JACKSON:  Objection.

10:54:45                    THE COURT:  What is the objection?

10:54:45                    MR. JACKSON:  Your Honor, the testimony was not
            responsive.

10:54:45                    THE COURT:  Sustained.

10:54:45        BY MR. MOGHADDAS:

10:54:45        Q.  You mentioned that you sought out another doctor,

10:54:45        Dr. Philippe?

10:54:45        A.  Yes.

10:54:45        Q.  Did you eventually get bariatric surgery?

10:54:45        A.  Yes.  The gastric bypass.

10:54:45        Q.  Did you have to do the nutritional evaluations we talked
            about earlier?

10:54:45        A.  Yes.

10:54:45        Q.  Can you describe what those were like?

10:54:45        A.  I had classes.  I had got to learn how to eat and regulate
            things and exercise.  I got a diet that I could follow, someone
            to talk to.  The doctor was there step-by-step.

10:54:45        Q.  Do you know how much GET-THIN billed your insurance
            company?

10:54:45        A.  Yes.

10:54:45        Q.  How much?

10:54:45        A.  $99,000, I believe.  Over 99.

ROUGH DRAFT ONLY - NOT CERTIFIED

sleep study, and no one gave you any instructions whatsoever?

10:54:45    A.   No one called me.  I called.  Every time I called, I was given the runaround.

10:54:45    Q.   Ma'am, ma'am, I'm sorry.

10:54:45    A.   And --

10:54:45    Q.   I understand your grievance.  I'm just asking you a very simple question.  Is it your testimony that, when you came to do the sleep study, no one ever gave you any instructions on what would need to happen in terms of the sleep study?

10:54:45    A.   No.  They gave me -- told me where to go.  No.

10:54:45    Q.   Okay.  Now, isn't it a fact --

10:54:45         You can take that down, Mr. McLeod, thank you.

10:54:45    Q.   Isn't it a fact, Ms. Steward, that you remember -- well, let me back up.  This is a better place to start.

10:54:45         Do you remember, during the testimony in your questioning from the prosecutors, the first time he asked you, "When was your first sleep study?" you said, "2009"?  Do you remember saying that?

10:54:45    A.   About 2009, yes.

10:54:45    Q.   Right.  And isn't it a fact that you had a sleep study before you ever came to GET-THIN?

10:54:45    A.   No.

10:54:45    Q.   Are you saying for sure you didn't, or are you saying that you don't remember?

10:54:45    A.   I am saying that I did not have a sleep study before I

ROUGH DRAFT ONLY - NOT CERTIFIED

ROUGH DRAFT ONLY - NOT CERTIFIED

10:54:45      A.   No.

10:54:45      Q.   In fact, the amount of money that you actually paid to
              GET-THIN was less than $1,000; right?

10:54:45      A.   I don't remember.

10:54:45      Q.   Okay.  Whatever the case may be, though, you were going
              through these financial difficulties at this time period that
              you were threatening Alywin Calado that you were going to get
              your lawyer in this situation?

10:54:45      A.   Okay.  Yes.

10:54:45      Q.   And was it the case, ma'am, that you thought that, if you
              could create enough of a situation with GET-THIN, that you
              might be able to extract some money from the situation?

10:54:45      A.   I felt like cattle.

10:54:45              MR. JACKSON:  Objection, Your Honor.

10:54:45              THE WITNESS:  I felt like I was being herded
              through --

10:54:45              MR. JACKSON:  Objection.  Nonresponsive.

10:54:45              THE COURT:  Ms. Steward, take a deep breath and just
              listen to the question and answer just the question.  You can
              take your time, if you'd like.

10:54:45              MR. JACKSON:  Your Honor, should we take a brief
              recess?

10:54:45              THE COURT:  Perhaps this is a good time to conclude
              for today.

10:54:45              MR. JACKSON:  Thank you very much, Judge.

