Michael S. Schachter** (NY 3910205)
Randall W. Jackson** (NY 5274048)
Casey E. Donnelly** (NY4936803)
**WILLKIE FARR & GALLAGHER LLP**
787 Seventh Avenue
New York, New York 10019
Tel: (212) 728-8102; Fax: (728) 728-8111
Email: *mschachter@willkie.com*

Simona Agnolucci (SBN 246943)
**WILLKIE FARR & GALLAGHER LLP**
One Front Street
San Francisco, CA 94111
Tel: (415) 858-7447, Fax: (415) 858-7599
Email: *sagnolucci@willkie.com*

Bruce H. Searby* (SBN 183267)
Edmund W. Searby** (OH 067455)
**SEARBY LLP**
1627 Connecticut Ave, NW, Suite 4
Washington, D.C. 20009
Tel: (202) 750-6106, Fax: (202) 849-2122
Email: *bsearby@searby.law*
*Appearing specially   ** Appearing pro hac vice
*Counsel for Defendant Julian Omidi*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| United States of America,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>Julian Omidi, *et al.,*<br><br>　　　　Defendants. | CR No. 17-00661 (A) – DMG<br><br>**DEFENDANT JULIAN OMIDI'S REPLY BRIEF IN FURTHER SUPPORT OF HIS TRIAL MEMORANDUM TO PRECLUDE THE TESTIMONY OF JESSICA MEYLE**<br><br>[No Hearing Set] |

**DEFENDANT JULIAN OMIDI'S REPLY BRIEF IN FURTHER SUPPORT OF HIS MOTION TO PRECLUDE THE TESTIMONY OF JESSICA MEYLE**
CASE NO. 17-00661 (A) – DMG

# TABLE OF CONTENTS

I.   The Prosecution Team's Claim That It "Does Not Recall" Reviewing the Privileged Communications Provides No Assurance That Mr. Omidi Has Not Been Prejudiced By The Government's Review of Privileged Documents. ............ 1

II.  The Prosecution Team's Review of Mr. OmiDI's Privileged Communications Was INEVITABLE, NOT "Inadvertent" ....................................... 4

III. The So-Called Independent Sources Identified by the Taint Team Are Themselves Protected by the Mediation Privilege and the Government's Possession of These Documents And Others Only Confirms that Meyle's Testimony Should Be Precluded. ................................................................ 8

# TABLE OF AUTHORITIES

**Cases**                                                            **Page(s)**

*Belden v. Cty. of San Bernardino,*
   No. EDCV19900RGKKKX, 2020 WL 3129208 (C.D. Cal. June 12, 2020) .............. 10

*City of Colton v. American Promotional Events, Inc.,*
   2014 WL 12740639 (C.D.C.A. June 24, 2014) ........................................................ 12

*Folb v. Motion Picture Indus. Pension & Health Plans,*
   16 F. Supp. 2d 1164 (C.D. Cal. 1998),
   *aff'd*, 216 F.3d 1082 (9th Cir. 2000) ................................................................. 10, 11

*Gomez v. Vernon,*
   255 F.3d 1118 (9th Cir. 2001) ............................................................................ 11, 14

*In re Grand Jury Proceedings,*
   814 F.2d 61 (1st Cir. 1987) ....................................................................................... 13

*In Re Grand Jury Subpoena,*
   148 F.3d 487 (5th Cir. 1998) ..................................................................................... 11

*In re Grand Jury Subpoenas,*
   454 F.3d 511 (6th Cir. 2006) ................................................................................... 4, 5

*Harbor Healthcare Sys., L.P. v. United States,*
   5 F. 4th 593 (5th Cir. 2021) ......................................................................................... 4

*Karubian v. Kaiser Ventures, LLC,*
   No. EDCV 17-597 PSG (EX), 2018 WL 10517183 (C.D. Cal. Oct. 17, 2018) .......... 10

*Mayorga v. Ronaldo,*
   Case No. 2:19-cv-00168 (D. Nev. October 6, 2021) ............................................ 11, 14

*U.S. Ethernet Innovations LLC v. Acer, Inc.,*
   No. C. 10-03724, 2014 U.S. Dist. LEXIS 45682 (N.D. Cal. Mar. 31, 2014) .............. 12

*United States v. Danielson,*
   325 F.3d 1054 (9th Cir. 2003) ..................................................................................... 4

