Michael S. Schachter** (NY 3910205)
Randall W. Jackson** (NY 5274048)
Casey E. Donnelly** (NY4936803)
**WILLKIE FARR & GALLAGHER LLP**
787 Seventh Avenue
New York, New York 10019
Tel: (212) 728-8102; Fax: (728) 728-8111
Email: *mschachter@willkie.com*

Simona Agnolucci (SBN 246943)
**WILLKIE FARR & GALLAGHER LLP**
One Front Street
San Francisco, CA 94111
Tel: (415) 858-7447, Fax: (415) 858-7599
Email: *sagnolucci@willkie.com*

*** Appearing pro hac vice*

*Counsel for Defendant Julian Omidi*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

United States of America,

Plaintiff,

v.

Julian Omidi, *et al.*,

Defendants.

CR No. 17-00661 (A) – DMG

**DEFENDANT JULIAN OMIDI'S TRIAL MEMORANDUM REGARDING APPROPRIATE SCOPE OF TESTIMONY OF COOPERATING WITNESSES**

[No Hearing Set]

Defendant Julian Omidi ("Omidi"), by and through his counsel, Willkie Farr and Gallagher LLP, hereby submits this trial memorandum on the appropriate scope of direct and cross-examination of the government's cooperating witnesses. Either because of inexperience, ignorance of the law, or intentional misconduct, the government has repeatedly attempted to lead the Court into error. It is simply impossible for the Court, which cannot possess the full range of information available to the parties, to appropriately police the admission of proper testimony when the government is repeatedly attempting to elicit from its witnesses testimony that the government knows has no proper basis for admission.

Specifically, the government is repeatedly attempting to elicit from its witnesses entirely improper speculation regarding what Mr. Omidi supposedly knew, intended, or believed. The Ninth Circuit has made clear that the government simply cannot do this, but the prosecutors here have insisted on doing just this even after being admonished by the Court. If the government's witnesses heard Mr. Omidi make a statement that pertains to what Mr. Omidi knew, intended or believed, the witnesses should be asked to tell the jury the statement that they heard Mr. Omidi make and the jury will be the arbiter of deciding what Mr. Omidi actually knew, intended or believed, based on the statements Mr. Omidi made. A witness for the government should not be offering their hypothesis as to what Mr. Omidi knew, intended or believed, but can only testify as to what they personally observed Mr. Omidi doing or saying.

The government is also asking an incredible number of improper leading questions. Even where the Court sustains the objection—and the Court has unquestionably sustained objections on many of these improper questions—when this type of improper leading questioning is done repeatedly, the improper effect is the same. Leading questions are prohibited because they implant in the witness's mind the "correct" answer to the question—that is, the answer that the prosecutor wants, expressed as the prosecutor prefers. This is completely improper, and it has happened repeatedly throughout the trial.

Similarly, the government has, and may continue, to improperly seek to limit lines of

cross-examination that the government knows are not only appropriate, but constitutionally required. Specifically, the government has objected to the defense's questions regarding witness bias, as related to the criminal penalties that the government has extinguished as a benefit to them. These questions are so clearly appropriate that courts have found that where they were not asked, the defendant had a viable claim for constitutionally ineffective counsel. Indeed, more than thirty years ago, the Supreme Court issued its opinion in *Delaware v. Van Arsdall*, where it held that when the defense is prohibited from cross-examining a witness about benefits from the government, the Sixth Amendment's Confrontation Clause has been violated. *See* 475 U.S. 673, 679-84 (1986). Given this long-enduring precedent, the government is well-aware that its objections are baseless, and they should stop immediately.

## I. THE COURT SHOULD PREVENT THE GOVERNMENT FROM ELICITING SPECULATION REGARDING THE DEFENDANTS' KNOWLEDGE AND INTENT FROM ITS COOPERATING WITNESSES.

