Michael S. Schachter** (NY 3910205)
Randall W. Jackson** (NY 5274048)
Casey E. Donnelly** (NY4936803)
**WILLKIE FARR & GALLAGHER LLP**
787 Seventh Avenue
New York, New York 10019
Tel: (212) 728-8102; Fax: (728) 728-8111
Email: *mschachter@willkie.com*

Simona Agnolucci (SBN 246943)
**WILLKIE FARR & GALLAGHER LLP**
One Front Street
San Francisco, CA 94111
Tel: (415) 858-7447, Fax: (415) 858-7599
Email: *sagnolucci@willkie.com*

Bruce H. Searby* (SBN 183267)
Edmund W. Searby** (OH 067455)
**SEARBY LLP**
1627 Connecticut Ave, NW, Suite 4
Washington, D.C. 20009
Tel: (202) 750-6106, Fax: (202) 849-2122
Email: *bsearby@searby.law*
*Appearing specially  ** Appearing pro hac vice*
*Counsel for Defendant Julian Omidi*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| United States of America, | CR No. 17-00661 (A) – DMG |
|---|---|
| Plaintiff, | **DEFENDANT JULIAN OMIDI'S TRIAL MEMORANDUM REGARDING INADMISSIBLE TESTIMONY FROM LARRY TWERSKY** |
| v. | |
| Julian Omidi, *et al.,* | |
| Defendants. | [No Hearing Set] |

# TABLE OF CONTENTS

**Page(s)**

I.   BACKGROUND .................................................................................................. 1

    A.   Charles Klasky's Alleged Confession to Larry Twersky ................................ 1

    B.   Larry Twersky's Alleged Observations of Patient Chart Review
       Meetings ........................................................................................................ 2

    C.   Larry Twersky's Envelope of Documents ...................................................... 3

    D.   Mr. Omidi's Relationship with Ara Salazar .................................................. 6

    E.   Alleged Threats by Brian Oxman and Konrad Trope .................................... 6

II.  ALL OF TWERSKY'S TESTIMONY STEMMING FROM HIS
     CONVERSATIONS WITH CHARLES KLASKY IS INADMISSIBLE
     HEARSAY. ........................................................................................................ 7

III. TWERSKY'S TESTIMONY ABOUT HIS OBSERVATIONS OF MR.
     OMIDI REVIEWING PATIENT CHARTS IS IRRELEVANT AND
     INADMISSIBLE. ............................................................................................... 9

IV.  TWERSKY'S "ENVELOPE DOCUMENTS," AND ANY TESTIMONY
     RELATED TO THEM, ARE IRRELEVANT AND INADMISSIBLE AS A
     "PRIOR CONSISTENT STATEMENT" BECAUSE TWERSKY
     PREPARED THE ENVELOPE AFTER HE DEVELOPED A MOTIVE TO
     FABRICATE. .................................................................................................... 12

V.   ANY TESTIMONY BY TWERSKY ABOUT MR. OMIDI'S
     RELATIONSHIP WITH ARA SALAZAR IS IRRELEVANT,
     SPECULATIVE, AND PREJUDICIAL. .............................................................. 14

VI.  TWERSKY'S TESTIMONY ALLEGING THAT HE WAS
     "THREATENED" BY BRIAN OXMAN AND KONRAD TROPE IS
     INADMISSIBLE BECAUSE THERE IS INSUFFICIENT FOUNDATION
     THAT TROPE AND OXMAN'S STATEMENTS WERE AUTHORIZED
     BY MR. OMIDI ................................................................................................ 15

VII. CONCLUSION ................................................................................................ 18

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Bigge v. Dist. Sch. Bd. of Citrus Cty., Fla.,*
    No. 5:13-CV-49-OC-10PRL, 2015 WL 1138472
    (M.D. Fla. Mar. 13, 2015) ...................................................................20

*Carmen v. San Francisco Unified Sch. Dist.,*
    237 F.3d 1026 (9th Cir. 2001) ..........................................................14

*City of Long Beach v. Standard Oil Co. of California,*
    46 F.3d 929 (1995) ..............................................................................19

*DataTreasury Corp. v. Wells Fargo & Co.,*
    No. 2:06-CV-72 DF, 2010 WL 11538713 (E.D. Tex. Feb. 26, 2010) ...............20

*Los Angeles News Serv. v. CBS Broad., Inc.,*
    305 F.3d 924 (9th Cir.),
    *opinion amended on denial of reh'g*, 313 F.3d 1093 (9th Cir. 2002) ...............19

*Tome v. United States,*
    513 U.S. 150 (1995)..............................................................................15

*United States v. Fielding,*
    645 F.2d 719 (9th Cir. 1981) ..............................................................11

*United States v. Freeman,*
    498 F.3d 893 (9th Cir. 2007) ..............................................................14

*United States v. Holden,*
    625 F. App'x 316 (9th Cir. 2014) .......................................................17

*United States v. Lawrence,*
    189 F.3d 838 (9th Cir. 1999) ..............................................................17

*United States v. Lynch,*
    903 F.3d 1061 (9th Cir. 2018) ............................................................15

*United States v. Moore,*
    818 F. App'x 774 (9th Cir. 2020) .......................................................10

*United States v. Nazemian,*
    948 F.2d 522 (9th Cir. 1991) ..............................................................10

*United States v. Williams,*
    No. CR-05-920-RSWL, 2008 WL 4644830 (C.D. Cal. Oct. 15, 2008).......10, 11

**Other Authorities**

Fed. R. Evid. 402 ...................................................................................................13

Fed. R. Evid. 403 ...................................................................................................17

Fed. R. Evid. 801(d)(2)(E).....................................................................................10

**DEFENDANT JULIAN OMIDI'S TRIAL MEMORANDUM REGARDING INADMISSIBLE TESTMONY FROM LARRY TWERSKY**

CASE NO. 17-00661 (A) - DMG

Defendant Julian Omidi ("Mr. Omidi"), by and through his counsel, Willkie Farr & Gallagher LLP, respectfully submits this trial memorandum addressing the inadmissible trial testimony the Government plans to elicit from witness Larry Twersky. Because nearly all of Twersky's putative testimony is either hearsay or completely irrelevant, the Court should preclude it.

