TRACY L. WILKISON
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
KRISTEN A. WILLIAMS (Cal. Bar No. 263594)
Deputy Chief, Major Frauds Section
ALI MOGHADDAS (Cal. Bar No. 305654)
DAVID H. CHAO (Cal. Bar No. 273953)
DAVID C. LACHMAN (Cal. Bar No. 261711)
Assistant United States Attorneys
Major Frauds/General Crimes Sections
     1100 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-2400
     Facsimile: (213) 894-6269
     E-mail:    Kristen.Williams@usdoj.gov
                Ali.Moghaddas@usdoj.gov
                David.Chao@usdoj.gov
                David.Lachman@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## UNITED STATES DISTRICT COURT

### FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 17-661(A)-DMG |
| Plaintiff, | GOVERNMENT'S OPPOSITION TO DEFENDANT JULIAN OMIDI'S TRIAL MEMORANDUM REGARDING TESTIMONY FROM LARRY TWERSKY; DECLARATION OF DAVID H. CHAO & EXHIBITS THERETO |
| v. | |
| JULIAN OMIDI, | Hearing Date: November 17, 2021 |
|   aka "Combiz Omidi," | Time:         8:45AM |
|   aka "Combiz Julian Omidi," | Location:     Courtroom of the |
|   aka "Kambiz Omidi," |               Hon. Dolly M. Gee |
|   aka "Kambiz Beniamia Omidi," | |
|   aka "Ben Omidi," | |
| SURGERY CENTER MANAGEMENT, LLC, | |
| and | |
| MIRALI ZARRABI, M.D., | |
|   aka "Mirali Akba Ghandchi Zarrabi," | |
|   aka "M.A. Ghandchi Zarrabi," | |
| Defendants. | |

Plaintiff United States of America, by and through its counsel

of record, the Acting United States Attorney for the Central District

1  of California and Assistant United States Attorneys Kristen A.

2  Williams, Ali Moghaddas, David H. Chao, and David C. Lachman, hereby

3  files its Opposition to defendant Julian Omidi's trial memorandum

4  regarding the testimony from Larry Twersky.

5      This Opposition is based upon the attached memorandum of points

6  and authorities, the attached declaration of David H. Chao and

7  exhibits thereto, the files and records in this case, and such

8  further evidence and argument as the Court may permit.

9  Dated: November 16, 2021          Respectfully submitted,

10                                   TRACY L. WILKISON
                                     Acting United States Attorney
11
                                     SCOTT M. GARRINGER
12                                   Assistant United States Attorney
                                     Chief, Criminal Division
13

14                                        /s/
                                     _____
15                                   KRISTEN A. WILLIAMS
                                     ALI MOGHADDAS
16                                   DAVID H. CHAO
                                     DAVID C. LACHMAN
17                                   Assistant United States Attorneys

18                                   Attorneys for Plaintiff
                                     UNITED STATES OF AMERICA

19

20

21

22

23

24

25

26

27

28

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.    INTRODUCTION

3    More than a year ago, in September 2020, the government

4    disclosed its intention to call Larry Twersky ("Twersky") as a

5    witness in its case-in-chief.  (See Declaration of David H. Chao

6    ("Chao Decl.") ¶ 2.)  Long before that, the government produced to

7    the defense reports of interviews with Twersky that disclosed his

8    knowledge regarding the matters that are the subject of the instant

9    motion.  Despite this ample notice, defendant JULIAN OMIDI ("OMIDI")

10   did not file any motion in limine but waited until the weekend before

11   Twersky's anticipated testimony to move to preclude it.  In

12   particular, OMIDI moves to exclude the following testimony from

13   Twersky regarding:

14   - Charles Klasky's ("Klasky") description of the fraud

15     scheme to Twersky in early 2012 and the subsequent threats

16     Twersky received from individuals working with OMIDI and

17     Get Thin;

18   - Twersky's observations of OMIDI's review of patient files;

19     and

20   - Twersky's contemporaneous collection of documents and

21     information related to the fraud

22   This testimony is relevant and highly probative of OMIDI's

23   intent.  It is also not inadmissible hearsay.  Accordingly, OMIDI's

24   motion should be denied.

