Michael S. Schachter** (NY 3910205)
Randall W. Jackson** (NY 5274048)
Casey E. Donnelly** (NY 4936803)
**WILLKIE FARR & GALLAGHER LLP**
787 Seventh Avenue
New York, New York 10019
Tel: (212) 728-8102; Fax: (728) 728-8111
Email: *mschachter@willkie.com*

*Attorneys for Defendant Julian Omidi*

[Additional Counsel Continued On Next Page]

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>*vs*.<br><br>JULIAN OMIDI, INDEPENDENT MEDICAL SERVICES INC., a professional corporation, SURGERY CENTER MANAGEMENT, LLC, and MIRALI ZARABI, M.D.,<br><br>Defendants. | Case No. CR 17-00661(A)-DMG<br><br>[*Assigned to Hon. Dolly M. Gee, District Court Judge*]<br><br>**DEFENDANTS JULIAN OMIDI'S MOTION TO COMPEL DISCOVERY AND TO HOLD EVIDENTIARY HEARING**<br><br>Hearing:  March 23, 2022 at 2:30 PM<br>Dept.:  Courtroom 8C<br>Location:  350 West 1st Street,<br>   8th Floor<br>   Los Angeles, CA 90012<br><br>Oral Argument Requested |

[Additional Counsel Continued From Previous Page]

Simona Agnolucci (SBN 246943)
**WILLKIE FARR & GALLAGHER LLP**
One Front Street
San Francisco, CA 94111
Tel: (415) 858-7447, Fax: (415) 858-7599
Email: *sagnolucci@willkie.com*

Edmund W. Searby** (OH 067455)
**PORTER WRIGHT MORRIS & ARTHUR LLP**
950 Main Avenue, Suite 500
Cleveland, OH 44113
Tel: (216) 443-2545, Fax: (216) 443-9011
Email: *esearby@porterwright.com*

** *Appearing pro hac vice*

*Counsel for Defendant Julian Omidi*

**TO THE HONORABLE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD HEREIN:**

**PLEASE TAKE NOTICE** that, on March 23, 2022 at 2:30 PM, or, as soon as this matter may be heard in Courtroom 8C, of this Court, located at 350 West 1st Street, 8th Floor, Los Angeles, California, 90012, Defendant Julian Omidi, by and through counsel of record, will move and does hereby move this Court for an order compelling discovery and to hold an evidentiary hearing.

Mr. Omidi's counsel met and conferred with the government regarding the relief requested herein, and the parties were unable to come to a resolution.

This Motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities in support of this Motion, the accompanying Declaration of Michael S. Schachter and attached exhibits, all matters which the Court may judicially notice, and the documents and pleadings previously filed with this Court.

Dated: February 22, 2022      Respectfully submitted,


**WILLKIE FARR & GALLAGHER LLP**

By: s/ Michael S. Schachter
    MICHAEL S. SCHACHTER
    RANDALL W. JACKSON
    CASEY E. DONNELLY
    SIMONA AGNOLUCCI

    ATTORNEYS FOR DEFENDANT
    JULIAN OMIDI

# TABLE OF CONTENTS

**Page(s)**

I.     INTRODUCTION ................................................................................... 1

II.    FACTUAL AND PROCEDURAL BACKGROUND ............................... 2

    A.     Charles Klasky's False Claim At His May 24, 2016 Proffer ........................ 2

    B.     The Government Confronted Mr. Klasky, Who Then Altered His Story ....... 4

    C.     Mr. Klasky's Trial Testimony ..................................................................... 5

    D.     The Government's Reliance on the "Gun to Your Head" Call During Closing Arguments ............................................................................. 6

    E.     Post-Trial Discussions Regarding the "Gun to Your Head" Call .................. 6

    F.     The Government's Late Disclosure of Brady Material And Refusal To Produce Or Identify Additional Relevant Documents ....................... 8

III.   THE COURT SHOULD COMPEL DISCOVERY ................................. 9

    A.     The Government Presented False And Misleading Testimony .................... 10

        1.     The Government Elicited False or Misleading Testimony ............... 10

        2.     The Government Knew Mr. Klasky's Testimony Was False ............. 13

        3.     Mr. Klasky's False and Misleading Testimony Was Material .......... 14

    B.     Further Discovery Is Needed To Understand Whether The Government Complied With Its Obligations To Investigate Mr. Klasky's False Claim ............................................................................. 16

    C.     Further Discovery Is Required to Understand the Extent of the Government's Brady Violation ............................................................. 17

        1.     Failure to comply with the Brady Identification Order ................... 17

        2.     Violation of Brady ........................................................................ 18

            a.     The Government Withheld Favorable Evidence .................... 18

            b.     The Government Suppressed The Withheld Evidence ............ 19

            c.     The Government's Suppression Prejudiced Mr. Omidi .......... 21

D.      Further Discovery Is Required Under Jencks ................................................. 23

E.      Further Discovery Is Relevant to the Proper Remedy ................................... 23

IV.     THE COURT SHOULD ORDER AN EVIDENTIARY HEARING .................... 24

V.      CONCLUSION ...................................................................................................... 24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **TABLE OF AUTHORITIES**

**Cases**                                                 **Page(s)**

*Andazola v. Woodford,*
  2011 WL 1225979 (N.D. Cal. Mar. 31, 2011) ................................... 19

*Benn v. Lambert,*
  283 F.3d 1040 (9th Cir. 2002) ................................................................ 22

*Brady v. Maryland,*
  373 U.S. 83 (1967) ..................................................................................... 9

*Comstock v. Humphries,*
  786 F.3d 701 (9th Cir. 2015) ................................................................ 18

*Giglio v. United States,*
  405 U.S. 150 (1972) .................................................................................. 9

*Hayes v. Brown,*
  399 F.3d 972 (9th Cir. 2005) ................................................................ 14

*Kyles v. Whitley,*
  514 U.S. 419 (1995) ................................................................. 21, 22, 23

*Mellen v. Winn,*
  900 F.3d 1085 (9th Cir. 2018) .............................................................. 16

*Milke v. Ryan,*
  711 F.3d 998 (9th Cir. 2013) ......................................................... 18, 20

*Miller–El v. Dretke,*
  545 U.S. 231 (2005) ................................................................................ 11

*Mooney v. Holohan,*
  294 U.S. 103 (1935) .............................................................................. 9, 10

*Morris v. Ylst,*
  447 F.3d 735 (9th Cir. 2006) ................................................................ 16

*Napue v. Illinois,*
  360 U.S. 264 (1959) .............................................................................. 9, 10

*Northern Mariana Islands v. Bowie,*
  243 F.3d 1109 (9th Cir. 2001) ...................................................................9, 16, 17

*Panah v. Chappell,*
  935 F.3d 657 (9th Cir. 2019) ...................................................................10

*Schell v. Witek,*
  218 F.3d 1017 (9th Cir. 2000) ...................................................................24

*Shelton v. Marshall,*
  796 F.3d 1075 (9th Cir. 2015) ...................................................................22

*Sivak v. Hardison,*
  658 F.3d 898 (9th Cir. 2011) ...................................................................13, 14

*United States v. Alvarez,*
  358 F.3d 1194 (9th Cir. 2004) ...................................................................24

*United States v. Bagley,*
  473 U.S. 667 (1985)...................................................................18

*United States v. Bernal-Obeso,*
  989 F.2d 331 (9th Cir.1993) ...................................................................19, 20

*United States v. Blanco,*
  392 F.3d 382 (9th Cir. 2004) ...................................................................20

*United States v. Blueford,*
  312 F.3d 962 (9th Cir. 2002) ...................................................................17

