Michael S. Schachter** (NY 3910205)
Randall W. Jackson** (NY 5274048)
Casey E. Donnelly** (NY 4936803)
**WILLKIE FARR & GALLAGHER LLP**
787 Seventh Avenue
New York, New York 10019
Tel: (212) 728-8102; Fax: (728) 728-8111
Email: *mschachter@willkie.com*

*Attorneys for Defendant Julian Omidi*

[Additional Counsel Continued On Next Page]

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>*vs*.<br><br>JULIAN OMIDI, INDEPENDENT MEDICAL SERVICES INC., a professional corporation, SURGERY CENTER MANAGEMENT, LLC, and MIRALI ZARABI, M.D.,<br><br>Defendants. | Case No. CR 17-00661(A)-DMG<br><br>[*Assigned to Hon. Dolly M. Gee, District Court Judge*]<br><br>**REPLY IN SUPPORT OF DEFENDANT JULIAN OMIDI'S MOTION TO COMPEL DISCOVERY AND TO HOLD EVIDENTIARY HEARING**<br><br>Hearing:   March 23, 2022 at 2:30 PM<br>Dept.:      Courtroom 8C<br>Location:  350 West 1st Street,<br>              8th Floor<br>              Los Angeles, CA 90012<br><br>Oral Argument Requested |

[Additional Counsel Continued From Previous Page]

Simona Agnolucci (SBN 246943)
**WILLKIE FARR & GALLAGHER LLP**
One Front Street
San Francisco, CA 94111
Tel: (415) 858-7447, Fax: (415) 858-7599
Email: *sagnolucci@willkie.com*

Edmund W. Searby** (OH 067455)
**PORTER WRIGHT MORRIS & ARTHUR LLP**
950 Main Avenue, Suite 500
Cleveland, OH 44113
Tel: (216) 443-2545, Fax: (216) 443-9011
Email: *esearby@porterwright.com*
** *Appearing pro hac vice*
*Counsel for Defendant Julian Omidi*

# TABLE OF CONTENTS

**Page(s)**

I.    MR. KLASKY MADE A FALSE REPORT ............................................... 2

    A.    The Government Cannot Walk Back Mr. Klasky's Story ............................. 2

    B.    The Government Knew About Mr. Klasky's False Report ........................... 5

II.   THE GOVERNMENT ELICITED FALSE TESTIMONY ...................................... 6

    A.    Mr. Klasky's Altered Story Before The Grand Jury Does Not Permit
        The Government To Ignore His False Report .................................... 6

    B.    Eliciting Mr. Klasky's Trial Testimony With Deliberate Imprecision
        Does Not Render His False Report True ...................................... 8

III.  THE GOVERNMENT'S BRADY VIOLATION IS CLEARLY
    ESTABLISHED ................................................................ 9

    A.    The Government's Intent Is Irrelevant ...................................... 10

    B.    The Government Withheld Favorable Evidence ................................. 11

    C.    The Government Cannot Avoid Its Duty To Disclose By Shifting The
        Burden To The Defense ...................................................... 11

    D.    The Withheld Evidence Was Material ......................................... 15

IV.   FULL DISCOVERY AND AN EVIDENTIARY HEARING IS
    WARRANTED .................................................................. 18

V.    CONCLUSION ................................................................. 20

# TABLE OF AUTHORITIES

**Cases**                                                                          **Page(s)**

*Amado v. Gonzalez,*
   758 F.3d 1119 (9th Cir. 2014) ............................................................... 13, 14

*Benn v. Lambert,*
   283 F.3d 1040 (9th Cir. 2002) ............................................................... 13, 16

*Brockmeier v. Solano Cnty. Sheriff's Dep't,*
   2010 WL 148179 (E.D. Cal. Jan. 12, 2010) ............................................... 8

*Dow v. Virga,*
   729 F.3d 1041 (9th Cir. 2013) ...................................................................... 17

*Farrow v. United States,*
   580 F.2d 1339 (9th Cir. 1978) ........................................................................ 8

*Kyles v. Whitley,*
   514 U.S. 419 (1995) ......................................................................... 7, 11, 17

*Mellen v. Winn,*
   900 F.3d 1085 (9th Cir. 2018) ........................................................ 12, 16, 17

*Milke v. Ryan,*
   711 F.3d 998 (9th Cir. 2013) .......................................................... 10, 11, 17

*Miller–El v. Dretke,*
   545 U.S. 231 (2005) ..................................................................................... 5

*N. Mariana Islands v. Bowie,*
   243 F.3d 1109 (9th Cir. 2001) ....................................................................... 9

*S. Ry. Co. v. Lanham,*
   403 F.2d 119 (5th Cir. 1968) ......................................................................... 8

*Silva v. Brown,*
   416 F.3d 980 (9th Cir. 2005) ....................................................................... 16

*Sims v. Cupp,*
   354 F. Supp. 698 (D. Or. 1972) ................................................................... 9

*Soto v. Ryan,*
   760 F.3d 947 (9th Cir. 2014) ......................................................................... 9

*Tennison v. City & Cnty. of San Francisco,*
   570 F.3d 1078 (9th Cir. 2009) ................................................................. 13

*United States v. Agurs,*
   427 U.S. 97 (1976)...................................................................................... 15

*United States v. Bagley,*
   473 U.S. 667 (1985).................................................................................... 15

*United States v. Bernal-Obeso,*
   989 F.2d 331 (9th Cir. 1993) .................................................................... 16

*United States v. Dupuy,*
   760 F.2d 1492 (9th Cir. 1985) ............................................................ 13, 14

*United States v. Griffin,*
   659 F.2d 932 (9th Cir. 1981) ...................................................................... 4

*United States v. Hsia,*
   24 F. Supp. 2d 14 (D.D.C. 1998) ............................................................ 12

*United States v. Kojayan,*
   8 F.3d 1315 (9th Cir. 1993) ........................................................................ 5

