Michael S. Schachter** (NY 3910205)
Randall W. Jackson** (NY 5274048)
Casey E. Donnelly** (NY 4936803)
**WILLKIE FARR & GALLAGHER LLP**
787 Seventh Avenue
New York, New York 10019
Tel: (212) 728-8102; Fax: (728) 728-8111
Email: *mschachter@willkie.com*

*Attorneys for Defendant Julian Omidi*

[Additional Counsel Continued On Next Page]

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>        *vs*.<br><br>JULIAN OMIDI, INDEPENDENT MEDICAL SERVICES INC., a professional corporation, SURGERY CENTER MANAGEMENT, LLC, and MIRALI ZARABI, M.D.,<br><br>                Defendants. | Case No. CR 17-00661(A)-DMG<br><br>[*Assigned to Hon. Dolly M. Gee, District Court Judge*]<br><br>**DEFENDANTS JULIAN OMIDI'S MOTION TO DISMISS INDICTMENT OR, ALTERNATIVELY, FOR A NEW TRIAL**<br><br>Hearing:    May 11, 2022 at 2:30 PM<br>Dept.:      Courtroom 8C<br>Location:   350 West 1st Street,<br>            8th Floor<br>            Los Angeles, CA 90012<br><br>Oral Argument Requested |

[Additional Counsel Continued From Previous Page]

Simona Agnolucci (SBN 246943)
**WILLKIE FARR & GALLAGHER LLP**
One Front Street
San Francisco, CA 94111
Tel: (415) 858-7447, Fax: (415) 858-7599
Email: *sagnolucci@willkie.com*

Edmund W. Searby** (OH 067455)
**PORTER WRIGHT MORRIS & ARTHUR LLP**
950 Main Avenue, Suite 500
Cleveland, OH 44113
Tel: (216) 443-2545, Fax: (216) 443-9011
Email: *esearby@porterwright.com*

** *Appearing pro hac vice*

*Counsel for Defendant Julian Omidi*

ii

**TO THE HONORABLE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD HEREIN:**

**PLEASE TAKE NOTICE** that, on May 4, 2022 at 2:30 PM, or, as soon as this matter may be heard in Courtroom 8C, of this Court, located at 350 West 1st Street, 8th Floor, Los Angeles, California, 90012, Defendant Julian Omidi, by and through counsel of record, will move and does hereby move this Court for an order dismissing the indictment or, alternatively, for a new trial.

This Motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities in support of this Motion, the accompanying Declaration of Michael S. Schachter and attached exhibits, all matters which the Court may judicially notice, and the documents and pleadings previously filed with this Court.

Dated:  March 30, 2022

Respectfully submitted,

**WILLKIE FARR & GALLAGHER LLP**

By: s/ Michael S. Schachter
      MICHAEL S. SCHACHTER
      RANDALL W. JACKSON
      CASEY E. DONNELLY
      SIMONA AGNOLUCCI

      ATTORNEYS FOR DEFENDANT
      JULIAN OMIDI

# TABLE OF CONTENTS

**Page(s)**

I.  INTRODUCTION ............................................................................................... 1

II.  FACTUAL AND PROCEDURAL BACKGROUND ...................................... 2

    A.  Charles Klasky's False Claim At His May 24, 2016 Proffer ...................... 2

    B.  The Government Confronted Mr. Klasky, Who Then Changed His Story ........................................................................................................... 4

    C.  Mr. Klasky's Trial Testimony .................................................................. 6

    D.  The Government's Reliance On The "Gun To Your Head" Call During Closing Arguments ................................................................................. 7

    E.  Post-Trial Discussions Regarding the "Gun to Your Head" Call .................. 7

    F.  The Government's Late Disclosure of *Brady* Material And Refusal To Produce Or Identify Additional Relevant Documents ........................ 9

III.  THE GOVERNMENT PRESENTED FALSE AND MISLEADING TESTIMONY ................................................................................................ 10

    A.  The Government Elicited False And Misleading Testimony ....................... 10

        1.  Elicitation of Perjured False Testimony Before the Grand Jury ........ 12

        2.  Elicitation of Perjured Testimony at Trial ........................................... 14

    B.  Mr. Klasky's False and Misleading Testimony Was Material ................... 16

        1.  The Government's Case Depended On Mr. Klasky ........................... 17

        2.  Disclosure And Correction Of Mr. Klasky's Falsity Would Have Been Devastating To His Credibility And The Government's Case ................................................................................................ 18

        3.  The Government Relied On The "Gun To Your Head" Call To Secure Mr. Omidi's Conviction. ........................................................ 20

        4.  Mr. Klasky's "Gun to Your Head" Call Testimony Was Not Cumulative of Other Testimony. ........................................................ 22

5. Mr. Omidi's Counsel's Inability To Cross-Examine Mr. Klasky And To Address Mr. Klasky's Testimony In Closing Arguments Do Not Render His False Testimony Immaterial ............................... 25

IV. THE GOVERNMENT'S FAILURE TO INVESTIGATE MR. KLASKY'S FALSE CLAIM IS A VIOLATION OF *BOWIE* ...................................... 27

V. THE GOVERNMENT WITHHELD EXCULPATORY EVIDENCE IN VIOLATION OF *BRADY* ........................................................ 29

A. The Government Withheld Favorable Evidence ............................................. 30

B. The Government Suppressed The Withheld Evidence .................................. 31

C. The Government's Suppression Prejudiced Mr. Omidi ............................... 32

1. The Government Deprived The Defense Of An Opportunity To Impeach The Government's Key Witness's Credibility .................... 33

2. Mr. Omidi's Counsel Was Unable To Impeach Mr. Klasky Regarding The "Gun to Your Head" Call ........................................... 35

VI. DISMISSAL IS THE PROPER REMEDY ................................................ 38

VII. CONCLUSION ........................................................................ 40

# <u>TABLE OF AUTHORITIES</u>

**Case**                                                                                                    **Page(s)**

*Alvarez v. Montgomery,*
  No. SACV-15-0987-DMG (KS), 2022 WL 868889
  (C.D. Cal. Jan. 27, 2022) ...............................................................15, 18, 33, 34

*Amado v. Gonzalez,*
  758 F.3d 1119 (9th Cir. 2014) ...............................................................36

*Andazola v. Woodford,*
  2011 WL 1225979 (N.D. Cal. Mar. 31, 2011) ...................................35

*Bagley v. Lumpkin,*
  798 F.2d 1297 (9th Cir. 1986) ........................................................20, 37

*Banks v. Dretke,*
  540 U.S. 668 (2004)........................................................18, 27, 35, 36

*Benn v. Lambert,*
  283 F.3d 1949 (9th Cir. 2002) ........................................................33, 34

*Blumberg v. Garcia,*
  687 F. Supp. 2d 1074 (C.D. Cal. 2010) ...............................................29

*Brady v. Maryland,*
  373 U.S. 83 (1963)...........................................................................1, 29

*Brockmeier v. Solano Cnty. Sheriff's Dep't,*
  2010 WL 148179 (E.D. Cal. Jan. 12, 2010) .......................................13

*Brown v. Borg,*
  951 F.2d 1011 (9th Cir. 1991) ...............................................................22

*Comstock v. Humphries,*
  786 F.3d 701 (9th Cir. 2015) ...............................................................29

*Dow v. Virga,*
  729 F.3d 1041 (9th Cir. 2013) ........................................................16, 20

*Dudley v. Duckworth,*
  854 F.2d 967 (7th Cir. 1988) ...............................................................25

*Farrow v. United States,*
    580 F.2d 1339 (9th Cir. 1978) ............................................................13

*Ferrara v. United States,*
    456 F.3d 278 (1st Cir. 2008)...............................................................39

*Gonzalez v. Wong,*
    667 F.3d 965 (9th Cir. 2011) .............................................................34

*Hayes v. Brown,*
    399 F.3d 972 (9th Cir. 2005) ......................................................*passim*

*Horton v. Mayle,*
    408 F.3d 570 (9th Cir. 2005) .......................................................18, 34

*Jackson v. Brown,*
    513 F.3d 1057 (9th Cir. 2008) .....................................................19, 40

*Jenkins v. Artuz,*
    294 F.3d 284 (2d Cir. 2002) ...............................................................20

*Killian v. Poole,*
    282 F.3d 1204 (9th Cir. 2002) .....................................................16, 33

*Kyles v. Whitley,*
    514 U.S. 419 (1995).......................................................................*passim*

*Lambert v. Blodgett,*
    393 F.3d 943 (9th Cir. 2004) ..............................................................13

*Maxwell v. Roe,*
    628 F.3d 486 (9th Cir. 2010) .......................................................15, 34

*Mellen v. Winn,*
    900 F.3d 1085 (9th Cir. 2018) .....................................................17, 21

*Milke v. Mroz,*
    236 Ariz. 276 (Ct. App. 2014).............................................................39

*Milke v. Ryan,*
    711 F.3d 998 (9th Cir. 2013) .........................................29, 30, 31, 38

*Miller–El v. Dretke,*
    545 U.S. 231 (2005)............................................................................11

DEFENDANT JULIAN OMIDI'S MOTION TO DISMISS THE INDICTMENT

*Morris v. Ylst,*
    447 F.3d 735 (9th Cir. 2006) ................................................................28

*N. Mariana Islands v. Bowie,*
    243 F.3d 1109 (9th Cir. 2001) ...................................................1, 27, 28

*Napue. Imbler v. Pachtman,*
    424 U.S. 409 (1976)...............................................................................16

*Napue v. Illinois,*
    360 U.S. 264 (1959)...........................................................1, 10, 12, 27

*Panah v. Chappell,*
    935 F.3d 657 (9th Cir. 2019) ......................................11, 14, 16, 25

*S. Ry. Co. v. Lanham,*
    403 F.2d 119 (5th Cir. 1968) ................................................................13

*Silva v. Brown,*
    416 F.3d 980 (9th Cir. 2005) ........................................................17, 34

*Simms v. Cupp,*
    354 F. Supp. 698 (D. Or. 1972) ....................................................14, 15

*Sivak v. Hardison,*
    658 F.3d 898 (9th Cir. 2011) ......................................10, 16, 19, 26

*Soto v. Ryan,*
    760 F.3d 947 (9th Cir. 2014) ...............................................................14

*Tennison v. City & Cnty. of San Francisco,*
    570 F.3d 1078 (9th Cir. 2009) .......................................................36, 37

*United States v. Abel,*
    469 U.S. 45 (1984)...........................................................................20

*United States v. Agurs,*
    427 U.S. 97 (1976)...........................................................................37

*United States v. Ausby,*
    916 F.3d 1089 (D.C. Cir. 2019) ...........................................................27

*United States v. Bagley,*
    473 U.S. 667 (1985)......................................................................30, 37

*United States v. Basurto,*
    497 F.2d 781 (9th Cir. 1974) ...................................................................38

*United States v. Bernal-Obeso,*
    989 F.2d 331 (9th Cir. 1993) ..........................................................19, 30

*United States v. Bruce,*
    984 F.3d 884 (9th Cir. 2021) ...................................................................39

*United States v. Bundy,*
    968 F.3d 1019 (9th Cir. 2020) ..........................................................38, 40

*United States v. Butler,*
    955 F.3d 1052 (D.C. Cir. 2020) ..............................................................22

*United States v. Chapman,*
    524 F.3d 1073 (9th Cir. 2008) ..........................................................38, 40

*United States v. Endicott,*
    869 F.2d 452 (9th Cir. 1989) ...................................................................33

*United States v. Hall,*
    113 F.3d 157 (9th Cir. 1997) ...................................................................30

*United States v. Hsia,*
    24 F. Supp. 2d 14 (D.D.C. 1998) ............................................................35

*United States v. Kojayan,*
    8 F.3d 1315 (9th Cir. 1993) ..........................................................15, 39

*United States v. LaPage,*
    231 F.3d 488 (9th Cir. 2000) ...................................................................18

*United States v. Maloney,*
    755 F.3d 1044 (9th Cir. 2014) .................................................................39

*United States v. Morgan,*
    786 F.3d 227 (2d Cir. 2015) ...................................................................25

*United States v. Price,*
    566 F.3d 900 (9th Cir. 2009) ................................................29, 31, 32, 33

*United States v. Prokupek,*
    632 F.3d 460 (8th Cir. 2011) ...................................................................13

*United States v. Reyes,*
    577 F.3d 1069 (9th Cir. 2009) ........................................................................23

