Michael S. Schachter** (NY 3910205)
Randall W. Jackson** (NY 5274048)
Casey E. Donnelly** (NY4936803)
**WILLKIE FARR & GALLAGHER LLP**
787 Seventh Avenue
New York, New York 10019
Tel: (212) 728-8102; Fax: (728) 728-8111
Email: *mschachter@willkie.com*

*Attorneys for Defendant*,
Julian Omidi

[Additional Counsel Continued On Next Page]

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>*vs*.<br><br>JULIAN OMIDI, INDEPENDENT MEDICAL SERVICES INC., a professional corporation, SURGERY CENTER MANAGEMENT, LLC, and MIRALI ZARABI, M.D.,<br><br>Defendants.<br><br>. | Case No. CR 17-00661(A)-DMG<br><br>[*Assigned to Hon. Dolly M. Gee, District Court Judge*]<br><br>**MOTION FOR NEW TRIAL PURSUANT TO RULE 33**<br><br>Hearing:   May 11, 2022 at 2:30 pm<br>Dept.:      Courtroom 8C<br>Location:  350 West 1st Street, 8th Fl.<br>             Los Angeles, CA 90012<br><br>Oral Argument Requested |

[Additional Counsel Continued From Previous Page]

Simona Agnolucci (SBN 246943)
**WILLKIE FARR & GALLAGHER LLP**
One Front Street
San Francisco, CA 94111
Tel: (415) 858-7447, Fax: (415) 858-7599
Email: *sagnolucci@willkie.com*

Edmund W. Searby** (OH 067455)
**PORTER WRIGHT MORRIS & ARTHUR LLP**
950 Main Avenue, Suite 500
Cleveland, OH 44113
Tel: (216) 443-2545, Fax: (216) 443-9011
Email: *esearby@porterwright.com*

*Appearing specially   ** Appearing pro hac vice*

*Counsel for Defendant Julian Omidi*

**TO THE CLERK OF THE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD HEREIN:**

**PLEASE TAKE NOTICE** that, on May 11, 2022, or, as soon as this matter may be heard in Courtroom 8C, of this Court, located at 350 West 1st Street, 8th Floor, Los Angeles, California, 90012, Defendant Julian Omidi ("Mr. Omidi"), by and through his counsel of record, will move and does hereby move this Court for an order to set aside the jury verdict and grant a new trial pursuant to Federal Rule of Criminal Procedure 33, based on the prejudicial and erroneous charges to the jury in Instructions 33 (the "Deliberate Ignorance Instruction) and Instruction 34 (the "Reckless Indifference Instruction"), and on the government's prosecutorial misconduct during summation. Mr. Omidi's motion is based on this Notice of Motion and Motion, the attached Memorandum of Law in Support of the Motion, all matters which the Court may judicially notice, and the documents and pleadings previously filed with this Court.

Dated:  March 30, 2022          Respectfully submitted,


**WILLKIE FARR & GALLAGHER LLP**

By: s/ Michael S. Schachter
          MICHAEL S. SCHACHTER
          RANDALL W. JACKSON
          CASEY E. DONNELLY
          SIMONA AGNOLUCCI

          ATTORNEYS FOR DEFENDANT
          JULIAN OMIDI

# TABLE OF CONTENTS

**Page(s)**

I.    INTRODUCTION ................................................................................ 1

II.   STATEMENT OF FACTS ................................................................... 2

      A.    The FSI Exclusively Charges Mr. Omidi with Intentional Conduct and Positive Knowledge, Foreclosing Deliberate Ignorance and Recklessness. ................................................................................ 2

      B.    Each and Every Charging Term of the FSI Incorporated the Alleged Willful Conduct with Actual Knowledge. ....................................... 4

      C.    The Government Waited Until the End of the Trial to Inform Mr. Omidi that it had Changed Its Theory and Would Seek Instructions on Deliberate Ignorance and Reckless Indifference. .............................. 4

III.  THE DELIBERATE IGNORANCE AND RECKLESS INDIFFERENCE INSTRUCTIONS CONSTRUCTIVELY AMENDED THE INDICTMENT ......... 6

      A.    The Deliberate Ignorance and Reckless Indifference Instructions Were Based on Facts Never Presented to the Grand Jury. ....................... 6

      B.    The FSI Did Not Provide Notice of the Deliberate Ignorance and Reckless Indifference Theories. ..................................................... 7

            1.    The Conduct and *Mens Rea* Alleged in the FSI is Antithetical to Deliberate Ignorance. ....................................................... 8

            2.    The *Mens Rea* Alleged in the FSI is Antithetical to Deliberate Ignorance. ................................................................................ 9

      C.    The FSI Charged Particular Crimes and the Government Was Limited to Proving those Particulars at Trial. ............................................. 10

      D.    The Deliberate Ignorance and Reckless Indifference Instructions Enabled the Government to Seek a Conviction Based on the Constructively Amended Charges ................................................... 16

IV.   ALTERNATIVELY, THE DELIBERATE IGNORANCE AND RECKLESS INDIFFERENCE INSTRUCTIONS RESULTED IN A FATAL VARIANCE .... 17

      A.    Government's Pivoted from the FSI's Theory at the End of the Trial. ........ 17

      B.    The Government's Shift in Theories at Trial Was Prejudicial. ................... 19

Page(s)

C. The Government Induced Mr. Omidi to Rely on the Theory of the FSI Before Trial. ...................................................................... 21

D. The Government's Refusal to Provide a Bill of Particulars Independently Warrants Reversal. ............................................. 22

E. Late Disclosure of the New Theories is Sufficient for Reversal. ............... 23

V. ALTERNATIVELY, THE ERRONEOUS RECKLESS INDIFFERENCE INSTRUCTION INDEPENDENTLY REQUIRES REVERSAL ......................... 24

A. The Reckless Indifference Instruction Was Erroneous. .................. 24

B. *United States v. Dearing* Distinguished. ......................................... 26

C. The Reckless Indifference Instruction is Inconsistent with *Heredia* ............ 27

D. The Reckless Indifference Instruction Permeated Each Charging Term of the FSI and Requires Reversal of the Verdict. .......................... 28

VI. THE COURT SHOULD AWARD MR. OMIDI A NEW TRIAL DUE TO PROSECUTORIAL MISCONDUCT DURING CLOSING ARGUMENTS. ........ 28

A. The Prosecutor Committed Misconduct By Denigrating Defense Counsel During Her Rebuttal. .......................................................... 28

B. The Prosecutor Committed Misconduct When She Displayed Evidence To The Jury That Was Not Admitted At Trial During Her Summation. ....... 33

VII. THE GOVERNMENT DISTORTED THE FACT FINDING PROCESS IN THE COURT'S RULE 403 DETERMINATION .................................................. 35

VIII. CONCLUSION ...................................................................................... 36

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Berger v. United States,*
  295 U.S. 78 (1935)................................................................................28

*Bruno v. Rushen,*
  721 F.2d 1193 (9th Cir. 1983) ....................................................29, 31

*Chapman v. California,*
  386 U.S. 18 (1967)...........................................................................31

*Darden v. Wainwright,*
  477 U.S. 168 (1986)..........................................................................31

*Farmer v. Brennan,*
  511 U.S. 825 (1994)..........................................................................25

*Gray v. Raines,*
  662 F.2d 569 (9th Cir. 1981) ..............................................................7

*Griffin v. United States,*
  502 U.S. 46 (1991)............................................................................28

*Howard v. Daggett,*
  526 F.2d 1388 (9th Cir. 1975) ...........................................................14

*Jeffers v. United States,*
  392 F.2d 749 (9th Cir. 1968) ........................................................9, 15

*Lincoln v. Sunn,*
  807 F.2d 805 (9th Cir. 1987) .............................................................23

*Russell v. United States,*
  369 U.S. 749 (1962).......................................................................7, 9

*Sakamoto v. Duty Free Shoppers, Ltd.,*
  764 F.2d 1285 (9th Cir. 1985) ...........................................................26

*Salviejo-Fernandez v. Gonzales,*
  455 F.3d 1063 (9th Cir. 2006) .............................................................9

*Stirone v. United States,*
  361 U.S. 212 (1960)....................................................................14, 15

*Turner v. Louisiana,*
   379 U.S. 466 (1965)....................................................................33

*United States v. Adamson,*
   291 F.3d 606 (9th Cir. 2002) ...........................................18, 19, 20, 21

*United States v. Alcantara-Castillo,*
   788 F.3d 1186 (9th Cir. 2015) .........................................................28

*United States v. Barrios-Siguenza,*
   567 F. App'x 519 (9th Cir. 2014).....................................................15

*United States v. Cancelliere,*
   69 F.3d 1116 (11th Cir. 1995) .........................................................12

*United States v. Carlson,*
   616 F.2d 446 (9th Cir. 1980) ...........................................................15

*United States v. Curtin,*
   489 F.3d 935 (9th Cir. 2007) ......................................................35, 36

*United States v. Davis,*
   854 F.3d 601 (9th Cir. 2017) ......................................................11, 12

*United States v. Dearing,*
   504 F.3d 897 (9th Cir. 2007) .................................................24, 26, 27

*United States v. Dipentino,*
   242 F.3d 1090 (9th Cir. 2001) .........................................................15

*United States v. Doucet,*
   994 F.2d 169 (5th Cir. 1993) ...........................................................24

*United States v. Dougan,*
   839 F. App'x 81 (9th Cir. 2020) .......................................................13

*United States v. Frederick,*
   78 F.3d 1370 (9th Cir. 1996) ...........................................................29

*United States v. Giese,*
   597 F.2d 1170 (9th Cir. 1979) .........................................................23

*United States v. Hartz,*
   458 F.3d 1011 (9th Cir. 2006) ......................................................7, 24

*United States v. Heredia,*
   483 F.3d 913 (9th Cir. 2007) ........................................................6, 8, 27

*United States v. Holmes,*
   413 F.3d 770 (8th Cir. 2005) ........................................................30, 31

*United States v. Jingles,*
   702 F.3d 494 (9th Cir. 2012) ..............................................................13

*United States v. Keith,*
   605 F.2d 462 (9th Cir. 1979) ................................................................9

*United States v. Kojayan,*
   8 F.3d 1315 (9th Cir. 1993) .........................................................33, 34

*United States v. L.A. Tucker Truck Lines,*
   344 U.S. 33 (1952).............................................................................27

*United States v. Laurienti,*
   611 F.3d 530 (9th Cir. 2010) ..............................................................12

*United States v. Lloyd,*
   807 F.3d 1128 (9th Cir. 2015) .......................................................5, 24

*United States v. Lockhart,*
   844 F.3d 501 (5th Cir. 2016) ..............................................................12

*United States v. Marolda,*
   615 F.2d 867 (9th Cir. 1980) ..............................................................21

*United States v. McLain,*
   823 F.2d 1457 (11th Cir. 1987) ..........................................................30

*United States v. Mickey,*
   897 F.3d 1173 (9th Cir. 2018) ............................................................11

*United States v. Miller,*
   471 U.S. 130 (1985).....................................................................10, 16

*United States v. Miller,*
   891 F.3d 1220 (10th Cir. 2018) ..........................................................15

*United States v. Pazsint,*
   703 F.2d 420 (9th Cir. 1983) ...............................................................7

*United States v. Prantil,*
   764 F.2d 548 (9th Cir. 1985) ....................................................................32

*United States v. Reyes,*
   660 F.3d 454 (9th Cir. 2011) ....................................................................35

