**McGUIREWOODS LLP**
KEVIN M. LALLY (SBN 226402)
355 South Grand Avenue, Suite 4200
Los Angeles, CA 90071
E-mail: klally@mcguirewoods.com
Telephone: 213-457-9862
Facsimile: 213-457-9882

ROBERT J. BITTMAN (*Pro hac vice*)
888 16th Street N.W., Suite 500
Washington, D.C. 20006
E-mail: rbittman@mcguirewoods.com
Telephone: (202) 857-2472
Facsimile: (202) 828-2962

Counsel for Defendant Julian Omidi

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>v.<br><br>JULIAN OMIDI, *et al.*,<br><br>                    Defendants. | No CR: 17-661(A)-DMG<br><br>*EX PARTE* APPLICATION FOR MODIFICATION TO  BRIEFING SCHEDULE AND SENTENCING HEARING DATES; DECLARATION OF KEVIN M. LALLY; EXHIBITS; [PROPOSED] ORDER<br><br>Current Dates:<br>All Initial Memoranda: Nov. 30, 2022<br>Optional Reply: Dec. 7, 2022<br>Sentencing Hearing: Dec. 14, 2022<br><br>Proposed Dates:<br>All Initial Memoranda: Jan. 11, 2023<br>Optional Reply: Jan. 18, 2023<br>Sentencing Hearing: Jan. 25, 2023 |

Defendants Julian Omidi ("Mr. Omidi") and Surgery Center Management ("SCM"), by and through their respective counsel of record Kevin M. Lally and Elon Berk, hereby seek *ex parte* relief in the form of a continuance of the filing dates of their sentencing memoranda and sentencing hearings to allow them the time necessary to review, assess, analyze and address the approximately 1,200 pages of loss and restitution-related materials produced by the government one week before sentencing memoranda are due and which contain extensive loss data newly sought by the government from multiple insurers who paid claims to SCM-related entities for sleep study and lap band services purportedly conducted under the direction of Mr. Omidi. This *ex parte* application is based on the accompanying declaration of Kevin M. Lally and supporting exhibits. If granted and the proposed dates are amenable to the Court, all parties would file their initial sentencing memoranda on Wednesday, January 11, 2023, with optional reply briefs due on Wednesday January 18, 2023. The sentencing hearing date for Mr. Omidi and SCM would take place on January 25, 2023 at 1 p.m.

The government, through Assistant United States Attorney Kristen Williams, opposes this request.

EX PARTE APPLICATION TO MODIFY BRIEFING SCHEDULE AND SENTENCING HEARING DATE

# DECLARATION OF KEVIN M. LALLY

I, Kevin M. Lally, declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1.  I am a partner at McGuireWoods LLP.  Along with other attorneys at my firm, I currently serve as counsel to defendant Julian Omidi ("Mr. Omidi") in *United States v. Julian Omidi, et al.*,  No. CR 17-661(A)-DMG. I submit this declaration in support of the *ex parte* application of Mr. Omidi and Surgery Center Management ("SCM") for a continuance of the filing dates and sentencing hearing due to the government's last minute production of 1,190 pages of newly obtained loss-related materials to allow Mr. Omidi's loss expert the necessary time to review, analyze, and assess these materials in advance of finalizing her loss report and for counsel to independently assess these materials before finalizing its sentencing arguments addressing loss, restitution, and forfeiture.

2.  On January 24, 2018, the government filed the First Superseding Indictment ("FSA") in the above-captioned case.  (CR 12.)  The FSA charged Mr. Omidi with mail fraud, wire fraud, false statements, aggravated identity theft, promotional money laundering and conspiracy to commit money laundering stemming from an alleged insurance fraud scheme.  It further charged SCM with the same offenses, except that SCM was not charged with identity theft, making false statements, and promotional money laundering. The FSA also seeks criminal forfeiture of funds involved in the charged conduct, pursuant to Title 18, United States Code, Sections 981(a)(1)(C), 982(a)(1), (a)(2)(B), (a)(7), 1029(c)(1)(C), and Title 28, United States Code, Section 2461(c).  (CR 12.)

3.  On December 16, 2021, Mr. Omidi and SCM were convicted of all counts with which each was charged. (CR 1577.)  Following the resolution of post-trial briefing, this Court set the sentencing hearings for Mr. Omidi and SCM for Tuesday, November 8, 2022, and ordered that the government's and the defendants

sentencing memoranda be filed two weeks and one week, respectively, in advance of this date. (CR 1783.)

4.   The United States Probation Office ("USPO") has produced Mr. Omidi's PSR and its sentencing recommendation letter.  The USPO's Guidelines calculation sets Mr. Omidi's total offense level at 45, principally due to a 28 level increase tied entirely to trial testimony from government expert Michael Petron setting the intended loss in excess of $250,000,0000.  This results in an advisory Guidelines recommendation of life imprisonment.  The USPO's sentencing recommendation, which utilizes Mr. Petron's findings for actual, rather than intended loss, is for a 204 month term of imprisonment (17 years).  Again, even under this formulation, the loss calculation served as the dominant factor in setting Mr. Omidi's total offense level.

5.   Approximately one month ago, the government, without comment, issued an updated expert loss report in which it had Mr. Petron exclude 13 individuals who previously were included in his loss analysis.[1]  As demonstrated in the updated report, the exclusion of even a few patients had a significant impact on the government's loss calculations, with the total intended loss dropping by more than 60 million dollars and the total actual loss dropping by 16 million dollars. The actual loss for the sleep studies decreased by 50 percent – from 24 million to 12 million – and the actual loss associated with CPAP billing decreased by over two-thirds, from 5.9 million dollars to 1.8 million dollars.

6.   Mr. Omidi retained an expert, Rebecca Busch of Medical Business Associates ("Ms. Busch"), to conduct an independent assessment of the loss

---

[1] Upon receipt of the new report, I sought clarification from the government regarding the basis for these exclusions. I was advised that the government had Mr. Patron exclude patients for whom there was an altered sleep study that did not impact the diagnosis category – a position consistent with Mr. Omidi's trial defense that Charles Klasky altered sleep studies for purposes unrelated to any alleged fraud.

calculations and to identify flaws in Mr. Petron's methodology and loss calculations. Ms. Busch diligently has been reviewing relevant insurer-based claims data. In doing so, she has found that the insurer-based claims data previously produced by the government was incomplete – a finding that will factor into her final analysis.

7. At 4:59 p.m. on November 22, 2022 (the Tuesday of Thanksgiving week), the government produced to Mr. Omidi and SCM through the file sharing device USAfx 1,190 pages of previously unproduced materials that the government recently had obtained from alleged victims, included multiple insurance companies.[2]

8. Upon receipt of the USAfx link, I made multiple attempts to access the documents but the program did not accept my password or allow me to change my password to one that would be accepted. Within an hour of having received the link, I notified the government of the difficulties I had experienced and requested assistance with resetting my password so that the documents would be accessible. A true and correct copy of the relevant e-mail exchange is attached as Exhibit A. Due to the Thanksgiving holiday, I did not receive the requested assistance until Friday, November 25, 2022. A true and correct copy of the relevant e-mail exchange is attached as Exhibit B.

9. Upon accessing the materials, I discovered that they included extensive loss-related data that the government only recently sought from insurance companies to support claims of loss and restitution. Specifically, the government requested that insurers provide it with accountings of: (1) the number of sleep

---

[2] Approximately 90 minutes earlier, government counsel: (1) notified Mr. Omidi and SCM that the government would be seeking a money judgment of over $98,000,000 in forfeiture against each defendant; (2) stated that the government did not believe it necessary to have a forfeiture hearing; and (3) requested the defendants' positions on whether they would agree to proceed without a hearing (even though the government has never provided the defendants with the factual support on which it intends to base its request for a money judgment of just under one hundred million dollars).

studies submitted during the charged scheme; (2) the total amount billed and paid for each sleep study; (3) the average claim for each sleep study; (4) the average amount paid for each sleep study; (5) a list of all SCM patients who received lap band surgery; (6) documentation presented in connection with pre-authorization approval for lap band surgery, and (7) billing data for these surgeries. True and correct copies of the government's production letter and a representative request for information are attached as Exhibits C and D, respectively. In response, several insurers provided the government with detailed spreadsheets, among other purported loss-related information. True and correct copies of the cover letters enclosing the insurers' productions are attached as Exhibit E. For example, HCSC (Blue Cross/Blue Shield) produced a 53-page spreadsheet with tens of thousands of rows of data, among other materials. Aetna similarly produced a series of spreadsheets with well over twenty thousand rows of data.  Other insurance companies, likewise, presented extensive materials. A link to Anthem related materials, which also likely are significant in size, were inaccessible as they were password protected and no accompanying password was provided.  Notably, the cover letter to the Anthem production, dated November 21, 2022 (one day prior to the production), stated that the insurer had experienced difficulty in locating requested letters of medical necessity submitted in connection with the paid claims and that this documentation was still being pursued, while also explaining the methodology that it independently devised to calculate the average claim and paid amounts. Others noted the absence of underlying materials.

10. Over the weekend, I advised Ms. Busch, who was traveling for the Thanksgiving holiday, of the government's production of new insurer-based claims and loss-related data. Ms. Busch stated that the newly provided data was relevant to her core tasks of properly assessing loss and identifying the infirmities in the loss information considered by Mr. Petron in connection with the government's expert reports in this case. She further stated that she would need to review, analyze and

assess this information before providing a final report addressing issues of loss in this case as the new information could alter has assessments and findings. Ms. Busch noted that, given the scope of the production and her existing work obligations, she would expect to need approximately two months to complete her review of the materials and to integrate the new information into her reports and ultimate findings. Ms. Busch also expressed a willingness to expedite the process to allow sentencing in a shorter time frame.

