KEVIN M. LALLY (SBN 226402)
**McGuireWoods LLP**
klally@mcguirewoods.com
355 South Grand Ave., Suite 4200
Los Angeles, California 90071
Telephone: (213) 457-9862
Facsimile: (213) 457-9882

ROBERT J. BITTMAN (*Pro hac vice*)
**McGuireWoods LLP**
rbittman@mcguirewoods.com
888 16th Street N.W., Suite 500
Washington, D.C. 20006
Telephone: (202) 857-2472
Facsimile: (202) 828-2962

Counsel for Defendant Julian Omidi

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>        vs.<br><br>JULIAN OMIDI; *et al.*,<br><br>                Defendants. | No. CR 17-00661(A)-DMG<br><br>**JULIAN OMIDI'S SENTENCING MEMORANDUM, MOTION FOR DOWNWARD VARIANCE, AND POSITION ON RESTITUTION**<br><br>Date:  March 2, 2023<br><br>Time:  1:30 PM<br><br>Hon. Dolly M. Gee |

1

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................... i

I.     INTRODUCTION .................................................................................... 1

II.    MR. OMIDI'S PERSONAL HISTORY AND CHARACTERISTICS ........... 2

    a.     Mr. Omidi's Personal History. ......................................................... 2

    b.     Mr. Omidi's Personal Characteristics. ............................................. 7

III.   THE ADVISORY SENTENCING GUIDELINES RANGE .......................... 9

    a.     Objections to the Offense Level Calculations and Recommended
        Sentence. ...................................................................................... 10

    b.     This Clear and Convincing Proof Threshold Must Be Applied to
        the Guideline Calculations. ........................................................... 12

        i.     Loss Calculation. ................................................................. 15

            1.     The PSR Erroneously Utilizes Intended Loss
                Instead of Actual Loss. ........................................... 15

            2.     The PSR's Loss Calculations Are Based on
                Fundamentally Flawed and Legally Insufficient
                Government Loss Calculations. ................................ 20

                a.     Mr. Petron's loss calculations are decoupled
                    from the charged insurance fraud. ................ 26

                b.     Mr. Petron's Loss Calculations Are Anchored
                    to an Invalid Legal Theory. ........................... 30

                c.     Mr. Petron's Loss Calculations Are
                    Decoupled from Medical Necessity
                    Considerations. ........................................... 37

                d.     Mr. Petron's Current Loss Calculations Are
                    Based On a Methodology That the
                    Government Jerry-rigged Post Trial. ............. 39

                e.     Mr. Petron's Loss Calculations Conflict with
                    the Government's Evidence. .......................... 42

                f.     Mr. Petron's Loss Calculations Were
                    Internally Inconsistent. ................................ 45

i

1

2

**TABLE OF CONTENTS**
(continued)

**Page**

g.   Mr. Petron's Loss Calculations Were
Designed to Capture Fees Paid on Unrelated
Medically Necessary Procedures And
Otherwise Overstates Loss....................................46

3.   The Appropriate Loss Calculation. ...............................48

ii.   Mr. Omidi's Role in the Offenses of Conviction. ....................52

iii.   No Obstruction of Justice Enhancement Should Be
Applied..............................................................................56

c.   The Appropriate Guidelines Calculation. ...........................................62

IV.   THE STATUTORY SENTENCING FACTORS SUPPORT A
DOWNWARD VARIANT SENTENCE.......................................................63

a.   Nature and Circumstances of the Offense. .......................................64

b.   Personal History and Characteristics. ................................................68

c.   Adequate Deterrence and Protection of the Public.............................69

d.   Just Punishment and Respect for the Law. ........................................74

e.   Avoiding Unwarranted Sentencing Disparities. .................................76

i.   Downward Variances Are Commonplace for Defendants
Convicted of Crimes of Fraud. ...................................76

ii.   As these examples demonstrate, the "need to avoid
unwarranted sentence disparities among defendants with
similar records who have been found guilty of similar
conduct," 18 U.S.C. § 3553(a)(6), counsels heavily in
favor of a below-Guidelines sentence for Mr. Omidi.  To
find otherwise would ignore this fundamental sentencing
factor as virtually no defendant convicted of a § 2B1.1
offense carrying a range of life is, in fact, sentenced to life
imprisonment.  To the contrary, there are countless
examples of below-Guidelines variances for defendants
with similar records who committed similar conduct to
Mr. Omidi.  The sentence this Court imposes should track
those trends.  None of Mr. Omidi's Co-Conspirators Will
Be Incarcerated. ........................................................81

ii

1

**TABLE OF CONTENTS**
(continued)

2

**Page**

3

    f.    Ability to Pay Fines ................................................................ 84

4

V.    THE REQUESTED SENTENCE ............................................... 84

5

VI.    POSITION WITH RESPECT TO RESTITUTION ........................... 86

6

    a.    Restitution Cannot Be Ordered At This Time. .................... 86

7

        i.    Government Imposed Limitations to Mr. Omidi's Ability to Fully Address Restitution. ..................................... 88

8

9

        ii.    To Date, the Government Has Failed to Provide Evidence Sufficient to Establish Victim Status as to the Insurers. .......... 92

10

        iii.    To the Extent a Designated Insurer Properly Qualifies as a Victim, Recovery Must Be Limited to the Scope of the Charged Fraud Scheme. ............................................ 93

11

12

    b.    An Evidentiary Hearing on Restitution is Required as There Exist Disputes of Material Fact. ........................................ 97

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

iii

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Gall v. United States*,
   552 U.S. 38 (2007) ................................................................. 9, 63, 69, 73

*i.e., United States v. Woods*,
   335 F.3d 993 (9th Cir. 2003) ............................................................. 31

*Kimbrough v. United States*,
   552 U.S. 85 (2007) ............................................................................ 19, 63

*Kisor v. Wilkie*,
   139 S. Ct. 2400 (2019) ................................................................. *passim*

*Neder v. United States*,
   527 U.S. 1 (1999) .............................................................................. 30

*Pepper v. United States*,
   562 U.S. 476 (2011) ....................................................................... 69, 73

*Rita v. United States*,
   551 U.S. 338 ..................................................................................... 69

*U.S. v. Klasky*,
   2:17-cr-00401-DMG, Dkt. 73, 2 ................................................. 89, 90

*United States v. Adair*,
   38 F.4th 341 (3rd Cir. 2022) ......................................................... 16

*United States v. Adelson*,
   441 F. Supp. 2d 506 (S.D.N.Y. 2006), aff'd, 301 F. App'x 93 (2d
   Cir. 2008) ........................................................................................ 71

*United States v. Ainabe*,
   938 F.3d 685 (5th Cir. 2019) ......................................................... 50

*United States v. Allen*,
   529 F.3d 390 (7th Cir. 2008) ......................................................... 86

*United States v. Alphas*,
   785 F.3d 775 (1st Cir. 2015) ......................................................... 49

iv

*United States v. Anderson*,
   741 F.3d 938 (9th Cir. 2013) ................................................................85, 88, 89

*United States v. Atilla*,
   1:15-cr-00867-RMB (S.D.N.Y.), Dkt. Nos. 505, 518 ........................................ 78

*United States v. Avila*,
   95 F.3d 887 (9th Cir. 1996) .......................................................................... 56

*United States v. Bane*,
   720 F.3d 818 (11th Cir. 2013) ...................................................................... 95

*United States v. Barnes*,
   890 F.3d 910 (10th Cir. 2018) ...................................................................... 70

*United States v. Bhikha*,
   2021 WL 3854753 (N.D. Cal. Aug. 30, 2021) .............................................. 94

*United States v. Bradley*,
   2:20-cr-451 (C.D. Cal.), Dkt. Nos. 267, 292 ................................................ 79

*United States v. Burgess*,
   691 F.2d 1146 (4th Cir. 1982) ...................................................................... 24

*United States v. Camacho*,
   348 F.3d 696 (8th Cir. 2003) ........................................................................ 50

*United States v. Campbell*,
   22 F.3d 438 (4th Cir. 2022) .......................................................................... 16

*United States v. Carter*,
   530 F.3d 565 (6th Cir. 2008) ........................................................................ 67

*United States v. Carty*,
   520 F.3d 984 (9th Cir. 2008) .......................................................................... 9

*United States v. Catoggio*,
   326 F.3d 323 (2d Cir. 2003) ....................................................................92, 93

*United States v. Davis*,
   2017 WL 3328240 (S.D.N.Y. Aug. 3, 2017). (CR 1312 .) ............................... 31

*United States v. De Nier*,
   2:12-cr-00496 (C.D. Cal.), Dkt. Nos. 144, 157 ............................................ 78

*United States v. Dupree,*
 57 F.4th 1269 (11th Cir. 2023)...................................................................16

*United States v. Fair,*
 699 F.3d 508 (D.C. Cir. 2012)...................................................................86

*United States v. Gagarin,*
 950 F.3d 596 (9th Cir. 2020)...................................................................86

*United States v. Geozos,*
 870 F.3d 890 (9th Cir. 2017)...................................................................34

*United States v. Gordon,*
 393 F.3d 1044 (9th Cir.2004)...................................................................96

*United States v. Gossi,*
 608 F.3d 574 (9th Cir. 2010)............................................................85, 88

*United States v. Hamilton,*
 37 F.4th 246 (5th Cir. 2022)...................................................................78

*United States v. Hanna,*
 49 F.3d 572 (9th Cir. 1995)..........................................................*passim*

*United States v. Henderson.*
 649 F.3d 955 (9th Cir. 2011)...................................................................19

*United States v. Holden,*
 908 F.3d 395 (9th Cir. 2018)...................................................................55

*United States v. Hopper,*
 177 F.3d 824 (9th Cir. 1999)...................................................................12

*United States v. Jimenez Martinez,*
 83 F.3d 488 (1st Cir.1996) .....................................................................96

*United States v. Jordan,*
 256 F.3d 922 (9th Cir. 2001)...................................................................12

*United States v. Karterman,*
 60 F.3d 576 (9th Cir. 1995)............................................................57, 62

*United States v. Kilpatrick,*
 798 F.3d 365 (6th Cir. 2015)...................................................................86

vi

*United States v. Lonich,*
    23 F.4th 881 (9th Cir. 2022)............................................................... 13

*United States v. Mahmood,*
    820 F.3d 177 (5th Cir. 2016).................................................................95

*United States v. May,*
    706 F.3d 1209 (9th Cir. 2013)...............................................................86

*United States v. McGowan,*
    668 F.3d 601 (9th Cir. 2012)......................................................... 19, 62

*United States v. Miller,*
    953 F.3d 1095 (9th Cir. 2020)...............................................................31

*United States v. Milton,*
    3:06-cr-00137 (D. Conn.) Dkt. Nos. 1115, 1164, 1216 ......................77

*United States v. Mirando,*
    768 F. App'x 596 (9th Cir. 2019)..........................................................50

*United States v. Nasir,*
    17 F.4th 459 (3rd Cir. 2021) (*en banc*) ............................................. 16

*United States v. Parlor,*
    2 F.4th 807 (9th Cir. 2021)................................................................... 14

*United States v. Patterson,*
    595 F.3d 1324 (11th Cir. 2010).............................................................88

*United States v. Popov,*
    742 F.3d 911 (9th Cir. 2014)................................................................49

*United States v. Providence Health & Servs.,*
    4:20-cv-05004-SMJ (E.D. Wash.), Dkt. Nos 23, 24 ..........................77

*United States v. Renick,*
    273 F.3d 1009 (11th Cir. 2001).............................................................21

*United States v. Ressam,*
    679 F.3d 1069 (9th Cir. 2012) (*en banc*)............................................9

*United States v. Riccardi,*
    989 F.3d 476 (6th Cir. 2021) ............................................................... 16

*United States v. Riley*,
    335 F.3d 919 (9th Cir. 2003) ........................................................ 12, 52

*United States v. Rizk*,
    660 F.3d 1125 (9th Cir. 2011) .................................................... 86, 96

*United States v. Rodriguez*,
    2:18-cr-00088 (C.D. Cal.), Dkt. Nos. 43, 86, 106 ............................. 78

*United States v. Rowan*,
    No. 1:16-cr-10343 (D. Mass.) ........................................................ 80

*United States v. Rutgard*,
    116 F.3d 1270 (9th Cir. 1997) ............................................37, 48, 49, 87

*United States v. Seymour Lazar, et al.*,
    CR No. 05-587-JFW ...................................................................... 77

*United States v. Sharma*,
    703 F.3d 318 (5th Cir. 2012) ..................................................... 87, 88

*United States v. Stone*,
    822 F. App'x 624 (9th Cir. 2020) ..........................................87, 88, 95

*United States v. Swor*,
    728 F.3d 971 (9th Cir. 2013) ......................................................... 86

*United States v. Tuzman*,
    No. 1:15-cr-00536 (S.D.N.Y.) .................................................... 79, 80

*United States v. Valle*,
    940 F.3d 473 (9th Cir. 2019) ......................................................... 11

*United States v. Vanderwerfhorst*,
    576 F.3d 929 (9th Cir. 2009) ...............................................19, 56, 62

*United States v. Vargas*,
    35 F. 4th 936 (5th Cir. 2022) ....................................................... 16

*United States v. Vivit*,
    214 F.3d 908 (7th Cir. 2000) .................................................... 37, 48

*United States v. Waknine*,
    543 F.3d 546 (9th Cir. 2008) ................................................*passim*

*United States v. Walter*,
   256 F.3d 891 (9th Cir. 2001) ................................................................. 68

*United States v. Watt*,
   707 F.Supp.2d 149 (D. Mass. 2010) ...................................................... 70

*United States v. Yates*,
   16 F. 4th 256 (9th Cir. 2021) ........................................... 30, 31, 33, 34

**Federal Statutes**

18 U.S.C. § 1028A ................................................................... *passim*

18 U.S.C. § 1035 ............................................................................... 63

18 U.S.C. § 1343 ............................................................................... 63

18 U.S.C. § 1349 ............................................................................... 30

18 U.S.C. §§ 1956(a)(1)(A)(i), (h) .................................................. 64

18 U.S.C. § 3553(a) ................................................................. *passim*

18 U.S.C. § 3553(a)(2) ..................................................................... 74

18 U.S.C. § 3553(a)(2)(B)-(C) ........................................................ 69

18 U.S.C. § 3553(a)(6) ............................................................. 76, 80

18 U.S.C. § 3663A(c)(1)(B) ............................................................. 92

18 U.S.C. § 3664(d)(4) ..................................................................... 96

U.S.S.G. 2B1.1, cmt.21(C) ............................................................... 10

U.S.S.G. § 2B1.1 .................................................................... *passim*

U.S.S.G. § 2B1.1(b)(1) ............................................................... 9, 19

U.S.S.G. § 2B1.1(b)(1)(A)-(b)(1)(P) .............................................. 14

U.S.S.G. § 2B1.1(b)(1)(F) ................................................................ 13

U.S.S.G. § 2B1.1(b)(1)(O) ......................................................... 9, 13

U.S.S.G. § 2B1.1(b)(2)(A)(i) ........................................................... 10

U.S.S.G. § 2B1.1 cmt.3 ..................................................................... 15

U.S.S.G. § 2S1.1(b)(2) ..................................................................... 10

U.S.S.G. § 3B1.1 ................................................................. 11, 13, 16, 52

U.S.S.G. § 3B1.1(a) ........................................................ 10, 52, 54, 62

U.S.S.G. §§ 3B1.1(a), (b) ................................................................ 52

U.S.S.G. §§ 3B1.1(c) .................................................................. 52, 53

U.S.S.G. § 3B1.1, cmt 4 ................................................................ 54

U.S.S.G. § 3B1.2(b), cmt.5 ............................................................ 53

U.S.S.G. § 3C1.1 ................................................................. 10, 11, 56, 62

U.S.S.G. § 3C1.1, and a ................................................................ 13

U.S.S.G. § 4B1.1 ........................................................................... 16

U.S.S.G. § 4B1.1's .......................................................................... 16

U.S.S.G. § 5K1.1 ........................................................................... 82

U.S.S.G. § 6A1.3 ........................................................................... 19

U.S.S.G. § 6A1.3 cmt. .................................................................... 96

Defendant Julian Omidi ("Julian," "Mr. Omidi"), by and through his counsel, McGuireWoods LLP, hereby submits this Sentencing Memorandum, Motion for Downward Variance, and Position on Restitution.

## I.      INTRODUCTION

Section 3553(a) requires the Court to fashion a sentence "sufficient, but not greater than necessary," to serve the purposes of sentencing.  To do so, this Court has to fully assess not just the offense conduct but the entirety of who Julian Omidi is. In doing so, this Court will learn, likely for the first time, that Julian, from his earliest childhood,  has endured horrific abuse and a series of unspeakable tragedies – all untreated – that have profoundly impacted his development and decision making. For five decades, Julian developed self-taught coping mechanisms to push through sexual abuse, multiple suicides involving his closest family and friends, and the tragic death of his fiancé. Living in an ever insular world, these self-taught coping measures sometimes failed him. Now is one such time. Mr. Omid humbly comes before this Court and respectfully submits that, when full consideration is given to his horrific personal history and the positions raised below, a substantial downward variance will be warranted.

1

## II.     MR. OMIDI'S PERSONAL HISTORY AND CHARACTERISTICS

### a.     Mr. Omidi's Personal History.[1]

_Upbringing in Iran._  Julian was born in Sanandaj, Iran to Firooz and Cindy Omidi.  Along with his younger brother, Michael, Julian was raised in a supportive, positive and loving household where value of hard work and the family's Jewish faith were emphasized.  Firooz was employed as a civil engineer and provided for the family, who lived in an upper middle-class neighborhood.  To external observers, the Omidi family may have appeared as a normal, hardworking family. The reality was far more complicated and tragic.

_A Stolen Childhood._  In the most formative moments of his childhood, in the place where he was supposed to be safest, and among the people who he loved the most, Julian was repeatedly subject to traumatic abuse that would forever change him. Beginning at just four years old, Julian became the victim of a long pattern of sexual abuse at the hands of a male teenager who lived in the Omidi home as a domestic worker.  For a period of nearly _five years_, the teen raped Julian multiple times each week when Firooz and Cindy were away.  Through physical restraint and verbal abuse, the teen dominated Julian and swore him to secrecy – threatening Julian that if he ever told his parents about the abuse, the police would take him away from his family forever.  Julian was powerless, afraid for himself and his younger brother, and

---

[1] The information in this section is drawn from Part C of the PSR (¶¶ 93-125), unless otherwise specifically sourced within the primary text.

confused about how and why this predator – who was always present in the family home – would hurt him so deeply.

These many years of sexual abuse ended only when Julian's mother found him in the bathroom after one of the episodes of rape bleeding and in extreme pain. The teen was thrown out of the family home immediately, but Julian's parents did not report the abuse to the police – nor did they seek any therapy or counseling for Julian out of personal shame. As Cindy explains, the family was "raised to keep silent about such things as it was a source of shame" and she personally feels "foolish and . . . devastated and responsible for him not getting therapeutic treatment in order to heal." *See* Exh. A at 4 (C. Omidi Ltr.). As noted by Dr. Richard Romanoff,[2] childhood sexual victimization can have "devastating consequences" to one's psychological development and, Julian's abuse contributed to mental health difficulties that "seriously undermined a wide range of critical psychological abilities needed to function" at healthy levels. Exh. B at 12, 19.

A series of extraordinary events then changed the family's course forever. First, in the late 1970s, the seeds of the Iranian Revolution began to take hold. Because of his close ties to the government, Firooz began to be the target of violent intimidation and death threats by those aligned with the Islamist organizations supporting the replacement of Iran's government. Additionally, that the Omidis were

---

[2] Dr. Richard Romanoff is a licensed clinical psychologist. He has prepared a report for the Court's consideration, attached hereto as Exhibit B. (Lally Decl. ¶ 3.)

open, actively-practicing Jews made them targets of harassment and intimidation. Indeed, Julian recalls being bullied at school both for his faith, and because his mother refused to wear a hijab. *See* Exh. B. at 6.

