E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
KRISTEN A. WILLIAMS (Cal. Bar No. 263594)
Deputy Chief, Major Frauds Section
ALI MOGHADDAS (Cal. Bar No. 305654)
DAVID H. CHAO (Cal. Bar No. 273953)
DAVID C. LACHMAN (Cal. Bar No. 261711)
Assistant United States Attorneys
Major Frauds/General Crimes Sections
    1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-0526
    Facsimile: (213) 894-6269
    E-mail:    Kristen.Williams@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 17-661(A)-DMG |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION AS TO DEFENDANT JULIAN OMIDI; DECLARATION OF KRISTEN WILLIAMS AND EXHIBIT THERETO; DECLARATION OF SARINE TOOMA |
| v. | |
| JULIAN OMIDI, | |
| Defendant. | Hearing Date: March 2, 2023 <br> Hearing Time: 3:00PM <br> Location:    Courtroom of the <br>             Hon. Dolly M. Gee |

Plaintiff United States of America, by and through its counsel
of record, the United States Attorney for the Central District of
California and Assistant United States Attorneys Kristen A. Williams,
Ali Moghaddas, David H. Chao, and David C. Lachman, hereby files its
objections to the Presentence Report and sentencing position as to
defendant JULIAN OMIDI.

1        The position is based upon the attached memorandum of points and

2   authorities, the attached declarations of Kristen A. Williams and

3   Sarine Tooma and exhibits thereto, the files and records in this

4   case, and such further evidence and argument as the Court may permit.

5   Dated: February 15, 2023          Respectfully submitted,

6                                     E. MARTIN ESTRADA
                                      United States Attorney
7
                                      MACK E. JENKINS
8                                     Assistant United States Attorney
                                      Chief, Criminal Division
9

10   _____
                                      KRISTEN A. WILLIAMS
11                                    ALI MOGHADDAS
                                      DAVID H. CHAO
12                                    DAVID C. LACHMAN
                                      Assistant United States Attorneys
13
                                      Attorneys for Plaintiff
14                                    UNITED STATES OF AMERICA

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                      2

**TABLE OF CONTENTS**

DESCRIPTION                                                                                         PAGE

TABLE OF AUTHORITIES.....................**Error! Bookmark not defined.**

MEMORANDUM OF POINTS AND AUTHORITIES................................1

I.    INTRODUCTION..................................................1

II.   THE PRESENTENCE REPORT AND GUIDELINE CALCULATION..............2

      A.    Loss to a Government Health Program.......................3

      B.    Loss.....................................................4

            1.    Intended Losses Should Be Based on the Amounts
                  Billed............................................5

            2.    Intended Losses Are Conservatively Estimated as
                  Between $250 and $500 Million......................7

III.  THE APPROPRIATE SENTENCE UNDER THE GUIDELINES AND SECTION
      3553(a)......................................................10

      A.    A 22-Year Sentence Is Reasonable Given the Nature and
            Circumstances of the Offense and the History and
            Characteristics of Defendant............................11

      B.    A 22-Year Sentence Is Reasonable Because It Reflects
            the Seriousness of the Offense and Affords Adequate
            Deterrence..............................................13

      C.    A 22-Year Sentence Will Avoid Unwarranted Sentencing
            Disparities.............................................14

IV.   RESTITUTION..................................................15

      A.    Legal Framework.........................................15

      B.    Restitution.............................................15

      C.    Victim Impact Statements................................16

V.    CONCLUSION...................................................16

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.   INTRODUCTION

3      At the end of a nearly three-month trial, after hearing from

4 dozens of witnesses and receiving hundreds, if not thousands, of

5 exhibits, the jury found defendant JULIAN OMIDI ("OMIDI") guilty on

6 all counts[1] stemming from his direction of a massive scheme to

7 defraud insurance companies through the provision of false

8 information, including fabricated sleep study results, in support of

9 requests for pre-approval to perform Lap-Band surgery.  The scheme

10 led to fraudulent claims for Lap-Band surgeries approved on

11 fraudulent premises, as well as claims for sleep studies and for

12 medical equipment purportedly justified by the fabricated sleep

13 studies.  The conduct spanned nearly five years, generated millions

14 in claims and payments, and affected the lives of thousands of

15 patients who were led to believe – and undergo medical treatment on

16 the basis that – they suffered from conditions they did not, in fact,

17 have.

