KEVIN M. LALLY (SBN 226402)
**MCGUIREWOODS LLP**
klally@mcguirewoods.com
355 South Grand Ave., Suite 4200
Los Angeles, California 90071
Telephone: (213) 457-9862

LAWRENCE S. ROBBINS (Pro hac vice)
ALEXANDRA ELENOWITZ-HESS (Pro hac vice)
**FRIEDMAN KAPLAN SEILER ADELMAN & ROBBINS LLP**
lrobbins@fklaw.com
7 Times Square
New York, NY 10036
Telephone: (212) 833-1118

EDMUND W. SEARBY (Pro hac vice)
**PORTER WRIGHT MORRIS & ARTHUR LLP**
esearby@porterwright.com
950 Main Avenue, Suite 500
Cleveland, OH 44113
Telephone: (440) 384-2337

ATTORNEYS FOR DEFENDANT JULIAN OMIDI

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>    *vs*.<br><br>JULIAN OMIDI, *et al*,<br><br>            Defendants. | Case No. CR 17-00661(A)-DMG<br><br>*Honorable Dolly M. Gee,*<br>*District Court Judge*<br><br>**DEFENDANT JULIAN OMIDI'S REPLY IN SUPPORT OF MOTION FOR BAIL PENDING APPEAL**<br><br>TIME:        3 P.M.<br>DATE:        April 17, 2023<br>PLACE:      Courtroom 8C<br>                    350 West 1st Street, 8th Fl.<br>                    Los Angeles, CA 90012<br><br>Request for Oral Argument |

3718772.3

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

ARGUMENT: THE APPEAL WILL PRESENT "SUBSTANTIAL" QUESTIONS
  OF LAW THAT, IF RESOLVED IN MR. OMIDI'S FAVOR, WOULD
  RESULT IN EITHER OUTRIGHT DISMISSAL OR IN A NEW TRIAL ON
  ALL COUNTS ................................................................................................. 2

    1.    Reckless Indifference Instruction 34 ..................................................... 2

    2.    Whether the Jury Instructions Gave Rise to a Constructive
        Amendment or a Fatal Variance. ........................................................... 4

    3.    The Government Presented an Invalid Theory of Property Fraud ....... 7

    4.    The Gun-to-the-Head Call ................................................................... 9

    5.    Whether the Failure to Disclose the Klasky Investigation
        Reports Violated *Brady v. Maryland*, 373 U.S. 83 (1963) ................ 11

    6.    Whether the Admission of the Michael Zarrabi Draft Sleep
        Studies Violated the Business Record Exception .............................. 12

    7.    Lack of Reliability of the Petron Expert Testimony .......................... 15

    8.    Government Interference With the Right to Counsel ........................ 16

    9.    The Motions to Suppress Present Substantial Questions as to the
        Denial of Fourth Amendment Rights .................................................. 17

CONCLUSION .................................................................................................. 20

# TABLE OF AUTHORITIES

**Cases**

*Alfred v. Garland*,
--- F.4th ----, No. 19-72903, 2023 WL 2703236 (9th Cir. Mar. 30, 2023) ................... 3

*Bearchild v. Cobban*,
947 F.3d 1130 (9th Cir. 2020) ................................................................................. 3

*Benn v. Lambert*,
283 F.3d 1049 (9th Cir. 2002) ............................................................................... 12

*Borden v. United States*,
141 S. Ct. 1817 (2021)........................................................................................... 2, 3

*Bourjaily v. United States*,
483 U.S. 171 (1987)................................................................................................ 10

*Brady v. Maryland*,
373 U.S. 83 (1963).................................................................................................. 11

*D'Aquino v. United States*,
180 F.2d 271 (9th Cir. 1950) ................................................................................... 1

*Daubert v. Merrell Dow Pharms., Inc.*,
43 F.3d 1311 (9th Cir. 1995) ................................................................................. 16

*E.E.O.C. v. Evans Fruit Co.*,
2013 WL 4498747 (E.D. Wash. Aug. 21, 2013)................................................... 14

*Global-Tech Appliances, Inc. v. SEB S.A.*,
563 U.S. 754 (2011)................................................................................................. 3

*Harbor Healthcare Sys., L.P. v. United States*,
5 F. 4th 593 (5th Cir. 2021) ................................................................................... 17

*Herring v. United States*,
555 U.S. 135 (2009)................................................................................................ 18

*Howard v. Daggett*,
526 F.2d 1388 (9th Cir. 1975) ................................................................................. 5

*Huang v. Jaguar Land Rover N. Am., LLC*,
2021 WL 6618732 (C.D. Cal. Sept. 28, 2021) ..................................................... 14

*In re Grand Jury Investigation Concerning Solid State Devices, Inc.*,
130 F. 3d 853 (9th Cir. 1997) ............................................................................... 18

ii

*In re Oracle Corp. Sec. Litig.*,
    627 F.3d 376 (9th Cir. 2010) ..................................................................... 13

*In re Retz*,
    606 F.3d 1189 (9th Cir. 2010) ........................................................... 2, 3, 4

*Luis v. United States*,
    578 U.S. 5 (2016) ........................................................................................ 16

*Miller v. Fairchild Indus., Inc.*,
    885 F.2d 498 (9th Cir. 1989) ..................................................................... 15

*Nationwide Transport Finance v. Cass Information Systems, Inc.*,
    523 F.3d 1051 (9th Cir. 2008) ...................................................................... 7

*Orr v. Bank of Am., NT & SA*,
    285 F.3d 764 (9th Cir. 2002) ...................................................................... 13

*Ortiz-Sandoval v. Gomez*,
    81 F.3d 891 (9th Cir. 1996) ........................................................................ 11

*United States v. Bailey*,
    444 U.S. 394 (1980) ...................................................................................... 3

*United States v. Baras*,
    2014 WL 4728992 (N.D. Cal. Sept. 18, 2014) ............................................ 6

*United States v. Bernal-Obeso*,
    989 F.2d 331 (9th Cir. 1993) ...................................................................... 12

*United States v. Bole*,
    2012 WL 3778883 (E.D. Cal. Aug. 31, 2012) .............................................. 6

*United States v. Bonds*,
    608 F.3d 495 (9th Cir. 2010) ............................................................... 10, 14

*United States v. Choy*,
    309 F.3d 602 (9th Cir. 2002) ........................................................................ 6

*United States v. Comprehensive Drug Testing, Inc.*,
    621 F. 3d 1162 (9th Cir. 2010) ................................................................... 19

*United States v. Danielson*,
    325 F. 3d 1054 (9th Cir. 2003) ................................................................... 16

*United States v. Davis*,
    854 F.3d 601 (9th Cir. 2017) ........................................................................ 5

*United States v. Dearing*,
504 F.3d 897 (9th Cir. 2007) ....................................................................... 4

*United States v. Dibble*,
429 F.2d 598 (9th Cir. 1970) ..................................................................... 14

