**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | Nos.  23-1719 |
| *Plaintiff - Appellee*, | 23-1959 |
| | D.C. No. |
| v. | 2:17-cr-00661- |
| | DMG-1 |
| JULIAN OMIDI, AKA Combiz Julian Omidi, AKA Combiz Omidi, AKA Kambiz Omidi, AKA Kambiz Beniamia Omidi, AKA Ben Omidi, | |
| | OPINION |
| *Defendant - Appellant*. | |

| | |
|---|---|
| UNITED STATES OF AMERICA, | No.    23-1941 |
| *Plaintiff - Appellee*, | D.C. No. |
| | 2:17-cr-00661- |
| v. | DMG-3 |
| SURGERY CENTER MANAGEMENT, LLC, | |
| *Defendant - Appellant*. | |

Appeal from the United States District Court
for the Central District of California
Dolly M. Gee, District Judge, Presiding

Argued and Submitted November 8, 2024
Phoenix, Arizona

Filed January 16, 2025

Before: Richard A. Paez and John B. Owens, Circuit
Judges, and Richard Seeborg, Chief District Judge.[*]

Opinion by Judge Owens

## SUMMARY[**]

### Criminal Law / Forfeiture

The panel affirmed the district court's forfeiture
judgment of nearly $100 million in a case in which Julian
Omidi and his business, Surgery Center Management, LLC
(SCM), were convicted of charges arising from their "Get
Thin" scheme in which Omidi and SCM defrauded insurance
companies by submitting false claims for reimbursement.

The panel held that in a forfeiture case seeking proceeds
of a fraud scheme under 18 U.S.C. § 981(a)(1)(C), there is
no so-called "100% Fraud Rule." All proceeds directly or
indirectly derived from a health care fraud scheme like Get
Thin—even if a downstream legitimate transaction

---

[*] The Honorable Richard Seeborg, United States Chief District Judge for
the Northern District of California, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

conceivably generated some of those proceeds—must be forfeited. The district court did not err in so concluding.

The panel addressed other claims in a concurrently filed memorandum disposition.

---

**COUNSEL**

Suria M. Bahadue (argued), Kristen A. Williams, David Chao, Ali Moghaddas, David C. Lachman, David R. Friedman, and James E. Dochterman, Assistant United States Attorneys; Bram M. Alden, Assistant United States Attorney, Chief, Criminal Appeals Section; Mack E. Jenkins, Assistant United States Attorney, Chief, Criminal Division; E. Martin Estrada, United States Attorney; United States Department of Justice, Office of the United States Attorney, Los Angeles, California; for Plaintiff-Appellee.

Benjamin L. Coleman (argued), Benjamin L. Coleman Law PC, San Diego, California; Edmund W. Searby (argued), Porter Wright Morris & Arthur LLP, Cleveland, Ohio; Kevin M. Lally, McGuire Woods LLP, Los Angeles, California; Lawerence S. Robbins, Jeffrey C. Fourmaux, Priyanka Wityk, and Alexandra Elenowitz-Hess, Friedman Kapaln Seiler Adelman & Robbins LLP, New York, New York; Elon Berk, Gurovich Berk & Associates, Sherman Oaks, California; for Defendants-Appellants.

4                            USA V. OMIDI

## OPINION

OWENS, Circuit Judge:

Julian Omidi and his business, Surgery Center Management, LLC ("SCM"), appeal from the district court's forfeiture judgment of nearly $100 million, which came after a lengthy criminal health insurance fraud trial and years of litigation.  We have jurisdiction under 28 U.S.C. § 1291, and we affirm.[1]

## I.  BACKGROUND

### A.  The "Get Thin" Scheme

Before Ozempic and similar "wonder drugs," medically-assisted weight loss had to happen the old-fashioned way—surgical intervention.  For Southern California residents in the 2010s (especially those stuck in traffic and staring at billboards), the Wizard of Loss was Dr. Julian Omidi.[2]  To make a long story short, Omidi helmed a massive health insurance fraud scheme called "Get Thin."  Omidi's scheme promised dramatic weight loss through Lap-Band surgery and other medical procedures.[3]  Using catchy radio jingles

---

[1] Omidi and SCM also challenge the sufficiency of the evidence supporting their convictions, certain jury instructions, several evidentiary rulings, and the legality of the restitution awards.  We address these claims in a concurrently filed memorandum disposition, in which we affirm.