ROUGH DRAFT ONLY - NOT CERTIFIED

1                 UNITED STATES DISTRICT COURT

2               CENTRAL DISTRICT OF CALIFORNIA

3                   WESTERN DIVISION

4                      -oOo-

5     HONORABLE MOLLY M. GEE, UNITED STATES DISTRICT JUDGE

6

7  UNITED STATES OF AMERICA,

8                 Plaintiff,

9     v.               No. 2:17-CR-000661-DMG-4

10  JULIAN OMIDI; INDEPENDENT
     MEDICAL SERVICES, INC.;
11  SURGERY CENTER MANAGEMENT, LLC;
     and MIRALI ZARRABI, M.D.,
12
                 Defendants.
13

14

15     REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16                   TRIAL DAY 3
               LOS ANGELES, CALIFORNIA
17
                SEPTEMBER 23, 2021
18

19   _____

20

21           SUZANNE M. McKENNON, CRR, RMR
            UNITED STATES COURT REPORTER
22
            UNITED STATES COURTHOUSE
23       312 N. SPRING STREET, ROOM 3411
        LOS ANGELES, CALIFORNIA 30012
24             (213) 894-3913
           suzanne@ears2hands.com
25

1    A.    Can you highlight it?

2          THE COURTROOM DEPUTY:   Counsel, the blackout screen

3    is still on for the witness.

4          MR. MOGHADDAS:   You can actually use the binder copy.

5    But you know what?   I'll do this.

6    Q.    How's that?

7    A.    Okay.   Starting with the last paragraph:  "Alywin, you

8    have been most helpful and I have not had a problem with you at

9    all.   Every time I call, if I'm unable to speak to you, I can

10   leave a message, and you will call me back and give me updates,

11   if you have any.   You are not a problem.   Everyone else --

12   well, that is another story.   They give me the runaround.   They

13   don't tell me what's going on with my files.   Some guys" --

14   Q    That's it.   That's it.

15         So yesterday, when you were asked about your interactions

16   with individuals at GET-THIN.

17         Is it true then that there were people giving you the

18   runaround there?

19   A.    Absolutely.

20   Q.    And what do you mean by giving you the runaround?

21   A.    Not telling me the truth.

22         MR. JACKSON:   Objection.

23         THE COURT:   Overruled.

24   BY MR. MOGHADDAS:

25   Q.    What do you mean by giving you the runaround?

77

1   A.   Not telling me the truth, handing me over to this person,

2   that person, not giving me my file.  I asked for an entire

3   file, and I should have had a file, but instead, I was given

4   only six pages.

5   Q.   And you were -- it was suggested that you knew, when you

6   first contacted GET-THIN, that Aetna only -- that Aetna would

7   not cover your lap band procedure with GET-THIN.

8        MR. JACKSON:  Objection.  There was no suggestion,

9   only questions.

10       THE COURT:  Overruled.

11  BY MR. MOGHADDAS:

12  Q.   Yesterday, it was suggested that you knew, at the time you

13  contacted GET-THIN, that Aetna would not cover your lap band;

14  is that true?

15  A.   That's not true.

16  Q.   So if you can -- I'm going to pull up a portion for you to

17  read.  And please just read the first line -- or the first

18  three lines, ending with "insurance."

19  A.   "You assured me, after going through this difficult

20  process since 2009, that my second attempt in filing an appeals

21  should be resolved, after finding out that your company does

22  not accept Aetna insurance."