*United States v. Fernandez,*
   388 F.3d 1199 (9th Cir. 2005) ................................................................................... 14

*United States v. Hinton,*
    543 F.2d 1002 (2d Cir. 1976) ..................................................................................... 3

*United States v. North,*
    910 F.2d 843 (D.C. Cir. 1990) ..................................................................................... 1

*United States v. Poindexter,*
    951 F.2d 369 (D.C. Cir. 1991) ..................................................................................... 1

*United States v. SDI Future Health, Inc.*,
    464 F. Supp. 2d 1027 (D. Nev. 2006) ......................................................................... 4

*United States v. Sullivan,*
    2020 WL 1815220 (D. Haw. Apr. 9, 2020) ................................................................. 5

*Vargas v. Quest Diagnostics,*
    No. CV198108DMGMRWX, 2021 WL 4642749 (C.D. Cal. Aug. 19, 2021) ............ 10

*Williams v. Los Angeles Sheriff's Dep't,*
    No. CV 17-05640-AB (EX), 2020 WL 8461520 (C.D. Cal. Sept. 25, 2020) .............. 10

**Statutes**

Federal mediation privilege, 1 Mediation: Law, Policy and Practice § 8.18 .................... 11

**Other Authorities**

Federal Rule of Evidence 501 ............................................................................... 10, 11

Defendant Julian Omidi ("Omidi"), by and through his counsel, Willkie Farr and Gallagher LLP, hereby submits this reply brief in further support of his trial memorandum seeking to preclude the testimony of Government witness Jessica Meyle, on the basis that her testimony is constitutionally tainted, given the Prosecution Team's review of Mr. Omidi's privileged communications concerning Ms. Meyle's claims. Mr. Omidi hereby responds to the Opposition brief and accompanying Declarations filed by the Prosecution Team on October 8, 2021 ("Pros. Br.") at Dkt. 1423, as well as the Taint Team Response ("Taint Br."), and accompanying Declaration of Elisa Fernandez, which were filed *in camera* on October 8, 2021.

## I. The Prosecution Team's Claim That It "Does Not Recall" Reviewing the Privileged Communications Provides No Assurance That Mr. Omidi Has Not Been Prejudiced By The Government's Review of Privileged Documents.

The primary rebuttal that the Prosecution Team makes with respect to its review of the Trope Memorandum and the Meyle Mediation Brief is its claim that AUSA Williams "does not recall" the "substance" of these documents and thus could not have "used" them to the Government's benefit. (Pros. Br. 1, 4.) This is incorrect. As numerous courts, including the D.C. Circuit, have explained, there is no way to know what AUSA Williams has retained from her review of these materials, even if she does not recall, today, precisely what she read during her review of these materials. *See, e.g., United States v. North*, 910 F.2d 843, 861 (D.C. Cir. 1990) (explaining, in the context of *Kastigar* and immunized testimony, that "there is no way a trier of fact can determine whether the memories of [a] witnes[s] would be substantially different" had the witness not reviewed the compelled testimony, since "memory is a mysterious thing."); *United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991) (finding that Government could not meet its burden under *Kastigar* unless it could prove that the thoughts and recollections of the individual exposed to the compelled testimony had not been "refreshed or otherwise shaped, altered, or affected by his exposure.").

For example, even accepting AUSA Williams's representation that she does not currently have a recollection of the substance of Trope Memorandum or the Meyle Mediation Brief, that does not mean that AUSA Williams did not learn something valuable from her review of these materials, and retains that knowledge today, even though, at this juncture, she can no longer recall the source of the information.[1] If AUSA Williams has discussed Ms. Meyle's testimony with other members of the Prosecution Team, the Court can have no confidence that information gleaned from Mr. Omidi's privileged communications has not been shared and discussed amongst the Prosecution Team. Indeed, while AUSA Moghaddas has represented to the Court that he and AUSA Williams have "not discussed" either the Trope Memorandum or the Meyle Mediation Brief specifically, it is hard to imagine that the Prosecution Team has not discussed Ms. Meyle's testimony, including the question of whether she should be called as a witness, how her direct should be organized, and what questions she is likely to encounter on cross examination. Given that AUSA Mogahaddas only joined the Prosecution Team in July and presumably did not have any knowledge of this case beforehand, the defense suspects that he and AUSA Williams have likely had *multiple* conversations concerning Ms. Meyle. The information conveyed to AUSA Mogahaddas from AUSA Williams may