The government has repeatedly posed questions to its witnesses first asking for their "understanding" regarding some aspect of the Defendants' knowledge or intent, and then asking the witness to offer a detailed explanation as to why the witness had this "understanding." This is nothing more than an improper invitation for the witness to inject hearsay and improper speculation into the record. *See United States v. Whitworth*, 856 F.2d 1268, 1284-85 (9th Cir. 1988). In *Whitworth*, the Ninth Circuit concluded that the district had abused its discretion in permitting a cooperating witness to testify as to the defendant's state of mind, writing:

> On a related matter, Whitworth claims that numerous irrelevant or speculative statements by Walker were improperly admitted at trial. One allegation requires our attention. During redirect examination, Walker was asked whether he ever had "suspicions or apprehensions that Mr. Whitworth knew that the real buyers were the Soviets?" After a defense objection was overruled, Walker answered affirmatively. He stated that his belief was

> based on "[c]ommon sense, sir. It made no sense that a friendly government or a criminal element would buy cryptographic material." The question clearly asked Walker to speculate about Whitworth's state of mind . . . . The district court abused its discretion in admitting the statement.

*Id.* The government's improper questions here as to whether witnesses "understood" or believed that the Defendants' possessed some guilty knowledge are equally improper. Indeed, in *Whitworth*, the government on appeal did not even attempt to justify such questioning, other than arguing that the questioning occurred on re-direct and the defense had opened the door. *See id.* Here, of course, the government is proceeding with such questioning on direct. Regardless, the Ninth Circuit rejected the "opening the door" argument in *Whitworth*, finding the questioning still was improper, if harmless in that case given the other evidence. *See id.* The Court should not allow any such questioning on the part of the government to continue.

## II. THE COURT SHOULD PREVENT THE GOVERNMENT FROM REPEATEDLY ASKING LEADING QUESTIONS WHICH ACCOMPLISH THEIR IMPROPER PURPOSE EVEN WHERE THE OBJECTION IS SUSTAINED.

The prosecutors have repeatedly asked leading questions in this case, despite repeated admonishment from the Court. The abuse of Rule 611's prohibition against leading question on direct examination has not been uniform throughout the trial, but it has been particularly egregious at various points in the trial. Indeed, the Court has sustained many of defense counsel's objections to leading questions and appropriately admonished the government. However, as has become apparent over the course of the trial, where the leading is repeated and intentional, mere sustaining of objections is insufficient, as the prosecutor has already accomplished the improper goal of guiding the witness towards his desired answer and robbing the jury of the ability to assess credibility that is at the heart of Rule 611. *See Waddington North American, Inc. v. Sabert Corp*, 2011 WL 344150 at *18 (D.N.J. Aug. 5, 2011) (granting a new trial and observing that

"After a certain point, it was not possible for [the opposing party] to object on every occasion without prejudicing itself . . . . **While the occasional improper leading question occurs in every case, repeatedly asking leading questions of a party's own witnesses is prejudicial. Indeed, leading questions have the effect of preventing the jury from making a proper credibility determination**."). Among the reasons why leading questions are prohibited is the fact that "if a witness cannot recall the events and has difficulty answering an open-ended question, a jury is entitled to find that testimony not credible." *Id.* "Leading questions rob the jury of the ability to make that determination [and] [r]epeated leading questions cause witnesses to become 'relatively unnecessary except as sounding boards.'" *Id.* (citing *Straub v. Reading Co.*, 220 F.2d 177, 180 (3d Cir. 1955)). The effect of repeated leading questions "is that the attorney testifies and the jury is unable to assess the credibility of the witness." *Id.* In *Straub*, the case relied upon by Chief Judge Brown in *Waddington*, the Third Circuit also reversed in part on the basis of repeated, improper leading questions, and observed that:

> Regarding the leading questions, appellee asserts that this problem is within the control of the trial court. This may be true in an ordinary law suit. But where that control is lost or at least palpably ignored and the conduct is a set piece running the length of the trial which produces a warped version of the issues as received by the jury, then that body never did have the opportunity to pass upon the whole case and a judgment based on that kind of a twisted trial must be set aside. . . . where, as here, there has been calculated sustained improper conduct producing biased issues as they went to the jury we cannot decline to act. Appellant thereby was deprived of its right to a fair trial. Civil or criminal, a trial is not a contest in which no holds are barred. It is the determination of basic rights under our Constitution.