## I.    BACKGROUND

The government intends to call Larry Twersky as a witness against Mr. Omidi. As the Court will recall from the testimony of Charles Klasky (Tr. 4791:18-4798:21; 5713:25-5720:5), Twersky worked closely with Klasky in the WLC sleep study program from mid-2011 through approximately March 2012. Twersky has participated in several lengthy interviews with government agents and prosecutors in anticipation of his testimony.

### A. **Charles Klasky's Alleged Confession to Larry Twersky**

Twersky has told the government that Klasky confessed to him about his participation in fraudulent activity after Twersky confronted him about using iterations of the "Book 11" spreadsheet to falsify sleep study reports ("SSR"s). In a June 5, 2016 proffer, Twersky stated that he "confronted KLASKY regarding the fact that he (KLASKY) and other GET-THIN employees were altering patient data," and that, upon being confronted, "KLASKY acknowledged the fraudulent activity in the Sleep Study portion of GET-THIN . . . . KLASKY sent an email to TWERSKY that spelled out the fraud that was occurring at GET-THIN and about JULIAN's role in directing the fraud." Exh. 1, 6/5/2016 Interview Report, p. 7.

In a subsequent interview with government agents and prosecutors on September 15, 2016, Twersky refined his story with new and different details:

> Once TWERSKY figured out the fraud that was occurring in using the Excel program to alter the 1-800- GET-THIN (GET-THIN) sleep study reports, he confronted CHARLES KLASKY with what he had discovered. The confrontation occurred at KLASKY's house. . . . The meeting at KLASKY's home occurred in the afternoon. KLASKY admitted to changing the

1

sleep study reports when confronted by TWERSKY. KLASKY told him that making these changes to the scored reports was the reason it took so long to get the finalized sleep study reports out and why they could not just utilize the results from the RESPIRONICS output. KLASKY said that "this is what JULIAN set up," referring to JULIAN OMIDI (J. OMIDI). . . .

TWERSKY told KLASKY that he (TWERSKY) could not continue to be involved in working with GET-THIN or the OMIDIs, referring to J. OMIDI, MICHAEL OMIDI (M. OMIDI), and CINDY OMIDI (C. OMIDI), and suggested that KLASKY should also stop working with them. KLASKY said he could not leave, that he could not walk away from GET-THIN. KLASKY's daughter was in college at that time. KLASKY said, "I'm in too deep," and that he could not get out. KLASKY said that if he (KLASKY) "played ball" by doing as he was directed, that J. OMIDI would take care of him.

Exh. 2, 9/15/2016 Interview Report, pp. 1-2.

## B. Larry Twersky's Alleged Observations of Patient Chart Review Meetings

Twersky also has provided the government with his alleged recollections of observing patient chart review meetings led by Mr. Omidi. Twersky recalls seeing Mr. Omidi asking for corrections to patient charts and placing post-it notes on pages of the charts. Exh. 2, p. 4 ("During these meetings, TWERSKY observed that J. OMIDI would review GET-THIN patient files and records, then bring in various GET-THIN employees and direct them to do things based on his review. J. OMIDI would look at a rejection letter from an insurer regarding a patient's clearance for bariatric surgery, then have that patient's file brought in. Looking at the reports and paperwork regarding the patient, J. OMIDI would say to the GET-THIN employee, 'No, check the height and weight on this person, this looks wrong.' Or J. OMIDI would say, 'Check the height on this one,' or 'Check the sleep study on this one.'"); Exh. 3, 3/9/2021 Interview Report, p. 3 ("People came in to the meeting room to correct files. JO would tell these people what needed to be changed or fixed. TWERSKY believes the files were for patients because they discussed coding like CPT codes [Current Procedural Terminology], billing, and resubmitting. TWERSKY

2

believes they would say this was denied about a procedure or something like that. JO would tell them what they needed to do to correct it."); Exh. 2, p. 4 ("TWERSKY observed J. OMIDI writing Post-It notes and placing the Post-It notes on various pages of the patient files.  The notes were sometimes coded, with just a letter or letters, such as 'S', 'H', and/or 'W'.  At the time, TWERSKY did not understand what these codes meant, and he was not really focused in on what he was observing.").  *Twersky did not understand any of Mr. Omidi's directions to be wrongful or illegal at the time he witnessed them*.  Exh. 4, 11/1/2021 Interview Notes, p. 5 ("Saw instructions going out but didn't understand at time.").