## II.   ARGUMENT

### A.   KLASKY'S DESCRIPTION OF THE FRAUD SCHEME TO TWERSKY IS ADMISSIBLE NON-HEARSAY

In February 2012, when Twersky confronted Charles Klasky regarding the alteration of sleep study results, Klasky acknowledged the fraud in the sleep study program and told Twersky about OMIDI's role in directing the fraud.  (Motion to preclude ("Mot."), Ex. 1, 6/5/2016 Interview Report, p. 7.)  Klasky has already testified regarding these statements to Twersky in February 2012 during both his direct and cross-examinations.  (RT 4797, 5715-18.)  Klasky has also testified that OMIDI knew that Twersky had found out about the sleep study fraud and that OMIDI was upset with Klasky over that discovery.  (RT 4797-98.)

OMIDI now seeks to exclude Twersky's testimony regarding this conversation with Klasky and its aftermath (discussed below in Section II.B).  OMIDI's argument that Klasky's statements to Twersky do not qualify as co-conspirator statements under Rule 801(d)(2)(E) of the Federal Rules of Evidence, however, is inapposite, because the government does not offer the testimony under the co-conspirator exception.  Rather, Klasky's statements to Twersky are admissible non-hearsay because they are both prior consistent statements pursuant to Rule 801(d)(1)(B), and statements made by a party opponent's agent or employee on matters within the scope of that relationship and while it existed, pursuant to Rule 801(d)(2)(D).

### 1.   Klasky's Prior Consistent Statements Are Admissible Non-Hearsay

A declarant's prior statement is not hearsay if: (1) the declarant testifies and is subject to cross-examination about a prior

2

statement; (2) the prior statement is consistent with the declarant's testimony; and (3) the prior statement is offered to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying or to rehabilitate the declarant's credibility as a witness when attacked on another ground. Fed. R. Evid. 801(d)(1)(B). Prior consistent statements may be introduced through another witness so long as the declarant has been subject to cross examination at some point during trial. See, e.g., United States v. Allen, 579 F.2d 531, 532 (9th Cir. 1978) (prior consistent statements of a declarant may be elicited from the person to whom statement was made under Rule 801(d)(1)(B)); United States v. Stuart, 718 F.2d 931, 935 (9th Cir. 1983)(same); United States v. Montague, 958 F.2d 1094, 1099 (D.C. Cir. 1992) (collecting circuit cases); 30B Michael H. Graham, FEDERAL PRACTICE AND PROCEDURE, § 7012 at 135 (2000) ("Where admissible, the prior consistent statement may be testified to by either the witness himself or any other person with personal knowledge of the statement.").

During trial, Klasky testified on direct examination that OMIDI directed him to falsify sleep study reports. (See, e.g., RT 4614:8-16; 4755-4756.) On cross-examination, OMIDI's counsel sharply accused Klasky of recent fabrication, improper influence, and having a motive to lie. For example, OMIDI's counsel asked questions suggesting that, because of the Brianne Miley's whistleblower lawsuit and subpoenas served in connection with the government's criminal investigation into Get Thin, Klasky concocted a story implicating OMIDI in the fraud. (RT 5575, 5599-5601; 5657-5668.) In doing so,

3

1    OMIDI levelled an express and implied charge that Klasky fabricated

2    his testimony and acted from an improper motive in so testifying.

3    Stuart, 718 F.2d at 934-35.

4         Against this backdrop, Twersky's testimony regarding Klasky's

5    prior consistent statement to him that OMIDI directed the

6    falsification of sleep study reports, is admissible evidence to rebut

7    the charge of Klasky's fabrication and improper motive.  Rule

8    801(d)(1)(B).  Klasky's prior consistent statement predates Miley's

9    unfiled complaint, dated June 2012, and the subpoenas in the criminal

10   investigation, which were served on or after February 28, 2012, that

11   provided the alleged basis for fabrication.  Moreover, Klasky

12   testified on direct and was subject to cross-examination regarding

13   his prior statement to Twersky, stating that he told Twersky "exactly

14   what was going on, same way with Sherwin" (RT 4797:3-20), and

15   "explained what was going on with the sleep study program and how we

16   were falsifying reports based on what Julian wanted to get approved .

17   . . for the lap band surgery" (RT 5715:20-5716:2).

18        Accordingly, Klasky's statements to Twersky are admissible as

19   prior consistent statements.