*United States v. Brumel-Alvarez,*
  991 F.2d 1452 (9th Cir. 1992) ...................................................................23

*United States v. Chapman,*
  524 F.3d 1073 (9th Cir. 2008) ...................................................................23

*United States v. Hall,*
  113 F.3d 157 (9th Cir. 1997) ...................................................................19

*United States v. Mazzarella,*
  784 F.3d 532 (9th Cir. 2015) ...................................................................24

*United States v. Meling,*
  47 F.3d 1546 (9th Cir. 1995) ...................................................................15

*United States v. Obagi,*
    965 F.3d 993 (9th Cir. 2020) ................................................................21

*United States v. Price,*
    566 F.3d 900 (9th Cir. 2009) ........................................................21, 22

*United States v. Prokupek,*
    632 F.3d 460 (8th Cir. 2011) ...............................................................12

*United States v. Reyes,*
    577 F.3d 1069 (9th Cir. 2009) .............................................................17

*United States v. Shaffer,*
    789 F.2d 682 (9th Cir.1986) ................................................................20

*United States v. Streater,*
    70 F.3d 1314 (D.C. Cir. 1995)..............................................................13

*United States v. Strifler,*
    851 F.2d 1197 (9th Cir. 1988) .............................................................19

*Zumot v. Borders,*
    483 F. Supp. 3d 788 (N.D. Ca. 2020)......................................11, 14, 15

## I.      INTRODUCTION

The government's case rested significantly on the credibility of its principal witness, Charles Klasky, and his contention that he falsified sleep study data at the direction of Defendant Julian Omidi.  At trial, the government elicited testimony from Mr. Klasky that Mr. Omidi, through Brian Oxman, tried to silence Mr. Klasky and thereby conceal the fraud. (Tr. at 4974-77; 8927: 2-14.)  Specifically, according to Mr. Klasky, Mr. Oxman, while with Mr. Omidi, called Mr. Klasky shortly before his first scheduled meeting with the government and said that if Mr. Klasky attended this interview he would be putting a "gun to [his] head."  (*Id.*)  In the final minutes of its rebuttal argument to the jury, the government emphasized this inflammatory testimony and drove home how it demonstrated Mr. Omidi's knowledge of the fraud and efforts to conceal it. (Tr. at 8927:2-14).

The government did so notwithstanding conclusive evidence to rebut that this phone call ever occurred as repeatedly represented by Mr. Klaksy.  For on the first day of his proffer interview with the government, Mr. Klasky related that he received this phone call (the "'Gun to Your Head' Call") from Mr. Oxman earlier that **very same morning**. However, when the Government researched Mr. Klasky's call history for the morning of May 24, 2016 (the date of the first proffer meeting), it found that Mr. Klasky had received phone calls from only two individuals—neither of whom was Mr. Oxman or Mr. Omidi.

This discovery should have given the government pause as to not only the truth of Mr. Klaksy's tale of obstruction, but as to his reliability as a witness in general. Furthermore, the fact that the "Gun to Your Head" Call could not have transpired as twice told by Mr. Klasky placed the government under a legal duty to investigate further and to specifically disclose the falsehood to the defense.  Instead, based in part upon evidence obtained only after the trial, it appears that the government manipulated Mr. Klasky's testimony at trial and sidestepped the compelling reason to doubt it with a leading question as to whether Mr. Klasky received "a call before that meeting," all the while concealing evidence that the government obtained confirming the falsity of Mr. Klasky's accusation.

After informal efforts to obtain full discovery of the documents at issue, Mr. Omidi

now seeks an order of this Court requiring the government produce all of its documents, including internal communications, regarding Mr. Klasky's testimony as to this alleged call and his credibility; an order requiring the government to preserve all of its communications, notes of interview, and other memoranda regarding Mr. Klasky; and for an evidentiary hearing.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

Post-verdict, Mr. Omidi assumes the Court's familiarity with the case and sets forth below the factual background relevant to this motion.

### A.     Charles Klasky's False Claim At His May 24, 2016 Proffer

Government cooperator Charles Klasky pled guilty to healthcare fraud and was the government's key witness at trial. Mr. Klasky began cooperating with the government after government agents searched his home on March 24, 2016. (Tr. at 4974:4-11.)

On May 24, 2016 at 10:00 am, Mr. Klasky met with government agents and prosecutors for his first proffer interview. During that interview, Mr. Klasky reported to the government that *earlier that same morning of May 24*, he saw Mr. Omidi and Mr. Oxman in a car together, and ten minutes later received a phone call from Mr. Oxman. Mr. Klasky claimed that during that call, Mr. Oxman sought to silence Mr. Klasky by telling him that attending his scheduled interview with the government would be akin to "putting a gun to your head," and further telling him "to keep his mouth shut, and to not tell the truth or his (KLASKY's) life would be over." (Ex. 2 at GT_ REPORTS_ 00097367-68.) Mr. Klasky claimed that, although he did not hear Mr. Omidi speak during the phone call, Mr. Klasky "was certain" that Mr. Omidi was present with Mr. Oxman. (*Id*.)

On May 25, 2016, the day after Mr. Klasky made this claim, the government sent a subpoena to Verizon, seeking Mr. Klasky's phone records from 2016. (Ex. 3.) The records that Verizon produced to the government show that, on the morning of May 24, 2016—when Mr. Klasky reported and claimed the "Gun to Your Head" Call occurred—Mr. Klasky received phone calls from only two phone numbers: (818) ▮▮▮▮ (the "818 Number") and (310) ▮▮▮▮ (the "310 Number"). (Ex. 5.) These subpoenaed phone records did not

identify the subscribers for these numbers.  The government was aware at the time that a different number, (562) ███████ (the "562 Number"), was associated with Mr. Oxman, and that Mr. Klasky had received calls from this number on dates other than May 24, 2016. (*See* Ex.  1 at 8; Ex. 4.)  Mr. Klasky's subpoenaed phone records do not, however, indicate that Mr. Klasky received any calls from the 562 Number on the morning of May 24, 2016. (Ex. 5.)

The government conducted an investigation of the subpoenaed call records, and on January 13, 2017 FDA Special Agent Samanta Kelley prepared and circulated to members of the prosecution team, including AUSA Kristen Williams, FBI Agent Mark Coleman, and FDA Special Agent Zeva Pettigrew, a detailed spreadsheet (the "Kelley Spreadsheet") indicating the results of government investigation to determine the identities people who called Mr. Klasky on May 24, 2016.  (Exs. 6-8.)  To create this spreadsheet, Special Agent Kelley relied on law enforcement TLOxp search reports (which the government performed in November 2016) to determine the subscribers for the only two phone numbers from which Mr. Klasky received calls on the morning of May 24, 2016: the 310 Number and the 818 Number (Exs. 9-10, the "November 2016 TLOxp Reports").

The November 2016 TLOxp Reports show that the most likely identity of the subscriber for the 310 Number was Cheryl Ann Nichols (or, spelled alternatively, Cheryl Ann Nickers or Sheryl Ann Nichols).  (Ex. 9.)  The November 2016 TLOxp Reports show that the most likely identity of the subscriber for the 818 Number was either Sevan or Vegen Shahnazari. (Ex. 10.)  The government's search for the 818 Number also revealed, however, that the next most likely identity for the subscriber was Richard A. Moss, which is the name of Mr. Klasky's attorney in connection with this matter.  (*Id.*)  Mr. Moss was present at Mr. Klasky's May 24, 2016 proffer interview with the government.  (Ex. 2.)