*United States v. Lucas,*
   841 F.3d 796 (9th Cir. 2016) .................................................................... 19

*United States v. Price,*
   566 F.3d 900 (9th Cir. 2009) .................................................................... 10

*United States v. Prokupek,*
   632 F.3d 460 (8th Cir. 2011) ...................................................................... 7

*United States v. Streater,*
   70 F.3d 1314 (D.C. Cir.1995)..................................................................... 7

*Zapata v. Vasquez,*
   788 F.3d 1106 (9th Cir. 2015) .................................................................. 17

The government's Opposition never forthrightly addresses what is fundamentally at stake—the government's clear knowledge that Mr. Klasky's tale of receiving the "Gun to Your Head" Call[1] was false because he claimed to have received the call *earlier the same morning* of his May 24, 2016 interview, and—as the government's post-trial disclosures clearly establish—Mr. Oxman did not call Mr. Klasky that morning. The government claims that perhaps Mr. Klasky never said he received the call the morning of his May 24, 2016 interview and its official memorandum recording that statement is in error. The government submits that Mr. Oxman may have called Mr. Klasky on some other day and therefore the government was right to believe the testimony it elicited.

But Mr. Klasky repeated this same false claim—that Mr. Oxman called him the morning of the interview—not once, but twice. There can be no doubt that the government's record is accurate; Mr. Klasky just lied to the government, repeatedly, when he claimed that just hours before his first government interview Mr. Oxman made the "Gun to Your Head" Call. And the government was aware of these lies. Understanding the power and importance of Mr. Klasky's claim, the government set out to investigate it and discovered—through its analysis of phone records and subscriber information it obtained—that Mr. Klasky's story could not have been true. The government confronted Mr. Klasky with this evidence and, after first reaffirming his initial false claim, Mr. Klasky changed his story to conform with the records the government showed him. Then, rather than investigating Mr. Klasky's claim further or reassessing the wisdom of building a case around Mr. Klasky's testimony, the government ignored Mr. Klasky's false report, concealed the evidence that demonstrably proved its falsity, and elicited and relied on Mr. Klasky's account of the "Gun to Your Head" Call at trial.

As set forth below, the government's effort to sidestep the true facts is belied by the record. And the government's record of misrepresentation, obfuscation, and refusal to respond to genuine concerns about the government's conduct only reaffirms the need for

---

[1] Capitalized terms not defined herein have the same meaning as in Mr. Omidi's Motion to Compel.

1    the Court to order discovery and hold an evidentiary hearing.

2    **I.    MR. KLASKY MADE A FALSE REPORT**

3           The government does not—because it cannot—reasonably dispute that Mr. Klasky's

4    claim to the government that he received the "Gun to Your Head" Call on the morning of

5    his May 24, 2016 proffer interview was false.  Instead, the government tries to distract from

6    this indisputable fact by falsely insinuating that Mr. Klasky may not even have made that

7    claim and by claiming that the government lacks any recollection of the relevant events.

8           **A.    The Government Cannot Walk Back Mr. Klasky's Story**

9           Mr. Klasky repeatedly told the government that he received the purported "Gun to

10   Your Head" Call on the morning of May 24, 2016, and the first time he told this story was

11   during an interview later that same morning.  The government's official report of that call

12   (Mot. Ex. 2 at 12) makes this clear:

13

14   interview, including a telephone conversation with OXMAN that occurred
     today, prior to the interview, with J. OMIDI present in the car with
15   OXMAN.  KLASKY had observed J. OMIDI and OXMAN leaving together in a car.
     Ten minutes after they left, OXMAN called KLASKY from the car.  Though J.
16

17   Although the government cannot argue that any such call actually occurred that morning,

18   as Mr. Klasky initially claimed, the government implies—but never directly states—that

19   perhaps Mr. Klasky did not really make that claim.  The government's efforts in this regard

20   rely on a misrepresentation of the government's own records.

21          While acknowledging that SA Coleman's official report of the interview (excerpted

22   above) states that Mr. Klasky claimed the call took place the morning of May 24, the

23   government now argues that "the contemporaneous agent notes do not indicate the precise

24   timing of the call."  (Opp. at 2-3.)  Later, the government repeats that Mr. Omidi's "sole

25   basis for claiming that the testimony was 'actually false' appears to be that the written report

26   of the May 24th Meeting (***but not the contemporaneous agent notes***) indicates that Klasky

27   said the 'gun-to-the-head call happened that morning . . . .'" (Opp. at 15 (emphasis added).)

28   But that is simply untrue.  SA Coleman's contemporaneous notes do indeed indicate that

Mr. Klasky said he saw Messrs. Omidi and Oxman "get in car together" prior to a call he received on his way "*[t]o meeting w/ AUSAs today*." (Opp. Ex. 1 at 20 (emphasis added).)



The Kelley Spreadsheet (Mot. Ex. 7) separately confirms that Mr. Klasky told the government that the "Gun to Your Head" Call occurred the morning of May 24. Specifically, SA Kelley, who participated in the May 24 interview (Mot. Ex. 2 at 12), added a notation in her spreadsheet quoting from SA Coleman's report that Mr. Klasky claimed the "Gun to Your Head" Call "occurred today, prior to the interview."

Initial Proffer of Klasky on 5/24/2016. J. OMIDI and OXMAN were aware that KLASKY was meeting with the Government today. They repeatedly told KLASKY not to go to the present interview, including a telephone conversation with OXMAN that occurred today, prior to the interview, with J. OMIDI present in the car with OXMAN. KLASKY had observed J. OMIDI and OXMAN leaving together in a car. Ten minutes after they left, OXMAN called KLASKY from the car. Though J. OMIDI did not speak during the telephone call, KLASKY was certain he was still with OXMAN because they had just left together in the car prior to the telephone call. OXMAN told him to stick to the ISONO memo story, to keep his mouth shut, and to not tell the truth or his (KLASKY's) life would be over.