*United States v. Reyes,*
    660 F.3d 454 (9th Cir. 2011) ..........................................................................18

*United States v. Roberts,*
    618 F.2d 530 (9th Cir. 1980) ..........................................................................27

*United States v. Sanfilippo,*
    564 F.2d 176 (5th Cir. 1977) ..........................................................................19

*United States v. Service Deli, Inc.,*
    151 F.3d 938 (9th Cir. 1988) ..........................................................................27

*United States v. Streater,*
    70 F.3d 1314 (D.C. Cir. 1995)........................................................................13

*United States v. Strifler,*
    851 F.2d 1197 (9th Cir. 1988) ........................................................................30

*United States v. Udechukwu,*
    11 F.3d 1101 (1st Cir. 1993)...........................................................................40

*United States v. Young,*
    17 F.3d 1201 (9th Cir. 1994) ..........................................................................20

*Walker v. City of New York,*
    974 F.2d 293 (2nd Cir. 1992) .........................................................................14

*Wearry v. Cain,*
    577 U.S. 385 (2016).........................................................................................33

*Zumot v. Borders,*
    483 F. Supp. 3d 788 (N.D. Cal. 2020)..............................................12, 16, 19, 20

## I.  INTRODUCTION

On the morning of May 24, 2016, government cooperator and key witness Charles Klasky attended his first proffer interview with the government and told government agents and prosecutors a story that the government now does not dispute was false.  Upon hearing Mr. Klasky's claim—that Brian Oxman called Mr. Klasky earlier that same morning and told Mr. Klasky that speaking with the government would be akin to "putting a gun to your head" (the "'Gun to Your Head' Call")—the government did not waste time attempting to corroborate it.  The government subpoenaed Mr. Klasky's phone records the next day and, soon after that, FDA Special Agent Samanta Kelley created a detailed spreadsheet to keep track of the people that called Mr. Klasky the morning he said he received the "Gun to Your Head" Call from Mr. Oxman.  To complete this work, the government obtained information that was not reflected in Mr. Klasky's Verizon phone records or disclosed to the defense before trial—reports detailing the subscribers to the phone numbers that called Mr. Klasky that morning.  These records clearly establish and led the government to conclude, as reflected in SA Kelley's spreadsheet, that Mr. Klasky did not receive a phone call from Mr. Oxman the morning of his proffer interview, as he had claimed.

The law is clear in dictating what the government was required to do once it learned that Mr. Klasky made this false claim.  *Napue v. Illinois* required the government to refrain from eliciting Mr. Klasky's false claim and presenting false testimony at trial to secure Mr. Omidi's conviction.   360 U.S. 264, 269 (1959).   *Northern Mariana Islands v. Bowie* required the government to make a good faith attempt to investigate and resolve Mr. Klasky's false claim.  243 F.3d 1109, 1118 (9th Cir. 2001).  And because the evidence of Mr. Klasky's false claim undermined both Mr. Klasky's credibility generally and his accusation that Mr. Oxman made the threatening "Gun to Your Head" Call with Mr. Omidi present, *Brady v. Maryland* required the government to disclose that evidence to the defense. 373 U.S. 83, 87 (1963).

In spite of these requirements and of Mr. Omidi's basic due process rights, the government did exactly the opposite of what these well-established legal principles dictate.

In violation of *Napue*, the government invited Mr. Klasky to testify regarding the "Gun to Your Head" Call at trial and then relied on that testimony in arguing Mr. Omidi's consciousness of guilt during closing arguments.  Rather than investigating further Mr. Klasky's false claim, the government ceased its investigation of the matter entirely, provided Mr. Klasky with information that enabled him to change his story to align more closely with his phone records, and then turned a blind eye when Mr. Klasky did just that.  And, rather than disclosing the results of its investigation to the defense, the government withheld clear evidence that Mr. Klasky's claim was false and that the government knew about its falsity, thus depriving the defense of the opportunity to confront Mr. Klasky with proof of his lie.

The totality of the government's conduct with respect to the "Gun to Your Head" Call, coupled with the prejudice that conduct caused Mr. Omidi, warrant dismissal of the indictment or, at the very least, a new trial.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

Post-verdict, Mr. Omidi assumes the Court's familiarity with the case and sets forth below the factual background relevant to this motion.

### A.    Charles Klasky's False Claim At His May 24, 2016 Proffer

On May 24, 2016 at 10:00 am, Mr. Klasky met with government agents and prosecutors for his first proffer interview.  According to the government's official written report, Mr. Klasky told the government during that meeting that "***today, prior to the interview***," he saw Mr. Omidi and Mr. Oxman in a car together, and ten minutes later he received a phone call from Mr. Oxman.  (Ex. 2 at 12.)  The handwritten notes from that interview similarly indicated that Mr. Klasky claimed to have seen Mr. Omidi and Mr. Oxman "get in car together" on his way "[t]o meeting w/ AUSAs today," before he received a call.  (Ex. 15 at 20.)  Mr. Klasky claimed that during that call, Mr. Oxman sought to silence Mr. Klasky by telling him that attending his scheduled interview with the government would be akin to "putting a gun to your head," and further telling him "to keep his mouth shut, and to not tell the truth or his (KLASKY's) life would be over."  (Ex. 2 at 12-13.)  Mr. Klasky

claimed that, although he did not hear Mr. Omidi speak during the phone call, Mr. Klasky "was certain" that Mr. Omidi was present with Mr. Oxman when the alleged threatening call occurred. (*Id.*)

On May 25, 2016, the day after Mr. Klasky made this claim, the government sent a subpoena to Verizon, seeking Mr. Klasky's phone records from 2016. (Ex. 3.) The records Verizon produced to the government show that, on the morning of May 24, 2016—when Mr. Klasky reported and claimed the "Gun to Your Head" Call occurred—Mr. Klasky received phone calls from only two phone numbers: (818) ████ (the "818 Number") and (310) ████ (the "310 Number"). (*Id.*) These subpoenaed phone records, which were produced to the defense in advance of trial, did not identify the subscribers for these numbers. The government was aware at the time that Mr. Oxman ordinarily used a different number, (562) ████ (the "562 Number"), to contact Mr. Klasky on dates other than May 24, 2016. (*See* Ex. 1.) While the Verizon records establish conclusively that Mr. Oxman did not call Mr. Klasky *from the 562 Number* on May 24, 2016—the date Mr. Klasky claimed to have received the "Gun to Your Head" Call—the Verizon records alone ***do not*** establish whether or not Mr. Oxman or anyone associated with him also may have used the 818 Number or the 310 Number, both of which did call Mr. Klasky that morning. (*See* Exs. 4-5.)

The government conducted an investigation to determine whether the 818 Number or the 310 Number were associated with Mr. Oxman. On January 13, 2017, SA Kelley prepared and circulated to members of the prosecution team, including AUSA Kristen Williams, FBI Agent Mark Coleman, and FDA Special Agent Zeva Pettigrew, a detailed spreadsheet (the "Kelley Spreadsheet") indicating the results of government investigation to determine the identities of the 310 Number and the 818 Number (Exs. 6-8.) The Kelley Spreadsheet leaves no doubt as to its purpose. It includes a reference to the government's report of its May 24, 2016 proffer interview with Mr. Klasky, specifying that Mr. Klasky reported that the "Gun to Your Head" Call occurred on the morning of May 24, 2016. (Ex. 7 at 2.) To create this spreadsheet, SA Kelley relied on law enforcement TLOxp search

reports (which the government obtained in November 2016) to determine the subscribers for the only two phone numbers from which Mr. Klasky received calls on the morning of May 24, 2016: the 310 Number and the 818 Number (Exs. 9-10, the "November 2016 TLOxp Reports").

The November 2016 TLOxp Reports show that the most likely identity of the subscriber for the 310 Number was Cheryl Ann Nichols. (Ex. 9.) The November 2016 TLOxp Reports show that the most likely identity of the subscriber for the 818 Number was either Sevan or Vegen Shahnazari. (Ex. 10.) The government's searches also revealed, however, that the next most likely subscriber to the 818 Number was Richard A. Moss, which is the name of Mr. Klasky's attorney in connection with this matter. (*Id.*) Mr. Moss was present at Mr. Klasky's May 24, 2016 proffer interview with the government. (Ex. 2.)

In other words, the November 2016 TLOxp Reports enabled the government to conclude, as reflected in the Kelley Spreadsheet, that Mr. Klasky received calls from Cheryl Nichols and Sevan Shahnazari (or, possibly, his attorney, Richard Moss) on the morning of May 24, 2016, but not from Mr. Oxman, as Mr. Klasky had reported. Neither the Kelley Spreadsheet nor either of the November 2016 TLOxp Reports was produced to the defense prior to trial. (*See* Ex. 1.) The government has since confirmed it knew these two numbers were unrelated to Messrs. Omidi and Oxman. (*See* ECF No. 1661 at 1.)

**B.    The Government Confronted Mr. Klasky, Who Then Changed His Story**

On August 14, 2017, two days prior to his Grand Jury testimony on August 16, 2017, Mr. Klasky, accompanied by his counsel, participated in an interview with members of the prosecution team. During that meeting, the government confronted Mr. Klasky with its evidence that his account of the "Gun to Your Head" Call could not have been true, but Mr. Klasky reaffirmed his earlier claim. Aware that Mr. Klasky had made calls to and received calls from Mr. Oxman on other days, the government showed Mr. Klasky his phone records, and, in an apparent attempt to enable Mr. Klasky to change his story to be consistent with the Verizon records, asked Mr. Klasky about a call he received from Mr. Oxman "the evening before" his May 24 proffer (as reflected in the Verizon phone records, which show

Mr. Oxman called Mr. Klasky at 8:31 pm on May 23, 2016). (Ex. 11 at 15.) But Mr. Klasky insisted, once again, that **the "'gun to your head' call was in the morning" of May 24, "right before [the] 10 AM meet[ing]."** (*Id.* (emphasis added).)

Mr. Klasky told the government that Mr. Oxman "always call[s] [Mr. Klasky] on his cell phone." (*Id.*) Notably, after being shown his phone records indicating he only received calls from the 310 Number and the 818 Number on the morning of May 24, 2016, Mr. Klasky falsely suggested that the 310 Number (which the government knew to be associated with Cheryl Nichols) may have been associated with Mr. Oxman. Mr. Klasky stated that Mr. Oxman "came from Santa Ana"—the location where the Verizon records Mr. Klasky was shown indicate the call from the 310 Number originated (Ex. 4)—and that Mr. Oxman "also has a (310) number," (Ex. 11 at 15). The government's notes of the meeting also indicate that the government raised with Mr. Klasky the results of its recent investigation of his claim and, specifically, its findings that the 310 Number and the 818 Number likely were associated with Cheryl Nichols and Sevan Shahnazari, respectively. (*Id.*) The notes include phonetic spellings of both names, and when asked these names, Mr. Klasky replied he had "no recollection" of these names, but stated that he "knows someone named Savan." (*Id.*) Neither Mr. Klasky nor his counsel (and Mr. Moss's colleague), William Fleming, mentioned that the 818 Number could belong to Mr. Moss, and the government did not ask Mr. Klasky whether the 818 Number belonged to Mr. Moss, despite the government's knowledge that the 818 Number may have been associated with him. Following this call, the government never investigated further who Cheryl Nichols and Vegan (or Sevan) Shahnazari were, or what relationship Mr. Klasky had with them. (Schachter Decl. ¶ 8.) The government has represented to the Court that there is no discoverable documentation of any further investigative work regarding this matter.

On August 16, 2017—two days after the meeting at which he insisted again that the "Gun to Your Head" Call occurred on May 24, 2016, right before the 10 am proffer meeting—Mr. Klasky testified before the Grand Jury and suddenly changed his story. While Mr. Klasky again claimed that he received a call from Mr. Oxman, during which Mr.

Oxman told Mr. Klasky, "You might as well … put a gun to your head and shoot yourself, kill yourself," Mr. Klasky now claimed, for the first time, that the "Gun to Your Head" Call occurred "late afternoon" the day before his May 24 proffer interview—a fact he expressly denied two days earlier—and further changed his story to represent that Mr. Klasky could hear Mr. Omidi speaking in the background of the phone call. (Ex. 12 at 164-165.)  Notably, Mr. Klasky's Verizon records do not indicate that he received a phone call from Mr. Oxman during the late afternoon of May 23, 2016.  (Ex. 4.)  The government did not confront Mr. Klasky with his inconsistent testimony during his grand jury testimony, and the government never investigated or spoke to Mr. Klasky or his counsel subsequently about this sudden change in his story.  (Schachter Decl. ¶ 9.)