*United States v. Rodrigues,*
   159 F.3d 439 (9th Cir. 1998), *amended*, 170 F.3d 881 (9th Cir. 1999) .............30

*United States v. Rodriguez,*
   880 F.3d 1151 (9th Cir. 2018) ...........................................................25, 26

*United States v. Ryland,*
   806 F.2d 941 (9th Cir. 1986) ....................................................................23

*United States v. Sanchez,*
   176 F.3d 1214 (9th Cir. 1999) ..................................................................30

*United States v. Sanchez-Soto,*
   617 F. App'x 695 (9th Cir. 2015) ..............................................................33

*United States v. Sanders,*
   966 F.3d 397 (5th Cir. 2020) ....................................................................12

*United States v. Shipsey,*
   190 F.3d 1081 (9th Cir. 1999) ........................................................13, 14, 15

*United States v. Smolar,*
   557 F.2d 13 (1st Cir. 1977)........................................................................24

*United States v. Strode,*
   229 F.3d 1161 (9th Cir. 2000) ..................................................................32

*United States v. Thomas,*
   893 F.2d 1066 (9th Cir. 1990) ....................................................................7

*United States v. Tydingco,*
   909 F.3d 297 (9th Cir. 2018) ....................................................................26

*United States v. Ward,*
   747 F.3d 1184 (9th Cir. 2014) ....................................................................7

*United States v. Weatherspoon,*
   410 F.3d 1142 (9th Cir. 2005) .............................................................30, 32

*United States v. Weissman,*
  899 F.2d 1111 (11th Cir. 1990) ........................................................... 14

*United States v. Wilbur,*
  674 F.3d 1160 (9th Cir. 2012) ........................................................6, 7

*United States v. Yi,*
  704 F.3d 800 (9th Cir. 2013) ................................................................ 8

*Voisine v. United States,*
  136 S.Ct. 2272 (2016) ......................................................................... 25

*Welchel v. Washington,*
  232 F.3d 1197 (9th Cir. 2000) ........................................................... 36

*Yeargain v. United States,*
  314 F.2d 881 (9th Cir. 1963) ............................................................. 23

*Zapata v. Vasquez,*
  788 F.3d 1106 (9th Cir. 2015) .....................................................31, 32

**Other Authorities**

Paul H. Robinson & Jane A. Grall, *Element Analysis in Defining Criminal
  Liability: The Model Penal Code and Beyond*, 35 Stan.L.Rev. 681 (1983) ...... 10

Restatement (Second) of Torts § 500 (1965), cmt. f ................................ 10

# I.      INTRODUCTION

In the first superseding indictment (the "FSI"), the grand jury alleged that Mr. Omidi violated the law by knowingly and deliberately engaging in specific fraudulent acts. Mr. Omidi faced charges of mail and wire fraud, and several other counts for crimes derivative of the alleged fraud scheme.  Mail and wire fraud may be committed in various ways, but the grand jury's accusations against Mr. Omidi's specify a single theory:  Mr. Omidi <u>purposefully</u> created a scheme to falsify sleep study reports ("SSRs") and <u>knowingly</u> authorized the submission of this false information to insurance companies in order to cheat them of money.  The charging terms in the FSI all incorporate the allegations that Mr. Omidi acted purposefully and with actual knowledge.

During the trial, it eventually became apparent that the government lacked compelling evidence supporting the FSI's theory. Nevertheless, the government waited until the charge conference to formally notify Mr. Omidi that it had changed its theory and would seek to have the jury instructed that Mr. Omidi could be found guilty without proof of positive knowledge or purposeful conduct, based on mere recklessness as to the truth of the SSRs or deliberate ignorance of fraud.  After the Court approved this request and so instructed the jury, the government spent much of its closing arguments attempting to persuade the jury to convict based on the Deliberate Ignorance Instruction or the Reckless Indifference Instruction.  Given the fundamental incompatibility between the specific theory of fraud charged FSI and the much more expansive theory underlying these disputed instructions, it is impossible to know whether the grand jury would have alleged that Mr. Omidi committed the specific crimes for which he may have been convicted. Thus, the jury instructions constructively amended the FSI.

In the alternative, the jury instructions constituted a prejudicial variance requiring a new trial.  Although the government did not announce its novel theory until the close of the evidence, it had introduced testimony and documents during its case-in-chief that could be used to support deliberate ignorance and reckless indifference theories.  Mr. Omidi did not focus his defense on countering this proof because the government never

informed him that he would be facing alternative theories that would make it relevant. The government's failure to provide notice hindered Mr. Omidi's ability to prepare an effective defense to the specific charges that the government ultimately pursued.  The proof at trial thus constitutes a prejudicial variance from the FSI.

A new trial is also warranted because the Reckless Indifference Instruction, which applied to the charging terms of each count in the FSI, was faulty and violated Mr. Omidi's due process rights. This is an independent basis to set aside the verdict.

Separate and apart from the above issues regarding the jury instructions, the verdict should be set aside due to the government's prosecutorial misconduct during jury instructions.

## II.   STATEMENT OF FACTS

### A.   The FSI Exclusively Charges Mr. Omidi with Intentional Conduct and Positive Knowledge, Foreclosing Deliberate Ignorance and Recklessness.

The FSI's *charging terms* allege in extraordinary detail that Mr. Omidi devised the fraudulent scheme alleged in the indictment and committed every single charged act with actual knowledge and with intent to deceive the insurance companies. (FSI at ¶¶ 18; 37; 38(e)-(n), (r)-(t), 39-45) (emphases added):

- ¶18. … J. OMIDI … **set and reviewed** GET THIN's policies and procedures…
- ¶37. … J. OMIDI… **knowingly and with intent to defraud**, devised, participated in, and executed a scheme to defraud TriCare and the Insurance Companies …by means of material false and fraudulent pretenses, representations, and promises, and the **concealment of material facts**.
- ¶38 e. … **policies set by** defendant J. OMIDI … defendant J. OMIDI **knew** that some of these patients had insurance that likely would not cover Lap-Band surgery under any circumstances, but that the insurance often would pay for the performance of one or more sleep studies.
- ¶38 f. … J. OMIDI **reviewed and approved** the payment of those commissions.
- ¶38 g. … J. OMIDI … **knew** … the SSRs … had been altered by co-conspirator C.K. and others at defendant J. OMIDI's direction to reflect results not supported by the raw data from the sleep studies…
- ¶38 h. … J. OMIDI **instructed** co-conspirator C.K., either directly or through intermediaries such as co-conspirator S.H. or through post-it notes on patient files, **to alter the sleep study results in the SSRs** (i) to make it appear as though the patients had OSA when they, in fact, did not; or (ii) to make it appear as though they had more severe OSA than they, in fact, had. … **J. OMIDI authorized** … co-conspirator S.H., to assist co-conspirator C.K. in the **falsification of SSRs**.

●¶38 i. … defendant J. OMIDI also instructed co-conspirator C.K. to conduct or provide ESS scores … which, as defendant J. OMIDI … **knew**, were often obtained after the sleep studies had already been performed and were often fabricated to indicate falsely that the patients were suffering from extreme daytime sleepiness when, in fact, they were not. …

●¶38 j. Defendant **J. OMIDI instructed co-conspirator C.K. to falsify the SSRs, knowing and intending** that (i) those falsified SSRs would be provided to TriCare and the Insurance Companies … and (ii) TriCare and the Insurance Companies would rely on the falsified SSRs (including their fabricated results and representation that the SSRs had been reviewed by defendant ZARRABI) and corresponding inaccurate LOMN statements regarding the sleep study results in making decisions regarding Lap-Band pre-approval. …

●¶38 k. … **co-conspirators C.K. and S.H., acting at defendant J. OMIDI's direction** or **with his knowledge and approval**, also **falsified other information that was included in the LOMNs**, including patients' heights, weights, and BMI's … As defendant **J. OMIDI knew and intended,** this **false information** was included in an effort to make the patients **more likely to receive insurance pre-approval for Lap-Band surgery**.

●¶38 l. …Defendant J. OMIDI at times **directed GET THIN employees to revise** the LOMNs, including to reflect the falsified sleep study results and ESS scores. … Defendant J. OMIDI typically approved the LOMNs before they were submitted to TriCare and the Insurance Companies.

●¶38 m. …**SSRs altered** by co-conspirators C.K. and S.H. and others **at defendant J OMIDI's direction**….

●¶38 n. … J. OMIDI … **knew and intended**, GET THIN Providers… billed TriCare and the Insurance Companies for sleep studies that had not been reviewed or interpreted by defendant ZARRABI. … J. OMIDI … also **knew and intended,** GET THIN employees submitted to TriCare and the Insurance Companies falsified SSRs in support of sleep study claims and often received payment from TriCare and the Insurance Companies for those claims.

●¶38 q. … J. OMIDI … **knew and intended**, the materials sent to DME providers in support of the purported medical necessity of the DME were used by those DME providers in support of claims ….

●¶38 r. … **to conceal the falsification** … J. OMIDI **directed co-conspirator C.K. to obtain and destroy the raw data** associated with the sleep studies

●¶38 s. Also in an **attempt to prevent discovery of the falsification of the SSRs** and lull GET THIN physicians into believing the changing of SSRs was medically appropriate, defendant J. OMIDI **directed co-conspirator C.K. to create documentation that attempted to justify the changing of SSRs**.

Nowhere does the FSI allege or provide notice to Mr. Omidi that he was being accused of fraud based on a deliberate effort to avoid confirming the existence of the very fraud scheme that the grand jury alleged he created, or based on mere reckless indifference to the truth of statements he approved for submission to insurance companies.

### B. Each and Every Charging Term of the FSI Incorporated the Alleged Willful Conduct with Actual Knowledge.

The allegations of *Mr. Omidi's willful conduct and actual knowledge were expressly incorporated into each and every charging term* of the FSI, forming the entire basis of the fraud scheme charged by the grand jury. *See* FSI at 1, ¶¶44, 46, 48, 50. The allegations of the FSI are incompatible with deliberate ignorance or reckless indifference, *e.g.*, that Mr. Omidi "conceal[ed] the falsification" and "directed" others to falsify.

### C. The Government Waited Until the End of the Trial to Inform Mr. Omidi that it had Changed Its Theory and Would Seek Instructions on Deliberate Ignorance and Reckless Indifference.