11. Beyond the need for Ms. Busch to review these documents, Mr. Omidi's and SCM's counsel also need additional time to review these materials and to assess how this newly produced claims data impacts issues of loss, restitution, and forfeiture and to incorporate these assessments into their sentencing memoranda. It is simply not possible to conduct the requisite due diligence in the time allotted. Undersigned counsel spent a significant amount of time since gaining access to the materials working through the new production and trying to place the materials in context for purposes of addressing the issue of loss, restitution, and forfeiture. Considerable additional work remains given the scope of the information provided.

12. To date, there has only been a single continuance of Mr. Omidi's and SCM's sentencing filing and hearing dates.  That continuance was the result of a joint stipulation with the government to allow the parties with time (1) for the government to acquire and to produce restitution related material; (2) for Ms. Busch to complete her independent analysis of loss-related issues and to prepare a report addressing her findings regarding loss; and (3) for medical personnel to complete their assessments, and prepare final reports addressing, Mr. Omidi's physical and mental well-being. (CR 1785)  As currently set, the parties are required to file their initial sentencing memoranda on Wednesday, November 30, 2022, with optional reply briefs due December 7, 2022, to be followed by a joint sentencing hearing at 1 p.m. on December 14, 2022. (CR 1786). If the requested dates are amenable to the

Court, initial memoranda would be due Wednesday, January 11, 2023, with optional reply briefs due Wednesday, January 18, 2023, and the joint sentencing hearing for Mr. Omidi and SCM would proceed on Wednesday, January 25, 2023 at 1 p.m.

13. On Sunday, November 27, 2022, I e-mailed government counsel to address the need for a continuance to allow the defendants the appropriate time to review the newly acquired and recently produced insurer-based loss information. The government opposed this request, stating that "we have no reason to believe [the claims information] would be substantively different from those produced" pre-trial and that it further believed, incorrectly, that Mr. Omidi had greater access to claims-related data through the Nextech system.  A true and correct copy of this e-mail exchange is attached as Exhibit F.

14. As addressed more fully in paragraph 9, the government's November 22, 2022 production is not a compilation of previously produced insurer-based loss documents that the insurers were asked to verify accompanied by victim witness statements. Instead, it represents the insurance companies' recent responses to new requests for broad categories of claims data information that the government expressly requested within the past few months.  The production contains substantive, highly detailed spreadsheets and other materials that bear directly on loss calculations, restitution, and forfeiture. Furthermore, to the extent that some of the produced information may be duplicative of previously produced discovery, the government did not cross reference that prior discovery to allow for this fact to be verified and for the scope of newly produced information to be properly identified and delineated. Significant time has been, and will continue to be, spent assessing, analyzing and utilizing the newly produced data in Mr. Omidi's sentencing submission.

15. Fundamental fairness requires that Mr. Omidi and SCM have adequate time to review this newly produced loss information. To that end, Mr. Omidi and SCM jointly request that the Court issue an order continuing the filing dates for

sentencing memoranda such that initial briefs are due on Wednesday, January 11, 2023, optional reply briefs are due on Wednesday, January 18, 2023, and that the joint sentencing hearing for Mr. Omidi and SCM be set for Wednesday, January 25, 2023 at 1 p.m.

16. Mr. Berk has reviewed this declaration and supports it being filed on behalf of SCM.

DATED: November 28, 2022

By: */s/ Kevin M. Lally*
Kevin M. Lally
Robert J. Bittman
McGUIREWOODS LLP
Attorneys for Defendant Julian Omidi

EX PARTE APPLICATION TO MODIFY BRIEFING SCHEDULE AND SENTENCING HEARING DATE

# **CERTIFICATE OF SERVICE**

I hereby certify that on November 28, 2022, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and service via transmittal of a Notice of Electronic Filing.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 28, 2022, at Los Angeles, California.


*/s/ Kevin M. Lally*
Kevin M. Lally
McGuireWoods LLP

EX PARTE APPLICATION TO MODIFY BRIEFING SCHEDULE AND SENTENCING HEARING DATE

# EXHIBIT A

**Lally, Kevin M.**

| | |
|---|---|
| **From:** | Lally, Kevin M. |
| **Sent:** | Tuesday, November 22, 2022 5:56 PM |
| **To:** | Susan Cavallone |
| **Subject:** | Re: Susan Cavallone has invited you to work together in "US v Julian Omidi, et  al. [2022.11.22 Production to Defense]" folder on Box |

Ms. Cavallone,

I was blocked due to a password issue.  While the program said it would provide links to unlock the account and reset my password, I have not received these links.

Regards,

Kevin Lally

On Nov 22, 2022, at 4:59 PM, Susan Cavallone <noreply@box.com> wrote:

**EXTERNAL EMAIL; use caution with links and attachments**



Susan Cavallone wants to work with you on US v Julian Omidi, et al. [2022.11.22 Production to Defense]

  US v Julian Omidi, et al. [2022.11.22 Productio...

"I'd like to share my files with you on Box."

1

# EXHIBIT B

## Lally, Kevin M.

| | |
|---|---|
| **From:** | Lally, Kevin M. |
| **Sent:** | Friday, November 25, 2022 12:54 PM |
| **To:** | Susan Cavallone |
| **Cc:** | 'Williams, Kristen (USACAC) 2'; Moghaddas, Ali (USACAC); Chao, David (USACAC) 1; Lachman, David (USACAC) |
| **Subject:** | RE: Susan Cavallone has invited you to work together in "US v Julian Omidi, et al. [2022.11.22 Production to Defense]" folder on Box |

Following up on this prior request, as I remain locked out.

**Kevin M. Lally**
Partner
McGuireWoods LLP
T: +1 213 457 9862
klally@mcguirewoods.com


**From:** Lally, Kevin M. <KLally@mcguirewoods.com>
**Sent:** Tuesday, November 22, 2022 5:56 PM
**To:** Susan Cavallone <noreply@box.com>
**Subject:** Re: Susan Cavallone has invited you to work together in "US v Julian Omidi, et al. [2022.11.22 Production to Defense]" folder on Box

Ms. Cavallone,

I was blocked due to a password issue.  While the program said it would provide links to unlock the account and reset my password, I have not received these links.

Regards,

Kevin Lally

On Nov 22, 2022, at 4:59 PM, Susan Cavallone <noreply@box.com> wrote:

**\*\*EXTERNAL EMAIL; use caution with links and attachments\*\***

1

# EXHIBIT C



# United States Department of Justice

## United States Attorney's Office
## Central District of California

---

*Kristen A. Williams*
*Assistant United States Attorney*
*Major Frauds Section*
*Phone: (213) 894-0526*
*E-mail: Kristen.Williams@usdoj.gov*

*1100 United States Courthouse*
*312 North Spring Street*
*Los Angeles, California 90012*

November 22, 2022

**VIA EMAIL**

Kevin Lally
McGuireWoods LLP
355 S. Grand Ave., Suite 4200
Los Angeles, CA 90071-3101
(213) 457-9862
klally@mcguirewoods.com

Counsel for Defendant Julian Omidi

Elon Berk
Gurovich, Berk & Assoc.
15250 Ventura Blvd., Suite 1220
Sherman Oaks, CA 91403
(818) 205-1555
eberk@crimlawla.com

Counsel for Defendant Surgery Center
Management, LLC

Re:     *United States v. Omidi, et al.,*
        CR No. 17-00661(A)-DMG

Dear Counsel:

Pursuant to your requests and the government's ongoing discovery obligations, enclosed please find a copy of additional materials related to Victim Impact Statements. (GT_VICTIM_00000001-GT_VICTIM_00001190)

As we have previously indicated, the government will make available for your inspection any item of evidence, as well as any other evidence seized from your client and/or that the government intends to offer in its case-in-chief.   Please contact us to arrange a mutually convenient time for your inspection of any such items.

The enclosed materials and any future discovery provided to you that may exceed the scope of discovery mandated by the Federal Rules of Criminal Procedure, federal statute, or relevant case law are provided voluntarily and solely as a matter of discretion.  By producing such materials to you, the government does not waive its right to object to any future discovery requests beyond the ambit of its legal obligations.

Last, the government requests all reciprocal discovery to which it is entitled under Rules 16(b) and 26.2 of the Federal Rules of Criminal Procedure.

Kevin Lally
Elon Berk
*United States v. Julian Omidi, et al.*, CR 17-00661(A)-DMG
November 22, 2022
Page 2


Please let us know if you have any questions, or would like to further discuss any of the matters raised above.

Very truly yours,

KRISTEN A. WILLIAMS
ALI MOGHADDAS
DAVID H. CHAO
DAVID C. LACHMAN
Assistant United States Attorneys

Enclosures

# EXHIBIT D



**U.S. Department of Justice**
Central District of California
Victim Witness Assistance Program
312 N. Spring St., Ste. 1700
Los Angeles, CA 90012
Phone: (213) 894-0640
Fax: (213) 534-7375

September 01, 2022

Health Net Inc.
Haley Fisher
21650 Oxnard St.
Suite 1560
Woodland Hills, CA 91367

Re:  Case Number 2012R01433 and Court Docket Number 17-CR-00661

Dear Haley Fisher:

The enclosed information is provided by the United States Department of Justice Victim Notification System (VNS). As a victim witness professional, my role is to assist you with information and services during the prosecution of this case. I am contacting you because you were identified by law enforcement as a victim or potential victim during the investigation of the above criminal case.