Following the overthrow of the Shah and the declaration of an Islamic state in 1979, the Omidis were forced to flee Iran – and with only their liquid assets.  Julian was just 11 years old.  As his cousin, who left Iran at a similar time, recounted, he and Julian were "uprooted from our childhood homes, escaping violent and horrific scenes of the revolution.  Our parents left for fear of religious persecution/prejudice and the safety of all of our lives."  *See* Exh. A at 47 (S. Monjazeb Ltr.).  With the clothes on their backs and fear in their hearts, the Omidi family immigrated to Yorba Linda, California – settling there in 1979.

*An Emphasis on Education.*  Despite his successful career in Iran, Firooz encountered significant obstacles finding steady employment in California.  He periodically worked in the construction industry, but was unable to find consistent financial success.  Project after project fell through or required Firooz to contribute the family's money to finish the job.  It became an extraordinarily stressful homelife for Julian and Michael.  Julian was very cognizant of his family's struggles, still reeling from the recent cessation of the years of abuse., and struggling to adjust to life in America.  As his aunt recounts, the dramatic differences in the two cultures were very challenging for Julian and he was picked on for his poor English.  *See* Exh. A at

60 (M. Pezeshk Ltr.).  Julian buried himself in his school work – keenly focusing on his academic pursuits to the exclusion of deep friendships or romantic relationships.

The Omidi family prioritized education.  Indeed, Julian understood that he was expected to excel academically and find success in his career.  Julian gained acceptance to the University of California at Irvine ("UCI") in 1986 where he took an exceptionally full course load focused on medical school prerequisites and did well. Then, in his junior year, he made a terrible choice when he assisted  one of his only friends, Arash Behnam, by obtaining a test for Arash to use in preparing for an exam. Though Julian believed the test was merely a practice exam, he understands that it was an incredible mistake to help Arash in this way.  Indeed, it fundamentally altered the rest of his professional life.  Arash was soon caught with the test, expelled from school, and criminally charged.  Shortly thereafter, he committed suicide in a Tijuana hotel room.  Arash was 21 years old at the time of his death.  So was Julian.

Julian was overcome with grief and guilt and confessed his involvement to school administrators .  He was expelled from UCI.  He later faced charges;  however, the charges were ultimately dismissed many years later. To his credit, Julian was determined not to let Arash's death and his expulsion from UCI derail his dream of becoming a doctor.  For the next three years, he took medical school prerequisite courses at local colleges and was accepted to St. Louis University Medical School in 1992.  Apart from a one-year internship at Loma Linda University, Julian lived in St. Louis for eight years, completing medical school and a dermatology residency.  Julian

loved his medical education and relished the idea of being a doctor.  It would, he thought, bring his family pride and financial stability.

*Significant Family Tragedies*.  Over the course of his adult life, Julian has experienced the tragic and unexpected loss of three people incredibly close to him. First, Firooz committed suicide in the family home when Julian was 28 years old – as a lack of professional success and onset of diabetes based health issues plunged him into a deep depression.  Julian was extremely close to his father and had had some sense of Firooz's struggles over the years.  He placed blame on himself – for not helping out financially, for helping his father's overcome his depression, and for his inability to provide for his mother and brother.  The entire family was devastated and, as before, Julian found solace in his studies – dedicating himself to excelling in medical school.  A friend describes that, at this time, Julian's "primary focus was for his mother and brother" and, to help them, Julian worked extremely hard, taking on jobs and "surviving on zero to a couple of hours sleep a day" to ensure they were taken care of.  *See* Exh. A at 43 (M. Mashour Ltr.).

In 1997, Julian met his first love,  Annette Michelle Pratt, while he was completing his dermatology residency and Anette was in law school.  When Julian completed his residency and moved home to California, Annette followed him, transferring her legal studies to California Western School of Law, from where she graduated in 2001. Julian and Annette were young, in love, and just starting out in their careers when a horrible tragedy ripped them apart. On July 6, 2003, 27-year-old

6

Annette was killed when she fell off the back of a motorcycle being driven by her co-worker.  Julian was numb; the future he had imagined for himself and Annette erased and yet another of those closest to him was tragically taken too soon.

Seven years later, in 2010, Julian suffered the third in his trilogy of incredibly painful personal losses when his uncle, Kamyar Ken Pezeshk, fell to his death from his apartment's balcony.

**b.     Mr. Omidi's Personal Characteristics.**

The collection of letters attached as Exhibit A paint a consistent picture of Julian as a passionate, generous, intelligent, and caring person.  Together, these words from Julian's friends, family, former employees, and others who know him describe a very different human than the image that emerged during his long trial.  Several aspects of Julian's true character stand out in the letters.

_Hard Work, Creativity, and Selflessness_.  Those who know him describe Julian as a brilliant creative thinker with a strong work ethic who gives freely of himself to those around him.  As one friend recounted, in addition to taking prerequisite courses for medical school, Julian dedicated himself to taking advanced Spanish language classes.   When asked why, Julian explained that "physicians would rely on interpreters that were poorly equipped to translate symptoms," which would detrimentally impact patient care.   Recognizing the healthcare inequalities that plagued the poorest Latino communities in California – Julian was determined to learn Spanish so he could speak directly with patients.  _See_ Exh. A at 43 (M. Mashour Ltr.).

7

As an adult, Julian has given generously of his time and money to help those less fortunate.  Dr. Freddy Behin describes Julian organizing and funding multiple medical mission trips to the Philippines, working tirelessly to help change lives and giving his own money to ensure patients had appropriate aftercare.  *See* Exh. A at 18 (F. Behin Ltr.) (further remarking about his amazement at the "genuine care and love for humanity and to help regardless of the economical burden").  These sentiments are echoed throughout the many character letters submitted for the Court's consideration at sentencing.  *See*, *e.g.*, Exh. A at 57 (A. Or-El Ltr.) (recounting Julian's volunteer work to help the poor in third-world countries and his provision of medical equipment, medications, and other necessity to impoverished villages); *id.* at 69 (J. Roistacher Ltr.) (describing his service on a mission trip to the Philippines funded and organized by Julian, and noting that his "time spent with Julian made [him] realize how much good can be done when the right stakeholders apply resources effectively.").  z

*Positive Impact on Others*.  Julian is a dedicated son and brother, a reliable friend, and an inspirational and giving employer.  He is the primary caretaker for his mother, Cindy, and has been her source of emotional and financial support since his father's suicide. Additionally, he is devoted to his larger family, and has been described as an incredibly loving uncle, nephew, and grandson.  *See*, *e.g.*, Exh. A at 66 (S. Pezeshk Ltr.) (recounting how Julian would spend hours each weekend with his grandparents once they became bedbound and stayed very close to them).

8

These sentiments are echoed by Julian's employees, who share that he was a capable and hardworking boss, who inspired them to be excellent at their jobs. *See* Exh. A at 28 (M. Esquivel Ltr.) (describing Julian as "one of the best patient advocates," who "has a lot to do with how [she] fight[s] for patients now.") He also cared deeply for his employees and looked after them and their families. For example, when one employee's husband underwent spine surgery, resulting in extreme financial hardship for her family, Julian provided financial support for the family to move to a single-family home appropriate for disabled individuals. *See* Exh. A at 41 (M. Javier Ltr.). Julian helped another employee pay for her insulin when she was in such dire financial straits that she was taking out payday loans to cover the cost. *See* Exh. A at 28 (M. Esquivel Ltr.).

## III.   THE ADVISORY SENTENCING GUIDELINES RANGE

The overarching goal of a sentencing court is to impose a sentence that is sufficient to "reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed education or vocational training, medical care, or other correctional treatment." *United States v. Ressam*, 679 F.3d 1069, 1088-89 (9th Cir. 2012) (*en banc*); *see United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008); 18 U.S.C. § 3553(a). A district court's sentencing proceedings, however, must begin

"by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007).   Mr. Omidi objects to this calculation in three respects.[3]

    a.    **Objections to the Offense Level Calculations and Recommended Sentence.**

Applying a preponderance standard, the USPO calculated Mr. Omidi's total offense level to be 45, which consisted of a base offense level of 7 (U.S.S.G. § 2B1.1(b)(1)), a 28-offense level increase based on the findings of government-retained statistician Michael Petron that the intended loss from the scheme was $354,412,721 (U.S.S.G. § 2B1.1(b)(1)(O)), a 2-level enhancement for more than 10 victims (U.S.S.G. § 2B1.1(b)(2)(A)(i)), a 2-level enhancement for a Section 1956 conviction (U.S.S.G. § 2S1.1(b)(2)), a 4-level aggravating role enhancement (U.S.S.G. § 3B1.1(a)), and a 2-level enhancement for obstruction of justice (U.S.S.G. § 3C1.1). PSR ¶¶ 62-76. Despite Mr. Omidi having absolutely no criminal history, these calculations result in an advisory Guidelines range of Life imprisonment. PSR ¶ 86. Based on its determination that Mr. Omidi's offense level calculation "substantially overstates the seriousness of the offense," the USPO found a downward departure to be appropriate pursuant to U.S.S.G. 2B1.1, cmt.21(C) and recommended that the advisory sentencing range be reduced from Life to 15 years' imprisonment,[4]

---

[3] The Offense Conduct described in the PSR at ¶¶ 20-48, tracks the allegations in the First Superseding Indictment and the government's Trial Memorandum (CR 1359), many of which were unsupported, contested, or disproved at trial.

[4] While not expressly stated, the recommended departure effectively equated with a twelve level decrease in offense level.

which was further subject to a consecutive two-year term due to Mr. Omidi's Section 1028A conviction. PSR ¶¶ 81, 157; March 1, 2022 Recommendation Letter, p. 1.

Mr. Omidi objects to the PSR's offense level calculations on the following grounds. First, the USPO misapplied the standard of proof, relying on the generally applicable preponderance standard, when the clear and convincing standard was required due to the gravely disproportionate impact of multiple disputed enhancements on Mr. Omidi's total offense level calculation and advisory sentencing range. Second, in calculating loss, the USPO, adhering to an erroneous Guidelines comment, applied the government's claim of "intended loss" rather than the actual loss incurred from the offense conduct. Third, this error is compounded as the government loss calculation on which it relies rests on flawed legal theories, contradicts its own trial evidence regarding the scope of the fraud, is undermined by fatal methodological and application errors, has materially changed since trial, and – as the USPO's departure recommendation highlights – substantially overstates the seriousness of the offense. Fourth, the facts established at trial, coupled with the government's assessment of co-conspirator role enhancements and reductions, support application of a two, rather than four, level role enhancement under § 3B1.1. Fifth, there is no credible evidence to support the obstruction of justice enhancement under § 3C1.1.

While Mr. Omidi fully supports the USPO's reasoned determination that a significant downward departure is required, he objects to the USPO's sentencing recommendation because it incorporates the errors addressed above.

### b. This Clear and Convincing Proof Threshold Must Be Applied to the Guideline Calculations.

Mr. Omidi, despite no criminal history, faces an advisory Guidelines sentence of Life imprisonment due to the cumulative application of several offense level enhancements that disproportionately -- in fact, draconianly – impact his Guidelines calculations and recommended sentence. The Ninth Circuit repeatedly has found that Due Process requires that the government prove disputed offense level enhancements "by clear and convincing evidence in cases where there is an extremely disproportionate impact on the sentence." *United States v. Valle*, 940 F.3d 473, 480 (9th Cir. 2019) (explaining that the magnitude of the disputed sentencing factors on the sentencing range required application of the clear and convincing burden of proof when the defendant's 37 month sentence resulted from disputed enhancements that increased his offense level by 11 levels and more than doubled the sentencing range.); *United States v. Jordan*, 256 F.3d 922, 930 (9th Cir. 2001) (finding "it is now settled that when a sentencing factor has an extremely disproportionate impact on the sentence relative to the offense of conviction, Due Process requires that the government prove the facts underlying the enhancement by clear and convincing evidence"). In determining when this heightened proof threshold is required, a district

court must look to the totality of the circumstances, including, but not limited to, oft-cited factors such as whether the cumulative application of the disputed enhancements increases the total offense level by more than four levels, doubles the sentencing range, or would result in a sentence beyond the statutory maximum sentence permitted for a count of conviction. *See, e.g.*, *United States v. Hopper*, 177 F.3d 824, 833 (9th Cir. 1999) (applying clear and convincing evidence standard to 7-level enhancement that increased the defendant's sentencing range from 24-30 months to 63-78 months); *United States v. Riley*, 335 F.3d 919, 925 (9th Cir. 2003) (finding that district court must consider "the combined impact of contested sentencing enhancements"); *Jordan*, 256 F.3d at 928 (finding no one factor is dispositive).

Notably, the Ninth Circuit recently considered the appropriate standard of proof in a case in which the defendants, who had been convicted of bank fraud, wire fraud, and money laundering, disputed a series of sentencing factors under U.S.S.G. § 2B1.1 that included a 20-level loss enhancement and that, if collectively imposed, would have added 22 and 26 offense levels to the defendant's total offense level calculations and further increased by approximately twelve-fold the sentencing range that each defendant faced had only the non-disputed factors been applied. *United States v. Lonich*, 23 F.4th 881, 910-912 (9th Cir. 2022). The Circuit ruled that "the result for defendants here is obvious: the clear and convincing standard must apply." *Id.* at 912.

The result here is equally obvious: the clear and convincing standard must apply to this Court's consideration of the disputed sentencing factors. Mr. Omidi

disputes the 28-level enhancement, under U.S.S.G. § 2B1.1(b)(1)(O), based on a purported intended loss of $354,412,721 (notwithstanding that the offenses of conviction involved jury findings relating to conduct that cumulatively involved just over $150,000 in fraudulent billings), a two-level obstruction enhancement, under U.S.S.G. § 3C1.1, and a four, rather than two, level role enhancement, under U.S.S.G. § 3B1.1. PSR ¶¶ 66, 72-75. The 28-level loss enhancement, standing alone, unquestionably has a "dominant" effect on both Mr. Omidi's offense level calculations and potential sentence, as it increases his total offense level by 18 levels[5] and causes his advisory sentencing range to skyrocket from 70 to 87 months to Life imprisonment. The impact is further magnified when the other disputed factors are considered, as they must be, which increases the overall disputed offense level to 22 levels, or approximately half the total offense level of 45, and if set aside, further decreases the applicable Guidelines range to 46-57 months as opposed to Life imprisonment. *United States v. Parlor*, 2 F.4th 807, 817 (9th Cir. 2021) (analysis requires consideration of the "cumulative effect of the disputed enhancements.") Moreover, application of the clear and convincing standard to the disputed sentencing factors is further compelled based on the fact that the recommended sentence of Life imprisonment dwarfs the statutory maximum sentence of the most serious offenses of conviction, which stand at 20 years' imprisonment. PSR ¶ 138.

---

[5] Under U.S.S.G. § 2B1.1(b)(1)(F), loss of more than $150,000 results in a 10-level enhancement.

Thus, in assessing whether the government has carried its burden as to each of the disputed Guidelines factors, this Court must consider whether the government has proved each enhancement by clear and convincing evidence. The government has not and cannot do so.

### i. Loss Calculation.

#### 1. The PSR Erroneously Utilizes Intended Loss Instead of Actual Loss.

Section 2B1.1 controls the principal offense level calculations for all but the Section 1028A conviction. Its predominant focus is on assessing the "loss" resulting from the offense, which amount, in turn, aligns with a series of escalating offense level enhancements that range from no enhancement for losses under $6,500 to a 30 level enhancement for losses exceeding $550,000,000. U.S.S.G. § 2B1.1(b)(1)(A)-(b)(1)(P). Section 2B1.1 does not define "loss." Application Note 3, however, instructs that "intended loss" (*i.e.*, the pecuniary harm that the defendant purposely sought to inflict) should be used instead of "actual loss" (*i.e.*, the reasonably foreseeable pecuniary harm that resulted from the offense") when it results in a higher loss calculation. U.S.S.G. § 2B1.1 cmt.3. As the government's calculation of intended loss is more than a quarter of a billion dollars higher than its equally erroneous calculation of actual loss ($354,412,521 vs. $71,454,610), the USPO, citing Application Note 3, added a 28-level enhancement to Mr. Omidi's total offense level

based on an intended loss of between $250,000,000 and $550,000,000. PSR ¶ 66. It erred in doing so.

In *Stinson v. United States,* the Supreme Court ruled that the "Guidelines are the equivalent of legislative rules adopted by federal agencies" and found that any accompanying commentary "is akin to an agency's interpretation of its own legislative rules" which should be afforded deference unless the commentary is contrary to, or inconsistent with, the Guidelines text, which remain controlling. 508 U.S. 36, 44-45 (1993). The Supreme Court subsequently clarified that deference to such agency interpretations should only be afforded when the legislative rule itself is truly ambiguous after "all traditional tools of construction" have been exhausted. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019).

Multiple Circuit Courts have recognized that *Kisor* extends to the Sentencing Guidelines and defines the appropriate deference to be afforded Guidelines commentary. *United States v. Nasir*,17 F.4th 459, 469-72 (3rd Cir. 2021) (*en banc*) (applying *Kisor* to U.S.S.G. § 4B1.1, finding commentary extending career offender status to inchoate offenses should be afforded no deference, reversing contrary precedent, and vacating defendant's sentence); *United States v. Adair*, 38 F.4th 341, 349, 354 (3rd Cir. 2022) (finding no deference should be afforded to commentary addressing role enhancements set forth in U.S.S.G. § 3B1.1); *United States v. Campbell*, 22 F.3d 438, 444 (4th Cir. 2022) (same); *United States v. Dupree*, 57 F.4th 1269, 1275-76 (11th Cir. 2023) (expressly finding that *Kisor* clarifies the level of

deference to be afforded Guidelines commentary and joining other circuits in concluding that references to inchoate offenses in U.S.S.G. § 4B1.1's Application Notes should be provided no deference); *cf. United States v. Vargas*, 35 F. 4th 936, 940 (5th Cir. 2022) (*Kisor's* failure to expressly state its application to the Guidelines warrants restraint). This includes whether deference should be afforded to Section 2B1.1's commentary, as set forth in Application Note 3, providing multiple definitions to the text's term "loss." In each instance, the Circuit Court has found that no deference should be applied to Application Note 3, as the term "loss" is unambiguous. *See, e.g., United States v. Riccardi*, 989 F.3d 476, 385-86 (6th Cir. 2021) (applying *Stinson* and *Kisor* to conclude that Application Note 3(F)(i)'s requirement that there be a $500 minimum loss for all access devices directly conflicted with the plain meaning of the term "loss" and therefore, should not be followed).

Two cases are particularly noteworthy. In *United States v. Kirilyuk*, the Ninth Circuit expressly found that it was not bound by prior precedent interpreting Note 3(F)(i)'s 500 minimum loss requirement for credit cards, as the prior decisions did not "squarely address" the specific issue of whether this commentary conflicts with the meaning of loss in Section 2B1.1 as prohibited by *Stinson*. *Kirilyuk*, 29 F.4th 1128, 1134-35 (9th Cir. 2022). It then noted that "loss" was not defined by Section 2B1.1, applied the basic analysis paradigm set forth in *Kisor*, found that Section 3(F)(i)'s expanded the commonly accepted definition of loss, and held that this "expansion of

the meaning of "loss" is "clearly inconsistent with the language of the Guideline and is not binding under *Stinson*."[6] *Id*. at 1137-38. In so finding, the *Kirilyuk* court emphasized "this case [which involved a loss finding that "skyrocketed" by $60,000,000 and added 22 levels to the total offense level of 43] illustrates the egregious problem with the Application Note's expansion of the meaning of 'loss'" and emphasized how the commentary improperly "operated as an enhanced punishment." *Id*. at 1138.