18      OMIDI committed serious crimes deserving of a serious sentence.

19 He has shown no remorse or acceptance of responsibility for his

20 actions and attempted to threaten and intimidate witnesses,

21 intermediaries or directly, throughout the government's investigation

22 and even after indictment.  The United States Probation Office

23 ("USPO") has recommended a 17-year custodial sentence.  (USPO Rec.

24 Ltr. at 2, Dkt. 1665.)  However, because the USPO arrives at this

25

26      ───────────────

27      [1] These include 28 counts of mail fraud, three counts of wire
fraud, one count of aggravated identity theft, two counts of false
statements relating to health care matters, conspiracy to commit
28 promotional money laundering, and two counts of promotional money
laundering.  (Dkt.

recommendation principally by holding OMIDI only accountable for the amounts paid on the fraudulent claims that resulted from the scheme -- a limitation which, as described below, is particularly inappropriate in this case -- the government does not believe a 17-year sentence would be sufficient.  Thus, the government recommends a sentence of 22 years, which, while still below the applicable Guidelines range of life in prison, sufficiently accounts for the nature of OMIDI's conduct and the remaining Section 3553(a) factors.

The government further recommends restitution to be paid to the identified victims below of at least $43,798,269.61, but respectfully requests the ability to supplement this amount if it uncovers additional victim losses that should be included.

Given the lengthy trial and other proceedings in this case, the government has assumed the Court's general familiarity with the factual background and will focus on the facts most relevant to this sentencing position in connection with its arguments below.

## II. THE PRESENTENCE REPORT AND GUIDELINE CALCULATION

In anticipation of sentencing, the USPO issued a PSR calculating the applicable Sentencing Guidelines range and finding that a total offense level of 45 (corresponding to a life sentence) applied to the fraud, false statements, and money laundering convictions, with a mandatory consecutive two-year sentence for OMIDI's aggravated identity theft conviction.  (PSR ¶¶ 140-141.)  The Probation Officer's total offense level calculation is as follows:

| Base Offense Level: | 7 | [U.S.S.G. §§ 2S1.1(a)(1), 2B1.1(a)(1)] |
|---|---|---|
| Loss Between $250,000,000 And $550,000,000: | +28 | [U.S.S.G. §§ 2S1.1(a)(1), 2B1.1(b)(1)(O)] |
| More than 10 Victims: | +2 | [U.S.S.G. §§ 2S1.1(a)(1), 2B1.1(b)(2)(A)] |
| Conviction under § 1956 | +2 | [U.S.S.G. § 2S1.1(b)(2)(B)] |
| Aggravated Role | +4 | [U.S.S.G. § 3B1.1(a)] |
| Obstruction: | +2 | [U.S.S.G. § 3C1.1] |
| Total Offense Level: | 45 | |

(PSR ¶¶ 55-81.)  The Probation Officer also found that OMIDI had no criminal convictions and thus zero criminal history points, falling within Criminal History Category I.  (PSR ¶¶ 83-87.)  The applicable Guidelines range is life in prison.

As discussed below, the government largely agrees with the Probation Officer's Guidelines calculation, but believes that an additional enhancement of 2 levels under U.S.S.G. § 2B1.1(b)(7)(i) should apply, bringing the total offense level to 47, which similarly corresponds to an applicable Guidelines range of life in prison. That additional enhancement, as well as supplemental information regarding loss, is discussed below.