*United States v. Dipentino*,
242 F.3d 1090 (9th Cir. 2001) ..................................................................... 6

*United States v. Federico*,
479 F. Supp. 3d 819 (N.D. Cal. 2020) ........................................................ 6

*United States v. Garcia*,
340 F.3d 1013 (9th Cir. 2003) ..................................................................... 1

*United States v. Gay*,
967 F.2d 322 (9th Cir. 1992) ....................................................................... 4

*United States v. Gonzalez-Lopez*,
548 U.S. 140 (2006)..................................................................................... 16

*United States v. Gracidas-Ulibarry*,
231 F.3d 1188 (9th Cir. 2000) ..................................................................... 3

*United States v. Guzman*,
2018 WL 6106381 (N.D. Cal. Nov. 21, 2018) ............................................ 6

*United States v. Handy*,
761 F.2d 1279 (9th Cir. 1985) .................................................................. 1, 3

*United States v. Heredia*,
483 F.3d 913 (9th Cir. 2007) ....................................................................... 3

*United States v. Holguin*,
51 F.4th 841 (9th Cir. 2022) ...................................................................... 15

*United States v. Kow*,
58 F. 3d 423 (9th Cir. 1995) ...................................................................... 18

*United States v. Lloyd*,
807 F.3d 1128 (9th Cir. 2015) .................................................................. 5, 6

*United States v. Love*,
535 F.2d 1152 (9th Cir. 1976) .................................................................. 5, 6

*United States v. Mapelli*,
971 F.2d 284 (9th Cir. 1992) ....................................................................... 5

*United States v. Miller,*
 953 F.3d 1095 (9th Cir. 2020) ........................................................... 3, 4

*United States v. Morgan,*
 786 F.3d 227 (2d Cir. 2015) ................................................................. 11

*United States v. Morton,*
 2022 WL 17076203 (9th Cir. Nov. 18, 2022) ....................................... 3

*United States v. Munoz,*
 233 F.3d 1117 (9th Cir. 2000) ................................................................ 4

*United States v. Ordonez,*
 737 F.2d 793 (9th Cir. 1983) ................................................................ 15

*United States v. SDI Future Health, Inc.,*
 568 F. 3d 684 (9th Cir. 2009) .............................................................. 18

*United States v. Shipsey,*
 190 F. 3d 1081 (9th Cir. 1999) .............................................................. 4

*United States v. Stein,*
 541 F. 3d 130 (2nd Cir. 2008) ............................................................. 16

*United States v. Tsinhnahijinnie,*
 112 F.3d 988 (9th Cir. 1997) ................................................................. 5

*United States v. Williams,*
 685 F.2d 319 (9th Cir. 1982) .................................................................. 2

*United States v. Yates,*
 16 F.4th 256 (9th Cir. 2021) .................................................................. 3

*Williams v. Illinois,*
 567 U.S. 50 (2012) ................................................................................ 15

**Statutes**

18 U.S.C. § 3143 .......................................................................................... 1

**Other Authorities**

Model Penal Code § 2.02 ......................................................................... 2, 3

Ninth Circuit Model Criminal Instruction 15.42 [Health Care Fraud],
 Comment (2022 ed.) .............................................................................. 3

## Rules

Fed. R. Crim. P. 41.................................................................................................18

Fed. R. Evid. 104 ................................................................................................10

Fed. R. Evid. 801 ...........................................................................................13, 14

Fed. R. Evid. 803(6)........................................................................................13, 15

Fed. R. Evid. 901(a)............................................................................................13

## Constitutional Provisions

U.S. Const. Amend. V.............................................................................................5

## INTRODUCTION

The government concedes that Omidi's appeal is not for the purpose of delay and that he is not likely to flee or pose a danger to anyone. Government's Opposition to Defendant Julian Omidi's Motion for Bail Pending Appeal ("Opp. Br."), Dkt. 1869, at 3 n.2. The only question presented, then, is whether Omidi's appeal will present a "substantial question of law or fact" within the meaning of the bail statute. Omidi readily meets that requirement.

The government evidently recognizes as much, because it tries to stack the deck at the outset. According to the government, Omidi must establish the "substantial question" element by "clear and convincing evidence." Opp. Br. at 13 n.4; *see also id.* at 21, 23–24 (same). That is just not true. Under 18 U.S.C. § 3143(b)(1), the "clear and convincing evidence" requirement applies *only* to subsection (A), *i.e.*, that the person is not a flight risk or a danger to the community. The correct standard for determining whether there is a substantial question simply requires the defendant to present "only a non-frivolous issue that, if decided in the defendant's favor, would likely result in reversal or could satisfy one of the other conditions," *United States v. Garcia*, 340 F.3d 1013, 1021 n.5 (9th Cir. 2003), in which case the "judicial officer shall order the release of the person," 18 U.S.C. § 3143(b)(1)(B). The Ninth Circuit has set this bar intentionally lower than the "close question" standard adopted by other circuits. *See United States v. Handy*, 761 F.2d 1279, 1282 & n.2 (9th Cir. 1985). Nor is it true that Omidi must demonstrate "reversal as to all counts" to qualify for bail pending appeal (although he does in fact meet that standard), because "the [substantial question] requirement could be filled by a likelihood of reduction to a non-prison sentence or a sentence less than the time that would be served by the end of the appeal process." *Garcia*, 340 F.3d at 1021 n.5. While the government repeatedly cites to this Court's prior decisions on the issues raised, this Court need not agree that there was error for bail pending appeal; only that an issue is fairly debatable. *D'Aquino v. United States*, 180 F.2d 271, 272 (9th Cir. 1950) ("The question may be 'substantial' even though the judge or justice hearing the application for bail would affirm on the merits of the appeal.").

Once the government's legal underbrush is cleared, there can be no serious doubt (and the government offers none) that Omidi's appellate issues are, to say the very least, "fairly

debatable."

## ARGUMENT

### THE APPEAL WILL PRESENT "SUBSTANTIAL" QUESTIONS OF LAW THAT, IF RESOLVED IN MR. OMIDI'S FAVOR, WOULD RESULT IN EITHER OUTRIGHT DISMISSAL OR IN A NEW TRIAL ON ALL COUNTS

#### 1.    Reckless Indifference Instruction 34

As the Supreme Court's decision in *Borden v. United States* makes clear, there are four states of mind in modern statutes and cases applicable to "criminal liability"—that is, *any* kind of criminal liability, including fraud. 141 S. Ct. 1817, 1823 (2021) (relying on § 2.02, General Requirements of Culpability, Model Penal Code § 2.02)). Those mental states are, "in descending order of culpability: purpose, knowledge, recklessness, and negligence." *Id.* "Purpose and knowledge are the most culpable levels in the criminal law's mental-state hierarchy" while "*[r]ecklessness and negligence are less culpable mental states*." *Id.* at 1823–24 (emphasis added).