[2] Omidi's medical license was revoked in 2009 due to unrelated misconduct.

[3] Lap-Band surgery is a weight loss surgery where a small balloon-like band is inserted into a patient's stomach to shrink its size and limit the amount of food the patient can digest.

and ubiquitous billboard ads, Omidi urged potential patients to call 1-800-GET-THIN and "Let Your New Life Begin."

Through the 800 number and an associated call center, Get Thin funneled patients to a network of consultants whom Omidi tasked to "close a sale." Omidi instructed these consultants, who lacked any medical credentials, to schedule patients for expensive medical tests and procedures, irrespective of medical need, to unearth comorbidities that could help get the lucrative Lap-Band surgery pre-approved by insurers. When patients opted out of the surgery or insurers declined coverage, consultants pushed other costly treatments that could still be billed, such as tummy tucks or nutritional advising. Consultants were trained to prioritize customers with the most generous insurance plans and follow up incessantly to ensure they attended their pre-operative appointments. Omidi carefully tracked patients' show rate and paid consultants commissions when their customers underwent procedures. Witnesses described Get Thin's call center as a "boiler room," with tactics akin to a "credit card collections agency."

Once patients were successfully recruited, Omidi directed his employees to falsify patient data, fabricate diagnoses, and misrepresent the extent of physician involvement in their treatments to deceive insurance companies into paying for thousands of sleep studies, endoscopies, Lap-Band insertions, and other costly treatments. Besides its 1-800-GET-THIN call center, Get Thin did not regularly obtain patients through any other avenues, such as referrals from other doctors or medical systems.

### B. Procedural History

A grand jury indicted Omidi and SCM for mail fraud, wire fraud, money laundering, and other related charges arising from the Get Thin scheme. In a nutshell, the government alleged that Omidi and SCM defrauded insurance companies by submitting false claims for reimbursement. The claims included, among other misrepresentations, fraudulent patient test results and false assertions that a doctor had reviewed and approved the medical procedures at issue. After three-and-a-half years of pretrial litigation and a 48-day jury trial, the jury convicted Omidi and SCM of all charges. The district court sentenced Omidi to 84 months' imprisonment and fined SCM over $22 million.

At a subsequent hearing, the district court considered forfeiture for both defendants. The government argued that the total proceeds of Get Thin's business during the fraud period—$98,280,221—should be forfeited because the whole business was "permeated with fraud." In other words, even if some parts of Get Thin seemed legitimate, the government argued that "*all proceeds* of that business are forfeitable," as "the proceeds of that so-called 'legitimate' side of the business would not exist but for the 'fraudulent beginnings' of the entire operation" (namely, the call center). Omidi and SCM objected to the forfeiture amount, arguing that Get Thin was "not entirely a fraud," and the forfeiture amount should be limited to the proceeds traceable to falsified insurance claims.

Applying the requisite preponderance standard (and after hearing weeks of trial testimony), the district court agreed with the government. Reviewing the relevant statutes and persuasive out-of-circuit authority, it agreed that the

USA v. OMIDI                                    7

$98,280,221 in proceeds were directly or indirectly derived from the fraudulent Get Thin scheme.  The district court reasoned that because patients "were recruited through the call center as part of the overall fraudulent billing scheme . . . proceeds from all services at least indirectly resulted from the scheme."  This was true even though some patients were redirected to less invasive, cheaper procedures than the high-priced Lap-Band surgery, and even though some procedures may have been medically appropriate in individual cases.

## II. DISCUSSION

### A.  Standard of Review

We review de novo a district court's interpretation of federal forfeiture law, and its calculation of the forfeitable amount for clear error.  *See United States v. Alcaraz-Garcia*, 79 F.3d 769, 772 (9th Cir. 1996).