23       THE COURT:  That's it.

24  BY MR. MOGHADDAS:

25  Q.   Hold on a second.  And if you can continue, starting with

```
1              THE WITNESS:  He would want the consultants to call
2    the patients to introduce themselves as the person who's going
3    to be with them during their lap band journey, and that they
4    will be meeting for the first time at the clinic where the lap
5    band seminar will be taking place.
6    BY MR. LACHMAN:
7    Q.   Did you ever hear complaints that patients or potential
8    patients were receiving too many calls?
9    A.   Yes.
10   Q.   I would like to turn to Exhibit 267.  Can you let me know
11   when you're there?
12   A.   I'm here.
13   Q.   Do you recognize this document?
14   A.   Yes, sir.
15   Q.   What is it?
16   A.   It's an e-mail from myself on Monday, July 11 of 2011 to
17   Ralph in the call center, to Dr. Michael Omidi, to Roberto
18   Macatangay, and to Julian Omidi.
19              MR. LACHMAN:  Your Honor, the government moves to
20   admit Exhibit 267 into evidence.
21              MR. JACKSON:  No objection, Your Honor.
22              MS. VON CANNON:  No, objection, Your Honor.
23              MR. DEVEREUX:  No, objection.
24              THE COURT:  It is admitted.
25        (Exhibit 267 was admitted into evidence.)
```

```
 1   BY MR. LACHMAN:
 2   Q.   Who is Ralph Almeida?
 3   A.   Ralph Almeida is the --
 4   Q.   Excuse me.
 5        MR. LACHMAN:   Your Honor, permission to publish to the
 6   jury.
 7             THE COURT:   Yes.
 8             THE WITNESS:   Ralph Almeida is the call center
 9   manager with the most seniority.
10   BY MR. LACHMAN:
11   Q.   What concerns was Ralph Almeida raising to you?
12   A.   He wrote that he's 100 percent against butchering
13   potential prospects if they were a no-show.
14   Q.   I want to direct your attention, now, down if you see
15   about four lines to the bottom, the sentence starting "Having
16   multiple different people."
17        Can you please read that?
18   A.   Where?
19   Q.   It's about four lines from the bottom.  It starts on the
20   right-hand side of the page.
21   A.   "Having multiple different people aggressively trying to
22   contact them with different stories and phone numbers to call
23   them back-to-back" -- back-to-back, I guess he means -- "can be
24   compared to the practices of a credit card collections agency.
25   And we all know how excited we are to take those calls."
```

```
 1   manager was dealing with patient complaints.
 2   A.   Yes.
 3   Q.   What type of complaints?
 4   A.   Many.
 5            MR. JACKSON:  Objection, Your Honor.  Relevance.
 6            THE COURT:  Overruled.
 7   BY MR. LACHMAN:
 8   Q.   You may answer.
 9   A.   Well, I did receive many complaints, because as a patient
10   care manager -- a lot of the job, as I said, earlier, became
11   receiving discontent patients.  So examples, patients who have
12   the pre-lap band testing, like the endoscopy or the sleep
13   study 1 or 2, and eight months later, they're waiting on their
14   lap band approval; right?
15            So that's a common question:  Where's my lap band?  But it
16   expanded beyond that to include complaints that were very
17   difficult for me, as a 25-year-old, to address, like complaints
18   about the bedside manner of the lap band surgeon or the nurses.
19   Q.   Did you receive any complaints from patients about the
20   sleep studies?
21   A.   Yes.
22   Q.   What sort of complaints?
23   A.   Common complaints that they didn't open the facility on
24   time and that they failed -- like, they stink.  They smell bad,
25   I mean.
```

144

1   Q.   What stink -- what stunk?

2            MR. JACKSON:  Objection, Your Honor.  Objection.

3   Relevance.

4            THE COURT:  What's the relevance?

5        (A discussion was held off the record between Counsel.)

6            MR. LACHMAN:  Your Honor, this goes to the conduct of

7   the sleep study program by GET-THIN, which is at the heart of

8   this case.

9            MR. JACKSON:  Your Honor, these are not the

10  allegations.

11           THE COURT:  Well, that kind of detail is not

12  necessary for the counts at issue.  So I'm going to sustain the

13  objection.

14           MR. JACKSON:  Your Honor, we move to strike.

15           THE COURT:  Stricken.  The jury will disregard.

16  BY MR. LACHMAN:

17  Q.   You mentioned earlier that you received complaints from

18  patients feeling like they were treated like cattle.

19       What did you mean by that?

20           MR. JACKSON:  Objection, Your Honor.  That misstates

21  what the witness's testimony was, and that question is

22  irrelevant.