---

[1] The Government makes much of AUSA William's email to Taint Team AUSA Shim where she claimed that she didn't even remember viewing the Meyle Mediation Brief. (Ex. A to Williams Declaration, Dkt. 1423-1). As an initial matter, one would hardly expect an experienced prosecutor like AUSA Williams to have affirmed in writing that she had, in fact, reviewed the brief carefully and was therefore tainted. But, more to the point, it is simply possible that AUSA Williams reviewed the mediation brief, without realizing exactly what she was looking at. The document is described as a mediation brief only on its title page and AUSA Williams could easily have overlooked that title. As both the Taint Team and the Prosecution Team cannot dispute, the discovery in this case includes thousands of pages of public pleadings and court documents and AUSA Williams could easily have reviewed the Mediation Brief without realizing that it was, in fact, a privileged mediation brief. The harm to Mr. Omidi does not depend upon Ms. William's *awareness* that she was reviewing privileged materials, but rather what she learned from those materials and how that information has been used.

very well originate from the Trope Memorandum or the Meyle Mediation Brief, whether AUSA Williams remembers those documents as the source of her knowledge or not.[2] *United States v. Hinton*, 543 F.2d 1002, 1010 (2d Cir. 1976) (under *Kastigar*, the Government must present objective evidence, rather than just a prosecutor's say-so, that no use was made of the defendant's compelled statements, because the "prospect of peering into . . . minds" to "ascertain whether [a defendant's] testimony was improperly used," is a procedure "fraught with applicable constitutional problems and with the potential for abuse.").

Moreover, the Government has not even attempted to disclaim all possible sources of taint. For example, as the Government admits, two *other* Prosecution Team attorneys, beyond AUSA Williams, reviewed the Meyle Mediation Brief. (Pros. Br. at 4.) Both former AUSA Kimberly Jaimez and "contract" attorney Nairi Gruzenski (who appears to be an attorney at the Department of Homeland Security, and thus not a "contract" attorney in the usual sense) also reviewed the Meyle Mediation Brief. *Id*. The Prosecution Team's filing does not discuss whether either of these two attorneys discussed the substance of the Meyle Meditation Brief with any of the agents on the matter, including SA Coleman, who has interviewed Ms. Meyle on at least two occasions since the Prosecution Team, including AUSA Jaimez and Ms. Gruzenski, accessed the Meyle Mediation Brief.

Finally, the Prosecution Team's assurance to the Court that the Trope Memorandum and the Meyle Mediation Brief have not been used during prep sessions with Ms. Meyle is hardly significant. This fact comes as no surprise, given that the documents are no longer available to the Prosecution Team. But, as Mr. Omidi's Memorandum attempted to make clear, prejudice to Mr. Omidi is established through

---

[2] Indeed, the Prosecution Team has previously represented to the Court that "the Filter Team has not turned over privileged documents to the Prosecution Team," *see* Joint Response, Dkt. 1278. Presumably AUSA Williams and the remainder of the Prosecution Team believed this to be true when they made this representation, but it was easily proved false by their own historical correspondence, which they apparently did not check before making this representation to the Court. In other words, just because AUSA Williams currently contends that she learned nothing from her review of Mr. Omidi's privileged communications, that belief may very easily be wrong.

means that are far more subtle than actually showing a defendant's privileged communications to a witness who is about to testify at the defendant's trial. Prejudice includes any "action[] designed to give the prosecution an unfair advantage at trial." *See United States v. Danielson*, 325 F.3d 1054, 1072 (9th Cir. 2003) ("assistance in focusing the investigation, deciding to initiate the prosecution, refusing to plea bargain, interpreting evidence, *planning cross-examination, and otherwise generally planning trial strategy*" all constitute improper use of privileged communications) (emphasis added).