*Straub*, 220 F.2d at 182; *see also Nurnberger v. United States*, 156 F. 721 (8th Cir. 1907) (reversing criminal conviction and observing that "[t]he repeated indulgence to the prosecutor in putting leading questions, and in form to suggest the answer, and calling for

the mere conclusion of the witness, was manifestly unfair and prejudicial to the defendant.”). This is an extraordinarily serious problem. Here, the pattern of questioning, even after the Court has sustained a defense objection regarding leading, suggests an affirmative intent to subvert the intention of the Court to grant the Defendants a fair trial. Just a few examples, where the Government achieved its goal of improperly directing the witness, in spite of the Court's ruling on the improper leading, follow:

> Q. Who signed those nutritional letters that we looked at yesterday?
> A. I don't know.
> Q. Was it Dr. Zarif?
> A. Yes.
> MR. JACKSON: Objection. Leading.
> THE COURT: Sustained.

(Tr. 464).

> Q. That's fair. Let me ask it this way. The same certification that's on the back of this form, it must apply to someone submitting this electronically; right?
> MR. SCHACHTER: Objection. Leading.
> THE COURT: Sustained.
> BY MR. MOGHADDAS:
> Q. Does the same certifications that are found on the back of this form apply to someone who is submitting it electronically?

(Tr. 944)

> Q. Did the consultants sometimes actually suggest what the weight needed to be in order to qualify?
> MR. JACKSON: Objection. Leading.
> THE COURT: Sustained.
> THE WITNESS: They call --
> THE COURT: Wait, wait. When the objection is sustained, then you can't answer the question.
> THE WITNESS: Sorry.
> BY MR. MOGHADDAS:

Q. When a consultant would call the patient that needed a reweigh, what are some of the things that they would say to the patient?
A. They can tell the patient that, "Oh, we cannot submit because the BMI is too low, and you should be like this weight.

(Tr. 3686).

A. I think he was just going around, like five in a day, and just get up and take a break, and then later on, he's going to go home. And so the next day it's -- like, it's slow. So sometimes -- so he teach me how to call the patient and give them some -- what do you call this?
Q. Script?
A. Script.
MR. JACKSON: Objection, Your Honor.
THE COURT: Sustained.
THE WITNESS:
A. He gave me some script. Because I just came from the Philippines, so, you know, my English is not that, you know, fluent before.
THE COURT: Mr. Moghaddas, I understand you're trying to assist the witness so that we can be more speedy in getting through this, but please do not lead him.
MR. MOGHADDAS: Absolutely, Your Honor. I apologize.

(Tr. 3663)

Q. And then can we look to the next page?
How about the contents of this page? Did you come up with this language?
A. No, sir.
**Q. This was part of the template?**
MR. JACKSON: Objection. Leading. The question should be, "Where did it come from?"
THE COURT: Sustained.
BY MR. CHAO:
Q. Ms. Alcantara, where did this language come from?
**A. It's a template.**

(Tr. 3597) (emphasis added).

> Q. So earlier you were testifying that Defendant Omidi instructed you to add two pounds or subtract two pounds to fluctuate it through all the letters. Is this an example --
> MR. JACKSON: Objection. Misstates the testimony and leading.
> MR. MOGHADDAS: Your Honor, I didn't even finish my question yet.
> THE COURT: All right. Rephrase your question.
> BY MR. MOGHADDAS:
> Q. Is this an example of where you or the nutrition department would fluctuate the weight in the letters based on Defendant Omidi's instruction to you?
> A. Yes, sir.

(Tr. 3677-78).

The Defendants' right to a fair trial is being undermined by repeated leading questions. We have not objected to leading questions that are simply designed to orient the witness, but as the examples above illustrate, the government has gone far beyond that in this case. The Court's appropriate attempts to cure the improper leading have not had the desired deterrent effect. We request that the Court instruct the government, again, that leading questions are not permitted on direct examination. If the government persists in posing such questions, we request that the Court strike the witness's testimony.