However, Twersky *now* believes that what he observed in these meetings was Mr. Omidi giving instructions to commit fraud, which he admits is hindsight based on Klasky's alleged confession.  Exh. 5, 10/21/2021 Interview Notes, p. 1 ("Color coded messages; see stick it/post it notes; check weight, check BMI as a cue + then walk away and handle . . . saw the change w/a different #; hindsight"); Exh. 1, p. 9 ("[T]he portion related to JULIAN directing changes on SSRs and in changing patient heights and weights to make the patient qualify as morbidly obese through coded emails or handwritten notes was information TWERSKY learned from KLASKY at the time TWERSKY confronted him about the fraudulent SSRs. . . .  TWERSKY himself observed JULIAN reviewing 'lots' of SSRs and JULIAN was always making notes on documents or putting sticky notes on documents, but TWERSKY did not know specifically what JULIAN wrote on any particular document or note.")

### C. <u>Larry Twersky's Envelope of Documents</u>

In his second meeting with the government, a June 5, 2016 interview conducted pursuant to a proffer agreement, Twersky informed the agents for the first time that he had prepared an envelope of documents relevant to the investigation and gave them the envelope. Exh. 1, p. 8.  The government has indicated that it may attempt to introduce the

envelope as a prior consistent statement.[1]  Despite disclosing the existence of this envelope for the first time ever in 2016, Twersky claims he "compiled" the documents and sealed the envelop in early 2012, supposedly after "discovering the fraud."  Exh. 1, p. 8 ("Over a period of approximately one month, TWERSKY compiled documents related to the fraud at GET-THIN. . . .  Twersky had not seen the contents the envelope since the time he sealed it sometime in early 2012.").  His stated reason for compiling the documents was "to report the information he uncovered to the authorities."  *Id.* ("After discovering the fraud in the GET-THIN Sleep Study program, TWERSKY decided to report the information he uncovered to the authorities.").  But Twersky did not independently "report" <u>anything</u> to <u>any</u> law enforcement agency after leaving WLC, whether in early 2012 or anytime thereafter.  In his proffer session, Twersky attempted to justify this incongruity by claiming that his counsel advised him not to notify the authorities or the press.  *Id*; Exh. 6, 10/25/2021 Interview Notes, p. 7.  Instead, Twersky claims that he gave sealed envelope to "an attorney"[2] to retain "for safekeeping" until "the day the FBI came to see him."  Exh. 1, p. 8.

The envelope includes the following documents:  (i) a document titled "1-800-GET-THIN Fraudulent Billing Practices Revealed in Detail" (Exh. 7 (EX-995), p. 4); (ii) a document listing the people that Twersky claims he intended to send the envelope to (Exh. 7, p. 5); (iii) a collection of documents titled "Six Actual Sleep Studies," which includes excerpts of four sleep study reports and two full sleep study reports (Exh. 7, pp. 6-19); (iv) a document titled "Sample Polysomnography Report Template," which purports to show the set of instructions needed to complete a finalized sleep study report (Exh. 7, pp. 20-26);

---

[1] Twersky's envelope is marked as government exhibit 995.  According to the most recent exhibit list provided to the defense, the government's "basis" for this exhibit is "prior consistent statement."  *See* Exh. A, (Excerpt of Government's Trial Exhibit List – September 20, 2021).

[2] According to the FD-302 report memorializing his proffer, Twersky told the government that he provided the envelope to an attorney named Kate Neiswender.  DX-3545-2, p. 8.  He did not specify whether Ms. Neiswender was *his* attorney, nor did he explain why he selected her to retain the envelope for him.

(v) screenshots of Klasky's falsification spreadsheets (Exh. 7, pp. 27-39); (vi) a list of WLC personnel which includes Twersky's understanding of each person's role in the WLC organization (Exh. 7, pp. 40-44); and (vii) an undated agenda for an WLC orientation seminar and minutes from two 2011 Managers' Meetings (Exh. 7, pp. 45-52). *See* Exh. 1, pp.8-11 (describing envelope documents).

Of the documents in the envelope, the only two that contain information addressing Mr. Omidi's role in the alleged scheme are documents (i) and (vi) above, both of which were authored by Twersky himself. Exh. 1, pp. 8-9 ("The first loose page titled '1-800-GET-THIN Fraudulent Billing Practices Revealed in Detail' [Page 4] provided an overview of what TWERSKY had uncovered related to the fraud at GET-THIN, based on his own observations or his discussions with others."), p. 10 ("The next grouping of documents [Pages 40-44] was a list of the key personnel in and around the GET-THIN organization. This list was compiled by TWERSKY and contained TWERSKY's understanding of each person's role in the organization.").

In these documents, Twersky claimed that the falsification of patient information was being done "at the instruction of Julian, Michael and Cindy Omidi," that "Julian would direct people with codes in emails" to change sleep apnea diagnoses or patient heights and weights, and that Mr. Omidi "is at the heart of the scam." Exh. 7, pp. 4, 40. These allegations against Mr. Omidi are <u>entirely</u> based on Klasky's purported confession. *See, e.g.*, Exh. 1, p. 9 ("[T]he portion related to JULIAN directing changes on SSRs and in changing patient heights and weights to make the patient qualify as morbidly obese through coded emails or handwritten notes was information <u>TWERSKY learned from KLASKY</u> at the time TWERSKY confronted him about the fraudulent SSRs.") (emphasis added); Exh. 2, p. 3 ("Regarding the statement in TWERSKY's previously reviewed write-up detailing the fraudulent practices at GET-THIN (marked as Page 4) that stated, 'Many times a sleep test was never even done, just a report created,' TWERSKY believed that <u>KLASKY told him that information</u>.") (emphasis added), pp. 4-5 ("<u>KLASKY said</u> that the Omidis were

destroying or deleting the underlying raw data related to the sleep study tests.") (emphasis added).