20             2.   Klasky's Statements Are Admissible as Agent Admissions

21        Klasky's statements are also admissible as party admissions

22   against both Surgery Center Management LLC ("SCM") and OMIDI.  A

23   statement is not hearsay if it is offered against a party and "was

24   made by the party's agent or employee on a matter within the scope of

25   that relationship and while it existed."  Rule 801(d)(2)(D).  The

26   Rule has three requirements for admitting a statement that would

27   otherwise be excluded as hearsay: "(1) the statement must be made by

28

                                    4

an agent or employee of the party against whom the statement is being offered; (2) the statement must concern a matter within the scope of that employment relationship; and (3) the statement must be made while the declarant is yet employed by the party." Weil v. Citizens Telecom Servs. Co., LLC, 922 F.3d 993, 999 (9th Cir. 2019).

Each of these requirements is satisfied here. First, there is ample evidence in the record that Klasky was an agent or employee of defendants OMIDI and SCM.[1] He was hired to work as the manager of the sleep study program, reported directly to OMIDI for all practical purposes, and "had to get Julian Omidi's approval for doing anything as related to the sleep study program." (RT 4537; Mot., Ex. 6 at 3 ("KLASKY was JULIAN's "front man" for the Sleep Study department at GET-THIN"; see also RT 81, 83, 4437-4438, 4442, 4446-4447, 4471-4472, 4481, 4521-4522.) Second, Klasky's statements to Twersky concerned the falsification of sleep study reports, which undoubtedly related to a matter within the scope of his employment as manager of the sleep study program. Third, Klasky's statement to Twersky were made in February 2012, while Klasky was still the manager of the Get Thin sleep study program.

That Klasky's statements pertain to, and implicate OMIDI in the direction of, a fraudulent scheme is no obstacle to their

---

[1] An agency relationship between a declarant employee and a defendant employer may be established by a variety of evidence, such as that the declarant answered directly to the defendant, see Zaken v. Boerer, 964 F.2d 1319, 1322-23 (2d Cir. 1992); that the declarant reported directly to the defendant, who owned the company, see United States v. Paxson, 861 F.2d 730, 734 (D.C. Cir. 1988); that the declarant was hired by the defendant and worked on matters in which the defendant actively involved, see United States v. Draiman, 784 F.2d 248, 256-57 (7th Cir. 1986); or that the defendant "directed [the declarant's] work on a continuing basis," Boren v. Sable, 887 F.2d 1032, 1041 (10th Cir.1989).

admissibility under Rule 801(d)(2)(D).  In <u>In re Sunset Bay Associates</u>, 944 F.2d 1503, 1519 (9th Cir. 1991), a Savings and Loan Association ("S&L") loan officer confessed to two third-party witnesses that his superior, the S&L's Chief Lending Officer, had instructed him to cover up the fraudulent diversion of funds from a loan account.  The Ninth Circuit held that the witnesses' testimony about the loan officer's statements implicating the Chief Lending Officer in the fraud was not hearsay with respect to the Chief Lending Officer, reasoning that "where an employee's superior has instructed the employee to act in furtherance of a fraudulent scheme, statements made by the employee relating to that scheme are admissible against the superior under Fed. R. Evid. 801(d)(2)(D)." <u>Id.</u> (citing <u>United States v. Gibson</u>, 690 F.2d 697, 701 (9th Cir. 1982)); <u>see also</u> <u>United States v. Riley</u>, 621 F.3d 312, 338 (3d Cir. 2010) (holding that "a statement of illegal activity can still be within the scope of employment and can be admissible under 801(d)(2(D)").  The Court further explained that whether the superior had authorized the statements at issue was of no relevance, because "the statements need only <u>concern</u> matters within the scope of the agency; they need not be made within the scope of the agency." <u>Id.</u> (emphasis in original); <u>see also</u> 6 Handbook of Fed. Evid. § 801:23 (9th ed. 2021) ("[A]ll that is required is that the statement concern a matter within the scope of the agency or employment, and that the agent or employee still be employed at the time of making the statement.")

Accordingly, Twersky's testimony about Klasky's statements regarding falsification of sleep study reports, and OMIDI's role in

directing the fraudulent scheme, are also admissible against both OMIDI and SCM as agent admissions.

### B. BRIAN OXMAN AND KONRAD TROPE'S THREATS AGAINST TWERSKY ARE ADMISSIBLE NON-HEARSAY AND HIGHLY PROBATIVE

As discussed above, OMIDI learned of Klasky's confession to Twersky shortly after it occurred.  Twersky is anticipated to testify that almost immediately after his meeting with Klasky, he started receiving a barrage of telephone calls from telephone numbers that Twersky recognized as belonging to Oxman and OMIDI.  Twersky did not answer the calls.  When Oxman finally got through to him, by calling from a phone number that Twersky did not recognize, Oxman told him that both Oxman and OMIDI wanted to meet with Twerksy together.  Twersky will state that he refused to meet with OMIDI, but agreed to meet one-on-one with Oxman.