In other words, the November 2016 TLOxp Reports enabled the government to conclude, as reflected in the Kelley Spreadsheet, that Mr. Klasky received calls from Cheryl Nichols and Sevan Shahnazari (or, possibly, his attorney, Richard Moss) on the morning of May 24, 2016, but not from Mr. Oxman, as Mr. Klasky had reported.  Neither the Kelley

Spreadsheet nor either of the November 2016 TLOxp Reports was produced to the defense prior to trial.  (*See* Ex. 1.)

### B.   The Government Confronted Mr. Klasky, Who Then Altered His Story

On August 14, 2017, two days prior to his Grand Jury testimony on August 16, 2017, Mr. Klasky, accompanied by his counsel, participated in an interview with members of the prosecution team, including Special Agents Kelley and Pettigrew, Agent Coleman, and AUSA Williams.  The government asked Mr. Klasky about the "Gun to Your Head" Call. (Ex. 11 at GT_REPORTS_00104958 ("KW Discussing re If you go to this meeting you might as well put a gun to your head.").)  According to the notes, Mr. Klasky then told the government that Mr. Oxman "always call[s] [Mr. Klasky] on his cell phone." (*Id.*)  The notes reflect that Mr. Klasky was specifically asked about a call from Mr. Oxman "the evening before" his May 24 proffer (as reflected in the Verizon phone records) and that Mr. Klasky insisted, once again, that *the "'gun to your head' call was in the morning" of May 24, "right before [the] 10 AM meet[ing]."*  (*Id.* (emphasis added).)

The notes from that meeting indicate that the government provided Mr. Klasky his Verizon phone records to review, and he attempted to suggest that the 310 Number (which the government knew to be associated with Cheryl Nichols) may have been associated with Mr. Oxman.  Mr. Klasky stated that Mr. Oxman "came from Santa Ana" (the location apparently associated with the 310 Number) and that Mr. Oxman "also has a (310) number." (*Id.*)  The government's notes of the meeting include phonetic spellings of the names that the government had discovered actually were associated with those numbers—Cheryl Nichols (spelled "Sharon Knicka") and Sevan Shahnazari (spelled "Savanazari").  (*Id.*) According to the notes, Mr. Klasky said he had no recollection of these names, but that he "knows someone named Savan." (*Id.*)  Neither Mr. Klasky nor his counsel (and Mr. Moss's colleague), William Fleming, mentioned that the 818 Number could belong to Mr. Moss, and the government did not ask Mr. Klasky whether the 818 Number belonged to Mr. Moss. The government never investigated further who Cheryl Nichols and Vegan (or Sevan) Shahnazari were, or what relationship Mr. Klasky had with them.  (Schachter Decl. ¶ 8.)

Two days after this meeting, Mr. Klasky testified before the Grand Jury on August 16, 2017.  During this appearance, the government elicited testimony from him regarding the "Gun to Your Head" Call.  (Ex. 12.)  Mr. Klasky again claimed that on this call Mr. Oxman told Mr. Klasky, "You might as well … put a gun to your head and shoot yourself, kill yourself."  (*Id.* at 165.)  However, Mr. Klasky claimed, for the first time, that the "Gun to Your Head" Call occurred "late afternoon" the day before his May 24 proffer interview and further changed his story to represent that Mr. Klasky could hear Mr. Omidi speaking in the background of the phone call.  (*Id.* at 164-165.)  Notably, Mr. Klasky's Verizon records do not indicate that he received a phone call from Mr. Oxman during the late afternoon of May 23, 2016.  (Ex. 4.)  The government did not confront Mr. Klasky with his inconsistent statement during his grand jury testimony, and the government never spoke to Mr. Klasky or his counsel subsequently about this sudden change in his story.  (Schachter Decl. ¶ 9.)

### C.  Mr. Klasky's Trial Testimony

Mr. Klasky's trial testimony lasted ten days.  He was, without question, the trial's most important witness, as he was the only witness who testified to having any personal knowledge of Julian Omidi's involvement in the falsification of sleep study results.  In short, Mr. Klasky's account of his time at Weight Loss Centers and, by extension, his credibility, were critical to the government's case against Mr. Omidi.

Prior to Mr. Klasky's testimony, Mr. Omidi's counsel raised concerns regarding the government potentially eliciting testimony that Mr. Oxman had appeared at Mr. Klasky's CJA counsel's office, as Mr. Klasky had claimed during his grand jury testimony.  The government agreed not to elicit this testimony.  (Tr. at 4980-81.)  The government did not indicate during those discussions that it would elicit testimony regarding the "Gun to Your Head" Call.  (Schachter Decl. ¶ 10.)

At trial, the government elicited testimony from Mr. Klasky regarding the purported "Gun to Your Head" Call by asking him, in leading fashion, whether he received a phone call from Mr. Oxman "before the meeting" Mr. Klasky had with the government on May

24, 2016.  (Tr. at 4974-4977.)  The government elicited this testimony notwithstanding its own investigation showing the event could not have transpired as reported by Mr. Klasky during his May 24, 2016 proffer interview.

### D.   The Government's Reliance on the "Gun to Your Head" Call During Closing Arguments

The government made multiple references to the "Gun to Your Head" Call during closing arguments.  First, during the government's summation, the prosecutor reminded the jury that "[r]ight before Mr. Klasky was supposed to meet with the government in May of 2016, you heard that Mr. Oxman told Mr. Klasky—or pressured Mr. Klasky not to go to that meeting." (Tr. at 8659.)  Later, during the government's rebuttal, the prosecutor argued that "Julian Omidi made sure that the story of the fraud didn't get out," noting in support of this argument that "Brian Oxman tried to pressure Charles Klasky not to meet with the government."  The prosecutor then displayed and read, verbatim, Mr. Klasky's trial testimony regarding the "Gun to Your Head" Call.  (*Id.* at 8926-27.)

### E.   Post-Trial Discussions Regarding the "Gun to Your Head" Call

Since the trial ended, Mr. Omidi's counsel has conferred with the government regarding its basis for presenting Mr. Klasky's testimony regarding the "Gun to Your Head" Call, the extent of the government's investigation into Mr. Klasky's claims about this call, and the available evidence regarding the same.

On December 23, 2021, a week after the conclusion of the trial, Mr. Omidi's counsel sent an email regarding the government's investigation into the "Gun to Your Head" Call. Mr. Omidi's counsel pointed out that the references to names in the notes from the government's August 14, 2017 interview of Mr. Klasky suggest that the government conducted some investigation into the calls Mr. Klasky received on the morning of March 24, but that it was "unclear how the government came up with those names referenced in the notes." (Ex. 1.)  Mr. Omidi's counsel requested the government "produce any records or reports relevant to the government's effort to determine whether Brian Oxman, Julian Omidi or anyone associated with Mr. Omidi in fact called Klasky on the morning of his

proffer." (*Id.*)

AUSA Williams responded on behalf of the government on December 31, 2021.  In her response, AUSA Williams stated that she did not "specifically recall what the 2017 notes you reference relate to, but can speculate they are associated with a Google search for the [818 Number], which returns results relating to individuals with the surname 'Shahnazari.'" (*Id.*)  She added that "[t]here is no outstanding discovery on this issue." (*Id.*)  In this initial response, the government made no mention of the government's November 2016 TLOxp Reports, the investigative work reflected in the Kelley Spreadsheet, or that the government possessed evidence that the 818 Number may have belonged to Mr. Klasky's counsel, Richard Moss.