Even if these three government sources were not enough to establish that Mr. Klasky claimed the "Gun to Your Head" Call occurred on the morning of May 24, the government ignores that Mr. Klasky repeated this same claim at his August 14, 2017 interview. There, Mr. Klasky again insisted that the "'gun to your head call' was in the morning" of May 24, 2016, "right before 10 am meet[ing]." (Mot. Ex. 11 at GT_REPORTS_00104958.) That

the government asked Mr. Klasky during the August 14, 2017 interview about the subscribers for the two numbers that called Mr. Klasky on the morning of May 24, 2016 confirms the government's understanding at the time that Mr. Klasky had claimed the "Gun to Your Head" Call took place the morning of May 24.

In her declaration, AUSA Williams surprisingly states that she "was not able to determine that [the Kelley Spreadsheet and underlying documents] were used in connection with the August 14, 2017 Klasky interview." (Williams Decl. at ¶ 9). But the record is clear that the names of these two subscribers (which are misspelled in the rough notes) were mentioned during the discussion of the "Gun to Your Head" Call.  The Kelley Spreadsheet and underlying November 2016 TLOxd Reports are the only known sources of this information, and the government had no reason to raise this information with Mr. Klasky unless he had told them that the "Gun to Your Head" Call occurred the morning of May 24, 2016.

Moreover, the government's suggestion that its own official report of the May 24 interview should be disregarded is particularly strange because, as the Ninth Circuit has held, "[i]t is the final report which becomes the Jencks Act statement and not the rough notes."  *United States v. Griffin*, 659 F.2d 932, 937–38 (9th Cir. 1981).  The government cannot now seek to avoid inconvenient facts from an interview by speculating that the Jencks material it provided to the defense may not have been accurate.[2]

In sum, Mr. Klasky's representation that he received the "Gun to Your Head" Call on the morning of May 24, 2016 is thoroughly documented in the completed report of the May 24 proffer interview, the rough notes of that same interview and a subsequent interview, and the Kelley Spreadsheet.

---

[2] AUSA Williams confusingly states in her Declaration not only that none of the government participants remembers the May 24, 2016 interview with Mr. Klasky, but also that "a written report of the interview was never generated."  (Williams Decl. ¶ 3.)  This of course is untrue; the government did prepare a memorandum of that interview, which the government cites in its brief.  (*See* Opp. at 2-3.)

**B.     The Government Knew About Mr. Klasky's False Report**

Significantly, the government does not dispute that the telephone records, recently disclosed subscriber information, and the government's own analysis of same (also recently disclosed) prove that Mr. Klasky did not receive the "Gun to Your Head" Call on the morning of May 24, 2016, as he at least twice represented to the government. Indeed, the government's desperate attempt to suggest that Mr. Klasky may not have made this claim underscores that the claim was false. Nor can the government rationally argue that Mr. Klasky made an innocent error as to the timing of the call, given that he first reported the call the same morning he claimed the call took place. Thus, Mr. Klasky's claim was not "subject to the usual risk of imprecision and distortion from the passage of time." *Miller–El v. Dretke*, 545 U.S. 231, 241 n.1 (2005). The government dodges the logical conclusion that Mr. Klasky's report was false, claiming that all of the May 24, 2016 interview's participants—including two FBI agents and two FDA agents, all of whom are trained law enforcement officers and professional witnesses—have collective amnesia regarding the government's first interview with its principal witness. (Williams Decl. ¶ 3.)

The government's own records establish conclusively that the entire prosecution team knew about Mr. Klasky's false report as early as January 2017. On January 13, 2017, SA Kelley emailed the Kelley Spreadsheet, which details the results of the government's investigation into Mr. Klasky's claim, to ten other members of the prosecution team, including AUSA Williams, SA Coleman, and SA Pettigrew. (Mot. Exs. 6-10.) At that point, the prosecution team was fully aware that on the morning of May 24, 2016, Mr. Klasky received phone calls from Cheryl Ann Nichols and Sevan Shahnazari (or possibly, according to the November 2016 TLOxd Reports, Mr. Klasky's attorney Richard Moss), but *not* Mr. Oxman. (Mot. Ex. 7.) The government's lack of recollection in spite of these clear records, coupled with its absurd suggestion that its own records, rather than Mr. Klasky's story, were inaccurate, is indicative of a troubling "unwillingness to own up to" its conduct with respect to Mr. Klasky's false claim. *United States v. Kojayan*, 8 F.3d 1315, 1318 (9th Cir. 1993).

## II.  THE GOVERNMENT ELICITED FALSE TESTIMONY

Unable to dispute the falsity of the story Mr. Klasky repeatedly told the government, the Opposition attempts to divert the Court's attention away from Mr. Klasky's lie to the version of that story that Mr. Klasky ultimately told during his trial testimony.  To do so, the government claims that Mr. Klasky's trial testimony is "nearly identical" to his grand jury testimony and consistent with the phone records.  By so arguing, the government glosses over the importance of Mr. Klasky's initial false claim and the circumstances under which he changed his story.

### A.  Mr. Klasky's Altered Story Before The Grand Jury Does Not Permit The Government To Ignore His False Report

The government's argument that the Court should disregard the proven falsity of Mr. Klasky's account of the "Gun to Your Head" Call because Mr. Klasky's trial testimony and grand jury testimony were "nearly identical" is misguided in several key respects.

To begin, the government's claim that Mr. Klasky's trial testimony is consistent with his grand jury testimony is false.  The two accounts differ in at least one significant respect.  Before the grand jury, Mr. Klasky claimed for the first time that he could hear Mr. Omidi directing Mr. Oxman in the background during the "Gun to Your Head" Call (Mot. Ex. 12), whereas when Mr. Klasky initially told the story to the government he said that Mr. Omidi "did not speak during the telephone call, [but] Klasky was certain he was still with Oxman because they had just left together." (Mot. Ex. 2).  At trial, Mr. Klasky reverted to his original version of his story, in which Mr. Omidi was seen shortly before the call but not heard during the call.  (Tr. at 4975.)