### C.    Mr. Klasky's Trial Testimony

Mr. Klasky's trial testimony lasted ten days.  He was, without question, the trial's most important witness, as he was the only witness who testified to having any personal knowledge of Mr. Omidi's involvement in the falsification of sleep study results.  In short, Mr. Klasky's account of his time at Weight Loss Centers and, by extension, his credibility, were critical to the government's case against Mr. Omidi.

Prior to Mr. Klasky's testimony, Mr. Omidi's counsel raised concerns regarding the government potentially eliciting testimony that Mr. Oxman had appeared at Mr. Klasky's CJA counsel's office, as Mr. Klasky had claimed during his grand jury testimony.  The government "indicated we do not intend to" elicit that testimony.  (Tr. at 4980-81.)  The government gave no indication during those discussions that it would elicit testimony regarding the "Gun to Your Head" Call.  (Schachter Decl. ¶ 10)

At trial, the government elicited testimony from Mr. Klasky, at the end of his direct examination, regarding the purported "Gun to Your Head" Call by asking him, in leading fashion, whether he received a phone call from Mr. Oxman "before the meeting" Mr. Klasky had with the government on May 24, 2016, (Tr. at 4974-4977.)  The government elicited this testimony notwithstanding its own investigation showing the event could not have transpired as reported by Mr. Klasky during his May 24, 2016 proffer interview.  Defense

counsel expressed his surprise.  (Tr. 4878 ("It never would have occurred to me that the government would have elicited that statement, which is wildly prone to misinterpretation.").)

### D.    The Government's Reliance On The "Gun To Your Head" Call During Closing Arguments

The government made multiple references to the "Gun to Your Head" Call during closing arguments.  First, during the government's summation, the prosecutor reminded the jury that "[r]ight before Mr. Klasky was supposed to meet with the government in May of 2016, you heard that Mr. Oxman told Mr. Klasky—or pressured Mr. Klasky not to go to that meeting."  (Tr. at 8659.)  Later, during the government's rebuttal, the prosecutor argued that "Julian Omidi made sure that the story of the fraud didn't get out," noting in support of this argument that "Brian Oxman tried to pressure Charles Klasky not to meet with the government."   The prosecutor then displayed and read, verbatim, Mr. Klasky's trial testimony regarding the "Gun to Your Head" Call.  (*Id.* at 8926-27.)

### E.    Post-Trial Discussions Regarding the "Gun to Your Head" Call

After the trial ended, Mr. Omidi's counsel conferred with the government regarding its basis for presenting Mr. Klasky's testimony regarding the "Gun to Your Head" Call, the extent of the government's investigation into Mr. Klasky's claims about this call, and the available evidence regarding the same.

On December 23, 2021, a week after the conclusion of the trial, Mr. Omidi's counsel sent an email regarding the government's investigation into the "Gun to Your Head" Call.  Mr. Omidi's counsel pointed out that the references to names in the notes from the government's August 14, 2017 interview of Mr. Klasky suggest that the government conducted some investigation into the calls Mr. Klasky received on the morning of March 24, but that it was "unclear how the government came up with those names referenced in the notes."  (Ex. 1.)  Mr. Omidi's counsel requested the government "produce any records or reports relevant to the government's effort to determine whether Brian Oxman, Julian Omidi or anyone associated with Mr. Omidi in fact called Klasky on the morning of his

1  proffer." (*Id.*)

2      AUSA Williams responded on behalf of the government on December 31, 2021.  In

3  her response, AUSA Williams stated that she did not "specifically recall what the 2017 notes

4  you reference relate to, but can speculate they are associated with a Google search for the

5  [818 Number], which returns results relating to individuals with the surname 'Shahnazari.'"

6  (*Id.*)  She added that "[t]here is no outstanding discovery on this issue." (*Id.*)  In this initial

7  response, the government made no mention of the government's November 2016 TLOxp

8  Reports, the investigative work reflected in the Kelley Spreadsheet, or that the government

9  possessed evidence that the 818 Number may have belonged to Mr. Klasky's counsel,

10  Richard Moss.

11      On January 3, 2022, Mr. Omidi's counsel asked the government a number of follow-

12  up questions, including whether the government searched for records of the Google search

13  the government mentioned in its December 31 email and whether the government obtained

14  any information regarding the subscribers for the phone numbers that called Mr. Klasky the

15  morning before his May 24 proffer interview—*i.e.*, for the 310 Number and the 818

16  Number.  (*Id.*)  The government responded to this January 3 email on January 13, 2022,

17  stating that the government "did not specifically investigate" whether the 310 Number

18  belonged to Mr. Oxman, but acknowledged that the government was aware that the 562

19  Number belonged to Mr. Oxman and that Mr. Oxman used that number to call Mr. Klasky

20  on multiple occasions.  (*Id.*)  The government further stated in its January 13, 2022 email

21  that "[t]here was no specific investigation at the time into" the 310 Number and that the

22  government did not "obtain the subscriber information for" either the 310 Number or the

23  818 Number.  The government did note that, in response to the inquiry from Mr. Omidi's

24  counsel, the government conducted a CPClear database search on January 12, 2022, which

25  the government stated showed that the 310 Number belongs to Cheryl Nichols and the 818

26  Number belongs to Vegan Shahnazari.  (*Id.*)  The government's January 13, 2022 email

27  again made no mention of the November 2016 TLOxp Reports, the Kelley Spreadsheet, or

28  the government's evidence tying the 818 Number to Mr. Klasky's counsel.

On January 18, 2022, Mr. Omidi's counsel asked the government if it would acknowledge that Mr. Oxman did not call Mr. Klasky the morning of May 24, 2016, in light of the government's stated knowledge that the 562 Number belongs to Mr. Oxman and the CPClear search results associating the 310 Number and the 818 Number with Cheryl Nichols and Vegan Shahnazari, respectively. (*Id.*)  Mr. Omidi's counsel also asked the government how it became aware of the names associated with the 310 Number and the 818 Number in advance of August 14, 2017 interview with Mr. Klasky, given that the only searches for this information that the government had disclosed to Mr. Omidi were the ones performed on January 12, 2022. (*Id.*)

## F. The Government's Late Disclosure of *Brady* Material And Refusal To Produce Or Identify Additional Relevant Documents

On January 25, 2022, after repeatedly maintaining that the government had not conducted any investigation of the calls Mr. Klasky received on May 24, 2016, the government disclosed, for the first time, the Kelley Spreadsheet, an email chain among the prosecution team regarding the same, and the November 2016 law enforcement TLOxd Reports. (*Id.*)  When later asked to explain why these materials were never previously produced, the government responded that it did not know. (Schachter Decl. ¶ 7.)  The government referred to the Kelley Spreadsheet as "agent work product" in an email, but it has not stated that the government identified and chose to withhold this document (or the November 2016 TLOxd Reports) on this or any other basis. (Ex. 1.)

What is more, the government has refused to state whether it continues to withhold any additional documents relevant to the investigation.  On a meet and confer call on February 7, 2022, the government would state only that it has not identified any additional relevant "discoverable" information.  The government notably declined to specify whether it possesses any relevant materials that it does not consider to be "discoverable." (Schachter Decl. ¶ 6.)  The government also specifically stated that it would not provide a log of everything in the government's case file that is not discoverable. (*Id.*)

The government's representation that it has no additional "discoverable" documents

and information apparently is based on the government's review of its case file in this case. (ECF No. 1661.)  When pressed during the parties' meet and confer call to describe with more specificity what the government's review entailed—for example, whether email searches were performed on any of the members of the case team—the government declined to do so.  (Schachter Decl. ¶ 6.)  Notably, the government has admitted that the recently disclosed November 2016 TLOxp Reports and Kelley Spreadsheet were ***not*** located in the government's case file.  (ECF No. 1678.)

On March 21, 2022, the Court denied Mr. Omidi's motion to compel production of documents regarding this matter.

## III.  THE GOVERNMENT PRESENTED FALSE AND MISLEADING TESTIMONY

The records the government recently disclosed establish conclusively that the government specifically investigated Mr. Klasky's May 24, 2016 claim that he received the "Gun to Your Head" Call earlier that morning, and that the government's investigation showed Mr. Klasky's claim to be false.  Despite learning this, the government allowed (or, worse, encouraged) Mr. Klasky to revise his story and then asked him to tell that story at trial.  By doing so, the government violated Mr. Omidi's constitutional right to a fair trial. As the Supreme Court held in *Napue*, "a conviction obtained through use of false evidence, known to be such by representatives of the [government], must fall." 360 U.S. at 269.  "It is irrelevant whether the defense knew about the false testimony and failed to object or cross-examine the witness, because defendants cannot waive the freestanding ethical and constitutional obligation of the prosecutor as a representative of the government to protect the integrity of the court and the criminal justice system." *Sivak v. Hardison*, 658 F.3d 898, 909 (9th Cir. 2011) (quotations and brackets omitted).  The government's presentation of and reliance on Mr. Klasky's debunked "Gun to Your Head" Call story at trial constitutes a *Napue* violation, the remedy for which is dismissal or, at the very least, a new trial.

### A.  The Government Elicited False And Misleading Testimony

The Ninth Circuit has held that to establish a *Napue* violation "the testimony or

evidence in question must have been false **or misleading**." *Panah v. Chappell*, 935 F.3d 657, 664 (9th Cir. 2019) (emphasis added). The government's presentation of Mr. Klasky's testimony regarding the "Gun to Your Head" Call easily meets that standard.

It is beyond dispute that the claim Mr. Klasky made on May 24, 2016 and repeated on August 14, 2017—that he received the "Gun to Your Head" Call from Mr. Oxman earlier the morning of May 24, 2016, shortly before his proffer interview—was a false claim. In its opposition to Mr. Omidi's motion to compel, the government acknowledged both that "the records do not reflect any calls that morning from Oxman's '562' number" and that the two phone numbers that did call Mr. Klasky on the morning of May 24, 2016 were associated with people other than Mr. Oxman. (ECF No. 1661 at 4, 7.) The Court likewise noted that Mr. Klasky only received phone calls from the 310 Number and the 818 Number on the morning of May 24, 2016, and that the government's recently disclosed records show that those numbers are associated with Cheryl Nichols and Vegan (or Sevan) Shahnazari. (ECF No. 1678 at 2.) In its opposition to Mr. Omidi's motion to compel, the government attempted to imply that Mr. Klasky may not have claimed on May 24, 2016 that the "Gun to Your Head" Call occurred earlier that morning, but that suggestion is flatly contradicted by the government's own official written report of the May 24, 2016 interview, the government's handwritten notes from that meeting, the Kelley Spreadsheet, and the fact that Mr. Klasky repeated the claim in response to government questioning on August 14, 2017. (*See* Exs. 2, 7, 11, 15.)

The government notably has not attempted to suggest that Mr. Klasky may simply have been mistaken or misremembered the timing of the "Gun to Your Head" Call because the government cannot plausibly make this suggestion in light of the contemporaneous nature of Mr. Klasky's claim. Mr. Klasky's report that he received a threatening call "***today, prior to the interview***," was not "subject to the usual risk of imprecision and distortion from the passage of time." *Miller–El v. Dretke*, 545 U.S. 231, 241 n.1 (2005). In short, although the government has been reluctant to admit so explicitly, it is undeniable that Mr. Klasky lied to the government when he told them on May 24, 2016 that he received a threatening

phone call from Mr. Oxman "today, prior to the interview." (Ex. 2.)

By eliciting the very story that was the subject of Mr. Klasky's provably false original May 24, 2016 claim, the government presented false evidence in violation of *Napue*. *See Zumot v. Borders*, 483 F. Supp. 3d 788, 818 (N.D. Cal. 2020) (granting habeas relief because government repeated at trial the deceased's accusation that the defendant made a threatening phone call to her, where phone records established that the defendant could not have made the phone call in question).

### 1. Elicitation of Perjured False Testimony Before the Grand Jury

To sidestep the ramifications of its indifference to and participation in Mr. Klasky's false claim, the government likely will note that Mr. Klasky changed his story when he testified before the grand jury in a manner that aligned more closely with the records the government showed him. But Mr. Klasky's attempt to clean up his false claim after being caught in a lie two days before at his August 14, 2017 interview does not absolve the government on its responsibility not to obtain a conviction "through use of false evidence," *Napue*, 360 U.S. at 269, and the full context of this change would have provided jurors with the "implication of coaching." *Kyles v. Whitley*, 514 U.S. 419, 444, n. 14 (1995).