Consistent with the FSI, in the government's opening statement and for most of the trial the government did not present a theory that Mr. Omidi committed fraud through deliberate ignorance or reckless indifference, instead focusing on the central claim of the FSI—that Mr. Omidi devised, orchestrated, instructed and knew about all aspects of the alleged scheme to submit false information to insurance companies. *See, e.g.*,

●Tr. 240 (AUSA Moghadas: [A]fter these sleep study results, when they would come in, and if they weren't what Defendant Omidi wanted, well, then he would instruct his employees to falsify those results to make it look like the person was, in fact, suffering from sleep apnea or more – or more severe sleep apnea than the person actually had. . . . And rather than tell them the truth, they were falsely diagnosed with sleep apnea, a disorder that they did not have. And this was done, these documents were falsified and then submitted to the insurance companies in support of their claims for sleep studies, in support of their eventual requests for a lap band.);

●Tr. 2218 (AUSA Chau: So to go back to Your Honor's point, yes, the fact that there are false documents in the company that are generated by the company at the direction of Julian Omidi, that is certainly relevant as circumstantial evidence.);

●Tr. 4669 (AUSA Williams: Q. Let's take a look at page 2. Again, we appear to have another Post-it Note on here. Is this one also Julian Omidi's handwriting? Mr. Klasky: A. Yes, it is. AUSA Williams: Q. And what direction is being given in this Post-it Note? Mr. Klasky: A. When Julian Omidi wrote, "Sleep study," that means I need to increase the sleep study AHI to reflect a severe sleep apnea.);

●Tr. 4722 (AUSA Williams: Q. And, again, how would you know what to increase those or how to change those numbers? Mr. Klasky: A. It depended upon what Julian wanted, if he wanted a "Moderate" or a "Severe.");

●Tr. 4825 (AUSA Williams: Q. Mr. Klasky, after you were directed by Julian Omidi to start falsifying sleep study results, was there an effort to create documents that would purportedly justify the new up-scored falsified scores? Mr. Klasky: A. Sure.);

**MOTION FOR NEW TRIAL**

1
2
3
4
5
6

●Tr. 5202 (Mr. Schachter: Q. Okay. And this is you outlining what you were hoping that Dr. Zarrabi -- some of the things that you hoped Dr. Zarrabi would say in a presentation that he was to make to internists, surgeons, and other physicians; is that correct?  Mr. Klasky: A. As I was directed by Julian Omidi to do so, yes.);

●Tr. 5258 (Mr. Schachter: Q. All right. Well, when you testified on Direct, you told the jury that you fabricated or falsified the template version "To increase the AHI." Do you remember that?  Mr. Klasky: A. On occasion, as requested by Julian Omidi. Mr. Schachter: Q. Yes.  That you created -- when you were acting at Mr. Omidi's directions, you created these reports that had higher AHI scores; correct?  Mr. Klasky: A. As directed by Julian Omidi, yes.).

7
8
9
10
11
12
13
14
15
16
17
18

However, shortly before the December 8, 2021 jury instruction conference, which was two days before closing arguments, the government informed Mr. Omidi's counsel that it would request the Court to instruct the jury on deliberate ignorance and reckless indifference theories.  Mr. Omidi filed a trial memorandum objecting to the Deliberate Indifference Instruction itself and also that it constituted a constructive amendment and/or a prejudicial variance.  (ECF 1533.)  Thereafter, at the jury instruction conference, counsel for Mr. Omidi verbally objected to the deliberate ignorance jury instruction and stated it would allow the jury to convict Mr. Omidi for committing fraud in a manner that the grand jury did not consider and did not allege in the FSI.  (Tr. 8243 ("charging these defendants, particularly Julian Omidi, with actual knowledge and directing the scheme;" "it is a very different scheme and situation charged than the one charged;" and "[i]t also squarely contradicts their theory of the case.")).

19
20
21
22
23
24
25

The Court ruled that the deliberate ignorance instruction was appropriate, relying on a solitary allegation by Charles Klasky _at trial_ that Mr. Omidi did not want to look at the spreadsheet through which Klasky was implementing fraudulent changes:  "THE COURT: … I will tell you why I'm including it. I recall that there was testimony from Mr. Klasky that he attempted to show the Excel spreadsheet to Mr. Omidi and he didn't want to see it." (Tr. 8241, emphasis added.)  The Court did not address Mr. Omidi's objection that the instruction constituted a constructive amendment and/or a prejudicial variance.

26
27
28

The Court then addressed the reckless indifference instruction.  Mr. Omidi's counsel stated that his objections were essentially the same as to the deliberate ignorance instruction (Tr. 8246) but added that the instruction is also defective pursuant to _United_

1   *States v. Lloyd*, 807 F.3d 1128, 1164 (9th Cir. 2015).  (Tr. 8249-50.)  The Court included

2   the Reckless Indifference Instruction as jury instruction 34.

## III.   THE DELIBERATE IGNORANCE AND RECKLESS INDIFFERENCE INSTRUCTIONS CONSTRUCTIVELY AMENDED THE INDICTMENT

### A.   The Deliberate Ignorance and Reckless Indifference Instructions Were Based on Facts Never Presented to the Grand Jury.

The Deliberate Ignorance and Reckless Indifference Instructions deprived Mr. Omidi of his constitutional right to be charged only by a grand jury.  The FSI's factual allegations concerning Mr. Omidi's alleged knowledge of the scheme and his intent to defraud—which were incorporated into the charging terms of each count in the FSI—are incompatible with the evidentiary requirements for deliberate ignorance (aka "willful blindness"), and are inconsistent with reckless indifference.

The unremarkable proposition that any party can request an instruction supported by the evidence at trial, *Heredia v. United States*, 483 F.3d 913, 922 (9th Cir. 2007), does nothing to resolve Mr. Omidi's injury.  Whether or not an instruction has a basis in the trial evidence, it still cannot alter or expand the charged crimes beyond what the grand jury alleged in the indictment.  *United States v. Wilbur*, 674 F.3d 1160, 1178 (9th Cir. 2012).  Here, the Court decided to issue the Deliberate Ignorance Instruction (and, implicitly, the Reckless Indifference Instruction) based on a solitary statement from Mr. Klasky's trial testimony:  "THE COURT: … I will tell you why I'm including it. I recall that there was testimony from Mr. Klasky that he attempted to show the Excel spreadsheet to Mr. Omidi and he didn't want to see it." (Tr. 8244.)  But even if there was some evidentiary basis for these Instructions in the evidence *at trial*, they have no basis whatsoever in the FSI.  Indeed, as discussed in point B.1, *infra*, Mr. Klasky's trial testimony on the Excel spreadsheet flatly contradicted his testimony to the grand jury, meaning that the Court's basis for issuing the Instructions did not and could not form the basis of any allegations in the FSI.

If the government or the court could simply change the charging part of the indictment to allege a theory of criminal liability with different elements from the ones

charged, "to suit its own notions of what it ought to have been, or what the grand jury would probably have made it if their attention had been called to suggested changes, the great importance which the common law attaches to an indictment by a grand jury . . . without which the Constitution says 'no person shall be held to answer,' may be frittered away until its value is almost destroyed." *Russell v. United States*, 369 U.S. 749, 770-71 (1962). Thus, "[a]fter an indictment has been returned, its charges may not be broadened through amendment - whether it be by physical alteration, jury instruction, or bill of particulars - except by the grand jury." *United States v. Pazsint*, 703 F.2d 420, 423 (9th Cir. 1983).

That is exactly what we have in this case: the Deliberate Ignorance and Reckless Indifference Instructions broadened the bases for conviction beyond the specific crimes charged by the grand jury, meaning that *"a constructive amendment necessarily occurred here*." *United States v. Ward*, 747 F.3d 1184, 1192 (9th Cir. 2014) (quoting *Stirone v. United States*, 361 U.S. 212, 219 (1960) (emphasis added)). A new trial is required because "a constructive amendment always requires reversal." *Wilbur*, 674 F.3d at 1178.

### B. The FSI Did Not Provide Notice of the Deliberate Ignorance and Reckless Indifference Theories.

By presenting the trial jury with bases for conviction that are not found in the FSI, the Deliberate Ignorance and Reckless Indifference Instructions undermined the very purpose of the FSI. A grand jury indictment "is designed to ensure that criminal defendants have fair notice of the charges that they will face and the theories that the government will present at trial." *United States v. Hartz*, 458 F.3d 1011, 1022 (9th Cir. 2006) (emphasis added); *Gray v. Raines*, 662 F.2d 569, 572 (9th Cir. 1981) (the requirement of a grand jury indictment vindicates the "right of an accused to be informed of the nature and cause of the accusations"). An indictment should be read in its entirety and "construe[d] . . . according to common sense" to determine whether it sufficiently apprised the defendant of the charges. *United States v. Thomas*, 893 F.2d 1066, 1070 (9th Cir. 1990). Here, a common sense reading of the FSI invalidates any suggestion that Mr.

1   Omidi had notice that he would face deliberate ignorance or reckless indifference theories

2   at trial, as both theories contradict the grand jury's allegations.

3   The FSI specifies that Mr. Omidi devised and orchestrated a scheme to submit

4   falsified SSRs to insurers, willfully and with actual knowledge, in order to deceive them

5   into paying his company, and that he carried out this fraud scheme (which underlies every

6   count of the FSI) through particular conduct:  by instructing Mr. Klasky and other co-

7   conspirators to falsify SSRs in order to obtain payment for unnecessary services, and by

8   closely directing Klasky's activities in furtherance of the scheme.  (*See, e.g.*, FSI ¶¶ 38,

9   38(h).  The FSI's allegations against Mr. Omidi are irreconcilable with deliberate

10  ignorance or reckless indifference.

11      1.      **The Conduct and *Mens Rea* Alleged in the FSI is Antithetical to
                Deliberate Ignorance.**

12

13  The FSI provides no notice that Mr. Omidi was accused of committing fraud

14  through deliberate ignorance.  "A [deliberately ignorant] defendant is one who took

15  *deliberate* actions to avoid confirming suspicions of criminality."  *United States v.*

16  *Heredia*, 483 F.3d 913, 918 n.4 (9th Cir. 2007) (emphasis in original); *United States v. Yi*,

17  704 F.3d 800, 804 (9th Cir. 2013) (to warrant a deliberate ignorance instruction, a

18  defendant must engage in "*deliberate actions*" to avoid learning the truth of the

19  criminality (emphasis added)).  The conduct and state of mind required for deliberate

20  ignorance are incompatible with the grand jury's allegations of Mr. Omidi's actual

21  knowledge.  *Heredia*, 483 F.3d at 922 ("Actual knowledge, of course, is inconsistent with

22  willful blindness.").  Nevertheless, the Court granted the government's request to issue the

23  Deliberate Ignorance Instruction as an alternative means of satisfying the knowledge

24  element for the charged crimes.  As noted, the Court's decision was based solely on Mr.

25  Klasky's trial testimony regarding his alleged failed attempt to show Mr. Omid the Excel

26  spreadsheet that was being used to falsify SSRs.

27  As an initial matter, Mr. Klasky's testimony on the Excel spreadsheet tended to

28  prove *actual* knowledge, not deliberate ignorance, as Mr. Klasky stated that he was

attempting to show Mr. Omidi a spreadsheet that was used to carry out _Mr. Omidi's_ fraud scheme. But more importantly, the grand jury heard a very different version of this story. In the grand jury, Mr. Klasky testified under oath that he _actually showed Mr. Omidi the Excel spreadsheet_ and _walked him through_ how it operated:

> And he [Julian Omidi] said, 'You need to make those reports different.' And so I said, 'Okay. Let me think about it. Let me work on it.' And then I did. And then I showed him the results of my work. And I said, 'See, it works like this. See, it works like that.' And so he would look at -- he was looking at the Excel file. And he saw that the numbers would change, you know, when you put in severe, when you put in mild, when you put in moderate. And then I showed him which part of the sleep study it would affect.

GJ TRANSCRIPTS 0005566 (Charles Klasky August 16, 2016 Grand Jury Transcript). This version of Mr. Klasky's Excel spreadsheet story invalidates the idea that Mr. Omidi was deliberately ignorant. The fact that the grand jury heard this version, and not the version the Court relied on in issuing the Deliberate Ignorance Instruction, affirmatively proves that the FSI _did not and could not_ charge Mr. Omidi with deliberate ignorance on the basis testimony that "[Mr. Klasky] attempted to show the Excel spreadsheet to Mr. Omidi and he didn't want to see it" (Tr. 8241.) This incongruity between the Court's basis for issuing the Deliberate Ignorance Instruction and evidence presented to the grand jury is emblematic of the substantially altered crimes that Mr. Omidi faced at trial, which lacked any basis in the charging terms of the FSI. Because the Deliberate Ignorance Instruction authorized the trial jury to convict on the basis of facts not found by the grand jury, it violated Mr. Omidi's Fifth Amendment rights. _Russell_, 369 U.S. at 770 (reversing conviction); _Jeffers v. United States_, 392 F.2d 749, 753 (9th Cir. 1968) (same); _United States v. Keith_, 605 F.2d 462, 464 (9th Cir. 1979) (same)..