At the time of defendants' sentencing, or soon thereafter, the Court may conduct a restitution hearing to evaluate the harm caused to victims, including the financial impact of said harm. As potential victims of defendants' offenses, you may qualify for restitution in this matter. In order to assess any harm caused by defendants and the financial amount of said harm to you, it is important that you provide the USAO with the following information, as well as any corresponding supporting documentation, forthwith:

1.

   Your name and most recent contact information

2.

   Short description of the alleged harm caused by defendants' conduct in the charged offenses (including the conduct of any affiliates)

3.

   Approximate amount of harm caused by defendants' conduct in the charged offenses (itemized, if applicable)


If you are or were an insurer or benefit plan who paid out on any claim submitted by defendants, please include the following additional information:

1.

   Number of sleep study claims submitted by defendants (including any affiliates) during the charged scheme (May 2010 through March 2016) (broken down by year)

2.

   Total amount billed and paid on those sleep study claims falling within the charged scheme (broken down by year)

3.

   Average claim amount for each sleep study

4.

GT_VICTIM_00000054

CONFIDENTIAL INFORMATION-CONTENTS SUBJECT TO PROTECTIVE ORDER

Average amount paid for each sleep study

5.

List of patients (including at least name, date of birth, date of service, name of submitting and reimbursed provider) on whom:

Defendants (including any affiliates) performed Lap Band surgery during the charged scheme (May 2010 through March 2016); **and**

Defendants (including any affiliates) had sought preapproval and/or preauthorization for the Lap Band surgery based, at least in part, on a diagnosis of sleep apnea, obstructive sleep apnea, and/or excessive sleepiness

6.

For the Lap Band surgeries covered by number (8):

Number of Lap Band surgeries performed (broken down by year)

Average claim amount for each Lap Band surgery

Average amount paid for each Lap Band surgery

We request your response by <u>September 12, 2022</u>, in order to ensure the Court and parties are able to review and consider your impact statements and any request for restitution.

Through the Victim Notification System (VNS) we will continue to provide you with updated scheduling and event information as the case proceeds through the criminal justice system. You may obtain current information about this case on the VNS website at https://www.notify.usdoj.gov or from the VNS Call Center at 1-866-DOJ-4YOU (1-866-365-4968) (TDD/TTY: 1-866-228-4619) (International: 1-502-213-2767). In addition, you may use the Call Center or Internet to update your contact information and/or change your decision about participation in the notification program.

For many VNS registrants email will provide the most timely notification. The email address VNS currently has for you is hfisher@centene.com. This email address has not been verified in VNS. As a result all notifications sent to this email address will contain limited information. To receive subsequent emails <u>with the full text of the notification</u> you must <u>verify</u> this email address by accessing the VNS Internet web page using the login information provided above. If the email address provided above is incorrect, please update the email address by accessing the VNS Web site.

Once you have verified/updated your email address, most, if not all, future notifications will be provided by email and not by letter. In order to continue to receive notifications, it is your responsibility to keep your contact information current.

You will use your Victim Identification Number (VIN) **'5644886'** and Personal Identification Number (PIN) **'2192'** anytime you contact the Call Center and the first time you log into VNS on the website. If you are receiving notifications with multiple victim ID/PIN codes please contact the VNS Call Center. In addition, the first time you access the VNS website, you will be prompted to enter your last name (or business name) as currently contained in VNS. The name you should enter is Health Net Inc..

GT_VICTIM_00000055

CONFIDENTIAL INFORMATION-CONTENTS SUBJECT TO PROTECTIVE ORDER

Remember, VNS is an automated system and cannot answer questions. If you have other questions which involve this matter, please contact this office at the number listed above.

Sincerely,

Acting USA Stephanie Christensen
United States Attorney

*Abigail Hooks*

Abigail Hooks
Victim Witness Specialist

GT_VICTIM_00000056

CONFIDENTIAL INFORMATION-CONTENTS SUBJECT TO PROTECTIVE ORDER

# EXHIBIT E

 **aetna**™

151 Farmington Avenue, RWA4
Hartford, CT  06156-7626
**David Erickson**
**Investigator**
Special Investigations Unit
Telephone: (860) 996-9714
Fax: (860) 975-9719

11/18/2022

Special Agent D. Duncan Suh
11000 Wilshire Blvd. #1700
Los Angeles, CA 90024

Case #:  20224915

Dear Special Agent D. Duncan Suh:

Enclosed is the information you requested via the RFI dated November 1, 2022, for the provider: Julian C. Omidi MD and those providers associated with 1-800-GETTHIN Enterprise ("GET THIN").

SIU reviewed and pulled the information for the following requests:

1) A copy of the claim detail report for those providers that billed for lap band surgery code: 43770 and those claims billed on the same date of service.  Per your request, if the diagnosis code: 780.57 is noted, then the cell was highlighted.
2) A copy of the claim detail report for those providers who billed for sleep studies reports with the following codes: 95810 and 95811
3) A copy of the claim detail report for TIN 205494469 for the following codes: E0601, E0562, and A7030-A7039.
4) There was a total of 5,625 sleep study codes billed with an average paid of $1,229.98.
5) There was a total of 1,369 claims submitted for sleep studies with an average paid of 5,052.89.
6) There was a total of 2,721 lap band surgery code 43770 billed with an average paid of $5,381.20.
7) There was a total of 1,739 claims submitted for lap band surgery and related services billed on the same date of service with a total paid of $9,165.76.

SIU is unable to provide the below identified requested information for the following reasons:

1) The preapproval/pre-authorizations related to those providers who sought preapproval and pre-authorization for the lap band surgery based on in part/entirely on the diagnosis of sleep apnea, obstructive sleep apnea, and/or excessive sleepiness.  SIU is unable to provide this documentation due to the age of the requested information and the system that it was stored on is no longer accessible by SIU. It should be noted that the diagnosis submitted by the providers is listed on the claim detail reports.
2) The pre-authorizations/letters of medical necessity for the following members:
However, SIU was able to obtain screen shots that these provider's sought preauthorization for these members, obtained medical records, and excel spreadsheets showing which claims were sought for preapproval and which were granted.  SIU is unable to provide the documents explicitly requested due to the age of the requested information and the system that it was stored on is no longer accessible by SIU.

Should you prosecute these providers for submitting false claims and the provider is convicted, we respectfully ask that any sentence imposed by the Court include full restitution to Aetna for the losses sustained. Any payments should be made to Aetna Life Insurance Company and sent to my attention at the following address:

Aetna – SIU Overpayments
P.O. Box 981105
El Paso, TX 79998-1105

Please include case # 20224915 on your check.

Should you have any questions or if you need additional information, you can contact me by telephone at (860) 996-9714, by fax at (860) 975-9719, or you can e-mail me at ericksond1@aetna.com.

GT_VICTIM_00001184

CONFIDENTIAL INFORMATION-CONTENTS SUBJECT TO PROTECTIVE ORDER

Page 2
Julian C Omidi MD
11/18/2022

Sincerely,

David Erickson
Investigator

GT_VICTIM_00001185

CONFIDENTIAL INFORMATION-CONTENTS SUBJECT TO PROTECTIVE ORDER

| | |
|---|---|
| **From:** | Reinhardt, Carl |
| **To:** | Allison.Stafford@usdoj.gov; susan.cavallone@usdoj.gov |
| **Cc:** | David.Schneider@anthem.com |
| **Subject:** | Secure: U.S. v. Omidi, et. al-Anthem Victim Statement |
| **Date:** | Monday, November 21, 2022 1:23:35 PM |
| **Attachments:** | 1-800-GET-THIN Anthem Victim Submission v2 110922.xlsx |

Allison & Susan,

I was getting error messages back on Friday when I was send this data off to you. Please reply and confirm receipt.

Attached are the claim details concerning the claims paid by Anthem Blue Cross to the defendants (including affiliates). Some of these claims would have been paid on behalf of other Blue Cross Blue Shield Plans which is our obligation under the Blue Cross Blue Shield Association agreement. All of the Patient information is included in the claims file to include address of records at the time the service was rendered.

5(b)-For patients who are covered though a Blue Cross Blue Shield Association health plan, the issuance of letter of medical necessity/prior authorization is done by the health plan that insures the patient. But, claims are submitted to the Blue Cross Blue Shield plan where the provider's practice is located. As such, Anthem Blue Cross will not have access to letters of medical necessity/prior authorizations for other Blue plans. From the list of patients that was included we are still searching for any copy of a UM authorization.

In calculating the average claim and paid amounts in 6(b) and (c), we took the ASC claims that billed for a lap-band procedure, and linked the ASC claim to other professional claims for the same member on the same date of service. Typically, when the defendants billed for their professional services in the provision of the lap-band, the claim included 3-4 services, the lap-band, EDG, liver biopsy, fundoplasty or a number of different codes for a hernia repair. All services that linked to the lap-band ASC claim are included in the Professional Lab Band Summary.

We have summarized the claims by ASC Sleep Study (the professional services were billed on the UB-04), ASC Lap Band, and Professional Lap Band.

I will send you the password under separate cover.