In *United States v. Banks*, the Third Circuit considered the very issue before this Court: whether the term "loss" in Section 2B1.1 could be interpreted to include "intended loss" as instructed by Application Note 3(A)(ii). 55 F.4th 246, 251 (3rd Cir. 2022). After noting that the term "intended loss" only appeared in Section 2B1.1's commentary and examining widely accepted definitions of the term "loss," – including the same sources relied upon by the Ninth Circuit in *Kirilyuk* -- the Third Circuit found that "in the context of a sentence enhancement for basic economic offenses (covered by Section 2B1.1), the ordinary meaning of the word "loss" is the loss the victim actually suffered" and therefore, does not include "intended loss." *Id*. at 258. Echoing the Ninth Circuit, the Third Circuit decried how Application Note 3's

---

[6] As this conflict directly violated *Stinson's* mandate, the Ninth Circuit noted that it did not need to reach the issue of whether it also could have rejected this commentary under *Kisor* deference. *Kirilyuk*, 29 F.4th at 1139.

commentary "expand[ed]  the definition of loss," imposed an improper penalty, and therefore, should not be applied. *Id.*

Consistent with the reasoning and analysis of the *Kirilyuk* and *Banks* Courts, this Court should find error in Application Note 3's undue expansion of the definition of "loss" under Section 2B1.1. Under *Stinson* and *Kisor*, the only acceptable definition of "loss" under Section 2B1.1 is actual loss. S*ee, e.g., Kirilyuk*, 29 F.4th at 1141; *Banks*, 55 F.4th at 262 ("because we find that 'loss' in the context of U.S.S.G. § 2B1.1 is not ambiguous, we will vacate the judgment"). Further, this is not a case where the loss is incalculable. The government had the means to calculate actual loss, but chose not to.

Therefore, the PSR's loss calculation, which applies intended loss, should be set aside. At sentencing, this Court should determine the actual loss proved by the government by clear and convincing evidence when setting Mr. Omidi's loss enhancement under Section 2B1.1(b)(1).[7]

---

[7] Should the Court be reluctant to apply *Kisor* to Application Note 3 absent controlling Circuit authority, it unquestionably still has *Kimbrough* discretion to reject Application Note 3's commentary addressing "intended loss" and to calculate loss based on actual loss. *United States v. Henderson*. 649 F.3d 955, 963-64 (9th Cir. 2011) (district courts may vary from a Guideline provision based on a policy disagreement). Such action would be warranted for the basic reasons set forth in *Kisor*, the absence of empirical data establishing the justification for using intended loss over actual loss when actual loss can be calculated and when intended loss artificially balloons the purported loss to astronomical, wholly unintended, and unrealizable levels. This is particularly true here, where government-created loss methodology and definitions were structured to increase the intended loss calculations by more than a quarter of a billion dollars (more than four times the 60 million dollar added loss the Ninth Circuit decried in *Kirilyuk*.)

19

### 2. The PSR's Loss Calculations Are Based on Fundamentally Flawed and Legally Insufficient Government Loss Calculations.

Evidence in support of a sentencing enhancement must have "sufficient indicia of reliability to support its probable accuracy."  U.S.S.G. § 6A1.3.  Indeed, "a trial court violates a defendant's due process rights by relying upon materially false or unreliable information at sentencing." *United States v. Hanna*, 49 F.3d 572, 577 (9th Cir. 1995). "[I]nformation is deemed false or unreliable if it lacks some minimal indicium of reliability beyond mere allegation." *United States v. Vanderwerfhorst*, 576 F.3d 929, 935–36 (9th Cir. 2009) (quotation marks and citation omitted). Accordingly, the Ninth Circuit regularly has vacated sentences that were based on information or evidence that is uncorroborated and unreliable. *See, e.g.*, *United States v. McGowan*, 668 F.3d 601, 607–08 (9th Cir. 2012) (vacating a sentence when the district court relied on the "completely uncorroborated" statements of an unreliable witness who "presumably provided information to the FBI in the hope of being granted some sort of leniency"); *Hanna*, 49 F.3d at 578 (vacating a role enhancement that was based on "allegations [that were] largely uncorroborated and unreliable" because those allegations "were not only inconsistent with [the defendant's] denials but were unsupported by the other co-defendants' statements, or any other evidence, as well").

The PSR applies a 28-level enhancement based solely on government-retained statistician Michael Petron's trial testimony that the intended loss from the offense

conduct was $354,412,721. PSR ¶ 66. It would be error to apply this enhancement because: (1) it uses intended loss when only actual loss should be considered; and (2) Mr. Petron's findings and testimony cannot serve as the proper basis of a loss calculation because they are inherently unreliable. The unreliability of Mr. Petron's calculations was addressed in detailed pre-trial submissions. (CR 1196, 1288, 1370, 151, 15226.)  It was amplified by Mr. Petron's voir dire testimony setting forth how the Prosecution Team dictated every step of his analysis.[8] And it now effectively has been conceded by the government through: (1) its post-trial abandonment of core premises that were central to Mr. Petron's trial-based calculations and testimony; and (2) its recasting of its methodology in a misguided attempt to salvage its incorrect and grossly overstated loss calculation, so as both to limit the extreme prejudice of misstating loss to a jury by more than $160,000.000 and to continue to artificially

---

[8] This Court declined to hold a *Daubert* hearing and never expressly made a reliability determination regarding Mr. Petron's testimony (CR 1370), instead allowing voir dire which concluded with the Court noting "He was given parameters by Agent Tooma and he did calculations. He didn't create the spreadsheet. He didn't create the columns. He, perhaps, does not know what some of those terms even mean." (RT 5527.) To the extent there was ambiguity before trial, there now is demonstrable evidence establishing this unreliability in the form of: (1) the jury verdict acquitting Dr. Zarrabi of all counts and thereby highlighting the absurdity of Mr. Petron's reliance on a loss category tied to whether the government had found an e-mail reflecting Dr. Zarrabi's approval of a sleep study (which accounted for approximately $143,000,000 in purported loss); and (2) the government's post trial recasting of this loss calculation in which Mr. Petron, at government direction and using the same nomenclature of actual and intended sleep study loss utilized in his earlier reports and trial testimony -- but substituting an entirely new methodology and new inputs – has advanced new loss calculations that materially differ from his sworn testimony before the jury. While the rules of evidence do not apply to sentencing, Mr. Omidi respectfully submits that this Court should now conduct *Daubert*-like assessment as to whether Mr. Petron's testimony and findings are sufficiently reliable such that they can properly be considered at sentencing.

21

prop up the loss figure to secure the highest offense level, and thereby highest sentence, against Mr. Omidi.  (Lally Decl. ¶ 6; Exh. E)  As addressed below, it is furthered established by the detailed findings of billing, insurance, and medical record expert Rebecca Busch, who has identified material deficiencies in the methodology, execution, and conclusions set forth in Mr. Petron's reports and testimony. As Mr. Petron's loss findings are not credible, they fall well short of establishing loss by a preponderance, much less clear and convincing evidence as required here. *United States v. Renick*, 273 F.3d 1009, 1025 (11th Cir. 2001) (government's burden must be established with "reliable and specific evidence.")

The flaws in Mr. Petron's findings are fundamental, numerous, and self-reinforcing. If accepted, they will be life determinative, and so it is necessary to address them individually. However, before doing so, it is essential to acknowledge that the flaws were born of a common cause: in this particular instance, Mr. Petron served not as a traditional expert, but rather as a government front man who ceded all critical analysis to the Prosecution Team and thereby, provided predetermined government loss calculations with unwarranted veneers of legitimacy and independence.[9] Mr. Petron conceded this fact, expressly noting that he: (1) "ma[de]

---

[9] Mr. Petron used a DHS-created statistical software program  to create a valid random sample of 250 patients from the field of 8,109 patients.  However, as he willingly notes in his reports and conceded in his trial testimony, all calculations were based on data provided from the government, applying a government created methodology, using government defined categories of fraud and government populated spreadsheets that categorized and assessed loss amounts, while adhering strictly to government instructions on how to conduct his calculations and what basic

no independent determination of what is or is not medically necessary" or "what constitutes an altered sleep study;" (2) "rel[ied] upon others to determine what sampled items fall into each defined category;" and (3) "rel[ied] on others to determine the amount of intended and/or actual loss associated with each sample unit." (Lally Decl. ¶ 4; Exh. D at 2-3, 6.)

Through trial, Mr. Petron blindly accepted the government's definitional framing of fraud, its prepopulated loss charts, and the accuracy of the information contained within those charts.[10] (TR 5468, 5474-78.) But these inputs were inherently

_____

mathematical equations should be performed as part of these calculations. (TR 5529; Lally Decl. ¶ 7; Exh. F Petron Reports.)

[10] Mr. Petron's testimony at trial demonstrates this principle. *See, e.g.,* TR 5468 ("I have not looked at those source files, and I have not – and I did not, obviously, create this spreadsheet"); TR 5485 ("I have no independent or expert knowledge about what a one-point difference means. . . [and relied on information provided by the Prosecution Team;]" TR 5489 (answering "that is correct" to the question "and you have no understanding of whether an increase in AHI of one point or more is clinically significant"); TR 5490 (after being advised that Dr. Norman had testified that a one level AHI increase was not clinically significant, "I was given the definition that I was given and I conducted any analysis, whether the information changes that, that is something for the government, not me"); TR 5502-03 (when asked to address how many insurers actually received an altered sleep study for patients in his sample, " that was not one of the things I was asked to independently estimate."); TR 5507-08 (I did not go through and try to independently verify the accuracy of the column [addressing sleep study loss] and that he had "no reason to agree or disagree" with the evidence presented to him during his testimony that there were only 8 patients who had altered AHI reports sent to an insurance company"); TR 5511 ("Again, just like the previous questions around the [sleep study] loss, I believe these three things were encapsulated into one particular column that I was instructed to use. I used that column."); TR 5510 ("Again, I don't know about e-mail feedback. I'm merely parroting the instructional memo I received."); TR 5552 ("Everything I've done is based upon the information I received from the government. I mean, I received a spreadsheet from the government. I received a very detailed instruction from how to use it."); TR 5521 (deflecting a question addressing his knowledge of the accuracy of the loss spreadsheets, by noting "I would ask Special Agent Tooma, who created this, what is meant by those three categories . . . [and conceding that] I don't know if these columns are represented on the spreadsheet"); TR 5524: (when asked if he "relied entirely on what agent Tooma put in that column labeled SS Billed," stating "I would say, even further, I relied on the instructional document I was given about how to use the column SS Billed."); TR 5525 (I don't know about what created the positive value or not. I was instructed to use the values

flawed, thereby ensuring the inaccuracy of Mr. Petron's report findings and his trial testimony. Post trial, Mr. Petron again uncritically executed new government instructions to recalculate the purported actual and intended loss for the sleep study-based fraud. This involved a wholesale abandonment of the methodology that Mr. Petron previously employed as the basis of his loss calculations that were central to his sworn testimony before the jury regarding the actual and intended loss addressing "altered sleep studies". (CR 1801; recognizing that Mr. Petron "supplemented his analysis" in a manner that reduced the intended sleep study loss from $160,953,725 to $116,673,103 ($44,280,622 or 25%))."[11] In fact, the report plainly shows that there was no analysis involved. Instead, as will be addressed further below, Mr. Petron simply executed the precise government-provided directions to arrive at yet another set of pre-determined loss figures manufactured by the government to ensure "Mr. Omidi [was] still comfortably within the same $250,000,000 to $500,000,000 loss range."

---

that were highlighted in yellow."); TR 5507 (USAO: "[Mr. Petron's] report quite clearly says that he basically looked at a highlighted yellow category that indicated that those – one of those three categories (altered sleep study sent to insurance, no Zarrabi e-mail, and titration study after normal PSG) had been met. TR5527 (USAO: "At this point, the government would stipulate that [Mr. Petron] relied on the column that he named when it was highlighted yellow to come to his determination.").

[11] Completely absent from government counsel's explanation is any recognition that Mr. Petron testified falsely before the jury when, on government questioning regarding the intended loss for the altered sleep studies, he stated that the amount of intended loss was $160,953,725 and that to a 95% confidence rate (which the jury was advised reflected high reliability ["the smaller the confidence interval, the more reliable the estimate"]) "we're extremely confident that $149,000,000 is the bottom. . . "the most conservative number" to use for the "amounts billed." TR 8128-31.

Mr. Petron's new "loss" calculations suffer from the same core flaw that undermined the credibility of his prior calculations, namely, that he merely is providing veneers of legitimacy and independence to pre-determined government loss calculations that are inherently unreliable.[12] And should Mr. Petron testify to these new calculations at sentencing, his testimony will be as fundamentally unreliable and as demonstrably false as was his testimony before the jury in this case.[13]

While statistical extrapolation of the type Mr. Petron conducted can be validly applied in the loss context, it is dependent on having a sound foundational methodology, accurate inputs, and internal consistency in execution. If either of the first two conditions are absent, the result will exemplify the maxim "garbage in, garbage out." *United States v. Burgess*, 691 F.2d 1146, 1155 (4th Cir. 1982). If the third condition is absent, calculation errors arise.  All three conditions are absent to fatal degrees in Mr. Petron's trial report and testimony, and his post trial report based on a materially revised methodology.  Each independently establishes the unreliability and inaccuracy of Mr. Petron's loss findings. When viewed together, they establish unequivocally that Mr. Petron's findings and testimony cannot properly serve as the

---

[12] This fact is further demonstrated in the government's sentencing position paper for cooperating defendant Hong, where the government independently conducts the same basic series of calculations as it instructed Mr. Petron to do to determine the intended and actual loss it sought to ascribe to Mr. Hong. (Lally Decl. ⁋ 6; CR 64 at 3-4.)

[13] It is not Mr. Omidi's claim that Mr. Petron intentionally lied at trial; rather that his lack of critical analysis accompanied by his use of deeply flawed instructions, definitions, and methodology resulted in the presentation of false testimony before the jury.

basis through which the government can establish loss by any standard, much less clear and convincing evidence.

There are established healthcare industrywide practices for identifying fraud and accurately assessing loss in the healthcare context when alleged fraud arises from the performance of medically unnecessary procedures to secure insurance proceeds. These practices are utilized by insurance companies and medical auditors on a daily basis to review patient populations that are far greater than the 8,109 patients involved here. Rather than implement an accepted methodology and/or utilize medically sound definitions and thresholds, the government created a case specific methodology that served one purpose: to maximize loss. While superficially successful in achieving this end, careful analysis of the methodology, definitions, and instructions reveal how structurally flawed each is and how brazenly unreliable and unsupported the government's loss calculations are.

> ### a.   Mr. Petron's loss calculations are decoupled from the charged insurance fraud.

Remarkably, in an insurance fraud case, the government designed methodology and defined loss factors do not require any proof that an insurance company actually was defrauded before assigning over $300,000,000 dollars in loss to Mr. Omidi. Specifically, the government-created methodology has no requirement that an insurance company actually received the document(s) that purportedly constitute the

fraudulent submission, much less factored any such submission into its authorization or approval processes.

Mr. Petron's loss calculations include three separate, government created and government defined loss categories: (1) Altered Sleep Study Loss; (2) Lap-Band Loss; and (3) CPAP DME Loss. To qualify as a loss for an "altered sleep study," the government, post trial, altered its methodology so that all that is needed is that the government has identified a sleep study with at least a one-point positive change in AHI that resulted in a changed in AHI category or a titration study after what the government defined as a normal PSG study. While additional deficiencies in this methodology and definition will be addressed below, the critical point here is that there is no requirement an insurance company was ever presented with the purported "altered" PSG or titration study. Based on this  criteria, the government, through Mr. Petron, attributes $105,186,283 in intended loss and $12,453,756 in actual loss (only 12% of the intended loss) to Mr. Omidi. To qualify for Lap-Band loss, the only requirement is that the patient had a government-defined altered sleep study and later had Lap-Band surgery.  Importantly, there is no requirement that the "altered sleep study" was received by, or factored into, either the Lap-Band approval or claims process (or in any way altered medical necessity, as will be discussed below). Based on this single criteria, the government, through Mr. Petron, attributes a staggering $175,909,247 in intended loss and $41,177,770 in actual loss (only 23% of the intended loss) to Mr. Omidi. Lastly, to qualify for CPAP DME Loss, the singular

27

requirement is that the CPAP provider (but not the insurance company) have received what the government defined as an altered sleep study that was used to secure a CPAP device for which a wholly unrelated third party entity separately billed insurance. Based on this criteria, the government, through Mr. Petron, has attributed $17,549,749 in intended loss and $5,964,409 in actual loss (only 34% of the intended loss) to Mr. Omidi.

The absence of any causal connection creates a chasm in this methodology that is as deep and wide as the Grand Canyon. At trial, the government sought to gloss over this deficiency, by claiming that it had presented evidence of such conduct through select witnesses and exhibits. However, this argument completely misses the entire premise of the statistical modeling that the government was advancing through Mr. Petron: by using statistical modeling, the government sidestepped the burden of presenting similar evidence to establish each instance of fraud and instead relied upon extrapolation from a statistically valid random sample to establish the presence of an event – in this case, loss from designated categories of wire fraud-based insurance fraud – within the entire population. By establishing a methodology that failed to incorporate the critical requirement that altered sleep studies have been presented to the insurance company – much less presented in such a way that they were material to the charged scheme to deceive and cheat the insurance company – the government utilized statistical modeling to generate approximately $310,000,000 in intended loss and approximately $61,000,000 in actual loss that is wholly untethered to actual wire

fraud-based insurance fraud. It is this "loss" that currently fuels both the 28-level enhancement and the Guidelines recommendation of life imprisonment.

Closer inspection of the underlying data reveals why the government created a methodology that lacks the generally accepted practice of ensuring that the insurer was presented with the fraudulent materials. In Petron's Third Supplemental Expert Report, the government's methodology for calculating the category of Altered Sleep Study Loss included as one of three contributing factors the requirement that an "altered sleep study" have been received by an insurance company. (Lally Decl. ¶ 9; Exh. I). At trial, Mr. Petron was forced to acknowledge that there were only eight patients, or just 3% of the entire patient population, for whom the government had evidence that an altered sleep study had actually been presented to an insurance company. (TR 5507-08.) When extrapolated to the entire population of 8,109 patients, there would only be 260 patients total for whom an insurance company received a copy of an "altered sleep study." Post trial, the government recast its methodology for calculating this loss category and jettisoned this requirement, removing the one slight connection that arguably tied Mr. Petron's statistical modeling to the wire fraud scheme charged in the FSI. (Lally Decl. ¶ 9; Exh. I.)

Ms. Busch's analysis of claims data provided by insurance companies post trial has confirmed that the methodology's failure to capture proof that the "altered sleep study" was received by an insurance company and factored into the insurer's payment resulted in: (1) instances in which the government included patients in loss

29

calculations when the insurer's claims data plainly shows that sleep apnea was not among the comorbidities identified by the insurance company in support of its payment; and (2) Mr. Petron exponentially overstated the actual and intended loss associated with that event.[14] (Lally Decl. ⁋ 4; Exh. D at 2.) The impact of this error was further magnified by the use of statistical sampling, which multiplied the loss for each patient by a factor of 32.4.  Ms. Busch identified two patients from the claims data who were included in Mr. Petron's sampling. Instead of what should have been a loss of zero, Mr. Petron assigned an intended loss of $345,000,000 and an actual loss of $70,000,000. (*Id.* at 9-10.) The actual amount of the overstatement is almost certainly exponentially higher, as there was only limited cross-over between the claims data provided and the patients utilized for Mr. Petron's sample. Therefore, while the methodological error has been identified, the full extent of the overcalculation is not currently known.