### A.   Loss to a Government Health Program

A two-level enhancement under U.S.S.G. § 2B1.1(b)(7)(i) should apply because OMIDI was convicted of a Federal health care offense, as defined in 18 U.S.C. § 24, and the intended losses to government health care programs Tricare and the Office of Personnel Management ("OPM") are conservatively estimated to be between $1,000,000 and $7,000,000, based on the information provided by Tricare and OPM in

connection with their victim impact materials.  (Declaration of Kristen A. Williams ("Williams Decl.") ¶ 2.)

### B. Loss

Under the fraud Sentencing Guideline, "loss is the greater of actual or intended loss."  U.S.S.G. § 2B1.1, App. Note 3(A) (2021).  "Intended loss" is defined as "pecuniary harm that the defendant purposely sought to inflict," even if "impossible or unlikely to occur" including in "an insurance fraud in which the claim exceeded the insured value."  Id. § 2B1.1, App. Note 3(A)(ii).  In United States v. Popov, 742 F.3d 911 (9th Cir. 2014), the Ninth Circuit followed several other circuits in finding that, in the case of health care fraud, the amount billed is sufficient to establish intended loss, although parties can introduce additional evidence that the amount billed over- or under-stated the defendant's intent.  Id. at 916.  By 2015, the Guidelines had explicitly adopted this position as well with respect to health care offenses involving government health programs (such as Tricare and OPM, both victims here (PSR ¶ 51), stating:

> the aggregate dollar amount of fraudulent bills submitted to the Government health care program shall constitute prima facie evidence of the amount of intended loss, i.e., is evidence sufficient to establish the intended loss, if not rebutted.

U.S.S.G. § 2B1.1, App. Note 3(F)(viii) (2015).

"[L]oss need not be determined with precision," but "need only [be] a reasonable estimate . . . given the available information."  United States v. Bussell, 504 F.3d 956, 960 (9th Cir. 2007) (internal quotation marks and citation omitted); see also U.S.S.G. § 2B1.1, App. Note 3(C) ("The court need only make a reasonable estimate of the loss.").  That loss estimate may be based on an extrapolation or

4

estimate from known data.  See U.S.S.G. § 2B1.1, App. Note 3(C)(iv)
("The Sentencing Guidelines also provide that estimates of loss in
fraud cases "may be based on the approximate number of victims
multiplied by the average loss to each victim."); see, e.g., United
States v. Scrivener, 189 F.3d 944, 950 (9th Cir. 1999), as amended
(Nov. 10, 1999) (approving extrapolation of fraud in sample to
estimate amount of intended loss in defendant's conduct as a whole);
United States v. Koenig, 952 F.2d 267, 271-72 (9th Cir. 1991)
(affirming district court's method of loss calculation where court
multiplied average value of counterfeit ATM cards by the number of
cards defendants had attempted to make); United States v. Kolodesh,
787 F.3d 224, 239 (3d Cir. 2015) (affirming healthcare fraud loss
based on agent's determination as to percentage of fraudulent claims
submitted); United States v. Pierce, 409 F.3d 228, 234 (4th Cir.
2005) (upholding calculation of fraud loss by extrapolating from
monthly averages from one period of years to another); United States
v. Bryant, 128 F.3d 74, 76 (2d Cir. 1997) ("[I]t is permissible for
the sentencing court, in calculating a defendant's offense level, to
estimate the loss resulting from his offenses by extrapolating the
average amount of loss from known data and applying that average to
transactions where the exact amount of loss is unknown.").

     1.   Intended Losses Should Be Based on the Amounts Billed

As noted, Ninth Circuit precedent and the Guidelines support
using the amounts billed to victim insurers on fraudulent claims to
quantify the losses that OMIDI intended to cause in this case.  The
USPO has recommended using that amount in its calculations.  (PSR
¶ 66.)  While generally appropriate in health care fraud cases, use
of the billed amount, rather than the paid amount, is particularly