In the present case, every charge required the government to prove that Omidi acted "knowingly" and "with intent to defraud." Yet, despite *Borden*'s admonition that a "*mens rea* of recklessness [is] a less culpable mental state than purpose or knowledge," *id.* at 1821–22, Instruction 34 told the jury that "knowledge and fraudulent intent . . . can [] be shown if [Omidi] acted with *reckless indifference* to the truth or falsity of their statements," Dkt. 1563, Instr. No. 34 (emphasis added). Instruction No. 34 is flatly inconsistent with *Borden*. *See, e.g.*, *In re Retz*, 606 F.3d 1189, 1199 (9th Cir. 2010) ("Reckless indifference or disregard for the truth may be circumstantial evidence of intent, but is not sufficient, alone, to constitute fraudulent intent.").

The government offers no persuasive response. Indeed, the government *acknowledges* (Opp. Br. at 7) that, per the Ninth Circuit's decision in *United States v. Williams*, 685 F.2d 319, 321 (9th Cir. 1982), reckless conduct is *insufficient* to prove knowledge. And the government's effort to distinguish *Borden* is wholly unavailing. According to the government, *Borden* has "no application to reckless indifference instructions in fraud cases" because *Borden* involved a "crime of violence" under the Armed Career Criminal Act. Opp. Br. at 6.

But *Borden*'s treatment of recklessness did not turn on the fact that the case happened to involve violent crimes. Nor is there any reason—the government certainly offers none—why "knowledge" or "recklessness" would carry a different meaning under the ACCA than it does in fraud cases. To the contrary: *see, e.g.*, *United States v. Bailey*, 444 U.S. 394, 404 (1980) (applying same "hierarchy of culpable states of mind" to a federal prison escape statute); *Alfred v. Garland*, --- F.4th ----, No. 19-72903, 2023 WL 2703236, at *12 (9th Cir. Mar. 30, 2023) (en banc) (immigration removal); *United States v. Gracidas-Ulibarry*, 231 F.3d 1188 (9th Cir. 2000) (en banc) (federal illegal reentry statute).

Equally telling, the government does not even cite, much less distinguish, the Supreme Court's decision in *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754 (2011), despite its prominence in our opening brief, Opening Br. at 5–6. There, the Supreme Court held that the doctrine of willful blindness (which *is* sometimes a permissible way to prove knowledge, though *not* fraudulent intent) "*surpasses recklessness and negligence*. . . . [A] willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts. By contrast, a reckless defendant is one who merely knows of a substantial and unjustified risk of such wrongdoing." *Global-Tech Appliances, Inc.*, 563 U.S. at 769-70 (relying on Model Penal Code § 2.02) (emphasis added); *see also United States v. Heredia*, 483 F.3d 913, 918 n.4, 924 (9th Cir. 2007) (en banc) (holding "deliberate ignorance, otherwise known as willful blindness, is categorically different from negligence or recklessness" and that "[r]ecklessness or negligence never comes into play").[1]

---

[1] The government has unearthed some Ninth Circuit cases that suggest that intent and knowledge may be proved "through reckless indifference." Opp. Br. at 6–7 (collecting cases). But every case cited by the government pre-dates *Borden and Miller. Id.* They likewise pre-date several other cases cited in our opening brief, and to which the government offers utterly no response. *See* Opening Br. at 4–7 (discussing *United States v. Yates*, 16 F.4th 256 (9th Cir. 2021), *United States v. Miller*, 953 F.3d 1095 (9th Cir. 2020), and *United States v. Heredia*, 483 F.3d 913 (9th Cir. 2007)). And the Ninth Circuit Model Criminal Instruction, which the government also invokes (Opp. Br. at 6), has not been revised since December 2019, nearly two years before *Borden* was decided and Omidi's trial began. Ninth Circuit Model Criminal Instruction 15.42 [Health Care Fraud], Comment (2022 ed.) ("Revised Dec. 2019"); *see Bearchild v. Cobban*, 947 F.3d 1130, 1142 (9th Cir. 2020) ("[u]se of a model jury instruction does not preclude a finding of error") (citation omitted). At minimum, the warring precedent cited by the parties suggests that the propriety of Instruction 34

The government's last-ditch argument is that even if Instruction 34 was wrong, other instructions dispelled the confusion. Not so. Even if the remaining instructions had correctly defined knowledge and intent (a proposition we do not concede), Instruction 34 completely vitiated their effect. Instruction 34 told the jury, point blank, that it could find *both* knowledge and intent if it found that Omidi was recklessly indifferent to the truth of certain representations. Instruction 34 was therefore a shortcut for the jury: If it found reckless indifference to the truth, it could put down its pens and vote "guilty." Not even the government defends that shortcut. *See* Opp. Br. at 7 ("[R]eckless conduct alone is not sufficient to supplant knowing conduct"). And that is scarcely surprising, given the most recent Ninth Circuit case law. *See In re Retz*, 606 F.3d at 1199 ("Reckless indifference or disregard for the truth may be circumstantial evidence of intent, but is not sufficient, alone, to constitute fraudulent intent."). There is little doubt that, if the Ninth Circuit agrees that Instruction 34 was erroneous, it will order a new trial on all counts of conviction and, therefore, bail pending appeal should be granted.[2]

## 2. Whether the Jury Instructions Gave Rise to a Constructive Amendment or a Fatal Variance.

The jury instructions were not only incorrect, but they constituted a constructive amendment of (or, at a minimum, a fatal variance with) the indictment. The government does not dispute that the indictment charged Omidi *only* with actual knowledge, not willful blindness. Opp. Br. at 8–9. Indeed, the indictment did not allege a single fact necessary to establish willful blindness. The only factual predicates for that theory emerged at trial.

Accordingly, because the grand jury specified the *mens rea* theory in the FSI as actual knowledge with deliberate intent, the government was "obligated to prove" the only *mens rea* theory stated in the indictment's requisite "statement of facts and circumstances." *United*

---

is an unsettled issue, and as such, warrants bail pending appeal. *United States v. Handy*, 761 F.2d 1279, 1282 (9th Cir. 1985). *Compare Borden*, *In re Retz*, *Gracidas-Ulibarrry, United States v. Morton*, 2022 WL 17076203, at *1 (9th Cir. Nov. 18, 2022) (applying *Borden*'s "recklessness" standard), and *United States v. Miller*, 953 F.3d 1095 (9th Cir. 2020) *with United States v. Dearing*, 504 F.3d 897, 902 (9th Cir. 2007), *United States v. Munoz*, 233 F.3d 1117, 1135–36 (9th Cir. 2000), and *United States v. Gay*, 967 F.2d 322, 326–27 (9th Cir. 1992).

[2] The government makes no argument that such an error would be harmless.