### B.  The   District   Court   Correctly   Assessed $98,280,221 in Forfeiture

Fraud   convictions   frequently   require   multiple determinations: the appropriate sentence, the restitution amount (which compensates victims for the harm caused), and the forfeiture judgment (which punishes defendants by depriving them of the proceeds of their crime).  *See United States v. Davis*, 706 F.3d 1081, 1083 (9th Cir. 2013) ("Forfeiture   is   imposed   as   punishment   for   a   crime; restitution makes the victim whole again.").   This case requires us to examine forfeiture, which is "much broader" and "serves an entirely different purpose" than restitution. *United States v. Lo*, 839 F.3d 777, 789 (9th Cir. 2016) (citations omitted).

8                          USA v. OMIDI

Here, the government sought forfeiture of the proceeds of Omidi and SCM's mail and wire fraud violations under 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).  While 18 U.S.C. § 981 governs civil forfeiture actions, 28 U.S.C. § 2461(c) "permits the government to seek criminal forfeiture whenever civil forfeiture is available and the defendant is found guilty of the offense[.]"  *United States v. Newman*, 659 F.3d 1235, 1239 (9th Cir. 2011) (emphasis omitted), *abrogated on other grounds by Honeycutt v. United States*, 581 U.S. 443, 454 (2017).  When applicable, such forfeiture is mandatory.  *Id*. at 1240; 28 U.S.C. § 2461(c).  If the government seeks forfeiture of specific property, such as the proceeds at issue here, it must establish "the requisite nexus between the property and the offense," Fed. R. Crim. P. 32.2(b)(1)(A), by a preponderance of the evidence.  *See United States v. Christensen*, 828 F.3d 763, 822 (9th Cir. 2016).

The question in this case is whether the district court erred in ordering the forfeiture of all Get Thin's proceeds, even though conceivably some of the incoming funds ultimately paid for legitimate and medically necessary procedures.  After a review of the relevant law and facts, we conclude that the district court got it right.

We begin with the relevant statutory language.  Under § 981(a)(1)(C), any property which "constitutes or is derived from proceeds traceable to" a mail or wire fraud scheme is subject to forfeiture. [4]   Section 981(a)(2)(A) defines

---

[4] To be even more precise, § 981(a)(1)(C) makes forfeitable property "traceable to . . . any offense constituting 'specified unlawful activity'" under 18 U.S.C. § 1956(c)(7), and mail and wire fraud meet that definition. *See* 18 U.S.C. § 1956(c)(7)(A) (defining "specified unlawful

"proceeds" in a health care fraud scheme as "property of any kind obtained *directly or indirectly*, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense" (emphasis added). Said more simply, any proceeds that directly or indirectly derive from the fraudulent scheme must be forfeited, even if particular proceeds were not profits from the offense itself.

Applying the above rules to this case, any money acquired via the fraudulent Get Thin funnel was subject to forfeiture. In its comprehensive review of the law and evidence, the district court found that to the extent certain proceeds derived from legitimate medical procedures, those proceeds still "were indirectly the result of the fraudulent portions of the business," and were thus subject to forfeiture. In other words, even though some patients who called 1-800-GET-THIN were ultimately redirected to non-Lap-Band treatments or could have qualified for Lap-Band surgery without Omidi's chicanery, the proceeds from those patients would never have existed but for Get Thin's fraudulent billing scheme, which began with the call center through which all patients were recruited. Our independent review of the extensive record confirms that the evidence supporting the district court's finding was overwhelming, and the district court did not clearly err by so concluding.

Rather than challenge this factual finding, Omidi and SCM argue that the district court applied the wrong legal standard. They contend that *United States v. Rutgard*, 116 F.3d 1270 (9th Cir. 1997), prevents the forfeiture of all the proceeds that flowed through Get Thin. In that case, the

---

activity" to include "any act or activity constituting an offense listed in" 18 U.S.C. § 1961(1)); *id.* § 1961(1) (listing mail and wire fraud).

government had to prove Rutgard's entire ophthalmology practice was fraudulent to convict him of laundering its proceeds. *Id*. at 1287. We concluded that the medical practice at issue performed both legitimate and illegitimate procedures, so Rutgard was not guilty of money laundering under 18 U.S.C. § 1957. *Id.* at 1287-93. In fact, we determined "[t]he actually-proved instances of fraudulent pretense of medical necessity for cataract surgery [we]re a tiny fraction of a practice that did thousands of cataract surgeries." *Id*. at 1289. Accordingly, under a different forfeiture statute, we concluded the evidence was insufficient to support the forfeiture of 100 percent of the practice's proceeds involved in the alleged money laundering transactions. *Id.* at 1293.