23           THE COURT:  Overruled.

24  BY MR. LACHMAN:

25  Q.   You may answer.

```
 1   A.    What was it?
 2   Q.    Yeah.  You mentioned earlier that you received complaints
 3   from patients saying they were -- they felt like they were
 4   treated like cattle.  What did you mean by that?
 5              MR. DEVEREUX:  Objection, Your Honor.  Speculation.
 6              THE COURT:  Overruled.
 7              THE WITNESS:  I have taken several calls of patients
 8   who said that what led to their bad experience and even leaving
 9   before the evaluation with the doctor started.  It was that
10   there were so many people -- like so many people waiting in the
11   facility, outside, during the seminar that they just felt like
12   cows, like cattle that was being herded from one point to the
13   other.  And that's a complaint that, I think, many doctors, who
14   were at lap band centers and consultants can vouch for.
15   BY MR. LACHMAN:
16   Q.    Was Defendant Omidi aware of the patient complaints?
17   A.    Yes.
18   Q.    What was his response?
19              MR. JACKSON:  Objection, Your Honor.  Which are we
20   talking about?  This is a very expansive question.
21              THE COURT:  Sustained.
22   BY MR. LACHMAN:
23   Q.    Was Defendant Omidi aware of complaints that you got from
24   patients that the lap band approvals were taking a long time?
25   A.    To my recollection, yes, because besides me, many office
```

146

```
 1   managers, overwhelmed by the amount of people showing to the
 2   seminars would call him to say, you know, "Like, there is a lot
 3   of people.  People are leaving.  We need more staff."
 4        So it was very common that the lap band seminar was hardly
 5   ever a good experience to those who attended.
 6   Q.   You mentioned earlier one of the ways you communicated
 7   with other employees was using an internal chat system.
 8        What was the name of that chat system?
 9   A.   It's within Nextech, our internal, and it's called Yak,
10   Y-A-K, Yak.
11   Q.   Did you use YakChats to communicate with other employees
12   in the normal course of your job?
13   A.   Yes, sir.
14   Q.   I'd like to turn now, if you would, to what's been marked
15   as government Exhibit 400?
16   A.   Okay.
17   Q.   Let me know when you're ready.
18   A.   I am.
19   Q.   Do you recognize this document?
20   A.   Yes.
21   Q.   Do you recall writing this message?
22   A.   Yes.
23   Q.   What is it?
24   A.   It's a Yak that I sent to a great number of employees at
25   GET-THIN.
```

1                 UNITED STATES DISTRICT COURT

2               CENTRAL DISTRICT OF CALIFORNIA

3                   WESTERN DIVISION

4                       -oOo-

5     HONORABLE MOLLY M. GEE, UNITED STATES DISTRICT JUDGE

6

7   UNITED STATES OF AMERICA,

8                   Plaintiff,

9       v.                No. 2:17-CR-000661-DMG-4

10  JULIAN OMIDI; INDEPENDENT
    MEDICAL SERVICES, INC.;
11  SURGERY CENTER MANAGEMENT, LLC;
    and MIRALI ZARRABI, M.D.,
12
               Defendants.
13

14

15      REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16                 TRIAL DAY 4
            LOS ANGELES, CALIFORNIA
17
            SEPTEMBER 24, 2021
18

19  _____

20

21        SUZANNE M. McKENNON, CRR, RMR
        UNITED STATES COURT REPORTER
22
         UNITED STATES COURTHOUSE
23       312 N. SPRING STREET, ROOM 3411
      LOS ANGELES, CALIFORNIA 30012
24            (213) 894-3913
        suzanne@ears2hands.com
25