## II. The Prosecution Team's Review of Mr. OmiDI's Privileged Communications Was INEVITABLE, NOT "Inadvertent"

Both the Taint Team and the Prosecution Team have emphasized to the Court that Ms. Meyle's testimony should not be precluded because the Prosecution Team's review of the Trope Memorandum and the Meyle Mediation Brief was "inadvertent." *See* Pros. Br. at 8; Taint Br. at 4-5. In fact, the Government's approach to the review of Mr. Omidi's privileged communications has been so littered with error that the disclosure of Mr. Omidi's privileged communications to the Prosecution Team was only a matter of *when*, not *if*. As Mr. Omidi has argued many times, the Government's unilateral decision to use a Taint Team was inappropriate, given the inherent conflict of interest that is present in any Taint Team review. *In re Grand Jury Subpoenas*, 454 F.3d 511, 523 (6th Cir. 2006) ("taint teams present inevitable, and reasonably foreseeable, risks to privilege, for they have been implicated in the past in leaks of confidential information to prosecutors. . .the government taint team may have an interest in preserving privilege, but it also possesses a conflicting interest in pursuing the investigation, and, human nature being what it is, occasionally some taint-team attorneys will make mistakes or violate their ethical obligations."); *Harbor Healthcare Sys., L.P. v. United States*, 5 F. 4th 593, 600 (5th Cir. 2021) (irreparable injury to litigant resulting from Government's seizure of privileged communications even though the government intended to review them with a filter team); *United States v. SDI Future Health, Inc.*, 464 F. Supp. 2d 1027, 1037 (D. Nev. 2006) ("Federal Courts have taken a skeptical view of the government's use of taint teams…").

As the Court knows, this case did not involve a circumstance in which the Government wished to use a Taint Team, the defense objected, and after a court considered the issue, the Government was provided with judicial approval to proceed. To the contrary, as Mr. Omidi has explained in prior briefing, *see* Dkts. 1162, 1267, 1313, the Government here sought court permission to use a Taint Team and Judge Abrams *denied* that request. The Government went ahead and implemented a Taint Team review anyway and as far as the defense has been able to tell, there was no protocol established to govern the review. *Cf. United States v. Sullivan*, 2020 WL 1815220, at *5 n.14 (D. Haw. Apr. 9, 2020) ("the use of the taint team process for the iCloud production was reviewed and approved by a neutral United States magistrate judge."). The lack of any protocol or oversight over the Taint Team is reflected in the multiple eleventh-hour disclosures that were made last month, on the eve of trial, including the fact that approximately *8 million* documents seized from the Get Thin offices were simply not reviewed by the Taint Team, and the fact, relevant to this brief, that on *twenty* different occasions, the Prosecution Team had to inform the Taint Team that it believed that privileged communications had been permitted to leak into the Prosecution Team's "clean" database. *In re Grand Jury Subpoenas*, 454 F.3d at 523 (there is an "obvious flaw in the taint team procedure: the government's fox is left in charge of the appellants' henhouse, and may err by neglect or malice, as well as by honest differences of opinion.").

It appears that the secrecy that Mr. Omidi has consistently encountered in connection with the Taint Team's process may be the result of a concerted effort by the Government to conceal exactly how flawed the Taint Team really was. For example, Mr. Omidi has sought, for years, the communications between the Prosecution Team and the Taint Team, since these documents are not protected by any privilege, but the Government has consistently refused to produce these materials. In connection with the present Motion, however, the Government has finally turned over two such emails: (i) AUSA Williams's correspondence with Taint Team AUSA Diane Shim on September 21, 2016, *see* Dkt. 1423-1; and (ii) the Taint Team's correspondence with Prosecution Team

paralegal Susan Cavallone, in late September 2016, which was produced by the Taint Team to Mr. Omidi on Sunday, October 10. *See* Ex. 1. These communications *prove* that the Taint Team was not acting as an independent, neutral arbiter of privilege. For example, after AUSA Shim admitted to AUSA Williams that documents, un-reviewed by the Taint Team, had been migrated over to the Prosecution Team's "clean" database, AUSA Shim first *asked* AUSA Williams if AUSA Williams "would like for [the Taint Team] to review the documents," even though it was AUSA Shim's job to *insist* upon the review of these documents, before any review by the Prosecution Team. (Dkt. 1423-1.) It appears that if AUSA Williams had replied in the negative, the Taint Team would have been perfectly happy to stand down, notwithstanding the fact that some of these documents were indeed privileged.

Moreover, once AUSA Shim *did* review the documents that had been released into the Prosecution Team's "clean" database, she emailed AUSA Williams to *ask whether AUSA Williams "agree[d]" that several of the documents were privileged*. *Id*. AUSA Shim informed AUSA Williams that she would *wait* to "lock" the documents from the Prosecution Team's database until she received confirmation from AUSA Williams that the Taint Team's designation of "privilege" was consistent with the Prosecution's Team view. *Id*. This exchange is deeply concerning. No member of the Taint Team should have believed, for any period of time, that the Prosecution Team's views on privilege were relevant, much less *determinative*. The fact that the Taint Team was not only asking the Prosecution Team for approval on what documents it should review, but was also actively soliciting an opinion from the members of the Prosecution Team regarding whether certain documents were privileged, is proof positive that the Taint Team in this case did not understand, or respect, the privilege it was supposed to be protecting.