## III. THE COURT SHOULD PREVENT THE GOVERNMENT FROM IMPROPERLY INFRINGING ON THE DEFENDANTS' SIXTH AMENDMENT RIGHTS WITH BASELESS OBJECTIONS TO APPROPRIATE BIAS QUESTIONS.

During the testimony of witness Daniel Carriedo, the defense attempted to question Carriedo with regard to his potential exposure to a criminal penalty, which the government had apparently chosen to not follow through on, for reasons that were never memorialized in any agreement. (Tr. 1692). The government conceded in colloquy that Carriedo had faced criminal exposure, and indeed the subject of Carriedo's testimony was that he had purportedly participated in a criminal scheme at the direction of Charles

Klasky. In fact, Carriedo was one of only three individuals that the government identified pre-trial as the Defendants' coconspirators in the charged insurance fraud scheme, along with Klasky and Hong. Nevertheless, when the defense attempted to question Carriedo on this significant benefit he had received, the government objected:

> Q. Let me just ask you: You are testifying here today -- I'm correct -- you have no agreement whatsoever with the government?
> A. For today?
> Q. Yes.
> A. No agreement.
> Q. Right. You haven't reached any sort of formal cooperation agreement?
> A. No.
> Q. You didn't have some sort of formal immunization process?
> A. For today, no.
> Q. You didn't have some sort of nonprosecution or deferred prosecution agreement with the government; correct?
> A. Correct.
> Q. And so you still agreed to come testify in this case; right?
> A. Correct.
> Q. And it's your understanding, with regard to you, that the government could have charged you for the activities that you admitted to them engaging in; right?
> MR. CHAO: Objection. Calls for a legal conclusion.
> THE COURT: Sustained.
> BY MR. JACKSON:
> Q. Well, my only question is: You understood that you received a benefit from the government in not being charged; correct?
> MR. CHAO: Objection. Vague. Calls for a legal conclusion.
> THE COURT: Sustained.

(Tr. 1691-92). The defense submits that Carriedo's understanding of the fact that the prosecution granted him an enormous benefit in not prosecuting him was an appropriate line of cross-examination, but Carriedo is off the stand and there is no longer an

opportunity to question him. The government's objection during Carriedo's cross-examination, however, raises a grave concern for the defense that the Government may attempt to prevent the defense from questioning its other alleged co-conspirator witnesses regarding the benefits they have received from the government through their plea agreements. This is traditional bias cross, and it would be reversible error for the government to offer any objection in this area. *See, e.g., United States v. Schoneberg*, 396 F.3d 1036, 1042 (9th Cir. 2005) (reversing conviction on the basis of district court's failure to permit cross examination of coconspirator on agreement with the government, writing "[w]here a plea agreement allows for some benefit or detriment to flow to a witness as a result of his testimony, the defendant must be permitted to cross examine the witness sufficiently to make clear to the jury what benefit or detriment will flow, and what will trigger the benefit or detriment, to show why the witness might testify falsely in order to gain the benefit or avoid the detriment."); *see also United States v. Nickle*, 816 F.3d 1230, 1235 (9th Cir. 2016) (finding district court abused its discretion in preventing defendant from questioning "government's cooperating witnesses about the Rule 35 terms of their plea agreements," citing *Schoneberg*, and observing "the district court had it precisely backwards: It is the fact that the government had not yet made a Rule 35 motion that would give the witnesses the greatest incentive to tailor their testimony to please the prosecution.").

## **CONCLUSION**

For all of the reasons stated herein, the Court should force the Government to abide by the law as it related to the testimony of its cooperating witnesses.

Respectfully submitted,

Dated: October 25, 2021

**WILLKIE FARR & GALLAGHER LLP**

By: s/ Michael S. Schachter
MICHAEL S. SCHACHTER
RANDALL W. JACKSON
CASEY E. DONNELLY
SIMONA AGNOLUCCI

ATTORNEYS FOR DEFENDANT
JULIAN OMIDI