### D. **Mr. Omidi's Relationship with Ara Salazar**

The list of WLC personnel in Twersky's envelope contains includes a description of Ara Salazar, who worked in the billing department. Exh. 7, p. 40. Twersky describes Ms. Salazar as "Billing manager/Julian's on/off girlfriend." *Id.* Like the rest of the statements in this document, the claim that Ms. Salazar was Mr. Omidi's "on/off girlfriend" is not supported by a citation or any other documents in the envelope. *Id.* In his interviews with the government, Twersky did not elaborate on what, if any, basis he had for claiming that Ms. Salazar had a romantic relationship with Mr. Omidi, and this allegation, though irrelevant, is entirely false.

### E. **Alleged Threats by Brian Oxman and Konrad Trope**

Twersky has also told the government that he was threatened by Brian Oxman and Konrad Trope after leaving WLC, and that these threats were based on his purported discovery of fraud. Exh. 2, p. 2 ("Only OXMAN and TWERSKY were in attendance. During the meeting, OXMAN tried to threaten and bully TWERSKY into not saying anything about the fraud he had uncovered at GET THIN."); p. 3 ("Following his meeting with OXMAN, TWERSKY got a call from KONRAD TROPE who reiterated OXMAN's threats about keeping quiet."). These alleged threats were made outside of Mr. Omidi's presence. *Id.* The government has not pointed to any evidence that Mr. Omidi authorized Oxman or Trope to threaten Twersky.

## II.   ALL OF TWERSKY'S TESTIMONY STEMMING FROM HIS CONVERSATIONS WITH CHARLES KLASKY IS INADMISSIBLE HEARSAY.

The Court should preclude the Government from eliciting from Twersky testimony regarding the purported confession Charles Klasky made to him in early 2012.  Almost all of Twersky's purportedly relevant testimony is rooted in Klasky's hearsay confession to him. Klasky's statements do not qualify as non-hearsay coconspirator statements under Federal Rule of Evidence 801(d) because they are admissions of wrongdoing made without any intent to further the conspiracy.  The Ninth Circuit has repeatedly made clear that such testimony is entirely inadmissible.

Rule 801(d) provides that: "(A) statement is not hearsay if . . .  (2) The statement is offered against a party and is ... (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E).  Klasky's alleged confession to Twersky—who is not a co-conspirator in the charged scheme—was not "in furtherance" of any conspiracy, as Rule 801(d)(2)(E) requires.  The Ninth Circuit has emphasized that, in this Circuit, the "in furtherance" requirement for purported coconspirator statements is "strictly construed." *United States v. Nazemian*, 948 F.2d 522, 529 (9th Cir. 1991).  "To be 'in furtherance,' [of a conspiracy] the statements must **further the common objectives of the conspiracy**." *Id* (emphasis added).  The focus of the inquiry is whether the declarant intended for his statements to further the conspiracy.  *United States v. Moore*, 818 F. App'x 774, 776 (9th Cir. 2020).

Statements by a co-conspirator to a third party are not in furtherance of the conspiracy when the co-conspirator does not "intend to elicit cooperation or assist[ance] in achieving the objective of the conspiracy." *United States v. Williams*, No. CR-05-920-RSWL, 2008 WL 4644830, at *15 (C.D. Cal. Oct. 15, 2008) (*citing United States v. Foster*, 711 F.2d 871, 880 (9th Cir. 1983)).  As such, "narrative declarations," in which the conspirator merely describes the activities of the conspiracy to a third party, are inadmissible as co-conspirator statements.  *Nazemian*, 948 F.2d at 529.  Similarly, "[c]onfessions or admissions of a coconspirator, . . . are not admissible since they cannot meet the condition

. . . that the statements must further the common objectives of the conspiracy." *United States v. Fielding*, 645 F.2d 719, 725 (9th Cir. 1981) (*quoting United States v. Eubanks*, 591 F.2d 513, 519 (9th Cir. 1979)).

Accordingly, Klasky's statements are inadmissible as a co-conspirator statements. The statements themselves are "confessions or admissions" that describe Klasksy's past activities and explain his choice to engage in fraud.  At no point did Klasky seek to "elicit cooperation" from Twersky. *Williams*, 2008 WL 4644830, at *15.  Indeed, Twersky has informed the government that when he confronted Klasky, he told Klasky he was going to reveal what he learned to the authorities if Klasky did not.  Exh. 4, p. 3 ("I first called CK + confronted him. . . .  Gave CK + said 'I'm gonna tell them if you don't.'"); Exh. 1, p. 7 ("TWERSKY told KLASKY that he (KLASKY) needed to inform the United States Attorney's Office of what was happening at GET-THIN.").

Klasky himself has made clear that he had no intention to further the purported goals of the conspiracy when he spoke to Twersky about his misconduct.  Tr. 4793:19-4974:94:2 ("Q. So, Mr. Klasky, why did you feel comfortable sharing Book 3, which was a–the spreadsheet that you were using to falsify sleep study reports, with somebody like Melvin? A. I didn't want Larry to get into trouble . . . .  And I–I liked him, and didn't want him to get pulled into something that he doesn't realize what's going on."); Tr. 4797:16-20 ("And I talked with him about exactly what was going on . . . I said, 'You don't want to be a part of this.'  And I respect him, and he saw–you know, he saw what was underneath the cover-up and stuff.").

Thus, both Klasky's testimony at trial and Twersky's statements to the government demonstrate that Twersky's purported relevant knowledge[3] is all based on the inadmissible hearsay statements that Charles Klasky made to him.  Neither's Klasky's nor Twersky's motivations are sufficient to render Klasky's statement to Twersky an attempt to further the conspiracy.  Rather, Klasky's confession reflects an intent to help Twersky end the conspiracy.  Thus, Klasky's statements are inadmissible under Rule 801(d)(2)(E).