Twersky will testify that he met with Oxman at a restaurant within a day or two of the phone call.  During the meeting, Oxman tried to intimidate Twersky into not saying anything about the fraud by making threats like "if you talk we will bury you" and "we'll blame this on you."  Oxman also said that the information Twersky had learned regarding the sleep studies was proprietary information.  Following the meeting, Twersky received a call from Trope, who repeated the threats to keep quiet, referencing potential violations of a confidentiality agreement that Twersky had signed.  Afterward, Twersky began taking steps to sever ties with Get Thin and terminated his assistant whom had been working with Klasky.

Twersky initially wanted to immediately report the fraud to authorities and spent approximately one month compiling Get Thin documents related to the fraud, as reflected in the preserved

7

envelope of materials.  (Mot., Ex. 7.)  But in the end, on the advice of counsel and others, Twersky decided to seal the documents in an envelope and provide it to his attorney for safekeeping.  When the FBI agents visited Twersky on May 19, 2016, he concluded the meeting by telling agents that "he believed that he had retained numerous documents from that time period and suggested that the interviewing agents allow him to refresh his memory regarding this time period and schedule another, more in depth interview in the near future." (Mot., Ex. 10 at 4.)  Thereafter, Twersky retrieved the still-sealed enveloped from his attorney and brought it to his next meeting with agents on June 5, 2016.  (Mot., Ex. 1 at 8.)

The threats leveled by OMIDI's agents against Twersky are admissible non-hearsay because they were not "statements" being offered for the truth, and in any event, they are admissions by a party opponent under Rule 801(d)(2)(D).  As discussed below, they are also highly probative of OMIDI's knowledge and consciousness of guilt.

        1.   The Threats Are Not Statements Offered for Their Truth

Preliminarily, the threats made by OMIDI's agents are not hearsay because they were not factual statements.  "Statements offered as evidence of commands or threats or rules directed to the witness, rather than for the truth of the matter asserted therein, are not hearsay."  United States v. Bellomo, 176 F.3d 580, 586 (2d Cir. 1999).  Rather, threats are akin to verbal acts, whose significance lie in the fact they were uttered.  United States v. Stratton, 779 F.2d 820, 830 (2d Cir. 1985).  Here, Oxman threatened Twersky that "if you talk we will bury you," "I'll ruin you," and

"we'll blame this on you."  (Mot., Ex. 2 at 3.)  Subsequently, Trope called Twersky and reiterated the threats about keeping quiet and referenced a confidentiality agreement Twersky had signed when he first started working with the Omidis.  (Id.)  These threats are not being offered for their truth – namely, as evidence that OMIDI and Oxman would in fact "bury" or "ruin" Twersky – but rather as highly probative evidence of OMIDI's knowledge and consciousness of guilt and his response to the discovery of the fraud.  Indeed, the Court has already ruled on an analogous issue when it admitted Klasky's testimony that Oxman threatened Klasky shortly before his 2016 meeting with the government.  (RT 4976:17-23.)

> 2.   The Threats Are Admissions by Agents of a Party Opponent

In the alternative, the threats against Twersky are admissible non-hearsay because they were made by SCM and OMIDI's agents on a matter within the scope of their agency relationship and while it existed.  Rule 801(d)(2)(D).  An agent is one who "act[s] on the principal's behalf and subject to the principal's control."  United States v. Bonds, 608 F.3d 495, 506 (9th Cir. 2010) (quoting Restatement (Third) Agency § 1.01).  "[O]ut-of-court statements may themselves be considered in determining the preliminary question, under Rule 801(d)(2)(D), of the scope of [the agent's] employment duties."  Hilao v. Est. of Marcos, 103 F.3d 767, 775 (9th Cir. 1996).  In deciding the preliminary question regarding agency, the court is not bound by evidence rules, except those on privilege.  Fed. R. Evid. 104(a).

Here, there is ample evidence that Oxman and Trope were agents of OMIDI at the time of the threats, including the following:

9

- At his initial appearance in this case in February 2018, OMIDI personally stated that Brian Oxman "has been representing me for seven years," was his "litigation coordinator" and "attorney assistant." (Dkt. 79 at 59, 65:12-13.)[2] OMIDI's then-counsel confirmed this. (Id. at 56:25-57:3 (Ms. Dean: "Mr. Oxman has actually been the litigation coordinator with regards to the criminal investigation as well as other litigation for many years – I believe back to 2008 or '9 or even '10."); id. at 57:9-11 (Dean: "Brian Oxman has been around the longest.").