On January 3, 2022, Mr. Omidi's counsel asked the government a number of follow-up questions, including whether the government searched for records of the Google search the government mentioned in its December 31 email and whether the government obtained any information regarding the subscribers for the phone numbers that called Mr. Klasky the morning before his May 24 proffer interview—*i.e.*, for the 310 Number and the 818 Number.  (*Id.*) The government responded to this January 3 email on January 13, 2022, stating that the government "did not specifically investigate" whether the 310 Number belonged to Mr. Oxman, but acknowledged that the government was aware that the 562 Number belonged to Mr. Oxman and that Mr. Oxman used that number to call Mr. Klasky on multiple occasions.  (*Id.*)  The government further stated in its January 13 email that "[t]here was no specific investigation at the time into" the 310 Number and that the government did not "obtain the subscriber information for" either the 310 Number or the 818 Number.  The government did note that, in response to the inquiry from Mr. Omidi's counsel, the government conducted a CPClear database search on January 12, 2022, which the government stated showed that the 310 Number belongs to Cheryl Nichols and the 818 Number belongs to Vegan Shahnazari.  (*Id.*)  The government's January 13 email again made no mention of the November 2016 TLOxp Reports, the Kelley Spreadsheet, or the government's evidence tying the 310 Number to Mr. Klasky's counsel.

On January 18, 2022, Mr. Omidi's counsel asked the government if it would acknowledge that Mr. Oxman did not call Mr. Klasky the morning of May 24, 2016, in light of the government's stated knowledge that the 562 Number belongs to Mr. Oxman and the CPClear search results associating the 310 Number and the 818 Number with Cheryl Nichols and Vegan Shahnazari, respectively.  (*Id.*)  Mr. Omidi's counsel also asked the government how it became aware of the names associated with the 310 Number and the 818 Number in advance of August 14, 2017 interview with Mr. Klasky, given that the only searches for this information that the government had disclosed to Mr. Omidi were the ones performed on January 12, 2022.  (*Id.*)

### F. The Government's Late Disclosure of *Brady* Material And Refusal To Produce Or Identify Additional Relevant Documents

On January 25, 2022, after repeatedly maintaining that the government had not conducted any investigation of the calls Mr. Klasky received on May 24, 2016, the government disclosed, for the first time, the Kelley Spreadsheet, an email chain among the prosecution team regarding the same, and the November 2016 law enforcement TLOxd Reports.  (*Id.*)  When later asked to explain why these materials were never previously produced, the government responded that it does not know.  (Schachter Decl. ¶ 7.)  The government referred to the Kelley Spreadsheet as "agent work product" in an email, but it has not stated that the government identified and chose to withhold this document (or the November 2016 TLOxd Reports) on this or any other basis.  (Ex. 1.)

What is more, the government has refused to state whether it continues to withhold any additional documents relevant to the investigation.[1]  On a meet and confer call on February 7, 2022, the government would state only that it has not identified any additional relevant "discoverable" information.  The government notably declined to specify whether it possesses any relevant materials that it does not consider to be "discoverable."  (Schachter Decl. ¶ 6.)  The government also specifically stated that it would not provide a log of

---

[1] In a recent filing, the government represented that it has produced all "discoverable" information and "complied with all of its discovery obligations," (ECF No. 1654), but it is unclear whether the government is continuing to withhold additional evidence it claims not to be obligated to disclose.

1   everything in the government's case file that is not discoverable.  (*Id.*)

2     During the parties' February 7 meet and confer call, Mr. Omidi's counsel asked the

3   government to specify how the government attempted to search for and identify relevant

4   documents responsive to Mr. Omidi's recent requests.  AUSA Williams stated that the

5   government reviewed its case file, and, when pressed to more specifically explain what this

6   review entailed—for example, whether email searches were performed on any of the

7   members of the case team—she declined to do so.  (*Id.*)

8     The government had also refused to answer Mr. Omidi's counsel's repeated question

9   as to whether the government believes that Mr. Klasky's May 24, 2016 claim that he

10   received a call from Mr. Oxman earlier that morning was true, but took the position that the

11   government's belief as to whether this statement was true is not "relevant."  (*Id* ¶ 5.*)  In a

12   recent filing, the government admitted that Mr. Klasky's phone records do not support his

13   story that he received the call on the same morning of the proffer interview, as he first

14   reported hat same day.  (ECF No. 1654.)

## III. THE COURT SHOULD COMPEL DISCOVERY

16     In his anticipated post-trial motion, Mr. Omidi intends to argue that the government

17   failed the fundamental requirement not to knowingly present false testimony under *Mooney*

18   *v. Holohan*, 294 U.S. 103 (1935), and *Napue v. Illinois*, 360 U.S. 264, 269 (1959), and to

19   specifically identify exculpatory and impeaching material pursuant to *Brady v. Maryland*,

20   373 U.S. 83 (1967), its progeny, including *Giglio v. United States*, 405 U.S. 150 (1972), and

21   this Court's order that the government specifically identify known *Brady* material (ECF No.

22   1333). [2]  The government also likely failed in its obligation to fully investigate Mr. Klasky's

23   representations pursuant to the Ninth Circuit's decision in *Northern Mariana Islands v.*

24   *Bowie*, 243 F.3d 1109 (9th Cir. 2001).

25

26   _____

27   [2] The Court's Order February 18, 2022 Order granting the extension to file post-trial motions makes a
reference to "the Ninth Circuit's standard for evaluating a motion for a new trial based on newly
discovered evidence."  ECF. 1657, citing *United States v. Davis*, 960 F.2d 820, 825 (9th Cir. 1992).  Mr.

28   Omidi respectfully submits that Mr. Omidi's intended motion for a new trial and to dismiss will implicate
different standards, governed by the Supreme Court's decisions in *Brady* and *Napue*.

The evidence already available to Mr. Omidi establishes a strong basis to dismiss the indictment or, at the very least, order a new trial, based on these violations, all of which caused Mr. Omidi significant prejudice at trial.  However, the government's current refusal to provide further discovery or even specify whether it is withholding any relevant documents and information prevents Mr. Omidi from fully developing his arguments in support of relief.  Without further discovery, both Mr. Omidi and the Court will be deprived of the full context and understanding of the government's conduct in this matter.

### A.   The Government Presented False And Misleading Testimony

By eliciting and affirmatively relying upon Mr. Klasky's testimony regarding the "Gun to Your Head" Call despite the results of the government's investigation into Mr. Klasky's claim, the government violated Mr. Omidi's constitutional right to a fair trial.  In *Mooney v. Holohan*, the Supreme Court held that the due process requirement "cannot be deemed to be satisfied" if the government "has contrived a conviction" by "depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured."  294 U.S. at 112.  The Court reaffirmed this principle in *Napue,* where it held "that a conviction obtained through use of false evidence, known to be such by representatives of the [government], must fall." 360 U.S. at 269.  A *Napue* claim has three elements. "First, the testimony or evidence in question must have been false or misleading." *Panah v. Chappell*, 935 F.3d 657, 664 (9th Cir. 2019).  "Second, the [government] must have known or should have known that it was false or misleading." *Id*. Third, "the testimony or evidence in question must be material." *Id*.

### 1.   The Government Elicited False or Misleading Testimony

Mr. Klasky's testimony was "actually false" pursuant to *Mooney* and *Napue*.  During his first proffer interview with the government on May 24, 2016, at 10:00 a.m., Mr. Klasky reported to the government that ***earlier that same morning***, he received the "Gun to the Head" Call.  But the information the government disclosed after trial clearly establishes that Mr. Klasky's May 24, 2016 report, which he reaffirmed on August 14, 2017, was false.