The government's argument that Mr. Klasky's alteration of his story when he testified before the grand jury somehow absolves him of making a false report in the first place is completely backwards.  The records establish that on August 14, 2017—months after the entire prosecution team became aware that Mr. Klasky made a false report—the government showed Mr. Klasky his phone records and asked him about the subscribers for the phone numbers that called Mr. Klasky on May 24, 2016.  (Mot. Ex. 11.)  After reaffirming during

the August 14, 2017 interview his initial claim that the "Gun to Your Head" Call occurred on the morning of May 24, 2016, Mr. Klasky changed his story and told the grand jury on August 16, 2017 that the "Gun to Your Head" Call took place "late afternoon" on May 23, 2016—an entirely new account, which was more closely aligned with the phone records the government had shown him two days before.[3]

This change in Mr. Klasky's account—particularly in the context of the recently disclosed information demonstrating that the government knew as early as January 2017 that his initial report of the "Gun to Your Head" Call was false—raises serious concerns regarding Mr. Klasky's credibility generally, as well as the veracity of his altered account. *See Kyles v. Whitley*, 514 U.S. 419, 444 (1995) ("[T]he evolution over time of a given eyewitness's description can be fatal to its reliability."). "A jury would reasonably have been troubled by the adjustments to the [Mr. Klasky's] original story." *Id*. at 443.

The altered story Mr. Klasky told the grand jury is implausible on its face insofar as it contradicts the contemporaneous report Mr. Klasky made on May 24, 2016. *United States v. Prokupek*, 632 F.3d 460 (8th Cir. 2011), is instructive. There, a contemporaneous government record showed that an officer who conducted a traffic stop told the defendant that he did so because the defendant had failed to signal his turn ***onto the exit ramp***. *Id.* at 461. At trial, however, the officer testified that he could not see the defendant's car when he turned onto the exit ramp, and that he pulled the defendant over for failing to signal his turn ***from the exit ramp to the county road***. *Id.* In reversing the district court's denial of a motion to suppress for clear error, the Eight Circuit found the officer's testimony was "implausible on its face" because it was contradicted by the officer's own contemporaneous statement. *Id.* at 463. *See also United States v. Streater*, 70 F.3d 1314, 1321 (D.C. Cir.1995) ("We conclude that the district court clearly erred in crediting trial counsel's testimony at the § 2255 hearing that he gave [the petitioner] correct legal advice when trial counsel's documented [prior] contemporaneous statements show the contrary."); *Farrow v. United*

---

[3] Although Mr. Klasky's phone records show two calls from Mr. Oxman to Mr. Klasky after 8:00 PM on May 23, 2016, they do not show any such calls during the afternoon of May 23, 2016. (Mot. Ex. 4.)

*States*, 580 F.2d 1339, 1361-62 (9th Cir. 1978) (record of contemporaneous statement renders subsequent altered statement "wholly unsubstantiated and refuted"); *S. Ry. Co. v. Lanham*, 403 F.2d 119, 128 (5th Cir. 1968) (statements taken from the witnesses shortly after the [event] constitute 'unique catalysts in the search for truth,' in that they provide an immediate impression of the facts that cannot be recreated or duplicated by a deposition that relies upon memory") (citation omitted); *Brockmeier v. Solano Cnty. Sheriff's Dep't*, 2010 WL 148179, at *6 (E.D. Cal. Jan. 12, 2010) ("Contemporaneous statements are viewed as unique and unduplicable") (quotations omitted).[4]

### B. Eliciting Mr. Klasky's Trial Testimony With Deliberate Imprecision Does Not Render His False Report True.

The government also contends that Mr. Klasky's trial testimony was not "actually false" because it was "consistent with Klasky's telephone records." (Opp. at 1, 10, 15.) This argument similarly ignores the import of Mr. Klasky's false report to the government, the evolving nature of his story, and the government's constitutional obligations in response to both.

With knowledge that Mr. Klasky had falsely claimed on multiple occasions that the "Gun to Your Head" Call occurred the morning of his May 24, 2016 proffer interview, the government purposefully asked Mr. Klasky at trial whether he received a call from Mr. Oxman "before that meeting," without specifying a date or asking Mr. Klasky to do so. (Tr. at 4974.) The government now attempts to hide behind this calculated vague questioning to justify its decision to elicit a story the government concluded years earlier was false. But

---

[4] The government's claim that Mr. Oxman may have said on a recording that he had a conversation with Mr. Klasky on May 23 is irrelevant and does not establish that the "Gun to Your Head" Call occurred on that date. Indeed, during his August 14, 2017 interview with the government, Mr. Klasky discussed an "evening call" with Mr. Oxman on May 23, but insisted that the "'gun to your head call' was in the morning" of May 24, 2016, "right before 10 am meet[ing]." (Mot. Ex. 11 at GT_REPORTS_00104958.). Nor do alleged discussions between Mr. Oxman and other individuals—Mr. Klasky's attorney, Larry Twersky, and Jaffy Palacios—regarding other purported events provide any corroboration for Mr. Klasky's claim regarding the "Gun to Your Head" Call. The government's reference to these other conversations is yet another attempt to distract the Court and avoid confronting the plain reality that the government discovered and concealed that Mr. Klasky made a false claim during his first proffer interview.

it is irrelevant whether this testimony was vague enough to be "consistent with Klasky's telephone records."   For purposes of *Napue*, "[t]here is no distinction between false testimony and the presentation of a witness's partial testimony which, when considered in isolation, creates a distorted picture of the facts."  *Sims v. Cupp*, 354 F. Supp. 698, 700 (D. Or. 1972); *cf. Soto v. Ryan*, 760 F.3d 947, 958 (9th Cir. 2014) ("[T]he state cannot allow a witness to give a materially false impression of the evidence").