As the November 2016 TLOxp Reports and the Kelley Spreadsheet reveal, the government knew when it met with Mr. Klasky on August 14, 2017—two days before his grand jury testimony—that Mr. Klasky's contemporaneous claim that he received the "Gun to Your Head" Call from Mr. Oxman the morning of his May 24, 2016 proffer interview was false. The government gave Mr. Klasky the opportunity to correct his earlier claim and state that the "Gun to Your Head" Call actually occurred on the night of May 23, 2016. Mr. Klasky insisted again that the "'gun to your head call' was in the morning" of May 24, 2016, "right before 10 am meet[ing]." (Ex. 11.). The government showed Mr. Klasky his phone records, which indicated that Mr. Klasky received calls from the 310 Number and the 818 Number the morning of May 24, 2016, but not from Mr. Oxman's 562 Number. (*Id.*) In response, Mr. Klasky attempted to support his initial claim by suggesting falsely that the 310 Number may have belonged to Mr. Oxman, which the government already knew was

false.  Critically, however, the government also discussed with Mr. Klasky the names the government understood to be associated with the 310 Number and the 818 Number, based on the November 2016 TLOxp Reports and as reflected in the Kelley Spreadsheet—Cheryl Nichols and Sevan Shahnazari.  (*Id.*)  Two days later, Mr. Klasky claimed, for the first time before the grand jury, that the "Gun to Your Head" Call occurred on May 23, 2016, on the day Mr. Klasky now knew there was proof he had spoken with Mr. Oxman.  This sudden, transparently convenient change, which was premised on evidence the government showed Mr. Klasky, cannot be used by the government to paper over Mr. Klasky's false claim.

In addition, Mr. Klasky's altered story simply cannot be taken seriously, in light of Mr. Klasky's claim on the morning of May 24, 2016 that the "Gun to Your Head" Call happened ***earlier that same morning***.  Courts have rejected as inherently implausible testimony that differs from a witness's earlier contemporaneous statement.  *See, e.g.*, *United States v. Prokupek*, 632 F.3d 460 (8th Cir. 2011) (reversing denial of motion to suppress for clear error because officer's testimony was "implausible on its face" because it contradicted the officer's earlier contemporaneous statement); *United States v. Streater*, 70 F.3d 1314, 1321 (D.C. Cir. 1995) ("We conclude that the district court clearly erred in crediting trial counsel's testimony at the § 2255 hearing that he gave [the petitioner] correct legal advice when trial counsel's documented [prior] contemporaneous statements show the contrary."); *Farrow v. United States*, 580 F.2d 1339, 1361-62 (9th Cir. 1978) (record of contemporaneous statement renders subsequent altered statement "wholly unsubstantiated and refuted"); *Lambert v. Blodgett,* 393 F.3d 943, 981 (9th Cir. 2004) (reversing a district court that had accepted the "self-serving testimony " of the petitioner and overlooked contemporaneous "evidence which objectively contradict[ed]" the testimony); *S. Ry. Co. v. Lanham*, 403 F.2d 119, 128 (5th Cir. 1968) (statements taken from the witnesses shortly after the [event] constitute 'unique catalysts in the search for truth,' in that they provide an immediate impression of the facts that cannot be recreated or duplicated by a deposition that relies upon memory") (citation omitted); *Brockmeier v. Solano Cnty. Sheriff's Dep't*, 2010 WL 148179, at *6 (E.D. Cal. Jan. 12, 2010) ("Contemporaneous statements are viewed as

unique and unduplicable") (quotations omitted).

### 2.      Elicitation of Perjured Testimony at Trial

Likewise, Mr. Klasky's trial testimony regarding the "Gun to Your Head" Call was "false or misleading" pursuant to *Napue*, *Panah*, 935 F.3d at 664, notwithstanding the government's vague questioning, which was carefully crafted to avoid asking Mr. Klasky to specify the date on which the "Gun to Your Head" Call occurred.  For purposes of *Napue*, "[t]here is no distinction between false testimony and the presentation of a witness's partial testimony which, when considered in isolation, creates a distorted picture of the facts." *Simms v. Cupp*, 354 F. Supp. 698, 700 (D. Or. 1972); *cf. Soto v. Ryan*, 760 F.3d 947, 958 (9th Cir. 2014) ("[T]he state cannot allow a witness to give a materially false impression of the evidence").  In *Simms*, the government elicited eyewitness testimony regarding the race of the witness's attacker, without asking the witness for additional details, after the witness had made prior statements inconsistent with the defendant's description.  In holding that the government presented false testimony in violation of the defendant's due process rights, the court explained, "[i]f the [government] believed [the witness's] recollection to be unreliable, [it] should not have permitted her to testify at the trial without disclosing that her description of the assailant did not fit" the defendant.  *Simms*, 354 F. Supp. at 700.

Similar circumstances were present in *Walker v. City of New York*, where an informant identified the defendant, along with a second man, as the individuals who robbed an armored truck and assaulted the driver.  974 F.2d 293, 295 (2nd Cir. 1992).  "The investigation suffered a [] setback," however, when the prosecution learned that the second man had been in prison on the day of the robbery.  *Id*.  "Undeterred," the government moved forward with the defendant's prosecution and had the informant testify before a grand jury and at trial, where he made no mention of the second man he had initially implicated.  *Id*. Years after the defendant was convicted the trial court dismissed the indictment with prejudice based on the government's presentation of the partial version of the informant's provably false story.  *Id*.  The Ninth Circuit has cited *Walker* as an exemplar of a case illustrating the prosecution's failure of "such basic norms of human conduct [as] the duty

not to lie or persecute the innocent." *United States v. Kojayan*, 8 F.3d 1315, 1324 (9th Cir. 1993). Similar to *Simms* and *Walker*, here, the government cannot circumvent due process by eliciting only part of a story when the full story, as told by the witness contemporaneously, is undisputedly false.

In addition, having investigated and knowing Mr. Klasky's "Gun to Your Head" claim was false, the government's elicitation of the same claim at trial in a vague manner so as to prevent it from being susceptible to verification constitutes the "covert subornation of perjury," a separate violation, in addition to the government's presentation of the perjured story. *Hayes v. Brown*, 399 F.3d 972, 981 (9th Cir. 2005). In reversing the defendant's conviction in *Hayes*, the Ninth Circuit rejected "the argument that the presentation of false testimony, carefully orchestrated to avoid perjury, does not offend the Constitution." *Id.* Indeed, "[t]here is nothing redemptive about the sovereign's conspiring to deceive a judge and jury to obtain a tainted conviction," *id.*, and the government's own participation in Mr. Klasky's efforts to finesse his account deepen, rather than alleviate, the due process concerns at play here.

Nor can the government avoid the consequences of Mr. Klasky's false testimony by professing ignorance or amnesia regarding the circumstances of Mr. Klasky's false claim. As the Ninth Circuit has made clear, "'[a] conviction based in part on false evidence, even false evidence presented in good faith, hardly comports with fundamental fairness.'" *Maxwell v. Roe*, 628 F.3d 486, 506 (9th Cir. 2010) (quoting *Killian v. Poole*, 282 F.3d 1204, 1209 (9th Cir. 2002)); *see also Alvarez v. Montgomery*, No. SACV-15-0987-DMG (KS), 2022 WL 868889, at *25 (C.D. Cal. Jan. 27, 2022) ("Under de novo review and under Ninth Circuit precedent, Petitioner is not required to prove that the prosecutor knew that [the witness's] testimony … was false.") (citing *Maxwell*, 628 F.3d at 506-07) (*report and recommendation adopted*, 2022 WL 860804 (C.D. Cal. Mar. 23, 2022) (Gee, J.)).

In any event, there is no doubt that the government knew—or at least should have known—that Mr. Klasky's testimony was false. The government's recent post-trial disclosures show that the November 2016 TLOxp Report and the Kelley Spreadsheet, which

conclusively establish the falsity of Mr. Klasky's claim, were emailed by SA Kelley to the entire prosecution team, including AUSA Williams, Special Agent Pettigrew, and Special Agent Coleman, on January 13, 2017. Moreover, the government's careful questioning of Mr. Klasky at trial—purposely avoiding any mention of the date on which Mr. Klasky claimed the "Gun to Your Head" Call took place but still allowing him to testify as to the version of what took place on the morning of the first proffer interview—further confirms the government's awareness of Mr. Klasky's false claim. (Tr. at 4974:24-25.)

### B.     Mr. Klasky's False and Misleading Testimony Was Material

The government's presentation at trial of Mr. Klasky's false claim violates *Napue* because Mr. Klasky's testimony regarding the "Gun to Your Head" Call was material. *Panah*, 935 F.3d at 664. In addition, the government's suppression of the evidence of its investigation showing the Mr. Klasky's claim was false, discussed in more detail below (*see* Sec. V), independently violates *Napue*. *Imbler v. Pachtman*, 424 U.S. 409, 431 n.34 (1976) ("A claim of using perjured testimony simply may be reframed and asserted as a claim of suppression of the evidence upon which the knowledge of perjury rested.").

"A *far lesser showing* is required under *Napue*'s materiality standard than under ordinary harmless error review." *Dow v. Virga*, 729 F.3d 1041, 1048 (9th Cir. 2013) (emphasis added); *see also Killian*, 282 F.3d at 1208 ("The knowing use of perjured testimony by a prosecutor generally requires that the conviction be set aside."). Specifically, the standard for materiality under *Napue* is whether "there is *any* reasonable likelihood that the false testimony *could* have affected the judgment of the jury." *Sivak*, 658 F.3d at 912 (emphasis in original, quotations omitted). "By contrast, evidence is not material if it is 'unimaginable' that the jury could have reached a different conclusion 'with or without' the evidence at issue." *Zumot*, 483 F. Supp. 3d at 813 (citing *Phillips v. Ornoski*, 673 F.3d 1168, 1191 (9th Cir. 2012)). This materiality standard is more favorable to the defense than the standard for prejudice under *Brady*, and courts "have gone so far as to say that if it is established that the government knowingly permitted the introduction of false testimony reversal is virtually automatic." *Sivak*, 658 F.3d at 912 (quotations omitted). Mr. Klasky's

false statement clearly meets this materiality standard.

### 1.    The Government's Case Depended On Mr. Klasky

"Impeachment evidence is especially likely to be material when it impugns the testimony of a witness who is critical to the prosecution's case." *Silva v. Brown*, 416 F.3d 980, 987 (9th Cir. 2005) (collecting cases).  Mr. Klasky was without question the most important witness at Mr. Omidi's trial and his testimony was "critical" to the government's case.  *Hayes*, 399 F.3d at 986.  His testimony lasted ten days, during which time he testified that Mr. Omidi gave him direct instructions to fabricate patient sleep study results.  Notably, Mr. Klasky was the only witness to testify that he received these direct instructions, as the other two witnesses who allegedly participated in the falsification of sleep study data— Daniel Carriedo and Sherwin Hong—testified that the instructions they received came from Mr. Klasky.  (*See* Tr. at 1522, 1677-1678, 3920.)  Put simply, the government's case hinged on its ability to convince the jury that Mr. Klasky's version of events was accurate, while Mr. Omidi's defense depended on his ability to cast doubt on Mr. Klasky's account.

As such, any evidence bearing on Mr. Klasky's credibility generally and, in particular, his willingness to make false, inflammatory accusations suggestive of Mr. Omidi's guilt, is highly relevant to the case's outcome.  *See Hayes*, 399 F.3d at 986 ("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.").

Moreover, Mr. Klasky's credibility is particularly important because he "testified to what amounted to a confession" from Mr. Omidi.  *Mellen v. Winn*, 900 F.3d 1085, 1097 (9th Cir. 2018).  "'A confession is like no other evidence.  Indeed, the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him.'"  *Id.* (quoting *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991)).

In short, Mr. Klasky's "testimony and credibility were crucial to the [government's] case."  *Hayes*, 399 F.3d at 987.  Consequently, the false evidence was material because "without the testimony of [Klasky], an entirely different trial would have occurred."

*Alvarez*, 2022 WL 868889, at \*27.  "Mr. [Klasky] testimony was central to the prosecution's case," *Horton v. Mayle*, 408 F.3d 570, 578 (9th Cir. 2005), and "was the glue that held the prosecution's case together" (*id.* at 581).   The importance of this testimony cannot be overstated which could easily have affected the judgment of the jury.