## 2. The _Mens Rea_ Alleged in the FSI is Antithetical to Deliberate Ignorance.

Similarly, nothing in the FSI could have notified Mr. Omidi that, at trial, he would face conviction based on a reckless indifference theory, _i.e._, that he committed the charged crimes _without_ an actual purpose to defraud insurers but instead with mere "reckless indifference to the truth or falsity of [his] statements." It is well settled that actual

knowledge is a higher level of culpability and is harder to prove than the uncharged recklessness. *Salviejo-Fernandez v. Gonzales*, 455 F.3d 1063, 1067 (9th Cir. 2006) (purpose is "the highest of four levels of culpable states of mind: purpose, knowledge, recklessness, and negligence"); *see also* Paul H. Robinson & Jane A. Grall, *Element Analysis in Defining Criminal Liability: The Model Penal Code and Beyond*, 35 Stan.L.Rev. 681, 694-697 (1983). Also, "[r]eckless misconduct differs from intentional wrongdoing in a very important particular. While an act to be reckless must be intended by the actor, the actor does not intend to cause the harm which results from it." Restatement (Second) of Torts § 500 (1965), cmt. f.

The FSI's charging terms alleged the opposite of reckless indifference—they repeatedly assert that Mr. Omidi acted with actual knowledge and purpose, *i.e.*, he knowingly submitted misrepresentations to insurers intending to cause the resulting harm of his conduct (deceiving the insurance companies). The Reckless Indifference Instruction diluted the *mens rea* alleged in the FSI and permitted a far lower bar for conviction.

### C.   The FSI Charged Particular Crimes and the Government Was Limited to Proving those Particulars at Trial.

The FSI's limited scope and the resulting lack of support for alternative theories of fraud are entirely attributable to government's own decisions. It was the government who chose to seek an indictment charging a particular type of fraudulent scheme—committed willfully and with actual knowledge of misrepresentations. And it was the government who chose to pivot from the FSI during trial and seek jury instructions allowing conviction based on a different fraudulent scheme—committed without Mr. Omidi's willful intent or actual knowledge. If the government intended to present both of these theories at trial as alternative bases for conviction, it was required to seek an indictment that clearly set forth both theories.

Where the government seeks to charge "the commission of any one offense in several ways...the crime and the elements of the offense that sustain the conviction [must

be] fully and clearly set out in the indictment." *United States v. Miller*, 471 U.S. 130, 136 (1985) (emphasis added).  Here, the government failed to do so.  Although the individual counts in the FSI charge Mr. Omidi with violating federal fraud, identity theft, and money laundering laws which can be committed in various ways—by engaging in different conduct and with different culpable states of mind—the *charging terms* of the FSI specifically alleged and *only* provided notice for the theory that Mr. Omidi committed fraud through willful intent and actual knowledge—not through deliberate ignorance and/or reckless indifference.  (FSI at ¶¶ 18; 37; 38(e)-(n), (r)-(t), 39-45).

Two Ninth Circuit cases illustrate the point.  In *United States v. Mickey*, 897 F.3d 1173 (9th Cir. 2018), the court considered a defendant's conviction under 18 U.S.C. § 1591, which includes four subsections establishing the various ways of proving *mens rea*, *i.e.*, by the means of force, threats of force, fraud, and coercion.  The jury instructions permitted the defendant to be convicted by any combination of these four means, and the defendant claimed this was a constructive amendment.  On plain error review, the Ninth Circuit found there was no constructive amendment "[b]ecause the indictment charged [the defendant] with *all four* means," and thus, "[t]he specific language in the indictment meant that [the defendant] was given notice that he would have to defend against all four means." *Id*. at 1183.

By contrast, in *United States v. Davis*, 854 F.3d 601 (9th Cir. 2017), which also dealt with a conviction under 18 U.S.C. § 1591, the Ninth Circuit found that the indictment had been constructively amended.  The defendant in *Davis* was charged in an indictment alleging violation of a specific subsection of the statute, § 1591(a), which forbids a defendant from causing a person to engage in a commercial sex act while "knowing or in reckless disregard of the fact that the person has not attained the age of 18 years." *Id*. at 604.  However, through the jury instructions and the government's closing argument, the jury was informed that it also could convict the defendant if he "had a reasonable opportunity to observe [the victim]." *Id*.  Though a different subsection, § 1591(c), permits a defendant to be convicted of the statutory offense if the defendant had a

reasonable opportunity to observe the victim beforehand, the indictment in *Davis* never alleged that this subsection (18 U.S.C. 1591(c)) had been violated.  Accordingly, the Ninth Circuit held that "a constructive amendment occurred because 'the crime charged [in the indictment] was substantially altered at trial, so that it was impossible to know whether the grand jury would have indicted for the crime actually proved.'"  *Davis*, 854 F.3d at 605 (quoting *United States v. Adamson*, 291 F.3d 606, 615 (9th Cir. 2002)); *see also United States v. Lockhart*, 844 F.3d 501, 514 (5th Cir. 2016) (reversing for constructive amendment of the *mens rea* element of the offense, and explaining "[w]hen the indictment alleges a particular set of facts as forming the basis for the defendant's violation of a statute, but the trial court allows evidence of other facts not alleged in the indictment to form the basis of the jury's guilty verdict, this court finds a constructive amendment.") (cited approvingly in *Davis*, 854 F.3d at 605); *United States v. Sanders*, 966 F.3d 397, 409 (5th Cir. 2020) ("[T]he district court impermissibly allowed the circumstances for Sanders's conviction to be broadened beyond the facts alleged in the indictment. Indeed, the indictment specifically accused Sanders of acting with knowledge that Jane Does 2 and 4 were minors. But by stating that the jury could disregard whether Sanders knew Jane Does 2 and 4 were underage, the district court broadened the indictment to include allegations that Sanders acted with any *mens rea* that the jury found applicable. 'It is this very type of "broadening" that' constitutes a constructive amendment."); *United States v. Cancelliere*, 69 F.3d 1116, 1121-22 (11th Cir. 1995) (finding constructive amendment when the district court disregarded the indictment's word "willfully", because "changing the requirement from proof of 'knowingly and willfully' to 'knowingly' impermissibly broadened the bases for Cancelliere's conviction, even though willfulness is not required under the money laundering statute.").[1]

---

[1] Nor is the *mens rea* copiously alleged in the FSI was mere surplusage.  For example, the Ninth Circuit has refused to strike the term "willfully" as surplusage in an indictment, "holding that the indictment's reference to the defendant's issuing checks 'willfully' was relevant because the government sought to prove that fact."  *United States v. Laurienti*, 611 F.3d 530, 547 (9th Cir. 2010) (describing *United States v. Terrigno*, 838 F.2d 371, 373 (9th Cir.1988)).

The FSI in this case is analogous to the one in *Davis*.  Although the *mens rea* for the crimes alleged in the FSI may, as a general matter, be proved by alternatives such as deliberate ignorance or reckless indifference, the FSI *did not* allege these means of establishing culpable *mens rea*. Rather, it only alleged and gave notice of Mr. Omidi's alleged willful intent and actual knowledge, neither of which are compatible with deliberate ignorance and reckless indifference.  Not only did the Deliberate Ignorance and Reckless Indifference Instructions substantially broaden the particular *mens rea* allegations in the FSI, but they also allowed conviction on theories that contradict the *mens rea* actually alleged by the grand jury.  *United States v. Jingles*, 702 F.3d 494, 501 (9th Cir. 2012) ("An amendment is thought to be bad because it deprives the defendant of his right to be tried upon the charge in the indictment as found by the grand jury and hence subjected to its popular scrutiny").

The government cannot salvage its convictions by claiming that the alternative means of establishing *mens rea* that the jury was permitted to rely on at trial were encompassed by the broad statutory crimes in the FSI.  The Ninth Circuit's decision in *United States v. Shipsey*, 190 F.3d 1081 (9th Cir. 1999), exposes the flaw in this argument. In *Shipsey*, the Ninth Circuit set aside a conviction "because the jury instructions amended the *mens rea* element of the crime."  *United States v. Dougan*, 839 F. App'x 81, 86 (9th Cir. 2020) (describing *Shipsey*).  In doing so, the Ninth Circuit specifically rejected the district court's holding that, despite the specific charging terms of the indictment, the defendant may be convicted "by any theory encompassed by the statute."  *Shipsey*, 190 F.3d at 1085.  Critically, the Ninth Circuit held that, because the charging terms of the indictment only presented and gave notice of a single theory of guilt, as did the FSI in this case, the district court is "*required to limit its instructions to a single theory*."  *Id*. at 1087 (emphasis added).  The Court stated: (1) "[a]n indictment must include a statement of facts and circumstances that will inform the accused of the specific offense with which he is charged"; (2) Shipsey's "indictment contained such a statement … incorporated into the theft counts [which] set forth the theory [of theft]"; and (3) "[n]owhere in the indictment is

there a statement of facts and circumstances that would support other possible § 664 theft theories broadly invoked in the theft counts." *Id.* The Ninth Circuit concluded:

> Thus, Shipsey had *notice only of the theory of theft by fraudulent pretenses* and the government was obligated to prove this theory of theft. Because there is a real likelihood that the jury actually convicted Shipsey of a crime for which the grand jury did not indict him, the district court's instruction constructively amended the indictment. We have held that this is plain error that requires reversal.

*Id.* (emphasis added).

Here, as in *Shipsey*, the charging terms of the FSI alleged a single theory of fraud conducted with actual knowledge and willful intent to defraud (FSI at 1, ¶¶44, 46, 48, 50), and "[n]owhere in the indictment is there a statement of facts and circumstances that would support other possible … theories" such as deliberate ignorance or reckless indifference for the crimes alleged in the FSI. *Shipsey*, 190 F.3d at 1087.

The grand jury could have returned a general indictment of Mr. Omidi as to the *mens rea* elements for the crimes charged, or included in its indictment a specific charge that Mr. Omidi may have committed the crimes with deliberate ignorance or reckless indifference, *but it did not*, and "we cannot know whether the grand jury would have included in its indictment [that] charge." *Stirone v. United States*, 361 U.S. 212, 219 (1960); *Howard v. Daggett*, 526 F.2d 1388 (9th Cir. 1975) (reversing for constructive amendment and explaining "[t]he grand jury might have indicted appellant in a general allegation… *But it did not do so*. …The supplemental instruction constituted an impermissible amendment of the indictment that destroyed the defendant's substantial right to be tried only on charges presented in an indictment returned by a grand jury.") (emphasis added); *United States v. Weissman,* 899 F.2d 1111, 1115 (11th Cir. 1990) (to avoid a constructive amendment, "[t]he government in styling the indictment could have used the general language of the statute to refer to the enterprise in which appellants allegedly were involved").