**Carl Reinhardt**
Director Special Investigations Unit-West
21215 Burbank Blvd., Woodland Hills, CA  91367
M: (805) 279-7936
Carl.Reinhardt@Anthem.com

**CONFIDENTIALITY NOTICE:** This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential

GT_VICTIM_00000968

CONFIDENTIAL INFORMATION-CONTENTS SUBJECT TO PROTECTIVE ORDER

| | |
|---|---|
| **From:** | Tooma, Sarine A., OIG DoD |
| **To:** | Williams, Kristen (USACAC) 2 |
| **Subject:** | [Not Virus Scanned] [EXTERNAL] [Not Virus Scanned] FW: Almont_Sentencing Deliveries |
| **Date:** | Thursday, September 29, 2022 11:00:16 AM |
| **Attachments:** | Almont Sentencing Tricare data.docx |



-----Original Message-----
From: Little, Jami D CIV DHA (USA) <jami.d.little.civ@health.mil>
Sent: Wednesday, September 28, 2022 10:10 AM
To: Tooma, Sarine A., OIG DoD <Sarine.Tooma@DODIG.MIL>
Subject: Almont_Sentencing Deliveries

Hi Sarine,
I am preparing to drop off a couple of deliveries for these requests. As stated-they've been delivered before so they *should* look familiar. I think the best way to move forward is to perhaps have you/Kristen take a look and see if you all can gain the data points you'd like for sentencing and if you have questions to set up a call to get any further answers you need.

I am out of office after today until Monday but am in the office next week-so let me know if that's what will work-but taking a look and having Kristen take a look will be the best place to take next steps to get what she's desiring here.


1.     Number of sleep study claims submitted by defendants (including any affiliates) during the charged scheme (May 2010 through March 2016) (broken down by year)
*Almont Claim Lines_Sentencing_Sept_2022----there are 3 spreadsheet worksheets and they are for 3 different TINs and that is clear on the worksheet matrix which TIN belongs to which worksheet.
*Date of service is identified in GREEN and can be filtered by year in Column E. They are already filtered to the 05/01/2010 - 03/01/2016 date span.

2.     Total amount billed and paid on those sleep study claims falling within the charged scheme (broken down by year)
*Columns J & N in Yellow
*Date of service is identified in GREEN and can be filtered by year in Column E. They are already filtered to the 05/01/2010 - 03/01/2016 date span.

3.     Average claim amount for each sleep study

GT_VICTIM_00001065
CONFIDENTIAL INFORMATION-CONTENTS SUBJECT TO PROTECTIVE ORDER

*$2,137.78

4.   Average amount paid for each sleep study
*$355.76

5.   List of patients (including at least name, date of birth, date of service, name of submitting and reimbursed provider) on whom:
*Columns V, W will show who the beneficiary is and their DOB in green.  Additionally the date of service, is column E in green.
   a.   Defendants (including any affiliates) performed Lap Band surgery during the charged scheme (May 2010 through March 2016); and
      *The rendering provider & affiliated TIN, group NPI/Individual NPI is found in green in columns Z, AA, AB, and AC

   b.   Defendants (including any affiliates) had sought preapproval and/or preauthorization for the Lap Band surgery based, at least in part, on a diagnosis of sleep apnea, obstructive sleep apnea, and/or excessive sleepiness
      *TBD

6.   For the Lap Band surgeries covered by number (5):
   a.   Number of Lap Band surgeries performed (broken down by year)
   b.   Average claim amount for each Lap Band surgery
   c.   Average amount paid for each Lap Band surgery
   *Our exposure for this was drilled down to those 6 beneficiaries.  That is included in the TRICAR_Classic Sleep Care_Fac_Stip_Nov_2021 with the specific claims for each of those specific 6 that were attested to in trial.

JL

Jami Little, MPA, MJ, CFE
Health Care Fraud Specialist
Defense Health Agency - TRICARE
Program Integrity Division

16401 E. Centretech Pkwy
Aurora, CO 80011
Phone 303-676-3937
Fax 303-676-3981
Email: jami.d.little.civ@mail.mil

***WARNING FOR OFFICIAL USE ONLY/LAW ENFORCEMENT SENSITIVE***
This email and attachment(s) are the property of the Department of Defense, Defense Health Agency (DHA) Program Integrity Division. Distribution outside DHA and the intended receiving agency without prior authorization of DHA-PID is not authorized.  Protected health information (PHI), personally identifiable information (PII), or LES information may be included.  Privacy Act and HIPAA guidelines restrict release without appropriate legal authority and law enforcement sensitive information may be withheld from the public as disclosure could cause a foreseeable harm to the interested protected by one or more exceptions of the Freedom of Information Act, 5 USC Section 552.

This e-mail is from the Department of Defense Office of Inspector General {DoD OIG}. It may contain Controlled Unclassified Information {CUI}, including information that is Law Enforcement Sensitive {LES}, subject to the Privacy Act, and/or other privileges and restrictions that prohibit release without appropriate legal authority. Do not disseminate without the approval of the DoD OIG.  If received in error, please notify the sender by reply e-mail and delete all copies of this message.

CONFIDENTIAL INFORMATION-CONTENTS SUBJECT TO PROTECTIVE ORDER



**BlueCross BlueShield**
**of Illinois**

VIA UPS

September 20, 2022

Abigail Hooks
Victim Witness Specialist
U.S. Department of Justice
Central District of California
Victim Witness Assistance Program
312 N. Spring St., Ste. 1700
Los Angeles, CA 90012

Re: Case Number 2012R01433 and Court Docket Number 17-CR-00661

Ms. Hooks,

This letter is in response to your above captioned request for information from Health Care
Services Corporation (HCSC), a Mutual Legal Reserve Company, an Independent Licensee of
the Blue Cross and Blue Shield Association.  This letter accompanies an encrypted disc with a
summary of the claims data you requested.  I will email you the password to the disc.  I also
include the letter you sent for reference.  Please substitute my contact information,
Dan_Groth@BCBSIL.COM for that of carl.reinhardt@anthem.com for the aspects of this case
concerning the HCSC plans: Blue Cross and Blue Shield of Illinois; Blue Cross and Blue Shield
of Montana; Blue Cross and Blue Shield of Texas of Oklahoma; and Blue Cross and Blue Shield
of Texas.

As to the questions in the letter, I cannot answer them at this time.  I have included the summary
data to request clarification from your agency.  As you can see from the data, lap band or sleep
study codes did not appear in the summary.  However, I am unfamiliar with your case and did
not know if the provider used masking of codes as part of the fraud scheme.  Can your team
review to determine if any of the codes included on the summary are relevant to your case?

The material you requested contains confidential and protected health information.  This
information is being produced in response to your demand, which we have perceived to be an
authorized investigative demand for the purpose of law enforcement activities made pursuant to
45 C.F.R. § 164.512(f).  If your demand is not related to law enforcement activities, or fails to
meet the requirements of 45 C.F.R. 164.512(f), we ask that the enclosed information be returned
to the undersigned as soon as possible.

300 East Randolph Street  ·  Chicago, Illinois 60601-5099  ·  (312) 653-6000  ·  www.bcbsil.com

*Blue Cross and Blue Shield of Illinois, A Division of Health Care Service Corporation, a Mutual Legal Reserve Company,*
*an Independent Licensee of the Blue Cross and Blue Shield Association*

GT_VICTIM_00000971
CONFIDENTIAL INFORMATION-CONTENTS SUBJECT TO PROTECTIVE ORDER

If you have any questions about this matter, please contact me at (312) 653 0509, or email me at Dan_Groth@BCBSIL.Com.

Very truly yours,

Dan Groth
Director - Special Investigations Department

300 East Randolph Street    ·    Chicago, Illinois 60601-5099    ·    (312) 653-6000    ·    www.bcbsil.com

*Blue Cross and Blue Shield of Illinois, A Division of Health Care Service Corporation, a Mutual Legal Reserve Company,*
*an Independent Licensee of the Blue Cross and Blue Shield Association*

GT_VICTIM_00000972
CONFIDENTIAL INFORMATION-CONTENTS SUBJECT TO PROTECTIVE ORDER



**BlueCross BlueShield**
**of Illinois**

VIA UPS

November 14, 2022

Kristen A. Williams, Esq.
Assistant United States Attorney
Deputy Chief, Major Frauds Section
U.S. Attorney's Office
Central District of California
1100 U.S. Courthouse
312 N. Spring St.
Los Angeles, CA 90012

Re: Case Number 2012R01433 and Court Docket Number 17-CR-00661

Ms. Williams,

This letter is a supplemental response to your above captioned request for information from
Health Care Services Corporation (HCSC), a Mutual Legal Reserve Company, an Independent
Licensee of the Blue Cross and Blue Shield Association. This letter accompanies an encrypted
disc with a summary of the claims data you requested. I will email you the password to the disc.

The material you requested contains confidential and protected health information. This
information is being produced in response to your demand, which we have perceived to be an
authorized investigative demand for the purpose of law enforcement activities made pursuant to
45 C.F.R. § 164.512(f). If your demand is not related to law enforcement activities, or fails to
meet the requirements of 45 C.F.R. 164.512(f), we ask that the enclosed information be returned
to the undersigned as soon as possible.

For the days of November 15 – 18, 2022, I will be out of the office for training. If you have any
questions or concerns regarding this disclosure, please contact me on my cell 773 919 7264 or
via email Dan_Groth@BCBSIL.COM.

Very truly yours,

Dan Groth
Director - Special Investigations Department

300 East Randolph Street  ·  Chicago, Illinois 60601-5099  ·  (312) 653-6000  ·  www.bcbsil.com

*Blue Cross and Blue Shield of Illinois, A Division of Health Care Service Corporation, a Mutual Legal Reserve Company,*
*an Independent Licensee of the Blue Cross and Blue Shield Association*

GT_VICTIM_00000974
CONFIDENTIAL INFORMATION-CONTENTS SUBJECT TO PROTECTIVE ORDER



CENTENE Corporation

September 12, 2022                           Via Secure Email Kristen.Williams@usdoj.gov

Kristen A. Williams, Esq., Assistance US Attorney
Deputy Chief Major Frauds Section
US Attorney's Office, Central District of California
312 N. Spring St, Suite 1100
Los Angeles, CA 90012

RE:     **Centene/Health Net Inc. Response to Victim Notification and Request for Information
        Letter dated September 1, 2022, Court Docket 17CR00661 US v. Julian Omidi et al.**

Dear Ms. Williams:

The Centene Special Investigations Unit (SIU) is in receipt of the Victim Notification Letter dated
September 1, 2022 addressed to Haley Fisher, Health Net Inc., in the matter of US v. Julian Omidi et al,
Court Docket 17CR00661.  Within the September 1, 2022 Notification Letter is a request for the following
information, with a requested response by September 12, 2022:

- Short description of alleged harm caused by defendant's conduct in the charged offenses for the period
  May 2010-March 2016, and approximate amount of harm.