**b.      Mr. Petron's Loss Calculations Are Anchored to an Invalid Legal Theory.**

While untethered to actual evidence that an insurance company was defrauded, Mr. Petron's loss calculation and testimony are founded upon an invalid legal theory, namely, that a business is entitled to accurate information so that it can properly make informed business determinations. The Ninth Circuit, following a government

---

[14] Ms. Busch also identified that precertification was not required in approximately 166 of the Lap-Band procedures identified, which further undercut a principal government trial theory that the initial sleep studies were conducted to manufacture comorbidities to be used to secure Lap-Band precertification.  (Lally Decl. ⁋ 4; Exh. D at 13.)

concession of error, recently held that there is "no cognizable property interest in 'the ethereal right to accurate information'" and therefore, "the accurate-information theory is legally insufficient" basis for a fraud conviction."[15] *United States v. Yates*, 16 F. 4th 256, 265 (9th Cir. 2021).  In *Ciminelli v. United States*, a wire fraud case currently pending before the Supreme Court, the government reinforced its concession in *Yates* with an even broader concession that the Second Circuit's "right to control" wire fraud theory (*i.e.*, a  business' right to control the disposition of its assets through accurate information) was "overbroad" and "without further limitation . . . would expand property fraud beyond its definition at common law and as Congress would have understood it." 2022 WL 10224977, at *12 (October 12, 2022). In fact, the Solicitor General's Office, in a desperate attempt to preserve the defendant's convictions and DOJ's historically unchecked use of this theory, conceded that the theory lowered prosecutor's proof obligations but represented that a narrow application of the theory to the fraudulent inducement context could remain viable if several conditions were satisfied, including a "demanding and rigorous" materiality standard, where a misrepresentation that "did not disturb the core of the bargain likely would be immaterial," (*id*. at *44) and by ensuring that the wire fraud statute's "by means of" requirement was established not through "but for caus[ation]" but rather

---

[15] *Yates* involved application of this theory to the bank fraud statute, 18 U.S.C. § 1349. *Yates*, 16 F.4th at 263. It is well established that the parallel language between the mail, wire and bank fraud statutes should be interpreted the same. *Neder v. United States*, 527 U.S. 1, 20, 23-25 (1999).

by "demand[ing] that the defendant's false statement is the mechanism naturally inducing a [victim] to part with its money." *Id.* at *43-44. Notably, when addressing the appropriate materiality standard, the Solicitor General Office's cited to the Supreme Court's prior finding that "a misrepresentation is material if it 'went to the very essence of the bargain'"[16] and further explained that "a misrepresentation that is of 'too frivolous a nature or too small a thing [] will not be sufficient." *Id.* (citing *Universal Health Services, Inc. v. United States*, 579 U.S. 176, 193 n.5).

The Justices expressed deep skepticism towards the government's position that the theory could, or should, be limited in this manner. Justice Thomas confirmed that the government was "abandoning the Second Circuit's control theory." (Lally Decl. ¶ 10; Exh. J at 33.) Justice Gorsuch marveled at the "radical agreement that the Second Circuit misinterpreted the law." *Id.* at 41. Responding to the Solicitor General Office's

---

[16] Throughout these proceedings, Mr. Omidi repeatedly argued for a nearly identical rigorous standard for materiality, asserting in briefing and proposed jury instructions that the material falsity needed to be "an essential element of the bargain." (CR 1188; 1365.) Mr. Omidi also repeatedly opposed the government's constant interjection of the term "material" into questioning addressing even *de minimis* acts. (TR 919.)  Mr. Omidi's objections were opposed by the government, which relied on a theory of fraud that the Ninth Circuit had previously rejected (*i.e.*, *United States v. Woods*, 335 F.3d 993 (9th Cir. 2003): a scheme to defraud could be established through evidence of a scheme to deceive; when controlling precedent, *United States v. Miller*, 953 F.3d 1095 (9th Cir. 2020), requires evidence of both a scheme to deceive and cheat) and case law, including a Second Circuit right to control case (*United States v. Davis*, 2017 WL 3328240 (S.D.N.Y. Aug. 3, 2017). (CR 1312 at 5, 9.)  This Court denied Mr. Omidi's motions, objections, and his proposed jury instruction on materiality. (CR 1370.) Operating within the void it fought to create, the government introduced evidence of "materiality" that fell well outside the scope of *Yates*, 16 F.4th at 256, and the rigorous standard the Solicitor General's Office in *Ciminelli* stated would be necessary to allow for a valid application of the right to control theory. *See, e.g.*, TR 1842(Q: "And no matter how small this misrepresentation, would that have affected Aetna's decision whether to approve a claim or not? A: Yes. Q: At a minimum, would that have caused Aetna to go back and scrutinize the claims that were submitted from this provider? A: Yes.")

concession that the right to control theory lowered the government's burden, Justice

Kavanaugh extorted that it was "very problematic' that it required "the bright light of

this Court, for the government to then say, actually, you know, the theory doesn't hold

up" after "pushing this theory all those years." (*Id*. at 62.) Justice Barrett noted that

the theory conflates multiple elements of the fraud statute, causing them to collapse

into one another. (*Id*. at 67.) Justice Sotamayor noted that she "totally remain[ed]

confused" about how the theory could remain viable in light of the government's

concessions. (*Id*. at 51.)

Regardless of whether the *Ciminelli* Court totally invalidates or significantly

limits the right to control theory, the record plainly establishes that the government

pursued through the FSI[17], insurer trial testimony[18], and Mr. Petron's loss testimony

a version of this theory that is impermissible under both *Yates* and the narrow

limitation of the right to control theory proposed by the Solicitor General.[19] As

---

[17] Paragraphs 33 to 36 of the FSI set forth the invalid accurate information theory that, as to sleep study and DME claims and Lap-Band pre-authorization approval requests, had TriCare and the insurance companies known particular facts (which extend beyond the fraudulent submission of documents to include how employees were compensated and questions related to medical authorizations), they "might have denied the claims or subjected them to additional scrutiny" or "might not have approved Lap-Band surgery or paid claims submitted for Lap-Band surgery and related services for that patient, or they might have subjected the pre-authorization request to additional scrutiny."

[18] *See, e.g.*, RT 1203-04 (Anthem: "If I put inaccurate information here, that calls into question accurate information on the other parts of the document she was providing me, and it would elicit a more thorough review of what's going on so that we can ascertain the veracity of it." TR 1760 (Aetna: "[Accurate information is important] because you want an accurate representation of the clinical picture for the member so that we can make the best decision for that member, and if we are not given true, accurate information, we may make the wrong decision.")

[19] It is axiomatic that the Solicitor General's litigation position before the Supreme Court constitutes the litigation position of the entire United States government.

addressed above, Mr. Petron's testimony and reports on loss do not account for whether an insurance carrier has been induced to act based on the presentation to it of fraudulent information; instead, the loss determinations only require that false information – as defined by the government – exists within a record. Moreover, the government repeatedly argued that Mr. Petron's testimony was admissible as to the element of materiality in that it showed the extent to which sleep study documents had been altered – an economically valuable fact that the government's asserts insurance companies likely would have factored into their decisional processes had they known of it (CR 1288 at 10 "as alleged, if the insurance company had known it was receiving false information, such as a fabricated sleep study, that may have caused it to deny approval or reject the claim, or at a minimum, subject it to greater scrutiny since it would raise significant questions about the credibility of the other information provided. ("FSI 34-36"); CR 1522 at 5-6; "Had the insurance companies known of these false statements, that would have been material to their approval and payment decisions. Petron's ability to illustrate the volume of reports that were fabricated provides evidence of the breadth of the scheme to defraud insurers, irrespective of the accuracy of Michael Zarrabi's initial reports."[20]).   Therefore, in

---

[20] This last clause is a tacit admission that Mr. Petron's testimony was advanced in furtherance of this theory. Through it, the government acknowledged that even if Mr. Omidi's arguments challenging the authenticity and accuracy of the Michael Zarrabi sleep study evidence was true, the scope of alterations addressed through Mr. Petron's testimony would be the type of information that insurers would want as part of their decisional process.

34

both substance and as applied, Mr. Petron's loss calculations are decoupled from traditional principles of wire fraud and instead tied directly to the insurer's right to make an informed business decision based on accurate information, even if that decision is to do nothing. This falls squarely within the accurate information theory that the Ninth Circuit held invalid in *Yates* and that the United States, through the Office of the Solicitor General, conceded to be invalid in *Ciminelli*. The government, therefore, cannot properly continue to advance this loss theory, which extends to every count of conviction, *and* at sentencing. (*United States v. Geozos*, 870 F.3d 890, 895–96 (9th Cir. 2017) (same as in a conviction at trial, in the sentencing context it is constitutionally impermissible to sentence a defendant if the general verdict "*may have*" rested on an invalid theory, and concluding "[w]e are persuaded that a rule analogous to the Stromberg principle should apply in the sentencing.").

Even if the Court were to find that Mr. Petron's testimony was based on a valid legal theory, it still should disallow all loss calculations arising from the government's application of the accurate information theory because, as framed in this case and as presented to the jury, it is far too speculative to support a loss finding. The FSI notes that if the insurers had the benefit of fully accurate information, they "might have denied the claims or subjected them to additional scrutiny." At trial, the government, often using hypothetical questions, elicited testimony from the insurance company representatives consistent with this position: had a particular insurance company known that it had been provided with false or fraudulent information, the insurance

35

company <u>may</u> have subjected the claim to greater scrutiny, <u>may</u> have denied the claim, or <u>may</u> have still elected to pay the claim.[21] (TR 992.) For example, the Anthem representative testified that Anthem would pay for a Lap-Band surgery where such surgery was medically necessary even if false information regarding a comorbidity was included as part of the application but that information regarding the falsity would be important "because it would lay the foundation for other claims that come to us, and raise questions about what's happening in other places." (TR 1000.) Similarly, the United Healthcare representative testified that the insurer would `"decouple" claims that contained inaccurate information and pay the remainder, while allowing the service provider to present a corrected claim, (TR 1345), while the Aetna representative testified that it would pay for medically necessary procedures. RT 1815, but also that "false information … would that have affected Aetna's decision to approve those claims." (TR 1760.) Speculative testimony that covers the full range of potential outcomes cannot be the basis of a loss finding -- much less one that artificially elevates the loss to more than $300,000,000 dollars.

---

[21] The government could have called medical professionals to identify procedures that would have been disallowed due to a lack of medical necessity or claims administrators to address particular claims.  It chose not to do so, proceeding instead with insurance company fraud investigators who were uninvolved in the claims administration process who generally answered hypotheticals about this process. It, likewise, it produced virtually no insurance plans, making it essentially impossible to definitely state whether, and under what circumstances, a procedure would be covered and approved. (*See, e.g.*, TR 1070-71, 3272.)

### c. Mr. Petron's Loss Calculations Are Decoupled from Medical Necessity Considerations.

Despite the fact that its principal theory of fraud centered on the claim that Messrs. Omidi, Klasky, and Hong intentionally altered sleep studies to provide patients who would not independently qualify for Lap Band surgery with a qualifying comorbidity – namely, sleep apnea –that then would elevate these patients to eligibility for the surgery. The government-created methodology gave no consideration to whether the patient qualified for Lap-Band surgery independently of any sleep apnea diagnosis. This is a particularly significant omission as accurate calculations of loss must exclude medically necessary procedures and the medical records establish that the Lap Band surgeries and the overwhelming majority of sleep studies were medically necessary. *United States v. Rutgard*, 116 F.3d 1270, 1294 (9th Cir. 1997); *United States v. Vivit*, 214 F.3d 908, 915 (7th Cir. 2000).

Trial evidence established that FDA guidelines hold that a Lap-Band procedure would be deemed medically necessary for all patients with a BMI of 40, as well as those patients with a BMI of 30 to 40 and a qualifying comorbidity, including, but not limited to, sleep apnea.  Mr. Petron's 250 patient sample was reportedly selected to be a statistically valid random sampling of the patient population who received sleep studies, Lap-Band surgery and/or CPAP DME from medical facilities connected to Mr. Omidi.  Ms. Busch's review of the patient records for this sample as well as the 28 patients named in the FSI strikingly revealed that: (1) 150, or 60%, of the patients

from the Petron sample, and 16, or 57%, of FSI named  patients had a BMI over 40,

and therefore automatically qualified for Lap Band surgery without the presence of

any comorbidity; (2) an additional 81, or 32%, of the Petron sample, and 8, or 29%,

of the FSI named patients had a BMI over 35 with multiple qualifying comorbidities;

and (3) the remainder for whom adequate data exists had BMI's over 30 with

qualifying comorbidities other than sleep apnea. Similarly, Dr. Atul Madan, a bariatric

surgeon, testified that he implemented a business-wide protocol instructing that all

potential Lap-Band patients receive a sleep study as such studies were medically

necessary to identify issues that may arise when the patient underwent general

anesthesia, to assess whether or not a patient had sleep apnea, and to determine

whether the patient had medical problem related to obesity.[22]*  (TR at 2900:4-25;

3015:11-12, 3038:18-21.) Therefore, these procedures also were medically necessary.

Lally Decl. (Lally Decl. ¶ 4; Exh. 4 at 2.)

While Mr. Petron was careful to note that his findings did not incorporate

medical necessity determinations, his sample fully was comprised of individuals for

whom Lap-Band surgery was a medical necessary and appropriate procedure. (*Id.* at

9-10.) The same holds true for the overwhelming majority of sleep studies. (*Id.*) Under

Ninth Circuit law, there should be no loss associated with these individuals and they,

---

[22] Dr. Atul testified without immunity and no evidence supported his involvement in the charged criminal conduct. The government did not present any medical witness who contradicted Dr. Atul's testimony regarding the medical necessity of the sleep studies in these instances or who disputed the legitimacy of Dr. Atul's protocol.

therefore, never should have been included in Mr. Petron's loss calculations.  Had this been done, Mr. Petron's loss calculations for Lap-Band surgery would decrease by $0 and his loss for "altered sleep studies" would have dropped to 0.[23]

### d.    Mr. Petron's Current Loss Calculations Are Based On a Methodology That the Government Jerry-rigged Post Trial.

Even more troublingly, Mr. Petron's loss calculations, and the methodology on which they are based, continue to be recast to ensure that a maximum loss figure and sentencing penalty can be imposed against Mr. Omidi. At trial, the government's loss category of Altered Sleep Study Loss was comprised of three subcomponents: (1) an "altered sleep study" that had been received by an insurance company; (2) the absence of an approval e-mail from Dr. Zarrabi, which the government equated to a fraudulent sleep study; and (3) a titration study after what the government identified as a normal PSG. (TR 5699, 5783-84.) The lack of Dr. Zarrabi e-mails represented the overwhelming contributing factor (approximately $143,000,000) to what Mr. Petron testified was $160,953,725 in intended loss. There was extensive litigation regarding whether this loss category and particularly, the lack of Dr. Zarrabi e-mails could serve as reliable evidence of loss. The government, which created this loss category based not on medically accepted practices or protocols, but rather because it aligned with its theory of liability against Dr. Zarrabi, insisted that it was credible proxy for whether

---

[23] Again, this was highly prejudicial information presented to the jury by the government, which bore the responsibility of determining medical necessity.

Dr. Zarrabi fraudulently had participated in the sleep study fraud. (CR 1522 at 5.) The government, however, had a complete failure of proof as to Dr. Zarrabi, who was acquitted on all counts. (CR 1579.)

Rather than set this loss category aside, the government on October 26, 2022 – more than ten months after Mr. Petron presented his loss calculations as purported evidence of Mr. Omidi's knowledge and intent in sworn testimony before the jury[24], and six months after the originally scheduled date for Mr. Omidi's sentencing – submitted a third supplemental expert report authored by Mr. Petron. (Lally Decl. ¶ 9; Exh. I.) Beyond timing, this report is exceptional in what it did and did not say and what it did to manufacture anew more than $100,000,000 in loss to be used against Mr. Omidi at sentencing.

As to what it did say: Mr. Petron's post trial report included new calculations of loss for the "altered sleep studies" that found the intended loss to be $116,673,103 – or 44,280,622 (25%) less than the $160,953,725 he testified to at trial – and the actual loss to be $12,453,756 – or $11,859,075 (49%) less than the $24,312,831 that he testified was the actual loss at trial. (Lally Decl. ¶ 9; Exh. I.) As with his prior reports, Mr. Petron's report reflected the exercise of no independent judgment, as he simply executed government directed instructions to perform basic mathematical calculations, which included excising from his calculations of loss 11 patients who

---

[24] Mr. Petron served as the final witness in the government's case-in-chief.

were simply listed by name.[25] Mr. Petron's report further states that "all other aspects of my reports remain unchanged." (*Id*.)

What it did not say: a lot, a whole lot. While Mr. Petron's post trial report notes the instruction to remove 11 names from his calculations, it did not say why. Further inquiry revealed that these individuals were removed because, while they technically met the government's definition of having an "altered sleep study," the alternation did not impact the AHI category.[26] Moreover, Mr. Petron's report makes no express mention of the fact that the government completely changed the methodology used to calculate losses purportedly attributable to "altered sleep studies," discarding two of the three pillars of its prior methodology, namely, the requirements that (1) an "altered sleep study" had been received by an insurance company and (2) the absence of an e-mail from Dr. Zarrabi equated to a fraudulent sleep study. [27]  As noted above, the absence of a Dr. Zarrabi e-mail alone equated to almost the entire prior loss calculations for this loss category, approximately $143,000.000, or 40% of the entire intended loss amount testified to by Mr. Petron. Moreover, by removing the requirement that an insurance company received an "altered sleep study" to the mere

---

[25] As Ms. Busch notes, there were patients in this grouping that had Lap-Band surgery but the government failed to instruct Mr. Petron to remove these individuals from his Lap Band analysis, which therefore was overstated by millions.

[26] Mr. Omidi argued pre-trial that these individuals could not be included in any loss calculations. The government insisted otherwise and presented loss calculations including this information before the jury. (CR 1288 at 9.)

[27] The fact that the government abandoned this theory post trial is irrelevant. The fact that it was ever included provides compelling proof of the unreliability of both the government-created methodology and Mr. Petron's loss calculations based on that methodology.

existence of an altered sleep study, the government dramatically altered its methodology so that this sub-component increased from 8 to 145 patients, or from 3 % to 58% of the entire sample, which in turn, allowed for a massive increase in the loss figures attributable to this group when extrapolated across the population.[28] Had the former requirement been used, the intended loss from this category would have been few million dollars.  Under the new methodology, it was over $100,000,000.

The government has downplayed the changed methodology, noting that Mr. Petron's new loss calculations keep Mr. Omidi "comfortably" within the same loss category that he would have been based on Mr. Petron inaccurate trial testimony. Simply stated, the government's surreptitious switcheroo of its loss methodology shows how unfounded and unreliable this methodology and Mr. Petron's calculations are.  This alone should be sufficient for this Court to conclude that Mr. Petron's calculations should not be credited at sentencing.

> e.      **Mr. Petron's Loss Calculations Conflict with the Government's Evidence.**

As it freely recasts methodologies to maximize loss, the government also steadfastly ignored evidence that it affirmatively presented at trial that demonstrate how unreliable its self-created methodology is. Most notably, the foundational

---

[28] While Mr. Petron's third supplemental report noted that he had been asked to use the column (AC) that contained all "altered sleep studies" when calculating loss amounts that excluded the 11 patients identified in his report, it was unclear that this represented a material change from the trial methodology, as that methodology also incorporated this column into an initial step of the calculus. (Lally Decl. ¶ 8-9; Exh. H, Exh. J.)

cornerstone of all of the government's loss calculations is its definition of "altered sleep study," as it factors into every single loss calculation across each loss category. For trial and for purposes of Mr. Petron's calculations, the government defined the term "altered sleep study" as any study for which a patient's AHI score deviated by at least one point from one version of the report to another. This one point threshold is not recognized in medical literature or practice but rather was created by the Prosecution Team.[29] Importantly, it's unreliability was expressly identified by the government's own sleep study expert, Dr. Daniel Norman, who testified that a 1.0 variance in AHI score was not a valid metric for measuring a clinically significant difference: "No, and I don't think any reasonable sleep physician would [because] such a fine difference is not clinically significant."[30] (TR 266.) Despite this fact, the Prosecution Team stubbornly continues to advance a "no[n] clinically significant" threshold that "no reasonable sleep physician" would rely upon as the cornerstone of

---

[29] As established at trial, however, AHI scores are grouped by severity of the patient's OSA:  an AHI score of between 15 to 30 constitutes "moderate" OSA and a score of 30 or greater qualifies for "severe" OSA.