appropriate here.  According to the evidence introduced at trial,
OMIDI determined the specific amount that would be billed for
services such as sleep studies and Lap-Band surgeries, knowing that,
as an out-of-network provider without a contract with the various
insurance plans, he was not bound by any contractual agreed-upon
payment and instead had the potential to receive the entirety of the
amount billed, whatever it might have been, from the insurers.
(11/19/2021 RT 6552, 6580-81.)  In setting the amounts charged for
sleep studies, in particular (typically between $14,331 and $16,252),
OMIDI was repeatedly informed by outside billing consultants like Tom
Johnson that those charges were far outside the norm for those
services, but OMIDI nonetheless persisted in using those exorbitant
amounts.  (RT 6562-70.)  OMIDI's strategy proved successful, given
that a number of insurers would pay the full amount billed,
notwithstanding that the amount was unusually large.  (RT 7106.)

Moreover, even if those insurers did not elect to pay the entire
amount, the fact that OMIDI and GET THIN were not in-network with the
various insurers and had no contract obligating them to accept a
certain payment meant that OMIDI could seek to recoup any balance not
covered by the insurer from the patient directly.  The fact that GET
THIN collected payments from patients for services during the scheme
and has continued to seek to recover the balance from patients,
including from victim Alexandra Platas (who testified at trial and
provided the complaint seeking those amounts billed from her in
connection with her victim impact statement[2]), further establishes
OMIDI's intent to causes losses for the entire amount billed.

---

[2] (See Platas Victim Impact Stmt.)

2. Intended Losses Are Conservatively Estimated as Between $250 and $500 Million

As noted above, the PSR found that the loss in this case was between $250 million and $500 million, corresponding to an adjustment of plus-28 under Section 2B1.1(b)(1)(O). That finding is consistent with the statistical extrapolation presented at trial, in which the government's expert, Michael Petron, found a total estimated intended loss of $354,412,721, comprised of

    i. $160,953,725 in claims billed for sleep studies where (a) the government received records from the insurer showing it received an altered study, (b) the study had no emailed feedback provided by co-defendant Dr. Mirali Zarrabi, the purported interpreting physician, and/or (c) the study was a titration study following a normal baseline study;

    ii. $175,909,247 in claims billed for Lap-Band surgeries for patients for whom there was also an altered sleep study found; and

    iii. $17,549,749 in claims billed for CPAP devices and accessories for patients for whom the DME provider received an altered sleep study from GET THIN. (See GEX 916, 917, 918.)

Following trial, Petron provided additional analysis regarding the claims for sleep studies. (See Ex. A to the Declaration of Kristen A. Williams ("Williams Decl.").) In his supplemental report, drawing from the same statistical sample to which he previously testified, Petron looked at the billing for sleep studies that had been altered such that the AHI increased by one point or more or the study was altered to be a different kind of study (PSG to a CPAP, for

example), excluding eleven studies where the AHI was altered but remained within the same diagnosis category (collectively, the "Altered Sleep Studies"). (Ex. A at 1.) Summing his results to the beneficiary level, Petron found that the amounts billed for these Altered Sleep Studies (the intended loss) extrapolated to the sample frame was estimated at $105,186,283. (Id. at 3.) Petron further extrapolated the amounts billed for CPAP studies that were billed after Michael Zarrabi scored the initial PSG as normal (and no CPAP study would thus have been medically necessary). That amount, extrapolated to the sample frame, was estimated at $11,486,820. Thus, in this supplemental analysis, Petron found a total of $116,673,103 in estimated intended losses associated with billings for Altered Sleep Studies or CPAP studies billed following a normal PSG study. That amount, combined with the intended losses for Lap-Band surgeries and CPAP devices and accessories from Petron's prior report and trial testimony, brings the total estimated intended losses to $310,132,099, still well within the $250-$500 million loss range corresponding to a plus-28 adjustment.

The Court should view the above estimates of loss as conservative estimates for multiple reasons.