*States v. Shipsey*, 190 F. 3d 1081, 1087 (9th Cir. 1999) (reversing conviction on constructive grounds; holding that the prosecution was expressly limited to prove the specific means or theory described in the statement of facts of the indictment; and rejecting the government's contention that it may prosecute under any means permitted by the charged counts). The government claims "[t]here is simply no requirement that 'deliberate ignorance' or 'reckless indifference' be alleged in the indictment." Opp. Br. at 9. However, while the grand jury was free to draft an indictment with a broad generic *mens rea* that would encompass the deliberate ignorance and recklessness theories, *it did not. Howard v. Daggett*, 526 F.2d 1388, 1390 (9th Cir. 1975) (reversing for constructive amendment because "[t]he grand jury might have indicted appellant in a general allegation. . . *[b]ut it did not do so*. . . . The supplemental instruction constituted an impermissible amendment of the indictment that destroyed the defendant's substantial right to be tried only on charges presented in an indictment returned by a grand jury.") (emphasis added; citation and internal quotation marks omitted).

The government's contrary view flies in the face of Circuit precedent that a willful blindness/deliberate ignorance instruction "is inappropriate where the facts point to actual knowledge." *United States v. Mapelli*, 971 F.2d 284, 286 (9th Cir. 1992) ("It is not a routine instruction for cases in which knowledge is at issue."). As the Ninth Circuit has explained, "[a] person is entitled under the Fifth Amendment not to be held to answer for a felony *except on the basis of facts which satisfied a grand jury that he should be charged.*" *United States v. Tsinhnahijinnie*, 112 F.3d 988, 992 (9th Cir. 1997) (citing U.S. Const. Amend. V) (emphasis added).

The government's sole rejoinder is its citations to *United States v. Love*, 535 F.2d 1152 (9th Cir. 1976) and *United States v. Lloyd*, 807 F.3d 1128 (9th Cir. 2015). Opp. Br. at 8. But as noted in our opening brief (Opening Br. at 11 n.8), neither case addressed whether a willful blindness theory may be offered at trial when the grand jury was presented with no evidence of willful blindness and made no such allegations in the indictment. *See United States v. Davis*, 854 F.3d 601, 605 (9th Cir. 2017) (reversing conviction on constructive amendment grounds where the indictment stated two possible *mens rea* but "the jury instructions afforded jurors a

third option for convicting" because "the district court's jury instruction and the government's argument had the effect of altering the terms of the indictment").[3]

The government does not cite a single case authorizing a willful blindness trial theory where there were no such allegations in the indictment. Nor are we aware of any. The question is thus "novel" in this Circuit, which is itself a well-established basis for finding a "substantial question." *See, e.g., Handy*, 761 F.2d at 1281 ("[T]he phrase 'substantial question' has referred to questions that are 'fairly debatable.' Included within this definition have been questions that are novel and not readily answerable.").[4]

If decided in Omidi's favor, the constructive amendment issue is likely to result in a new trial on all counts. As we noted in our opening brief (to which the government offers no answer), this Circuit frequently reverses convictions based on legal theories never presented to the grand jury. *See, e.g., United States v. Ward*, 747 F.3d 1184, 1191 (9th Cir. 2014) (reversing conviction where defendant "may have been convicted on a charge the grand jury never made against him, so a constructive amendment necessarily occurred here") (citation and internal quotation marks omitted); *United States v. Choy*, 309 F.3d 602 (9th Cir. 2002) ("Because the indictment and the evidence presented at trial represented two distinct sets of facts, the second of which could not be anticipated by Choy, the variance amounts to an impermissible constructive amendment of the indictment."); *United States v. Dipentino*, 242 F.3d 1090 (9th Cir. 2001) ("It is evident that the district court constructively amended the indictment because the jury instruction permitted the jury to convict the defendants of violating a work practice standard they were not charged in the indictment with violating."). Indeed, the Ninth Circuit has held that even a "possibility" of a constructive amendment

---

[3] Separately, the reckless indifference instructions in both *Love* and *Lloyd* contained the additional requirement that the jury also find "and made or caused to be made with the intent to deceive." *Love*, 535 F.2d at 1157-58; *Lloyd*, 807 F.3d at 1163. Omidi's request for this same additional requirement was denied. Tr. 8249. Thus, the additional requirement in the recklessness instruction in *Love* and *Lloyd* required the jury to find intent and not just recklessness, which Instruction 34 in this case did not require.

[4] *See also United States v. Federico*, 479 F. Supp. 3d 819, 822 (N.D. Cal. 2020) (same); *United States v. Guzman*, No. 17-CR-00499-PJH-1, 2018 WL 6106381, at *1 (N.D. Cal. Nov. 21, 2018) (same); *United States v. Baras*, No. CR 11-00523-YGR, 2014 WL 4728992, at *3 (N.D. Cal. Sept. 18, 2014) (same); *United States v. Bole*, No. 2:11-CR-00505 KJN, 2012 WL 3778883, at *2 (E.D. Cal. Aug. 31, 2012) (same).

"requir[es] reversal." *Ward*, 747 F.3d at 1191.[5] Accordingly, if the Ninth Circuit decides the substantial question in Omidi's favor, it is certain to reverse.

### 3.    The Government Presented an Invalid Theory of Property Fraud

Quoting from this Court's ruling on Omidi's stay application, the government asserts that its trial theory was not "solely" about the deprivation of the insurers' right to control their decision-making, but also about the deprivation of the insurers' money. Opp. Br. at 22. Respectfully, that is the wrong question, and "[n]o answer is what the wrong question begets." Alexander Bickel, *The Least Dangerous Branch* 103 (1962). The right question is whether the evidence and arguments at trial, coupled with the governing instructions, invited the jury to convict Omidi on a legally erroneous theory. *Nationwide Transport Finance v. Cass Information Systems, Inc.*, 523 F.3d 1051, 1060 (9th Cir. 2008) ("a party is not entitled to present evidence on an erroneous or inapplicable legal theory to the jury"). The answer to that question is plainly yes.

As we have catalogued at greater length in our stay papers, the transcript is chock full of testimony and other evidence asserting that Omidi's crime was depriving the insurers of the information they needed to make a fully-informed decision. *See* Dkt. 1837, at 5–8. For example, the government elicited testimony that:

- Aetna expected that all "documents are *true and accurate*" because "if we're not given *true, accurate informatio*n, *we may make the wrong decision*." Tr. 1860 (emphasis added).
- The reason a false sleep apnea diagnosis was material to Anthem, even if the patient already qualified for the Lap Band without the false sleep apnea diagnosis, is because "*inaccurate information"* calls into question "other parts" of the submission and would therefore "*elicit a more thorough review*." Tr. 1203-04 (emphasis added).
- Health Net's position "is that *we need to be making prior-authorization decisions, claim decisions, payment decisions based on true, accurate, and complete information*. …the expectation is that the complete information is *true, accurate, and complete*. That some

---

[5] Even if this case were characterized as a variance and not an amendment, it is highly likely that the court of appeals would find sufficient prejudice to overturn the conviction. The government hammered home the deliberate ignorance theory (and, worse still, the reckless indifference alternative) in its summations. Tr. 8649. What's more, these un-charged options went to the very heart of Omidi's defense: That he did not know about any false statements and lacked the requisite intent to defraud. An amendment (or variance) on such crucial elements is quite unlikely to be disregarded by the court of appeals.

of it is true and some of it is false continues to *impact your decision making*." Tr. 7131 (emphasis added).