Omidi and SCM seize on this unique holding to contend that under *Rutgard*, forfeiture of 100 percent of the Get Thin proceeds required the government to prove "100 percent of [Get Thin's] medical practice was fraudulent" (citing *id.* at 1289). Any proceeds generated from allegedly "untainted" or "appropriate" services initiated through Get Thin's call center would not be forfeited, the argument goes, as they would not be proximately traceable to falsified insurance claims.

This argument overreads *Rutgard*, which concerned money laundering convictions and an entirely different forfeiture statute—18 U.S.C. § 982(a)(1).[5] *See id.* at 1293. Section 982(a)(1) specifically targets laundered funds and requires proof that the funds at issue were either "involved in" the particular illegal transaction or "traceable to such

---

[5] The statute is materially the same today as it was at the time of Rutgard's forfeiture judgment in March 1995. *Compare* 18 U.S.C. § 982(a)(1) (2018) *with id.* (1994).

property" before forfeiture can occur—it never mentions
proceeds and lacks the more expansive "derived from" and
"directly and indirectly" language from § 981(a)(1)(C) and
§ 981(a)(2)(A). Thus, the district court correctly concluded
that *Rutgard*'s strict § 1957 money laundering analysis—
featuring very different facts and statutes—had no
application here.

And although there is no precise Ninth Circuit law on
point, our sister circuits (which, unlike the court in *Rutgard*,
have analyzed forfeiture in the fraud context) reject Omidi's
proposed "100% Fraud Rule" and support the district court's
approach. For example, in *United States v. Warshak*, 631
F.3d 266 (6th Cir. 2010), the Sixth Circuit faced a very
similar argument. There, the mail and wire fraud defendants
contended that certain sales from their fraudulent herbal
supplements business were legitimate, so the proceeds from
those transactions were not subject to forfeiture. *Id.* at 330-
31. Their theory had "no traction," the Sixth Circuit
explained, because the "very nucleus of [the defendants']
business model [was] rotten and malignant" and "[a]ny
money generated through these potentially legitimate
sales . . . resulted 'directly or indirectly'" from the
fraudulent scheme. *Id.* at 332. Thus, forfeiture of "money
generated through supposedly legitimate transactions[] was
appropriate." *Id.* at 333.[6] We reach the same conclusion in

---

[6] *See also United States v. Gladden*, 78 F.4th 1232, 1251 (11th Cir. 2023)
(affirming forfeiture of gross proceeds because "the evidence
demonstrates that [the company's] legitimate operations were facilitated
by the illegitimate operations"); *United States v. Bikundi*, 926 F.3d 761,
792 (D.C. Cir. 2019) (rejecting identical argument as "overlook[ing] the
breadth" of a similarly-worded forfeiture statute, given that "'[g]ross
proceeds traceable' to the fraud include 'the total amount of money

this case, in which all Get Thin proceeds were derived from a single intake process that, by design, disregarded medical necessity in favor of profit as part of the larger fraudulent billing scheme.

Accordingly, we follow our sister circuits to conclude that in a forfeiture case seeking proceeds of a fraud scheme under § 981(a)(1)(C), there is no so-called "100% Fraud Rule." All proceeds directly or indirectly derived from a health care fraud scheme like Get Thin—even if a downstream legitimate transaction conceivably generated some of those proceeds—must be forfeited. The district court did not err in so concluding.

**AFFIRMED**.

---

brought in through the fraudulent activity, with no costs deducted or set-offs applied'" (quoting *United States v. Poulin*, 461 F. App'x 272, 288 (4th Cir. 2012))); *United States v. Sanders*, 952 F.3d 263, 286 (5th Cir. 2020) ("If the business couldn't have existed absent the fraud, then even [funds from legitimate business] trace[] to it.").