1   As defense Counsel asked you, at the top this is a recap
2   of the evening -- this evening's meeting and Dr. Julian's
3   instructions.
4   Does this document mention Mr. Klasky at all?
5   A.   Can I have a moment to read through?
6   Q.   Of course.
7   A.   I don't see Charles Klasky's name here.
8   Q.   Does it mention information about the sleep studies?
9   A.   Well, on number 3, it says that sleep studies and EGDs
10  should always be booked, scheduled during the initial
11  evaluation with the doctor.
12  Q.   And I will note for you the date of this YakChat is
13  May 13, 2010.
14  Do you recall whether Mr. Klasky even worked at GET-THIN
15  at that time?
16  A.   I don't recall.
17  Q.   So Mr. Jackson asked you about the goal to treat patients
18  with dignity and respect.  That's a goal you shared; correct?
19  A.   A goal that I what?
20  Q.   You believed that you wanted to treat all patients with
21  dignity and respect?
22  A.   Yeah.  Based on the bad complaints, I wanted to improve
23  the quality of service.
24  Q.   There was -- was there a high volume of complaints?
25  A.   Yes, sir.

1   Q.   Did Defendant Omidi know about these complaints?

2   A.   Yes.

3   Q.   One of the complaints you talked about on

4   Cross-examination, by Mr. Jackson, was about matching bedding.

5        Do you recall that?

6   A.   Yes.

7   Q.   This is Defense Exhibit 415.

8        THE COURT:   4015.

9   BY MR. LACHMAN:

10   Q.   Did you receive or were you aware of any other complaints

11   regarding the sleep studies?

12        MR. JACKSON:   Objection, Your Honor.   Scope.

13   BY MR. LACHMAN:

14   Q.   Were you aware -- I'll retract that question.

15        Were you aware of any other complaints regarding the

16   bedding and the beds?

17        MR. JACKSON:   Objection, Your Honor.   403.

18   Relevance.

19        MR. LACHMAN:   Mr. Jackson opened the door to this.

20        THE COURT:   Overruled.

21   BY MR. LACHMAN:

22   Q.   Were you aware of any other complaints regarding the

23   bedding and the beds at the sleep centers?

24   A.   Yes.

25   Q.   What were those complaints?

1          MR. JACKSON:   Objection, Your Honor.   403.

2    Relevance.

3          THE COURT:   Sustained as to relevance.

4    BY MR. LACHMAN:

5    Q.   Were you aware of how Defendant Omidi responded to those

6    complaints about the bedding?

7          MR. JACKSON:   Objection.

8          MR. LACHMAN:   They've put in one of Defendant Omidi's

9    responses.   There is another response that I would like to

10   elicit from this witness.

11         THE COURT:   Overruled.

12   BY MR. LACHMAN:

13   Q.   I want to ask you specifically whether there were

14   complaints about whether the linens were clean and whether they

15   smelled and what was Defendant Omidi's response to those

16   complaints.

17         MR. JACKSON:   Objection, Your Honor.   He's testifying

18   to over Your Honor's ruling.

19         THE COURT:   He explained why he's getting into it.

20   The objection is overruled.

21         MR. JACKSON:   Thank you.

22   BY MR. LACHMAN:

23   Q.   Please proceed.

24   A.   Okay.   So I talk?

25   Q.   Yes.

1   A.   Okay.   That the bedding stinks, that smells sweaty or

2   human fluids, and the response was to Febreze the fabrics so

3   they wouldn't smell, you know --

4   Q.   And just so I'm clear, that was a response approved by

5   Defendant Omidi?

6   A.   From what I recall, yes.

7            MR. LACHMAN:   No further questions.

8            THE COURT:   Recross?

9                          RECROSS-EXAMINATION

10  BY MR. JACKSON:

11  Q.   One of the things that you said on Redirect, when you were

12  asked to explain on that sheet the various insurance

13  benefits -- the first thing you said was you'll do your best;

14  right?   Do you remember saying that a moment ago?

15  A.   Maybe.

16  Q.   Am I correct that the reason you said that is because,

17  even the question of what type of coverage a person has, based

18  on all of the different types of insurance available, can be

19  very complicated?

20  A.   I was going to do my best to explain it to the jury.

21  Q.   Right.   But I'm right that the various requirements

22  dealing with different insurance companies can be a very

23  complicated matter?

24  A.   To some, yes.

25  Q.   And, also, you were asked some questions about