Indeed, the Taint Team's carelessness is also on display in a subsequent email, between the Taint Team and Susan Cavallone, the Prosecution Team's paralegal. In this instance, the Taint Team reached out and affirmatively asked Ms. Cavallone to *access* a document that the Taint Team *believed was privileged*. According to the Government, the

Taint Team only wanted to ensure that the document was "locked," but it beggars belief that there was no other person in the entire Department of Justice, except members of the Prosecution Team, who could confirm for the Taint Team what viewing permissions were in place on the documents at issue.

Moreover, based on the Government's filings to date, it appears that after receiving these problematic communications from the Taint Team—which clearly demonstrate that the Taint Team did not understand the nature of the "wall" that should have been in place between itself and the Prosecution Team—the Prosecution Team did *nothing*. Mr. Omidi has seen nothing to suggest that these communications concerned the Prosecution Team enough that they insisted upon a new Taint Team, or a better-trained Taint Team, or at a minimum asking the Taint Team what protocols, if any, it had instituted. Indeed, the Government has already admitted that, in addition to the exchanges discussed above, there are *nineteen* other exchanges in which the Prosecution Team contacted the Taint Team about privileged documents that had leaked into the "clean" database. Mr. Omidi has not been provided with the actual correspondence regarding these nineteen other instances, but there is no reason to believe that the Taint Team comes across as any more competent in these communications than it does in the September 2016 exchanges discussed above. More to the point, it appears that in September 2016, and on at least *nineteen* other occasions, the Prosecution Team simply accepted that the Taint Team was potentially failing in its mission to protect Mr. Omidi's privileged communications and took no steps to remedy this obvious problem.

Given this history, the Prosecution Team's review of privileged communications was all but inevitable. When the Government's process is so flawed as to make disclosure of protected communications a forgone conclusion, it is not correct to say that the Government's review of privileged communications was "inadvertent." *See* Pros. Br. at 8; Taint Br. at 4-5. Rather, the more accurate description is that the Government's review of Mr. Omidi's privileged communications is a direct result of the Government's own, deliberate actions, and inactions, with respect to the privilege review in this case.

### III. The So-Called Independent Sources Identified by the Taint Team Are Themselves Protected by the Mediation Privilege and the Government's Possession of These Documents And Others Only Confirms that Meyle's Testimony Should Be Precluded.

Even though the Taint Team is supposed to be the equivalent of a "neutral" party in this case, it has filed a response that not only describes the "facts" concerning the Prosecution Team's viewing of the Trope Memorandum and the Meyle Mediation Brief but also engages in advocacy on behalf of the Prosecution Team, urging the Court to find that no prejudice has or will result to Mr. Omidi as a result of the Prosecution Team's review of the Trope Memorandum and the Meyle Mediation Brief. The Court should therefore view the Taint Team's submission with the same amount of reasonable skepticism as it would any brief submitted by a party with a vested interest in a particular outcome.

The primary purpose of the Taint Team's response is to assert that the Prosecution Team had "independent sources" that otherwise revealed all of the defense strategy discussed in the Trope Memorandum and Meyle Mediation brief. To support this theory, the Taint Team has submitted eight documents, which can be found in the Prosecution Team's "clean" database. *See* Fernandez Decl. at Exs. 1-8. In fact, none of these documents serve as an "independent source" for the defense strategy found in the Trope Memorandum or the Meyle Mediation Brief.

First, the Taint Team argues that the civil complaint filed by Ms. Meyle can serve as an independent source. (Taint Br. 6.) This is obviously incorrect. The Meyle Complaint does not contain any information about Mr. Omidi's defense strategy with respect to *rebutting* Ms. Meyle's claims. For the same reason, the witness statement authored by the FDA, concerning its interviews with Ms. Meyle in the summer of 2012, does not serve as an independent source. (*See* Fernandez Decl. at Ex. 4.) Ms. Meyle did not know what Mr. Omidi's defense strategy was and thus did not describe it, in any way, to the FDA agents.