## III.   TWERSKY'S TESTIMONY ABOUT HIS OBSERVATIONS OF MR. OMIDI REVIEWING PATIENT CHARTS IS IRRELEVANT AND INADMISSIBLE.

The government also intends to have Twersky testify about his observation of Mr. Omidi during patient chart review meetings with WLC staff members.  This testimony is inadmissible because Twersky's personal knowledge of these meetings is limited to irrelevant, benign observations, and any relevant testimony he has to offer is based entirely on Klasky's inadmissible hearsay confession.

Twersky's actual observations of the patient chart meetings reflect no wrongdoing by Mr. Omidi whatsoever.  He merely saw Mr. Omidi giving instructions to WLC employees to check patient charts and make appropriate corrections to obtain insurance approvals.  *See* Ex. 2, p. 4 ("During these meetings, TWERSKY observed that J. OMIDI would review GET- THIN patient files and records, then bring in various GET-THIN employees and direct them to do things based on his review.  J. OMIDI would look at a rejection letter from an insurer regarding a patient's clearance for bariatric surgery, then

---

[3] Nearly all of Twersky's testimony addressing Mr. Omidi's role in the alleged scheme derives from Klasky's supposed confession. *See, e.g.*, Exh. 1, p. 9 ("[T]he portion related to JULIAN directing changes on SSRs and in changing patient heights and weights to make the patient qualify as morbidly obese through coded emails or handwritten notes was information TWERSKY learned from KLASKY at the time TWERSKY confronted him about the fraudulent SSRs."); Exh. 2, p. 3 ("Regarding the statement in TWERSKY's previously reviewed write-up detailing the fraudulent practices at GET-THIN (marked as Page 4) that stated, 'Many times a sleep test was never even done, just a report created,' TWERSKY believed that KLASKY told him that information."), pp. 4-5 ("Klasky said that the Omidis were destroying or deleting the underlying raw data related to the sleep study tests.").

9

have that patient's file brought in.  Looking at the reports and paperwork regarding the patient, J. OMIDI would say to the GET-THIN employee, 'No, check the height and weight on this person, this looks wrong.'  Or J. OMIDI would say, 'Check the height on this one,' or 'Check the sleep study on this one.'"); Exh. 3, p. 3 ("People came in to the meeting room to correct files.  JO would tell these people what needed to be changed or fixed.  TWERSKY believes the files were for patients because they discussed coding like CPT codes [Current Procedural Terminology], billing, and resubmitting.  TWERSKY believes they would say this was denied about a procedure or something like that. JO would tell them what they needed to do to correct it.").

Twersky also observed Mr. Omidi placing post-it notes on patient charts, but he had no understanding of what the notes meant.  Exh. 2, p. 4 ("TWERSKY observed J. OMIDI writing Post-It notes and placing the Post-It notes on various pages of the patient files.  The notes were sometimes coded, with just a letter or letters, such as 'S', 'H', and/or 'W'.  At the time, TWERSKY did not understand what these codes meant, and he was not really focused in on what he was observing.").  The bottom line is that, although Twersky claims to have witnessed many patient chart review meetings involving Mr. Omidi, he lacks any personal knowledge of Mr. Omidi ever giving an instruction to commit fraud.  Exh. 4, p. 5 ("Saw instructions going out but didn't understand at time.").

Because Twersky's personal knowledge concerning the patient chart meetings and the post-it notes is entirely benign, any testimony he offers on these subjects will be irrelevant and inadmissible.  Fed. R. Evid. 402.  It would also be cumulative in light of the extensive testimony the government has already elicited concerning the patient chart review meetings.

The government apparently recognizes this, because it does not intend to limit its questioning of Twersky to his personal knowledge of the review meetings.  Rather, the government will elicit testimony from Twersky that he is *now* of the opinion that his observations are evidence of fraud.  Twersky himself admits that his opinion is hindsight based entirely on what he says he learned during Klasky's confession.  Exh. 5, p. 1 ("Color

**DEFENDANT JULIAN OMIDI'S TRIAL MEMORANDUM REGARDING INADMISSIBLE TESTIMONY FROM LARRY TWERSKY**

coded messages . . . see stick it post it notes; check weight, check BMI as a cue and then walk away and handle; saw the change w/a different #; <u>hindsight</u>") (emphasis added); Exh. 1, p. 9 ("[T]he portion related to JULIAN directing changes on SSRs and in changing patient heights and weights to make the patient qualify as morbidly obese through coded emails or handwritten notes was information TWERSKY learned from KLASKY at the time TWERSKY confronted him about the fraudulent SSRs. . . . TWERSKY himself observed JULIAN reviewing 'lots' of SSRs and JULIAN was always making notes on documents or putting sticky notes on documents, but TWERSKY did not know specifically what JULIAN wrote on any particular document or note.").

Any such testimony from Twersky should be excluded because it clearly is not derived from his personal knowledge, but instead simply repackages Klasky's inadmissible alleged hearsay statements. *United States v. Freeman*, 498 F.3d 893, 904 (9th Cir. 2007) ("If Shin relied upon or conveyed hearsay evidence when testifying as a lay witness or if Shin based his lay testimony on matters not within his personal knowledge, he exceeded the bounds of properly admissible testimony."); *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1028 (9th Cir. 2001) ("It is not enough for a witness to tell all she knows; she must know all she tells.").