- During the hearing, one topic of debate was the magistrate judge's decision to impose a pre-trial restriction limiting Oxman's contact with witnesses, based on factual findings that Oxman had engaged in improper contact with a juror in the related criminal case against OMIDI's mother. (See CR 13-739-SVW, Dkt. 274 at 10-12, 17 n.16.) In contesting that ruling, OMIDI personally argued that Oxman was essential because he had spoken to most of the witnesses in the instant criminal case and that witnesses "contact him all the time." (Dkt. 79 at 59:4-13, 60:2-6.) OMIDI underscored the importance of Oxman's role by stating "my whole defense here is talking to these witnesses and seeing what they know." (Id. at 59:14-15.)

- Oxman himself has testified under oath that he represented OMIDI on a personal basis beginning in 2010, receiving payments for that work from defendant SCM. (Dkt. 121,

---

[2] For convenience, relevant excerpts of this transcript at Dkt. 79 are attached as Exhibit A to the Chao Declaration.

10

Declaration of Alexander Wyman ("Wyman Decl."), Ex. A at 17:19-24.)  He also testified that he was retained to represent SCM in 2011 and became its "litigation coordinator" after he was disbarred in February 2012.  (Id. at 23:8-10, 28:23-29:10.)  He also testified he was a "litigation coordinator" for defendant SCM between 2010 and 2016 (Wyman Decl., Ex. B at 14:15-17, 15:1-2), as well as for a variety of other Get Thin-related individuals and entities, including OMIDI (id. at 15:21-23, 16:5-9).[3]

- Twersky would testify that between 2011-2012, he observed Oxman routinely meeting with OMIDI about a variety of matters relating to public relations, litigation, and similar issues.  During these conversations, OMIDI would instruct Oxman on how to handle such matters.  Twersky would also testify that he observed Trope serving as OMIDI's de facto general counsel at the time.

- Klasky has already testified at trial that Oxman worked very closely with OMIDI and was likely with OMIDI when he made similar threats to Klasky, who was about to meet with the government.  (RT 4974-4977.)

- The government anticipates that Jaffy Palacios, a Get Thin manager, will testify regarding Oxman's efforts to pressure him into testifying falsely before the grand jury in this investigation.

---

[3] For convenience, relevant excerpts of these transcripts attached to Dkt. 121 are attached as Exhibit B to the Chao Declaration

- Privilege logs produced by defendant Surgery Center
  Management LLC establish that both Oxman and Trope had a
  multitude of communications with OMIDI during, preceding,
  and after the month of February 2012. (Chao Decl. ¶ 5, Ex.
  C.)  Oxman typically participated in communications with
  OMIDI concerning matters implicating sensitive public
  relations or litigation concerns or risks, such as sexual
  harassment charges, whistleblower complaints and other
  litigation, press releases and radio ads, matters relating
  to the L.A. Times, and dealings with the City Attorney and
  Board of Supervisors (id. at 27, 36, 43, 45-46, 50, 57, 59-
  61, 63).  Trope participated in communications with OMIDI
  discussing contracts and dealings with personnel, doctors,
  and third parties, including Twersky (id. at 23, 29-30, 31
  (Email with Twerksy and OMIDI re: "Contract Request"), 32,
  36-38), organization policies and training (id. at 29, 30),
  as well as matters relating to public relations,
  investigations, and litigation (id. at 40, 42, 46-51, 54-
  63, 66).

- Invoices and financial records obtained from defendants
  show that Oxman and Trope (through his firm, Centurion Law
  Group, P.C.) were paid on a periodic basis by Get Thin for
  services performed around the time of the threats,
  including February 2012. (Chao Decl. ¶ 6, Ex. D).  Trope's
  invoice is addressed to SCM.