It merits emphasis that this is not a situation in which the government merely

refreshed a witness's recollection as to when some event transpired far in the past.  Mr. Klasky's May 24, 2016 contemporaneous report to government agents and prosecutors at his first proffer meeting of the startling "Gun to the Head" Call as having transpired minutes or hours *earlier that same morning*, was not "subject to the usual risk of imprecision and distortion from the passage of time." *Miller–El v. Dretke*, 545 U.S. 231, 241 n.1 (2005). The fact that the call could not have been received that morning—as the government now admits—discredits the story as a whole and should have raised fundamental concerns regarding Mr. Klasky's credibility.

Furthermore, after Mr. Klasky was pressed to change the date of the call, he also changed the substance of the story so as to continue to implicate Mr. Omidi.  During his May 24 interview Mr. Klasky stated that he did not hear Mr. Omidi during the call with Mr. Oxman but had seen Messrs. Oxman and Omidi leaving together shortly before the call. (Ex. 2.)  During his Grand Jury testimony he did not testify that he saw Messrs. Oxman and Omidi together, but testified that he heard Mr. Omidi speaking in the background during the call.  (Ex. 12.)  The government then invited Mr. Klasky to tell the same story at trial (the first version—where Mr. Omidi is seen but not heard—without specifying the date) and relied upon that story in arguing to the jury to convict during its final arguments.

These circumstances are similar to (but even more concerning than) those in *Zumot v. Borders*, where a district court in the Northern District of California recently granted habeas relief to a defendant based on a conclusion that the government's presentation of false evidence violated the defendant's due process rights.  483 F. Supp. 3d 788, 818 (N.D. Cal. 2020).  At the trial in *Zumot*, the government elicited testimony that the defendant, who was charged with murdering his girlfriend, had made a threatening phone call to the deceased on a specific date prior to her death.  The court concluded that this testimony constituted "actually false" evidence under *Mooney* and *Napue* because phone records "establish[ed] that there were no calls between [the defendant's] and [the deceased's] phones on" that particular date.  *Id.* at 815-16.  Likewise here, Mr. Klasky's phone records, together with the Kelley Spreadsheet and the November 2016 TLOxp Reports, conclusively

establish that Mr. Klasky's May 24, 2016 report that he received the "Gun to Your Head" Call from Mr. Oxman earlier that same morning was false. The government conceded as much in its recent opposition to Mr. Omidi's *Ex Parte* Application for a Stay of the Deadline to File Post-Trial Motions. (ECF No. 1654.)

Nevertheless, in that same opposition, the government falsely asserted that Mr. Klasky's account of the "Gun to Your Head" Call "has been materially consistent." (ECF No. 1654 at 3.) And, although the government has now finally conceded that Mr. Oxman did not call Mr. Klasky the day of his May 24, 2016 proffer interview, the government attempted to minimize Mr. Klasky's false statement by vaguely stating that Mr. Klasky stated the call occurred that morning "on other occasions." (*Id.* at 1.) But this flippant description ignores that Mr. Klasky's report that the "Gun to Your Head" Call occurred on the morning May 24 was made ***later that same morning***. At his first proffer interview with the government, Mr. Klasky was not trying to piece together a story from years earlier; he was making a specific accusation about a shocking call he supposedly received minutes or—at most—a couple hours earlier. As much as the government would like to portray Mr. Klasky's account as an ambiguous amalgam of multiple calls he received on various dates, Mr. Klasky's report was anything but ambiguous. Indeed, when the government met with Mr. Klasky on August 14, 2017 and suggested to him that the call may have occurred on a different date, he insisted, again, that the "'gun to your head call' was in the morning" of May 24, 2016, "right before 10 am meet[ing]." (Ex. 11 at GT_REPORTS_00104958.) Having finally acknowledged that this report was untrue, the government cannot simply shrug off the details of that statement as irrelevant.

The government likewise cannot avoid the ramifications of Mr. Klasky's false report by pointing to his subsequent grand jury testimony that the "Gun to Your Head" Call occurred on a different date, which was elicited after Mr. Klasky was confronted with the falsity of his May 24, 2016 contemporaneous report. *See United States v. Prokupek*, 632 F.3d 460 (8th Cir. 2011) (reversing conviction for clear error because witness's subsequent testimony contradicting his contemporaneous "statement at the time of the events" is

"implausible on its face") (quotations omitted); *United States v. Streater*, 70 F.3d 1314, 1321 (D.C. Cir. 1995) ("We conclude that the district court clearly erred in crediting [the witness's subsequent] testimony ... when [the witness's prior] documented contemporaneous statements show the contrary.").

It is likewise irrelevant, for purposes of this analysis, that the government elicited Mr. Klasky's trial testimony vaguely so as to avoid specifying the date on which the "Gun to Your Head" Call allegedly occurred.  Even though the government knew that Mr. Klasky repeatedly made false statements to the government about the "Gun to Your Head" Call and that he changed his story during his grand jury testimony after he was confronted with the falsity of his earlier statements, the government nevertheless asked Mr. Klasky to tell this story to the jury at trial.  By doing so, the government presented "actually false" testimony in violation of *Mooney* and *Napue*.  That the government asked Mr. Klasky, with calculated imprecision, if he received a call from Mr. Oxman "before that meeting," and allowed him to tell a version that Mr. Klasky changed in the grand jury does not absolve the government from presenting a story the government had investigated and knew to be false.  (Tr. at 4974:24-25.)  When the date had to change, so did the substance.  The government's "solution" of allowing Mr. Klasky to testify to the discredited first version of the story but without reference to the date suborned perjury.  The government's intentional avoidance of the date by a carefully worded leading question only underscores the government's awareness that Mr. Klasky, if asked to provide more specific information about the "Gun to Your Head" Call, would have disclosed the details which prove the story to be false.

It is extremely troubling that the government has refused repeatedly to disclose clear evidence of this falsity, after withholding that evidence from the defense for years.  Mr. Omidi and the Court are entitled to obtain any and all additional documents and information the government possesses regarding its investigation of Mr. Klasky's initial claim.

## 2. The Government Knew Mr. Klasky's Testimony Was False

The government "knew or should have known" that Mr. Klasky's testimony was false.  *Sivak v. Hardison*, 658 F.3d 898, 908 (9th Cir. 2011).  The recently disclosed

November 2016 TLOxd Reports and Kelley Spreadsheet, emailed to the entire prosecution team on January 13, 2017, establish, quite clearly, that the government acted initially to verify Mr. Klasky's May 24, 2016 report, and that the government concluded Mr. Klasky's report was false.  And as noted above, the government's careful questioning of Mr. Klasky at trial—purposely avoiding any mention of the date on which Mr. Klasky claimed the "Gun to Your Head" Call took place but allowing him to testify as to the version of what took place on the morning of the first proffer interview—further confirms the government's awareness of Mr. Klasky's false claim.  (Tr. at 4974:24-25.)  This overwhelming evidence of the government's awareness of the falsity of Mr. Klasky's claim contrasts with its recent attempt to paper over his past false statements and suggest, falsely, that Mr. Klasky's account was merely hazy or ambiguous, rather than false.  Any further evidence of these efforts is highly relevant to the government's now-blasé approach to the veracity of Mr. Klasky's claim.

### 3.    Mr. Klasky's False and Misleading Testimony Was Material

The standard for materiality under *Mooney* and *Napue* is whether "there is *any* reasonable likelihood that the false testimony *could* have affected the judgment of the jury." *Sivak*, 658 F.3d at 912 (emphasis in original, quotations omitted).  "By contrast, evidence is not material if it is 'unimaginable' that the jury could have reached a different conclusion 'with or without' the evidence at issue." *Zumot*, 483 F. Supp. 3d at 813 (citing *Phillips v. Ornoski*, 673 F.3d 1168, 1191 (9th Cir. 2012).  This materiality standard is more favorable to the defense than the standard for prejudice under *Brady*, and courts "have gone so far as to say that if it is established that the government knowingly permitted the introduction of false testimony reversal is virtually automatic." *Sivak*, 658 F.3d at 912 (quotations omitted). Mr. Klasky's false statement regarding the "Gun to Your Head" Call clearly meets this materiality standard.