At bottom, the government's arguments that Mr. Klasky's trial testimony was consistent with his grand jury testimony or that either testimony is not "actually false" because Mr. Klasky changed the aspects of his story that the government discovered were contradicted by the phone records simply evades what is at issue here.  The government caught Mr. Klasky in a story that the phone records, the subscriber information, and the government's analysis thereof established conclusively could not be true.  As a matter of law, the government had a constitutional duty under these circumstances to investigate and confront Mr. Klasky regarding his false, perjured statement.  *N. Mariana Islands v. Bowie*, 243 F.3d 1109, 1118 (9th Cir. 2001).  At a minimum, the discovery of Mr. Klasky's false claim should have led the government to seriously consider whether Mr. Klasky, the principal witness in this case, could be legally and ethically relied upon to testify at trial. As the Ninth Circuit stated in *Bowie*, "nowhere in the Constitution…or in any other writing of the Founding Fathers, can one find a single utterance that could justify a decision by any oath-beholden servant of the law to look the other way when confronted by the real possibility of being complicit in the wrongful use of false evidence to secure a conviction in court." *Id.* at 1096.  The government did not have latitude to groom the story into a version that avoided the obvious reason for its falsity.  Nevertheless, in disregard of its constitutional obligations, the government here "press[ed] ahead without a diligent and good faith attempt to resolve" what the government knew was a "real possibility of false testimony."  *Id.* at 1118.  The government's conduct denied Mr. Omidi due process of law.

## III.  THE GOVERNMENT'S *BRADY* VIOLATION IS CLEARLY ESTABLISHED

The government does not dispute that it failed to produce for use at trial both the

Kelley Spreadsheet (Mot. Ex. 7), which reflects the government's investigative efforts and conclusion that Mr. Klasky made a false claim regarding the "Gun to Your Head" Call, and the November 2016 TLOxd Reports, which enabled the government to reach that conclusion (Mot. Exs. 9, 10).  And AUSA Williams, in her declaration, acknowledges that on December 31, 2021, she informed Mr. Omidi's counsel, in response to a specific request for these and similar documents, that "there was no outstanding discovery on the issue raised." (Williams Decl. ¶ 7.)   Of course, this earlier representation—which predated the government's ultimate disclosure of the Kelley Spreadsheet, the November 2016 TLOxd Reports, and related emails—was inaccurate.  In spite of that, the government now expects Mr. Omidi and the Court merely to accept AUSA Williams's assurance that, this time, the government really does not have "any outstanding discovery" regarding the issues raised in Mr. Omidi's motion.  But this asks too much of Mr. Omidi and of the Court, particularly in light of the government's clear *Brady* violation.

### A.    The Government's Intent Is Irrelevant

In the Opposition, the government attempts to excuse its failure to disclose exculpatory impeachment evidence by asserting that this evidence was not in the government's evidence management database, and that the members of the prosecution team apparently forgot about this evidence. (Opp. at 12.)  The government conspicuously does not specify whether this evidence was kept in the individual case files of any of the ten members of the prosecution team who received it.  In any event, all of this is irrelevant to the *Brady* analysis.  The prosecution violates its constitutional obligation when it fails to produce evidence favorable to the accused irrespective of the good faith or intentionality of the prosecutor.  *United States v. Price*, 566 F.3d 900, 908 (9th Cir. 2009).  Moreover, "[t]he prosecutor is charged with knowledge of any *Brady* material of which the prosecutor's office or the investigating police agency is aware."  *Milke v. Ryan*, 711 F.3d 998, 1012 (9th Cir. 2013).

If anything, the government's admission that it did not properly maintain this evidence and profession of ignorance regarding this failure only raise questions about what

else the government may not have disclosed and further emphasize the need for further discovery and a hearing.

### B.   The Government Withheld Favorable Evidence

It is beyond argument that the undisclosed phone record analysis refuting Mr. Klasky's story that he received the "Gun to Your Head" Call on the morning of May 24 qualifies as evidence favorable to the accused. *See Milke*, 711 F. at 1012 ("Any evidence that would tend to call the government's case into doubt is favorable for Brady purposes."). The Opposition engages in a now familiar charade of summarizing the facts of other cases finding evidence to qualify as *Brady/Giglio*, and then stating that "[t]he potential subscribers of phone numbers not known to be connected with Oxman are nothing like the classic impeachment in those cases." (Opp. at 11.)  This statement is absurd.  As noted above, the government's phone subscriber analysis, as reflected in the Kelley Spreadsheet, disproved that Mr. Klasky received the "Gun to Your Head" Call on the morning of the first proffer interview as he at least twice claimed, and thus not only refuted the story the government presented at trial, but impugned the credibility of the government's principal witness and the integrity of its investigation in general.  *Kyles,* 514 U.S. at 445-47.

### C.   The Government Cannot Avoid Its Duty To Disclose By Shifting The Burden To The Defense

The government attempts to shift the blame for its non-disclosure to defense counsel by noting that it produced *some* discovery on this topic but the defense "decided not to cross-examine" Mr. Klasky regarding his false testimony.  (Opp. at 12.)  This circular argument assumes, incorrectly, that Mr. Omidi's counsel had the opportunity to do so.  To the contrary, the thrust of Mr. Omidi's *Brady* claim is that the government deprived Mr. Omidi's counsel of that opportunity by withholding the evidence confirming that Mr. Oxman did not call Mr. Klasky the morning of May 24, 2016, thus proving as false both Mr. Klasky's initial story and his subsequently altered version.