### 2.   Disclosure And Correction Of Mr. Klasky's Falsity Would Have Been Devastating To His Credibility And The Government's Case

Here, "the prosecution raised no red flag when [Mr. Klasky] testified, untruthfully." *Banks v. Dretke*, 540 U.S. 668, 675 (2004).  However, the *Napue* obligation not to present false testimony carries with it "a constitutional duty to correct th[is] false impression of the facts."  *United States v. LaPage*, 231 F.3d 488, 492 (9th Cir. 2000).  Disclosure "that the [government] had solicited [Klasky's] testimony to the contrary knowing that he would be providing false evidence … would have had a ***devastating effect*** on the credibility of the entire prosecution case."  *Hayes*, 399 F.3d at 988.

Here, the government's case was dependent on the jury's belief in Mr. Klasky's version of events.  The mere fact that the government relied on and trusted Mr. Klasky was relevant in convincing the jury to do the same.  "[F]alse or misleading assertions" by an official whose "opinion carries with it the imprimatur of the Government … may induce the jury to trust the Government's judgment rather than its own view of the evidence." *United States v. Reyes*, 660 F.3d 454, 462 (9th Cir. 2011).  But the jury's usual trust in the government's view of the evidence would have been severely undermined had the jury known of the government's decision to ignore Mr. Klasky's perjury during his first proffer and to forge ahead with presenting that testimony at trial, notwithstanding the government's documented knowledge of the perjury ***for four years***.   As discussed below, the government's conduct also constitutes a *Bowie* violation entitling Mr. Omidi to relief.[1]

In addition, the government's correction of Mr. Klasky's false claim, as *Napue*

---

[1] Mr. Klasky's false account of the "Gun to Your Head" Call would shed particular light on the government's investigation, as the circumstances of Mr. Klasky's evolving story would have raised with the jury the "implication of coaching," which could have extended not only to Mr. Klasky but to other witnesses, including Mr. Twersky and Mr. Palacios.  *Kyles*, 514 U.S. at 444, n. 14.

requires, would have exposed Mr. Klasky's "willingness to lie under oath" and "irreparably damaged" his credibility. *Sivak*, 658 F.3d at 916 (emphasis added).  Indeed, "[t]here is a substantial difference between general evidence of untrustworthiness and specific evidence that a witness has lied." *Id.* at 916.   Exposure of Mr. Klasky's lie would have had a particular impact on the jurors in this case who were specifically instructed that if a witness told a single deliberate lie, they could disregard the entirety of his testimony.   (Jury Instruction No. 9.).  *United States v. Sanfilippo*, 564 F.2d 176, 178 (5th Cir. 1977) ("A jury may very well give great weight to a precise reason to doubt credibility when the witness has been shown to be the kind of person who might perjure himself.").  Because disclosure of the suppressed evidence would have had a "devastating effect" on the government's case, *Hayes*, 399 F.3d at 988, and rendered Mr. Klasky's credibility "irreparably damaged."*Sivak*, 658 F.3d at 916, it is not "unimaginable" that the outcome of this case would have been different.  *Zumot*, 483 F. Supp. 3d at 813.  Dismissal or a new trial is warranted.

Similarly, Mr. Klasky's credibility would have been undermined had the jury learned of the circumstances under which his account of the "Gun to Your Head" Call changed; *i.e.*, that on August 14, 2017, just prior to his grand jury testimony, he learned of the evidence the government had refuting his claim, and then he changed his story.  "[T]he evolution over time of a given eyewitness's description can be fatal to its reliability."  *Kyles*, 514 U.S. at 444.  Mr. Klasky "could well be seen by a jury as someone whose testimony should be flatly rejected," because "[i]f he would lie to the [government] … why would he not lie to a jury…." *United States v. Bernal-Obeso,* 989 F.2d 331 (9th Cir. 1993).

Mr. Klasky's false statement is particularly relevant in light of the government's portrayal of Mr. Klasky as a victim of Mr. Omidi who was forced under duress to commit fraud and who, despite receiving a threat to this life on the morning of May 24, 2016, courageously went to the U.S. Attorney's Office to tell the truth, because "[i]t was the right thing to do." (Tr. at 4977.)  As set forth in detail above, this story is false and the government knew it, but the government nevertheless used it improperly to lend Mr. Klasky enormous credibility before the jury.  *Jackson v. Brown*, 513 F.3d 1057 (9th Cir. 2008) (finding

material *Napue* violation where misleading testimony created "false impression" that witness was "an altruistic volunteer stepping forward to testify truthfully").

Exposure of Mr. Klasky's false "Gun to Your Head" Call story implicating Mr. Omidi in obstruction and a threat to his life, to prosecutors during his proffer and to the jury at trial, would have demonstrated Mr. Klasky's extreme bias against Mr. Omidi.  Proof of such bias is "almost always relevant" to a jury's assessment of "the accuracy and truth of a witness's testimony." *United States v. Abel*, 469 U.S. 45, 52 (1984).  "[L]ies under oath to conceal [Mr. Klasky's] bias and prejudice raise the impeachment evidence to such a level that it is difficult to imagine anything of greater magnitude that would undermine confidence in the outcome of any trial." *Bagley v. Lumpkin*, 798 F.2d 1297, 1301 (9th Cir. 1986).

### 3. The Government Relied On The "Gun To Your Head" Call To Secure Mr. Omidi's Conviction.

Moreover, "[t]he importance of [Mr. Klasky's] testimony was underscored by the prosecution in its closing argument." *Hayes,* 399 F.3d at 986; *see also Zumot* 483 F. Supp. 3d at 817 (concluding that the presentation of false evidence regarding a purported threatening phone call was material where the prosecutor relied on the allegations about the purported call during closing argument); *Jenkins v. Artuz*, 294 F.3d 284, 294 (2d Cir. 2002) (prosecutor's reiteration of false testimony in closing argument "plainly sharpened the prejudice resulting from the use of [the witness's] initial untruthful testimony"); *United States v. Young*, 17 F.3d 1201, 1203 (9th Cir. 1994) (concluding that "[t]he appearance of misconduct in this case is serious," where "[p]rosecutors not only presented [witness's] false testimony but referred specifically to it during closing arguments").  During closing arguments the government relied on Mr. Klasky's testimony regarding the "Gun to Your Head" Call for a critical reason—to support the government's argument that Mr. Omidi had the requisite intent, knowledge, and consciousness of guilt to have committed the charged crimes.  *Dow*, 729 F.3d at 1050 (conviction reversed where the "prosecutor argued on the basis of the evidence admitted in violation of *Napue* that [petitioner] had acted in a manner consistent with a consciousness of guilt").

Unable to point to direct evidence showing that Mr. Omidi directed or even knew of Mr. Klasky's falsification of patient sleep study data, the government told the jurors that, "for intent and for knowledge, too," they should "look at circumstantial evidence," including "the efforts that defendants take to conceal what they do … in order to get in their head." (Tr. at 8649:7-13.) As evidence of these alleged concealment efforts, the prosecutor invoked Mr. Klasky's account of the "Gun to Your Head" Call, reminding the jurors, "you heard that Mr. Oxman told Mr. Klasky – or pressured Mr. Klasky not to go to that meeting." (Tr. at 8659:1-4.) The government reiterated this point in its rebuttal summation, arguing that Mr. Omidi "made sure that the story of the fraud didn't get out" and displaying the transcript of Mr. Klasky's testimony regarding the "Gun to Your Head" Call to drive this point home, making sure that the highly inflammatory threat was one of the last things that the jury heard before beginning its deliberations. (Tr. at 8926:23-24.)

The government's arguments regarding the call were foreshadowed by the government's insistence, after the testimony was elicited at trial, that Mr. Klasky's testimony was "absolutely relevant with the pressure that is being placed on someone who could go to the government and reveal this fraud", and "absolutely goes to the issues of knowledge and intent in this case and of the desire to continue concealing the fraud." (Tr. at 4980.) "The [prosecutor's] word about the 'likely damage' of the suppressed evidence is particularly strong evidence that the testimony was material." *Mellen v. Winn*, 900 F.3d 1085, 1097 (9th Cir. 2018) (quotations omitted).

Meanwhile, the government's presentation of Mr. Klasky's false testimony, coupled with its concealment of the statement's falsity, permitted the government to rebut Mr. Omidi's defense, which, like the government's case, focused significantly on Mr. Klasky. During the government's rebuttal argument, the government characterized Mr. Omidi's defense as stating that Mr. Omidi was "manipulated by Charles Klasky, that he was tricked into thinking that what was happening was standard with the rescoring, the changing of studies, the fabrication of studies," but the government responded that "you know that that's not what the evidence showed you, adding that "[t]he government is not afraid of the

evidence." (Tr. at 8921.)  However, the government withheld the evidence it supposedly was "not afraid of."  In *Brown v. Borg*, the Ninth Circuit reversed the conviction where the government similarly kept the exculpatory evidence secret, while deliberately insinuating that the evidence supported a theory at odds with the withheld evidence.  951 F.2d 1011, 1015 (9th Cir. 1991).  The court deemed the prosecutor's conduct "intolerable," and reaffirmed that "a prosecutor's presentation of tainted evidence is viewed seriously and its effects are exceedingly carefully scrutinized."  *Id*. (citation omitted).

The Court should foreclose any government attempt to minimize the importance of the "Gun to Your Head" Call by arguing that it amounted to a certain number of lines or pages in the transcript from a lengthy trial.  Courts have rightly rejected such simplistic analysis.  For example, in *United States v. Butler*, a dissenting opinion argued that false testimony "played only a minor role in [the] trial" because "the testimony designated as false comprised only 'twelve lines of text during a four-day prosecution.'"  955 F.3d 1052, 1062-63 (D.C. Cir. 2020) (quoting *id.* at 1070 (Katsas, J., dissenting)).  Relying on another case in which "the same number of lines of transcript text" were devoted to false testimony that constituted a *Napue* violation, the court rejected the dissent's reasoning and held that "the allegedly limited role played by the false [] testimony in this case affords no grounds for reaching a different result."  *Id.* (citing *United States v. Ausby*, 916 F.3d 1089 (D.C. Cir. 2019).  This line of argument is particularly inappropriate here, as it overlooks the emphasis that was placed on this testimony, which served as the coda to Mr. Klasky's direct examination, and amounted to vouching as to Mr. Klasky's credibility to the jury because he bravely ignored the alleged threat to his life and spoke with the government because "[i]t was the right thing to do." (Tr. at 4977.)  In addition, it was emphasized in the government's summation to the jury.

### 4.   Mr. Klasky's "Gun to Your Head" Call Testimony Was Not Cumulative of Other Testimony.

In the government's opposition to its motion to compel, the government noted that "the Court also heard testimony about Oxman's efforts to pressure other potential

government witnesses," and specifically cited the testimony of Larry Twersky and Jaffy Palacios. (ECF No. 1661.)  The government's reliance on this other testimony in an attempt to minimize Mr. Klasky's testimony should not be taken seriously, and is separate and apart from the impact on Mr. Klasky's credibility and the government's case, discussed above.

Mr. Palacios testified at trial that he met with Mr. Oxman on January 8, 2013—the day before Mr. Palacios' grand jury testimony on January 9, 2013—and that during this meeting Mr. Oxman told Mr. Palacios "to say that Julian is just a consultant." (Tr. at 7653.) The government possesses documentary evidence that casts serious doubt on Mr. Palacios' claim, which he made for the first time in interviews with the government after the trial began.  Specifically, the government produced to the defense an email that Mr. Oxman sent to Mr. Omidi at 10:51 AM PST on January 8, 2013—the day Mr. Palacios claims to have met with Mr. Oxman.  In the email, Mr. Oxman communicated that his father "had a rough night" and that Mr. Oxman was "going to stay with him." (Ex. 13.)  Another document the government produced shows that the next morning, Mr. Oxman sent Mr. Omidi an email regarding Mr. Oxman's father's worsening health condition and stated, "I will come in when we figure out what is happening." (Ex. 14.)  Together, these emails strongly suggest that Mr. Oxman did not come to work but was with his sick father at the hospital on January 8 and 9, 2013, and not, as Mr. Palacios claimed at trial, meeting with Mr. Palacios regarding his grand jury testimony.   The government's presentation of Mr. Palacios' testimony, despite the government's possession of these emails, potentially raises an independent *Napue* concern.[2]  *United States v. Reyes,* 577 F.3d 1069, 1077 (9th Cir. 2009) ("[I]t is improper for the government to present to the jury statements or inferences it knows to be false or has very strong reason to doubt.").   At the very least, however, this evidence undercuts the government's ability to argue that Mr. Klasky's false "Gun to Your Head" story was harmless because it was duplicative of Mr. Palacios' claim.  Moreover, Mr. Klasky was the government's most important witness, and the government's case depended

---

[2] These emails notably were not identified by the government as *Brady* material pursuant to the Court's *Brady* Identification Order.  (ECF. 1333).

on the jury's belief in Mr. Klasky's version of events.  The same cannot be said for Mr. Palacios, whose testimony was limited in scope and who admitted at trial that he had previously lied under oath when he testified before the grand jury.  (Tr. at 7652-53.)