The Ninth Circuit consistently holds the government to its own choices when it elects not to allege all possible statutory grounds of conviction in an indictment. *See*

*United States v. Dipentino*, 242 F.3d 1090, 1095 (9th Cir. 2001) (reversing for constructive amendment when the jury instructions permitted defendant to be found guilty on a theory of liability that would have been permissible under the statute but which the government had elected not to allege in the indictment); *Jeffers v. United States*, 392 F.2d 749, 752 (9th Cir. 1968) (reversing for constructive amendment because, unless explicitly stated in the indictment, a court "cannot say" that "the theory now advanced by the government" as the basis for the charge is "the [same] theory adopted by ... the grand jury," or that a petit jury will ultimately convict on "the same theory" found by the grand jury); *United States v. Carlson*, 616 F.2d 446, 447 (9th Cir. 1980) (reversing for constructive amendment and explaining "[t]he difficulty is that the grand jury, in its indictment, has precisely spelled out the form of misapplication for which it concluded appellant should stand trial .... The instruction as given permitted the petit jury to find appellant guilty of misapplication of funds based on misconduct other than that upon which the grand jury based its charge."); *United States v. Barrios-Siguenza*, 567 F. App'x 519, 521 (9th Cir. 2014) (reversing for constructive amendment and explaining that "once the indictment specified a particular [theory of guilt]—the district court was required to limit the jury instruction accordingly.").

"In short, '[i]t is settled law in this circuit, as elsewhere, that the language employed by the government in its indictments becomes an essential and delimiting part of the charge itself, such that if an indictment charges particulars, the jury instructions and evidence introduced at trial must comport with those particulars.'" *United States v. Miller*, 891 F.3d 1220, 1235 (10th Cir. 2018) (citing *inter alia Ward*, 747 F.3d at 1192).

Because the charging terms of the FSI specified the particular type of knowledge and intent supporting Mr. Omidi's fraud charges, it failed to give notice to that he could be convicted based on the alternative standards for establishing these elements articulated in the Deliberate Ignorance and Reckless Indifference instructions. Thus, the instructions broadened the possible bases for conviction, constituting "fatal error" which requires reversal. *Stirone*, 361 U.S. at 219; *Shipsey*, 190 F.3d at 1087. Such an error deprives an

accused of a "basic right [and] is far too serious to be treated as nothing more than a variance and then dismissed as harmless error." *Miller,* 471 U.S. at 140 (emphasis in original) (quoting *Stirone,* 361 U.S. at 217).

### D. The Deliberate Ignorance and Reckless Indifference Instructions Enabled the Government to Seek a Conviction Based on the Constructively Amended Charges.

Despite the utter lack of any support for such theories in the FSI, the jury was instructed that it could find that Mr. Omidi had a criminally culpable state of mind if it found: that Mr. Omidi "1. was aware of the high probability that [e.g., false or misleading representations were made to insurers or that fraudulent claims were being submitted], and 2. Deliberately avoided learning the truth" (Instruction #33); or that Mr. Omidi "acted with reckless indifference to the truth or falsity of [his] statements" (Instruction #34). As demonstrated above, the charges in the FSI are totally incompatible with the notion that Mr. Omidi did not have actual knowledge of the fraud or that he acted without intending the fraud. But because the government pivoted from the FSI and toward these incompatible theories near the end of trial, it is entirely possible that the jury convicted Mr. Omidi for crimes that the grand jury never alleged.

From the beginning of this case, and continuing until the last week of trial, the government consistently reiterated that its theory of the case was the specific fraud alleged in the FSI, *i.e.*, that Mr. Omidi actually knew of, and in fact controlled, the scheme to falsify SSR's in order to obtain payment for unnecessary procedures. (*See, e.g.*, Tr. 3775:3-5 (AUSA Ali Moghaddas: "Your Honor, the 'that' refers to falsifying sleep studies, which Defendant Omidi absolutely knew about.")). When Mr. Omidi requested a bill of particulars before trial, for the specific purpose of clarifying the government's theory of the case, the government opposed Mr. Omidi's request, claiming that its theory had been made obvious in the FSI. (ECF 179 at 8.) Nevertheless, as the trial reached its conclusion, the government all but abandoned its attempt to convict Mr. Omidi of the specific fraud alleged by the grand jury, and instead requested jury instructions on deliberate ignorance and reckless indifference—wholly incompatible theories which

allowed the petit jury to convict without proof of the purposeful conduct and knowing state of mind specified in each count of the FSI. Mr. Omidi's fundamental rights were violated when the Court instructed the jury on these incompatible theories.

The volume of evidence presented by the government at trial—a seemingly endless parade of witnesses and documents that were only marginally probative of the crimes actually alleged in the FSI—combined with the erroneous jury instructions and the government's closing arguments, empowered and even guided the jury to find Mr. Omidi guilty for alternative crimes that the grand jury never charged. Indeed, during its closing arguments, the government highlighted the deliberate ignorance and reckless indifference instructions, unsubtly urging the jury to convict on these theories:

> So let's talk now a little bit about how the evidence shows that the defendants knew and intended for it to happen. So as the Court instructed, the defendant acts knowingly when they are aware of what they do and don't do it by accident. And you also heard that a defendant can act knowingly where they are aware of a high probability that, for example, false or misleading representations were made to insurers or that fraudulent claims were being submitted, and then they deliberately avoid learning the truth. . . . And even if the defendants acted with reckless indifference as to whether the claims and statements they submitted were true or false, as the Court instructed you, they still intended to defraud.

(Tr. 8648-49). Because there is no way to know whether the grand jury would have charged Mr. Omidi with the theories of fraud on which the trial jury may have based its convictions, the verdict must be set aside.

## IV.   ALTERNATIVELY, THE DELIBERATE IGNORANCE AND RECKLESS INDIFFERENCE INSTRUCTIONS RESULTED IN A FATAL VARIANCE

### A.   Government's Pivoted from the FSI's Theory at the End of the Trial.

Even if the Court concludes that the Deliberate Ignorance and Reckless Indifference Instructions did not constructively amend the FSI, it should still grant a new trial in light of the variance between the complex of facts alleged by the grand jury and the theory on which the petit jury was instructed. When the government introduces new theories of liability that are not contained in the indictment, in the midst of trial, the variance between the government's proof and the grand jury's allegations may mislead the defendant as to

1  the charges against him, impairing his ability to prepare an effective defense. When the

2  theory at trial is sufficiently different from the indictment, the variance is prejudicial, and

3  a conviction obtained under these circumstances must be reversed. *United States v.*

4  *Adamson*, 291 F.3d 606, 616 (9th Cir. 2002).

5      In *Adamson*, the Ninth Circuit reversed for prejudicial variance because of a stark

6  divergence between the allegations and the proof. The indictment in that case charged

7  wire fraud based on a misrepresentation that computer servers had not been upgraded.

8  291 F.3d at 609-10. However, the defendant had actually upgraded the servers using

9  software that he was not authorized to use. *Id*. The evidence thus established that the

10  defendant did not misrepresent the fact that he had upgraded the servers; rather, he

11  misrepresented *the means* by which they were upgraded. *Id.* at 610-11. Although the

12  proof at trial may well have established that the defendant committed wire fraud based on

13  some type of misrepresentation, it was not the misrepresentation that the grand jury

14  alleged. The Ninth Circuit held that the divergence between the allegation and the proof

15  constituted a variance because there was "but one set of facts with a single divergence,

16  namely, the content of the misrepresentation that the defendant made to [Hewlett-

17  Packard]." *Id.* at 616 (citation and internal quotation marks omitted). This variance

18  required reversal because the indictment's specific allegation of the means of

19  misrepresentation failed to inform the defendant of the means of misrepresentation that

20  would be shown at trial, which "affirmatively misled the defendant and obstructed his

21  defense at trial." *Id.* at 616. Importantly, the Ninth Circuit found prejudice in part based

22  on the government's representation during the case—that the misrepresentation in the

23  indictment was the only misrepresentation at issue—which "induced the defendant to

24  prepare a defense that would be insufficient to ward off the government's proof at trial."

25  *Id. Adamson* further held that the district court erred when it instructed the jury that it

26  could convict based on the government's new account of the misrepresentation. This was

27  error because it "implicitly condoned [the government's] wrongs" by allowing the

28  defendant to be convicted on a theory other than that alleged in the indictment. *Id.*

1
      **B.     The Government's Shift in Theories at Trial Was Prejudicial.**

2         Here, the prejudice is even more apparent than it was in *Adamson*. Whereas the

3 indictment in that case alleged fraud by a single specified misrepresentation, here the FSI

4 charged a whole complex of factual allegations demonstrating that Mr. Omidi committed

5 fraud in a particular way: by purposefully creating and meticulously supervising a scheme

6 to submit false SSRs to insurers with the specific intent to defraud them of money. This

7 manner of committing fraud is far afield from a theory of fraud based on the defendant's

8 mere recklessness to the truth of statements, and is *flatly incompatible* with a theory that

9 alleges that one of the key elements of the defendant's fraud was taking deliberate action

10 to avoid actual knowledge of fraud that he subjectively believes may be occurring. The

11 prejudice is apparent because Mr. Omidi's defense strategy was focused on proving that

12 he did not know or intend the falsifications of the SSRs to occur. Such an approach can be

13 highly effective to counter the government's original theory that Mr. Omidi was the

14 mastermind who originated and coordinated the details of the fraud, with clear actual

15 knowledge and intent. But Mr. Omidi's strategy was undermined and rendered ineffective

16 with the issuance of the Deliberate Ignorance and Reckless Indifference Instructions,

17 which additionally permitted conviction even if Mr. Omidi was merely reckless or

18 deliberately ignorant of fraud originated by someone else.

19         When the government shifted its theory towards the end of its case, thereby

20 sidestepping the defense that Mr. Omidi had spent months preparing and executing, Mr.

21 Omidi suffered severe prejudice. The government notified Mr. Omidi that it would seek a

22 deliberate ignorance instruction on the Friday before closing arguments. To that point, the

23 government's presentation of evidence had aligned with the FSI's theory of the fraud. But

24 once the Court instructed the jury on the Deliberate Ignorance and Reckless Indifference

25 Instructions, the government then highlighted the Instructions in its closing argument. The

26 government presented evidence that was insufficient to prove the FSI's fraud theory, but

27 instead spoke to whether a normal person in Mr. Omidi's position should have realized

28 there was fraud at WLC, based principally on his oversight of insurance submissions and

sleep studies.  Mr. Omidi was significantly prejudiced by the government's choice to pursue these novel theories late in the trial, and then to highlight for the jury that it could convict Mr. Omidi based on proof of a type of fraud that was not alleged in the FSI.  The prejudice to Mr. Omidi was enhanced by the government's failure not to notify Mr. Omidi of its decision to pursue the novel theories until a few days before closing argument.  This situation amounts to a prejudicial variance.  *Adamson*, 291 F.3d at 616.

The variance here requires reversal because it affected Mr. Omidi's substantial rights.  *See id.*  Had Mr. Omidi been informed before trial of the government's desire to all but abandon the FSI's theory of fraud, he may have had the opportunity to make further pre-trial motions, to have the government's arguments on these theories precluded, and to develop themes and evidence in response.  Instead, the government hindered Mr. Omidi's defense by insisting that it intended to pursue the theory contained in the FSI.  Mr. Omidi's attorneys therefore prepared a defense focused exclusively on the particular manner of fraud described in the FSI.  Mr. Omidi mounted a defense to counter the FSI's principal allegation that Mr. Omidi committed fraud by knowingly and purposefully directing the submission of Klasky's falsified SSRs to insurers in order to obtain allegedly unwarranted reimbursement payments.  But the government's late-in-the-day variance from the FSI allegations pretermitted these efforts.  In closing, the government argued to the jury that Mr. Omidi should have been able to discover that fraud was occurring, and hardly even mentioned the central FSI allegation that Mr. Omidi was the originator, mastermind and director of the scheme.  (Tr. 8649-51 ("And you also heard that a defendant can act knowingly where they are aware of a high probability that, for example, false or misleading representations were made to insurers or that fraudulent claims were being submitted, and then they deliberately avoid learning the truth.  Now, for intent and for knowledge, too, for that matter, you can't get inside people's heads. So what do we do instead?  We have to look at circumstantial evidence. . . .  You've heard that Julian Omidi was not only the one controlling GET-THIN but he was also a micromanager. . . .  If you're sitting there and you're opening chart after chart and looking at them with detail,

you know, letter of medical necessity, or 'What can I find in the file that I can put in that letter of medical necessity?' he was looking at, those charts in detail.  And when you do that, for chart after chart after chart right in a row, you're going to see the patterns.")).