- Number of Sleep Study claims submitted by defendants (including affiliates) for the period May 2010-
  March 2016, broken down by year, along with the average claim (billed) amount of each sleep study.

- Number of lap band surgeries billed during the period May 2010-March 2016, broken down by year,
  with average claim amount billed and paid for the lap band surgery.

- The list of patients on whom defendants performed bariatric lap band surgery during the period May
  2010-March 2016, and identification of patients for whom defendants sought prior authorization based
  in part on diagnosis of sleep apnea and related diagnoses.

To the extent the Centene SIU was able to access archival claims data covering the period May 2010-March
2016, we have done so to address the requests above by the September 12, 2022 response deadline.  We
also note that Health Net SIU supplied data and documentation on multiple occasions starting in 2011
through 2015 to the United States Attorney's Office, Central District of California and a number of law
enforcement entities.  The data on which the analyses below are based was provided to the Federal Bureau
of Investigation in June 2012.[1]

The Centene SIU's responses to these requests are given below.

---

[1]      See SIU Transmittal Letter dated 6/7/2012 addressed to Special Agent Nancy Kevany.

GT_VICTIM_00000049

CONFIDENTIAL INFORMATION-CONTENTS SUBJECT TO PROTECTIVE ORDER

Kristen Williams, Esq
September 12, 2022
Centene/Health Net SIU Response to Letter dated September 1, 2022
Page 2 of 4

### 1) Short Description of Alleged Harm Caused by Defendants to Health Net

The Health Net SIU initiated an investigation on or about September 2010 into patient referral and billing practices, claim submissions and patient services related to multiple entities associated with the 1-800 GET THIN bariatric lap band network operated/controlled by Julian Omidi, and associated Omidi family members and businesses. During the course of the investigation, Health Net SIU identified approximately 300 affiliated physicians and/or business entities for 1-800 GET THIN and the Omidi Enterprise.

The Health Net SIU investigation established through interviews and documentation evidence that non-medical and non-licensed 1-800 GET THIN marketing personnel were ordering diagnostic blood and metabolic lab tests, endoscopies, abdominal ultrasounds and sleep studies under the guise of medically qualifying a patient for bariatric lap band surgery. The investigation established that the patient referrals for these diagnostic tests were initiated by marketing personnel to facilities and diagnostic service providers in which the Omidi family members had a financial interest, and for which Omidi-controlled entities performed billing and collection services, and paid for contracted physicians. The investigation also identified instances where templated medical records were used, and evidence of medical record fabrication and falsification was developed. Numerous patients reported undergoing procedures (some under anesthesia) without a physical exam performed by a licensed medical professional.

As a result of these investigative findings, the Health Net SIU issued a preliminary audit report to the 1-800 GET THIN entities and the Omidis on March 24, 2011, and made referrals for healthcare claims fraud to the California Department of Insurance, California Medical Board, and the Federal Bureau of Investigation, among others.

While the current request for information relates only to billed sleep studies and lap band procedures, Health Net SIU's investigation established that from January 1, 2009 through April 30, 2012, the Omidi-related 1-800 GET THIN entities billed Health Net over $27 million and were paid over $3.3 million for pre-lap band diagnostic testing, bariatric lap band surgeries and post-operative lap band adjustments, and other surgical services. The 1-800 GET THIN entities effectively ceased billing Health Net in mid-2012.

With respect to the sleep studies [CPT code 95810-95811] and bariatric lap band surgical procedure [CPT code 43770] billed during the May 1, 2010 through March 31, 2016 period, Health Net was billed $5,662,744 and paid $472,985 by the 1-800 GET THIN affiliates entities.

### 2) Number of Sleep Study claims submitted by defendants (including affiliates) for the period May 2010-March 2016, broken down by year, along with the average claim (billed) amount of each sleep study.

The Table below is a summary of the unique claims by known 1-800 GET THIN entities for paid dates May 1, 2010 through March 31, 2016 for Sleep Studies 95810 and 95811 including denied claims such as duplicate submissions and contested/incomplete claims.

GT_VICTIM_00000050

CONFIDENTIAL INFORMATION-CONTENTS SUBJECT TO PROTECTIVE ORDER

Kristen Williams, Esq
September 12, 2022
Centene/Health Net SIU Response to Letter dated September 1, 2022
Page 3 of 4

| UNIQUE Claims for Paid date May 1, 2010 through March 31, 2016 for Sleep Studies 95810 and 95811 INCLUDING DUPLICATE SUBMISSIONS AND CONTESTED/INCOMPLETE CLAIMS | | | | |
|---|---|---|---|---|
| | BILLED | PAID | COUNT OF CLAIMS | Count of Member |
| FACILITY (Claim Type I) | $3,757,498.22 | $151,348.26 | 229 | 111 |
| PROFESSIONAL (Claim Type P) | $102,590.00 | $34,537.20 | 8 | 6 |
| | $3,860,088.22 | $185,885.46 | 237 | |

All of the above claims were paid in the period May 1, 2010 through December 31, 2010. No paid claims for 95810 and 95811 were identified after December 31, 2010.

The available claim detail, including patient and billing provider identification, is contained in the attached spreadsheet *SIU CASE 2010-0078-Claims Data Paid 050110-033116_ANALYSIS, Tab Sleep Study Claims*[2].

3) **Number of lap band surgeries billed during the period May 2010-March 2016, broken down by year, with average claim amount billed and paid for the lap band surgery.**

The Table below is a summary of the unique claims by known 1-800 GET THIN entities for paid dates May 1, 2010 through March 31, 2016 for the bariatric lab band placement procedure billed using CPT code 43770 including denied claims such as duplicate submissions and contested/incomplete claims.

| UNIQUE Claims for Paid date May 1, 2010 through March 31, 2016 for Bariatric Lap band placement CPT 43770 INCLUDING DUPLICATE SUBMISSIONS AND CONTESTED/INCOMPLETE CLAIMS | | | | |
|---|---|---|---|---|
| | BILLED | PAID | COUNT OF CLAIMS | Count of Member |
| FACILITY (Claim Type I) | $1,004,178.54 | $250,054.27 | 13 | 11 |
| PROFESSIONAL (Claim Type P) | $758,476.94 | $37,044.88 | 38 | 15 |
| | $1,762,655.48 | $287,099.15 | | |

The distribution by year for paid claims for CPT 43770 is shown below:

| Paid Claims | 5/1/2010-12/31/2010 | 2011 | 2012 |
|---|---|---|---|
| Bariatric Lap band placement CPT 43770 (combined Claim Types I and P) | $239,879.42 | $47,219.73 | $0 |

The available claim detail, including patient and billing provider identification, is contained in the attached spreadsheet *SIU CASE 2010-0078-Claims Data Paid 050110-033116_ANALYSIS, Tab 43770 Claims*.

---

[2]      Health Net is providing the specific claim data that may relate to the average quantifications requested. Health Net had implemented a pre-payment review of claims in late 2010/early 2011 on the 1-800 GET THIN billing entities. The prepayment review required submission of medical records prior to payment. As the data shows, all of the paid sleep study claims were paid prior to the implementation of the prepayment review. The majority of claims were denied and/or contested for records that were not received.

GT_VICTIM_00000051

CONFIDENTIAL INFORMATION-CONTENTS SUBJECT TO PROTECTIVE ORDER

Kristen Williams, Esq
September 12, 2022
Centene/Health Net SIU Response to Letter dated September 1, 2022
Page 4 of 4

4) **The list of patients on whom defendants performed bariatric lap band surgery during the period May 2010-March 2016, and identification of patients for whom defendants sought prior authorization based in part on diagnosis of sleep apnea and related diagnoses.**

The patient list for billed bariatric lap band surgery are listed on the tab 43770 Claims. This includes patient name, SSN/Health Net member ID, billing provider and date of service. Additional information such as Date of Birth and last known address and other contact information would require additional time and research.

The patients with known prior authorizations show an authorization number in Column AB on the spreadsheet *Tab 43770 Claims*. Due to the time constraints in responding to this September 1, 2022 letter, Health Net has not conducted further research to determine which patients on the 43770 claim list were subject of prior authorization requests (either approved or denied) for bariatric lap band surgery where a diagnoses of sleep apnea, obstructive sleep apnea or excessive sleepiness.

Health Net provided approved and denied prior authorization information for the lap band procedure CPT 43770 on or about May 14, 2015 to Special Agent Samantha Kelly, FDA in response to a Federal Grand Jury Subpoena dated February 25, 2015. A notice of the documentation transmittal was also sent to you. If this information needs to be re-transmitted, Health Net can arrange to send it via secured email.

We hope the information provided her, and on the attached spreadsheet *SIU CASE 2010-0078-Claims Data Paid 050110-033116_ANALYSIS* is responsive to your request. In the event you have any questions, or require additional information, please contact me at telephone (916) 502-6003, or via email lisanoelle.legare@centene.com. A backup contact is Candice Malone, Pacific Region SIU Manager, telephone (602) 618-6551, email candice.t.malone@centene.com .