[30] Beyond being a non-clinically significant factor, this formulation was highly problematic as Michael Zarrabi had significant mental health issues and admitted to the government that he often fabricated study results. (TR. 5236-5237.) Mr. Zarrabi was never called as a witness to authenticate the sleep studies or to testify to what extent he had altered these studies for reasons unrelated to the charged fraud scheme. Mr. Omidi incorporates the extensive briefing and argument on this issue, but emphasizes this is yet another basis on which this definition – which is incorporated into every loss calculation – is inherently flawed and unreliable. In addition, only physician-interpreted reports of Dr. Zarrabi are legal medical reports, *not* the draft reports of technician Michael Zarrabi. Despite being notified the Dr. Zarrabi reports were on an FTP site for over 5 years, the government never retrieved them. Thus, it cannot be determined whether the sleep apnea severity alterations in the "altered" reports are from proper corrections by Dr. Zarrabi.

loss calculations that attribute more than $310,000,000 in intended loss and $61,000,000 in actual loss to Mr. Omidi.

Similarly, the government's two cooperating defendants, Klasky and Hong, testified that the criminal scheme consisted of altering sleep studies to create co-morbidities for patients *who otherwise would not have qualified for Lap-Band surgery*. While sleep studies were altered in multiple directions for reasons unexplained by the cooperators[31], the fraud was limited to the narrow class of patients who needed external assistance to meet insurance eligibility thresholds. Despite an extraordinary number of pretrial communications with these witnesses, the government did not then, and still has not now, adjusted its methodology to limit consideration to those patients and procedures falling within the scope of the scheme as set by the participants in that scheme.

Additionally, the government had Mr. Petron count as "altered sleep studies" for loss purposes any sleep study that met the government's definition even if the patient independently qualified for Lap Band surgery or never pursued such surgery under the theory that medically unnecessary testing was performed to hunt for a qualifying comorbidity. This theory was directly undercut by its own witness, Dr. Madan, whose testimony clearly explained the policy that *he* implemented requiring that sleep studies be conducted for all patients, and the multiple medically recognized

---

[31] Mr. Hong testified repeatedly that there was no "reason for anyone to manipulate anything with regard to a sleep study " for a patient with a BMI 40 or higher. (TR 4072, 4249.)

reasons for this policy. (TR 2900; 3015, 3038.) Similarly, the government's definition also includes medically necessary and medically authorized sleep studies that occurred *after the sleep studies themselves were performed,* which is illogical. As the insurance company representatives the government called as trial witnesses acknowledged, the companies pay for medically necessary sleep studies *regardless of what the results of those studies are.* (TR 1815:1-7.) The result of the test and whether a particular test may have been altered for a distinct and separate purpose is wholly independent of the insurance companies obligation to pay for the test itself. And given that Dr. Madan testified that he instituted a companywide policy in 2010 advising physicians as to the medical need for uniformly conducting sleep studies, the studies themselves were medically necessary and medically authorized procedures not subject to be counted for purposes of loss.

### f.   Mr. Petron's Loss Calculations Were Internally Inconsistent.

Mr. Petron, after discovering that only seven Dr. Zarrabi e-mails were found across the 250 patient sample, advised the Prosecution Team that "due to the small number of sample units that fit the criteria, I have recommended not to extrapolate this category." (Lally Decl. ¶ 8; Exh. H at 2-3.) Mr. Petron reaffirmed this finding during his voir dire and the government cited this fact in support of Mr. Petron's independence and reliability. (TR 5426.) Mr. Petron's trial calculations of actual loss and intended loss for the "altered sleep studies," however, *did extrapolate* this

45

category. Specifically, utilizing a prepopulated spreadsheet that combined three categories of government defined fraud: (1) altered sleep study that had been sent to an insurer; (2) titration study after normal PSG; and (3) no Zarrabi e-mail feedback, Mr. Petron extrapolated the entire amount to $160,000,000 of loss, of which approximately $143,000,000 was based on the extrapolation of the loss tied to the lack of Dr. Zarrabi's e-mails. Mr. Petron testified that he adhered to instructions to calculate loss figures from prepopulated columns and simply looked for predesignated highlighted markings to identify which loss figures to include.  By not critically analyzing what he was asked to do, Mr. Petron extrapolated a factor that he said should not have been extrapolated and that factor accounted for almost the entirety of the Altered Sleep Study Loss and 40% of the cumulative intended loss to which Mr. Petron testified at trial. In addition, Ms. Busch has identified multiple other instances of double counting based on structural flaws in the methodology, which further overstate the loss amount.  (Lally Decl. ⁋ 4; Exh. D at 2-3.)

> **g.    Mr. Petron's Loss Calculations Were Designed to Capture Fees Paid on Unrelated Medically Necessary Procedures And Otherwise Overstates Loss.**

At the instruction of the Prosecution Team, the loss charts prepared for, and relied upon by,  Mr. Petron included within loss all fees sought for medical services, included unrelated procedures that were conducted during the course of a Lap-Band surgery. (Lally Decl. ⁋ 6; Exh. 5 at 2-3.) As such, these figures necessarily inflate the

amount of actual and intended loss from the fraud, which then is compounded by a magnitude of 32.4 to extrapolate to the entire 8,109 patient population. Notably, Ms. Busch's review of medical records for approximately three dozen patients from the Petron sample reflected that the government's methodology incorrectly inflated amounts billed by approximately 15% and the amounts paid by 5%. As there is no basis to claim that these additional procedures were not medically necessary, there likewise is no basis to include them in sentencing-based loss calculations. (Lally Decl. ¶ 4; Exh. D at 2-3.)

Recent claims data provided by Anthem show marked differences between the amount the insurance company identifies as the amount billed and paid when compared to the data contained in the government's loss charts, with the government repeatedly overstating loss. As set forth by Ms. Busch, the government claimed billed amounts that were tens of thousands – and in one instance $104,000 – higher than set forth in the Anthem claims data.  (*Id.* at 34.) Similarly, the government's assessment of the amounts paid by Anthem (*i.e.*, its claimed actual loss) regularly exceeded the amount set forth in Anthem's claims data by thousands to tens of thousands of dollars. A near identical scenario, although involving lesser amounts, was found during Ms. Busch's comparison of Aetna's CPAP billing data with that for patients on the government's loss charts.  (*Id*. at 34.) These significant discrepancies raise yet more concerns regarding the fundamental reliability of the government's loss methodology and Mr. Petron's loss calculations. For example, the discrepancies involving the ten

47

identified Anthem patients, standing alone, cause the government's estimation of intended loss to be more than $21,600,000 higher than if Anthem's claims data was used. (*Id*. at 21-22.) Again, the overstatement in loss due to inclusion and/or computational error is almost certainly multitudes higher given the magnitude of the overstatement due to just these 10 patients. Unless and until such discrepancies are fully reconciled and explained.

Simply stated, Mr. Petron's loss findings are deeply, deeply flawed and completely unreliable. It would be error to rely on these loss calculations at sentencing regardless of the amounts involved. However, it would plainly violate Mr. Omidi's substantial rights if such unreliable testimony and findings are used to support an intended loss of more than $300,000,000, actual loss of more than $60,000,000, an advisory Guidelines sentence of life imprisonment, and restitution and forfeiture tied to this amount.

### 3.      The Appropriate Loss Calculation.

As Mr. Petron's loss findings do not constitute reliable evidence of loss, the government has failed to carry its burden and no Section 2B1.1(b) enhancement should be applied. Moreover, any effort by the government to supplement its loss presentation must include proof by clear and convincing evidence that the medical service to which loss is being attributed was not medically necessary. Under Ninth Circuit law, "as always, the burden is on the government to establish what services were not medically necessary" and a district court at sentencing must ensure that a

48

defendant is "given credit for medical services that he rendered that were justified by medical necessity" *Rutgard*, 116 F.3d at 1294 (applying requirement in case of ophthalmologist convicted of mail fraud for billing insurers for medically unnecessary procedures involving a subset of patients."); *see also*, *Vivit*, 214 F.3d at 915 (vacating defendant's sentence because the district court failed to eliminate legitimate billing for medical care from the loss amount, and noting "[d]espite the government's contention that the overwhelming majority of Vivit's billing was based on unperformed or unnecessary services, the evidence presented demonstrates that Vivit did perform some legitimate medical services. For this reason, we calculate the amount of loss suffered by the insurers by netting the total costs submitted by Vivit, minus the legitimate medical services that he provided."); *accord United States v. Alphas*, 785 F.3d 775, 784 (1st Cir. 2015) (finding error in loss calculation and instructing district court on remand to compare the amount sought with what would have paid had only a bona fide claim been submitted.).

The government steadfastly has avoided addressing medical necessity, but now must be required to do so. [32] Should the government attempt to do so, this Court will find that the overwhelming percentage of services provided, in fact, were medically necessary. To be clear, it is the government's burden to prove loss and *not* Mr.

---

[32] Mr. Petron, who had no involvement in acquiring or reviewing the applicable data, testified that it "would take years and years and tons of money" to review the 8,109 files for an accurate accounting. (TR 8118.) However, the government has spent years and years and tons of money to conduct statistical sampling based on invalid assumptions that grossly overstate the loss, and thereby the potential sentence, attributable to Mr. Omidi.

Omidi's burden to disprove it. *Rutgard*, 116 F.3d at 1294; *Cf. United States v. Popov*, 742 F.3d 911, 915-16 (9th Cir. 2014) (applying burden shifting to offset considerations involving Section 2B1.1's special rule involving government providers). Nevertheless, Ms. Busch, as part of her assessment of the government's loss calculations, reviewed the medical records and services provided to each of the named patients in the FSI and the 250 patients in Mr. Petron's random sample. As explained in detail in her report and attached spreadsheet, Ms. Busch concluded (1) that "intended loss" figures calculated by Petron are an ill-fit for calculating damages because providers are typically paid significantly less than the billed amount based on contractual rates set by insurers;[33]   (2) actual loss is the most legitimately representative form of loss; (3) all of the patients in the FSI and Mr. Petron's random sample qualified for Lap-band surgery per FDA guidelines; and (4) the overwhelming majority of sleep study and DME based services also were medically necessary. (Lally Decl. ¶ 4; Exh. D at 2-3, 6.) Based on these conclusions, and as captured in Table 1 of the Report, Ms. Busch has calculated the total <u>actual</u> loss amount attributable to Mr. Omidi's offenses of conviction at **$339,239**. (*Id.* at 7.) This consists of $339,239 for CPAP DME losses; and $0 Altered Sleep Study and Lap-Band losses. Should the

---

[33] Mr. Omidi maintains his position that intended loss is an invalid expansion of loss under Section 2B1.1 and should not be applied. Nevertheless, it bears noting to Ms. Busch's position is consistent with prior Circuit Court rulings in healthcare context and further supported by patient records and insurer payments in this case. *United States v. Ainabe*, 938 F.3d 685, 693 (5th Cir. 2019) (intended loss should be reduced below amount billed to reflect lower insurer set amounts); *United States v. Mirando*, 768 F. App'x 596, 598 (9th Cir. 2019) (same).

Court need additional evidence to make its determination, Mr. Omidi is prepared to provide it. *See United States v. Camacho*, 348 F.3d 696, 700 (8th Cir. 2003) (vacating a sentence when the district court relied solely on the PSR recommendation regarding loss, despite defendant's objection that it included legitimate billing, because the district court should have taken additional evidence and made findings; "It may be that the $585,559.25 amount accounts for legitimate payments. But that determination must come from the evidence, not from the conclusions of the probation officer as contained in the PSR and its Addendum.").

Mr. Petron's trial testimony should not preclude his testimony in an evidentiary hearing addressing the proper calculation of loss for sentencing. First, Mr. Petron's testimony at trial was admitted solely as evidence of Mr. Omidi's knowledge and intent of the scheme, not to establish loss. Therefore, while Mr. Petron was subject to cross-examination, it was for a separate purpose. Mr. Omidi's counsel, who repeatedly moved to exclude Mr. Petron due in part to the extreme, unfair prejudice that the fantastical loss figures would interject into the guilt phase, cannot be faulted for not engaging in an extended cross-examination on Mr. Petron's methodology or findings, as doing so would shed virtually no light on the issues of Mr. Omidi's knowledge or intent but would act to reinforce the impermissible and grossly prejudicial concept of loss as Mr. Petron addressed in detail the factors considered and the loss calculations applied. Moreover, by issuing a third supplemental report that completely jettisoned one of the three loss categories that accounted for 45% of

the intended loss calculation ($160,000,000 of $354,000,000) presented to the jury and replacing that calculation with a wholly separate set of loss criteria, Mr. Petron personally has interjected questions regarding the reliability of his methodology and analysis, the independence of his findings, and the falsity of his testimony before the jury that could not possibly have been addressed at trial. Therefore, should the Court consider crediting Mr. Petron's testimony in support of a Section 2B1.1(b) loss finding, he first must be made available for questioning at an evidentiary hearing regarding the basis for these material post-trial changes.

### ii.      Mr. Omidi's Role in the Offenses of Conviction.

Mr. Omidi objects to the PSR's recommendation that the court impose a 4-level enhancement as an "organizer or leader" of the underlying conspiracy under § 3B1.1(a).  PSR ¶¶ 71-72. Section 3B1.1 provides for the imposition of graduated enhancements of between 2 and 4 levels for individuals who served as organizers, leaders, managers or supervisors of criminal conduct, dependent principally on the size of the criminal organization and the degree of relative responsibility of a participant. Four and 3-level increases, respectively, are warranted if a defendant was an "organizer or leader" or a "manager or supervisor" of criminal activity that either "involved five or more participants" or "was otherwise extensive."   U.S.S.G. §§ 3B1.1(a), (b).  A 2-level enhancement applies to individuals who held organizational, leadership, managerial, or supervisory roles in the criminal conduct

that involved fewer than five participants.[34]  U.S.S.G. §§ 3B1.1(c). The government bears the burden of establishing the applicability of a particular role enhancement by clear and convincing evidence. *Riley*, 335 F.3d at 925.

    This Court should impose no more than a 2-level role enhancement, as such an enhancement would be fundamentally consistent with how the government, the USPO, and this Court have applied role enhancements and departures in this case. At its core, the charged conspiracy involved three principal participants: Messrs. Omidi, Klasky, and Hong. Through his plea agreement, plea colloquy and trial testimony, Klasky admitted that: (1) the sleep study fraud scheme originated shortly after he started as manager of the sleep study program; (2) he oversaw "all operational and technical aspects of the program" including "both clinical and non-clinical aspects" through which he directly altered sleep studies; (3) he recruited Hong to assist in the alteration of sleep studies; and (4) "to ensure the continuation of the scheme, [he] routinely coordinated with [Mr. Omidi] to ensure the sleep study employees necessary to the scheme were paid." Despite plainly qualifying for, at a minimum, a 2-level enhancement under Section 3B1.1(c), no role enhancement was sought by the government, recommended by the USPO, or imposed by the Court. Similarly, Mr. Hong, through his plea agreement, plea colloquy, and trial testimony, admitted to fraudulently altering over 2,000 sleep studies at Klasky's direction over the course of

---

[34] Section 3B1.2 similarly allows for downward reductions in offense level for those participants who played "minor" or "minimal" roles in the charged conspiracy.

years. For this conduct, the government sought, the USPO recommended, and this Court imposed a 2-level minor role reduction, which applies to individuals who are "less culpable than most other participants in the criminal activity." U.S.S.G. § 3B1.2(b), cmt.5.

In this context, a 2-level enhancement under Section 3B1.1(c), would be the most logically consistent enhancement applicable to Mr. Omidi based on the relative roles of the parties as established through trial testimony. Even though Mr. Omidi may bear the most culpability, the testimony established that he and Klasky worked closely together in a coordinated effort to produce the desired sleep study reports that formed the core basis of the fraudulent scheme and that it was Klasky, not Mr. Omidi, who directed Hong's illicit activities. *See, e.g.*, FSI, Dkt. No. 12, at 14-15 (alleging that "[a]t co-conspirator [Charles Klasky's] direction, the RPSGT would input the sleep study scores into a sleep study report ("SSR")" and cause Dr. Zarrabi's signature to appear on the altered SSRs). Trial testimony confirmed that the pair operated in a largely symbiotic fashion. Klasky ran the sleep study program, *e.g.*, TR 4442, interacted directly with Dr. Zarrabi, *e.g.*, TR 4875-77, and recruited and trained sleep study technicians, *e.g.*, TR 5155-56. Mr. Omidi reviewed the sleep study scores, *e.g.*, TR 4754, 5602-03, and handled standard internal and external company affairs, including communicating with insurance agencies, *e.g.*, TR 5074. In other words, the relationship between the two was one of divided labor, as Mr. Omidi and Klasky had a similar "nature of participation in the commission of the offense" and "degree of

54

participation in planning or organizing the offense" and both "exercise[d] decision making authority" in their relative management spheres.  U.S.S.G. § 3B1.1, cmt 4.

The Ninth Circuit has held that precisely this type of relationship did not require the imposition of a 4-level enhancement as an "organizer or leader" under § 3B1.1(a). In *United States v. Frega*, an attorney conspired with three then-Superior Court judges to provide payments and benefits to the judges in exchange for an "unfair advantage" in his cases before those judges.  179 F.3d 793, 798 (9th Cir. 1999).  The district court refused to apply the enhancement on the grounds that "[t]he evidence in th[at] case was that all defendants were in effect in it together. There was not one leader supervising or directing the activities of the others. It is hard for the Court to conclude that Mr. Frega here was an organizer." *Id.* at 811. The Ninth Circuit affirmed. Although it acknowledged that "there is evidence that Frega was the scheme's central actor, having bankrolled it, profited from it, involved other participants, and exercised control over co-conspirators", the court steadfastly declined to hold that the district court abused its discretion in not applying a four level enhancement. *Id.*  Instead, it pointed out the reality of that criminal enterprises that applies with equal force here: "while the scheme started with Frega trying to ingratiate himself with the judges, the pattern developed into a corrupt enterprise with all of the parties more or less equally involved." *Id.*  This Court should conclude similarly here. *See also*, *See United States v. Holden*, 908 F.3d 395, 402 (9th Cir. 2018) ("Nor is it sufficient for a defendant to

have organized property or activities—the defendant must have organized *participants*." (emphasis in original)).

Finally, although there was testimony that Mr. Omidi exercised control and authority over SCM's employees, this Court must carefully distinguish between that authority and his purported authority *vis-à-vis* the *criminal conspiracy*. Otherwise, any individual in a leadership role who participates in a workplace based conspiracy of any meaningful duration would necessarily qualify for a 4-level enhancement, regardless of the number of individuals actually involved in the criminal conduct. But the enhancement is designed to target organizers, leaders, managers, and supervisors in criminal enterprises, not those individuals whose criminal conduct involves few principals but is conducted in an environment with at least five people. In this vein, Elizabeth Holmes, the founder and leader of Theranos, who perpetuated one of the largest frauds in U.S. history, received no role enhancement. Rather, it is more appropriate to describe Mr. Omidi as a business leader who bears more culpability than others for his role in "arrang[ing] the transaction[s]" critical to the scheme's workflow and success which, by itself, does not support a 4-level "organizer or leader" enhancement. *See United States v. Avila*, 95 F.3d 887, 891-92 (9th Cir. 1996). Accordingly, this Court should, at most, apply a 2-level role enhancement.