First, these estimates do not include losses associated with sleep study reports or LOMNs tainted by other false information. The Court heard information about multiple other types of false information typically included in these documents, including fabricated Epworth Sleepiness Scale ("ESS") scores, falsely inflated BMI scores, and fabricated nutrition summary reports, for example. Daniel Carriedo estimated that he falsified approximately 10,000 ESS

scores, which were often used in both sleep study reports and LOMNs.[3] Indeed, because the template sleep study report also typically included a set ESS score of either 16 or 17 (corresponding to excessive daytime sleepiness), it is likely that nearly all of the sleep study reports would have included false ESS scores, even where the reports were not altered as to the AHI.  The billings associated with that volume of sleep studies containing and the Lap-Band surgeries that sought approval based in part on other false information like that listed above would obviously be much higher than the figures described above.

Second, Petron's statistical extrapolation used a sample created from the sleep study reports produced by Michael Zarrabi.  Because Michael Zarrabi stopped working at GET THIN in or around July 2014 and GET THIN continued to bill for sleep studies that were now neither scored nor interpreted (and thus medically unnecessary and supported by fabricated documentation), the sample Petron used for his estimates is smaller than the total amount of potentially fraudulent studies and his estimates do not include estimated losses associated with any sleep study, Lap-Band, or CPAP device or accessory claims tainted by fabricated sleep studies after July 2014.

Third, the Lap-Band losses currently correspond to the billings associated with the procedures performed on the date of the Lap-Band surgery, and exclude subsequent follow up related to that Lap-Band surgery (adjustments to the band, for example) that, likewise, would not have been conducted but for the Lap-Band surgery predicated on fraud.

---

[3] (10/1/2021 RT 1527.)

9

**III.  THE APPROPRIATE SENTENCE UNDER THE GUIDELINES AND SECTION 3553(a)**

While not definitive, the Guidelines range provides the starting point for finding a reasonable sentence and must then be considered with the factors set forth in 18 U.S.C. § 3553(a).  See <u>United States v. Cantrell</u>, 433 F.3d 1269, 1279 (9th Cir. 2006).  "To comply with the requirements of <u>Booker</u>, the district court must have sufficiently considered the Guidelines as well as the other factors listed in § 3553(a).  This requirement does not necessitate a specific articulation of each factor separately, but rather a showing that the district court considered the statutorily-designated factors in imposing a sentence."  <u>United States v. Nichols</u>, 464 F.3d 1117, 1125 (9th Cir. 2006) (quoting <u>United States v. Knows His Gun</u>, 438 F.3d 913, 918 (9th Cir. 2006)).

The Section 3553(a) factors are as follows:

1) The nature and circumstances of the offense and the history and characteristics of the defendant;

2) The need for the sentence imposed –

    (A)  To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)  To afford adequate deterrence to criminal conduct;

    (C)  To protect the public from further crimes of the defendant; and

    (D)  To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

3) The kinds of sentences available;

4) The kinds of sentence and the sentencing range established for the offense and the defendant as set forth in the Sentencing Guidelines;

5) Any pertinent policy statement issued by the Sentencing Commission;

6) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

7) The need to provide restitution to any victims of the offense.

See 18 U.S.C. § 3553(a). The government believes that the factors set forth in 18 U.S.C. § 3553(a) would be satisfied by a sentence of 22 years' imprisonment, including 20 years to be served concurrently on the mail and wire fraud, false statement, and money laundering charges and a two-year mandatory consecutive sentence for his conviction of aggravated identity theft. Such a sentence would be "sufficient, but not greater than necessary" to comply with the purposes enumerated in 18 U.S.C. § 3553(a)(2), discussed further below. 18 U.S.C. § 3553(a).,

**A.   A 22-Year Sentence Is Reasonable Given the Nature and Circumstances of the Offense and the History and Characteristics of Defendant**

Defendant spearheaded a scheme to defraud insurers through fabricated sleep study results and other falsified information that was submitted with sleep study claims and used in pursuit of approval for lucrative Lap-Band surgeries and in the provision of CPAP devices and accessories to patients. He did so from a position of power, as a member of the wealthy family that controlled GET THIN, and wielded that power over mostly low-wage workers in a chaotic, high-pressure, and almost abusive environment where employees often stayed and followed his directions only because they were dependent upon GET THIN for the ability to stay in the country or upon the paycheck or health insurance provided. Defendant's conduct spanned years,