The government gilded the lily further in summation, emphasizing from the outset that all the jury needed to find was a deprivation of accurate information. *See* Tr. 8625 ("Now, at bottom, ladies and gentlemen, this is not a complicated scheme, just like *the rule that claims and documentation that is provided with them must be truthful, accurate, and complete is not a complicated rule*.") (emphasis added).

It is not surprising that the government resorted to this right-to-accurate-information theory. As we noted in our stay papers, the evidence showed that the insurers had a duty to pay most of the claims regardless of the results of the sleep studies. *See* Dkt. 1837, at 2–3. So, a falsified sleep study could affect only *the process by which the insurers decided the claim*. That's why the government offered the jury the right-to-control path to conviction.

The Order on this issue states "the false statements were material because they would have led to a greater scrutiny of the claims, which would have led to denial of the claims." Dkt. 1848 at 3–4 (citing to the government's summation argument, Dkt. 1632 at 102). Respectfully, however, the record says otherwise. Perhaps the best indicator of that impermissible path to conviction is reflected in Anthem witness Carl Reinhardt (the Director for Special Investigations for Anthem Blue Cross of California). Reinhardt testified that while a false diagnosis may have been "material to Anthem's decision to approve th[e] claim," *Anthem could still have authorized a Lap Band surgery "[e]ven if there was a comorbidity that was falsified*." Tr. 999-1000 (Q. So is it possible that a patient may have, in fact, a comorbidity that exists, that Anthem would then approve the lap band surgery for? A. Yes. Q. *Even if there was a comorbidity that was falsified? A. Yes.*") (emphasis added). Similarly, in the Reinhardt Declaration attached to the government's sentencing reply (Dkt. 1852-1), the witness states that Anthem's loss was the deprivation of a right of control. As Reinhardt explains, Anthem does not necessarily "require [a] provider to submit particular supporting documentation in connection with a claim or pre-approval request," including "an ICD-9 diagnosis code for sleep apnea"; rather, it is only if the documentation is actually provided does "Anthem expects it to be true and accurate." *Id.* ¶ 7(a)&(c); *see also id.* ¶ 7(b).

Assuming a provider does submit a pre-approval request for Lap-Band surgery and Anthem learned that it "contained false information," Anthem would simply investigate or scrutinize the submitted claim, to include "its impact on the overall medical necessity of the surgery," to determine whether it "should be paid or the approval granted." *Id.* ¶ 7(a)&(b). In other words, the false information *may not have affected payment at all*. This is clearly *not* a traditional theory of property fraud, but rather a quintessential right-to-control theory because the alleged "loss" is the deprivation of information affecting the insurers' economic decision to further scrutinize or investigate. Similarly, while the other insurance companies testified that a misrepresentation would have "affected" or "mattered" in the insurer's decision making and generally result in further scrutiny, they did not say they would invariably deny the Lap Band request or claim. *See, e.g.*, Aetna (Tr. 1760–61, 1842); Healthnet (Tr. 7132–33, 7193–7194).

Under black-letter law, if the Ninth Circuit agrees that the government offered the jury a legally impermissible route to conviction, it is likely to reverse—even if it concludes that the jury was *also* given a permissible route.[6] *See, e.g.*, *United States v. Yates*, 16 F.4th 256, 265 (9th Cir. 2021) (reversing conviction where one of four legal theories presented to the jury was "legally insufficient" because "presenting those theories to the jury was not harmless"). For that reason, the right-to-control issue is also a substantial question for bail purposes.[7]

### 4.    The Gun-to-the-Head Call

The government makes the same mistake with respect to the Oxman call that it made at trial. When the defense objected to Klasky's testimony about the gun-to-the-head call, the government contended that the statement was not offered for its truth. The defense immediately explained (and tried, without success, to offer argument on the point (Tr. 4976)),

---

[6] It is respectfully requested that the Court reconsider its Order Re Defendants' Motion for Stay of Proceedings, Dkt. 1848, given that it was based on factual and legal error advanced by the government.

[7] The right-to-control theory affected all counts because it was used as the basis for government expert Michael Petron's testimony regarding Omidi's "knowledge and intent"—the main issue for all counts in this case. In addition, this theory extends to all counts because Instruction 27 "Scheme to Defraud – Vicarious Liability" permitted the jury to convict Omidi for any "other co-schemers' actions during the course of and in furtherance of the scheme," Dkt. 1563 at 36, which extends to all counts in the indictment.

that its objection was based on *relevance*, not *hearsay*. The government repeats the same hearsay distraction in its bail opposition. *See* Opp. Br. at 9–10.

As the Court recognized at the time the evidence was offered, Oxman's alleged threat was relevant and admissible against Omidi if, but only if, the declarant was Omidi's agent at the time he made the out-of-court statement. Tr. 4975. When the government offered the Oxman statement, the Court had two choices under Fed. R. Evid. 104(a) and (b). It could either make a finding of agency by a preponderance of the evidence introduced up to that point (*see Bourjaily v. United States*, 483 U.S. 171 (1987)), or it could admit the evidence subject to connection. The Court chose Option 1: It admitted the evidence, once and for all, concluding that the government had sufficiently proved that Oxman was Omidi's agent at the time of the gun-to-the-head statement.

So the question is: Did the government actually prove such agency by a preponderance of the evidence as of the time the Court admitted the Oxman statement? The answer is, plainly not. All the government had shown at that point was that Klasky had seen Oxman leave the building with Omidi shortly before the call was allegedly made (Tr. 4974–75), and that Oxman and Omidi had "work[ed] closely" together during the time Klasky worked at the company (Tr. 4976). That's it. The government presented no evidence that Oxman had the authority to bind Omidi or that Oxman generally acted at Omidi's direction or control. Nor did the government show that Oxman's purported threat to Klasky was "within the scope of any agency relationship" with Omidi. *See United States v. Bonds*, 608 F.3d 495, 506-07 (9th Cir. 2010) (reversing count of conviction because there was not a sufficient "agency" relationship to justify admitting the trainer's out-of-court statements against Bonds and holding "an agency relationship exists only if both the provider and the recipient have manifested assent that the provider will act subject to the recipient's control and instruction").

The government apparently recognizes how frail its agency proof is. In defending the Court's *November 4*, 2021 agency ruling, the government cites evidence adduced some *two weeks and even four weeks later*. Opp. Br. at 10. Needless to say, none of that evidence was before the Court when it ruled; the government did not even make an offer of proof of any

agency evidence yet to come. To be clear, we don't think any of that later proof shows agency either. But what matters for present purposes is that most of the "agency" evidence invoked by the government in its brief was not before the Court when it ruled that Oxman was Omidi's agent.