Second, the Taint Team points to a series of press releases that Get Thin released regarding Ms. Meyle's claim that certain medical instruments were not properly sterilized. (*See* Fernandez Decl. at Exs. 5-8.) But, the allegations in the Meyle Complaint regarding sterilization procedures at Get Thin are not part of the Indictment against Mr. Omidi and thus, should not be at issue during Ms. Meyle's trial testimony. For this reason, Mr. Omidi has not argued that the Government is likely to use the information in the Trope Memorandum regarding Mr. Omidi's response to the sterilization claims to gain an advantage at trial. Because the medical instrument sterilization issue is not at issue, the press releases contained in Exs. 5-8 do not aid the Government's argument.

Finally, the Taint Team points to three exhibits—Exs. 1-3 to the Fernandez Declaration—which were apparently produced to the Prosecution Team by Ms. Meyle's former attorney, Alexander Robertson. Exs. 1-3 are marked-up and annotated examples of "version 1" of a draft settlement document exchanged between Robertson and Mr. Omidi's attorneys. But, unlike the Trope Memorandum, Exs. 1-3 do *not* contain Mr. Trope's comments and analysis. Moreover, in Exs. 1-3, all of the material portions of the document concerning what Ms. Meyle could be made to admit are "crossed out," suggesting that the parties agreed that Ms. Meyle could *not* make such admissions. But, as noted above, Exs. 1-3 relate to "version 1" of the draft document; the Trope Memorandum, on the other hand, involves Mr. Trope's comments to "version 5," where those admissions have been re-introduced into the document. Thus, to the extent that a prosecutor viewed Exs. 1-3, they would have concluded that the defense believed that Ms. Meyle would *not* admit to the statements that are crossed out. But, when the Prosecution Team reviewed the Trope Memorandum, which came later in time, it learned that in fact, the defense believed that Ms. Meyle *could* be made to concede on these points. Thus, the Trope Memorandum offers a window into Mr. Omidi's cross-examination of Ms. Meyle that Exs. 1-3 do not.

More important, however, is the fact that Ex. 1-3 are *themselves protected by privilege* and should never have been made available to the Prosecution Team. The

defense has learned that the Government received these documents—and hundreds of additional privileged mediation documents—after serving a grand jury subpoena on Ms. Meyle's attorney, Mr. Robertson, that expressly sought all "settlement" communications concerning Ms. Meyle's civil lawsuit. (Ex. 2 (June 11, 2013 Grand Jury Subpoena to A. Robertson seeking, in connection with the Meyle Civil Lawsuit, all "settlement agreement(s), drafts of any settlement agreement proposed by opposing counsel, and documents relating to communications between opposing counsel regarding settlement agreements").)

The Government's subpoena for mediation materials was entirely inappropriate, given that there is a "blanket" mediation privilege in the Ninth Circuit that not only protects documents submitted by the parties to the mediator himself, but also protects "all communications" submitted between the parties as part of the mediation process, which would include every one of the mediation documents that the Government sought via the subpoena to Mr. Robertson. *Folb v. Motion Picture Indus. Pension & Health Plans*, 16 F. Supp. 2d 1164, 1179-80 (C.D. Cal. 1998), *aff'd*, 216 F.3d 1082 (9th Cir. 2000) (affirming the existence of a federal common law mediation privilege, adopted pursuant to Federal Rule 501, that protects all mediation communications); *Vargas v. Quest Diagnostics*, No. CV198108DMGMRWX, 2021 WL 4642749, at *3 n.4 (C.D. Cal. Aug. 19, 2021) ("the weight of authority persuasively suggests the existence of a federal [mediation] privilege that would itself prevent the requested discovery."); *Belden v. Cty. of San Bernardino*, No. EDCV19900RGKKKX, 2020 WL 3129208, at *5 (C.D. Cal. June 12, 2020) ("Courts in the Ninth Circuit have adopted a federal mediation privilege under Federal Rule of Evidence 501, 'applicable to all communications made in conjunction with a formal mediation.' "); *Williams v. Los Angeles Sheriff's Dep't*, No. CV 17-05640-AB (EX), 2020 WL 8461520, at *11 n.9 (C.D. Cal. Sept. 25, 2020) (same); *Karubian v. Kaiser Ventures, LLC*, No. EDCV 17-597 PSG (EX), 2018 WL 10517183, at *4 (C.D. Cal. Oct. 17, 2018) ("the Court finds that the emails and draft documents were exchanged in the course of or pursuant to the mediation and are therefore protected, whether it be under the Local Rule