For example, in *United States v. Freeman*, a government witness testified that he understood the benign statement "I'm going to bring that to you at 1:00 p.m. tomorrow" to mean that a defendant would bring money owed for cocaine, but his understanding was based solely on inadmissible hearsay. 498 F.3d 893, 904 (9th Cir. 2007). The Ninth Circuit held that the testimony was inadmissible. *Id.* Twersky's account of the patient chart meetings suffers from the same defect as the inadmissible testimony in *Freeman*. His hindsight about what he saw the patient chart meetings derives entirely from Klasky's hearsay statements, and for that reason it is inadmissible.

IV.   **TWERSKY'S "ENVELOPE DOCUMENTS," AND ANY TESTIMONY RELATED TO THEM, ARE IRRELEVANT AND INADMISSIBLE AS A "PRIOR CONSISTENT STATEMENT" BECAUSE TWERSKY PREPARED THE ENVELOPE AFTER HE DEVELOPED A MOTIVE TO FABRICATE.**

The government has represented that it intends to offer the documents in Twersky's envelope as a prior consistent statement.  Exh. 7 (envelope documents); Exh. 8 (describing the evidentiary basis for Exh. 7).  Because Twersky prepared the envelope well after he developed a motive to fabricate, the government should not be permitted to introduce it as a prior consistent statement, nor should Twersky be permitted to testify about its contents or how he created it.  Under Federal Rule of Evidence 801(d)(1)(B), a statement is not hearsay when it is "consistent with the declarant's testimony" and is offered "to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying."  The Supreme Court has explained that "the Rule permits the introduction of a declarant's consistent out-of-court statements to rebut a charge of recent fabrication or improper influence or motive only when those statements were made before the charged fabrication, influence, or motive."  *Tome v. United States*, 513 U.S. 150, 167 (1995); *see also United States v. Lynch*, 903 F.3d 1061, 1070 (9th Cir. 2018) ("To be a prior consistent statement, a statement must occur before a motivation to fabricate arises.").

Here, the statements in Twersky's envelope were made after Twersky developed a motive to fabricate.  In several of the documents, Twersky claims that the falsification of patient information was being done "at the instruction of Julian, Michael and Cindy Omidi," that "Julian would direct people with codes in emails" to change sleep apnea diagnoses or patient heights and weights, and that Mr. Omidi "is at the heart of the whole scam."  Exh. 7, pp. 4, 40.  The envelope also includes several example sleep studies, an example of the sleep study template Klasky used, and snapshots of Klasky's falsification spreadsheet.  Exh. 7, pp. 6-39.  The statements in the envelope are inherently unreliable, and inadmissible under Rule 801(d)(1)(B), for two reasons: 1) Twersky's account of when and why he made

the statements is highly suspect; and 2) even in Twersky's version of events, he was incentivized to lie when he prepared the envelope documents.

As an initial matter, Twersky's account of creating the envelope in early 2012–purportedly to alert authorities about a fraud that he "discovered"–is not credible. Twersky never alerted anyone to fraud, and didn't even remember that he had created such an envelope in his first interview with government agents.[4] Moreover, Twersky appears to have personally authored all of the statements in the envelope that inculpate Mr. Omidi, based entirely on his inadmissible account of Klasky's hearsay confession. In light of these glaring issues, the far more likely story is that Twersky compiled the envelope after he realized he may be implicated in Klasky's fraud, and that his motive was to protect himself by pointing the finger at Mr. Omidi.

But even accepting Twersky's claim that he learned of Klasky's fraud sometime in early 2012 and then collected documents and sealed them in an envelope in March 2012, the envelope still does not satisfy the premotive requirement. In February 2012, when he was still on good terms with Mr. Omidi, Twersky already knew of the federal criminal investigation into the WLC sleep study program, with which he had been deeply involved for several months. Exh. 9 ("Questions for the Board: . . . Contingency plans if on the off chance anything is found in the investigation or lawsuits"). And before he prepared his envelope in March 2012, Twersky knew that his employee, Melvin Benhamou, had helped Klasky falsify sleep study reports. Exh. 1, p. 6 ("To help alleviate the backlog, TWERSKY sent one of his employees, MELVIN [BENHAMOU], to assist KLASKY in finalizing the SSRs. . . . MELVIN showed TWERSKY that he was taking results from what TWERSKY believed were properly scored SSRs, and inputting those numbers into an Excel spreadsheet that created new, higher numbers which were then placed into the finalized SSRs.").

---

[4] In this initial interview, Twersky did not even <u>mention</u> that he was aware of any fraud at WLC. *See generally* Exh. 10, 5/19/2016 Interview Report.

**DEFENDANT JULIAN OMIDI'S TRIAL MEMORANDUM REGARDING INADMISSIBLE TESTIMONY FROM LARRY TWERSKY**

CASE NO. 17-00661 (A) - DMG

1    Twersky's concerns about the criminal investigation, which undoubtedly were
2    amplified by the issuance of the grand jury subpoenas[5], gave him a clear motive to fabricate
3    a story that absolved him of responsibility and blamed Mr. Omidi.   And this motive
4    definitely arose before Twersky collected the documents for his envelope, even on his own
5    dubious account of the timeline.   Thus, the envelope documents cannot be used to rebut Mr.
6    Omidi's contention that Twersky's testimony is a fabrication.   *United States v. Holden*, 625
7    F. App'x 316, 318 (9th Cir. 2014) ("The statements were not 'prior consistent statements'
8    because they were made after [the declarant] knew about the investigation and had a motive
9    to testify falsely.").   For the same reason, Twersky should not be permitted to testify about
10   the contents of his envelope or about the circumstances of its creation.