Based on the foregoing, there is more than a preponderance of evidence to establish that Oxman and Trope were agents of OMIDI and SCM at the time of the threats against Twersky.[4]

Nor is there any question that Oxman and Trope's threats concerned matters within the scope of their agency relationships. "Significantly, the statements need only concern matters within the scope of the agency; they need not be made within the scope of the agency." In re Sunset Bay Assocs., 944 F.2d 1503, 1519 (9th Cir. 1991). Contrary to OMIDI's view, "the rule does not require a showing that the statement is within the scope of the declarant's agency. Rather, it need only be shown that the statement be related to a matter within the scope of the agency." Hoptowit v. Ray, 682 F.2d 1237, 1262 (9th Cir. 1982), abrogated on other grounds by Sandin v. O'Connor, 515 U.S. 472 (1995). Thus, OMIDI's argument that there is no "foundation that Mr. Omidi authorized Oxman or Trope to make any threats against Twersky" is a strawman, because Rule 801(d)(2)(D) does not require such a showing. Here, the evidence makes clear that both Oxman and Trope's threats concerned matters within the scope of their agency. Oxman's agency encompassed diverse matters that implicated acute risks to OMIDI's public relations or exposure to liability. OMIDI himself admitted one of Oxman's roles was to speak with witnesses such as those in this criminal case. Trope's agency similarly encompassed matters relating to issues that implicated acute public relations concerns, as well as dealings and contracts

---

[4] Los Angeles News Serv. v. CBS Broad., Inc., 305 F.3d 924 (9th Cir. 2002), opinion amended on denial of reh'g, 313 F.3d 1093 (9th Cir. 2002), is distinguishable. Unlike in Los Angeles News Serv., where the sole evidence was agency was the out-of-court statement, here there is ample documentary and testimonial evidence supporting the agency relationship and the scope of the agency.

with personnel and third parties, which explains why Trope referenced a confidentiality agreement signed by Twersky in the course of making his threats.  Accordingly, Oxman and Trope's threats were squarely concerning matters within the scope of their agency and are admissible non-hearsay under Rule 801(d)(2)(D).

        3.   The High Probative Value of Twersky's Testimony Outweighs Any Risk of Unfair Prejudice

OMIDI's reliance on Rule 403 is also misplaced, as the relevance of the threats, leveled on the heels of OMIDI's realization that Twersky had learned of the fraud and OMIDI's repeated attempts to call Twersky, is highly probative to show OMIDI's consciousness of guilt.  See United States v. Begay, 567 F.3d 540, 552 (9th Cir. 2009) (finding evidence that defendant intimidated two government witnesses was admissible to show consciousness of guilt and noting that the "probative value outweighed any danger of unfair prejudice because the evidence also tended to explain why Clark and Lee delayed coming forward to investigators until they each had moved away from Greasewood"); United States v. Meling, 47 F.3d 1546, 1557 (9th Cir. 1995) (affirming district court's determination that an attempt to intimidate witnesses is admissible to show "consciousness of guilt-second only to a confession in terms of probative value").  Its probative value is further enhanced by the fact that it helps explain why Twersky did not immediately report the fraud to authorities, and instead preserved his findings in an envelope supplied to his attorney.  This significant probative value substantially outweighs any danger of unfair prejudice.  The exclusion of evidence under Rule 403 is an extraordinary remedy that is to be invoked only sparingly. See United States v. Patterson, 819 F.2d 1495, 1505 (9th Cir. 1987);

14

see also United States v. Dodds, 347 F.3d 893, 897 (11th Cir. 2003)

("[W]e have also recognized that Rule 403 is an extraordinary remedy

which the district court should invoke sparingly, and the balance . .

. should be struck in favor of admissibility." (internal quotation

marks omitted)).

Moreover, the mere fact that evidence tends to support a

defendant's guilt does not make it unfairly prejudicial.  As the

Ninth Circuit noted in United States v. Hankey, 203 F.3d 1160 (9th

Cir. 2000):

> Relevant evidence is inherently prejudicial; but
> it is only unfair prejudice, substantially
> outweighing probative value, which permits
> exclusion of relevant matter under Rule 403.
> Unless trials are to be conducted as scenarios,
> or unreal facts tailored and sanitized for the
> occasion, the application of Rule 403 must be
> cautious and sparing. Its major function is
> limited to excluding matter of scant or
> cumulative probative force, dragged in by the
> heels for the sake of its prejudicial effect.

Id. at 1172 (quoting United States v. Mills, 704 F.2d 1553, 1559

(11th Cir. 1983)); see also United States v. Bailleaux, 685 F.2d

1105, 1111 (9th Cir. 1982) ("All evidence which tends to establish

the guilt of a defendant is, in one sense, prejudicial to that

defendant, but that does not mean that such evidence should be

excluded."), modified on other grounds by Huddleston v. United

States, 485 U.S. 681 (1988).[5]

---

[5] The two unreported district court cases cited by the defense
in support of their Rule 403 argument — Bigge v. Dist. Sch. Bd. of
Citrus Cty., Fla., No. 5:13-CV-49-OC-10PRL, 2015 WL 1138472, at *8
(M.D. Fla. Mar. 13, 2015) and DataTreasury Corp. v. Wells Fargo &
Co., No. 2:06-CV-72 DF, 2010 WL 11538713 (E.D. Tex. Feb. 26, 2010) —
are inapposite. The statements at issue in both of those cases
concern attorney assessments of litigation strategy, not threats to a
witness immediately after his discovery of evidence of a fraudulent
scheme.