Indeed, the government demonstrated the materiality of the "Gun to Your Head" Call by relying on Mr. Klasky's testimony regarding this call both in the government's summation and in its rebuttal argument. *Hayes v. Brown*, 399 F.3d 972, 986 (9th Cir. 2005)

("The importance of [witness'] testimony was underscored by the prosecution in its closing argument."); *Zumot* 483 F. Supp. 3d at 817 (concluding that the presentation of false evidence regarding a purported threatening phone call was material where the prosecutor relied on the allegations about the purported call during closing argument).

The government first cited Mr. Klasky's testimony about this issue to support the government's argument that Mr. Omidi had the requisite intent and knowledge to be guilty of the charged crimes. After three months of trial, the government could not point the jury to any direct evidence of Mr. Omidi's knowledge of the alleged fraud—no emails, text or chat messages, recorded conversations, or other statements by Mr. Omidi that evidenced such knowledge. Instead, the prosecutor told the jurors that, "for intent and for knowledge, too," they should "look at circumstantial evidence," including "the efforts that defendants take to conceal what they do … in order to get in their head." (Tr. at 8649:7-13.) As evidence of these alleged concealment efforts, the prosecutor invoked Mr. Klasky's account of the "Gun to Your Head" Call, reminding the jurors, "you heard that Mr. Oxman told Mr. Klasky – or pressured Mr. Klasky not to go to that meeting." (Tr. at 8659:1-4.)

After Mr. Omidi's counsel noted in his summation that the government could not present any evidence of Mr. Omidi's knowledge of the alleged fraud, the prosecutor responded in her rebuttal by arguing that Mr. Omidi "made sure that the story of the fraud didn't get out." (Tr. at 8926:23-24.) In support of this contention, the prosecutor relied even more strongly on the "Gun to Your Head" Call and Mr. Klasky's claim that he observed Mr. Omidi and Mr. Oxman shortly before the call occurred. In fact, the prosecutor displayed Mr. Klasky's testimony on this topic for the jury and read it aloud, verbatim. (Tr. at 8926:23-8927:14.) Clearly, the government considered Mr. Klasky's account of the "Gun to Your Head" Call to be material, damning evidence. This testimony served as compelling circumstantial evidence suggesting that Mr. Omidi was aware of the fraud committed by Mr. Klasky, while also providing a plausible explanation for the dearth of direct evidence of Mr. Omidi's knowledge. *See United States v. Meling*, 47 F.3d 1546, 1557 (9th Cir. 1995) (threat to a government witness "shows consciousness of guilt—second only to a confession

in terms of probative value"). The problem was that the government knew the story could not have taken place on the morning of the proffer interview as recounted.

This assessment of the materiality of the "Gun to Your Head" Call is also consistent with the government's insistence, after the testimony was elicited at trial, that Mr. Klasky's testimony was "absolutely relevant with the pressure that is being placed on someone who could go to the government and reveal this fraud", and "absolutely goes to the issues of knowledge and intent in this case and of the desire to continue concealing the fraud." (Tr. at 4980.) "The [prosecutor's] word about the 'likely damage' of the suppressed evidence is particularly strong evidence that the testimony was material." *Mellen v. Winn*, 900 F.3d 1085, 1097 (9th Cir. 2018) (quotations omitted).

## B. Further Discovery Is Needed To Understand Whether The Government Complied With Its Obligations To Investigate Mr. Klasky's False Claim

The Ninth Circuit has held that the government's responsibility not to present false testimony, pursuant to *Mooney* and *Napue*, carries with it an obligation "to act when put on notice of the real possibility of false testimony." *N. Mariana Islands v. Bowie*, 243 F.3d 1109, 1118 (9th Cir. 2001). This "duty to investigate flows from the constitutional obligation of the [government] and its representatives to collect potentially exculpatory evidence, to prevent fraud upon the court, and to elicit the truth." *Morris v. Ylst*, 447 F.3d 735, 745 (9th Cir. 2006).

As things currently stand, the evidence Mr. Omidi possesses establishes that the government violated its obligation to fully investigate the falsity of Mr. Klasky's report, pursuant to *Bowie*. Instead, the government effectively abandoned its investigation of Mr. Klasky's false May 24, 2016 report once he changed his story in front of the grand jury after being confronted with evidence of his initial false statement. By doing so, the government did exactly what *Bowie* prohibits—namely, "pressing ahead without a diligent and good faith attempt to resolve" the "real possibility of false testimony." *Bowie*, 243 F.3d at 1118. The government cannot sidestep its obligation not to present false testimony by "refusing to search for the truth and remaining willfully ignorant of the facts," especially after the

government discovered that Mr. Klasky's claim at his May 24, 2016 proffer interview was false. *Id.* "This ploy allowed the prosecution [to avoid] having to risk further challenge and damage to the credibility of their own accomplice witness[]." *Id.* at 1121-22.

In this respect, the government's position that its belief as to the truth or falsity of Mr. Klasky's claim in his May 24, 2016 proffer interview is not "relevant" is telling. It is plainly improper for the government to present not only evidence the government knows to be false, but evidence the government "has very strong reason to doubt." *United States v. Blueford*, 312 F.3d 962, 968 (9th Cir. 2002); *United States v. Reyes*, 577 F.3d 1069, 1077 (9th Cir. 2009) (same). The prosecution's treatment of Mr. Klasky's May 24, 2016 false report as irrelevant runs afoul of this basic precept of criminal law and of Mr. Omidi's constitutional rights. "The prosecution saw fit without prophylaxis to call to the stand [a] witness[] whom it had clear reason to believe might... lie under oath." *Bowie,* 243 F.3d at 1123.

If the government, indeed, possesses no further evidence whatsoever of any efforts to investigate Mr. Klasky's claim, its violation of *Bowie* will be clearly established. Of course, at this time, the government refuses to specify whether or not any such materials exist, instead only repeating that it does not possess any further "discoverable" evidence.

## C.   Further Discovery Is Required to Understand the Extent of the Government's *Brady* Violation

### 1.   Failure to comply with the *Brady* Identification Order

The government's duty to disclose exculpatory evidence was heightened in this case because Mr. Omidi filed a motion to compel the government to specifically identify *Brady* material, including "any communications relevant to [Mr. Klasky's] credibility and bias." (ECF No. 1154.) The Court granted that motion over the government's objection. (ECF No. 1333 (the "*Brady* Identification Order").) Nevertheless, the government failed to identify as *Brady* material the subpoenaed phone records, the documentary basis for issuing the May 25, 2016 subpoena to Verizon for Mr. Klasky's phone records, the subpoena itself, or the government's investigative reports establishing that Mr. Klaksy provided a false report on May 24, 2016, (ECF No. 1333 at 4.) This is, of course, not to mention the

November 2016 TLOxd Reports and the Kelley Spreadsheet, which, as set forth below, were improperly withheld from the defense in violation of *Brady*.  As set forth below, the government's suggestion that Mr. Omidi's counsel should have exposed Mr. Klasky's false statement based on the information the government had disclosed is baseless; nevertheless, the government's failure to identify this impeachment evidence among the more than one million documents it had produced violates the *Brady* Identification Order.