The government's argument that the recently disclosed discovery was "was cumulative of discovery already produced" (Opp. at p. 9) fails as a matter of law.  The Ninth

Circuit has repeatedly "rejected this argument before," including recently instructing that "the government cannot satisfy its *Brady* obligation to disclose exculpatory evidence by making some evidence available and claiming the rest would be cumulative." *Mellen v. Winn*, 900 F.3d 1085, 1099 (9th Cir. 2018). Rather, the government is obligated to disclose *all* material information casting a shadow on a government witness's credibility." *Id.* at 1097-98 (9th Cir. 2018) (*citing Carriger v. Stewart*, 132 F.3d 463, 481–82 (9th Cir. 1997) (en banc) (emphasis in original)).

In any event, the recently disclosed evidence was not cumulative, as the evidence disclosed prior to trial was insufficient to establish the clear falsity of Mr. Klasky's claim, much less to establish that the government investigated and discovered Mr. Klasky's story to be false. Although the government produced notes from its interviews with Mr. Klasky and Mr. Klasky's subpoenaed phone records, those records do not reflect what the recently disclosed materials clearly proved—namely, the subscriber identities of the phone numbers that called Mr. Klasky on the morning of May 24, 2016 and the government's conclusion, based on that information, that Mr. Klasky made a false report. Even if such information could be gleaned from those materials, the government overlooks that this disclosed evidence was included in a massive and difficult to search production of more than 1.5 million documents spanning more than 10 million pages. The government "cannot meet its *Brady* obligations by providing" a defendant with such a huge volume of discovery "and then claiming that [he] should have been able to find the exculpatory information in the haystack." *See United States v. Hsia*, 24 F. Supp. 2d 14, 29 (D.D.C. 1998).

The government's suggestion that Mr. Omidi and his counsel should have uncovered and exposed Mr. Klasky's lie through other means—for example, based on Mr. Omidi's "association with Oxman" (Opp. at 10), and presumed familiarity with Mr. Oxman's regular phone number—is similarly specious. The Ninth Circuit has explicitly "reject[ed] as untenable a broad rule that any information possessed by a defense witness must be considered available to the defense for *Brady* purposes" and maintained that "[t]he availability of particular statements through the defendant himself does not negate the

government's duty to disclose." *Tennison v. City & Cnty. of San Francisco*, 570 F.3d 1078, 1091 (9th Cir. 2009). Rather, "[d]efense counsel is entitled to plan his trial strategy on the basis of full disclosure by the government." *Id.*

Even if Mr. Omidi knew that Mr. Oxman ordinarily uses the 562 Number (as defined in the Motion) to communicate, that knowledge could not be used to confront Mr. Klasky, or to prove, conclusively, that Mr. Oxman did not also use one of the phone numbers that called Mr. Klasky on the morning of May 24, 2016. In fact, when the government confronted Mr. Klasky with his phone records on August 14, 2017, Mr. Klasky attempted to excuse his false claim by suggesting—falsely—that the 310 Number may have belonged to Mr. Oxman. (Mot. Ex. 11.) If anything, the records of this interview—which the government did disclose—gave the defense reason to believe that Mr. Klasky could provide a plausible explanation in response to cross-examination. *See Benn v. Lambert*, 283 F.3d 1040, 1062 (9th Cir. 2002) ("A defendant furnished with such inculpatory evidence by the [government] is not required to assume that the [government] has concealed material information and has thereby obligated him to ascertain the *Brady* material on his own."). The only way to disprove that faulty excuse is with evidence as to who actually did subscribe to the 310 Number (and the 818 Number). The government obtained that evidence and knew neither person was Mr. Oxman, but did not disclose it.

Put simply, Mr. Omidi's counsel should not be expected to craft a cross-examination based on facts the government concealed. *See Amado v. Gonzalez*, 758 F.3d 1119, 1139 (9th Cir. 2014) (reversing conviction for *Brady* suppression when "[defendant's] cross-examination of [key witness] did not address any of these points, for [defendant], without the suppressed impeachment evidence, lacked a good-faith basis to ask the appropriate questions."). In this regard, the government's reliance on *United States v. Dupuy*, 760 F.2d 1492 (9th Cir. 1985) is misplaced. (*See* Opp. at 10.) In *Dupuy*, the court permitted the government to withhold *Brady* material that was subject to confidentiality restrictions, but provided explicit notice of the existence of this material to the defense and provided the defense an opportunity to contact the witnesses who had made the statements that were

reflected in the withheld documents.  760 F.2d at 1501.  As the Ninth Circuit observed in *Amado*, the holding in *Dupuy* meant only "that when defense counsel was put on notice as to potential *Brady* material and given the opportunity to seek it out, then a defendant likely could not later claim that a *Brady* violation had occurred." *Amado*, 758 F.3d at 1137.  Here, as in *Amado*, "[n]o such explicit notice was provided." *Id.*  Indeed, far from providing "explicit notice," the government concealed the identities of the individuals who called Mr. Klasky on the morning of May 24, 2016, depriving the defense of the opportunity to even investigate who these people were and what their relationship with Mr. Klasky was.

More fundamentally, the government's suggestion that it was defense counsel's responsibility to uncover the principal government witness's demonstrable lie, when the government had already done so itself, ignores the government's affirmative duty to produce and identify exculpatory material.  "[A] prosecutor should not be excused from producing that which the law requires him to produce, by pointing to that which conceivably could have been discovered had defense counsel expended the time and money to enlarge his investigations.  No *Brady* case discusses such a requirement, and none should be imposed." *Amado*, 758 F.3d at 1136-37.  At a minimum, the government was obligated to specifically disclose as *Brady* the results of the government's investigation and the change in Mr. Klasky's testimony, and not simply to bury it in a mountain of discovery.