Nor could the government rely significantly on the account of Mr. Twersky, whose version of events differed in several material respects from Mr. Klasky's.  For example, Mr. Twersky attempted to claim in his testimony that he was not aware that Mr. Klasky was manipulating sleep study data until Mr. Twersky's employee, Melvin Benhamou, showed him the spreadsheet Mr. Klasky was using, at which point Mr. Twersky fired Mr. Benhamou and confronted Mr. Klasky.  (Tr. at 6321-6328.)  However, Mr. Klasky testified that he showed Mr. Twersky how the spreadsheet worked, that Mr. Twersky's reaction to seeing the spreadsheet was to say, "Whoa, that's a neat trick," that Mr. Twersky requested Mr. Klasky "to train his employee, Melvin Benhamou, to use the spreadsheet," and that "Twersky understood that this was how the fraud in the sleep study was being conducted." (*Id.* at 5714-5720.)  Further, email correspondence between Messrs. Klasky and Twersky at the time Mr. Benhamou's work on the spreadsheet began, which Mr. Twersky could not explain at trial, directly refuted Mr. Twersky's timeline and his claim he wasn't involved in Mr. Klasky's fraudulent conduct.  (Tr. at 6444-6448.)  Mr. Twersky's claim that Mr. Oxman discouraged him from "going public" with his knowledge that Mr. Klasky was manipulating the sleep study data carries significantly less weight, in light of Mr. Twersky's questionable denial of his own involvement in Mr. Klasky's conduct.

Further, neither Mr. Palacios nor Mr. Twersky claimed that Mr. Omidi was present when Mr. Oxman allegedly spoke to them.  In contrast, the government went out of its way at trial to elicit Mr. Klasky's claim that he saw Mr. Omidi and Mr. Oxman together shortly before he received the "Gun to Your Head" Call from Mr. Oxman.  In fact, the Court permitted the testimonies of Messrs. Twersky and Palacios regarding Mr. Oxman after the government established foundation that Mr. Omidi was present during Mr. Klasky's purported "Gun to Your Head" Call.  If the defense been able to establish that statement was false and manipulated, the defense could have plausibly raised the "implication of

coaching" with respect to the testimony not only of Mr. Klasky but also of other witnesses. *Kyles*, 514 U.S. at 444, n. 14.

Finally, neither Mr. Palacios nor Mr. Twersky provided inflammatory testimony akin to Mr. Klasky's claim that Mr. Oxman told him that meeting with the government "would be the same thing as if I were to put a gun to my head and just kill myself." (Tr. at 4977.) Courts have regularly held that threats or intimations of violence, such as the one that Mr. Klasky accused Mr. Oxman of making, are among the most prejudicial evidence that may be presented in a criminal trial and, thus, give rise to significant Rule 403 concerns. *See, e.g.*, *United States v. Morgan*, 786 F.3d 227, 229 (2d Cir. 2015) ("[T]he potential for unfair prejudice is so great that Rule 403's balancing test permits admission of death threat evidence only if there is clear need for the evidence and it serves an important purpose.") (citation omitted); *Dudley v. Duckworth*, 854 F.2d 967, 970 (7th Cir. 1988) (testimony that a witness was threatened "can amount to an evidential harpoon and become[] so prejudicial to a defendant that no jury could be expected to apply it solely to the question of the credibility of the witness before it and not to the substantial prejudice of the defendant") (quotations omitted).

In any event, the testimony of Mr. Palacios, Mr. Twersky, and others provided is not anything near the level of evidence courts have found sufficiently cumulative to disregard. For example, the court in *Panah* found that, "[e]ven setting aside [the witness']s testimony, the case against [the defendant] was devastating." 935 F.3d at 666. In so holding, the court pointed to overwhelming physical and other evidence that the defendant had committed murder, including, among other things, the discovery of the victim's body in the defendant's closet and the presence of the victim's blood on the defendant's clothes. *Id.* No such overwhelming evidence is present here; the government's case depended entirely on the jury's believing Mr. Klasky. Any evidence regarding Mr. Klasky's credibility was critically relevant.

**5.     Mr. Omidi's Counsel's Inability To Cross-Examine Mr. Klasky And To Address Mr. Klasky's Testimony In Closing Arguments Do Not**

**Render His False Testimony Immaterial**

The government may also argue that Mr. Klasky's false testimony was not material because Mr. Omidi's counsel had the opportunity to cross examine him regarding the "Gun to Your Head" Call, but chose not to do so.  This argument misses the mark completely.  As set forth in more detail below (*see infra* Sec. V), Mr. Omidi and his counsel were deprived of the opportunity to cross examine Mr. Klasky by the government's failure to disclose the results of its investigation into Mr. Klasky's claim or to correct Mr. Klasky's testimony as *Napue* requires.  While the government may argue that the defense should have figured out from the government's disclosures that Mr. Klasky changed the date on which he claimed the "Gun to Your Head" Call occurred and that he did not receive a call from Mr. Oxman's 562 Number on the morning of May 24, 2016, Mr. Omidi still lacked the evidence the government had showing that the 310 Number and the 818 Number were not associated with Mr. Oxman and that the government found Mr. Klasky's initial claim to be provably false.  Without those records, Mr. Omidi's counsel could not effectively cross examine Mr. Klasky regarding this issue.  In fact, Mr. Omidi's counsel could not risk challenging Mr. Klasky's account, given that he had previously suggested in a government interview that the 310 Number belonged to Mr. Oxman.  (Ex. 11 at 15.)

The government also noted in its opposition to Mr. Omidi's motion to compel that Mr. Omidi's counsel "addressed the issue" in closing arguments.  But this similarly overlooks that Mr. Omidi at the time lacked the evidence in the government's possession proving that Mr. Klasky had made a false claim to the government, and that the government ignored the falsity of Mr. Klasky's claim and allowed him to finesse his testimony to more closely align with the records the government showed him.  The mere fact that the defense addressed false testimony without direct evidence of its falsity in closing arguments does not render the false testimony immaterial.  To the contrary:  "There is a substantial difference between general evidence of untrustworthiness and ***specific evidence that a witness has lied***."  *Sivak*, 658 F.3d at 916 (quoting *Benn v. Lambert,* 283 F.3d 1949, 1056–57 (9th Cir. 2002)).  The D.C. Circuit rejected the government's line of reasoning in *Butler*.

Although the dissenting opinion in that case noted that "defense counsel explained the limitations of" the false testimony "in his own closing argument," the majority found that, as in *United States v. Ausby*, the defense's attempt to undermine a witness's in a false testimony does not render the testimony immaterial under *Napue*.  955 F.3d 1052 at 1062-63.  In any event, "[i]t makes little sense to argue that because the defendant tried to impeach the witness and failed, any further impeachment evidence would be useless."  *See United States v. Service Deli, Inc.*,151 F.3d 938, 944 (9th Cir. 1988).

For similar reasons, the government may not argue that Mr. Omidi's counsel sufficiently impeached Mr. Klasky's credibility in other respect.  *Banks*, 540 U.S. at 702 (rejecting the government's argument that suppressed evidence of a witness's role as an informant was immaterial merely because the witness's testimony was already impeached on other grounds); *Napue*, 360 U.S. at 270 ("[W]e do not believe that the fact that the jury was apprised of other grounds for believing that the witness ... may have had an interest in testifying against petitioner turned what was otherwise a tainted trial into a fair one.").  That is especially true because the government rehabilitated Mr. Klasky and bolstered his credibility by asserting Mr. Klasky would not testify falsely due to the provision in his plea agreement that he must be "truthful."  (Tr. at 6057-58).  In *United States v. Roberts*, the Ninth Circuit raised concerns about the government's reliance on a plea agreement's truthfulness provision as evidence of witness's truthfulness to bolster a witness's credibility.  618 F.2d 530, 536 (9th Cir. 1980).  Here the government *knew* Mr. Klasky made a false "Gun to Your Head" Call claim in violation of his plea, did nothing despite the plea, hid these facts from the jury, and still used the plea for rehabilitation.

## IV.   THE GOVERNMENT'S FAILURE TO INVESTIGATE MR. KLASKY'S FALSE CLAIM IS A VIOLATION OF *BOWIE*

*Napue* provides that the government has a "responsibility and duty to correct what [it] knows to be false and elicit the truth."  *Napue*, 360 U.S. at 269-70.  This responsibility "requires a prosecutor to act when put on notice of the real possibility of false testimony."  *N. Mariana Islands v. Bowie*, 243 F.3d 1109, 1118 (9th Cir. 2001).  As the Ninth Circuit

explained in *Bowie*, "[t]his duty is not discharged by attempting to finesse the problem by pressing ahead without a diligent and good faith attempt to resolve it.  A prosecutor cannot avoid this obligation by refusing to search for the truth and remaining willfully ignorant of the facts." *Id*.  This "duty to investigate flows from the 'constitutional obligation of the [government] and its representatives to collect potentially exculpatory evidence, to prevent fraud upon the court, and to elicit the truth.'"  *Morris v. Ylst*, 447 F.3d 735, 745 (9th Cir. 2006) (quoting *Bowie*, 243 F.3d at 1117).  The government's response to its discovery that Mr. Klasky made a false report regarding the "Gun to Your Head" Call is completely at odds with *Bowie*'s requirement that the government make a "diligent and good faith attempt to resolve" Mr. Klasky's false claim.

The November 2016 TLOxp Reports and the Kelley Spreadsheet show that the government made a concerted effort to confirm Mr. Klasky's contemporaneous claim that he received the "Gun to Your Head" Call the morning of his proffer interview.  (Exs. 6-10.) When those records contradicted, rather than confirmed, Mr. Klasky's accusation, the government confronted Mr. Klasky with this evidence during his August 14, 2017 interview, at which Mr. Klasky repeated the same false claim.  (Ex. 11. )  Two days later, Mr. Klasky finessed his story when he testified before the grand jury, in a manner that was more aligned with the records the government had shown him two days earlier.  (Ex. 12.)

After Mr. Klasky conveniently and suddenly changed his story, the government made no attempt to "search for the truth," as *Bowie* requires. 243 F.3d at 1118.  The government conducted no further investigation, as their recent representations to the Court and the parties confirm.  The government never confronted Mr. Klasky about the change in his testimony or asked him what prompted him to change it.  Instead, the government did just what *Bowie* prohibits—it "finesse[d] the problem by pressing ahead without a diligent and good faith attempt to resolve it," while "refusing to search for the truth and remaining willfully ignorant of the facts." *Id*

To the extent the government argues that Mr. Klasky's claim was not "actually false" under *Napue*, its argument is ***entirely dependent*** on the government's own "refus[al] to

1  search for the truth" and "willful[] ignoran[ce] of the facts."  The government cannot avoid
2  the requirements of due process through its direct violation of the Ninth Circuit's directive
3  in *Bowie*.  *See Blumberg v. Garcia*, 687 F. Supp. 2d 1074, 1126 (C.D. Cal. 2010) (adopting
4  report and recommendation finding that the prosecution breached its duty under *Napue*
5  when it had abundant reason to question the witness's veracity but failed to investigate).