Because the government's case had nearly ended by the time it gave notice to Mr. Omidi of its reversal, Mr. Omidi had no time to prepare cross examination scripts or to identify lay witnesses (*e.g.*, doctors who extensively reviewed charts with SSRs and were not able to discern the falsity), experts, or documentary evidence to undermine the government's novel theory that he was subjectively aware of the high risk of fraud and either ignored that risk or took deliberate steps to avoid learning the truth.  Similarly, Mr. Omidi lacked notice to develop trial themes and strategies that could have presented a compelling emotional case to the jury for why he should not be found guilty based on mere recklessness or deliberate ignorance of *someone else's* fraud.  Had Mr. Omidi known of the government's uncharged theories in advance, he might well have chosen to testify on his subjective state of mind.  *United States v. Marolda*, 615 F.2d 867, 872 (9th Cir. 1980) (reversing conviction when district court altered a charging term in the indictment, stating "Marolda might well have chosen to testify as to his subjective state of mind.")

### C.   The Government Induced Mr. Omidi to Rely on the Theory of the FSI Before Trial.

Just as the government's representations in *Adamson* "induced the defendant to" rely on the allegations in the indictment in preparing the defense, 291 F.3d at 616, Mr. Omidi was induced to rely on the FSI based on the government's representations that its theory of the case was the one articulated in the FSI.  In addition, the government's trial evidence emphasized Mr. Omidi's actual knowledge and intent through (1) testimony that Mr. Omidi oversaw and directed all aspects of the sleep study program and insurance processing, (*see, e.g.*, Tr. 3723-26, 3667-69, 3693-96, 6275-84, 6298-6305, 6334); and (2) evidence that Mr. Omidi's agents intentionally falsified information at his direction and submitted it to insurance companies.  (*See, e.g.*, Tr. 3740-44, 3766-69, 3776-88, 3791-93, 3799, 3814).  This comported with the theory of the FSI that Mr. Omidi had actual

knowledge and flatly contradicted an alternative theory of deliberate ignorance or reckless indifference.  Additionally, the government devoted much of its case-in-chief to establishing the extent of Mr. Omidi's control and oversight over sleep studies and insurance processing to bolster (not contradict) testimony from the cooperating witnesses that Mr. Omidi had actual knowledge and was directing the fraudulent scheme. (*See, e.g.*, Tr. 3740-44, 3766-69, 3776-88, 3791-93, 3799, 3814.)

The government's decision not to afford Mr. Omidi adequate notice as to the exact nature of the charges he faced is particularly troubling because Mr. Omidi's expressly requested clarity before trial regarding the government's theory, in the form of a bill of particulars. (ECF 172.)  The government successfully rebuffed his request as unnecessary, in light of the obvious theory alleged in the FSI.  (ECF 179.)  It is now apparent that this action by the government allowed it to maintain flexibility and avoid committing itself to proving purposeful conduct and positive knowledge.

Mr. Omidi had no notice that the government intended to pursue a conviction based on deliberate ignorance and reckless indifference theories until the charging conference, when the government argued that, despite its own theory, the jury should be allowed to convict if it found that Mr. Omidi *took deliberate action to avoid gaining actual knowledge* to confirm his subjective belief about probable fraud, or that *he recklessly avoided confirming statements made by others in SSRs*.  The government's conduct led to a significant variance between the allegations Mr. Omidi expected to defend against and the proof actually offered at trial.  The variance between the FSI and the trial evidence so undermined Mr. Omidi's ability to prepare a defense that the verdict must be set aside.

### D.  The Government's Refusal to Provide a Bill of Particulars Independently Warrants Reversal.

Even if this Court finds that the FSI's charging terms were broad enough to put Mr. Omidi on notice of unspecified and uncharged theories of fraud, the Court should still set aside the verdict because the government's representations in refusing to grant Mr. Omidi's request for a bill of particulars actively misled Mr. Omidi and severely prejudiced

him.  In hindsight, the government's opposition to a bill of particulars (ECF 179) may even indicate a deliberate effort to obstruct and mislead Mr. Omidi.

Under Ninth Circuit law, Mr. Omidi was "entitled to know ... the theory of the government's case." *United States v. Ryland*, 806 F.2d 941, 942 (9th Cir. 1986); *United States v. Giese*, 597 F.2d 1170, 1180 (9th Cir. 1979) (noting that two functions of the bill of particulars are "to inform the defendant of the nature of the charge[s] against him with sufficient precision to enable him to prepare for trial [and] to avoid or minimize the danger of surprise at the time of trial" (citation omitted)); *Yeargain v. United States*, 314 F.2d 881, 882 (9th Cir. 1963) (the "purpose of a bill of particulars is to protect a defendant against a second prosecution for an inadequately described offense, and enable him to prepare an intelligent defense.").

The government's opposition to the bill of particulars touted the clarity of its theory of the case, as alleged in the FSI, while chastising Mr. Omidi for even filing the motion. (ECF 179 at 8 ("How defendant OMIDI can claim to have received insufficient notice of the government's theory of the case while simultaneously summarizing that theory for the Court is a mystery.")).  The law does not permit the government to avoid a bill of particulars so that the government can pursue additional theories at trial in the event the trial evidence supporting the actual theory in the FSI is unpersuasive.  As it turns out, the government's obstruction paid off, as demonstrated by the prosecutor's repeated emphasis of evidence that could support a deliberate ignorance or reckless disregard finding, but not a finding of actual knowledge.  It is hard to avoid the implication that the government's opposition to Mr. Omidi's request was motivated by bad faith.  Mr. Omidi was prejudicially lulled into relying on the government's representation that it had fully disclosed its theory of the case, when, in fact, it had not.  Reversal is warranted on this basis alone.

E.     **Late Disclosure of the New Theories is Sufficient for Reversal.**

The disclosure of the uncharged theories close to the end of trial is also sufficient to dismiss the indictment.  *See Lincoln v. Sunn*, 807 F.2d 805, 813 (9th Cir. 1987) ("A

1  change in the government's theory late in the case might constitute prejudicial variance.");

2  *United States v. Smolar*, 557 F.2d 13, 19 (1st Cir. 1977) (prejudicial variance where the

3  instructions "materially altered the theory of criminal liability set forth in the indictment"

4  because the defendants were not "sufficiently apprised of the charges against them");

5  "The Government's change in position during the trial can be sufficient to work a

6  constructive amendment in the indictment [even] *where the court does not formally alter*

7  *the elements of the offense in the jury charge. United States v. Doucet,* 994 F.2d 169, 171

8  (5th Cir. 1993) (emphasis in original).  Mr. Omidi was "blindside[ed] . . . with an

9  unforeseeable basis of liability [and] prosecution strategy."  *Hartz*, 458 F.3d at 1023.

10  ## V.  ALTERNATIVELY, THE ERRONEOUS RECKLESS INDIFFERENCE INSTRUCTION INDEPENDENTLY REQUIRES REVERSAL

11  ### A.  The Reckless Indifference Instruction Was Erroneous.

12  The verdict should also be set aside for the independent reason that the Reckless

13  Indifference Instruction (No. 34) erroneously failed to charge the jury that it must find

14  criminal intent.  At trial, Mr. Omidi's counsel objected to the government's requested

15  instruction which stated in relevant part that "*knowledge* and *fraudulent intent* . . . can also

16  be shown if the defendants acted with reckless indifference to the truth or falsity of their

17  statements." (*See* Jury Instruction 34, and Tr. 8648-49, emphasis added.)  Counsel for Mr.

18  Omidi requested that, if the instruction were given, "the defendant was acting with an

19  intent to deceive the victim" be added.  (Tr. 8249.)  Defense counsel explained that "[t]he

20  problem with this [proposed] instruction, Your Honor, is it allows the jury to find intent

21  based exclusively on reckless indifference, and that is not the law." *Id.*  The government

22  opposed and cited to *United States v. Dearing*, 504 F.3d 897, 903 (9th Cir. 2007), and Mr.

23  Omidi's counsel responded with citation to *United States v. Lloyd*, 807 F.3d 1128, 1164

24  (9th Cir. 2015).  (Tr. 8249-50.)

25  The Court ultimately adopted the government's instruction, which states in relevant

26  part that "knowledge *and* fraudulent intent . . . can also be shown if the defendants acted

27  with reckless indifference to the truth or falsity of their *statements*," (*see* Jury Instruction

28

1    34, emphasis added), without including Mr. Omidi's requested addition.

2          In in *United States v. Rodriguez*, 880 F.3d 1151 (9th Cir. 2018), the Ninth Circuit

3    provided the correct standard for criminal recklessness:

> the Supreme Court has made plain that criminal recklessness generally requires that
> "a person disregards a risk of harm of which he is aware." *Farmer* [*v. Brennan*],
> 511 U.S. [825] at 837, 114 S.Ct. 1970 [(1994)] (citing, *inter alia*, Model Penal Code
> § 2.02(2)(c) ); *accord Voisine v. United States*, ——— U.S. ———, 136 S.Ct. 2272,
> 2278, 195 L.Ed.2d 736 (2016). Thus, the defendant "must both *be aware of facts*
> from which the inference could be drawn that a substantial risk of serious harm
> exists, and he must *also draw the inference*." *Farmer*, 511 U.S. at 837, 114 S.Ct.
> 1970 (emphasis added). In other words, the standard requires that the defendant
> "was subjectively aware of the risk." *Id.* at 829, 114 S.Ct. 1970. [¶]. The instruction,
> here, was contrary to *Farmer*. First, the instruction states that "[r]eckless disregard
> is defined as knowledge of facts" from which an inference of risk could be drawn,
> but does not meet the requirement in *Farmer* that the *defendant* "must ... be aware
> of facts" from which the inference could be drawn. *Id.* at 837, 114 S.Ct. 1970.

13   *Id.* at 1159–60 (emphasis in original, footnote omitted).

14         Here, the Reckless Indifference Instruction was deficient because it did not state the

15   mandatory standard of criminal recklessness to the jury that Mr. Omidi "must both *be*

16   *aware of facts* from which the inference could be drawn that a substantial risk of serious

17   harm exists, and he must *also draw the inference*." *Farmer*, 511 U.S. at 837 (emphasis

18   added). Or, to put it differently, the Instruction is erroneous because it did not advise the

19   jury that, in order to find Mr. Omidi recklessly indifferent, it must find that Mr. Omidi

20   knew the underlying facts and was "subjectively aware of the risk" that false claims were

21   being submitted, as required by both *Farmer* and *Rodriguez*.