Sincerely,

Lisa-Noelle LeGare, CFE, AHFI
Senior Investigator, Special Investigations Unit
Cell Phone: (916) 502-6003
Email:  lisanoelle.legare@Centene.com
**Mailing Address:**
1370 Timberlake Manor Parkway
Chesterfield, MO 63017

Attachments (via secure email)
- Victim Witness Notification and Request for Information dated September 1, 2022 **Court Docket 17CR00661 US v. Julian Omidi et al.**

- SIU CASE 2010-0078-Claims Data Paid 050110-033116_ANALYSIS

GT_VICTIM_00000052

CONFIDENTIAL INFORMATION-CONTENTS SUBJECT TO PROTECTIVE ORDER

| From: | Kimball, Paul |
|---|---|
| To: | Williams, Kristen (USACAC) 2 |
| Subject: | [EXTERNAL] RE: U.S. v. Omidi, et al. -- Victim Impact Statements Needed by 11/21/2022 (send secure) |
| Date: | Tuesday, November 15, 2022 12:56:22 PM |
| Attachments: | OPM Omidi Spreadsheet - FEHBP Losses.xlsx |

Kristen,

In regards to the request;

1. Number of sleep study claims submitted by defendants (including any affiliates) during the charged scheme (May 2010 through March 2016) (broken down by year)
   1. **Answer: 181 (See summary spreadsheet)**
2. Total amount billed and paid on those sleep study claims falling within the charged scheme (broken down by year)
   1. **Answer: Billed - $ 2,476,222.00  Paid - $ 697,368.62  (See Summary Spreadsheet)**
3. Average claim amount for each sleep study
   1. **Answer: $5,148.07 (See Summary spreadsheet)**
4. Average amount paid for each sleep study
   1. **Answer: $ 1,449.83 (See summary spreadsheet)**
5. List of patients (including at least name, date of birth, date of service, name of submitting and reimbursed provider) on whom:
   1. Defendants (including any affiliates) performed Lap Band surgery during the charged scheme (May 2010 through March 2016); **and**
   2. Defendants (including any affiliates) had sought preapproval and/or preauthorization for the Lap Band surgery based, at least in part, on a diagnosis of sleep apnea, obstructive sleep apnea, and/or excessive sleepiness
      1. **Answer:  See Patient List in Excel attachment (second tab).**
6. For the Lap Band surgeries covered by item #5:
   1. Number of Lap Band surgeries performed (broken down by year)
      1. **Answer: 43 (See summary spreadsheet)**
   2. Average claim amount for each Lap Band surgery
      1. **Answer: $13,393.95 (See summary spreadsheet)**
   3. Average amount paid for each Lap Band surgery
      1. **Answer: $2.357.41 (See summary spreadsheet)**

A few additional matters to consider in your submission:

1. With respect to the request in 5(b) to focus on Lap-Band surgery billing for patients for whom preapproval/preauthorization was sought based at least in part on (that is, the pre-authorization request or letter of medical necessity cited or attached a sleep study report reflecting) a diagnosis of sleep apnea, obstructive sleep apnea, and/or excessive sleepiness, if you are having difficulty isolating those patients or that information, we request you provide an explanation of why that information is proving difficult to gather.

GT_VICTIM_00000977
CONFIDENTIAL INFORMATION-CONTENTS SUBJECT TO PROTECTIVE ORDER

1. **Answer: Our claims analysis focused on only those patients who received a diagnosis of sleep apnea, obstructive sleep apnea, and/or excessive sleepiness prior to their Lap-Band procedure date. We identified a total of 22 patients.**

2. With respect to the average claim and paid amounts in 6(b) and (c), the government has previously used the codes billed on the same day as the Lap-Band code 43770 as a measure of Lap-Band surgery losses. In your submission, please indicate which CPT codes you are using in order to determine the amount and provide your rationale for including those in the applicable actual losses.

   1. **Answer: Our calculations for this measure includes only the Lap-Band code 43770 or 43771.**

Let me know if you need any additional information.

Respectfully,

**Paul D. Kimball** | Assistant Special Agent in Charge
U.S. Office of Personnel Management
Office of the Inspector General
Office of Investigations - Region 3
13434 Plank Road, #183, Baker, LA 70714
225-413-6161

**From:** Williams, Kristen (USACAC) 2 <Kristen.Williams@usdoj.gov>
**Sent:** Thursday, October 27, 2022 2:03 PM
**To:** Kimball, Paul <Paul.Kimball@opm.gov>; Ruzylo, Scott <Scott.Ruzylo@opm.gov>
**Cc:** Williams, Kristen (USACAC) 2 <Kristen.Williams@usdoj.gov>
**Subject:** RE: U.S. v. Omidi, et al. -- Victim Impact Statements Needed by 11/21/2022

Thanks for your email! I'll look forward to your response. In case it is helpful, I've attached a list of NPIs/TINs for many of the GET THIN entities. I previously had contact with SA Richard Pandis on this matter, but that's been several years ago, and I wasn't able to reach him in connection with this victim impact request. I believe we also received materials at some point from Irma Mantilla, a forensic auditor with the Investigative Support Group – Field Operations, so she may have more context for you if she's still around. Some prior materials reference what may be a case number (C-12-00386 Lap Band 800 Get Thin) in case that is helpful in locating materials. Please feel free to reach out with any questions.
Kristen

Kristen A. Williams
Assistant United States Attorney
Deputy Chief, Major Frauds Section

GT_VICTIM_00000978
CONFIDENTIAL INFORMATION-CONTENTS SUBJECT TO PROTECTIVE ORDER

Ms. Abigail Hooks
Page 4
November 21, 2022

For the sixty United members identified above for whom Mr. Omidi's entities performed a sleep study for which United paid, United and the United Plans also paid for numerous other procedures for those members, including, for example, Lap Band surgery (43770), Lap Band adjustments (S2083), Esophagogastroduodenoscopy procedures (43239), Laparoscopic procedures on the esophagus (43280), and abdominal ultrasounds (76700), among many other procedures and office visits. In sum, United paid the Omidi-related entities $251,132.28 for these sixty members for Lap Band related procedures in addition to the $95,457.84 for the sleep study, for a total of $346,590.12.

With respect to Items 5 and 6 requested in the September 1, 2022 letter, identification of patients for whom claims were submitted for Lap Band surgery and the pre-approval request was based in part on a diagnosis of sleep apnea would be extremely difficult to determine as this information is not readily available in the claims data or other available reports. In order to determine such information, United would need to collect and review individual records for all members who received a Lap Band during the time period at issue to identify any letters or medical necessity or preauthorization requests that included a citation to sleep apnea diagnosis or provision of any sleep study report with the pre-authorization request.

In the meantime, United pulled certain records for the nine individual patient names provided by USAO Kristin Williams on October 7, 2022. What was readily available for these nine patients was information provided in the HSC History, which provides a snapshot of certain information. Of those nine patients, based on the information in the HSC History report, there were five of whom United paid claims for Lap Band surgery where the pre-approval request was based in part on a diagnosis of sleep apnea. This is indicated by "sleep apnea" being listed as a co-morbidity for each of those patients. We provided on October 24, 2022 the HSC History information for each of these members. The total amount United and the United Plans paid on Lap Band related claims for these five members alone is $171,861.49. For these nine members, United attempted to search for and identify other care management records that would be available supporting the pre-authorization request for the Lap Band surgery, but has not been able to identify any additional documents that are readily accessible. The system housing the care management records from that period over 10+ years ago has been archived and is not currently readily accessible.

In conclusion, United and the United Plans paid a significant sum to Mr. Omidi and his related entities due to Mr. Omidi's long-running scheme and requests restitution in this matter of **$46 million** or at a minimum **$17,351,902.57**, which is the amount United and the United Plans paid to the dozens of entities Mr. Omidi owned, managed, or controlled from May 2010 through 2014. If you need any additional information in support of United's claim for restitution, please contact me.

Sincerely,

Michelle S. Grant

cc: Steve Burstein, UnitedHealthcare

50 South Sixth Street | Suite 1500 | Minneapolis, MN | 55402-1498 | T 612.340.2600 | F 612.340.2868 | dorsey.com

GT_VICTIM_00001063
CONFIDENTIAL INFORMATION-CONTENTS SUBJECT TO PROTECTIVE ORDER



MICHELLE S. GRANT
PARTNER
(612) 340-5671
(612) 340-8738
grant.michelle@dorsey.com

October 19, 2022

Ms. Abigail Hooks
Victim Witness Specialist
U.S. Department of Justice
Central District of California
312 N. Spring St., Ste. 1700
Los Angeles, CA 90012

     Re:    Case Number 2012R01433 and Court Docket Number 17-CR-00661

Dear Ms. Hooks:

    I represent United Healthcare Services, Inc.; UnitedHealthcare Insurance Company; and OptumInsight, Inc. (collectively, "United") (Victim Identification Number (VIN): 5644932) and I write on their behalf in response to the Government's invitation to provide information about the harm caused to United and its customers because of Mr. Julian Omidi's fraud scheme.

    In its capacities as an insurer and a claims administrator, United is responsible for administering the hundreds of millions of health care claims it receives every year. In this role, United reasonably and in good faith relies on the veracity of the descriptions of the services rendered as stated on the claims form and the amount of the bill submitted by the provider for each service. We understand that a jury convicted Mr. Omidi of numerous criminal offenses, including as it relates to the submission of fraudulent claims to United by entities and providers he owned, managed, or supervised.