### iii.   No Obstruction of Justice Enhancement Should Be Applied.

Mr. Omidi objects to the PSR's assignment of a two-level enhancement under U.S.S.G. § 3C1.1, which applies to a defendant who "willfully obstructed or impeded

56

. . . the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction" and such "obstructive conduct related to his offense of conviction and any relevant conduct." PSR ¶¶ 72-76. The enhancement is based solely on the testimony of cooperating defendant Charles Klasky, PSR ¶ 75, which was patently unreliable and simply insufficient to support the application of this enhancement under any proof threshold, including the applicable clear and convincing standard. *Hanna*, 49 F.3d at 577 (reliance on materially false or unreliable evidence at sentencing violates a defendant's substantial rights); *Vanderwerfhorst*, 576 F.3d at 935–36 ("[I]nformation is deemed false or unreliable if it lacks some minimal indicium of reliability beyond mere allegation.") *see also United States v. Karterman*, 60 F.3d 576, 584 (9th Cir. 1995) (emphasizing that "testimony should be viewed with caution" when a witness's "reliability is questionable (for example, she received benefits from the government for testifying, she allegedly was an alcoholic, and she admitted she had been a drug user)").

Klasky's testimony regarding the destruction of the external hard drives containing the original sleep study data -- and Mr. Omidi's role in this process --is facially inconsistent, wholly uncorroborated, and inherently unreliable. First, Klasky's testimony is internally inconsistent. Klasky repeatedly has flip-flopped in his description of material aspects of this alleged act of obstruction, including whether, and when, it occurred:

- During Klasky's first interview with agents – which coincided when he was vying to become a government confidential source – Klasky intentionally lied that he never destroyed any documents, when, in fact, he deleted extensive data, including sleep study information, from his work computer, instructed Sherwin Hong to similarly destroy evidence implicating both men, and later claimed to have destroyed the four external hard drives containing the original sleep data[35]  (Lally Sealed Decl. ℙℙ 5- 6; Exh. O at 2; Exh. P at 1.)

- In a May 2016 proffer, Klasky represented that he had destroyed the hard drives containing the original sleep study reports, claiming that this act of obstruction followed the government's execution of business search warrants in June 2014." (Lally Sealed Decl. ℙ 4; Exh. N at 1.)

- In his August 2016 grand jury testimony, Klasky reversed course and claimed that he destroyed the hard drives at Mr. Omidi's instruction in 2013 ("When you were asked to destroy; you said it was after January 2013. Was it before or after the search warrant in 2014?" Answer: "Before.") Having the act of destruction occur in 2013 was significant as it preceded the development and implementation of an attorney-approved companywide document retention program that would result in the systematic destruction of the original sleep data according to a fixed time schedule. (Lally Sealed Decl. ℙ 5; Exh. O at 1.)

- In May 2018, Klasky reversed course again, when he reiterated during yet another proffer that he obtained and destroyed the hard drives with the original sleep studies <u>after</u> the government executed the business search warrants in 2014 and provided support for this date by tying the timing to the arrival of a co-worker who joined their team that year ("the destruction of the hard drives occurred after the 2014 search of Get Thin because that was the time that [Tim] Kollars came to Get Thin."). (Lally Sealed Decl. ℙ 6; Exh. P at 1.)

---

[35] Klasky spent dozens of proffer and trial preparation sessions with the government during which the topic of past lies necessarily would have been addressed. This number of proffer and preparation sessions is exceptionally unusual, and potentially unprecedented, even for principal cooperators in complex cases. During his trial preparation sessions, it is standard practice to address areas of potential impeachment, including past lies. Nevertheless, Klasky testified at trial repeatedly that he did not believe he had lied to agents during his initial proffer and did not recall telling them that day that he did not destroy any evidence. When impeached with his prior statements, Klasky provided the qualified admission that, while he did not remember making the prior statement, but had he done so, it would be a lie." (TR 5813:2-5816-6.)

- At trial, Klasky did yet another 180 degree reversal, testifying that he and Mr. Omidi "had a conversation in mid-2012" about the custody of the sleep study raw data hard drives, during which he was instructed "you have to get those raw data files, and you have to get rid of them." (TR 4891-92.) Klasky testified that, in compliance with Mr. Omidi's instructions, he "obtained the hard drives from Michael Zarrabi and then destroyed them in early 2013." (TR 5726.) This testimony again was presented such that the act of destruction preceded the development and implementation of the companywide document retention policy that issued in 2013.

- On cross-examination, Klasky admitted that he previously told the government that the destruction occurred in 2014: namely, that "after the search by the federal agents occurred in June 2014," Mr. Omidi "asked [him] where the raw data archives were kept" and "to go get them." (TR 5728-29.)

Klasky's testimony regarding how he carried out the destruction of the hard drives also was wholly implausible. Klasky testified that Mr. Omidi "want[ed] to have those" drives, TR 4891, and pestered Klasky over the course of months to recover the hard drives containing the original sleep study from Michael Zarrabi. Klasky testified incredibly that, despite not yet having any agreement with government investigators, "I wanted [Michael Zarrabi] to have that information out there. It proves that there was falsification [which Klasky had directed and for which he was criminally culpable]." TR 4892. When Klasky ultimately secured from Michael Zarrabi the four external hard drives containing the original sleep study data, he claimed that he "put the hard drives on [Mr. Omidi's] desk." (TR 5729.)  Despite purportedly being desperate to destroy these hard drives for months, Mr. Omidi did not take or destroy the hard drives. Klasky testified that he then moved the hard drives to his own office, where for two weeks they sat visibly on a shelf "as a protest" reflecting Klasky's

59

refusal to honor Mr. Omidi's purported instructions. During this period, neither Mr. Omidi  nor any employee made any attempt to destroy the hard drives, despite Mr. Omidi's purported daily insistence that the hard drives be destroyed.   (TR 5731-34.) Klasky testified that he then took the hard drives to his home, after which he planned to simply lie and claim that the hard drives had been destroyed. Two weeks later, Klasky, based on imaginary concerns that Mr. Omidi would have coworkers seize and destroy the hard drives from his home (despite none having done so when the hard drives were freely open to seizure and destruction while prominently displayed in his office) purportedly abandoned this plan and started destroying one hard drive per week by smashing it to pieces with a hammer. Notwithstanding purported daily badgering regarding the status of the hard drives, Klasky testified that he withheld advising Mr. Omidi of the actual destruction until a month later when the job had been fully completed. Upon being so advised, Klasky conceded that Mr. Omidi provided no meaningful response.

Klasky's inconsistent and implausible account of having destroyed the hard drives at Mr. Omidi's direction also was wholly uncorroborated.[36] Notably, Klasky testified in response to government questioning that he asked Ashkan Rajabi what methods could be used to destroy a hard drive and was advised to use a hammer. (TR

---

[36] What has been corroborated is that Klasky, without any involvement from Mr. Omidi, encouraged Sherwin Hong to destroy evidence that directly would implicate the two cooperators in the sleep study fraud and that Klasky, while working as a government confidential informant, knowingly, intentionally, and without any involvement from Mr. Omidi, destroyed company files on his last day of work.

4894.) Mr. Rajabi, however, was never called by the government to corroborate this fact – presumably because Mr. Rajabi's grand jury testimony made no mention of any such discussion but did address in detail how Mr. Rajabi, through his information technology consulting company Ash Tech, Inc., had undisputed documented evidence that Klasky, while working as a government confidential source, permanently deleted all of his work computer files "delet[ing] essentially all of the files which related to sleep studies and correspondence and papers relating to his work and the sleep studies." (Lally Sealed Decl. ⁋ 3; Exh. M at 2:6-26.) Likewise, the government never called Michael Zarrabi to corroborate any aspect of Klasky's claims.

In fact, other than Klasky's self-serving and ever evolving claims, there is no evidence that the hard drives actually were destroyed. There are broken shards, no photographs, no witnesses, nothing. All that is known is that these hard drives were not located by law enforcement or voluntarily produced by Klasky, who purportedly had possession of these highly self-inculpatory materials. *See Hanna*, 49 F.3d at 578 (vacating a role enhancement that was based on "allegations [that were] largely uncorroborated and unreliable" because those allegations "were not only inconsistent with [the defendant's] denials but were unsupported by the other co-defendants' statements, or any other evidence, as well").

Finally, even if the Court were to credit Klasky's story that Mr. Omidi at some point instructed him to destroy the hard drives, application of a two-level obstruction enhancement still would not be justified. Klasky's testified that he ignored Mr.

61

Omidi's instructions, repeatedly and overtly. When Klasky purportedly did destroy the hard drives, he did so on his own terms and timetable, peculiarly dragging out the process out over multiple weeks. Therefore, if Klasky did destroy these hard drives, he did so based on the intervening, independent decision to obstruct justice, as the government's trial questioning effectively bears out ("Why did you change your mind and then end up destroying those records?" A: I was afraid of the repercussions [should Mr. Omidi ever learn that he had not destroyed the hard drives].")  For this, Klasky, and only Klasky, should be held accountable.

Simply stated, Klasky's inconsistent, implausible, and wholly uncorroborated testimony, which was advanced in exchange for favorable treatment from prosecutors, may be many things, but it is not proof on which this Court can rely to impose a sentencing enhancement, particularly under the clear and convincing evidence threshold. To the contrary, his ever-shifting claims embody all the aspects of unreliability that should preclude its very consideration. *See McGowan*, 668 F.3d at 607–08; *Hanna*, 49 F.3d at 578; *Karterman*, 60 F.3d at 584. As the factual premise for the enhancement "lacks some minimal indicium of reliability beyond mere allegation," this Court must find that the proposed obstruction enhancement cannot be applied. *Vanderwerfhorst*, 576 F.3d at 935–36.

## c.   The Appropriate Guidelines Calculation.

To summarize, Mr. Omidi objects to:  (a) the assignment of a 28-level enhancement under Section 2B1.1 based on an intended loss exceeding

$250,000,000[37], rather than a 12-level enhancement based on an actual loss of $339,239; (b) the application of a 4-level, rather than a 2-level, aggravating role enhancement pursuant to Section 3B1.1(a); and (c) the attribution of a 2-level enhancement for obstruction of justice under Section 3C1.1.  As such, Mr. Omidi submits that his properly-calculated Offense Level Total is 25 which, when combined with his Criminal History Category of I, results in and advisory guidelines range attributable to his offenses of conviction is **57 to 71** months incarceration. A two year consecutive mandatory minimum term is required due to Mr. Omidi's Section 1028A conviction.

## IV.   THE STATUTORY SENTENCING FACTORS SUPPORT A DOWNWARD VARIANT SENTENCE

The Court's task in sentencing is to identify and "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing.  18 U.S.C. § 3553(a).  Although the Sentencing Guidelines are the starting point for the calculation of an appropriate sentence, a district court "may not presume that the Guidelines range is reasonable." *Gall v. United States*, 552 U.S. 38, 50 (2007). Instead, the Court "must make an individualized assessment based on the facts" of

---

[37] The USPO concurs that the use of Mr. Petron's intended loss figures overstates the seriousness of Mr. Omidi's offense conduct. In forming its sentencing recommendation, the USPO applied a downward departure based on Application Note 21(C) to § 2B1.1, which authorizes a downward departure for cases "in which the offense level determined by this guideline substantially overstates the seriousness of the offense."  Finding that the intended loss amount, as opposed to the actual loss amount, "greatly inflates the total offense level and does not reflect the seriousness of the offense," the USPO recommended that Mr. Omidi receive a below-Guidelines sentence.

each case, recognizing that a within-Guidelines sentence may be greater than necessary to serve the purposes of sentencing. *Id.*; *Kimbrough v. United States*, 552 U.S. 85, 91 (2007). These purposes support a below-Guidelines sentence for Mr. Omidi.

### a.   Nature and Circumstances of the Offense.

The government charged Mr. Omidi in a FSI with 31 counts of participating in a mail and wire fraud scheme, in violation of 18 U.S.C. § 1343, two counts of making a false statement to a healthcare benefit program, in violation of 18 U.S.C. § 1035, one count of conspiring to commit money laundering and two counts of substantive promotional money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), (h), and one count of aggravated identity theft, in violation of 18 U.S.C. § 1028A.[38] (CR 12.) Despite the FSI's inclusion of more than three dozen felony counts,[39] the charged offense conduct flowed from a single discrete scheme that involved the material alteration of sleep studies to manufacture a comorbidity to boost an otherwise ineligible patient past the insurance eligibility threshold such that the patient could have the desired surgery for which the business was paid by insurance companies. While the FSI did reference a broader scheme, the actual charged instances of mail and wire fraud involved just over $150,000 in insurance proceeds, while the charged

---

[38] The statutory maximum penalties for these offenses ranged from 20 years imprisonment for the mail, wire fraud, and money laundering counts, to five years for the false statement to a healthcare program counts, and a two year consecutive sentence on the aggravated identity count.
[39] Mr. Omidi's two principal co-conspirators, Messrs. Klasky and Hong, each pled guilty to a single count indictment.

promotional money laundering scheme involved seven instances of alleged laundering totaling $7,784 through the payment of employee salaries. *Id*.

According to the FSI, the scheme was executed principally by three individuals: Messrs. Omidi, Klasky, and Hong, who worked together at medical facilities that provided an array of services, including but not limited to bariatric surgery for weight loss, dermatological procedures, and gynecological services.[40] It began in the early summer of 2010 – shortly after Mr. Klasky was retained by Mr. Omidi to run the operation's sleep study program – as the three men initiated a several year plan to alter patient sleep studies results so that patients would have a comorbidity with which to qualify for lucrative Lap Band surgeries. Additionally, the FSI alleged that patients occasionally would be assigned a second sleep study, known as a titration study, that was medically unnecessary because the PSG study had produced normal results but done to both secure a second sleep study charge and to obtain a test result that could be presented to medical equipment companies to justify the issuance of CPAP equipment.

Prior to, and throughout trial, the government proceeded on two theories of liability. The first was the classic scheme to bill insurance companies for completed, but medically unnecessary, services. As testified to by cooperating defendants Klasky

---

[40] The indictment also charged corporate entity Surgery Center Management and Dr. Mirali Zarrabi, a licensed physician who was responsible for reviewing raw sleep study data and approving the results, which the FSI alleged he either did not do or did knowing that the results had been falsified. Dr. Zarrabi was acquitted on all counts at trial.

and Hong, the scheme to alter sleep studies was effectively a back-up plan that was implemented in those instances when a patient did not otherwise qualify for Lap-Band surgery – *i.e.*, the patient lacked a BMI over 40, which provided automatic eligibility, or had a BMI between 30 and 40 but lacked the necessary comorbidity that would qualify the patient for this surgery. (TR. 4765-4766; *see also*, TR 5187; 8-9-17 Klasky Plea TR 29; 10-19-22 Klasky Sentencing TR 18-19.) Second, the FSI alleged, and the government introduced considerable evidence at trial to support, the theory that insurance companies have the right to receive accurate information so that they can control their business decisions in the manner that they so determine. *See* FSI ¶¶ 33-36. At trial, the government also introduced, over Mr. Omidi's repeated objections, the testimony of government retained statistician Michael Petron, who used government-created loss methodology, definitions, and instructions to conduct loss calculations that were introduced under the theory that they demonstrated evidence of Mr. Omidi's knowledge and intent. Specifically, Mr. Petron testified that the intended loss from the fraud scheme was over $350,000,000, while the actual loss exceeded $70,000,000. Notably, post trial, the government had Mr. Petron conduct new loss calculations using a different methodology that materially lowered the intended loss by more than $40,000,000 and the actual loss by $10,000,000. (TR 8128-8134.) Following a multi-month jury trial, the government argued to the jury that Mr. Omidi either knew or was deliberately or recklessly ignorant of the fraud scheme at his business. The jury returned a general verdict convicting Mr. Omidi on all counts.

66

The offense conduct is unquestionably serious and should not have occurred. However, as addressed above, an overwhelming percentage of the patients presented with medically significant obesity. The Busch report shows that *all* patients in the Petron sample qualified for Lap Band surgery without an altered sleep study. (Lally Decl. ⁋ 4; Exh. D at 23, 27-28.) Thus, in the overwhelming majority of cases, these patients were provided with medical services that were medically necessary, medically authorized by a licensed physician, medically performed by a licensed physician, and properly covered by the patient's insurance. For these individuals, the services and surgeries presented a potentially life-altering outcome from the ever-persistent and ever-increasing physical harm caused by living with morbid obesity. Both the medical profession and the patients they serve are desperate to curb the obesity epidemic that has ravaged so many people in this country. It is why, for example, physicians throughout the country are engaged in the widespread off label prescription of Ozempic and Mounjaro and why the American Association of Pediatric Medicine recently issued new guidelines recommended bariatric surgery for children meeting certain conditions. Mr. Omidi understood this problem in the gravest way possible, as weight-induced diabetes contributed significantly to his father's mental state and eventual suicide. In attempting to address this problem – and at a time when Mr. Omidi had just lost his uncle who had served as a second father to him – significant mistakes were made.

### b.    Personal History and Characteristics.

As described by over 40 different letters as a passionate, generous, intelligent, and caring person, Mr. Omidi's personal history and characteristics (outlined in § II(B) above) weigh heavily against a lengthy period of incarceration.  Mr. Omidi asks the Court to consider the words of those who know him best when balancing the importance of § 3553(a)(1) in this case. These words are well corroborated by positive contributions that Mr. Omidi has made to his family, his colleagues, the community, and charitable organizations, including the live changing treatment that he organized as part of Philippine charitable organization. *United States v. Carter*, 530 F.3d 565 (6th Cir. 2008) (good works may serve as a basis for departure).

Mr. Omidi also asks the Court to consider his physical, mental, and emotional health.  As described in detail above, Julian comes before the Court for sentencing with layers of untreated, deeply embedded, psychological trauma.  It is only now – while endeavoring to show his true self to the Court – that Julian has truly begun to understand the damage wrought by the sexual abuse and family tragedies that marked his past. *See, e.g., United States v. Walter*, 256 F.3d 891 (9th Cir. 2001) (downward variance for childhood sex abuse permissible). While he long suppressed the debilitating aspects of this trauma, once forced to confront this condition, he has embraced therapy with the same commitment and vigor that he previously applied to his professional life. It will be lengthy, if not lifelong process, to reduce the impact of

five decades of untreated trauma, however, Mr. Omidi, who is beset by daily suicidal iterations, is fighting to prevail.

Finally, the Court should weight Mr. Omidi's history of substance and alcohol abuse when determining the appropriate sentence.  As recounted by Dr. Richard Romanoff, Julian has abused Adderall and ephedrine for decades to reduce the anxiety brought on by his history of incredible personal trauma. (Lally Decl. ¶ 3; Exh. B at 14.) Further, Julian used alcohol to self-medicate, "to numb[] himself of the thoughts feelings he was struggling to avoid." (*Id.* at 18.) Julian's alcohol consumption is described by Dr. Romanoff as "frequent and intense"– and directly tied to his psychological infirmities. (*Id.* at 14, 18.)  For these reasons, and as recommended by Dr. Romanoff, Mr. Omidi asks that the Court consider recommending intensive treatment within the Bureau of Prisons – specifically the Residential Drug Abuse Program (RDAP).

### c.    Adequate Deterrence and Protection of the Public.

The needs "to afford adequate deterrence to criminal conduct" and "protect the public from further crimes of the defendant," 18 U.S.C. § 3553(a)(2)(B)-(C), would be served by a term of imprisonment, which statutorily has to be at least two years. 18 U.S.C. § 1028A. Guidelines are a starting point, *Gall v. United States*, 552 U.S. 38, 39 (2007), and there is no presumption that sentencing guidelines should apply. *Rita v. United States*, 551 U.S. 338. The "overarching duty" is to apply the §3553

factors to impose "a sentence sufficient, but not greater than necessary" to comply

with the purposes of sentencing." *Pepper v. United States*, 562 U.S. 476, 493 (2011).