11

affected thousands of patients, and led to hundreds of millions in fraudulent billings.  During the course of the investigation, he attempted to minimize and obfuscate his role, threatened and intimidated potential witnesses against him or had others do so on his behalf, directed others like Charles Klasky to destroy evidence, and attempted to conceal the fraud through other means, including through internal memoranda designed to cover up the falsification of sleep study results and his own destruction of the post-it notes he used to direct others in the fraud.

Defendant's conduct is all the more serious, given that it induced patients to undergo medical treatment like CPAP treatment they did not need or serious surgeries like Lap-Band surgery that carry with them significant risks and lifelong health impacts. Indeed, during the course of or shortly after Lap-Band surgery, multiple GET THIN patients died, including one, P.R., who was the subject of several counts of conviction.  Other patients have spoken eloquently of their experiences at trial and in their victim impact statements.  Defendant was also well aware of the seriousness of these medical procedures, being a physician himself; indeed, he appears to have flouted the 2009 revocation of his license through work at GET THIN that involved clinical decision-making and fabrication of medical records on a regular basis.

Defendant is also unlike many defendants that this Court sees in that he has a strong educational and professional background that would have enabled him to engage in meaningful, well-paid work without resulting to crime.  To engage in this fraud was a choice.

**B.   A 22-Year Sentence Is Reasonable Because It Reflects the Seriousness of the Offense and Affords Adequate Deterrence**

Defendant's crime was serious both financially and personally for the patients caught up in the scheme.  He has expressed no remorse and his actions intimidating witnesses reflect a willingness to double-down on his conduct.  Defendant also engaged in this scheme as a pseudo-medical professional, effectively directing the treatment of patients through his high-pressure perversion of the bariatric surgery model.  That conduct reflects a disrespect for rules and authority, including the authority and judgment of the California Medical Board, which took the unusual step of revoking his license after rejecting OMIDI's claim that he did not intend to deceive the Board by omitting the fact that he had been expelled from the University of California Irvine and charged (and convicted) of conspiracy, second-degree burglary, and possession of stolen property in connection with an incident there.  (See PSR ¶ 88, 112.)

Moreover, this Court is well aware of the epidemic of health care fraud that plagues this District.  If individuals like defendant, who engage in fraud schemes concerning hundreds of millions in fraudulent claims, do not receive lengthy sentences, there will be little incentive for others to curb their conduct.

However, given defendant's age, the government believes that life sentence is not necessary to avoid any risk of recidivism. Instead, a 22-year sentence would have defendant in custody until he is in his seventies, a time when he would be unlikely to return to business operations where there would be a risk he would reoffend.

### C.    A 22-Year Sentence Will Avoid Unwarranted Sentencing Disparities

Pursuant to 18 U.S.C. § 3553(a)(6), the Court is required to minimize sentencing disparity among similarly situated defendants. One way of doing so is to correctly calculate the Guidelines range. See United States v. Treadwell, 990 F.3d 990, 1011 (9th Cir. 2010) ("Because the Guidelines range was correctly calculated, the district court was entitled to rely on the Guidelines range in determining that there was no 'unwarranted disparity' . . . ."); see also Gall v. United States, 552 U.S. 38, 54, 128 S. Ct. 586, 599 (2007) ("[A]voidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Sentencing Guidelines ranges.  Since the District Judge correctly calculated and carefully reviewed the Guidelines range, he necessarily gave significant weight and consideration to the need to avoid unwarranted disparities."). Here, the applicable Guidelines range calls for a sentence of life in prison.  While the length of that sentence evokes the seriousness of defendant's conduct, in determining a reasonable sentence that is no greater than necessary, the government has looked to other sentences imposed in this district for similar significant fraud schemes.  In reviewing those sentences, the government observed, for example that the defendant in United States v. Zachary Horwitz, CR 21-214-MCS, received a 20-year sentence following his conviction for a $650 million dollar Ponzi scheme that falsely claimed to license foreign film rights.  While the total amount of that fraud is more than is at issue here, defendant Horwitz pleaded guilty and thus was given credit for accepting responsibility, something that defendant has not done in this case.  That fraud also did not involve a scheme in which