Then things go from bad to worse for the government. In what can only be charitably described as a hail-Mary pass, the government argues that Oxman *must* have been Omidi's agent because only Omidi "stood to be implicated by Klasky's statements to the government, not Oxman." Opp. Br. at 10. This is the most perverse sort of bootstrapping. We readily agree that the gun-to-the-head threat was devastating to Omidi; but that has no more to do with the question of agency than a "well-made buttonhole." Oscar Wilde, *Complete Works of Oscar Wilde.*

The government asserts, finally, that the gun-to-the-head threat will likely be disregarded as harmless error on appeal. Opp. Br. at 10–11. After all, says the government, Klasky's account of the Oxman threat took up only a page or two of a lengthy transcript. *Id.* We doubt the Ninth Circuit will resolve this issue by counting lines on the page. More likely, the court of appeals will focus on the fact that this testimony—which came in without the limiting instruction requested by the defense (Tr. 4978–79)—was inherently explosive. *See, e.g., Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 898 (9th Cir. 1996) ("The potential of unfair prejudice from the introduction of threats is severe."); *United States v. Morgan*, 786 F.3d 227, 233 (2d Cir. 2015) (vacating conviction where "limiting instruction would likely [have] mitigate[d] the prejudicial effect of the death threat evidence, *i.e.*, the likelihood that the jury would substitute the death threat evidence for consideration of the elements of the charged crimes"). And while the government professes that this proof was not part of the "primary dispute at trial," Opp. Br. at 10, it was important enough for the government to pound the point home, not once but twice, at the end of the case.

### 5. Whether the Failure to Disclose the Klasky Investigation Reports Violated *Brady v. Maryland*, 373 U.S. 83 (1963)

The government downplays its failure to produce subscriber analysis showing that Klasky's very first proffer was false. In the government's view, the withheld evidence bears

only on the date of the Oxman threat, not the fact that threat was made. Opp. Br. at 10–11. We recognize that the Court has subscribed to that view, but it is fairly debatable as to whether the Ninth Circuit will agree. The fact that Klasky falsely claimed that he had received the alleged threat earlier that same morning calls into serious question the overall credibility of the government's chief witness.  It is scarcely "frivolous" to suggest that the court of appeals will draw the same conclusion and reverse Omidi's conviction on that basis. *See Benn v. Lambert*, 283 F.3d 1049, 1056-57 (9th Cir. 2002) (reversing conviction and concluding that suppressed evidence of key witness's false statement "was 'direct proof' of his lack of credibility," and the failure to disclose his fabrication was prejudicial); *United States v. Bernal-Obeso*, 989 F.2d 331, 336 (9th Cir. 1993) (reversing for *Brady* violation and explaining that evidence of "a lie might be equivalent to the proverbial smoking gun"). *See also* 4-4-22 Schachter Decl., Dkt. 1669 ¶¶ 5 & 11 ("If Mr. Omidi's counsel had that proof during trial, they would have been able to impeach Mr. Klasky's testimony regarding the purported 'gun to your head' call and impeach government witnesses regarding their reliance on Mr. Klasky's claims.").

Defense counsel should not be faulted for not discovering evidence in the gigantic electronic haystack of discovery to disprove Klasky's story "which conceivably could have been discovered had defense counsel expended the time and money to enlarge his investigations. No *Brady* case discusses such a requirement, and none should be imposed." *Amado v. Gonzalez*, 758 F.3d 1119, 1136–37 (9th Cir. 2014). Counsel understandably relied on the government's obligation to comply with the *Brady* Identification Order (Dkt. 1333), which the Court issued specifically because of "the sheer volume of discovery" and "difficulties searching the Government's electronic discovery," *id.* at 3.  *See Amado*, 758 F.3d at 1136–37 ("[D]efense counsel may rely on the prosecutor's obligation to produce that which *Brady* and *Giglio* require him to produce. . . . [The] requirement of due diligence would flip that obligation, and enable a prosecutor to excuse his failure by arguing that defense counsel could have found the information himself.")

### 6. Whether the Admission of the Michael Zarrabi Draft Sleep Studies Violated the Business Record Exception

The government did not meet its burden of proof as to the admissibility of the GT_MZ

reports under any rule of evidence. *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 385 (9th Cir. 2010) (stating that the party seeking admission of the evidence "[bears] the burden of proof to show its admissibility"). Before trial, the Court held that the GT_MZ reports were admissible under Fed. R. Evid. 901(a), 801(d)(2)(C) & (D), and 803(6). Dkt. 1370, at 8. At trial, however, the government elected not to call Michael Zarrabi as a witness, despite repeatedly interviewing him before and during the trial, citing his ongoing mental illness. Tr. 2604–05. Nevertheless, and over defense counsel's objection, the reports were offered for their truth and were admitted on that basis. *See, e.g.*, Tr. 1123–29, 1243–44, 2776-77, 3465–69, 3495–99, 6763–65; *see also* Dkt. 1119-4. This was error.[8]

First, it is blackletter law that the GT_MZ reports were not admissible under Fed. R. Evid. 901(a). Authentication under Rule 901(a) "is a condition precedent to admissibility," *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002); in other words, authentication is necessary, *but not sufficient*, for a document to be deemed admissible. After determining authenticity, the Court must still conduct its "next inquiry," namely, "whether the exhibits are inadmissible hearsay." *Id.* at 778 (excluding authenticated document as inadmissible hearsay). Therefore, Rule 901(a) could not provide the basis for the admission of the GT_MZ reports.

Second, the GT_MZ reports were not admissible *against Omidi* under Fed. R. Evid. 801(d)(2)(C) & (D). Those rules provide that a statement is not hearsay and may be offered against "an opposing party" when it "was made by a person whom the party authorized to make a statement on the subject" or "was made by the party's agent or employee on a matter within the scope of that relationship and while it existed." *Id.* According to the government, the GT_MZ reports were appropriate as a party admission because they "were precisely what Michael Zarrabi *was employed by GET THIN to do*." Opp. Br. at 14 (emphasis added). It is doubtful that Zarrabi was even an employee, rather than an independent contractor, or if he ever even spoke to Omidi. But even if the government's claim is true, that makes the reports admissible against GET THIN, *but not against Omidi*. *See, e.g.*, Dkt. 1370, at 8 ("it is

---

[8] The government does not dispute this fact, nor does the government argue that the incorrect admission of the reports would be harmless. *See generally* Opp. Br. at 12–16.

undisputed that Michael Zarrabi was Get Thin's RPSGT and Technical Facilities Manager"). Put another way, Get Thin is the "opposing party" against whom the GT_MZ reports might be admissible, *not Omidi. See, e.g.*, *Bonds*, 608 F.3d at 504 (affirming exclusion of testimony under Rule 801(d)(2)(C)&(D) where the witness was not defendant's "employee or agent"); *Huang v. Jaguar Land Rover N. Am., LLC*, No. 8:19-CV-1958, 2021 WL 6618732, at *1 (C.D. Cal. Sept. 28, 2021) (excluding testimony where "Plaintiff has not demonstrated that an agency relationship exists" between defendant and the witness); *E.E.O.C. v. Evans Fruit Co.*, No. 11-CV-3093, 2013 WL 4498747, at *10 (E.D. Wash. Aug. 21, 2013) (excluding employee-witness testimony because "[t]he mere fact that [the witness] was a crew leader for [the defendant-company] and [the individual defendant] was his foreman at the time the statement was allegedly made . . . , does not establish it was made pursuant to an agency relationship that existed between them").