or a federal mediation privilege.").[3] In other words, given this authority, there can be no question that it was wrong for the Government to intentionally seek, from Mr. Robertson, privileged mediation documents. *Gomez v. Vernon*, 255 F.3d 1118 (9th Cir. 2001) (sanctions imposed upon Government for intentionally seeking privileged materials); *Mayorga v. Ronaldo*, Case No. 2:19-cv-00168, Order and Report and Recommendation, Dkt. 143, at *22 (D. Nev. October 6, 2021) (dismissing case where party sought and used the opposing side's privileged communications, without seeking a court ruling on whether the documents were in fact privileged).

Moreover, once the Government received the production from Mr. Robertson, two things should have occurred, which did not. First, the Taint Team should have reviewed Mr. Robertson's production and marked each of these materials privileged, shielding them from review by the Prosecution Team.[4] Instead, these documents have been available to

---

[3] The Prosecution Team suggests in a footnote that mediation materials might not be privileged but merely confidential, at least in criminal cases. (Pros. Br. at 5, fn. 5). This is incorrect. The Government's support is a Fifth Circuit case, *In Re Grand Jury Subpoena*, 148 F.3d 487 (5th Cir. 1998), but the Fifth Circuit based its decision on the fact that it did not recognize a federal common law mediation privilege. *See id.* Courts in the Ninth Circuit, on the other hand, *do* recognize a federal common law mediation privilege, adopted under Federal Rule of Evidence 501, as the above-cited cases make clear. *See also* Federal mediation privilege, 1 Mediation: Law, Policy and Practice § 8:18 (noting that "Federal district courts in California and Pennsylvania reached exactly the opposite conclusion [on the federal mediation privilege than the Fifth Circuit]."). Further, privileges adopted pursuant to Federal Rule of Evidence 501 apply in both criminal and civil cases. *See* Fed. R. 501 (Advisory Notes) (Rule 501 deals with the "privilege of a witness not to testify. . .[and] federal privilege law applies in criminal cases"). Moreover, to the extent that there is any exception to the mediation privilege in "criminal" cases, which there is not, *Folb* makes clear that any such exception would only apply where the *defendant* needed certain documents in order to exercise his rights under the Confrontation Clause. *Folb,* 16 F. Supp. 2d at 1178.

[4] Indeed, there is no question that the Taint Team knew that mediation document were privileged; the email correspondence between AUSA Williams and Taint Team AUSA Shim includes confirmation from Ms. Shim that she was marking materials that "seemed related to some settlement ligation" as privileged. *See* Dkt. 1423-1.

the Prosecution Team for *years,* and indeed, the Taint Team suggests that the Prosecution Team has used and reviewed them, which only *compounds* the prejudice that resulted from the Prosecution Team's review of the Trope Memorandum and Meyle Mediation Brief and further confirms why the preclusion of Ms. Meyle's testimony is appropriate.

Second, when the Government received the production from Robertson, which *included* the Confidential Settlement Agreement and General Release between Mr. Omidi and Ms. Meyle, the Government should have asked Mr. Robertson whether he had complied with its terms. The Settlement Agreement between Ms. Meyle and Mr. Omidi (along with other mediation participants) provides that if Mr. Robertson were to receive a "subpoena" seeking any of the parties' settlement materials, Mr. Robertson was obligated to give "10 business days" written notice to Mr. Omidi, so that Mr. Omidi could challenge the subpoena in court, on the grounds that the documents sought were protected by the mediation privilege. (Ex. 3 ("Confidential Settlement Agreement and General Release") at ¶ 7.3.) Had Mr. Robertson given Mr. Omidi the required notice, Mr. Omidi would have moved to quash the subpoena and almost certainly would have won, meaning that these documents would never have made it into the Government's possession in the first place. *See, e.g.*, *U.S. Ethernet Innovations LLC,* 2014 U.S. Dist. LEXIS 45682, at *18-19 (quashing document request that sought mediation materials on the basis of the federal common law mediation privilege); *City of Colton v. American Promotional Events, Inc.*, 2014 WL 12740639, at *3-4 (C.D.C.A. June 24, 2014) (upholding mediation privilege and refusing to permit discovery of mediation-related communications).