11   ## V.   ANY TESTIMONY BY TWERSKY ABOUT MR. OMIDI'S RELATIONSHIP WITH ARA SALAZAR IS IRRELEVANT, SPECULATIVE, AND PREJUDICIAL.

13   Twersky should not be permitted to offer speculation that Mr. Omidi was in an
14   "on/off" relationship with Ara Salazar.   First, Twersky lacks foundation for such a belief–
15   he has no first-hand knowledge, and indeed he could not have first-hand knowledge because
16   his speculation is false.   Mr. Omidi was never in a relationship with Ara Salazar.   Moreover,
17   it is irrelevant–the nature of any relationship between Mr. Omidi and Ms. Salazar has no
18   bearing on any of the genuine issues at trial.   Finally, even assuming relevance, the
19   probative value of such testimony would be miniscule, and far outweighed by the danger of
20   unfair prejudice.   Fed. R. Evid. 403; *United States v. Lawrence*, 189 F.3d 838, 843 (9th Cir.
21   1999) (holding that admission of testimony concerning a defendant's marriage in a mail
22   fraud prosecution was reversible error because "[a]ny relevance this testimony may have
23   had is easily outweighed by the unfair prejudicial effect it had on the jury's ability to focus
24   on the issues relevant to the charges").   Whether or not Mr. Omidi had a relationship with
25   Ms. Salazar has no bearing on the fraud and money laundering charges in the indictment,
26   but such "lifestyle" evidence may irreparably damage the jury's perception of him.   *Id.*

---

[5] The government began serving grand jury subpoenas in February 2012.

("The improperly admitted testimony delivered a fatal blow to [the defendant]'s credibility, infecting the jury's ability to make an unbiased assessment of it."). Twersky should not be permitted to inject his prejudicial speculation about Mr. Omidi and Ms. Salazar into the trial.

## VI.   TWERSKY'S TESTIMONY ALLEGING THAT HE WAS "THREATENED" BY BRIAN OXMAN AND KONRAD TROPE IS INADMISSIBLE BECAUSE THERE IS INSUFFICIENT FOUNDATION THAT TROPE AND OXMAN'S STATEMENTS WERE AUTHORIZED BY MR. OMIDI.

Finally, the Court should preclude Twersky from testifying about an alleged discussion with Brian Oxman and Konrad Trope. Twersky claims that he spoke with both of them outside of Mr. Omidi's presence and was threatened to "keep quiet" about his alleged discovery of fraud. Exh. 2, p. 2 ("Only OXMAN and TWERSKY were in attendance. During the meeting, OXMAN tried to threaten and bully TWERSKY into not saying anything about the fraud he had uncovered at GET THIN. . . . Following his meeting with OXMAN, TWERSKY got a call from KONRAD TROPE who reiterated OXMAN's threats about keeping quiet.").

As an initial matter, Twersky has made clear in his interviews with the government that any threats he claims to have heard were not literal threats but rather "threats" he understood as regarding unspecified legal responses. Exh. 2, p. 2 ("OXMAN's threats were more related to OXMAN acting like a lawyer, and saying the information TWERSKY had learned was proprietary information. . . . TWERSKY had signed a confidentiality agreement when he first started working with the OMIDI enterprise and it was related to potential violations of this agreement that he was being threatened by TROPE."). Regardless, any threats by Oxman and Trope are inadmissible against Mr. Omidi as party admissions because the government cannot lay a foundation that Mr. Omidi authorized Oxman or Trope to make any threats against Twersky. Under Federal Rule of Evidence 801(d)(2)(D), a statement is not hearsay if it is "offered against a party and is . . . a statement by the party's agent or servant concerning a matter within the scope of the agency or

employment, made during the existence of the relationship." The proponent bears the burden of laying the appropriate foundation for such a statement. *City of Long Beach v. Standard Oil Co. of California*, 46 F.3d 929, 937 (1995). "The contents of the hearsay statements are not alone sufficient to establish that the hearsay declarant was an agent of a party-opponent or that the declaration was within the scope of the agency." *Los Angeles News Serv. v. CBS Broad., Inc.*, 305 F.3d 924, 934 (9th Cir.), *opinion amended on denial of reh'g*, 313 F.3d 1093 (9th Cir. 2002).

In *Los Angeles News Serv. v. CBS Broad., Inc.*, the plaintiff sought to introduce out-of-court statements by an editor of one defendant and a lawyer of another defendant. 305 F.3d 924, 934 (9th Cir.), *opinion amended on denial of reh'g*, 313 F.3d 1093 (9th Cir. 2002). For both declarants, the only evidence establishing the scope of their agency was their own hearsay declarations. *Id*. The Ninth Circuit explained that even if agency relationships existed between the defendants and the declarants, the declarants' statements lacked adequate foundation as admissions under Rule 801. *Id*.