### C.  TWERSKY'S PERCIPIENT OBSERVATIONS ARE RELEVANT AND ADMISSIBLE

From at least August 2011 until January 2012, Twersky met with OMIDI on a regular basis, sometimes as frequently as three times a week.  During this period, he participated in approximately 20-25 lengthy, disjointed meetings held in a conference room at Get Thin's 9100 Wilshire Boulevard headquarters.  During these meetings, Twersky observed OMIDI reviewing patient charts and interacting with Get Thin employees regarding those charts.  Specifically, Twersky will testify that during the course of those meetings he observed:

- OMIDI reviewing stacks of patient charts;
- OMIDI making annotations in the charts, including by writing on Post-It Notes and then placing those Post-It Notes either on the medical record itself or on the front of the patient chart;
- OMIDI organizing the patient charts into stacks, summoning Sherwin Hong, Jaffy Palacios, and Ara Salazar, and then providing each of them with a separate stack of charts containing his notes and other instructions;
- OMIDI providing patient charts to Hong that included Post-It Notes concerning sleep study reports;
- Hong delivering stacks of patient charts to OMIDI; and
- OMIDI reviewing the charts he received from Hong, and then removing sleep study reports and Post-It Notes from those charts and discarding them in the trash.

(See, e.g., Mot., Ex. 2 at 3-4; Ex. 3 at 3; Ex. 4 at 1-3.)

The Court should reject OMIDI's last-ditch attempt to exclude the percipient testimony of Twersky.  Like any other lay witness,

16

1    Twersky may offer testimony to the extent that it is rationally based

2    on his perceptions, helpful to the trier of fact, and not based on

3    the specialized knowledge governed by Rule 702.  Fed. R. Evid. 701.

4    Contrary to OMIDI's claim, Twersky's testimony is directly relevant

5    to corroborate Hong and Klasky's accounts of how they routinely

6    received instructions from OMIDI to alter sleep study reports via

7    Post-It Notes placed in the patient charts, and how OMIDI

8    subsequently destroyed the Post-It Notes to obscure his role in

9    directing the fraud.

10         Twersky's testimony is also relevant to rebut the defense's

11   repeated attempts to disprove or minimize the existence of the

12   manager meetings in which OMIDI provided instructions to Mr. Hong,

13   Mr. Klasky, and others.  For example, OMIDI's counsel attempted to

14   impeach Mr. Hong by suggesting that he had only attended one meeting

15   in which OMIDI was reviewing patient charts with other Get Thin

16   managers.  (RT 4197-4200.)  Similarly, OMIDI's counsel vigorously

17   cross-examined Mr. Klasky regarding these "case review" meetings,

18   attempting to call into question whether other individuals would have

19   witnessed OMIDI giving instructions.  (RT 5748-5756.)  OMIDI's

20   attempts to challenge the very existence of these meetings, and his

21   central role in them, underscores the relevance of Twersky's

22   testimony.

23         OMIDI argues Twersky's anticipated testimony that, after

24   learning of the fraud, he realized that OMIDI was instructing Klasky

25   to falsify the sleep study reports through his Post-It notes is

26   improper hindsight "opinion"; however, the government does not plan

27   to elicit any such opinion testimony.  Rather, the government plans

28
                                    17

to elicit direct testimony about what Klasky told him during their February 2012 conversation, which as discussed above in Section II.A is admissible non-hearsay as both a prior consistent statement of Klasky's and an agent admission.

For the foregoing reasons, Twersky's testimony is based on his percipient knowledge, and is both relevant and admissible.