### 2.     Violation of *Brady*

*Brady* requires the government to produce exculpatory evidence "whether or not the defendant requests any such evidence."  *Milke v. Ryan*, 711 F.3d 998, 1003 (9th Cir. 2013).  There are three components of a *Brady* violation:  "(1) the evidence at issue must be favorable to the accused, (2) the evidence must have been suppressed by the State, and (3) the suppression must have been prejudicial."  *Comstock v. Humphries*, 786 F.3d 701, 708 (9th Cir. 2015).  The government's established failure to disclose the materials it produced on January 24, 2022 already satisfies each of these three factors and constitutes a violation of both the general *Brady* requirement and the Court's directive in the *Brady* Identification Order.  However, the extent of the government's violation remains unknown because the government refuses to indicate whether it is continuing to withhold any additional relevant materials.

### a.     The Government Withheld Favorable Evidence

"Any evidence that would tend to call the government's case into doubt is favorable for *Brady* purposes."  *Milke*, 711 F.3d at 1012.  This includes impeachment evidence. *United States v. Bagley*, 473 U.S. 667, 675 (1985).  Mr. Klasky was ***the*** central prosecution witness, and the government was required to disclose for use at trial the Kelley Spreadsheet and November 2016 TLOxp Reports, which show unequivocally that Mr. Klasky's May 24, 2016 report of the Call is false, and thereby impeach Mr. Klasky's credibility and cast doubt on the integrity of the government's investigation as a whole. [3]

---

[3] Mr. Klasky's direct examination at trial ended with his testimony that he attended the May 24 proffer, in the face of the "Gun to Your Head" Call, because "[i]t was the right thing to do."  (Tr. at 4977:9.)

That a witness has made a false report must be disclosed under *Brady*.  *See, e.g.*, *United States v. Strifler*, 851 F.2d 1197, 1202 (9th Cir. 1988) (evidence that witness previously had "l[ied] to authorities" must be disclosed under *Brady*); *Andazola v. Woodford*, 2011 WL 1225979, *7, *12 (N.D. Cal. Mar. 31, 2011) (granting habeas relief for the prosecution's failure to disclose the police officer who testifed at defendant's trial had filed false reports in other cases); *United States v. Hall*, 113 F.3d 157, 158-160 (9th Cir. 1997) ("What most impeached [informant's] credibility was his false report to the police. That crime, more than his crimes carrying higher penalties, suggested the possibility that he would lie to the police to frame an innocent man.").  By failing "to turn over to the defense in discovery *all* material information casting a shadow on a government witness's credibility," the government failed to meet the Ninth Circuit's expectation that "prosecutors and investigators [] take all reasonable measures to safeguard the system against treachery." *United States v. Bernal-Obeso,* 989 F.2d 331, 334 (9th Cir.1993) (emphasis in original).

It makes no difference that Mr. Klasky's testimony at trial may have been elicited vaguely enough not to specify the date and time of the "Gun to Your Head" Call.  As explained above, the evidence the government recently disclosed is sufficient to show that the government presented "actually false" testimony within the meaning of *Napue*.  (*See supra* Sec. III.A.)  When the date changed, so too did the substance of Mr. Klasky's testimony.  However, as to the *Brady* violation, whether Mr. Klasky's trial testimony was "actually false" is in any event irrelevant to the question of whether the recently disclosed materials are favorable to Mr. Omidi.  The materials impeach Mr. Klasky's credibility, even putting aside his trial testimony, because they unquestionably show that the story he told the government on May 24, 2016—*i.e.,* that he received a threatening call from Mr. Oxman that same morning—was false.  The fact that Mr. Klasky later altered his account based on the government's confrontation of him with the undisclosed evidence enhances, rather than diminishes, the impeachment value of these materials.

### b.    The Government Suppressed The Withheld Evidence

The government unquestionably suppressed this favorable evidence.  *Brady* and

*Giglio* dictate that impeachment evidence such as the Kelley Spreadsheet and the November 2016 TLOxp Reports "must be disclosed unilaterally as a matter of constitutional right," and the government did not disclose these materials until after trial. *Milke*, 711 F.3d at 1006.

Even after trial, the government continued to withhold favorable evidence and even denied its existence for weeks, before finally producing the materials in response to Mr. Omidi's counsel's third post-trial request. (*See* Ex. 1 ("There is no outstanding discovery on this issue."); *id.* ("The government did not subsequently obtain the subscriber information for" the 310 Number or the 818 Number).)

In its recent submission in response to Mr. Omidi's *Ex Parte* Application, the government suggested that the materials it recently disclosed "exceeded its discovery obligations." This position is baseless, but it underscores precisely why the Court should order further discovery. If the government considers these recently disclosed materials not to be "discoverable", neither Mr. Omidi nor the Court can be expected to accept at face value the government's assertion that it does not possess any additional discoverable materials. Indeed, in granting a new trial based on a *Brady* violation, the Ninth Circuit observed that if the government's post-trial disclosure of exculpatory evidence "were in the prosecutor's file and not produced, failure to disclose indicates the 'tip of an iceberg' of evidence that should have been revealed under Brady." *United States v. Shaffer*, 789 F.2d 682, 690-91 (9th Cir.1986).

Courts within this circuit have regularly ordered further discovery upon a showing that the government suppressed *Brady* material, as is the case here. *See United States v. Blanco*, 392 F.3d 382, 394 (9th Cir. 2004) ("Given the government's suppression of the *Brady/Giglio* material pertaining to Rivera's immigration status, we believe that for prophylactic reasons, the district court should order full disclosure by the government of any and all potential *Brady/Giglio* material, whether or not related to Rivera's immigration status.") (quotations omitted); *United States v. Bernal-Obeso*, 989 F.2d 331, 333 (9th Cir. 1993) ("We believe the better course is to flush out the truth from behind the government's

veil and then determine what to do with it in the light of its implications, if any, with respect to [witness's] credibility. Moreover, the government should be required under these circumstances, for prophylactic reasons at least, to demonstrate whether it discharged its obligation under *Brady* [], and *Giglio* to provide the defense with material exculpatory evidence within the government's possession, including evidence that could have been used to impeach the informant's credibility.")

### c.   The Government's Suppression Prejudiced Mr. Omidi

Finally, the government's suppression of this evidence was prejudicial.  Under *Brady*, "[e]vidence is material—and therefore requires reversal—when there is any reasonable likelihood that it could have affected the judgment of the jury." *United States v. Obagi*, 965 F.3d 993, 997 (9th Cir. 2020).  A defendant therefore need only demonstrate the "possibility of an acquittal" had the suppressed evidence been disclosed, not that an acquittal was certain, or even that it was likely." *Kyles v. Whitley,* 514 U.S. 419, 435 (1995).  There is no question that Mr. Omidi was prejudiced by the government's failure to disclose evidence that both contradicted Mr. Klasky's account of the "Gun to Your Head" Call and undermined Mr. Klasky's credibility.   As the Ninth Circuit has repeatedly held, "[i]mpeachment evidence is especially likely to be material when it impugns the testimony of a witness who is critical to the prosecution's case." *United States v. Price*, 566 F.3d 900, 914 (9th Cir. 2009) (quotations omitted).  Mr. Klasky indisputably was the prosecution's ***most critical*** witness, and the "Gun to Your Head" Call was a critical aspect of his testimony and the government's case.