This obligation should exist in any case, but it is a clear command in this case where, over the government's opposition, this Court ordered the government to specifically identify evidence favorable to the accused of which it was aware.  (ECF No. 1333).  The government relegates its acknowledgement of the Court's *Brady* Identification Order to a cursory footnote denying that it "somehow violated" the Order without explaining why not.  (*See* Opp. at 14, n.6.)  The Kelley Spreadsheet and the underlying November 2016 TLOxd Reports demonstrate the government's discovery of compelling evidence favorable to Mr. Omidi and likely fatal to the credibility of Mr. Klasky.  But in defiance of a constitutional requirement and this Court's Order, it never produced these documents until cornered after the trial.  The *Brady* Identification Order is particularly relevant here because Mr. Omidi's

motion requesting that Order specifically asked that the government "identify[] communications relevant to [Mr. Klasky's] credibility and bias." (ECF 1154 at 4.)  The government failed to produce the Kelley Spreadsheet and the underlying November 2016 TLOxd Reports or to make any mention of the "Gun to Your Head" Call in response to this specific request.  By doing so, the government violated both the *Brady* Identification Order and *Brady* itself.  The law has long been clear that "[w]hen the prosecutor receives a specific and relevant [discovery] request, the failure to make any response is seldom, if ever, excusable." *United States v. Agurs*, 427 U.S. 97, 106 (1976).  In light of the government's incomplete and misleading response to this request, the government's argument now that Mr. Omidi's counsel should have uncovered the falsity of Mr. Klasky's story and cross-examined him on it is particularly troubling.  *United States v. Bagley*, 473 U.S. 667, 682 (1985) ("[A]n incomplete response to specific [*Brady*] requests not only deprives the defense of certain evidence but has the effect of representing to the defense that the evidence does not exist.  In reliance on this misleading representation, the defense might abandon lines of independent investigation, defense or trial strategies that it otherwise would have pursued.").

### D.    The Withheld Evidence Was Material

While the government cannot credibly argue that the recently disclosed evidence was not favorable to the accused, it argues that the evidence was not sufficiently "material" to constitute a *Brady* violation.  This argument is plainly inconsistent with the record, the government's own reliance on the evidence at trial, and applicable law.

### 1.    The Evidence Impeaches Mr. Klasky's Testimony And Credibility

As the Ninth Circuit has repeatedly held, "[i]mpeachment evidence is especially likely to be material when it impugns the testimony of a witness who is critical to the

prosecution's case." *Silva v. Brown*, 416 F.3d 980, 987 (9th Cir. 2005) (collecting cases).[5] *Accord. Mellen*, 900 F.3d at 1097. In particular, evidence that an informant lied to government authorities is "relevant evidence of the informant's credibility" that "might be equivalent to the proverbial smoking gun." *United States v. Bernal-Obeso*, 989 F.2d 331, 335-36 (9th Cir. 1993). "[D]irect proof" of a "lie . . . eliminate[es] the need for inferences." *Benn*, 283 F.3d at 1056. Mr. Omidi's Motion to Compel set forth in detail the importance of Mr. Klasky's testimony and the manner in which the withheld evidence contradicts his account of the "Gun to Your Head" Call while also impugning his credibility generally by demonstrating that he lied to the government during his first interview. (Mot. at 21-23.)

Well aware it was caught presenting false testimony and suppressing evidence to disprove it, the government makes half-hearted attempts to downplay the importance of the testimony at issue (*see* Opp. at 5, 12-13), after arguing at trial that this testimony was "absolutely relevant" and then relying on the story during summation and rebuttal. The government's suggestion now that this testimony was unimportant based on the number of transcript pages devoted to it is a preposterous oversimplification. The statement that Mr. Klasky's "testimony about the substance of that call took up less than one page of testimony" overlooks that this testimony was the last page of Mr. Klasky's direct testimony, which was punctuated by Mr. Klasky's self-serving statement that he ignored Mr. Oxman's purported advice not to cooperate because "[i]t was the right thing to do." (Tr. at 4977.) Likewise, the precise number of lines the government devoted to the "Gun to Your Head" Call during closing arguments is a distraction from the critical purpose for which the government cited this testimony in both its summation and its rebuttal—demonstrating Mr. Omidi's knowledge of and attempt to conceal the alleged fraud. (Tr. at 8659, 8926-27.) More generally, reducing these references to a number of lines understates the importance

---

[5] The Opposition notes that Mr. Omidi's "trial lasted more than 40 days, with nearly 40 government witnesses," and acknowledges that Mr. Klasky "was one of the government's *more significant* witnesses." (Opp. at 12 (emphasis added).) To the extent the government intends to imply that Mr. Klasky was not the government's *most significant* witness, Mr. Omidi is confident the Court recalls that he was.

of the prosecutor's statements during closing arguments.  *See Mellen*, 900 F.3d at 1097 ("The [prosecutor's] word about the 'likely damage' of the suppressed evidence is particularly strong evidence that the testimony was material."); *Dow v. Virga*, 729 F.3d 1041, 1043 (9th Cir. 2013) (conviction reversed where "the prosecutor [falsely] told the jury during closing argument that Dow had demonstrated consciousness of guilt by trying to hide his scar in order to prevent the sole eyewitness from identifying him"); *Zapata v. Vasquez*, 788 F.3d 1106, 1122 (9th Cir. 2015) ("The presentation of improper material at the end of trial magnifies its prejudicial effect because it is freshest in the mind of the jury when it retires to deliberate.") (alterations and citations removed).

### 2.     The Evidence Casts Doubt On The Government's Investigation

Moreover, the recently disclosed evidence would have permitted Mr. Omidi not only to impeach Mr. Klasky, but to undermine the integrity of the government's investigation.  It is a "common trial tactic of defense lawyers" to "discredit the caliber of the investigation or the decision to charge the defendant."  *Kyles v*, 514 U.S. at 446.  As such, *Brady* and its progeny "require the state to disclose all material evidence that could exculpate the defendant, including evidence that could be used to impeach one of the prosecution's witnesses or *undermine the prosecution's case*."  *Milke*, 711 F.3d at 1003  (emphasis added). By withholding the results of its investigation into Mr. Klasky's claim (Exhs. 6-10), the government concealed not only the falsity of Mr. Klasky's claim regarding the "Gun to Your Head" Call, but also the government's response to learning that Mr. Klasky made this false claim and then changed his story to conform with the records the government showed him during his August 14, 2017 interview.  With the withheld evidence, Mr. Omidi could have effectively attacked the "good faith of the investigation," *Kyles*, 514 U.S. at 450, and put "the reliability of the investigation into doubt," *id.* at 447, by showing that the government was "irresponsible in relying on" Mr. Klasky, *id.* at 450*.