6  ## V.   THE GOVERNMENT WITHHELD EXCULPATORY EVIDENCE IN VIOLATION OF *BRADY*

7  Pursuant to the Supreme Court's decision in *Brady*, the government must disclose all
8  evidence favorable to the accused where the evidence is material either to guilt or
9  punishment. 373 U.S. at 87.  "The law requires the prosecution to produce *Brady* and *Giglio*
10 material whether or not the defendant requests any such evidence." *Milke v. Ryan*, 711 F.3d
11 998, 1003 (9th Cir. 2013) (citation omitted).  *Brady* reflects the constitutional requirement
12 of due process, which "imposes an 'inescapable' duty on the prosecutor 'to disclose known,
13 favorable evidence rising to a material level of importance.'" *Milke*, 711 F.3d at 1012
14 (quoting *Kyles,* 514 U.S. at 438).  Here, the government's duty to disclose exculpatory
15 evidence was heightened because Mr. Omidi filed a motion to compel the government to
16 specifically identify *Brady* material, including "any communications relevant to [Mr.
17 Klasky's] credibility and bias."  (ECF No. 1154.)  The Court granted that motion over the
18 government's objection.  (ECF No. 1333 (the "*Brady* Identification Order").)

19 There are three components of a *Brady* violation: "(1) the evidence at issue must be
20 favorable to the accused, (2) the evidence must have been suppressed by the State, and (3)
21 the suppression must have been prejudicial." *Comstock v. Humphries*, 786 F.3d 701, 708
22 (9th Cir. 2015); *United States v. Price*, 566 F.3d 900, 907 (9th Cir. 2009) (same); *Milke*,
23 711 F.3d at 1012 (same).  The government's failure to disclose and identify materials
24 relating to the government's investigation of the "Gun to Your Head" Call satisfies each of
25 these components and violates both the general *Brady* requirement and the Court's directive
26 in the *Brady* Identification Order.

### A.    The Government Withheld Favorable Evidence

"Any evidence that would tend to call the government's case into doubt is favorable for *Brady* purposes." *Milke*, 711 F.3d at 1012. This includes impeachment evidence. *Id.* at 1112, 1116; *United States v. Bagley*, 473 U.S. 667, 675 (1985). Mr. Klasky was **the** central prosecution witness, and the government was required to disclose for use at trial the Kelley Spreadsheet and November 2016 TLOxp Reports, which show unequivocally that Mr. Klasky's May 24, 2016 report of the Call is false, and thereby impeach Mr. Klasky's credibility and cast doubt on the integrity of the government's investigation as a whole.

That a witness has made a false report must be disclosed under *Brady*. *See, e.g.*, *United States v. Strifler*, 851 F.2d 1197, 1202 (9th Cir. 1988) (evidence that witness previously had "l[ied] to authorities" must be disclosed under *Brady*); *United States v. Hall*, 113 F.3d 157, 158-160 (9th Cir. 1997) ("What most impeached [informant's] credibility was his false report to the police. That crime, more than his crimes carrying higher penalties, suggested the possibility that he would lie to the police to frame an innocent man."). By failing "to turn over to the defense in discovery *all* material information casting a shadow on a government witness's credibility," the government failed to meet the Ninth Circuit's expectation that "prosecutors and investigators [] take all reasonable measures to safeguard the system against treachery." *Bernal-Obeso,* 989 F.2d at 334 (emphasis in original).

It makes no difference that Mr. Klasky's testimony at trial may have been elicited vaguely enough not to specify the date and time of the "Gun to Your Head" Call. As explained above, the evidence the government recently disclosed is sufficient to show that the government presented false or misleading testimony within the meaning of *Napue*. (*See supra* Sec. III.A.) When the date changed, so too did the substance of Mr. Klasky's testimony. However, as to the *Brady* violation, whether Mr. Klasky's trial testimony was "actually false" is in any event irrelevant to the question of whether the recently disclosed materials are favorable to Mr. Omidi. The materials impeach Mr. Klasky's credibility, even putting aside his trial testimony, because they unquestionably show that the story he told the government on May 24, 2016—*i.e.,* that he received a threatening call from Mr. Oxman

that same morning—was false.  The fact that Mr. Klasky later altered his account after the government confronted him with the undisclosed evidence enhances, rather than diminishes, the impeachment value of these materials.

### B.    The Government Suppressed The Withheld Evidence

"The term 'suppression' does not describe merely overt or purposeful acts on the part of the prosecutor; sins of omission are equally within *Brady*'s scope."  *Price*, 566 F.3d at 907 (citing *Benn*, 283 at 1503).  Put simply, *Brady* and *Giglio* dictate that impeachment evidence such as the Kelly Spreadsheet and the November 2016 TLOxp Reports "must be disclosed unilaterally as a matter of constitutional right," and the government did not disclose these materials until after trial.  Even then, the government continued to withhold this favorable evidence and even denied its existence for weeks, before finally producing the materials in response to Mr. Omidi's counsel's third request.  (*See* Ex. 1 ("There is no outstanding discovery on this issue.); *id.* ("The government did not subsequently obtain the subscriber information for" the 310 Number or the 818 Number).)

To the extent AUSA Williams and other members of the prosecution team profess ignorance of the undisclosed materials, the Court should reject this response as both implausible and irrelevant.  Far from being unaware of the results of the government's investigation into the identities behind the 310 Number and the 818 Number, AUSA Williams received the Kelly Spreadsheet via email on January 13, 2017 (Ex. 6), and she participated in the August 14, 2017 interview during which the government discussed this information with Mr. Klasky (Ex. 11).  In any event, the extent of AUSA Williams's knowledge of the government's investigation of this matter is irrelevant for purposes of establishing a *Brady* violation because "[t]he prosecutor is charged with knowledge of any *Brady* material of which the prosecutor's office or the investigating police agency is aware." *Milke*, 711 F.3d at 1012.  This is because, as the Supreme Court explained in *Kyles*:

> [T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.  But whether the prosecutor succeeds or fails in meeting this obligation (whether, that is, a failure to disclose is in good faith or bad faith), the prosecution's responsibility for failing to disclose known, favorable

evidence rising to a material level of importance is inescapable.

514 U.S. at 437-38 (citations omitted).  Accordingly, in assessing whether suppression occurred here, the Court should consider, not whether AUSA Williams or any other prosecutor was actually aware of the undisclosed materials prior to trial, but rather "whether the government failed to disclose the relevant information in the possession of *any* of its agents involved in [Mr. Omidi's] prosecution."  *Price*, 566 F.3d at 908 (emphasis in original).

The Ninth Circuit's decision in *Price* is instructive.  There, the defendant learned after trial about "multiple acts of fraud or dishonesty" on the part of the prosecution's key witness.  *Id.* at 902.  The government argued in response to the defendant's *Brady* motion that he "did not have a specific recollection as to what information he personally possessed," and that he did not know whether the investigating agent had learned the information about the witness's prior acts of dishonesty reflected in police reports.  *Id.*  The district court rejected the defendant's *Brady* claim, concluding that the defendant "had failed to demonstrate that the prosecutor personally had evidence in his possession that would have revealed [the witness's] extensive history."  *Id.* at 907.  In reversing the district court's decision, the Ninth Circuit explained:

> [W]hatever the truth, the government has failed to demonstrate that the prosecutor satisfied his constitutional duty to learn the results of [the detective's] investigation.  Certainly, where the prosecutor states either that he cannot remember or does not know what information his agents relayed to him, the government's burden is not met.  Allowing such convenient and conclusory testimony to defeat a *Brady* claim would render a defendant's right to obtain *Brady* material meaningless.

*Id.* at 910.  Here, the identities of the individuals who called Mr. Klasky on the morning of May 24, 2016 was not unobtainable to the government; to the contrary, the government not only searched for but obtained this information.  The government's failure to disclose this information to the prosecutor constitutes suppression, regardless of what any individual prosecutor "personally knew."  *Id.* at 908.

## C.   The Government's Suppression Prejudiced Mr. Omidi

For purposes of *Brady*, "[e]vidence qualifies as material when there is any reasonable likelihood it could have affected the judgment of the jury." *Id.* "To prevail on his *Brady* claim," however, Mr. Omidi "need not show that he 'more likely than not' would have been acquitted had the new evidence been admitted. He must show only that the new evidence is sufficient to 'undermine confidence' in the verdict." *Id.* Thus, Mr. Omidi "can prevail even if … the undisclosed information may not have affected the jury's verdict." *Id.* n. 6. "Prejudice" is interchangeable with "materiality." *Benn*, 283 F.3d at 1053 n.9. "Prejudice is determined by looking at the cumulative effect of the withheld evidence[.]" *Killian v. Poole*, 282 F.3d 1204, 1210 (9th Cir. 2002). As set forth in detail above with respect to Mr. Omidi's *Napue* claim, Mr. Klasky's false testimony regarding the "Gun to Your Head" Call was unquestionably material. (*See supra* Sec. III.B.) For the same reasons, the government's failure to disclose the evidence that it found Mr. Klasky's claim to be false is material pursuant to *Brady* because it "undermine[s] confidence" in the jury's verdict. *Wearry v. Cain*, 577 U.S. 385, 392 (2016) (quotation omitted).

### 1. The Government Deprived The Defense Of An Opportunity To Impeach The Government's Key Witness's Credibility

As explained in greater detail above, Mr. Klasky's testimony was critical to the prosecutor's case. Indeed, "the jury had to believe [Mr. Klasky's] testimony in order to believe the prosecutor's theory." *Alvarez*, 2022 WL 868889, at *23 (quotations omitted). "Thus, [Mr. Klasky's] testimony was the most important evidence of [Mr. Omidi's] guilt." *Id.* Here, Mr. Omidi is entitled to relief because "when the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility warrants a new trial irrespective of the good faith or bad faith of the prosecution." *United States v. Endicott*, 869 F.2d 452, 456 (9th Cir. 1989).

As the Ninth Circuit held in *Benn*, the suppression of a confirmed specific fabrication by a key witness, here Mr. Klasky, to falsely implicate a defendant, here Mr. Omidi, is sufficiently prejudicial, "***standing alone***," because it "could have been used to show" that the witness "was willing to lie about" the defendant "and even to accuse him falsely." 283

F.3d at 1056-57 (concluding that suppressed evidence of witness's false statement "was 'direct proof' of his lack of credibility, and the failure to disclose his fabrication was prejudicial") (emphasis added); *see also Maxwell*, 628 F.3d at 512 ("Because [the witness's] testimony implicating [the defendant] was critical to [the defendant's] conviction, the jury's assessment of [the witness's] credibility was crucial to the outcomes of this trial."); *Silva*, 416 F.3d at 986 ("We cannot overemphasize the importance of allowing a full and fair cross-examination of government witnesses whose testimony is important to the outcome of the case.") (quotations omitted).

Although the defense argued at trial that Mr. Klasky lacked credibility, the suppressed evidence undermining Mr. Klasky's credibility was not cumulative because "it was substantial and was far more damaging to [Mr. Klasky's] credibility than the impeachment evidence available to the defense at trial." *Benn*, 283 F.3d at 1055; *Gonzalez v. Wong*, 667 F.3d 965, 984 (9th Cir. 2011) ("Where the withheld evidence opens up new avenues for impeachment, it can be argued that it is still material.")

In sum, because the undisclosed evidence "could well have undermined the credibility of a vital prosecution witness, 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Silva*, 416 F.3d at 991 (quoting *Kyles*, 514 U.S. at 433); *Horton*, 408 F.3d at 581 (where the prosecution fails to disclose evidence "valuable in impeaching a witness whose testimony is central to the prosecution's case, it violates the due process rights of the accused and undermines confidence in the outcome of the trial.").

Moreover, as explained in greater detail above, the government relied significantly on the "Gun to Your Head" Call during closing arguments to prove critical points and secure a conviction of Mr. Omidi. The suppression of evidence refuting that story "'would have undermined the [] prosecutor's closing argument,'" as well as its case overall. *Alvarez,* 2022 WL 868889, at *25 (quoting *Singh v. Prunty*, 142 F.3d 1157, 1163 (9th Cir. 1998)). "Disclosure would therefore have raised opportunities for the defense to attack the thoroughness and even the good faith of the investigation, and would also have allowed the

defense to question the probative value of certain crucial physical evidence." *Kyles*, 514 U.S. at 420; *Andazola v. Woodford*, 2011 WL 1225979, at *7, *12 (N.D. Cal. Mar. 31, 2011) (granting habeas relief because of the posecution's failure to disclose the officer who testifed at defendant's trial had filed false reports in other cases was material).

### 2. Mr. Omidi's Counsel Was Unable To Impeach Mr. Klasky Regarding The "Gun to Your Head" Call

The government suggested in opposition to Mr. Omidi's Motion to Compel that Mr. Omidi should have impeached Mr. Klasky at trial regarding the "purported inconsistency" in his account of the threatening call, even without the benefit of the government's untimely post-trial disclosures. (ECF No. 1661.) This argument fails in several respects. First, "[i]t was not incumbent on [Mr. Omidi] to prove these representations false; rather, [Mr. Omidi] was entitled to treat the prosecutors' submissions as truthful." *Banks*, 540 U.S. at 698.