22         In *United States v. Rodriguez*, the Ninth Circuit applied *Farmer* to jury instructions

23   which defined recklessness "as knowledge of facts which, if considered and weighed in a

24   reasonable manner, indicate a substantial and unjustifiable risk ...." *Id.* at 1158.  The

25   Ninth Circuit held that the instruction was erroneous because it did not require the jury to

26   find that the defendant "was subjectively aware of the risk," *id.* at 1160 (citation omitted),

27   and that he actually "drew the inference." *Id*.  The court explained that a "correct

28   definition of 'reckless disregard' " would include the defendant's "'disregard[ ] [of] a risk

of harm of which [the defendant] is aware.' " *Id*. at 1161 (alterations in original).  The Ninth Circuit reversed the conviction for plain error.  *Id*.

Likewise, in *United States v. Tydingco*, 909 F.3d 297, 300 (9th Cir. 2018), the Ninth Circuit reversed a conviction where the reckless disregard instruction did not require that the defendant himself be aware of facts from which an inference of risk could be drawn and the defendant must actually draw the inference.  *Id*. at 304.  Because of the incorrect reckless disregard instruction, "the jury might have relied on a legally invalid theory." *Id*. at 306.  Even on plain error review, the Ninth Circuit held that "[t]he jury's possible reliance on a legally invalid theory constitutes a miscarriage of justice which would seriously affect 'the fairness, integrity or public reputation of judicial proceedings." *Id*. (citation and internal quotations omitted).

Contrary to the standard of recklessness in *Farmer*, *Rodriguez* and *Tydingco*, the Reckless Indifference Instruction in this case did not require the jury to find Mr. Omidi was subjectively aware of the risk of harm posed by his alleged indifference to the truth. This instructional error was not harmless beyond a reasonable doubt because it went to the heart of Mr. Omidi's primary defense—that he lacked *actual knowledge* of the scheme or the *intent to deceive* the insurance companies.  *Id*. at 304.  In other words, Mr. Omidi's defense was that he was not subjectively aware of, and did not actually intend, the harm caused by the alleged fraud scheme.  Because the jury was allowed to find "proof of knowledge or intent" sufficient to find him guilty *even if* it determined that he lacked this knowledge and intent, the prejudice is manifest.  Based on the general verdicts returned by the jury, there is no way to know if the convictions were based on the improper reckless indifference instruction.  *Rodriguez*, 880 F.3d at 1163-64.

### B.    *United States v. Dearing* Distinguished.

The government's citation to *United States v. Dearing* in the cited by the government is inapt for two reasons.  First, *Dearing* does not address the holding of *Farmer*, which is directly controlling.  *Sakamoto v. Duty Free Shoppers, Ltd.*, 764 F.2d 1285, 1288 (9th Cir. 1985) ("[U]nstated assumptions on non-litigated issues are not

precedential holdings binding future decisions."); *United States v. L.A. Tucker Truck Lines,* 344 F.3d 33, 37–38 (1952) (prior decision is not binding precedent on point neither raised by counsel nor discussed in the opinion of the court in that case).   Second, in *Dearing*, the Ninth Circuit permitted the instruction, reasoning:

> More importantly, the "reckless indifference" instruction that Dearing challenges was tethered to the "specific intent to defraud" element, which the government was required to prove *in addition to* the first element. Therefore its inclusion did not negate the separate instruction that to convict, the jury had to find that Dearing acted "knowingly and willfully."

*Dearing*, 504 F.3d at 903 (emphasis in original).

However, in this case, the Reckless Indifference Instruction was untethered and was permitted to simultaneously be proof of *both* knowledge and fraudulent intent. Defendant's proffered amendment to the instruction—that "the defendant was acting with an intent to deceive the victim" (Tr. 8249)—would have cured this defect, but the Court did not include this language.

### C.    The Reckless Indifference Instruction is Inconsistent with *Heredia*

"[D]eliberate ignorance, otherwise known as willful blindness, is categorically different from negligence or recklessness." *Heredia*, 483 F.3d at 918 n.4.  In *Heredia*, the Ninth Circuit specifically permitted the Deliberate Ignorance instruction because the jury would *not* be also instructed on recklessness which would dilute the *mens rea*:

> Nor do we agree that the *Jewell* instruction risks lessening the state of mind that a jury must find to something akin to recklessness or negligence.... Recklessness or negligence never comes into play, and there is little reason to suspect that juries will import these concepts, as to which they are not instructed, into their deliberations.

*Heredia*, 483 F.3d at 923-24.

However, in this case, for the very *same* Klasky's trial testimony discussed in sections I.C and II.A, *supra*, the Court permitted *both* the Deliberate Ignorance and Reckless Indifference Instructions, which are contradictory to each other, committing the very error *Heredia* warned against, and created the real risk of confusing the jury.

### D.   The Reckless Indifference Instruction Permeated Each Charging Term of the FSI and Requires Reversal of the Verdict.

The erroneous Reckless Indifference Instruction undermines the entire verdict because it allowed the jury to convict on each count of the FSI based on a legally erroneous theory.  Because "[j]urors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law," a conviction must be overturned if one of the theories that was submitted to the jury was legally erroneous.  *Griffin v. United States,* 502 U.S. 46, 59 (1991).  Here, Mr. Omidi timely objected to the omission of criminal intent based on the Reckless Indifference Instruction, and the verdict should be reversed because [w]hen ... jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error....."  *Id*.

The erroneous Reckless Indifference Instruction is an independently sufficient reason for new trial.  The Court should vacate the verdict even if it determines that the Deliberate Ignorance and Reckless Indifference Instructions did not amount to prejudicial variance or a constructive amendment of the FSI.

## VI.   THE COURT SHOULD AWARD MR. OMIDI A NEW TRIAL DUE TO PROSECUTORIAL MISCONDUCT DURING CLOSING ARGUMENTS.

### A.   The Prosecutor Committed Misconduct By Denigrating Defense Counsel During Her Rebuttal.

A new trial is also warranted, independent of any error in the jury instructions, because of the serious prosecutorial misconduct that occurred during closing arguments.  A prosecutor's dual function as both an advocate and a minister of justice is well-established.  *See Berger v. United States*, 295 U.S. 78, 88 (1935) (observing that "while [the prosecutor] may strike hard blows, he is not at liberty to strike foul ones").  Thus, a "'prosecutor's job isn't just to win, but to win fairly, staying well within the rules.'" *United States v. Alcantara-Castillo*, 788 F.3d 1186, 1191 (9th Cir. 2015) (quoting *United States v. Maloney*, 755 F.3d 1044, 1046 (9th Cir. 2014) (en banc)).

As the Ninth Circuit has repeatedly held, a prosecutor is explicitly prohibited from

denigrating defense counsel in in front of the jury.  In *Bruno v. Rushen*, the Ninth Circuit explained:

> [A prosecutor cannot] state that defense counsel, in general, act in underhanded and unethical ways, and absent specific evidence in the record, no particular defense counsel can be maligned. Even though such prosecutorial expressions of belief are only intended ultimately to impute guilt to the accused, not only are they invalid for that purpose, they also severely damage an accused's opportunity to present his case before the jury. It therefore is an impermissible strike at the very fundamental due process protections that the Fourteenth Amendment has made applicable to ensure an inherent fairness in our adversarial system of criminal justice. Furthermore, such tactics unquestionably tarnish the badge of evenhandedness and fairness that normally marks our system of justice and we readily presume because the principle is so fundamental that all attorneys are cognizant of it. Any abridgment of its sanctity therefore seems particularly unacceptable. Even more egregious, however, are attempts by representatives of the government to resort to these reprehensible means to shortcut their responsibility to ferret out all admissible evidence and use only that to meet their burden of proof. We fear resort to such conduct indicates either an absence of sufficient evidence to convict or reflects shoddy government efforts that have failed to unearth admissible evidence.

721 F.2d 1193, 1195 (9th Cir. 1983); *see also United States v. Frederick*, 78 F.3d 1370, 1379-80 (9th Cir. 1996) (same).

Here, the prosecutor committed misconduct when she denigrated defense counsel during rebuttal argument.  The prosecutor began her rebuttal argument by stating that defense counsel's summation was a "con job" designed to "build a rapport" with the jury and "selectively cite to evidence" to convince the jury that Mr. Omidi is not guilty. Specifically, the prosecutor stated:

> Now, I submit to you, ladies and gentlemen, that what you just heard was a con job.  They talked about building confidence. You heard the defense [c]ounsel tell you stories and anecdotes about his childhood, his dog, his family, things that have nothing to do with this case, to make you feel like he was credible, to build a rapport with you.  You heard him selectively cite to evidence and then repeat it and repeat it and repeat it, trying to convince you by repetition.

1   *See* Tr. 8921:3-10.

2   Many courts have found comments like the ones made here to be improper. *See*,

3   *e.g.*, *United States v. Sanchez*, 176 F.3d 1214, 1224-25 (9th Cir. 1999) (reversing

4   conviction where prosecutor committed misconduct by denigrating the defense as a sham

5   in summation); *United States v. Rodrigues*, 159 F.3d 439, 450-51 (9th Cir. 1998),

6   *amended*, 170 F.3d 881 (9th Cir. 1999) (reversing convictions where prosecutor

7   committed misconduct in summation and told jury that defense counsel had been trying to

8   deceive the jury); *United States v. Holmes*, 413 F.3d 770, 776–77 (8th Cir. 2005) (granting

9   new trial where prosecutor referred to defense counsel's summation as "smoke and

10  mirrors" and a "red herring" designed to distract the jury from the truth); *United States v.*

11  *McLain,* 823 F.2d 1457, 1462 (11th Cir. 1987) (prosecutor accused defense counsel of

12  intentionally misleading jurors and of lying; this, coupled with other errors, required

13  reversal) (overruled on other grounds).[2]

14  *United States v. Sanchez* is instructive.  In *Sanchez,* the Ninth Circuit reversed a

15  defendant's conviction where the prosecutor committed misconduct when he stated during

16  summation that "the defense in this case read the records and then told a story to match the

17  records. And, ladies and gentlemen, I'm going to ask you not to credit that scam that has

18  been perpetrated on you here." 176 F.3d at 1224.  Indeed, the comments here are virtually

19  identical to those the court determined to be misconduct in *Sanchez*.  (*Compare* (1)

20  "scam" vs. "con job" and (2) "defense . . . read the records and then told a story to match

21  the records" vs. "you heard him selectively cite to evidence and then repeat it and repeat it

22  and repeat it, trying to convince you by repetition.").

23  The relevant question in determining a claim of prosecutorial misconduct is whether

24  the prosecutor's comments "so infected the trial with unfairness as to make the resulting

25

26  ─────────────
    [2] This is particularly so where the government's comments are "designed to appeal to the
27  passions, fears and vulnerabilities of the jury." *United States v. Weatherspoon*, 410 F.3d
    1142, 1149 (9th Cir. 2005) (reversing conviction).  Here, the government's comments
28  could have given the jury the impression that Mr. Omidi hired defense counsel in order to
    con the jury.

conviction a denial of due process." *Darden v. Wainwright,* 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637 (1974)). Where prosecutorial misconduct violates constitutional rights, reversal is warranted unless the misconduct was harmless beyond a reasonable doubt. *See Chapman v. California,* 386 U.S. 18, 24 (1967). In determining whether improper remarks about defense counsel are harmless, the Court looks to: (1) whether the remarks were made at an important stage of trial; (2) whether they were extensive or isolated; (3) whether they were accidental or calculated to wrongfully impute guilt; and (4) whether they were "withdrawn after objection." *Bruno v. Rushen*, 721 F.2d 1193, 1195 (9th Cir. 1983) (citation omitted).