    Mr. Omidi's scheme had a significant impact on United and those benefit plans it insures or administers (the "United Plans"). Mr. Omidi and others created, organized, directed, and profited from a vast and sophisticated network of corporations and other business entities designed to submit fraudulent and misleading claims to the United Plans. After luring patients into his ambulatory surgical centers through an advertising campaign that blanketed Southern California, Mr. Omidi and others directed the performance of unnecessary medical procedures, invasive surgeries, and sleep studies with the aim of defrauding United and the United Plans. Among the more egregious aspects of his fraud, Mr. Omidi often misled patients about the terms of their insurance coverage, and as a result, those patients received obesity-related tests and services preliminary to and associated with Lap Band surgery, only to be told after the tests and services were provided that they did not have coverage for Lap Band surgery. Mr. Omidi, and those working on his behalf, would then submit bills to United that misleadingly omitted that the services were for obesity-related or other services for which there was no coverage.

    Mr. Omidi's (and his related entities) lies to their patients resulted in a particularly horrific result for at least one member. There, Mr. Omidi and others told a United Member that her health benefit plan covered all costs associated with her Lap Band surgery. Those statements

CT_VICTIM_00000983
CONFIDENTIAL INFORMATION-CONTENTS SUBJECT TO PROTECTIVE ORDER

Ms. Abigail Hooks
Page 2
October 19, 2022

were false. This member was then told she needed to undergo a variety of costly medical services "in preparation for" Lap Band surgery, including an endoscopy procedure that resulted in a perforated esophagus and a secondary infection that required surgical debridement and her being fed through a feeding tube for six weeks. Only after this member suffered a severe injury did Mr. Omidi and his related entities acknowledge that this member's insurance plan did *not* cover Lap Band surgery—a fact they knew all along. Mr. Omidi's fraud cost United millions, but it also led to serious injuries in some cases.

Many of these preliminary services were sleep studies that Mr. Omidi and his colleagues ordered as a profit-driven scheme to obtain coverage for Lap Band surgery. That is, many benefit plans provided coverage for Lap Band surgery only if a patient presented with a co-morbidity, such as sleep apnea. In a further effort to obtain insurance coverage for Lap Band surgery, Mr. Omidi and those he controlled often fraudulently manipulated the results of sleep studies to give the appearance that a particular patient presented with sleep apnea.

In short, Mr. Omidi's fraud succeeded and he deceived United and the United Plans into paying approximately **$46 million** (from 2008 to 2014)[1] it did not otherwise owe to the dozens of entities Mr. Omidi owned, managed, or controlled. From May 2010 to 2014, United and the United Plans paid **$17,351,902.57** to the dozens of entities Mr. Omidi owned, managed, or controlled.

From 2008-2012, United paid $22,779,662.60 for Lap Band procedures (CPT 43770) on behalf of approximately 430 members. It paid another $1,464,371.64 for Lap Band adjustments (CPT S2083). A break-down of payments made for Lap Band procedures is provided here:

### Lap Band Payments (CPT 43770) – By Year

| Year | Amount Billed | Amount Paid |
|---|---|---|
| 2008 | $3,088,406.44 | $2,157,500.33 |
| 2009 | $14,494,436.06 | $10,063,022.30 |
| 2010 | $13,275,656.38 | $10,289,292.51 |
| 2011 | $641,764.08 | $236,100.60 |
| 2012 | $131,010.27 | $33,746.86 |
| Grand Total | $31,631,273.23 | $22,779,662.60 |

Of this amount, United paid $6,757,040.14 for Lap Band procedures (CPT 43770) from May 2010 through 2012.

---

[1] The claims data United has readily available to it is for dates of service from January 2008 to February 2014. That data was filed in the matter captioned *Almont Ambulatory Surgery Center, LLC, et al., v. UnitedHealth Group Incorporated, et al.*, Case No. 2:14-cv-03053-MWF-AFM, in the Central District of California (*see* ECF No. 531-2).

50 South Sixth Street | Suite 1500 | Minneapolis, MN | 55402-1498 | T 612.340.2600 | F 612.340.2868 | dorsey.com

GT_VICTIM_00000984
CONFIDENTIAL INFORMATION-CONTENTS SUBJECT TO PROTECTIVE ORDER

Ms. Abigail Hooks
Page 3
October 19, 2022

The available claims data also shows United paid $161,109.60 for sleep studies (CPT 95810 and 95811) provided to seventy-one United members. Of this, United paid $95,458.02 for sleep studies (CPT 95810 and 95811) from May 2010 through 2013. A break-down of the sleep study claims is provided here:

| Sleep Study Claims (CPT 95801 and 95811 – By Year | | | |
|---|---|---|---|
| Year | Amount Billed | Amount Paid | Number of Members |
| May-Dec 2010 | $37,753.44 | $26,604.85 | 4 |
| 2011 | $113,705 | $64,430.02 | 23 |
| 2012 | $46,273.00 | $704.87 | 27 |
| 2013 | $31,942.00 | $3,718.10 | 6 |
| Grand Total | $229,673.44 | $95,457.84 | 60 |

In addition to the above sleep study claims, United paid $3,888,543.93 to Classic Sleepcare LLC from May 2010 to March 2016 as reflected in UHC_A_0067072 and 67073.

For the sixty United members identified above for whom Mr. Omidi's entities performed a sleep study for which United paid, United and the United Plans also paid for numerous other procedures on those members, including, for example, Lap Band surgery (43770), Lap Band adjustments (S2083), Esophagogastroduodenoscopy procedures (43239), Laparoscopic procedures on the esophagus (CPT 43280), and abdominal ultrasounds (CPT 76700), among many other procedures and office visits. In sum, United paid the Omidi-related entities $251,132.28 for these sixty members for Lap Band related procedures.

With respect to Items 5 and 6 requested in the September 1, 2022 letter, identification of patients for whom claims were submitted for Lap Band surgery and the pre-approval request was based in part on a diagnosis of sleep apnea would be extremely difficult to determine as this information is not readily available in the claims data or other available reports. If such information is needed, United will need additional time to provide this information and may supplement this letter at a future date.

In the meantime, United has pulled records for the nine patients provided by USAO Kristin Williams on October 7, 2022. Of those nine patients, there were five of whom United paid claims for Lap Band surgery where the pre-approval request was based in part on a diagnosis of sleep apnea. We will provide separately those pre-approval requests and claims data identifying the procedures billed and paid for each of these members. The total amount United and the United Plans paid on Lap Band related claims for these five members alone is $171,861.49.

In conclusion, United and the United Plans paid a significant sum to Mr. Omidi and his related entities due to Mr. Omidi's long-running scheme and requests restitution in this matter of

GT_VICTIM_00000985
CONFIDENTIAL INFORMATION-CONTENTS SUBJECT TO PROTECTIVE ORDER

Ms. Abigail Hooks
Page 4
October 19, 2022


**$46 million** or at a minimum **$17,351,902.57**, which is the amount United and the United Plans paid to the dozens of entities Mr. Omidi owned, managed, or controlled from May 2010 through 2014. If you need any additional information in support of United's claim for restitution, please contact me.

Sincerely,

Michelle S. Grant

GT_VICTIM_00000986
CONFIDENTIAL INFORMATION-CONTENTS SUBJECT TO PROTECTIVE ORDER



MICHELLE S. GRANT
PARTNER
(612) 340-5671
(612) 340-8738
grant.michelle@dorsey.com

November 21, 2022

Ms. Allison Stafford
Victim Witness Supervisor
U.S. Department of Justice
Central District of California
312 N. Spring St., Ste. 1700
Los Angeles, CA 90012

     Re:    Case Number 2012R01433 and Court Docket Number 17-CR-00661

Dear Ms. Stafford:

    I represent United Healthcare Services, Inc.; UnitedHealthcare Insurance Company; and OptumInsight, Inc. (collectively, "United"), and I write on their behalf in response to the Government's invitation to provide information about the harm caused to United and its customers because of Mr. Julian Omidi's fraud scheme. This letter supplements and provides additional information to my letter dated October 19, 2022.

    As previously noted, in its capacities as an insurer and a claims administrator, United is responsible for administering the hundreds of millions of health care claims it receives every year. In this role, United reasonably and in good faith relies on the veracity of the descriptions of the services rendered as stated on the claims form and the amount of the bill submitted by the provider for each service. We understand that a jury convicted Mr. Omidi of numerous criminal offenses, including as it relates to the submission of fraudulent claims to United by entities and providers`he owned, managed, or supervised.

    Mr. Omidi's scheme had a significant impact on United and those benefit plans it insures or administers (the "United Plans"). Mr. Omidi and others created, organized, directed, and profited from a vast and sophisticated network of corporations and other business entities designed to submit fraudulent and misleading claims to the United Plans. After luring patients into his ambulatory surgical centers through an advertising campaign that blanketed Southern California, Mr. Omidi and others directed the performance of unnecessary medical procedures, invasive surgeries, and sleep studies with the aim of defrauding United and the United Plans. Among the more egregious aspects of his fraud, Mr. Omidi often misled patients about the terms of their insurance coverage, and as a result, those patients received obesity-related tests and services preliminary to and associated with Lap Band surgery, only to be told after the tests and services were provided that they did not have coverage for Lap Band surgery. Mr. Omidi, and those working on his behalf, would then submit bills to United that misleadingly omitted that the services were for obesity-related or other services for which there was no coverage.