   *Specific Deterrence*.   A lengthy period of incarceration is not necessary to

protect the public from Mr. Omidi or deter him from committing future crimes.  He

is 54-years old and not a danger to society.  He has no criminal history and the offense

conduct occurred a decade ago. He has been under pretrial supervision for *more than*

*five years* and is, and always has been, in compliance with the terms of his release.

Moreover, since the jury returned their verdict nearly a year ago, Mr. Omidi has

continued his pattern of a perfect pretrial services record such that his Pretrial Services

officer has no opposition to Mr. Omidi continuing on bail pending appeal.  There is

simply no reason to believe he would commit another fraud – nor would he be in a

position to do so as this Court can fashion any supervised release conditions it deems

necessary to address any lingering concerns it has about his ability to remain law

abiding.  *United States v. Barnes*, 890 F.3d 910, 918 (10th Cir. 2018) (upholding

sentence of 24 months [despite Guidelines range of 70-87 months] based in part on

the fact that, before his crime, defendant, "led a stable lifestyle and appear[ed] active

in his community" and his risk of recidivism was "low to nonexistent and he posed

no apparent threat to the community"); *United States v. Watt*, 707 F.Supp.2d 149, 151

(D. Mass. 2010) (facing a Guideline sentence of 60 months, court imposed 24 month

sentence for first-time, white-collar offender involved in massive identity theft ring

where millions of victims lost more than $400 million).

Moreover, this case has consumed Julian's life for a decade and has left an indelible mark on his psyche. Ten years of investigations and lawsuits have taken their toll. Despite great intelligence and an equally great desire to help others, Julian has been forever forced out of the healthcare industry. He has had extremely limited job prospects given the publicity associated with this case and the specter of lengthy jail term. Friends and acquaintances have abandoned him and his life became incredibly insular. As described by numerous character letters, Julian has become withdrawn, devastated, and extremely depressed.  (Lally Decl. ⁋ 2; Exh. A at 77 (R. Sedgh Ltr.)) (Julian's legal troubles have "handicapped him and stopped him from contributing to the world and reach his potentials [sic]."); (*id.* at 39) (J. L. Hidalgo Ltr.) (Julian "stopped living a normal life" and has been "like a prisoner in his own home for years" following his criminal legal troubles.) Julian's name – and his family's name – have been for a decade held in disrepute because of his conduct, which has been devastating to him as he assumed the male leadership role in his family after his father's suicide. And notwithstanding what sentence is imposed by this Court, Mr. Omidi has years of civil litigation ahead of him that will serve as daily reminders of past mistakes. These are forms of punishment that Mr. Omidi and his family will endure for the rest of his life regardless of the sentence this Court imposes.

Mr. Omidi is non-violent, middle-aged, and poses a threat to no one. Extended incarceration is not a legitimate penological need.

_General Deterrence_.   Incarcerating Mr. Omidi for a lengthy term of imprisonment does not aid the goal of general deterrence of crime, and would not serve to dissuade those who may commit similar crimes to those for which he has been convicted.   _See, e.g._, _United States v. Adelson_, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006), aff'd, 301 F. App'x 93 (2d Cir. 2008) ("[T]here is a considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders."); U.S. SENTENCING COMMISSION, Recidivism Among Federal Offenders: A Comprehensive Overview, 30 (March 2016) (concluding that fraud offenders had the lowest rearrest rate when compared with firearms offenses, robbery, immigration, drug trafficking, larceny, and others, and that an offender's advanced age and minimal criminal history were most strongly correlated with low rearrest rates)[41]. As the Department of Justice recognizes: "Sending an individual convicted of a crime to prison isn't a very effective way to deter crime. . . . [P]rison sentencing (particularly long sentences) are unlikely to deter future crime."  U.S. Department of Justice, National Institute of Justice, _Five Things About Deterrence_ (May 2016), at 1. The problem with basing punishment on the concept of general deterrence is that "there are no reliable findings related to the marginal deterrent effects of various punishment levels. _Id._ General deterrence is premised on the potential offender's knowledge of the penalty and risk of detection,

---

[41] _Available at:_ https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf

and this type of factual data on which a deterrent system must be founded does not exist."  Todd Haugh, *Sentencing the Why of White Collar Crime*, 82 Fordham Law Review 3143, 3182 (internal quotation omitted); *accord* Kelly D. Tomlinson, *An Examination of Deterrence Theory: Where Do We Stand?*, 80 Federal Probation Vol 3, 33, 37 (Dec. 2016) (noting that the "scientific evidence leads to the conclusion there is a marginal deterrent effect for legal sanctions, but this conclusion must be swallowed with a hefty dose of caution and skepticism; it is very difficult to state with any precision how strong a deterrent effect the criminal justice system provides.") (internal quotation omitted).

  <u>*Post-Offense Rehabilitative Efforts*</u>. In choosing an appropriate sentence, Courts "consider every convicted person as an individual and every case as a unique study in human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52 (2007) (citation omitted). Julian has suffered adversity in life including religious persecution as a child in Iran, the loss of his Father to suicide, his mother's fight with cancer, and his sexual abuse as a child. When faced with this current adversity, Mr. Omidi has taken meaningful steps towards rehabilitating the incredible damage that five decades of untreated trauma has caused. The conduct leading to his conviction occurred more than seven years ago, and Mr. Omidi has not reoffended. He has complied with all conditions of his release, engages at least twice weekly in formal religious activities and daily prayer, and has committed himself to psychological and behavioral

treatment, including over a hundred hours of intensive treatment that remains ongoing. (Lally Sealed Decl. ¶ 18; Exh. X. at 8-9); *cf. Pepper*, 131 S. Ct. 1229 (disagreeing with policy statement in sentencing guidelines that suggest rehabilitative efforts not relevant.). Mr. Omidi has committed to not engage in any activity which remotely can even have the appearance of impropriety. (Lally Decl. ¶ 2; Exh. A at 1 (J. Omidi Ltr.)) ("I have made extreme efforts to be a different person than I was even during the trial. I have made a commitment in my life to be an upstanding citizen beyond the letter of the law and stay away from even the perception of wrongdoing in all my endeavors. I have made many mistakes, recognize others have suffered, and express my sincere regret for my actions and their consequences.") He asks that these efforts when assessing an appropriate sentence.

### d.    Just Punishment and Respect for the Law.

The goals of promoting respect for the law and providing just punishment for the offense, as captured in 18 U.S.C. § 3553(a)(2) are not served by a lengthy term of incarceration for Mr. Omidi.

By every account, the government, and Mr. Omidi in turn, pursued this case with exceptional zeal. From near the outset, it was clear that the stakes were extraordinarily high. The government seized money that included tens of millions of dollars earned by he and his family before the criminal scheme began. It seized millions of business records, including extensive privileged communications, and had an informant participate in meetings, including when attorneys were present. The

74

government prosecuted his mother on a structuring charge in an effort to gain leverage over him.[42] For years, the government made known that it would seek a sentence of up to life imprisonment and charged him with more than three dozen felony offenses, while brokering exceptionally lenient pleas for his two co-defendants. Post trial, it recast the methodology utilized to calculate loss in this case to ensure that he remained at an offense level that would result in a recommended term of life imprisonment.

While most anybody would fight back in response to these external threats, Dr. Romanoff explains why it was particularly likely, given his decades of fighting through his untreated trauma, that Mr. Omidi would fight back as if his life depended on it. But let there be no doubt, Mr. Omidi to this day has incredible respect for this Court and the process that allowed him to pursue his Constitutional right to fully defend himself against the government's indictment. He understands that he did not prevail, and at a minimum, is subject to a two-year jail term that will deprive his mother of her principal caretaker at a time when she is at an advanced age and suffering from post-cancer related health deficiencies.  As a man in his mid-50's who has incurred the deep financial and emotional scars that accompany a vigorous, but unsuccessful, self-defense, he is not likely to recidivate.  In fact, for male offenders of his age and with non-existent criminal histories, the recidivism rate is just 6.2%. It

---

[42] Mrs. Omidi was convicted and sentenced to probation notwithstanding the government's request for a 41 month sentence. *United States v. Cindy Omidi*, CR 13-739-SVW (CR 424, 443.)

is even lower for individuals, like Julian, who are well educated and have continuing family support.

Society views just punishment and respect for the law as demonstrated by both sides of the criminal justice process. The government's singular focus on Mr. Omidi and its request for a substantial term of imprisonment, a substantial restation order, and a substantial forfeiture that even it acknowledges exceeds levels contemplated through trial – if imposed – would effectively cancel Mr. Omidi's life. Notwithstanding mistakes that were made, such an outcome, respectfully, would not objectively be viewed as a just punishment that garners respect for the law.

### e.    Avoiding Unwarranted Sentencing Disparities.

The "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" weighs in favor of a downward variant sentence for Mr. Omidi.  18 U.S.C. § 3553(a)(6).

### i.    Downward Variances Are Commonplace for Defendants Convicted of Crimes of Fraud.

Most defendants across the nation sentenced for crimes for which the main Guideline is § 2B1.1 have received below-Guidelines sentences.  (Sentencing Commission Interactive Data Analyzer Capture, https://ida.ussc.gov/analytics/saw.dll?Dashboard).  Below-Guidelines sentences are even more common in this district for defendants subject to § 2B1.1 with no criminal history.  (Sentencing Commission Interactive Analyzer Capture,

https://ida.ussc.gov/analytics/saw.dll?Dashboard).  And from 2017 through 2021, in this district, a defendant of Mr. Omidi's age, convicted of fraud, with no criminal history, and in Zone D of the Guidelines received a sentence that included a median term of incarceration of 32 months.  (Sentencing Commission Interactive Analyzer Capture, https://ida.ussc.gov/analytics/saw.dll?Dashboard).

Regardless of how this Court resolves Mr. Omidi's objections to the substantial loss amount claimed by the government and to the enhancement for an organizer or leader in the criminal fraudulent activity, the Court would be in good and abundant company in imposing a significant downward variant sentence.  The following cases are some (of many) such examples:

- In largest fraud case brought by this United States Attorney's Office in the past two decades, the principal defendants – attorneys at Milberg Weiss who engaged in criminal conduct over decades, victimized hundreds of thousands of victims, defrauded multiple courts, while generating hundreds of millions of dollars in illicit proceeds – received sentences of between probation and 30  months' imprisonment. *United States v. Seymour Lazar, et al.*, CR No. 05-587-JFW.

- Providence Healthcare entered a civil resolution with the Department of Justice, which substantiated reports that several of its doctors were performing medically unnecessary procedures to secure insurance high insurance recoveries, and paid a fine of $22,690,458. Neither the healthcare provider nor the named physicians has been criminally charged.  *United States v. Providence Health & Servs.*, 4:20-cv-05004-SMJ (E.D. Wash.), Dkt. Nos 23, 24.

---

- The vice president of one of the largest finance and insurance corporations in the world was convicted of numerous fraud counts. His Guidelines range was initially calculated to be 168 to 210 months' of imprisonment, but the court later found that the loss amount increased the offense level by 30 points to (470 months—treated as life). However, the defendant ultimately received a 48-month sentence. *United States v. Milton*, 3:06-cr-00137 (D. Conn.) Dkt. Nos. 1115, 1164, 1216.

- A licensed physician was convicted of fraudulently submitting false claims to Medicare resulting in a loss amount of more than $9.5 million and receiving illegal kickback payments. She faced a statutory-maximum sentence of 300 months' imprisonment (below the Guidelines range of 324 to 405 months) but received a sentence of 60 months' imprisonment. *United States v. Hamilton*, 37 F.4th 246 (5th Cir. 2022).

- A defendant was convicted of multiple conspiracies, including conspiracy to commit bank fraud—that the government contended seriously threatened the national security interests of the United States—resulting in a Guidelines range of life imprisonment. The government advocated for 188 months' imprisonment, but the Court imposed a sentence of 32 months. *United States v. Atilla*, 1:15-cr-00867-RMB (S.D.N.Y.), Dkt. Nos. 505, 518.

This Court has likewise imposed significant downward variances in cases involving large and complex fraud schemes:

- The owner of a battery supplier company was convicted of wire fraud and conspiring to defraud the United States by, among other things, providing poor, knock-off batteries affixed with counterfeit labels to the Department of Defense. The defendant received more than $2.6 million for the defective

78

batteries and used the money to finance a luxurious lifestyle.  Although the Guidelines range was 168 to 210 months' imprisonment, this Court imposed an 87-month sentence.  *United States v. De Nier*, 2:12-cr-00496 (C.D. Cal.), Dkt. Nos. 144, 157.

- A defendant was involved in a years-long conspiracy to steal identities, forge documentation purporting to certify that the victims were disabled, apply for disability benefits in their names, and intercept the resulting benefits in the mail.  The government contended that the properly-calculated range was 135 to 168 months though it recommended a 100-month sentence.  This Court imposed a 72-month sentence.  *United States v. Rodriguez*, 2:18-cr-00088 (C.D. Cal.), Dkt. Nos. 43, 86, 106.

- A defendant organized and led a scheme to defraud several banks by altering postal money orders, thereby causing $2.8 million in intended losses.  He faced a Guidelines range of 75 to 87 months' imprisonment, but this Court imposed a 24-month sentence.  *United States v. Bradley*, 2:20-cr-451 (C.D. Cal.), Dkt. Nos. 267, 292.

A below-Guidelines sentence is similarly appropriate here given the need for uniformity in sentencing and the other § 3553(a) factors discussed herein.  It is no answer to suggest—as the government may—that Mr. Omidi was motivated by ambition or the desire to accumulate wealth. Nonetheless, in even in cases where wealth was the objective, courts have regularly imposed substantially below-Guidelines sentences.  For example, one CEO was convicted of numerous securities and wire fraud schemes that were motivated by his desire to make the company an attractive acquisition target, "sell the company[,] and become fantastically wealthy,"

and he faced 210 to 262 months' imprisonment.  *United States v. Tuzman*, No. 1:15-cr-00536 (S.D.N.Y.) Sentencing Tr., Dkt. No. 1216, at 62.  Even so, the court sentenced the defendant to time served because of his service work while on pretrial release, the lack of a criminal record, and severe trauma he experienced in a Colombian prison after his arrest.  *Id.* at 66-67.  For his part, Mr. Omidi has endured significant trauma throughout his life, had no criminal history, and faces a significant restitution order that is all but certain to consign him to a life of simplicity after imprisonment.

Similarly, in *United States v. Rowan*, No. 1:16-cr-10343 (D. Mass.), a defendant was convicted for bribing doctors to prescribe a fentanyl spray and to defraud insurance companies.  His Guidelines range was 324 to 405 months, but he received a 26-month sentence in part because noting that the defendant had otherwise lived a "good life and a respectful life" marked by "real decency."  *Id.* at Dkt. No. 1064; Sentencing Tr., Dkt. No. 1167, at 40.  Neither the evidence presented at trial nor the PSR suggest that Mr. Omidi lived anything other than a good and decent life prior to the criminal conduct at issue here.  This Court should consider these circumstances as the court did in *Tuzman*, *Rowan*, and other examples like it.

  **ii.** **As these examples demonstrate, the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), counsels heavily in favor of a below-Guidelines sentence for Mr. Omidi. To find otherwise would ignore this fundamental sentencing factor as virtually no defendant convicted of a § 2B1.1 offense carrying a range of life is, in fact, sentenced to life imprisonment. To the contrary, there are countless examples of below-Guidelines variances for defendants with similar records who committed similar conduct to Mr. Omidi. The sentence this Court imposes should track those trends. None of Mr. Omidi's Co-Conspirators Will Be Incarcerated.**

More jarring is the fact that none of Mr. Omidi's co-conspirators – who, by definition, have been found guilty of "similar conduct" – will not serve *any period of incarceration whatsoever*. In fact, despite what the government repeatedly has hailed as a massive, wide ranging fraud scheme, not a single person besides Mr. Omidi will spend even one day in prison. Not. One. Day.

The FSI represents that there were unindicted co-conspirators. (CR 12 at 12.) Whomever these individuals may be, the government made the affirmative decision not to charge them criminally.

Dr. Zarrabi was acquitted of all charges when the jury rejected the government's theory of the case against him.

As to the two individuals who were charged, Messrs. Klasky and Hong, the government has taken extraordinary steps rarely seen in criminal cases in this district to ensure that they would not receive jail time for their multi-year participation in this fraud scheme. Both were presented with plea agreements that did not include the most

readily provable offense – the mail and wire fraud schemes – as these offenses have

statutory maximum penalties of 20 years' imprisonment. Instead, Mr. Klasky was

permitted to plead guilty to a single Section 371 conspiracy (identified as the wire

fraud scheme under Section 1347), which capped his sentencing exposure at five

years' imprisonment, which was more than 50% below the Guidelines range for the

offense conduct to which he admitted. (Klasky CR 62) ("The parties agreed to the

applicable Guidelines, which correspond to a total offense level of 33 including

defendant's acceptance of responsibility, while recognizing the ultimate sentence

would be limited by the statutory maximum for the conspiracy count of conviction.)

To lessen the attendant immigration consequences of his guilty plea, Mr. Hong was

permitted to plead guilty to a single count of making a false statement affecting a

health care program, which did not include any stipulation to the amount of loss, and

set the statutory maximum penalty at five years' imprisonment.

On October 19, 2022, this Court sentenced Mr. Klasky to a term of 3 years'

probation.  This was the government's requested sentence but required additional aid

from this Court. (Klasky CR 62 at 5-6.)  The government moved for a 13-level

downward departure under U.S.S.G. § 5K1.1, which the lead prosecutor represented

was the largest substantial assistance reduction that she had requested in her decade

long career. (*Id.* at 15.) As the applicable Guidelines range was 135 to 168, not 60,

months as the government mistakenly believed, a 22-level 5K1.1 motion was required

and the government's 13-level motion only reduced Klasky's sentence to an advisory

range of 33 to 41 months. (*Id.* at 17.) This Court, noting that "there are many roads to Rome," issued a downward variant sentence to three years' probation to give effect to what the government represented had been the expectation of the parties. (*Id.* at 17-18.)  Moreover, despite a stipulated restitution amount of several million dollars, the government sat silent when Klasky transferred his principal asset – his home – to his daughter in the lead up to trial and then sold the home with the proceeds again going to the daughter several months before the sentencing hearing when the restitution order would be imposed.[43]

On January 18, 2023, Mr. Hong also was sentenced to a term of probation. To achieve this outcome, the government provided a substantial 5K1.1 motion and did not declare a breach of the plea agreement despite Mr. Hong refusing to stipulate to the restitution amounts to which he had stipulated in the plea agreement. (Hong CR 64)  ("For [Hong] to agree in his plea agreement that his conduct caused losses to victim insurers through fraudulent claims . . .but argue now that the Court should order no restitution, threatens to deprive the government of the benefit of its bargain") The Court, also, allowed for a deviation for the terms of the plea agreement and instead of a restitution order of more than $5,500,000, Hong only will be required to pay $22,000.

---

[43] It is within the government's discretion not to declare a breach of the plea agreement, to charge the involved parties with a fraudulent conveyance, and to forego any meaningful recovery of restitution. However, the comparative treatment of the parties should be accounted for when assessing what is the appropriate sentence for Mr. Omidi.

### f.     Ability to Pay Fines.

The PSR correctly recognizes that Mr. Omidi's financial liabilities far outweigh his assets. He requests that the Court find, as the PSR recommends, that no fine be imposed. PSR ¶ 135.