14

1 patients were pushed through medical procedures as a result of the

2 fraud, which is an aggravating factor.  Balancing these issues, the

3 government believes that a 22-year sentence, although below the

4 applicable Guidelines range, strikes the appropriate balance.

5 **IV.  RESTITUTION**

6     **A.  Legal Framework**

7     OMIDI was convicted of mail and wire fraud and false statements

8 regarding health care matters, Title 18 offenses to which the

9 Mandatory Victims Restitution Act ("MVRA") and Victim Witness

10 Protection Act ("VWPA") apply.  See 18 U.S.C. §§ 3663(a)(1)(A),

11 3663A(c)(1)(A)(ii).

12     The goal of restitution is "to make victims of the crime whole,"

13 which means "to restore the defrauded party to the position he would

14 have had absent the fraud."  United States v. Gordon, 393 F.3d 1044,

15 1048 (9th Cir. 2004).  The government has the burden of establishing

16 the amount of restitution by a preponderance of the evidence.  See 18

17 U.S.C. § 3664(e).  The Ninth Circuit has noted that the "restitution

18 process [should] be expedient and reasonable, with courts resolving

19 uncertainties with a view toward achieving fairness to the victim."

20 Gordon, 393 F.3d at 1060.

21     **B.  Restitution**

22     The government has reviewed the materials provided by the

23 victims in this case, in connection with the evidence in its

24 possession regarding the alteration of sleep studies that tainted

25 sleep study, Lap-Band and CPAP device claims as described in the

26 attached declaration of Special Agent Sarine Tooma.  Based on this

27 review, at this time, the government recommends that the Court award

28 restitution as follows:

| Insurer Victim | Total Paid |
|---|---|
| Aetna | $11,893,929.30 |
| Allied | $30,493.18 |
| Anthem | $23,558,053.38 |
| Blue Cross Blue Shield | $3,343,918.18 |
| CIGNA | $2,031,832.69 |
| HealthNet | $48,888.95 |
| Tricare | $68,314.57 |
| United Health | $2,822,839.36 |
| **Total:** | **$43,798,269.61** |

(See Declaration of Sarine Tooma.)

The government recognizes that patient victims have also submitted requests for restitution. However, those requests appear at this time not to provide sufficient information for compensable losses, and requests the ability to supplement this information later as to those losses (or any additional losses identified by insurer victims).

### C.   Victim Impact Statements

The government received victim impact statements in this case, and, consistent with the government's obligations, is submitting those victim impact statements to the Court in a concurrent under seal filing.  The government has also been alerted that one or more of those victims would like an opportunity to address the Court at sentencing.

### V.   CONCLUSION

For the foregoing reasons, the government requests that the Court impose a 22-year custodial sentence, to be followed by three-

years of supervised release, and the payment of a special assessment of $100.  The government further requests that the Court order restitution in an amount no less than $43,798,269.61, as provided above to the identified victims in this case.

## DECLARATION OF KRISTEN A. WILLIAMS

I, Kristen A. Williams, state and declare as follows:

1.    I am an Assistant United States Attorney ("AUSA") for the Central District of California and am one of the attorneys assigned to the prosecution of United States v. Julian Omidi, et al., CR No. 17-00661-DMG.  I make this declaration in support of the Government's Sentencing Position Regarding Defendant Julian Omidi.

2.    Based on my review of the Tricare and OPM submissions, I am informed and believe that taking 58% (corresponding to Michael Petron's percentage of Altered Studies in his supplemental analysis) of the total patients billed for sleep studies and multiplying that amount by $14,331, an amount charged for a sleep study on the lower end, results in a total billed amount between $1,000,000 and $7,000,000.