Third, and finally, the GT_MZ reports were not admissible under Fed. R. Evid. 803(6). In his opening brief, Omidi described in great detail, with extensive legal and factual citation, how the government failed to meet the foundation requirement of Rule 803(6). *See* Opening Br. at 19–24. The government's response is just a bunch of hand-waving. It simply asserts, *ex cathedra*, that there "can be no real dispute that these original sleep study reports were kept in the course of regularly conducted business activity." Opp. Br. at 15. But of course, that proposition is *hotly* disputed; that's what it means to object at trial, which Omidi did. Tr. 7221–257. The government fails to cite any portion of the transcript for its claim that these records were regularly kept, doubtless because there is no such evidence to cite.

Indeed, a review of the record reveals that the government failed to proffer a witness with the required "personal knowledge of the facts" who could "attest[] to the identity and due execution of the document." *United States v. Dibble*, 429 F.2d 598, 602 (9th Cir. 1970). Sherwin Hong testified that he had no personal knowledge of how the GT_MZ Reports were created and whether they were accurate. Tr. 4176–4177. Charles Klasky, who claimed to have been Michael Zarrabi's primary point of contact, confirmed that he, like Mr. Hong, never actually observed Michael Zarrabi doing his work. Tr. 5221. And Karla Tapia, who worked

as a sleep technician under Michael Zarrabi, stated during her direct examination that she did not know whether Michael Zarrabi manually scored the sleep studies. Tr. 1963–64.[9]

The Court nevertheless concluded that: (1) the "testimony from Mr. Klasky and from Sherwin Hong" met Rule 803(6)'s familiarity-with-the-manner-of-preparation requirement (Tr. 7253) and (2) the documents were "trustworthy" in that they were "a regularly created type of document used by this business in conducting its business" regardless of "[w]hether that information on that document is always true and correct" (Tr. 7243–44; *see also* Tr. 7274 ("They may have been accurate sometimes; they may not have been accurate sometimes.")). This interpretation of Rule 803(6)—as both a legal and factual matter—is "fairly debatable."

## 7. Lack of Reliability of the Petron Expert Testimony

The government concedes that the Court did not make an explicit reliability finding as to Mr. Petron's testimony, but contends "[t]he Court is not required to make explicit reliability findings on the record." Opp. Br. at 19. Not so. As the Ninth Circuit has repeatedly stated: "Reliability findings must be made 'explicit' on the record—an 'implicit' finding does not suffice." *United States v. Holguin*, 51 F.4th 841, 853 (9th Cir. 2022). Nor is it true that *Williams v. Illinois*, 567 U.S. 50 (2012), permitted Petron to "express an opinion . . . based on facts that the expert assumes, but does not know, to be true." Opp. Br. at 17. As the government neglects to mention, *Williams* was a bench trial, and the "Federal Rules bar an expert from

---

[9] That the "metadata for hundreds of these reports . . . confirmed they were created close in time to the patients' sleep studies" (Opp. Br. at 15) is wholly insufficient to satisfy Rule 803(6) because the rule requires "the testimony of anyone who [was] familiar *with the manner in which the document was prepared*," *Miller v. Fairchild Indus., Inc.*, 885 F.2d 498, 514 (9th Cir. 1989) (emphasis added). Further, no metadata evidence was admitted nor was any metadata testimony given. The record shows the metadata was "completely unreliable because it is showing that the documents are being printed prior to the documents even being created," Tr. 7250. The government also fails to respond to the undisputed record (*see* Opening Br. at 20-21) that for the AHI scores Michael Zarrabi created for at least 84% of the GT_MZ reports, it was impossible for him to have "*personal knowledge of the facts recorded*," *i.e.*, that the AHI scores he recorded were derived from and reflected the underlying raw sleep study data, because *undisputed testimony from the government's own witness Dr. Neil Kline was that the underlying raw data was so corrupted or incomplete that it was impossible for anyone to determine an AHI score*. Tr. 867–870. *See United States v. Ordonez*, 737 F.2d 793, 805 (9th Cir. 1983) (reversing counts of conviction where "[n]o evidence was offered by any person that the records *were kept by persons having personal knowledge of the facts recorded* or that the entries were made at or near the time of the transaction [and] *[n]o evidence was presented to demonstrate that the persons who made the entries were truthful and had a clear recollection of the facts*") (emphasis added).

1   disclosing the inadmissible evidence in jury trials but not in bench trials." *Williams*, 567 U.S.
2   at 69.

3   As for the contention that it was permissible for Petron to alter his Expert Report by
4   close to $100 million after trial, that dog won't hunt. If, as the government asserts, Petron
5   "simply looked at the data set in a different way *more focused on . . . anticipated sentencing*
6   *arguments regarding loss*," Opp. Br. at 21 (emphasis added), the post-trial report should have
7   looked exactly the same as the trial report. Both were addressed to the amount of loss sustained
8   by the putative victims. The fact that Petron felt it necessary to cut back his estimate so
9   dramatically demonstrates that his trial testimony was completely unreliable. *Daubert v.*
10  *Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1322 (9th Cir. 1995) (post-trial "tailoring of the
11  experts' conclusions would . . . fatally undermine any attempt to show that these findings were
12  derived by the scientific method").

13  **8.   Government Interference With the Right to Counsel**

14  An unjustified denial of counsel is "indeterminable structural error," such that courts
15  should "not even ask whether the error harmed the defendant." *United States v. Gonzalez-*
16  *Lopez*, 548 U.S. 140, 147–48 (2006); *accord Luis v. United States*, 578 U.S. 5, 18 (2016). The
17  government's claim of harmless error is thus beside the point. And even if the funds at issue
18  were in the name of another person or entity, the Sixth Amendment prohibits the Government
19  from "interfering with financial donations by others." *United States v. Stein*, 541 F. 3d 130,
20  156 (2d Cir. 2008).