Mr. Robertson, however, failed to give Mr. Omidi the required notice, meaning that Mr. Omidi had no opportunity to prevent his privileged materials from being produced to

the Government. [5] Moreover, it appears that when the Government obtained the Settlement Agreement, it did not take any action to ensure that the "notice" provision set forth in Paragraph 7.3 of the Agreement was respected. Instead, it did the *opposite*: in a undated letter, the US Attorney's Office wrote to Mr. Robertson and expressly told him to refrain from informing Mr. Omidi (or anyone else) about the "documents [Mr. Robertson]…produced to investigators." *See* Ex. 4 (Letter from AUSA Consuelo S. Woodhead to A. Robertson). In other words, not only did the Government intentionally seek out materials that it knew were protected by privilege, but it also took affirmative steps to ensure that Mr. Omidi would *not* learn that these privileged communications had been produced to the Government. *In re Grand Jury Proceedings*, 814 F.2d 61 (1st Cir. 1987) (prosecutor's letter directing witness not to disclose existence of subpoena *duces tecum* for 90 days, was misconduct); American Bar Association's Standards for Criminal Justice, 3-3.1(c) ("A prosecutor should not advise any person or cause any person to be advised to decline to give to the defense information which such person has the right to give."). The Government's actions further prevented Mr. Omidi from learning that his privledged communications had been produced to the Government and prevented him from filing a belated motion to quash the subpoena and for the documents to be destroyed. Instead, the Prosecution Team was provided with the strategic advantage of having years to review these materials in connection with putting together its case, including its decision to call Ms. Meyle as a witness.

---

[5] In fact, it wasn't until the Taint Team filed its Declaration on Friday, October 8 that the defense even realized that these privileged mediation materials had been produced by Mr. Robertson and made available to the Prosecution Team. As the Court is aware, there are millions of documents in discovery and many of them do not respond to search terms. Moreover, Mr. Omidi's attorneys, in 2015, asked Mr. Robertson to produce to them any materials that he had ever provided to the Government. Mr. Robertson did not object to this request but what he turned over was only a handful of non-privileged documents, not the hundreds of documents that he *actually* produced to the Government.

Mr. Omidi intends to file a more comprehensive motion regarding the Government's misconduct with respect to the mediation materials produced by Mr. Robertson. *Gomez*, 255 F.3d 1118 (imposing sanctions and finding that the Government had "bypassed questions of ethics in an effort to gain advantage in. . .litigation" where it intentionally sought privileged communications and then retained them once they were obtained). At a minimum, however, these facts make clear that the Government's intrusion into privileged materials was deliberate and extensive. The Prosecution Team should never have reviewed the Trope Memorandum, the Meyle Mediation Brief, or any of the Meyle mediation materials, including Exs. 1-3 of the Fernandez Declaration. This review has given the Prosecution Team an unfair advantage, based on information and strategy that should never have been known to it. *See Mayorga*, Case No. 2:19-cv-00168, Order and Report and Recommendation, Dkt. 143, at *22 (ordering case to be dismissed, after determining that because one litigant had "read, reviewed, and thoroughly analyzed [the other's side privileged communication], their knowledge of the documents' contents cannot be undone" and there was "no possible way for this case to proceed where the Court cannot tell what arguments and testimony are based on these privileged documents.").

The Court should not permit the Government to further violate Mr. Omidi's rights and should preclude Ms. Meyle's trial testimony.[6] *United States v. Fernandez*, 388 F.3d 1199, 1240 (9th Cir. 2005) (because district court precluded government witness from testifying at the defendant's trial about any of the matters that were detailed in the defendant's privileged communications, defendant was not substantially prejudiced and the Sixth Amendment's right to counsel was not violated).

---

[6] Mr. Omidi believes that the Government's actions with respect to the mediation materials may merit a sanction stronger than the preclusion of Ms. Meyle's trial testimony. The brief that Mr. Omidi intends to file that more comprehensively describes the Government's misconduct will address the appropriate sanction.

Dated: October 11, 2021

Respectfully submitted,

**WILLKIE FARR & GALLAGHER LLP**

By: _s/ Michael S. Schachter_
MICHAEL S. SCHACHTER
RANDALL W. JACKSON
CASEY E. DONNELLY
SIMONA AGNOLUCCI

ATTORNEYS FOR DEFENDANT
JULIAN OMIDI