Here too, the government can point to no evidence, other than hearsay statements relayed by Twersky, that could support a finding that Mr. Omidi authorized Oxman or Trope to make alleged threatening statements to Twersky in response to hearing about such a discovery. There is simply no other evidence that supports Twersky's account that he was threatened at all, let alone that these threats were authorized by Mr. Omidi. Importantly, at the time of this alleged meeting, Twersky and Mr. Omidi were engaged in extended discussions about the ownership of 1-800-SNORING and other potential contractual matters. Exh. 11, 10/28/2011 Interview Notes, p. 2 ("They were holding all the $ + we were trying to get Johnson paid + the rest of the team. Bedspreads and other stuff so we can properly close the business."). Even assuming Mr. Omidi authorized Oxman and Trope to speak with Twersky, there is no evidence that Mr. Omidi had any awareness of what Twersky claims was the ultimate subject matter of the meeting, and Mr. Omidi had every reason to believe that there were several live subjects for discussion having nothing to do with Klasky's alleged confession to Twersky. Under these circumstances, it would be

improper to assume, without foundation, that the un-contextualized statements of Oxman and Trope, which Twersky claims he understood as threats related to the Klasky confession, were authorized agent statements by Mr. Omidi.  The government should not be permitted to bootstrap Twersky's unfounded claim into an admission by Mr. Omidi.

Even if Oxman and Trope's statements were non-hearsay, Rule 403 would bar their admission because they are minimally relevant and highly prejudicial.  *See Bigge v. Dist. Sch. Bd. of Citrus Cty., Fla.*, No. 5:13-CV-49-OC-10PRL, 2015 WL 1138472, at *8 (M.D. Fla. Mar. 13, 2015) ("[T]o the extent these [attorney statements] could arguably be shown to fall within a hearsay exception, any probative value that could be attributed to them would be far outweighed by their potential prejudice, again rendering them inadmissible at trial."); *DataTreasury Corp. v. Wells Fargo & Co.*, No. 2:06-CV-72 DF, 2010 WL 11538713, at *34 (E.D. Tex. Feb. 26, 2010) (provisionally granting motion *in limine* to exclude a letter prepared by counsel based on Rule 403 because it was minimally relevant).

In *Bigge v. Dist. Sch. Bd. of Citrus Cty., Fla.*, a plaintiff pursuing a retaliation claim against a school board sought to introduce statements by the school board's attorney regarding how certain emails by school officials would be interpreted by a jury, purportedly to demonstrate that the board directed the officials to hire a private attorney and send a cease and desist letter.  2015 WL 1138472, at *8 (M.D. Fla. Mar. 13, 2015).  The court excluded the statements, even assuming the plaintiff could prove they were otherwise admissible, because their slight probative value was far outweighed by the prejudice that would result if the attorney's views on how a jury would receive evidence were admitted.

In *DataTreasury Corp. v. Wells Fargo & Co.*, the plaintiff sought to introduce a letter opinion from the defendant's counsel concerning the validity of a patent, which the plaintiff claimed was relevant to its infringement claim.  2010 WL 11538713, at *34 (E.D. Tex. Feb. 26, 2010).  The defendant claimed that the letter was not probative because it was actually about the likely outcome of a jury trial as the case stood five years prior, and it provided no basis for its conclusion.  *Id.*  The court provisionally excluded the attorney letter under Rule 403.

Here too, the statements at issue are highly attenuated from relevant issues, and any probative value is far outweighed by the risk of prejudice. Twersky's claim is that he was threatened by Oxman or Trope in response to "the fraud he had uncovered," but he never actually details what he said to them, what corroboration he provided to them regarding his supposed discovery, or what he told them he planned to do. Without more, it is impossible to know what exactly Oxman or Trope were allegedly reacting to, even assuming that they responded with threats. As such, Twersky's story is irrelevant to the charges against Mr. Omidi. By contrast, the mere invocation of a "threat" made on behalf of Mr. Omidi is sure to prejudice the jury against him. The Court should preclude Twersky from testifying about these alleged threats pursuant to Rule 403. Indeed, the Court has already permitted the government to admit one highly inflammatory statement purportedly made by Mr. Oxman. We understand and accept the Court's ruling as to the prior Oxman statement, but at some point, and we submit this is the point, the government's attempts to introduce stray inflammatory statements purportedly made by Oxman raise real due process concerns–this is the trial of Julian Omidi, not Brian Oxman. We are approaching the third month of the trial, which has already featured over two dozen Government witnesses–the government should not have to introduce statements of dubious context and admissibility made by others against Mr. Omidi. The sheer volume of the other evidence that the government has already introduced and further intends to introduce underscores the grave Rule 403 concerns raised by this evidence.

Given all of these factors, the Court should preclude Twersky from testifying about these alleged threats.

## VII.   CONCLUSION

For the foregoing reasons, the Court should preclude the government from 1) eliciting testimony from Twersky regarding Charles Klasky's hearsay confession; 2) eliciting irrelevant testimony from Twersky regarding his observation of patient chart review meetings or hindsight testimony from Twersky about his current opinion of those meetings;

3) offering Twersky's envelope as a prior consistent statement or eliciting testimony from Twersky regarding the envelope's contents and/or its preparation; 4) eliciting testimony from Twersky regarding his speculation about a relationship between Ara Salazar and Mr. Omidi; and 5) eliciting testimony regarding Twersky's account of the discussions between him and Brian Oxman and Konrad Trope.

Dated:  November 14, 2021

Respectfully submitted,

**WILLKIE FARR & GALLAGHER LLP**

By:  s/ Randall W. Jackson
MICHAEL S. SCHACHTER
RANDALL W. JACKSON
CASEY E. DONNELLY
SIMONA AGNOLUCCI

ATTORNEYS FOR DEFENDANT
JULIAN OMIDI

**DEFENDANT JULIAN OMIDI'S TRIAL MEMORANDUM REGARDING INADMISSIBLE TESTMONY FROM LARRY TWERSKY**

CASE NO. 17-00661 (A) - DMG