### D.   TWERSKY'S ENVELOPE DOCUMENTS MAY WELL BE ADMISSIBLE AS PRIOR CONSISTENT STATEMENTS

OMIDI's attempt to preclude Twersky's preserved envelope of document is both premature and misguided.  As an initial matter, as the government made clear in the meet-and-confer process, it does not intend to offer this evidence during Twersky's direct examination. With respect to redirect examination, the basis for admission of the evidence, as prior consistent statements or for some other purpose, may well depend on how OMIDI cross-examines Twersky, including whether and when OMIDI accuses Twersky of fabricating testimony.  But it remains ambiguous how cross-examination will unfold because OMIDI equivocates between asserting that Twersky fabricated his account in 2012 (Mot. at 13-14) versus in 2016 (Mot. at 3-4.)  Therefore, the Court should reserve ruling on this issue until after OMIDI's cross-examination of Twersky.

Assuming arguendo that OMIDI accuses Twersky of fabricating his testimony, OMIDI's allegation that Twersky was motivated to fabricate -- at any time -- is pure speculation and defies common sense.  See, e.g., United States v. Payne, 944 F.2d 1458, 1472 (9th Cir. 1991) (finding prior consistent statement properly admitted where the declarant's "motive to fabricate was largely speculative").  OMIDI asserts that "Twersky compiled the envelope after he realized he may

18

be implicated in Klasky's fraud, and that his motive was to protect himself by pointing the finger at Mr. Omidi." (Mot. at 13.) As an initial matter, Twersky had no impetus to protect himself in March 2012 because he did not believe he was the target of any investigation or lawsuit, nor was he aware of any investigation or lawsuit regarding the sleep study program. Twersky was only aware of an investigation into the deaths of several Get Thin patients, which did not implicate him. OMIDI's naked assertion that Twersky had knowledge of any criminal investigation or grand jury subpoenas is simply untrue. Given that Twersky had no exposure in the first place, it is not surprising that he does not attempt to "absolve" himself of responsibility, contrary to OMIDI's claim. (Mot. at 14.) A review of the contents of the envelope demonstrate that Twersky evinced no motivation to protect himself. In the 104 pages of documents preserved in the envelope, there is not a single statement that seeks to exculpate Twersky or minimize his role. On the contrary, as the document itself shows, Twersky would testify that he initially intended to send the document to law enforcement authorities, the obvious effect of which would be to call more attention to his activities with Get Thin. (Mot. Ex. 7 at 2.) Moreover, the suggestion that Twersky sought to protect himself by identifying OMIDI makes no sense; if Twersky had any exposure for his engagement with the sleep study program, his liability would remain the same whether or not he identified OMIDI as the leader. For these reasons, to the extent the government does elect to offer the materials in the envelope as prior consistent statements for the truth of the matters asserted therein, OMIDI cannot demonstrate any

motivation to fabricate that would preclude the admission of such evidence.[6]

**III.  CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Court deny the Motion.

---

[6] As it made clear in its meet-and-confer email, the government does not intend to elicit testimony from Twersky regarding any relationship between OMIDI and Ara Salazar.  Accordingly, OMIDI's arguments on this point are moot.

20

1

## DECLARATION OF DAVID H. CHAO

2      I, David H. Chao, state and declare as follows:

3      1.   I am an Assistant United States Attorney ("AUSA") for the

4  Central District of California and am one of the attorneys assigned

5  to the prosecution of United States v. Julian Omidi, et al., CR No.

6  17-00661-DMG.  I make this declaration in support of the government's

7  opposition to defendant JULIAN OMIDI's trial memorandum regarding the

8  testimony from Larry Twersky.

9      2.   Based on my review of the file in this case, I understand

10  the government produced a trial witness list to defendant OMIDI on or

11  about September 30, 2020, identifying Larry Twersky as a witness.

12      3.   Attached hereto as Exhibit A is a true and correct copy of

13  excerpts of a transcript of defendant OMIDI's initial appearance in

14  this case on February 28, 2018 (Dkt. 79).

15      4.   Attached hereto as Exhibit B is a true and correct copy of

16  excerpts of Exhibits A and B attached to the Declaration of Alexander

17  Wyman in support of the government's Request for Inquiry into

18  Potential Conflicts of Interest Regarding Representation of

19  Defendants Omidi, Independent Medical Services, Inc., and Surgery

20  Center Management, LLC (Dkt. 121).

21      5.   Attached hereto as Exhibit C is an annotated copy of a

22  privilege log dated April 15, 2013, obtained from defendant Surgery

23  Center Management, LLC.

24      6.   Attached hereto as Exhibit D are true and correct copies of

25  invoices and financial records pertaining to Brian Oxman and Konrad

26  Trope obtained from defendant Surgery Center Management, LLC.

27

28

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief and that this declaration was executed on November 16, 2021, at Los Angeles, California.

_____
DAVID H. CHAO

22