The government suggested in its recent response to Mr. Omidi's *Ex Parte* Application that Mr. Omidi should have impeached Mr. Klasky at trial regarding the "purported inconsistency" in his account of the threatening call, even without the benefit of the government's untimely post-trial disclosures.  In so arguing, the government not only ignores the Court's order that the government specifically identify impeachment material prior to trial (ECF No. 1333), but also conflates what it characterizes as merely an "inconsistency" in Mr. Klasky's statements—whether the call occurred on May 24 or May

23—with evidence that the government investigated Mr. Klasky's initial claim and obtained confirmation that it was false.  Even if the inconsistency the government claims Mr. Omidi's counsel should have discovered was apparent from the existing discovery, the results of the government's investigation was not.  In addition, it is one thing to impeach Mr. Klasky with an inconsistency, but it would have been altogether different to impeach Mr. Klasky with the government's undisclosed investigative report proving Mr. Klasky had provided a materially false report to the government on May 24, 2016.  *Benn v. Lambert,* 283 F.3d 1040, 1056–57 (9th Cir. 2002) (There is a substantial difference between "general evidence of untrustworthiness [with an inconsistency] and specific evidence that a witness has lied.")

Without the evidence that the government set out to corroborate, but instead contradicted, Mr. Klasky's account of the call, Mr. Omidi and his counsel were deprived of the opportunity not only to "impugn[] the testimony of a witness who is critical to the prosecution's case," *Price*, 566 F.3d at 914 (quotations omitted), but also to call into question the integrity of the government's investigation.  Put differently, Mr. Omidi's approach to the cross examination of Mr. Klasky and government agents would have been very different had Mr. Omidi known, as he does now, that the government found evidence contradicting Mr. Klasky's report, confronted him with that evidence, and then accepted Mr. Klasky at face value when he changed his account during his grand jury testimony. *Kyles v. Whitley*, 514 U.S. 419, 420 (1995) ("Disclosure would therefore have raised opportunities for the defense to attack the thoroughness and even the good faith of the investigation, and would also have allowed the defense to question the probative value of certain crucial physical evidence."); *Shelton v. Marshall*, 796 F.3d 1075, 1089 (9th Cir. 2015) (casting "serious doubts about the good-faith of the prosecution as a whole" in light of *Brady* errors and that the suppression stole the opportunity from the defense to "diminish[] the State's own credibility as a presenter of evidence").  For example, Mr. Omidi would have raised these issues in the cross examination of FDA Special Agent Samantha Kelley, who created the recently disclosed spreadsheet confirming the falsity of Mr. Klasky's May 24, 2016 accusation, as well as other agents who received the evidence

that Mr. Klasky's story could not have occurred as represented (including FDA Special Agent Zeva Pettigrew), to "attack[] the reliability of the investigation . . . in tolerating (if not countenancing) serious possibilities that incriminating evidence had been planted." *Kyles*, 514 U.S. at 446.  In light of the suppression of the very information necessary to impeach Mr. Klasky, the government's suggestion that Mr. Omidi's counsel "strategically" chose not to impeach Mr. Klasky on this issue is baseless.

Mr. Omidi unquestionably suffered prejudice due to this suppression, and any further evidence of the government's failure to disclose will only enhance that prejudice.

### D.   Further Discovery Is Required Under *Jencks*

Mr. Omidi requests the Court to order the government to disclose all material related to Mr. Klasky's credibility under the *Jencks* act, from FDA Special Agent Zeva Pettigrew, who testified as a government witness at trial regarding Mr. Klasky and his credibility. *United States v. Brumel-Alvarez*, 991 F.2d 1452, 1464 (9th Cir. 1992) ("The prosecution is obligated to disclose to the defense statements falling within the Jencks Act regardless of anyone's perception of the utility of the statements for impeachment. Moreover, it is sufficient that, [i]n determining whether the statements in question 'related to' the direct testimony of the witness, it must relate *generally to the events and activities testified to.*") (citations and internal quotations omitted, emphasis in original).

### E.   Further Discovery Is Relevant to the Proper Remedy

In his post-trial motion, Mr. Omidi intends to request a new trial, the basis for which is clearly established as set forth above.  Mr. Omidi also intends to request that the Court exercise its supervisory powers to dismiss the indictment.  The Court should not be deprived of the full extent and context of the government's conduct with respect to this matter before determining whether to exercise that authority.

The Court may dismiss an indictment under its supervisory powers if the government has engaged in "flagrant" misconduct or has acted with "reckless disregard" for its constitutional obligations.  *United States v. Chapman*, 524 F.3d 1073, 1085 (9th Cir. 2008). To the extent the government is continuing to withhold further relevant discovery regarding

its investigation of Mr. Klasky's report and his credibility, both the withheld evidence and the mere fact that the government is, once again, suppressing evidence, would be highly relevant to Mr. Omidi's request and to the Court's determination of the appropriate remedy.

## IV.   THE COURT SHOULD ORDER AN EVIDENTIARY HEARING

Regardless of whether the government's misconduct ultimately proves limited to Mr. Klasky's testimony regarding the "Gun to Your Head" Call, Mr. Omidi should be afforded an evidentiary hearing so that the Government answers under oath as to its knowledge of the falsity of Mr. Klasky's testimony and the reasons for its failures to disclose impeaching information as to this testimony and Mr. Klasky's credibility as a whole. *Schell v. Witek*, 218 F.3d 1017, 1027 (9th Cir. 2000) ("Evidentiary hearings are particularly appropriate when claims raise facts that occurred out of the courtroom and off the record."); *United States v. Mazzarella*, 784 F.3d 532, 539, 542 (9th Cir. 2015) (vacating the district court's denial of motions for a new trial and remanding for discovery and an evidentiary hearing on the *Brady* issue "on an open record"); *United States v. Alvarez*, 358 F.3d 1194, 1209 (9th Cir. 2004) ("In *United States v. Bernal–Obeso*, 989 F.2d 331 (9th Cir.1993), the court stated that '[b]ecause neither we nor the trial court know what it is we are attempting to review ... [t]he appropriate step is to vacate the defendant's conviction and remand to the district court for an evidentiary hearing' to determine whether the government had discharged its obligation to provide the defense with material exculpatory evidence, including impeachment evidence, within its possession regarding a confidential informant/witness.").

The Government's claim that its belief in the truth or the falsity of Mr. Klasky's testimony is "irrelevant" is untenable under clearly established law.  The basic integrity of this case requires that all of the facts receive the full light of discovery and a hearing.

## V.   CONCLUSION

Based on the foregoing, Mr. Omidi respectfully requests that the Court compel the government to search for and produce all documents and information it possesses relating to Mr. Klasky's allegations concerning the "Gun to Your Head" Call and the government's investigation thereof or, at the very least, compel the government to identify in a log any

and all such documents it is continuing to withhold and the government's basis for doing so.  Mr. Omidi also requests that the Court hold an evidentiary hearing regarding this matter and order the government to preserve and not destroy all of its communications, notes of interview, and other memoranda regarding Mr. Klasky.

Dated:  February 22, 2022                    Respectfully submitted,


                                             **WILLKIE FARR & GALLAGHER LLP**

                                             By: s/ Michael S. Schachter
                                                 MICHAEL S. SCHACHTER
                                                 RANDALL W. JACKSON
                                                 CASEY E. DONNELLY
                                                 SIMONA AGNOLUCCI

                                                 ATTORNEYS FOR DEFENDANT
                                                 JULIAN OMIDI

## PROOF OF SERVICE

I am employed and a resident of New York. I am over the age of 18 and not a party to the within action; my business address is 787 Seventh Avenue, New York, NY 10019. On February 22, 2021, I served the document described as:

**DEFENDANTS JULIAN OMIDI'S MOTION TO COMPEL DISCOVERY AND TO HOLD EVIDENTIARY HEARING**

Upon the interested parties in this action as follows:

     X     By the Court's ECF.

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on February 22, 2021.

s/ Michael S. Schachter
Michael S. Schachter