As Mr. Omidi argued in his Motion to Compel, had he been provided with the results of the government's investigation, he could have questioned government agents, including SA Kelley, regarding the government's decision not to continue its investigation of Mr.

Klasky's claim and to allow him to change his story when he testified before the grand jury. (Mot. at 22-23.)  In response, the government notes that SA Kelley did not testify and Mr. Omidi "did not elect to call her."  (Opp. at 13.)  Again, the government's argument in this regard is circular; without the Kelley Spreadsheet and underlying results of the investigation, Mr. Omidi had no reason to call SA Kelley and no grounds to challenge the government's response to Mr. Klasky's false statement regarding the "Gun to Your Head" Call.  Likewise, the government's statement that Mr. Omidi had the opportunity to cross-examine SA Pettigrew "about Mr. Klasky's prior statements on other issues" does not change that Mr. Omidi was not provided the information necessary to cross-examine her regarding this particular statement.

## IV.   FULL DISCOVERY AND AN EVIDENTIARY HEARING IS WARRANTED

While the parties brief at length the merits of the allegations of serious misconduct, what is now before the Court is simply the issue of whether this Court will order the production of any remaining relevant documents and hold an evidentiary hearing before deciding the underlying claims for relief.  The evidence already adduced warrants a full and honest inquiry.

The government's Opposition reinforces, rather than contradicts, the need for discovery and a hearing.  For example, the government makes no effort in the Opposition to explain how it possibly reconciled its fundamental duty to prevent false testimony with its undeniable discovery that Mr. Klasky lied to the government about the "Gun to Your Head" Call during his first proffer interview.  Remarkably, AUSA Williams claims in her declaration that "none of the government participants present in the May 24, 2016 interview have any independent recollection of Oxman's contacts with Klasky before the May 24[th] Meeting."  (Williams Decl. ¶ 3.)  This is difficult to believe given the documentary evidence disclosed after trial showing the government's discovery that "Gun to Your Head" Call could not have transpired as repeatedly told by Klasky and the documented effort to confront him with the phone records at the August 14, 2017 interview.  But this purported lack of recollection, coupled with the government's efforts to avoid the implications of Mr.

Klasky's false report—is precisely why the Court should grant the present Motion.

Moreover, the government's documented suppression of clear *Brady* material regarding Mr. Klasky further underscores the need for full discovery and an evidentiary hearing. The Ninth Circuit's decision in *United States v. Lucas*, on which the government relies in its Opposition, makes this much clear. 841 F.3d 796 (9th Cir. 2016) (explaining that a defendant may "challenge the government's representation that it lacks *Brady* information" by "demonstrat[ing] that the government improperly withheld favorable evidence").

The government repeatedly asserts in its Opposition, as it has claimed before, that "there is no outstanding discovery on this issue." (Opp. at 1, Williams Decl. ¶ 10.). This same representation proved incorrect in the past. (Mot. Exh. 1.) The government conspicuously refuses to inform the Court—just as it refused to answer the defense— whether it possesses any additional relevant documents that it deems not "discoverable," or to provide a log of any relevant documents it is withholding. But the mere fact that the government opposes this Motion and continues to evade that critical inquiry—rather than simply stating that no additional relevant documents exist—strongly suggests that the government is continuing to withhold relevant information. The Opposition is similarly vague and evasive regarding the manner in which the government has "review[ed] the case file" to conclude that there is "no outstanding discovery." (Williams Decl. ¶ 20.) This is consistent with the government's earlier refusal to specify how the government went about searching for the documents and information Mr. Omidi had requested. (Schachter Decl. ¶ 6.) The manner in which the government searched for responsive documents is particularly relevant in light of the government's revelation in the Opposition that the recently disclosed materials were not in the government's evidence database for reasons unknown. (Williams Decl. ¶ 9.)

In short, Mr. Omidi's concern that the government is continuing to withhold relevant evidence and *Brady* material that it designates as not discoverable is well-founded, and the Opposition does nothing to allay that concern or even respond directly with candor. In light

of the government's documented past failure to comply with its *Brady* obligations and the Court's *Brady* Identification Order, the Court should not be expected to accept blindly the government's vague assurance that "there is no outstanding discovery on this issue."

## V.    CONCLUSION

For the foregoing reasons, Mr. Omidi respectfully requests that the Court grant Mr. Omidi's Motion.

Dated:  March 8, 2022                    Respectfully submitted,

**WILLKIE FARR & GALLAGHER LLP**

By: s/ Michael S. Schachter
        MICHAEL S. SCHACHTER
        RANDALL W. JACKSON
        CASEY E. DONNELLY
        SIMONA AGNOLUCCI

        ATTORNEYS FOR DEFENDANT
        JULIAN OMIDI

PROOF OF SERVICE

I am employed and a resident of New York. I am over the age of 18 and not a party to the within action; my business address is 787 Seventh Avenue, New York, NY 10019. On March 8, 2022, I served the document described as:

**REPLY IN SUPPORT OF DEFENDANT JULIAN OMIDI'S MOTION TO COMPEL DISCOVERY; REQUEST FOR EVIDENTIARY HEARING**

Upon the interested parties in this action as follows:

     X    By the Court's ECF.

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on March 8, 2022.

s/ Michael S. Schachter
Michael S. Schachter