Moreover, as a factual matter, the evidence disclosed prior to trial, including Mr. Klasky's prior statements and his Verizon records, was insufficient to establish the clear falsity of Mr. Klasky's claim, much less to establish that the government investigated and discovered Mr. Klasky's story to be false. Although the government produced notes from its interviews with Mr. Klasky and Mr. Klasky's subpoenaed phone records, those records do not reflect what the recently disclosed materials clearly proved—namely, the subscriber identities of the phone numbers that called Mr. Klasky on the morning of May 24, 2016 and the government's conclusion, based on that information, that Mr. Klasky made a false report. Even if such information could be gleaned from those materials, the government overlooks that this disclosed evidence was included in a massive and difficult to search production of more than 1.5 million documents spanning more than 10 million pages. The government "cannot meet its *Brady* obligations by providing" a defendant with such a huge volume of discovery "and then claiming that [he] should have been able to find the exculpatory information in the haystack." *See United States v. Hsia*, 24 F. Supp. 2d 14, 29 (D.D.C. 1998). The government failed to identify the *Brady* material as required by the Brady Identification Order (ECF 1333), which was meant to address this concern.

As a matter of law, Mr. Omidi's counsel should not be expected to craft a cross-examination based on facts the government concealed. *See Amado v. Gonzalez*, 758 F.3d 1119, 1139 (9th Cir. 2014) (reversing conviction for *Brady* suppression when "[defendant's] cross-examination of [key witness] did not address any of these points, for [defendant], without the suppressed impeachment evidence, lacked a good-faith basis to ask the appropriate questions."). The government's suggestion that it was defense counsel's responsibility to uncover the principal government witness's demonstrable lie, when the government had already done so itself, ignores the government's affirmative duty to produce and identify exculpatory material. "The prosecutor's obligation under *Brady* is not excused by a defense counsel's failure to exercise diligence with respect to suppressed evidence." *Amado*, 758 F.3d at 1134-35. That is, "[a] prosecutor should not be excused from producing that which the law requires him to produce, by pointing to that which conceivably could have been discovered had defense counsel expended the time and money to enlarge his investigations. No *Brady* case discusses such a requirement, and none should be imposed." *Amado*, 758 F.3d at 1136-37. "In other words, defense counsel may rely on the prosecutor's obligation to produce that which *Brady* and *Giglio* require him to produce." *Id.* at 1136 (holding the proposition "that defense counsel could have found the information himself . . . is contrary to federal law as clearly established by the Supreme Court, and unsound public policy."); *see also Banks*, 540 U.S. 695-96 ("Our decisions lend no support to the notion that defendants must scavenge for hints of undisclosed Brady material when the prosecutor represents that all such material has been disclosed.").

At a minimum, the government was obligated to specifically disclose as *Brady* the results of the government's investigation and the change in Mr. Klasky's testimony, and not simply to bury it in a mountain of discovery. The Ninth Circuit has explicitly "reject[ed] as untenable a broad rule that any information possessed by a defense witness must be considered available to the defense for *Brady* purposes" and maintained that "[t]he availability of particular statements through the defendant himself does not negate the government's duty to disclose." *Tennison v. City & Cnty. of San Francisco*, 570 F.3d 1078,

1091 (9th Cir. 2009). Rather, "[d]efense counsel is entitled to plan his trial strategy on the basis of full disclosure by the government." *Id*.

This obligation should exist in any case, but it is a clear command in this case where, over the government's opposition, this Court ordered the government to specifically identify evidence favorable to the accused of which it was aware. (ECF No. 1333). The Kelley Spreadsheet and the underlying November 2016 TLOxp Reports demonstrate the government's discovery of compelling evidence favorable to Mr. Omidi and likely fatal to the credibility of Mr. Klasky. But in defiance of a constitutional requirement and this Court's Order, it never produced these documents until cornered ***after*** the trial. Nor did it, as part of its *Brady* disclosure, point to the inconsistency between Mr. Klasky's initial interview and his testimony before the Grand Jury (and expected testimony at trial). The *Brady* Identification Order is particularly relevant here because Mr. Omidi's motion requesting that Order specifically asked that the government "identify[] communications relevant to [Mr. Klasky's] credibility and bias." (ECF 1154 at 4.) The government failed to produce the Kelley Spreadsheet and the underlying November 2016 TLOxd Reports or to make any mention that Mr. Klasky claimed the "Gun to Your Head" Call happened the same day he first mentioned it, in response to this specific request. By doing so, the government violated both the *Brady* Identification Order and *Brady* itself. The law has long been clear that "[w]hen the prosecutor receives a specific and relevant [discovery] request, the failure to make any response is seldom, if ever, excusable." *United States v. Agurs*, 427 U.S. 97, 106 (1976). In light of the government's incomplete and misleading response to this request, the government's argument that Mr. Omidi's counsel should have uncovered the falsity of Mr. Klasky's story and cross-examined him on it is particularly troubling. The government's failure in this regard "not only deprive[d] [Mr. Omidi's] defense of certain evidence, but also ha[d] the effect of representing to the defense that the evidence d[id] not exist." *Bagley*, 473 U.S. at 682. As the Supreme Court recognized in *Bagley*, "[i]n reliance on this misleading representation, the defense might abandon lines of independent investigation, defenses, or trial strategies that it otherwise would have pursued." *Id*.

## VI.   DISMISSAL IS THE PROPER REMEDY

The Court may exercise its supervisory powers to dismiss an indictment where the prosecutor's actions rise to the level of "flagrant prosecutorial misconduct," a defendant suffers "substantial prejudice," and no lesser remedial action is available for the misconduct. *United States v. Chapman*, 524 F.3d 1073, 1085-87 (9th Cir. 2008) (upholding dismissal where "[t]he government egregiously failed to meet its constitutional obligations under *Brady* and *Giglio*").   In light of the totality of the government's misconduct by violating the Due Process Clause in obtaining the indictment "based partially on perjured testimony," *United States v. Basurto*, 497 F.2d 781, 786 (9th Cir. 1974), ignoring and withholding evidence of Mr. Klasky's perjured statement for over four years despite investigating and knowing it to be false, and proceeding to present and rely upon the same false statement at trial to convict, the Court should exercise that discretion here to dismiss the Indictment.

To establish "flagrant prosecutorial misconduct" sufficient for dismissal, a defendant need not show that the government intentionally withheld exculpatory evidence; reckless disregard for the prosecution's constitutional obligations is sufficient to give rise to flagrant misconduct.   *United States v. Bundy*, 968 F.3d 1019, 1037-38 (9th Cir. 2020).   In deciding that this standard was met in the context of a *Brady* violation in *Bundy,* the Ninth Circuit explained:

> Someone in the government made a conscious choice to withhold these documents.  It may not have been a malicious choice, but it also was not a matter of simple oversight.   At best, the government failed to appreciate the relevance of the evidence.  At worst, it sought to handicap the defendants by withholding evidence directly relevant to mens rea.  In either circumstance, the government fell well short of its obligations to work toward fairly and faithfully dispensing justice rather than simply notching another win.

*Id.* at 1041.  Similar circumstances were present in *Milke v. Ryan*.  There, the Ninth Circuit found that the prosecution knowingly violated its *Brady* and *Giglio* obligations by failing to disclose impeaching information about a key witness, even though the information was within the government's knowledge and the government could not assert that it was unable

to produce the material prior to trial.  711 F.3d at 1005-07.  After the case was remanded by the Ninth Circuit, the Arizona Court of Appeals dismissed the case against the defendant, holding that "the State's failure to disclose these matters to [the defendant] amounts to egregious misconduct because the [withheld] material was 'highly significant to the primary jury issue' with potential to have an 'important effect on the jury's determination.'"  *Milke v. Mroz*, 236 Ariz. 276, 282 (Ct. App. 2014) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974)).

Here, however, the government's misconduct goes beyond merely withholding exculpatory material.  The totality of the government's actions with respect to the "Gun to Your Head" Call is akin to circumstances in cases where courts have singled out the government's misconduct as particularly egregious.  For example, in *Ferrara v. United States*, the First Circuit found "egregiously impermissible conduct" by the government sufficient to set aside the defendant's guilty plea as involuntary, where the government knew that a witness had recanted his statement inculpating the defendant and, "instead of fulfilling [its] obligation" to correct the witness's earlier statement, "the prosecution team manipulated the witness and deliberately tried to cover up the evidence."  456 F.3d 278, 291 (1st Cir. 2008).

Additionally, "[i]n determining the proper remedy, we must consider the government's willfulness in committing the misconduct and its willingness to own up to it." *United States v. Kojayan*, 8 F.3d 1315, 1318 (9th Cir. 1993).  Here, the government has refused to acknowledge any violation whatsoever. To the contrary, when the defense inquired into the extent to which the government investigated Mr. Klasky's claim, the government repeatedly denied that any investigation had even occurred before finally disclosing the suppressed evidence.  And, to this day, the government refuses to reveal whether any additional evidence regarding this investigation exists.  Put simply, rather than acting in good faith, the government has engaged in misconduct and gamesmanship at every step of the process.  In this respect, "the government's response fail[s] to acknowledge its broader ethical responsibility," *United States v. Bruce*, 984 F.3d 884, 896 (9th Cir. 2021),

which "isn't just to win, but to win fairly, staying well within the rules," *United States v. Maloney*, 755 F.3d 1044, 1046 (9th Cir. 2014). And, as set forth in detail above, Mr. Omidi suffered substantial prejudice from the government's improper suppression of exculpatory, impeaching evidence regarding the government's key witness's false, inflammatory claim upon which the government relied repeatedly in closing arguments. (*See supra* Sec. III.B.)

In light of this egregious misconduct and the substantial resulting prejudice to Mr. Omidi, dismissal is the only adequate remedy here. As the Ninth Circuit explained in *Bundy*, "[l]esser sanctions"—such as a new trial, which would involve "starting over— would [] give[] the government an opportunity to strengthen its case at the defendant's expense." 968 F.3d at 1044. This concern is particularly acute here, where after a three-month trial involving more than 40 witnesses, the government has already been exposed to the defense's strategy in response to the government's case. *See Chapman*, 524 F.3d at 1087 ("[T]he government should not be permitted to try out its case identifying any problem areas and then correct those problems in a retrial.") (internal quotations and alterations omitted).

## VII. CONCLUSION

Based on the foregoing, Mr. Omidi respectfully requests that the Court dismiss the Indictment. To the extent that the Court does not find this remedy is warranted by either of the Court's *Napue* violation, its *Bowie* violation, or its *Brady* violation, standing alone, Mr. Omidi respectfully submits that the cumulative effect of the government's conduct (including the issues raised in Mr. Omidi's other concurrently filed motions) warrants relief. *See Jackson*, 513 F.3d at 1076 (reversing conviction after "consider[ing] all of the *Napue* and *Brady* violations collectively") (quotations omitted); *United States v. Udechukwu*, 11 F.3d 1101, 1106 (1st Cir. 1993) (finding that *Brady* and *Napue* errors created "a kind of double-acting prosecutorial error").

Alternatively, if the Court does not believe dismissal is the proper remedy for these violations, Mr. Omidi respectfully requests that Mr. Omidi be granted a new trial pursuant to Rule 33 based on the foregoing.

Dated:  March 30, 2022

Respectfully submitted,

**WILLKIE FARR & GALLAGHER LLP**

By: s/ Michael S. Schachter
     MICHAEL S. SCHACHTER
     RANDALL W. JACKSON
     CASEY E. DONNELLY
     SIMONA AGNOLUCCI

     ATTORNEYS FOR DEFENDANT
     JULIAN OMIDI

1

## PROOF OF SERVICE

I am employed and a resident of New York. I am over the age of 18 and not a party to the within action; my business address is 787 Seventh Avenue, New York, NY 10019. On March 30, 2022, I served the document described as:

**DEFENDANTS JULIAN OMIDI'S MOTION TO DISMISS OR, ALTERNATIVELY, FOR A NEW TRIAL**

Upon the interested parties in this action as follows:

_____X_____  By the Court's ECF.

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on March 30, 2022.


s/ Michael S. Schachter
Michael S. Schachter