Here, there is no question that the remarks were made at an important stage of the trial. In fact, improper comments during rebuttal argument are particularly prejudicial because they are the last words the jury hears before deliberating. *United States v. Holmes*, 413 F.3d 770, 775–76 (8th Cir. 2005) (reversing a conviction based on a prosecutor's improper remarks during rebuttal, noting that "the potential for prejudice is great" when improper remarks are made during rebuttal because it is "right before the case goes to the jury" and the defense has "no opportunity to respond.") (collecting cases); *Zapata v. Vasquez*, 788 F.3d 1106, 1122 (9th Cir. 2015) (reversing conviction after finding that "[t]he prominence of timing of [improper] comments also point to prejudice" where "[t]he prosecutor repeated the statements throughout the closing rebuttal, and they were among the last words the jurors heard before they were sent to deliberate.").

Similarly, the prosecutor's remarks—beginning rebuttal by dubbing defense counsel's summation as a "con job" designed to "build a rapport" with the jury and "selectively cite to evidence" to convince the jury of Mr. Omidi's innocence—was clearly calculated to wrongfully impute guilt and to "strike at the jugular" of the defense. Finally, the improper comments were not withdrawn after objection. To the contrary, even after the defense objected,[3] the prosecutors doubled down. *See* Tr. 8956:5-6 ("Your Honor, I

_____

[3] Defense counsel timely objected to the prosecutor's comments immediately following rebuttal argument and requested that the Court instruct the jury that the prosecutor made an improper argument in denigrating defense Counsel, and that should be entirely

1    stand by the statements that I made."); Tr. 8959:9 ("we stand by our closing argument").

2    After the defense objected, "although the jury was generally instructed that

3    'statements made by the attorneys during the trial are not evidence,' the jury was never

4    specifically instructed to disregard the inflammatory statements made in the prosecutor's

5    rebuttal." *Zapata*, 788 F.3d at 1123. "By contrast, cases that have held prosecutorial

6    misconduct nonprejudicial have pointed to the use of a specific limiting instruction." *Id*.

7    Here, the Court declined the defense's request for a specific limiting instruction. (Tr.

8    8958) ("Your Honor, I would request that the Court instruct the jury that the prosecutor

9    made an improper argument in denigrating defense Counsel, and that should be entirely

10   disregarded and should not be a part of their deliberations.")

11   To the extent the government argues that the defense somehow "opened the door"

12   to its response—and it did not—this argument in any event fails as a matter of law. The

13   Ninth Circuit has recognized that "the prosecution is not allowed to use improper tactics

14   even in response to similar tactics by the defense," particularly where, as here, the

15   government's comments "did far more than simply 'right the scale.'" *Weatherspoon*, 410

16   F.3d at 1151.

17   Mr. Omidi thus respectfully requests that the Court grant him a new trial on the

18   basis that the prosecutor's referring to his counsel's summation as a "con job" deprived

19   him of a fair trial.[4]

20

21   disregarded and should not be a part of their deliberations. *See* Tr. 8955; 8958; *cf. United
     States v. Strode*, 229 F.3d 1161 (9th Cir. 2000) ("because counsel objected immediately

22   after closing, the objection was timely"); *United States v. Prantil*, 764 F.2d 548, 555 n.4
     (9th Cir. 1985) (noting that Ninth Circuit has recognized a motion for a mistrial—filed

23   after the conclusion of summations—as "an acceptable mechanism by which to preserve
     challenges to prosecutorial conduct in a closing argument in lieu of repeated interruptions

24   to the closing arguments.").

25

26   [4] To the extent that the government contends that the prosecutor's misconduct was
     remedied by the Court's generalized instruction that the arguments of counsel are not

27   evidence, the government is incorrect. *Weatherspoon*, 410 F.3d at 1151 ("failures to
     correct the improper statements at the time they were made cannot be salvaged by the later

28   generalized jury instruction reminding jurors that a lawyer's statements during closing
     argument do not constitute evidence . . . the curative instructions offered here did not

### B.   The Prosecutor Committed Misconduct When She Displayed Evidence To The Jury That Was Not Admitted At Trial During Her Summation.

As the Supreme Court has found, the Constitution requires that a jury's verdict be based on the evidence developed at trial. *Turner v. Louisiana*, 379 U.S. 466, 472 (1965) ("The requirement that a jury's verdict 'must be based upon the evidence developed at the trial' goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury."). *Id.* at 472. "In the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." *Id.* at 472-73.

It is axiomatic that a prosecutor may not base her closing argument on evidence not in the record. The Ninth Circuit has "made plain that when a prosecutor makes unsupported factual claims it is definitely improper." *United States v. Kojayan*, 8 F.3d 1315, 1321 (9th Cir. 1993) ("When a lawyer asserts that something not in the record is true, he is, in effect, testifying. He is telling the jury: 'Look, I know a lot more about this case than you, so believe me when I tell you X is a fact.' This is definitely improper."); *see also United States v. Sanchez-Soto*, 617 F. App'x 695, 697 (9th Cir. 2015) (reversing conviction where prosecutor based closing argument on evidence not in the record) (citing *United States v. Gray*, 876 F.2d 1411, 1417 (9th Cir.1989)).

That is exactly what the prosecutor did here. In fact, the prosecutor not only based her closing argument on evidence that was neither offered nor admitted in evidence, the prosecutor actually displayed the document to the jury as part of a PowerPoint presentation she used as a visual aid during closing argument. (*See* Tr. 8653; Dkt. 1550 at 7). The "evidence" in question was an instant message sent from an employee of Get-

---

neutralize the harm of the improper statements because they did not mention the specific statements of the prosecutor and were not given immediately after the damage was done") (citations omitted).

Thin which implied that Julian Omidi instructed her to falsify a patient's height in patient records to make it appear as though the patient had a higher BMI.  Specifically, it was an instant message from Jessica Suotmaa to Jaffy Palacios stating: "I remembered last night that this was the pt JO told me to use ht 5'6 per Medical Clearance because pt needed BMI 35 and with 5'7 pt's BMI is 34 something."  The prosecution displayed this document on the screen for the jury on a PowerPoint slide with a heading that read, that read: "'JO TOLD ME TO USE SHORTER HEIGHT".  Dkt. 1550 at 7 (emphasis in original).  The prejudice to Mr. Omidi from this misconduct cannot be understated.  The document in question is arguably the most inculpatory piece of evidence that would have been presented at the trial given that the government presented *no evidence* that Mr. Omidi ever instructed anyone to falsify patient records.  The Court should award Mr. Omidi a new trial.

Although the display of this exhibit was the most glaring example of the government's misrepresentation of the record during closing arguments, it is not the only example.   During closing arguments, the government displayed a post-it note and represented to the jury that the note stated, "Ask J.O. 238," in an attempt to suggest that Mr. Omidi had instructed that the patient's weight be increased to 238 pounds.  Tr. 8654.  But at trial Mr. Hong testified that the note read "232" (the amount other documents indicated the patient weighed), not "238."  The government was certainly aware of Mr. Hong's different interpretation of the text; in fact, the prosecutor conducting his direct examination attempted to encourage Mr. Hong to change his testimony, in response to which the Court sustained Mr. Omidi's counsel's objection.  (*See* Tr. 4296 (in which the prosecutor began to ask Mr. Hong, "Are you sure…," and told him to "focus in on the numbers").)  Despite the prosecutor's efforts, Mr. Hong did not change his testimony, but the government nevertheless persisted in its preferred interpretation, which was suggestive of Mr. Omidi's guilt, during closing arguments.  This distortion of the record, like the government's display of a document not in evidence, is precisely the kind of "unsupported factual claim" that the government is not permitted to make.  *Kojayan*, 8 F.3d 1315 at

1321; *see also United States v. Reyes*, 660 F.3d 454, 462 (9th Cir. 2011) ("[F]alse or misleading assertions" by an official whose "opinion carries with it the imprimatur of the Government... may induce the jury to trust the Government's judgment rather than its own view of the evidence.")

## VII.  THE GOVERNMENT DISTORTED THE FACT FINDING PROCESS IN THE COURT'S RULE 403 DETERMINATION

A new trial is also warranted based on the government's distortion of the Court's fact-finding process in ruling on the defense's objection to Mr. Klasky's testimony regarding the "Gun to Your Head" Call (as defined and described in detail in Mr. Omidi's concurrently filed motion to dismiss).

The defense objected to that testimony on Rule 403 grounds on the basis that Mr. Klasky gave the jury the impression "that Mr. Oxman was suggesting that there was some sort of threat of physical violence to come to" Mr. Klasky.  Mr. Omidi's defense counsel noted that this "inflammatory" testimony "raise[d] grave 403 concerns," and requested that the statements be "stricken," and "a limiting instruction to the jury that there is no evidence in this case or any indication that Mr. Omidi ever authorized such a statement or that he made any threats whatsoever against this witness." (Tr. 4979).  In response, the government defended its presentation of that evidence.  As Mr. Omidi's motion to dismiss makes clear, however, the government—but not the defense—knew at the time that Mr. Klasky's story regarding the "Gun to Your Head" Call was false and misleading.

Undoubtedly, the government's knowledge of the claims falsity or—at the very least—of the fact that Mr. Klasky had previously been caught lying about the "Gun to Your Head" Call—would have critically aided the Court's determination of whether to strike Mr. Klasky's statement under Rule 403.  In reversing a conviction in *United States v. Curtin*, the Ninth Circuit stated that, "as a matter of law [] a court does not properly exercise its balancing discretion under Rule 403 when it fails to place on the scales and personally examine and evaluate *all* that it must weigh." 489 F.3d 935, 958 (9th Cir. 2007) (emphasis in original).  By concealing evidence of Mr. Klasky's past false

statements, the government deprived the Court of the opportunity to "evaluate *all* that it must weigh." *Id.*

This additional instance of the government's misconduct at trial independently warrants a new trial.

## VIII.  CONCLUSION

For the foregoing reasons, Mr. Omidi respectfully requests that the Court set aside the verdict and grant Mr. Omidi a new trial.  To the extent the Court does not deem any of the above grounds to be sufficient, standing alone, to warrant this relief, Mr. Omidi respectfully submits that the cumulative impact of the foregoing (as well as the issues raised in Mr. Omidi's other concurrently filed motions) entitles him to relief.  *Welchel v. Washington*, 232 F.3d 1197, 1212 (9th Cir. 2000) (Cumulative error applies where, although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors has still prejudiced a defendant.") (quotations and alterations omitted).

Dated:  March 30, 2022                    Respectfully submitted,


                                          **WILLKIE FARR & GALLAGHER LLP**

                                          By: s/ Michael S. Schachter
                                              MICHAEL S. SCHACHTER
                                              RANDALL W. JACKSON
                                              CASEY E. DONNELLY
                                              SIMONA AGNOLUCCI

                                              ATTORNEYS FOR DEFENDANT
                                              JULIAN OMIDI

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

<u>PROOF OF SERVICE</u>

I am employed and a resident of New York. I am over the age of 18 and not a party to the within action; my business address is 787 Seventh Avenue, New York, NY 10019. On March 30, 2022, I served the document described as:

**DEFENDANTS JULIAN OMIDI'S MOTION FOR NEW TRIAL PURSUANT TO RULE 33**

Upon the interested parties in this action as follows:

_____X_____ By the Court's ECF.

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on March 30, 2022.

<u>s/ Michael S. Schachter</u>
Michael S. Schachter