    Mr. Omidi's (and his related entities) lies to their patients resulted in a particularly horrific result for at least one member. There, Mr. Omidi and others told a United Member that her health benefit plan covered all costs associated with her Lap Band surgery. Those statements

GT_VICTIM_00001060
CONFIDENTIAL INFORMATION-CONTENTS SUBJECT TO PROTECTIVE ORDER

Ms. Abigail Hooks
Page 2
November 21, 2022

were false. This member was then told she needed to undergo a variety of costly medical services "in preparation for" Lap Band surgery, including an endoscopy procedure that resulted in a perforated esophagus and a secondary infection that required surgical debridement and her being fed through a feeding tube for six months. Only after this member suffered a severe injury did Mr. Omidi and his related entities acknowledge that this member's insurance plan did *not* cover Lap Band surgery—a fact they knew all along. Mr. Omidi's fraud cost United millions, but it also led to serious injuries in some cases. This was not an isolated instance. The Omidi-related entities lied to numerous other patients regarding coverage for the Lap Band surgeries and then performed unnecessary medical procedures, invasive surgeries, and sleep studies with the aim of defrauding United and the United Plans, including a Lap Band and a hiatal hernia surgery. For these members, the Omidi-related entities fraudulently omitted from the claim forms and other records the mention of the Lap Band placement. A number of these patients later had complications from the Lap Band resulting in significant claims paid by United for treatment as a result of the complications. As just one example, one member suffered severe injury from the Lap Band. This member was forced to seek emergency medical care from an in-network hospital just a month after the Lap Band was placed, and on two additional occasions in 2010. During these emergency treatments, she was forced to undergo a series of invasive and costly medical procedures as a result of the uncovered Lap Band, including ultrasounds, x-rays, CT scans, cardiovascular stress tests, heart imaging, and EKGs. Furthermore, the member was hospitalized for almost a month in early 2011 due to complications from the Lap Band. During that hospital stay, she was treated for infection, septicemia, peritoneal abscess, intestinal abscess, acute respiratory failure, among others, and her Lap Band was removed. This member was on a liquid diet for months following this hospital treatment, and suffered long term health consequences from the Lap Band placed by the Omidi-related entities.

Many of these preliminary services were sleep studies that Mr. Omidi and his colleagues ordered as a profit-driven scheme to obtain coverage for Lap Band surgery. That is, many benefit plans provided coverage for Lap Band surgery only if a patient presented with a co-morbidity, such as sleep apnea. In other cases, where the plan excluded obesity-related surgery, the Omidi-related entities would argue that the Lap Band surgery was medically necessary to treat the patient's sleep apnea. In a further effort to obtain insurance coverage for Lap Band surgery, Mr. Omidi and those he controlled often fraudulently manipulated the results of sleep studies to give the appearance that a particular patient presented with sleep apnea.

In short, Mr. Omidi's fraud succeeded and he deceived United and the United Plans into paying approximately **$46 million** (from 2008 to 2014)[1] it did not otherwise owe to the dozens of entities Mr. Omidi owned, managed, or controlled. From May 2010 to 2014, United and the United Plans paid **$17,351,902.57** to the dozens of entities Mr. Omidi owned, managed, or controlled.

---

[1] The claims data United has readily available to it is for dates of service from January 2008 to February 2014. That data was filed in the matter captioned *Almont Ambulatory Surgery Center, LLC, et al., v. UnitedHealth Group Incorporated, et al.*, Case No. 2:14-cv-03053-MWF-AFM, in the Central District of California (*see* ECF No. 531-2).

50 South Sixth Street | Suite 1500 | Minneapolis, MN | 55402-1498 | T 612.340.2600 | F 612.340.2868 | dorsey.com

GT_VICTIM_00001061
CONFIDENTIAL INFORMATION-CONTENTS SUBJECT TO PROTECTIVE ORDER

Ms. Abigail Hooks
Page 3
November 21, 2022

From 2008-2012, United paid $22,779,662.60 for Lap Band procedures (CPT 43770) on behalf of approximately 430 members. It paid another $1,464,371.64 for Lap Band adjustments (CPT S2083). A break-down of payments made for Lap Band procedures is provided here:

| Lap Band Payments (CPT 43770) – By Year | | |
|---|---|---|
| Year | Amount Billed | Amount Paid |
| 2008 | $3,088,406.44 | $2,157,500.33 |
| 2009 | $14,494,436.06 | $10,063,022.30 |
| 2010 | $13,275,656.38 | $10,289,292.51 |
| 2011 | $641,764.08 | $236,100.60 |
| 2012 | $131,010.27 | $33,746.86 |
| Grand Total | $31,631,273.23 | $22,779,662.60 |

Of this amount, United paid **$7,601,983.31** for 165 Lap Band procedures from May 2010 through 2013 This amount includes payment for not only the billed CPT Code 43770 (which totaled $6,757,040.00), but all other services billed for each of those same patients on the same date of service as the Lap Band. Mr. Omidi's affiliated entities often unbundled and separately billed various services on the same date of service as the surgery that were part of the Lap Band surgical Procedure.[2] On average, the Omidi entities billed $71,281.27 for each of these Lap Band surgeries and United paid $46,072.63 for each surgery.

With respect to sleep study claims, the available claims data also shows United paid $161,109.60 for sleep studies (CPT 95810 and 95811) provided to seventy-one United members. Of this, United paid $95,458.02 for sleep studies (CPT 95810 and 95811) from May 2010 through 2013. A break-down of the sleep study claims is provided here:

| Sleep Study Claims (CPT 95810 and 95811 – By Year | | | |
|---|---|---|---|
| Year | Amount Billed | Amount Paid | Number of Members |
| May-Dec 2010 | $37,753.44 | $26,604.85 | 4 |
| 2011 | $113,705 | $64,430.02 | 23 |
| 2012 | $46,273.00 | $704.87 | 27 |
| 2013 | $31,942.00 | $3,718.10 | 6 |
| Grand Total | $229,673.44 | $95,457.84 | 60 |

On average, the Omidi-related entities billed $3,827.89 for each sleep study and United paid $1,590.97 for each sleep study for the above members. In addition to the above sleep study claims, United paid $3,888,543.93 to Classic Sleepcare LLC from May 2010 to March 2016 as reflected in UHC_A_0067072 and 67073.

---

[2] This includes claims for the following CPT Codes: 39520, 39599, 43280, 43281, 43282, 44160, 44180, 47100, 49321, 49568, 49570, 88300, 99070, 99211, 99213, and 99244.

50 South Sixth Street | Suite 1500 | Minneapolis, MN | 55402-1498 | T 612.340.2600 | F 612.340.2868 | dorsey.com

GT_VICTIM_00001062
CONFIDENTIAL INFORMATION-CONTENTS SUBJECT TO PROTECTIVE ORDER

# EXHIBIT F

**Lally, Kevin M.**

| | |
|---|---|
| **From:** | Williams, Kristen (USACAC) 2 <Kristen.Williams@usdoj.gov> |
| **Sent:** | Sunday, November 27, 2022 7:35 PM |
| **To:** | Lally, Kevin M. |
| **Cc:** | Moghaddas, Ali (USACAC); Chao, David (USACAC) 1; Lachman, David (USACAC); Elon Berk; Williams, Kristen (USACAC) 2 |
| **Subject:** | Re: [EXTERNAL] Need for Continuance Based on Newly Produced Claim Data |

**\*\*EXTERNAL EMAIL; use caution with links and attachments\*\***

Kevin,

We do not believe the production of victim impact statements three weeks before sentencing warrants a continuance of the sentencing date. While the victim insurers provided targeted claims information in support of their victim impact statements, we have no reason to believe these would be substantively different from those produced many years ago in discovery, since there have been no new claims. Indeed, some victims reference data previously provided. Moreover, you and your client have your own, much more comprehensive figures (in that they encompass all billings, not just from the select victims who choose to request restitution) from the Nextech system also provided long ago and which system was repeatedly used by the defense at trial. Please indicate in your ex parte application that we oppose.

Thank you,
Kristen

Sent from my iPhone

> On Nov 27, 2022, at 1:36 PM, Lally, Kevin M. <KLally@mcguirewoods.com> wrote:
>
> Counsel,
>
> We have been reviewing the 1,190 pages of victim witness reports produced this past week. As you know, a considerable portion of these materials consist of recently obtained claim data from insurance companies involving payment requests and amounts actually paid on medical procedures at medical facilities connected with Mr. Omidi and SCM. As you also know, Mr. Omidi retained an expert to address the issue of monetary loss, which is the singular most significant factor driving Mr. Omidi's Guidelines calculations. That expert has spent considerable time and resources preparing a report addressing the issue of loss based on materials that had been produced in pre-trial discovery but will need to review these newly produced materials before she can finalize her report. Given the scope and timing (the eve of Thanksgiving holiday) of the production, it is simply impossible for the expert to: (1) review the attached materials; (2) assess the extent to which such materials impact her analysis and findings; and (3) address these issues in her report by this Wednesday's filing date. A continuance of the sentencing date, therefore, will be necessary. As the request is necessitated by the government's recent disclosure, a stipulation would be appropriate and in the normal course of USAO practice. Please advise me as-soon-as-possible of the government's position, as Mr. Burke and I otherwise will need to proceed with an *ex parte* application.

Regards,

Kevin

**Kevin M. Lally**
Partner
McGuireWoods LLP
Wells Fargo Center
South Tower
355 S. Grand Ave., Suite 4200
Los Angeles, CA 90071-3103
T:  +1 213 457 9862
F:  +1 213 457 9882
klally@mcguirewoods.com
Bio | VCard | www.mcguirewoods.com

# McGuireWoods

*This e-mail from McGuireWoods may contain confidential or privileged information. If you are not the intended recipient, please advise by return e-mail and delete immediately without reading or forwarding to others.*