## V.     THE REQUESTED SENTENCE

There are not many people who have had to endure the horrific trauma experienced by Mr. Omidi, which began at the most formative years of his life and continued uninterrupted and without treatment for decades. Despite ever-present adversity, Mr. Omidi, through great intelligence and individual perseverance, has survived into his fifth decade and contributed greatly to the lives of so many family, friends, and former patients. Given these considerations, Mr. Omidi respectfully submits that a downward variance from the applicable Guidelines range should be granted, with the understanding that this Court must impose at least a 24 month term of imprisonment followed by three years of supervised release.[44] For a middle-aged man who never before has been incarcerated, a sentence of this length would be sufficient, but not greater than necessary, to achieve the statutory purposes of sentencing as required by 18 U.S.C. § 3553(a) by adequately capturing the seriousness of his offenses of conviction, protecting against unwarranted sentencing disparities,

---

[44] This proposed term consists of 0- [months imposed] on each of Counts 1 through 37, all to be served concurrently; and 24 months on Count 32 to be served consecutively to all other counts. Additionally, the proposed supervised release term of three years consists of three years on each of Counts 1 through 31 and 33 through 37; and one year as to Count 32, all such terms to run concurrently.

84

and reflecting Mr. Omidi's long history of untreated physical and psychological trauma.

Additionally, as detailed above, *see supra* § **IV(b)**, Mr. Omidi comes before the Court with a history of substance abuse and dependence, as well as a troublingly pattern of alcohol abuse during the relevant times of the offense.  In order that he can receive intensive treatment for his years-old abuse of Adderall and alcohol, enabling him to break the cycle of abuse and move into the next phase of his life with a clear mind, we respectfully request the Court recommend that Mr. Omidi be placed in the Bureau of Prisons' Residential Drug Abuse Program (RDAP) at an appropriate facility in Southern California.

Finally, as detailed in a filing which will be filed in the near future, Mr. Omidi requests that he be granted bail pending appeal. Should the Court be disinclined to grant this request, Mr. Omidi, consistent with the recommendation of the U.S. Probation Office, requests permission to self-surrender to the institution to which he is designated by the Bureau of Prisons at a date to be determined by the Court. This will provide Mr. Omidi with continuity of critically important psychological treatment addressing his past trauma and substance abuse through the time when he will be assigned to an institution with appropriate treatment programs.

## VI.   POSITION WITH RESPECT TO RESTITUTION

### a.   Restitution Cannot Be Ordered At This Time.

"Federal courts have no inherent power to award restitution, but may do so only pursuant to statutory authority." *United States v. Gossi*, 608 F.3d 574, 577 (9th Cir. 2010) (quoting *United States v. Follet*, 269 F.3d 996, 998 (9th Cir.2001) (quotations and citations omitted)).  The Mandatory Victims Right's Act of 1996 ("MVRA"), 18 U.S.C. § 3663A, provides for discretionary awards of restitution after conviction for certain crimes, including wire fraud. The government bears of the burden of establishing by a preponderance of the evidence both who is entitled to receive restitution and the amount to be recovered.  *United States v. Waknine*, 543 F.3d 546, 555 (9th Cir. 2008).

The MVRA limits restitution to "victims" who are defined as "'a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." *United States v. Anderson*, 741 F.3d 938, 951 (9th Cir. 2013), (quoting *United States v. Yeung*, 672 F.3d 594, 600 (9th Cir. 2012)). Victims, in turn, may recover solely for actual "loss that flows directly from 'the specific conduct that is the basis of the offense of conviction.'" *United States v. May*, 706 F.3d 1209, 1214 (9th Cir. 2013) (quoting *United States v. Gamma Tech Indus., Inc.*, 265 F.3d 917, 927 (9th Cir. 2001)); (restitution limited to victim's actual loss); *United States v. Fair*, 699 F.3d 508, 514 (D.C. Cir. 2012) ("The MVRA demands that restitution be awarded only for the victim's actual, provable loss . . ."). Under Ninth

Circuit precedent, actual loss "represents the difference between (1) the loss the victim incurred because of the unlawful conduct and (2) the loss the victim would have incurred had defendant acted lawfully." *United States v. Gagarin*, 950 F.3d 596, 607 (9th Cir. 2020) (quoting *United States v. Bussell*, 504 F.3d 956, 964 (9th Cir. 2007) Thus, "'[b]ut for' cause is insufficient." *United States v. Swor*, 728 F.3d 971, 974 (9th Cir. 2013).   Although district courts need not calculate restitution with "exact precision", it may not engage in [s]peculation" when setting an award. *United States v. Kilpatrick*, 798 F.3d 365, 388 (6th Cir. 2015) (cites omitted). In fact, the Ninth Circuit repeatedly has held that it is plain error to order restitution in an amount greater the actual loss incurred by the victim. *United States v. Rizk*, 660 F.3d 1125, 1137 (9th Cir. 2011); *Waknine*, 543 F.3d at 555; *see also*, *United States v. Allen*, 529 F.3d 390, 397 (7th Cir. 2008) (restitution award that exceeds loss affects the defendant's substantial rights).

Consistent with Ninth Circuit precedent that a victim can recover only for the amount the victim otherwise would not have been obligated to pay, restitution in healthcare fraud cases are limited such that "an insurer's actual loss for restitution purposes must not include any amount that the insurer would have paid had the defendant not committed the fraud[,]" *i.e.*, medically authorized, appropriate and/or necessary procedures. *United States v. Sharma*, 703 F.3d 318, 324 (5th Cir. 2012).  In addressing such loss, the government bears the "burden . . . to establish what services were not medically necessary." *United States v. Rutgard*, 116 F.3d 1270, 1294 (9th

87

Cir. 1997) (applying burden in context of broader Section 2B1.1 loss calculations); *see also United States v. Stone*, 822 F. App'x 624, 625-26 (9th Cir. 2020) ("just because the insurance companies potentially had the right to cancel coverage does not mean they suffered actual losses;" the government must prove that "no claims would have been paid absent [the fraud].")

### i.  Government Imposed Limitations to Mr. Omidi's Ability to Fully Address Restitution.

Prior to the issuance of the PSR, the government failed to provide the United States Probation Office ("USPO") with specific restitution documents and data supporting restitution but did provide the USPO with Mr. Petron's post trial loss calculations.  PSR ¶ 51. The PSR, in turn, states that Mr. Omidi should be ordered to pay restitution of $71,454,610 – a figure that aligns with Mr. Petron's trial testimony regarding the purported actual loss from the charged fraud scheme.[45]  PSR ¶ 155. This is error for three reasons.

First, it is well established that restitution and actual loss calculations pursuant to U.S.S.G. § 2B1.1 are distinct calculations. *Gossi*, 608 F.3d at 579-80 ("the method of calculating loss is different" for sentencing and restitution "due to the different purposes behind the two statutes"); *Anderson*, 741 F.3d 938 at 952 ("a district court should not rely on its calculation of the loss in the Sentencing Guidelines to determine

---

[45] The PSR further notes that the government "ha[d] not provided the loss amounts by each victim of this offense." PSR ¶ 155. While the government has produced some restitution-related materials, it still has not identified the loss amounts incurred by each statutorily eligible victim.

the amount of restitution as the two measures serve different purposes and utilize different calculation methods"); *Stone*, 822 F. App'x at 626 (Section 2B1.1 "concerns culpability of the offender [while] restitution is about 'actual losses' to the victim."); *United States v. Patterson*, 595 F.3d 1324, 1327 (11th Cir. 2010) (restitution "must be based on the amount of loss actually caused by the defendant's conduct" and "it does not require restitution to match the loss figure used for sentencing.").  Such is the case here.  For example, Mr. Petron's "actual loss" calculations include all amounts paid —regardless of whether the procedures were medically necessary or separate from the charged scheme. *Sharma*, 703 F.3d at 324 (insurers cannot recover for procedures that would have been covered absent the fraud). Use of this figure, therefore, necessarily would overstate an insurer's actual loss and constitute  plain error.  Second, it appears that the government no longer stands by the accuracy of Mr. Petron's trial testimony, as the government instructed Mr. Petron post trial to conduct new loss calculations that now set the government's assessment of actual loss for Section 2B1.1 purposes at $61,448,538.[46]  Third, as explained at length, *supra pp*. 26-48, Mr. Petron's trial and post trial loss calculations are deeply flawed and should not be used as a basis for calculating loss under Section 2B1.1, much less for determining actual loss for restitution purposes.  *Anderson*, 741 F.3d at 951-52 (district court may

---

[46] The government cited to this figure as the actual loss from the fraud scheme at the sentencing of cooperating defendant Klasky. *U.S. v. Klasky*, 2:17-cr-00401-DMG, Dkt. 73, 2 ¶ 3(b) (Jan 17, 2023) (hereinafter, "Klasky Stip").

only rely on "evidence that possesses sufficient indicia of reliability to support its probable accuracy" when assessing restitution); *Waknine*, 543 F.3d at 557 (same).

In late-November and early December 2022, the government produced victim impact statements from 14 purported victims, consisting of insurers and former patients, some of whom have ongoing lawsuits against Mr. Omidi, that were accompanied by approximately 1,200 pages of documents that, in part, included 150,000 rows of claims data. .  (Lally Sealed Decl. ¶ 15; Exh. U.; CR 1800 at 2.) These materials varied significantly across parties[47] but were consistent in that they were wholly lacking in a legally sufficient support establishing how much money each victim purportedly was entitled to receive in restitution. The government since has conceded the inherent deficiencies in these submissions in its sentencing memoranda in the Klasky and Hong matters: "the victim impact statements provided by victims in this case do not themselves segregate the losses based on the conspiracy to defraud insurers of which defendant has been convicted and/or request losses that are not available under 18 U.S.C. § 3663A." *Klasky Stip.* at 2-3; *U.S. v, Sherwin Hong*, 2:17-cr-00641-DMG at 8 (Jan. 4, 2023) (hereinafter "Wong SP").  Notably, at these sentencings, the government only sought restitution for five insurer claimants,

---

[47] For instance, an insurer provided nothing more than an excel spreadsheet without any accompanying explanation while a patient submitted only a handwritten note with a few words scribbled on a page.  (Lally Sealed Decl. ¶ 9; Exh. R.)

reflecting its apparent determination that the other nine submissions involved claimants who failed to meet Section 3663A's requirements for "victim" status. *Id.*

On January 24, 2023, Mr. Omidi requested clarification from the government as to which victims it had "identified as not being entitled to restitution"; and which claims were not "legally permissible given the counts of conviction and scope of Section 3663A." (Lally Sealed Decl. ¶ 10; Exh. S at 1-2.) Mr. Omidi further requested that the government: (1) identify all non-qualifying restitution claims for "those entities/individuals that/who the government has determined are only entitled to a subset of the restitution claimed in the government's prior production;" and confirm that "the loss calculations in Mr. Petron's third supplemental report are not only 'alternative' calculations but the loss calculations that the government will be relying upon at sentencing." (*Id.*) On January 26, 2023, the government, notwithstanding its obligation to provide Mr. Omidi with information favorable to his sentencing, declined to provide any clarification and responded that it "will address its position on restitution and loss in its sentencing filing." (*Id.* at 1.) Thus, Mr. Omidi lacks the ability to provide a fulsome response to all restitution-based issues and will address these issues in further depth in his reply memorandum after having an opportunity to review the government's position.

### ii. To Date, the Government Has Failed to Provide Evidence Sufficient to Establish Victim Status as to the Insurers.

While the government has refused to identify which claimants have presented lawful claims for restitution as to Mr. Omidi, the government limited recovery to the following five entities in the Hong and Klasky sentencings: Anthem, United, Aetna, Cigna, and UFCW (collectively, the "Insurers"). (*Klasky Stip.* at 3 ¶ 3(d); *Hong* at 9.) This briefing will consider those entities as the class of prospective claimants.

To date, the government has provided no evidence that the Insurers are the real parties in interest for all the claims included in the victim statements. Specifically, the government has failed to account for the fact that ERISA plans were involved in almost all instances and that the Insurers only served as third party administrators for the businesses that actually insured the patients. At trial, Carl Rheinhardt, Director of Special Investigations for Anthem, nicely summarized the issue, when he testified:

> **Over half of the people that we say are Anthem insured are actually insured through their own employer. The employer is at risk for all the money. Anthem simply administrates the plan on their behalf.** So essentially the monies that the insurer collects from the premiums go into a separate fund, and anthem pays claims, handles customer services and whatever, but **we are not at risk for those dollars.** If something happens, that employer group is fully at risk for it. (RT 946:1-11.) (emphasis added).

Anthem's claims data corroborates the veracity of this statement. Of the 8,118 claims submitted by Anthem, only twelve were funded by Anthem itself. (Lally Sealed Decl.

¶ 16; Exh. V; GT_VICTIM_00000970.)   And Anthem is not alone.[48] United acknowledged that it only paid for some of the claims for which it seeks to recover, but failed to identify those claims, referring to a vague, redacted .pdf filed in another matter.  (Lally Sealed Decl. ¶ 15; Exh. U.)

The government has not produced the underlying ERISA plans establishing that the Insurers have a current contract with the employers or even have standing to recoup funds on the employers' behalf.  Absent such evidence, the Insurers should not be deemed as victims for those procedures involving patients with ERISA plans. *United States v. Waknine*, 543 F.3d 546, 557 (9th Cir. 2008) (government has burden to prove party qualifies as victim and must do so only through evidence that possesses 'sufficient indicia of reliability to support its probable accuracy.'"); *United States v. Catoggio,* 326 F.3d 323, 328 (2d Cir. 2003); *see* 18 U.S.C. § 3663A(c)(1)(B) ("restitution can only be imposed to the extent that the victims of a crime are actually identified."). Instead, the Insurer's qualification as a victim should be limited solely to those claims, if any, for which they were independently responsible.

### iii.   To the Extent a Designated Insurer Properly Qualifies as a Victim, Recovery Must Be Limited to the Scope of the Charged Fraud Scheme.

In addressing the restitution sought by the Insurers, the government twice has conceded that its restitution materials are legally deficient.  *See Klasky Stip.* at 2-3

---

[48] Cigna did not submit a victim statement.  (Lally Sealed Decl. ¶ 12.)Aetna and UFCW did not identify the employer-sponsors in the claims data provided.  (Lally Sealed Decl. ¶¶ 8, 13.)

("victim impact statements provided by victims in this case do not themselves segregate the losses based on the conspiracy to defraud insurers of which defendant has been convicted and/or request losses that are not available under 18 U.S.C. § 3663A.;" Hong SP at p.5; "the claims provided by victim insurers have not segregated those payments associated with Lap-Band claims following falsified sleep study reports that constitute relevant conduct to defendant's offense."[49]  But lost in the government's concessions regarding the unreliability of this data is that it is the government's obligation to affirmatively advance proof sufficient to support a restitution claim. To the extent the government sought to outsource its burden to the purported victims, it must accept these submissions as its own. And just as the government has acknowledged that these submissions cannot support recovery, this Court should find that the government, which has had more than eleven years to prepare a restitution case, has failed to meet its burden and deny the legally deficient restitution claims.

---

[49] This is readily apparent from the victim statements, several of which directly or tacitly acknowledge that they seek  recovery for claims where there was no fraud (*e.g.*, including *all* claims billed for specific codes related to Lap-Band surgeries and sleep studies, regardless of whether sleep apnea was a diagnosis, "but for" procedures such as all "professional claims for the same member on the same date of service" regardless of whether those claims were for medically necessary procedures. (Lally Sealed Decl. ⁋ 11; Anthem GT_VICTIM_00000968]; *see also* GT_VICTIM_00001090 (same); (Lally Sealed Decl. ⁋ 15; Exh. U.)(conceding that no effort was made to determine whether claims were approved because of an altered sleep study because doing so would be "difficult."); s*ee also United States v. Catoggio*, 326 F.3d 323, 329 (2d Cir. 2003) (holding that MVRA requires district court to "identify the victims and their actual losses" before imposing restitution, "even where a defendant's complex fraud scheme results in many victims whose identities and losses are difficult to ascertain").

At this late date the government should not be permitted to present additional restitution data which would significantly prejudice defendants and delay proceedings, given that the government rejected efforts by the defense to obtain valid information. "The MVRA does not require a sentencing court to award restitution when determining the award would unduly burden the court." *United States v. Bhikha*, 2021 WL 3854753, at *2 (N.D. Cal. Aug. 30, 2021).  In *Bikha* the court declined to provide restitution because ([a] sentencing court need not order restitution 'if the court finds, from facts in the record, that ... determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process.'" *Id*., at *2, quoting § 3663A(c)(3)(B) (the "undue burden" provision). The defense has spent months and significant funds attempting to decipher the victim loss statements provided by the government, which are untethered to the theory of loss in this case. It would require multiple minitrials, extensive amounts of discovery, and an inordinate amount of work both by defendants and this Court to determine what the restitution amount should be, to whom it should be paid, and whether these five insurance companies have legal capacity or standing to seek restitution.

Even if the government had provided valid data by presenting a targeted subset of claims based data, restitution should be quite limited. Trial evidence established that the insurance companies would pay for medically necessary procedures,

95

including Lap-Band surgery, even if an authorization request was accompanied by false information. *United States v. Bane*, 720 F.3d 818 (11th Cir. 2013) (cost of medically necessary equipment or procedures must be removed from restitution award). It is the obligation of the government, not Mr. Omidi, to establish the lack of medical necessity across the patient population, *United States v. Mahmood*, 820 F.3d 177, 195-6 (5th Cir. 2016) ("burden is on the government to establish what services were not medically necessary."); however, it is known from Ms. Busch's report that medical necessity was present in every instance involving Lap-Band surgery for the 250 patient sample that Mr. Petron utilized to extrapolate across the patient population. In the rare instance in which the government is able to establish that a procedure was not medically necessary, it should be required to advance claims data showing whether sleep apnea factored to into the Insurer's payment determination. *Waknine*, 543 F.3d at 556 (non-itemized victim affidavits without requiring evidence or proof that all costs were directly related to the defendant's convictions constituted error); *Stone*, 822 F. App'x at 625 ("to meet this burden, the government must provide the district court with more than just general invoices ostensibly identifying the amount of their losses . . . it has the burden to prove which portion of the insurance payout was fraudulent.")  Notably, as to this point, Ms. Busch's examination of claims data provided by the Insurers in support of their restitution claims showed that sleep disorders, to include sleep apnea, rarely appeared among the listing of comorbidities cited by the Insurers as the basis for their payment. To award restitution without such

proof would be to plainly err as it would allow for recovery that extends beyond the loss that flows directly from the scheme and would provide a legally prohibited windfall to the Insurers. *Rizk*, 660 F.3d at 1137; *Waknine*, 543 F.3d at 555.

      **b.**    **An Evidentiary Hearing on Restitution is Required as There Exist Disputes of Material Fact.**

While any of these reasons, standing alone, are enough to conclude that the government's claim is facially insufficient, in the alternative, an evidentiary hearing is required because there are disputes of material fact regarding which victims qualify for restitution and, for those who do, the appropriate amount of restitution.  *See* 18 U.S.C. § 3664(d)(4) (allowing the district court to receive additional documentation or hear testimony to resolve factual issues arising as part of the restitution analysis); *United States v. Gordon*, 393 F.3d 1044, 1049-50 (9th Cir.2004) (district court conducted an evidentiary hearing to resolve disputed restitution issues); see also U.S.S.G. § 6A1.3 cmt. (evidentiary hearings may be held to resolve disputed factual issues at sentencing).   Indeed, when the evidentiary basis of a district court's sentencing decision is of questionable reliability, it may be error for a district court to decline a defendant's request for an evidentiary hearing. *See United States v. Jimenez Martinez*, 83 F.3d 488, 494-95 (1st Cir.1996). Given the complex nature of the restitution request at issue, the large amount of money requested, the significant volume of evidence, and dispute of material fact, an evidentiary hearing is the appropriate procedural vehicle to resolve these factual disputes.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

JULIAN OMIDI'S SENTENCING MEMORANDUM, MOTION FOR DOWNWARD VARIANCE, AND POSITION ON RESTITUTION

**CERTIFICATE OF SERVICE**

I certify that, on February 15, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notice to all counsel of record.

*s/ Kevin M. Lally*
Kevin M. Lally