3.    Attached as Exhibit A is true and correct copy of a Supplemental Report by Michael Petron.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief and that this declaration was executed on February 15, 2023, at Los Angeles, California.

_____
KRISTEN A. WILLIAMS

1

### DECLARATION OF SARINE TOOMA

2        I, Sarine Tooma, state and declare as follows:

3        1.   I have been a Special Agent with the Defense Criminal

4    Investigative Service ("DCIS") since April 2017.   Prior to that, I

5    was a Special Agent with the Air Force Office of Special

6    Investigations for 15 years.   I have been assigned to the

7    investigation of defendants Julian Omidi, Independent Medical

8    Services, Surgery Center Management LLC ("SCM"), and Mirali Zarrabi

9    ("ZARRABI").   I make this declaration in support of the government's

10   sentencing position with respect to defendants Julian Omidi and SCM.

11       2.   In connection with the sentencing of defendants Omidi and

12   SCM, I was tasked to review and analyze claims data in the form of

13   Microsoft Excel spreadsheets that were provided by the victim

14   insurers in this case, including Aetna, Allied, Anthem, Health Care

15   Service Corporation - Blue Cross Blue Shield (HCSC-BCBS), CIGNA,

16   HealthNet, Tricare and United Healthcare (United).   With respect to

17   each victim's spreadsheet, either I or my colleague, Intelligence

18   Analyst Whitney Jacques, Federal Bureau of Investigation, applied

19   the following process to analyze the claims data.[1]

20       a.   First, we used Current Procedural Terminology ("CPT")

21   procedure codes to filter the data to include only the claims

22   billing for sleep studies, lap-band surgeries,[2] and Continuous

23

24   _____

25   [1] In the instances where my colleague performed the analysis in
     the first instance, I subsequently spot-checked her work for
26   accuracy.

27   [2] Included in claims for lap-band surgeries were related claims
     for services or items accompanying lap-band surgery, such as
28   anesthesia, blood tests, surgical pathology etc., which were
     identified using the date of surgery.

Positive Airway Pressure machines and accessories.  We then further filtered the data for the claims that were paid by the insurer ("Paid Claims Data").

b.   Second, we cross-referenced the names of patients appearing in the Paid Claims Data with the names of patients listed in another Excel spreadsheet, provided to me by Assistant United States Attorney Kristen A. Williams ("AUSA Williams"), which identifies the apnea-hypopnea index ("AHI") from sleep study reports produced by Michael Zarrabi ("M.Z. Spreadsheet").  We then filtered the Paid Claims Data to include only the claims in which the corresponding patient was also listed in the M.Z. Spreadsheet, and whose Apnea-Hypopnea Index ("AHI") was less than 30 ("Matched Claims").

c.   Third, using the names of the remaining patients contained in the Matched Claims, we used a document review platform, Relativity, to find and review those individuals' patient records obtained in discovery, bearing either the FDA, CKSearch, or GT_SH Bates-stamp prefix.  We then filtered the Matched Claims to include only the claims corresponding to patients for whom we located a patient file reflecting an AHI score that was 1.0 or more higher than the score contained in the M.Z. Spreadsheet for the same sleep study for the same patient ("Altered Claims").

3.   For each insurer-victim, I supplied AUSA Williams with a spreadsheet with the results of my efforts, reflecting the Altered Claims that were paid by the victim, which are summarized in the below table:

2

| Insurer Victim | Total Paid |
|:---:|:---:|
| Aetna | $11,893,929.30 |
| Allied | $30,493.18 |
| Anthem | $23,558,053.38 |
| Blue Cross Blue Shield | $3,343,918.18 |
| CIGNA | $2,031,832.69 |
| HealthNet | $48,888.95 |
| Tricare | $68,314.57 |
| United Health | $2,822,839.36 |

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief and that this declaration was executed on February 15, 2023, at Los Angeles, California.


_____
Sarine Tooma