21  Mr. Omidi's appeal will also present a substantial legal question as to whether the
22  government should bear the burden of demonstrating non-use of his privileged attorney-client
23  communications. *See United States v. Danielson*, 325 F. 3d 1054 (9th Cir. 2003). Although
24  the government insists that it was "just trying its best under challenging circumstances," (Opp.
25  Br. at 26) that cannot justify seizing and reviewing privileged attorney-client communications
26  absent prior judicial authorization. Still less does this excuse reviewing privileged materials
27  where, as here, the government expressly, but unsuccessfully, sought judicial authorization,
28  and the government went ahead and reviewed the privileged material anyway. In this respect,

the conduct of the government is worse than in *Harbor Healthcare Sys., L.P. v. United States*, 5 F. 4th 593, 599 (5th Cir. 2021), where the government's seizure without prior authorization demonstrated "callous disregard" for the attorney-client privilege.

As this Court acknowledged: "(A)lthough this Court does not endorse the Government's practice of using the Filter/Taint Team in a case involving such a huge volume of documents, and while the Government could have (and probably should have) sought further judicial approval to amend the privilege review protocol, this does not mean that the Government's use of the Filter/Taint Team in itself amounted to a constitutional violation." Dkt. 1376 at 6–7. The missing element is, of course, prejudice, and there is a substantial and important question whether the burden should shift to the government under *Danielson* in this context. Privilege holders lack visibility into what happens to their privileged communications after seizure, and without an evidentiary hearing or shifting the burden, they will rarely be able to demonstrate prejudice.

**9.    The Motions to Suppress Present Substantial Questions as to the Denial of Fourth Amendment Rights.**

A substantial question remains whether the government was permitted to review any digital device seized because, in October 2015, when the government unilaterally took over the privilege review with its taint team, all extensions for all warrants had expired. Although the Court concluded that the government did not act with intentional and deliberate disregard of the warrants' 60-day search limitation *prior to this time*, at a minimum the record strongly suggests that *after October 2015* the government's failure to obtain an extension was knowing and intentional. Specifically, on October 6, 2015, Omidi's counsel asked the government "Can you please provide me with the orders extending deadlines [of the search warrants]? No one has ever received a copy of those orders," to which the government responded: "We won't be producing the extension orders at this time, which I believe are sealed in any event." Dkt. 1866, at ECF 2. Thus, the record is clear the government was acutely aware and on express notice of its obligation to obtain extensions on the expired warrants, but instead chose to mislead Omidi's counsel into believing "the extension orders" were actually obtained but the government would not produce them because they were under seal. *Id.* The government also

1  failed to disclose this information to this Court at trial and continued to impermissibly review

2  the extensive production from the expired subpoenas for six years thereafter, while knowing

3  full well all the subpoenas had expired. The government's conduct here was "sufficiently

4  deliberate that exclusion can meaningfully deter it." *Herring v. United States*, 555 U.S. 135,

5  144 (2009); *see also United States v. Negrete-Gonzales*, 966 F.2d 1277, 1283 (9th Cir. 1992)

6  (Technical errors of Fed. R. Crim. P. 41 require suppression "if: (1) the defendants were

7  prejudiced by the error, or (2) there is evidence of deliberate disregard of the rule. Prejudice

8  in this context means the search would otherwise not have occurred or would have been less

9  intrusive absent the error."). At a minimum, this issue is "fairly debatable."

10      As for the facially limitless search warrants, the government incants "permeated with

11  fraud," but sidesteps the Ninth Circuit and other case law cabining this "doctrine" lest it simply

12  eviscerate the Fourth Amendment. *See* Opening Br. at 36–37. For example, the government

13  claims that *United States v. SDI Future Health, Inc.*, 568 F.3d 684 (9th Cir. 2009), is

14  "distinguishable" (Opp. Br. at 28), but ignores that case's emphatic holding that "the

15  permeated with fraud" doctrine applies only if the "*entire* business was fraudulent," *SDI

16  Future Health, Inc.*, 568 F. 3d at 703 n.13 (emphasis added). *Accord United States v. Kow*, 58

17  F. 3d 423, 428 (9th Cir. 1995) (holding government must establish "that *the entire business is

18  merely a scheme to defraud* or that *all* of the business's records are likely to evidence criminal

19  activity") (emphasis added).

20      The government ignores this principle doubtless because the search-warrant affidavit

21  came nowhere close to showing that Omidi's entire business was fraudulent. The warrants

22  permitted the seizure of every "aspect of 174 entities," but only a few are even referenced in

23  the affidavit, much less shown to be fraudulent. The affidavit further acknowledges that even

24  as to Lap-Band surgery, "some of GET THIN's insurance claims were clean." This admission

25  in itself forecloses the "permeated with fraud" doctrine. *See In re Grand Jury Investigation

26  Concerning Solid State Devices, Inc.*, 130 F. 3d 853, 857 (9th Cir. 1997) (holding "[w]here a

27  business appears . . . to be engaged in some legitimate activity," the "permeated with fraud"

28  exception does not apply).

The government also cannot obscure the substantial issue arising from its unlimited and unrestrained execution of the search warrants. The most it can say is that this Court decided these issues against Omidi, but that is certainly true of any issue raised in the context of bail pending appeal. The government's seizure of electronically stored information without any limitation and then retention of all of the seized material for years raises a substantial issue to be addressed. The Ninth Circuit has done more than any other circuit or court to curtail this potential to simply eradicate the Fourth Amendment. *United States v. Comprehensive Drug Testing, Inc.*, 621 F. 3d 1162, 1176 (9th Cir. 2010) (en banc) (addressing "serious risk that every warrant for electronic information will become in effect, a general warrant, rendering the Fourth Amendment irrelevant"). But, as this case well illustrates, there remains a substantial need for clear guidance to conform the government's legitimate need to gather electronically stored information and other evidence while preserving the core commands of the Fourth Amendment.

## CONCLUSION

For the foregoing reasons, Mr. Omidi respectfully submits that he should be afforded bail pending appeal.

Dated:  April 13, 2023                    Respectfully submitted,


**MCGUIREWOODS LLP**

By: s/ Kevin M. Lally
    KEVIN M. LALLY

**FRIEDMAN KAPLAN SEILER ADELMAN & ROBBINS LLP**

By: s/ Lawrence S. Robbins
    LAWRENCE S. ROBBINS

**PORTER WRIGHT MORRIS & ARTHUR LLP**

By: s/ Edmund W. Searby
    EDMUND W. SEARBY

*Attorneys for Defendant Julian Omidi*

1

## CERTIFICATE OF SERVICE

2          I certify that, on April 13, 2023, I electronically filed the foregoing with the Clerk of

3     the Court using the CM/ECF system, which will send notice to all counsel of record.

4

5                               _s/ Lawrence S. Robbins_
                                Lawrence S. Robbins

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CASE NO. CR 17-00661(A)-DMG                21

3718772.3          **DEFENDANT JULIAN OMIDI'S REPLY IN SUPPORT OF MOTION FOR BAIL PENDING APPEAL**